USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/19/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
:
IN RE WORLD TRADE CENTER DISASTER   :   **OPINION DISCUSSING**
SITE LITIGATION                      :   **METHODOLOGY FOR**
                                     :   **DISCOVERY AND TRIALS OF**
                                     :   **SAMPLE CASES**
                                     :
                                     :   21 MC 100 (AKH)
                                     :
-------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

> In the months following September 11, 2001, thousands of workers participated in New York City's effort to clean up the vast destruction caused by terrorists. The airplane crashes and explosions at the World Trade Center left acres of twisted metal and crumbled concrete. Noxious dust blanketed the rubble and hung in the air for weeks, producing an acrid smell throughout downtown Manhattan. Those who helped in the search and rescue operations, and in the effort to clear the mountains of debris, had to breathe this air as they worked. According to the allegations, protective masks, when worn, filtered this air in varying degrees.

> Overlapping government agencies managed the workers, as did private contractors engaged by the City's Department of Design and Construction. Nine thousand and ninety of these workers have filed suits in this court claiming various respiratory injuries and cancers resulting from their exposures to worksite contaminants.[1] They claim inadequate safety procedures and supervision.

---

[1] The number, 9,090, reflects the current count, eliminating duplication and transfers to other dockets. The larger number previously represented was approximately 10,500.

1

## I.    Procedural History

Most of the cases were initiated in the New York Supreme Court and then removed to this court. They were assigned to me as related to docket 21 MC 97, which contained September 11th wrongful death actions that I had grouped into one coordinated proceeding. I denied class status because of the variety of illnesses alleged by the plaintiffs, the varying severity of their illnesses, the transient nature of the worksites, the varying levels of supervision governing plaintiffs' work, the variety of defendants, and the complexity of determining and evaluating pre-existing medical conditions. See Transcript of Status Conference at 31-34 (Oct. 28, 2004).

I organized the cases into their own master docket, 21 MC 100, and considered the issue of jurisdiction. The aggregate demands of the lawsuits – those already filed and the hundreds more that were expected – promised far to exceed the maximum liability set by the Air Transportation Safety and System Stabilization Act ("ATSSSA"), 49 U.S.C. § 40101. ATSSSA capped liability at $350 million or the City's insurance protection, whichever was larger. The latter, at the time, seemed not to exist.

I ruled, in an extensive opinion, that claims arising from the search and rescue operations, extending for two weeks after September 11th, arose from the terrorist-related aircraft crashes and were subject to the district court's exclusive jurisdiction. However, claims arising from work and exposures thereafter were much more akin to the activities and risks of construction worksites and to issues addressed by the New York Labor Law, on which the New York Supreme Court had developed a century of expertise. Accordingly, I remanded these later claims to that court. Hickey v. City of

2

New York, 270 F. Supp. 2d 357 (S.D.N.Y. 2003).[2] An appeal followed and, after lengthy consideration, the Court of Appeals ruled that all the cases were to be considered subject to the district court's exclusive jurisdiction. McNally v. Port Auth., 414 F.3d 352 (2d Cir. 2005). See Robin J. Effron, Event Jurisdiction and Protective Coordination: Lessons from the September 11th Litigation, 81 S. Cal. L. Rev. 199 (2008).

Following remand of the cases to me, I turned to their organization. I appointed Liaison Counsel for plaintiffs and for defendants. Case Management Order No. 2 (Feb. 7, 2005). At plaintiffs' request, I ordered master pleadings to be filed that alleged the issues common to all plaintiffs. Case Management Order No. 4 (May 12, 2005); see Master Complaint (Sept. 16, 2005). And, I ordered the parties to file short form complaints. Case Management Order No. 4 (May 12, 2005). These complaints were intended to set out where, when, and for which contractors plaintiffs worked, as well as the causes of their injuries and the defendants' alleged faults.

At the same time, defendants sought to advance their defense that the City and the contractors enjoyed immunity arising from federal and New York State laws. Both sides considered that the prospective substantial litigation expense made it important to clarify the reach and efficacy of this defense at an early time. I ordered discovery on limited issues relevant to the defense. The same discovery also would be relevant to defining the relationships between plaintiffs and the scores of defendant contractors, between defendant contractors and the City, and among the City, the State, and federal agencies that were active at the World Trade Center worksite.

---

[2] I had held previously that traditional workplace injuries similarly were to be remanded. Graybill v. City of New York, 247 F. Supp. 2d 345 (S.D.N.Y. 2002); Spagnuolo v. City of New York, 245 F. Supp. 2d 518 (S.D.N.Y. 2002).

3

The parties pursued discovery to satisfy both objectives with mixed

success. The pleadings were conclusory in their allegations and impossible to understand

in relation to essential facts and issues. Remonstrations at conferences and rulings on

motions did not seem to advance matters. See, e.g., Transcript of Status Conference at

31-32 (May 13, 2005); Order Regulating Limited Discovery (June 15, 2005). As happens

with discovery confined to limited issues, it proved difficult to define boundaries.

Finally, however, defendants made their motions, and I denied the motions in a lengthy

opinion, ruling that the issue of immunity hinged on controverted facts. Opinion

Denying and Granting Motions for Judgment on the Pleadings and for Summary

Judgment (Oct. 17, 2006). I denied defendants' motion that my order was eligible for

immediate review or, alternatively, for certification for interlocutory review, Opinion and

Order Denying Motion for Interlocutory Appeal and Asserting Continuing Jurisdiction

(Jan. 8, 2007), but the Court of Appeals ruled that the appeal could nevertheless be

pursued because rulings on immunity sufficiently satisfied an exception for final

decisions on severable issues. 469 F. Supp. 2d 134 (S.D.N.Y. 2007), rev'd, McCue v.

City of New York, 503 F.3d 167 (2d Cir. 2007). The Court of Appeals also granted a

stay of all proceedings on March 9, 2007, causing a complete stand-still until March 26,

2008, when the stay was dissolved. The Court of Appeals then affirmed my decision.

McCue v. City of New York, 521 F.3d 169 (2d Cir. 2008).

## II.    The Litigation's Complexities

During the lengthy stay, I considered how these cases should progress

were they to be remanded. There were few precedents, perhaps none. These are not

typical mass tort claims in which a single product or event injures the victims in a

4

relatively similar way. Here, the victims were injured over a protracted period of time —
days, weeks, and months, varying with the hours and dates particular plaintiffs worked in
the widespread area (sixteen acres) constituting the World Trade Center site. Case
Management Order No. 3 (Feb. 7, 2005) (defining World Trade Center site). The
exposure to the environment had different medical effects on different individuals. The
environment itself varied from one worksite area to another depending on which toxic
materials prevailed at which place and time. In aggregate, plaintiffs allege hundreds of
different diseases from working among the debris, each of different severity and effects.

       The complexity in sorting the plaintiffs' claims is matched by the complex
interplay of defendants. Many governmental agencies and scores of contractors were
responsible for the World Trade Center work, in varying degrees and with varying
overlap. The contractor defendants were engaged in different ways, by different prime
contractors, and were supervised and guided by different layers of government agencies.
Nor is responsibility clear, for some defendants may be covered by various immunities
under federal or state laws and, if found liable, may enjoy a congressional liability cap.
Because of such a cap, I would have to carefully administer all settlements and judgments
since each plaintiff's recovery would diminish the next plaintiff's potential recovery.

       The insurance coverage issues provide additional complexities. Related
proceedings clarified the City's insurance coverage and were beginning to disclose the
coverage of private contractors. My early concern, that ATSSSA's $350 million liability
cap would mean partial and inadequate satisfaction for vast numbers of claimants, had
become academic.  § 408(a)(3), 49 U.S.C. § 40101. New York City, in fact, is covered
by several layers of private coverage, amounting to approximately $75 million, in excess

of the costs of defense, and one billion dollars of coverage through a captive insurance company funded by the Federal Emergency Management Agency. See WTC Captive Ins., Inc. v. Liberty Mutual Fire Ins. Co., 549 F. Supp. 2d 555, 557-58 (S.D.N.Y. 2008), appeal docketed, No. 08-2787 (2d Cir. June 5, 2008). And, beyond that, the private contractors have their own insurance to an extent not yet known.

It would be difficult, perhaps impossible, to obtain and sort all this insurance information in conventional discovery proceedings relating to more than 9,000 cases. While all might have a claim, of possible and varying merit, against the City, it would be necessary to match specific claims of plaintiffs against specific contractors, and to evaluate such claims in relation to different and varying layers of primary, excess, and reinsurance agreements and exclusions.

Finally, all that I and the parties do must be done with an eye towards public accountability. The September 11th litigation stems from an unprecedented national tragedy that impacted New York City, the State, and the Nation in long-lasting ways. The resolutions of these cases must depend on careful and individual evaluations of personal injury and merits in a manner that allows the public to view and understand the results.

## III. Court-Ordered Discovery and Special Masters

The inability of counsel to style useful pleadings, or to proceed with discovery relevant to the immunity defenses without excessive and wasteful disputes, made it necessary to develop an alternative manner of proceeding. See, e.g., Transcript of Status Conference at 23-26 (Nov. 3, 2006). Normal discovery to advance 9,090 cases against more than 200 defendants is not possible. But neither is it tolerable to neglect

6

these cases, nor to postpone recoveries for years, nor to allow attorneys motivated in part by their own economics to dictate which cases advance and how. There must be criteria developed to select cases meriting early treatment and capable of serving as models for the rest. Case Management Order No. 8, as amended, sets out a protocol that reflects such criteria. It provides a procedure for selecting appropriate cases for intensive pre-trial discovery, motions, and trials on specific dates. I now set out the efforts leading to this order.

I believed that the parties and I needed core discovery to provide the fundamental facts of the cases, the varying responsibilities of government agencies and contractors, and the complex layers of insurance coverage. I required Special Masters, skilled and impartial, to help me devise such discovery, and to develop computer systems to collect the information and make it accessible.

Following the return of the case to my jurisdiction, after the Court of Appeals dissolved its stay, and after vetting the issue with the lawyers, I appointed Professors James A. Henderson, Jr. of Cornell Law School and Aaron D. Twerski of Brooklyn Law School as Special Masters. Memorandum and Order Appointing Special Masters (Dec. 12, 2006). Professors Henderson and Twerski are distinguished scholars, neutral in relation to the issues of the litigation.[3] Given the assistance of computer experts engaged through competitive bidding, they have the experience and capability to

---

[3] Professors Henderson and Twerski are the co-authors of the leading treatise Products Liability: Problems and Process (4th ed. 2000) and co-reporters for the RESTATEMENT OF THE LAW (THIRD) TORTS: PRODUCTS LIABILITY. Professor Henderson, Cornell Law School's Frank B. Ingersoll Professor of Law, and Professor Twerski, Brooklyn Law School's Irwin and Jill Cohen Professor of Law, have also together and individually published articles in the nations leading law journals, including the Yale Law Journal and Columbia Law Review.

structure and oversee the required exchange of information between the parties and the collection of that information in an efficient and accessible database.

Working with the lawyers, the Special Masters have developed the structure for creating a large database for the litigation. The parties will be required to answer under oath approximately 360 narrowly-tailored questions seeking case-crucial data for each plaintiff: pedigree information, medical history, tobacco use, alleged injuries, medical tests, diagnoses, symptoms, treatments, and any worker's compensation filings and recoveries. Each plaintiff and each defendant will have to detail the hours plaintiffs worked and for which employers, in addition to the safety warnings given, the safety training provided, and the safety precautions taken. Each defendant will disclose his insurance and indemnity protection.[4]  The database should promote success because it requires greater detail and specificity than prior efforts at core discovery, operates in a more sophisticated medium, and limits the responses to certain key questions to a list of permissible answers (called a "pick list").[5]  See Transcript of Status Conference at 5 (Sept. 16, 2008).

## A.  Traditional Discovery and Trials as Enforcement Mechanisms

The database should provide an enormous amount of relevant discovery information in a functional format. But the information, to be provided by each party, could be self-serving, and needs to be tested for integrity and reliability. While conventional discovery and trials are a court's traditional tools in this regard, there were

---

[4] A previous effort did not succeed. I had ordered each plaintiff to provide details of when and where the plaintiff worked, the injuries the plaintiff claimed, and other basic information. Each defendant was required to supply particulars of its insurance coverage, describe the work it performed, and name subcontractors and employees it engaged. See Case Management Order No. 4 (May 12, 2005). However, conclusory answers and numerous objections frustrated the effort.

[5] I have attached a print-out of the database (Attachment 1).

8

too many cases to proceed in a traditional manner. Select cases would have to be chosen for discovery and trial.

Deciding which cases adequately represent the field would be difficult. How could information from hundreds of doctors' reports and thousands of examinations be studied for prior conditions and severity of current illnesses? How could one sort the conditions of scores of workplaces and intersecting levels of supervision? Solving such problems – indeed, even enumerating all possible issues – threatened to overwhelm progress. It was critical to establish a set of priorities, and allow those priorities to determine how to proceed.

The first priority was to tend to the most severely injured plaintiffs. Their cases deserved to be tried first, for if they were to prevail, they had the greatest need for a monetary recovery. The second priority was to create a methodology for sampling in relation to the general run of cases, severe, mild, and everything between, in order that rulings on liability, damages, and responsibility might be extended from the particular case in which rulings are made to the rest of the cases. Every case had to be considered as important, for each plaintiff and each defendant deserved rulings on particular merits.

## B. Determining the Most Severely Injured

Determining who are the most severely injured is not a straightforward task. The 9,090 plaintiffs, in the aggregate, claim approximately 387 diseases ranging from the most life-threatening to the merely irritating. Some plaintiffs have very mild cases of serious diseases while others have very severe cases of less serious diseases. Even permitting trials of only the most severe cases of each disease could mean hundreds of trials, still too many to administer in a reasonable period of time.

9

To proceed, the Special Masters, in cooperation with Liason Counsel,

looked to a diagnostic system established by the American Medical Association and the

American Thoracic Society. The system ranks the severity of an individual's illness

among the population suffering from that illness by grading that person's condition from

0 (least severe) through 4 (most severe). The rank corresponds to recorded outcomes of

standard medical tests taken by the plaintiff, typically measuring the degree of

dysfunction associated with the disease. In consultation with Liason Counsel, the Special

Masters selected six major disease categories that subsumed the generality of illnesses.[6]

Although the rankings are specific to each disease category, and severity cannot easily be

evaluated across the different categories, the medical criteria do allow a neutral observer

to identify a set of the most severely ill in each of the six disease categories.[7] Final

selections from this set can be made after considering additional limited criteria

considered relevant, for example, plaintiff's length of exposure to hazardous worksite

conditions or plaintiff's pre-existing medical conditions.

## IV.    The Resulting Order

The court proposed and approved Case Management Order No. 8 with

modifications suggested by the parties. The amended Order, issued today and attached

herein, implements these criteria.

---

[6] The AMA uses additional criteria when determining diagnoses, but these tests compose much of the objective component used in diagnosing. For two diseases the parties agreed on objective criteria partially derived from AMA ratings and other sources. See Attachment 5 (Severity Chart for Interstitial Lung Disease and Upper Digestive Tract Diseases, e.g., Gastroesophageal reflux disease, Barrett's Esophagus, Gastritis, Esophagitis, and GI stricture).

[7] The database allows for those who have not yet taken the required test, but those plaintiffs will not be eligible to be selected as one of the 200 cases ranked most severe.

10

1.    The 9,090 cases are to be divided into five groups of 2,000 cases, according to their filing sequence.[8]  Every forty days, one such group of plaintiffs is to populate a subset of the data fields, specifically fields eliciting each plaintiff's disease rankings, the duration of exposure at the World Trade Center, and any pre-existing disorders.

2.    The Special Masters, within ten days following, will identify 200 cases categorized as severe.  From these 200, plaintiffs and defendants will each choose two cases.

3.    The Special Masters also will select twenty-five additional cases for diseases not necessarily included in the severity chart.

4.    From this pool of 225 cases, I (with the assistance of the Special Masters) will select two cases, additional to the four selected by plaintiffs and defendants.

5.    The six cases thus identified, from the field of 2,000, will proceed through full pre-trial discovery, to be completed within a set period of time (ranging from 270 days for some of the cases in the first field of 2,000 to 190 days for cases in the fifth field), followed by motions, followed by trial (if dismissal motions are not successful).

6.    Thirty cases will be set for trial, six from each field of 2,000.  Despite the sequential process in which these cases will be selected, all trials will begin on a fixed date – May 17, 2010.  If one case is resolved, later-filed cases will be

---

[8] The fifth group will contain the remainder of the cases, beyond 8,000, including any after-filed cases. Plaintiffs may file cases within three years of the time plaintiff discovers, or reasonably should have discovered, the injury, whichever is earlier, even though their cause of action accrues upon ingestion or aspiration of the polluting substance.  N.Y. C.P.L.R. § 214-c(2) (McKinney 2000).

tried instead. If more than one case for trial remains, other judges may be asked to preside over them, or they may be reached in sequence.

7.  Thus, a resolution is in sight for the most severe cases and for representative cases. And one can expect that many of these cases, and many others, will settle either in anticipation of firm trial dates or aided by values gleaned from trials or settlements.[9]

The procedures outlined above were intended swiftly to identify a representative few cases for discovery of all issues and early trials. But the entire field of 2,000 could not be neglected. It was necessary to develop information relevant to all the cases, for otherwise the parties could not share key knowledge about the field of cases, or intelligently discuss the degree to which the cases identified for discovery and trial were representative. Two additional procedures provided for the full field:

8.  The parties are required to populate the entire database for each of the 2,000 cases in the group, according to a fixed schedule. Forty days after the Special Masters choose the 225 cases, the parties are to populate the entire database for these cases. On the same day they select the 225 cases, the Special Masters will identify 400 additional cases (chosen at random) from that group of 2,000. The parties must fully populate the database for these 400 cases 120 days later. Every forty days, this process is repeated for the next group of 2,000 cases. By November 27, 2009, the parties will have fully populated the

---

[9] This was the experience in the wrongful death actions brought by passengers and crew in the four hijacked airplanes. Setting fixed trial dates for issues of damages and reserving liability issues for a later time resulted in a large number of settlements, without the need of any trials. At present, ninety-three of the original ninety-six claimants have settled, leaving but three for completion of discovery and trial. I ordered the master docket, 21 MC 97, closed and transferred the remaining cases to 21 MC 101, the collection of property damage cases against the aviation defendants. See In re September 11 Litig., 567 F. Supp. 2d 611, 616-17 (S.D.N.Y. 2008).

12

entire database for 3,125 cases, taken from all five groups (5 multiplied by 625). Finally, the parties will populate the database for each of the 1,375 cases in every group that were not selected as part of the 225-case subgroup or the 400-case subgroup. By January 1, 2011, the entire database for each filed case will be populated.

9.     From each group of 400 randomly selected cases, each party will choose two cases, and I (with the Special Masters' assistance) will select an additional two. These cases will proceed with pre-trial discovery along with the selected "severe" cases. However, trial dates will not be set for these cases, at least not until we know the outcome of the schedule for the "severe" cases.

I recognize that the methodology of Case Management Order No. 8 is extraordinarily complex. It needed to be so because of the number and variety of cases, and to create a consensual agreement for going forward. I recognize also that complexity creates an artificial rigidity that needs adjustment. As further orders may be necessary, they will be made. But the trial and motion schedules will remain firm.[10]

## V.     Rationale of Case Management Order No. 8

The plan involves three stratagems to bring the thousands of cases before me to resolution. First, since the claims of those most gravely injured commend themselves to highest priority, the plan provides a procedure to identify these cases, a methodology to select a representative sample for full discovery and early trial, and a firm and intensive schedule to begin trials. Full discovery on all issues will assure the

---

[10] I have attached to this decision the amended Case Management Order No. 8 (Attachment 2), its accompanying schedule (Attachment 3), the Severity Chart which parties must complete prior to responding to certain database fields (Attachment 4), and the Severity Chart's introductory language which was agreed upon by the parties (Attachment 5).

13

integrity of each side's disclosures in the database and a thorough testing of all claims and defenses. A basis for settlement, or valuation by trial, should promote prompt resolution of all such severe cases.

Second, the full population of the database of all remaining cases, first by sample and then in full, enables values to be negotiated for all cases.

Third, the combination of court-established interrogatories for the database and traditional, broad discovery in selected cases will allow the parties vigorously to test their opponents' claims, assuring the integrity and reliability of the parties' disclosures and establishing a procedure that can promote broad resolutions of cases in a fair, efficient, and just manner.

### VI.    Conclusion

No general plan for over 9,000 cases can be so wise as to be immutable, or so clever as to foresee all possibilities. However, Case Management Order No. 8 was forged with the experience of earlier failures and frustrations, and with full and intensive cooperation of Special Masters and plaintiffs' and defendants' counsel. It establishes a flexible, fair, and efficient plan to move these cases through discovery and to trial in reasonable time. It remains for the parties to act consistently with its provisions to bring about just such results.

SO ORDERED.

Dated:          February 18, 2009
                New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

14

# ATTACHMENT 1

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| **1** | **CASE PROFILE DATA** | | |
| 2 | Plaintiff-Employee (PE) last name | Text | Plaintiff |
| 3 | PE first name | Text | Plaintiff |
| 4 | PE docket number | Text | Plaintiff |
| 5 | PE social security number | Numeric | Both |
| 6 | Identify all defendants against whom PE has brought WTC actions. | Pick List | Plaintiff |
| 7 | Defendant (DF) focused on in this record (same as #235) | Pick List | Plaintiff |
| **8** | **WTC WORK BACKGROUND DATA** | | |
| 9 | Did DF hire/engage PE as an employee to work at WTC? | Yes/No | Both |
| 10 | On which dates did PE work as DF's employee? | Date(s) | Both |
| 11 | If DF did not hire/engage PE as an employee, which of the following statements best describes the basis on which DF is allegedly responsible for PE's safety in connection with PE's WTC work? | Pick List | Plaintiff |
| 12 | Was PE hired/engaged on a full-time basis? | Yes/No | Both |
| 13 | For what type(s) of work was PE hired/engaged to perform? | Pick List | Both |
| 14 | Did DF train PE for work at WTC? | Yes/No | Both |
| 15 | On what dates did DF train PE for Work at WTC? | Date(s) | Both |
| 16 | Did DF instruct/direct PE to work at WTC? | Yes/No | Both |
| 17 | On which date(s) did DF instruct/direct PE to work at WTC? | Date(s) | Both |
| 18 | Which of DF's agents instructed/directed PE to work at WTC? (Identify by status.) | Pick List (by status) | Both |
| 19 | For what type(s) of work was PE instructed/directed to perform? | Pick List | Both |
| 20 | What type(s) of work did PE actually perform at WTC? | Pick List | Both |
| 21 | At which WTC location(s) did PE work? | Pick List | Both |
| 22 | On what date(s) did PE work at each WTC location? | Date(s) | Both |
| 23 | Was PE terminated from WTC employment prior to the end of DF's work on the WTC project? (separate entry for each DF) | Yes/No | Both |
| 24 | On what date(s) was PE terminated? | Date(s) | Both |
| 25 | What was stated reason(s) for termination? | Pick List | Both |
| 26 | At which WTC location(s) did DF work? | Pick List | Defendants |
| 27 | On what date(s) did DF work at each WTC location? | Date(s) | Defendants |
| 28 | Which entity(s) hired/engaged DF to work at WTC? | Pick List | Defendants |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 29 | On what date(s) was DF hired/engaged by this entity(s)? | Date(s) | Defendants |
| 30 | For what specific task(s) was DF hired/engaged? | Pick List | Defendants |
| 31 | Which entity(s) instructed/directed DF to perform work at WTC? | Pick List | Defendants |
| 32 | Did DF enter agreement(s) with other entity(s) regarding DF's WTC work? | Yes/No | Defendants |
| 33 | What type of agreement(s)?  (Oral, written, other.) | Pick List | Defendants |
| 34 | With which entity(s) did DF enter agreement(s) regarding DF's WTC work? | Pick List | Defendants |
| 35 | On what date(s) was this agreement(s) entered into? | Date(s) | Defendants |
| 36 | Did DF provide PPE to its WTC employees generally? | Yes/No | Defendants |
| 37 | By what means did DF provide PPE to its WTC employees? | Pick List | Defendants |
| 38 | On what date(s) did DF provide PPE to its WTC employees? | Date(s) | Defendants |
| 39 | What type(s) of PPE did DF provide to its WTC employees? | Pick List | Defendants |
| 40 | Did DF provide instructions, directions, or training regarding PPE to its WTC employees? | Yes/No | Defendants |
| 41 | What type(s) of instructions, directions, or training did DF provide? | Pick List | Defendants |
| 42 | **DEMOGRAPHIC DATA** | | |
| 43 | What is PE's date of birth? | Date | Plaintiff |
| 44 | Is PE deceased? | Yes/No | Plaintiff |
| 45 | What is date of death, if deceased? | Date | Plaintiff |
| 46 | What was stated cause of death? | Text | Plaintiff |
| 47 | Was death certificate issued? | Yes/No | Plaintiff |
| 48 | Was autopsy performed? | Yes/No | Plaintiff |
| 49 | **CURRENT EMPLOYMENT HISTORY** | | |
| 50 | Who is PE's current employer(s)? | Text | Plaintiff |
| 51 | What is PE's current employer's address? | Text | Plaintiff |
| 52 | What is PE's current occupation(s)? | Pick list | Plaintiff |
| 53 | What was PE's first date of employment with current employer? | Date | Plaintiff |
| 54 | What is PE's current gross annual income from current employment? | Currency | Plaintiff |
| 55 | **PREVIOUS EMPLOYER(S) (FROM 1995 TO 9/11/01)** | | |
| 56 | Did PE have a previous employer(s), other than DF, from 1995 to 9/11/01? | Yes/No | Plaintiff |
| 57 | Who was PE's previous employer(s) from 1995 to 9/11/01? | Text | Plaintiff |
| 58 | What is each previous employer's address? | Text | Plaintiff |

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 59 | What was PE's occupation(s) in each previous employment? | Pick List | Plaintiff |
| 60 | What were PE's dates of employment for each previous employer? | Date(s) | Plaintiff |
| 61 | What was PE's gross annual income from each previous employment? | Currency | Plaintiff |
| 62 | **TOBACCO USE** | | |
| 63 | Did PE ever use tobacco product(s)? | Yes/No | Plaintiff |
| 64 | Does PE currently use tobacco product(s)? | Yes/No | Plaintiff |
| 65 | What type(s) of tobacco product(s) have been used by PE? | Pick list | Plaintiff |
| 66 | At what age did PE begin to use tobacco product(s)? | Numeric | Plaintiff |
| 67 | How frequently did PE use tobacco product(s)? | Pick list | Plaintiff |
| 68 | Has PE finally stopped all tobacco product use? | Yes/No | Plaintiff |
| 69 | At what age did PE finally stop all tobacco product use? | Numeric | Plaintiff |
| 70 | **DURATION OF PE'S WTC WORK** | | |
| 71 | | | |
| 72 | What was first date that PE was present at WTC site? | Date | Plaintiff |
| 73 | What was last date that PE was present at WTC Site? | Date | Plaintiff |
| 74 | How many hours did PE work at WTC site on 9/11/01? | Numeric | Plaintiff |
| 75 | How many hours did PE work at WTC site on 9/12/01? | Numeric | Plaintiff |
| 76 | How many hours did PE work at WTC site on 9/13/01? | Numeric | Plaintiff |
| 77 | How many hours did PE work at WTC site from 9/14/01-9/30/01? | Numeric | Plaintiff |
| 78 | How many hours did PE work at WTC site from 10/1/01-10/31/01? | Numeric | Plaintiff |
| 79 | How many hours did PE work at WTC site from 11/1/01-11/30/01? | Numeric | Plaintiff |
| 80 | How many hours did PE work at WTC site from 12/1/01-12/30/01? | Numeric | Plaintiff |
| 81 | How many total WTC hours did PE work at WTC site after 12/30/01? | Numeric | Plaintiff |
| 82 | **RESPIRATOR(S) AVAILABLE TO/RECEIVED BY PE AT WTC SITE** | | |
| 83 | Were respirator(s) available to PE from any on site source in connection with WTC work? | Yes/No | Plaintiff |
| 84 | What type(s) of respirator(s) was available to PE from any source on site in connection with WTC work? | Pick list | Plaintiff |
| 85 | Did PE obtain respirator(s) from any source in connection with WTC work? | Yes/No | Plaintiff |
| 86 | What type(s) of respirator(s) did PE obtain from any source in connection with WTC work? | Pick list | Plaintiff |
| 87 | On what dates did PE obtain respirator(s) in connection with WTC work? | Date | Plaintiff |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 88 | Which individual(s) or entity(s) provided respirator(s)  to PE in connection with WTC work? | Pick list | Plaintiff |
| 89 | On what dates did PE wear respirator(s) in connection with WTC work? | Date | Plaintiff |
| 90 | Did PE receive respirator training from any source in connection with WTC work? | Yes/No | Plaintiff |
| 91 | On what dates did PE receive respirator training at WTC site? | Text | Plaintiff |
| 92 | Which individual(s) or entity(s) provided PE with respirator training at WTC site? | Pick list | Plaintiff |
| 93 | **PPE (OTHER THAN RESPIRATORS) AVAILABLE TO/RECEIVED BY PE AT WTC** | | |
| 94 | Did PE receive PPE (other than respirators) in connection with WTC work? | Yes/No | Plaintiff |
| 95 | What type(s) of PPE (other than respirators) did PE receive in connection with WTC work? | Pick list | Plaintiff |
| 96 | On what date(s) did PE receive PPE (other than respirators) at WTC site? | Date(s) | Plaintiff |
| 97 | On what date(s) did PE wear PPE (other than respirators) in connection with WTC work? | Date(s) | Plaintiff |
| 98 | Did PE receive PPE (other than respirator) training at WTC site? | Yes/No | Plaintiff |
| 99 | On what dates did PE receive PPE (other than respirator) training at WTC site? | Date(s) | Plaintiff |
| 100 | Which individual(s) or entity(s) provided PE with PPE (other than respiratory) training at WTC site? | Pick List | Plaintiff |
| 101 | **PRIOR RESPIRATOR EXPERIENCE** | | |
| 102 | Did PE ever use a respirator prior to 9/11? | Yes/No | Plaintiff |
| 103 | Did PE ever receive respirator training from any source prior to 9/11? | Yes/No | Plaintiff |
| 104 | **ENVIRONMENTAL HEALTH AND SAFETY TRAINING** | | |
| 105 | Did PE receive environmental health and safety training regarding PPE in connection with WTC work? | Yes/No | Plaintiff |
| 106 | On what date(s) did PE receive environmental health and safety training in connection with WTC work? | Date(s) | Plaintiff |
| 107 | What individual(s) or entity(s) provided environmental health and safety training to PE? | Pick list | Plaintiff |
| 108 | Did PE receive training certificate(s)/certification(s) for environmental health and safety training received while working at WTC site? | Yes/No | Plaintiff |
| 109 | On what date(s) did PE receive certificate(s)/certification(s) in connection with WTC work? | Date(s) | Plaintiff |

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 110 | **PRE-EXISTING (1995 - 9/11/01) DISORDERS, DISEASES AND ANATOMICAL ABNORMALITIES** | | |
| 111 | Does or did PE suffer from one or more pre-existing (1995 to 9/11/01) disorder(s), disease(s), or anatomical abnormality(s)? | Yes/No | Plaintiff |
| 112 | If so, from what type(s) of pre-existing (1995 to 9/11/01) disorder(s), disease(s), or anatomical abnormality(s) does or did PE suffer? | Pick list | Plaintiff |
| 113 | On what date(s) did PE's pre-existing (1995 to 9/11/01) disorder(s), disease(s), or anatomical abnormality(s) begin? | Date | Plaintiff |
| 114 | Has PE's pre-existing disorder(s), diseases(s), or anatomical abnormality(s) ended? | Yes/No | Plaintiff |
| 115 | If so, on what date(s) did PE's pre-existing (1995 to 9/11/01) disorder(s), disease(s), or anatomical abnormality(s) end? | Date(s) | Plaintiff |
| 116 | Was PE's pre-existing (1995-9/11/01) disorder(s), disease(s), or anatomical abnormality diagnosed? | Yes/No | Plaintiff |
| 117 | On what date was PE's pre-existing (1995 to 9/11/01) disorder(s), disease(s), or anatomical abnormality(s) diagnosed? | Date | Plaintiff |
| 118 | Were medications prescribed to treat PE's pre-existing (1995 to 9/11/01) disorder(s), disease(s), or anatomical abnormality(s)? | Yes/No | Plaintiff |
| 119 | If so, what medications were prescribed for PE's pre-existing condition(s)? | Pick List | Plaintiff |
| 120 | What type of treatment(s), modality(s) or surgery(s) was used to treat PE's pre-existing (1995 to 9/11/01) disorder(s), disease(s), or anatomical abnormality(s)? | Pick List | Plaintiff |
| 121 | **DISABILITY CLAIMS** | | |
| 122 | Did PE file any disability claim(s) from 1995 to date? (Only if related to a disorder, disease or anatomical abnormality, of a sort the same as, or similar to, the disorder, disease or anatomical abnormality for which recovery is sought in this litigation.) | Yes/No | Plaintiff |
| 123 | Did PE file any disability claim(s) in connection with WTC work? | Yes/No | Plaintiff |
| 124 | If so, on what date(s) did PE file disability claim(s)? | Date(s) | Plaintiff |
| 125 | What was medical basis(s) for disability claim(s)? | Pick List | Plaintiff |
| 126 | What was disposition of disability claim(s)? | Pick List | Plaintiff |
| 127 | **WORKERS' COMPENSATION CLAIMS FILED BY PE** | | |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 128 | Did PE file any workers' compensation claim(s) from 1995 to 9/11/01? (Only if related to injury of type for which recovery is sought in this litigation and present at time of 9/11.) | Yes/No | Plaintiff |
| 129 | Did PE file any workers' compensation claim(s) in relation to WTC work? | Yes/No | Plaintiff |
| 130 | If so, on what date(s) did PE file workers' compensation claim(s)? | Date(s) | Plaintiff |
| 131 | What was medical basis for pre-9/11/01 workers' compensation claim(s)? | Pick List | Plaintiff |
| 132 | What was disposition(s) of pre-9/11/01 workers' compensation claim(s)? | Pick List | Plaintiff |
| 133 | DIAGNOSED CONDITIONS, INJURIES, AND DISEASES FOR WHICH PE SEEKS RECOVERY IN THIS LITIGATION | | |
| 134 | For which diagnosed condition(s)/injury(s)/disease(s) does PE seek recovery? | Pick list | Plaintiff |
| 135 | On what date(s) was PE's condition(s)/injury(s)/disease(s) diagnosed? | Date | Plaintiff |
| 136 | Which professional(s)/entity(s) made the diagnosis? | Text | Plaintiff |
| 137 | What was the profession/specialty of diagnosing professional(s)/entity(s)? | Pick list | Plaintiff |
| 138 | Was a physical exam conducted as part of diagnostic process? | Yes/No | Plaintiff |
| 139 | Was a medical, social, and occupational history taken as part of diagnostic test? | Yes/No | Plaintiff |
| 140 | Did PE experience an emergency room visit(s) and/or hospitalization(s) related to diagnosed condition? | Yes/No | Plaintiff |
| 141 | If so, on what date(s) did such emergency-room visit(s) and/or hospitalization(s) occur? | Date(s) | Plaintiff |
| 142 | Was drug therapy(s) prescribed to treat PE's diagnosed condition(s)? | Yes/No | Plaintiff |
| 143 | What course(s) of drug therapy (including dosage(s)) was prescribed to treat PE's diagnosed condition(s)? | Pick list | Plaintiff |
| 144 | Who was treating physician(s) for PE's diagnosed condition(s)? | Text | Plaintiff |
| 145 | Was there a primary treating physician for PE's diagnosed condition? | Yes/No | Plaintiff |
| 146 | What type of physician(s) treated PE's diagnosed condition(s)? | Pick list | Plaintiff |
| 147 | What is treating physician's address? | Text | Plaintiff |
| 148 | Did PE's treating physician(s) treat PE prior to 9/11/01? | Yes/No | Plaintiff |
| 149 | Has plaintiff undergone surgery(s) related to diagnosed condition, injury and/or disease? | Yes/No | Plaintiff |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 150 | What surgery(s) did PE undergo? | Pick list | Plaintiff |
| 151 | On what date(s) did each surgery occur? | Date(s) | Plaintiff |
| 152 | What medical provider(s)/entity(s) performed such surgery(s)? | Text | Plaintiff |
| 153 | What was outcome(s) of the surgery(s)? | Text | Plaintiff |
| 154 | Has PE's diagnosed condition(s)/injury(s)/disease(s) been resolved? | Yes/No | Plaintiff |
| 155 | **DIAGNOSTIC TESTS UNDERGONE BY PE (9/11 to PRESENT)** | | |
| 156 | Have diagnostic tests been undergone by PE (1995 to 9/11/01) in connection with any condition of the sort for which PE seeks to recover in this litigation? Respiratory, MRI, Blood, Urine, Sleep Studies, X-Rays, etc.) (Separate response for each test). (For those diagnostic tests with voluminous and significant test values (i.e. PFTs), there will be separate data fields.  See below.) | Yes/No | Plaintiff |
| 157 | What type(s) of diagnostic test(s) did PE undergo? | Pick list | Plaintiff |
| 158 | What were the date(s) of these diagnostic test(s)? | Date(s) | Plaintiff |
| 159 | Which medical entity/individual conducted  PE's diagnostic test(s)? | Text | Plaintiff |
| 160 | **RESULT(S) OF DIAGNOSTIC TEST(S)** | | |
| 161 | What were the results of (CT Sinus Scan)? | Pick list | Plaintiff |
| 162 | Re sleep apnea tests, what were the number of obstructive events per hour (Polysomnogram)? | Numeric | Plaintiff |
| 163 | What was PE's VHI score (Voice Handicap Index Test)? | Pick list | Plaintiff |
| 164 | What were the results for PE's Strobovideo-laryngoscopy? | Pick list | Plaintiff |
| 165 | What were the results for PE's Objective Voice and Speech Measures Test(s)? | Pick list | Plaintiff |
| 166 | Did PE undergo an inspiratory view (High Resolution Computed Tomography)? | Yes/No | Plaintiff |
| 167 | What were the results of PE's Endoscopy-Gastroenterological Test(s)? | Pick list | Plaintiff |
| 168 | Was PE graded on Los Angeles ("L.A.") Classification (Endoscopy - Gastroenterological)? | Yes/No | Plaintiff |
| 169 | Results of PE graded on Los Angeles ("L.A.") Classification (Endoscopy - Gastroenterological)? | Pick List | Plaintiff |
| 170 | Impression / Results of Diagnostic Tests | Text | Plaintiff |
| 171 | **PULMONARY FUNCTION TEST (1995 to PRESENT)** | | |
| 172 | Did PE undergo a Pulmonary Function Test (PFT) (1995 to Present)? | Yes/No | Plaintiff |
| 173 | What was the date of PFT (1995 to Present)? | Date | Plaintiff |

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 174 | Who was the medical provider/entity who conducted PFT? | Text | Plaintiff |
| 175 | What was PE's Forced Vital Capacity ("FVC")? | Numeric | Plaintiff |
| 176 | What was PE's FVC% predicted? | Numeric | Plaintiff |
| 177 | What was PE's Forced Expiratory Volume ("FEV1") | Numeric | Plaintiff |
| 178 | What was PE's FEV1% predicted? | Numeric | Plaintiff |
| 179 | What was PE's FEV1/FVC ratio? | Numeric | Plaintiff |
| 180 | Was PE's FEV1/FVC Ratio below 70%? | Yes/No | Plaintiff |
| 181 | What was PE's FEV1 after bronchodilator? | Numeric | Plaintiff |
| 182 | What was PE's numeric change in FEV1 after bronchodilator? | Numeric | Plaintiff |
| 183 | What was PE's percentage change in FEV1 after bronchodilator? | Numeric | Plaintiff |
| 184 | Was percentage change in FEV1 after bronchodilator greater than 12%? | Yes/No | Plaintiff |
| 185 | What was PE's Total Lung Capacity (TLC)? | Numeric | Plaintiff |
| 186 | What was PE's TLC% predicted? | Numeric | Plaintiff |
| 187 | What was PE's Forced Expiratory Flow 25-75? | Numeric | Plaintiff |
| 188 | What was PE's Residual Volume (RV)? | Numeric | Plaintiff |
| 189 | What was PE's RV% predicted? | Numeric | Plaintiff |
| 190 | What was PE's RV/TLC Ratio? | Numeric | Plaintiff |
| 191 | What was PE's Diffusion Capacity for Carbon Monoxide ("DLCO")? | Numeric | Plaintiff |
| 192 | What was PE's DLCO% predicted? | Numeric | Plaintiff |
| 193 | VO2 Max (Exercise Test) (ML per Kg per minute) | Numeric | Plaintiff |
| 194 | Did PE Smoke on day of PFT? | Yes/No | Plaintiff |
| 195 | Did PE ingest respiratory medication(s) on day of PFT? | Yes/No | Plaintiff |
| 196 | If so, what medications, in what dosages? | Pick List | Plaintiff |
| 197 | What were the results of PE's PFT test? | Pick List | Plaintiff |
| 198 | **METHACHOLINE CHALLENGE TEST(S) (1995 to PRESENT)** | | |
| 199 | Did PE undergo a Methacholine Challenge Test (1995 to Present)? | Yes/No | Plaintiff |
| 200 | On what date(s) did PE undergo a Methacholine Test? | Date(s) | Plaintiff |
| 201 | What were the test results for PE's Methacholine Test? | Pick list | Plaintiff |
| 202 | What dose of methacholine caused 20% reduction in PE's FEV1? | Numeric (mg/ml) | Plaintiff |
| 203 | How many days prior to Methacholine Challenge did PE use bronchodilator? | Numeric | Plaintiff |
| 204 | What medical entity/individual conducted PE's Methacholine Challenge Test? | Text | Plaintiff |
| 205 | **SEVERITY CHARTS RANKING DATA** | | |
| 205 | Does PE seek to recover for an impairment that qualifies for a ranking on Chart One of the Severity Charts? | Yes/No | Plaintiff |
| 206 | | | |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 207 | If so, for which impairment(s) identified in Chart One does PE claim to recover? | Pick List | Plaintiff |
| 208 | What is the ranking level(s) for such impairment(s)? | Numeric | Plaintiff |
| 209 | Does PE seek to recover for a previous, completely-resolved impairment under Part I of Chart Two of the Severity Charts? | Yes/No | Plaintiff |
| 210 | If so, for which previous impairment(s) identified in Chart One does PE seek to recover? | Pick List | Plaintiff |
| 211 | What is the ranking level for such previous, completely-resolved impairment(s)? | Numeric | Plaintiff |
| 212 | Does PE seek to recover for a partially-resolved impairment under Part II of Chart Two of the Severity Charts? | Yes/No | Plaintiff |
| 213 | If so, for what partially-resolved impairment(s) identified in Chart One does PE seek to recover? | Pick List | Plaintiff |
| 214 | What is the ranking level for the previous impairment before partial resolution? (See subpart(a) of Part II of Chart Two.) | Numeric | Plaintiff |
| 215 | What is the ranking level for the residual impairment after partial resolution of the previous impairment? (See subpart (b) of Part II of Chart Two.) | Numeric | Plaintiff |
| 216 | Does PE seek to recover for an impairment referred to in Chart Three of the Severity Charts? | Yes/No | Plaintiff |
| 217 | If so, for which such impairment(s)? | Pick List | Plaintiff |
| 218 | **PRESCRIPTION MEDICATION(S)** | | |
| 219 | What medication(s) was  prescribed for PE from 1995 to date? | Pick list | Plaintiff |
| 220 | On what date(s) was medication(s) first prescribed? | Date(s) | Plaintiff |
| 221 | Who is/was the prescribing healthcare provider(s)? | Text | Plaintiff |
| 222 | For what medical conditions or illnesses were medications prescribed for PE from 1995 to present? | Text | Plaintiff |
| 223 | Did PE actually take the medication(s) as prescribed from 1995 to date? | Yes/No | Plaintiff |
| 224 | What was the dosage/frequency with which prescribed medication(s) was actually taken from 1995 to date? | Pick list | Plaintiff |
| 225 | **COLLATERAL SOURCES** | | |
| 226 | Did PE receive any collateral payment(s) related to WTC work and/or alleged injury(s) (including insurance, government, VCF, Medicare, Medicaid, Social Security)? | Yes/No | Plaintiff |
| 227 | What type(s) of collateral payment(s) has PE received related to WTC work and/or alleged injury? | Pick list | Plaintiff |
| 228 | On what date(s) did payment(s) to PE related to WTC work and/or alleged injury begin? | Date(s) | Plaintiff |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 229 | What insurance carrier(s) or other entity(s) has provided PE with payment(s) related to WTC work and/or alleged injury? | Text | Plaintiff |
| 230 | What has been the disposition of PE's claim(s) related to WTC work and/or alleged injuries? | Pick list | Plaintiff |
| 231 | What is the reason(s) for PE receiving benefit(s) related to WTC work and/or alleged injury(s)? | Pick list | Plaintiff |
| 232 | What is the yearly amount(s) that PE has received from all collateral sources related to WTC work or alleged injuries? | Currency | Plaintiff |
| 233 | What is the total amount of payment(s) that PE has received to date from all collateral sources related to WTC work or alleged injuries? | Currency | Plaintiff |
| 234 | **DEFENDANT IDENTIFYING INFORMATION** | | |
| 235 | Name of the defendant (DF) upon which this record focuses.   [cf. field #7.] | Pick list | Plaintiff |
| 236 | Where is DF's principal executive office? | Open Text | Defendants |
| 237 | What is the name of DF's Registered Agent? | Open Text | Defendants |
| 238 | What is DF's registered agent's address? | Open Text | Defendants |
| 239 | By what other name(s) is DF known? | Open Text | Defendants |
| 240 | What is the address of the DF's headquarters? | Open Text | Defendants |
| 241 | Is DF still engaged in business? | Yes/No | Defendants |
| 242 | **DF'S HEALTH INSURANCE/WORKERS COMPENSATION INSURANCE** | | |
| 243 | Who is and/or was PE's health insurance carrier(s) during the time PE worked at the WTC site? | Pick list | Plaintiff |
| 244 | Did PE receive medical service(s) related to PE's work at the WTC site that was paid for by health insurance? | Yes/No | Plaintiff |
| 245 | What was the total amount paid for such services by PE's health insurance carrier? | Currency | Plaintiff |
| 246 | Did PE file workers compensation claim(s) related to the collapse of the WTC? | Yes/No | Plaintiff |
| 247 | On what date(s) did PE file the workers compensation claim(s) related to the collapse of the WTC? | Date | Plaintiff |
| 248 | What was the disposition(s) of PE's WTC-related workers compensation claim(s)? | Pick list | Plaintiff |
| 249 | How much, in total, did PE receive under the workers compensation claim(s)? | Currency | Plaintiff |
| 250 | During what period(s)/on what date(s) did Plaintiff receive compensation under the workers compensation claim(s)? | Date(s) | Plaintiff |
| 251 | **DF'S WTC SITE SAFETY** | | |
| 252 | Did DF ever stop any work related to the collapse of the WTC for safety and/or health concerns of any workers? | Yes/No | Defendants |

| Field # | Data Element | Data Type | Who Populates |
|---------|--------------|-----------|---------------|
| 253 | How many times did DF stop any work related to the collapse of the WTC for safety and/or health concerns of any workers? | Numeric | Defendants |
| 254 | Was any of DF's work related to the collapse of the WTC stopped by someone other than DF for health or safety concerns? | Yes/No | Defendants |
| 255 | On what date(s) was DF's work related to the collapse of the WTC stopped for health or safety concerns? | Date(s) | Defendants |
| 256 | Why was DF's work related to the collapse of the WTC stopped for health or safety reasons? | Text | Defendants |
| 257 | Were DF's employees told to wear respirators for work related to the WTC site? | Yes/No | Defendants |
| 258 | On what dates were DF's employees told to wear respirators for work related to the WTC site? | Date(s) | Defendants |
| 259 | Did any of DF's employees attend health and safety meeting(s) for work related to the collapse of the WTC? | Yes/No | Defendants |
| 260 | On what date(s) did DF's employees attend health and safety meeting(s) for work related to the collapse of the WTC? | Pick List | Defendants |
| 261 | Who conducted the health and safety meeting(s) that DF's employees attended for work related to the collapse of the WTC? | Pick List | Defendants |
| 262 | Did any of DF's employees complete an environmental exposure incident report for work related to the collapse of the WTC? | Yes/No | Defendants |
| 263 | **DEFENDANT'S EMPLOYMENT PRACTICES** | | |
| 264 | Does DF maintain employee files? | Yes/No | Defendants |
| 265 | Do DF's employee files contain results of employees' medical evaluations? | Yes/No | Defendants |
| 266 | Do DF's employee files contain any medical records? | Yes/No | Defendants |
| 267 | **DF'S MEDICAL SURVEILLANCE PROGRAM** | | |
| 268 | Does DF require its employees to undergo "entry medical" examinations prior to employment? | Yes/No | Defendants |
| 269 | Who is the medical provider performing such "entry medical" examinations? | Pick list | Defendants |
| 270 | Did PE undergo an "entry medical" examination prior to employment? | Yes/No | Both |
| 271 | What were the results of the PE's "entry medical" examination? | Pick list | Defendants |
| 272 | Did PE undergo an "entry medical" exam prior to working at WTC site? | Yes/No | Both |
| 273 | What was the result of PE's "entry medical" exam prior to working at the WTC site? | Pick List | Defendants |
| 274 | On what date(s) was the "entry medical" examination(s) performed on PE? | Date(s) | Both |
| 275 | Did the PE undergo an "exit medical" exam? | Yes/No | Both |
| 276 | On what date(s) did PE undergo an "exit medical" examination? | Date | Both |
| 277 | Who was the medical provider who performed such "exit medical" examination(s)? | Pick list | Defendants |
| 278 | What were the results of PE's "exit medical" examination(s)? | Pick List | Defendants |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 279 | **DF'S HEALTH AND SAFETY PRACTICES** | | |
| 280 | Did DF provide any type of Safety and Health training to employees generally after 9/11/01? | Yes/No | Defendants |
| 281 | What type of Safety and Health training did DF provide employees generally after 9/11/01? | Pick List | Defendants |
| 282 | Did DF have a respiratory protection compliance program after 9/11/01? | Yes/No | Defendants |
| 283 | Did DF inform its employees after 9/11/01 about environmental hazards by any form of material data safety sheets and/or employee training? | Yes/No | Defendants |
| 284 | Did DF have a PPE compliance program after 9/11/01? | Yes/No | Defendants |
| 285 | **INDEMNIFICATION AGREEMENTS (Defendants understand that to the extent that responses to fields 285-311 go beyond reporting factual events, circumstances or other data they should not be construed as binding admissions as to any legal position and/or conclusion. Further, Defendants preserve all of their rights and arguments with respect to any disputes concerning erroneous denials of coverage, or with respect to any other litigation, and shall not be limited in argument by responses to fields 285-311 that go beyond reporting factual events, circumstances or other data.)** | Yes/No | Defendants |
| 286 | Was there a contract (written or oral) purporting to require DF to indemnify the City of New York? | Yes/No | Defendants |
| 287 | Was there a contract (written or oral) purporting to require DF to indemnify the Port Authority of New York and New Jersey? | Yes/No | Defendants |
| 288 | Was there a contract (written or oral) purporting to require DF to indemnify Bovis Lend Lease? | Yes/No | Defendants |
| 289 | Was there a contract (written or oral) purporting to require DF to indemnify Tully Construction? | Yes/No | Defendants |
| 290 | Was there a contract (written or oral) purporting to require DF to indemnify Turner/Plaza? | Yes/No | Defendants |
| 291 | Was there a contract (written or oral) purporting to require DF to indemnify AMEC Construction? | Yes/No | Defendants |
| 292 | Was there a contract (written or oral) purporting to require DF to defend the City of New York? | Yes/No | Defendants |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---------|--------------|-----------|---------------|
| 293 | Was there a contract (written or oral) purporting to require DF to defend the Port Authority of New York and New Jersey? | Yes/No | Defendants |
| 294 | Was there a contract (written or oral) purporting to require DF to defend Bovis Lend Lease? | Yes/No | Defendants |
| 295 | Was there a contract (written or oral) purporting to require DF to defend Tully Construction? | Yes/No | Defendants |
| 296 | Was there a contract (written or oral) purporting to require DF to defend Turner/Plaza? | Yes/No | Defendants |
| 297 | Was there a contract (written or oral) purporting to require DF to defend AMEC Construction? | Yes/No | Defendants |
| 298 | Was there a contract (written or oral) purporting to require DF to name the City of New York as an additional insured? | Yes/No | Defendants |
| 299 | Was there a contract (written or oral) purporting to require DF to name the Port Authority of New York and New Jersey as an additional insured? | Yes/No | Defendants |
| 300 | Was there a contract (written or oral) purporting to require DF to name Bovis Lend Lease as an additional insured? | Yes/No | Defendants |
| 301 | Was there a contract (written or oral) purporting to require DF to name Tully Construction as an additional insured? | Yes/No | Defendants |
| 302 | Was there a contract (written or oral) purporting to require DF to name Turner/Plaza as an additional insured? | Yes/No | Defendants |
| 303 | Was there a contract (written or oral) purporting to require DF to name AMEC Construction as an additional insured? | Yes/No | Defendants |
| 304 | Was there a contract (written or oral) purporting to require an entity to indemnify DF? | Yes/No | Defendants |
| 305 | Was there a contract (written or oral) purporting to require an entity to defend DF? | Yes/No | Defendants |
| 306 | Was there a contract (written or oral) purporting to require an entity to name DF as an additional insured? | Yes/No | Defendants |
| 307 | What were the terms of any oral agreement for indemnification where defendant agreed to perform work that related to worker and site health and safety? | Open Text | Defendants |
| 308 | What were the terms of/parties to any oral agreements regarding indemnification? | Open Text | Defendants |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 309 | What were the terms of/parties to any oral agreements to defend? | Open Text | Defendants |
| 310 | What were the terms of/parties to any oral agreements to name one of the above listed entities as an additional insured? | Open Text | Defendants |
| 311 | On what date(s) was (were) such agreements entered into? | Date(s) | Defendants |
| 312 | **INSURANCE INFORMATION (Defendants understand that to the extent that responses to fields 312-328 go beyond reporting factual events, circumstances or other data they should not be construed as binding admissions as to any legal position and/or conclusion. Further, Defendants preserve all of their rights and arguments with respect to any disputes concerning erroneous denials of coverage, or with respect to any other litigation, and shall not be limited in argument by responses to fields 312-328 that go beyond reporting factual events, circumstances or other data.)** | | |
| 313 | Is there any insurance that may be available or claimed to be available, other than the WTC Captive or OCIP, to cover any liabilities that DF may incur in this litigation? | Yes/No | Defendants |
| 314 | What type of insurance, other than the WTC Captive or OCIP, may be available or claimed to be available to cover any liabilities DF may incur in this litigation? | Pick list | Defendants |
| 315 | For each type of insurance identified above, identify the potentially applicable policy periods. | Date - Date | Defendants |
| 316 | Who is/are the Insurance Carrier(s) who wrote the policy? | Pick list | Defendants |
| 317 | What are the Insurance Policy Number(s)? | Open Text | Defendants |
| 318 | What are the initial policy limits set out in the policy? | Numeric | Defendants |
| 319 | What are the remaining policy limits? | Numeric | Defendants |
| 320 | Are the policies claims-made or occurrence based? | Pick list | Defendants |
| 321 | If policy is claims-made, what is the prior acts date and/or retroactive date? | Date - Date | Defendants |
| 322 | Was/were there claims made against this policy with respect to plaintiffs in this litigation? | Yes/No | Defendants |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 323 | Was there a communication from the insurer that purported to disclaim with respect to any plaintiffs in this litigation? | Yes/No/Unkn own | Defendants |
| 324 | What was the date(s) of the communication from the insurer purporting to disclaim with respect to any plaintiffs in this litigation? | Date(s) | Defendants |
| 325 | Was there a communication from the insurer that purported to reserve rights with respect to plaintiffs in this litigation? | Yes/No/Unkn own | Defendants |
| 326 | What was the date(s) of the communication from the insurer that purported to reserve rights with respect to plaintiffs in this litigation? | Date(s) | Defendants |
| 327 | What is/was the stated basis of the communication from the insurer that purported to disclaim or purported to reserve rights with respect to plaintiffs in this litigation? | Pick list | Defendants |
| 328 | Was a declaratory judgment action filed against the carrier with respect to this litigation? | Yes/No | Defendants |
| 329 | **DID DF PROVIDE PPE (OTHER THAN RESPIRATORY PPE) TO ITS EMPLOYEES?** | | |
| 330 | Did DF provide PPE (other than respiratory) to its employees? | Yes/No | Defendants |
| 331 | If so, what type(s) of nonrespiratory PPE? | Pick list | Defendants |
| 332 | At what locations did DF distribute PPE (other than respiratory) to its employees? | Pick list | Defendants |
| 333 | Was instruction given on proper use of PPE (other than respiratory) (donning on/off, etc.)? | Yes/No | Defendants |
| 334 | On what date(s) was instruction on proper use of PPE (other than respiratory) given? | Date(s) | Defendants |
| 335 | **DID DF PROVIDE RESPIRATORY PPE TO ITS EMPLOYEES?** | | |
| 336 | Did DF provide respiratory PPE to its WTC employees? | Yes/No | Defendants |
| 337 | What type(s) of respiratory PPE did DF distribute to its employees who worked at WTC? | Pick list | Defendants |
| 338 | At what location(s) at WTC site did DF distribute respiratory PPE? | Pick list | Defendants |
| 339 | Did DF give instruction(s) on proper use and maintenance of respiratory equipment? | Yes/No | Defendants |
| 340 | Which of DF's agents gave such instruction(s)? | Pick list | Defendants |
| 341 | At what location(s) was the instruction(s) given? | Pick List | Defendants |
| 342 | On what date(s) was the instruction(s) given? | Date(s) | Defendants |
| 343 | Did DF provide cartridges for respiratory PPE to its WTC employees? | Yes/No | Defendants |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 344 | How frequently did DF provide cartridges for respiratory PPE? | Pick List | Defendants |
| 345 | Did PE receive a qualitative respirator fit test? | Yes/No | Plaintiff |
| 346 | On what date(s) was/were the qualitative respirator fit test(s) given to plaintiff? | Date(s) | Plaintiff |
| 347 | Did PE receive information about the need for and/or consequences of not wearing respirators for work related to the collapse of the WTC? | Yes/No | Plaintiff |
| 348 | Who gave PE information regarding the need for and/or consequences of not wearing respirators for work related to the collapse of the WTC? | Pick list | Plaintiff |
| 349 | On what date(s) was information regarding the need for and/or consequences of not wearing respirators given to PE for work related to the collapse of the WTC? | Date(s) | Plaintiff |
| 350 | Did DF require its employees to use respiratory protection for work related to the collapse of the WTC site? | Yes/No | Defendants |
| 351 | What type of respiratory protection did DF generally require for work related to the collapse of the WTC? | Pick List | Defendants |
| 352 | On what date(s) did DF require the use of respiratory protection for work related to the collapse of the WTC? | Date(s) | Defendants |
| 353 | Who required the use of respiratory protection for work related to the collapse of the WTC? | Pick List | Defendants |
| 354 | Did DF discipline its employees at any time, in any manner for failing to wear respiratory protection for work related to the collapse of the WTC? | Yes/No | Defendants |
| 355 | Which employee(s) did DF discipline for failing to wear respiratory protection for work related to the collapse of the WTC? | Text | Defendants |
| 356 | How did DF discipline its employees for failing to wear respiratory protection for work related to the collapse of the WTC? | Pick List | Defendants |
| 357 | On what date(s) were employees disciplined for failing to wear respiratory protection for work related to the collapse of the WTC? | Date(s) | Defendants |
| 358 | Did DF document employee discipline in any manner for failing to wear respiratory protection or work related to the collapse of the WTC? | Yes/No | Defendants |
| 359 | Did anyone ever inform DF of the environmental conditions at the WTC site on or following September 11, 2001? | Yes/No | Defendants |
| 360 | How was DF informed of the environmental conditions at the WTC site? | Pick List | Defendants |
| 361 | Who informed DF of the environmental conditions at the WTC site? | Pick List | Defendants |
| 362 | On what date(s) was DF informed of the environmental conditions at the WTC site? | Date(s) | Defendants |

Merged Data Elements Chart as Coded by Special Masters

| Field # | Data Element | Data Type | Who Populates |
|---|---|---|---|
| 363 | What information did DF receive about the environmental conditions at the WTC site following September 11, 2001? | Pick List | Defendants |
| 364 | Did DF receive any instructions from any source concerning PPE use for work related to the collapse of the WTC? | Yes/No | Defendants |
| 365 | How were instructions on PPE given to the DF? | Pick List | Defendants |
| 366 | What was the source of the instructions DF received concerning PPE use for work related to the collapse of the WTC? | Pick List | Defendants |
| 367 | On what date(s) did DF receive instructions concerning PPE use for work related to the collapse of the WTC? | Date(s) | Defendants |
| 368 | What instructions concerning PPE use for work related to the collapse of the WTC did DF receive? | Pick List | Defendants |

# ATTACHMENT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                                           :
IN RE WORLD TRADE CENTER DISASTER      :   **ORDER AMENDING CASE**
SITE LITIGATION                        :   **MANAGEMENT ORDER NO. 8**
                                                           :
                                       :   21 MC 100 (AKH)
                                                           :
---------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

           Negotiations have concluded between the parties and Special Masters

regarding the form and substance of the Discovery Database, and I approve the resulting

final version. I issue this order amending Case Management Order No. 8 to reflect certain

modifications and to order into effect this most recent version of the Database.*

           I have heard and considered recommendations, including those presented at

the December 10, 2008 Status Conference, from the parties and the Special Masters

regarding the case management plan in this matter. I order that the protocol outlined

below, and illustrated in the attached schedule (Attachment 1), shall regulate the onward

progression of these cases towards final resolution.

   1. Divide the aggregate number of plaintiffs into five groups.

        A. Group A: Cases with case index numbers 1 – 2000
        B. Group B: Cases with case index numbers 2001 – 4000
        C. Group C: Cases with case index numbers 4001 – 6000
        D. Group D: Cases with case index numbers 6001 – 8000
        E. Group E: Cases with case index numbers 8001 – (highest index #)

   2. Forty days after the onset of this process which began on January 1, 2009, the
      parties must deliver to the Special Masters responses, under oaths of plaintiffs and

---

* I have attached a print-out of the Database (Attachment 2), along with the "pick lists" that appear within
certain response fields of the Database, reflecting all acceptable responses to the relevant query
(Attachment 3). For the sake of efficiency, I have not included the very lengthy "pick list" used for
Database questions 137, 174, 204, and 221 which lists all plaintiffs' doctors. I have also included the
Severity Chart (Attachment 4) which parties must complete prior to responding to particular Database
fields, as well as the Severity Chart's introductory language (Attachment 5).

1

defendants, for Group A, in index number sequence, fully and truthfully answering the following set of 35 data entry points ("Severity and Other Fields" or "SOF") from the attached Discovery Database ("Database").

    A.  Case profile information (data entry points 2 – 6)
    B.  Duration of exposure at World Trade Center site (data entry points 72 – 81)
    C.  Plaintiff's pre-existing disorders (data entry points 111 – 117)
    D.  Severity of claimed illnesses (data entry points 206 – 217)
    E.  Conditions, injuries, and diseases for which plaintiff seeks recovery (data entry point 134)

3.  Ten days later (the 50th day), the Special Masters shall identify:

    A.  Group A1: 200 cases selected as most severe from Group A
    B.  Group A2: 25 cases selected[†] from the remainder of Group A
    C.  Group A3: 400 additional cases selected randomly[‡] from the remainder of Group A
    D.  Group A4: All remaining cases within Group A

4.  Forty days later (the 90th day), the parties shall populate the entire Database for Groups A1 and A2, fully and truthfully answering all data entry points, under oaths of plaintiffs and responding defendants.

5.  Five days later (the 95th day), plaintiffs' Liason Counsel and defendants' Liason Counsel shall each have identified two Group A1 cases for discovery and trial.

    A.  The parties may make their selection(s) any time after Group A1 is designated.
    B.  Once a case has been selected, discovery will commence promptly and will be permitted on all issues relevant for discovery and trial, including information disclosed in response to database queries.
    C.  The discovery completion date, the final date for filing motions, the date upon which parties will argue motions, and the trial date are fixed in the attached schedule.

6.  Five days later (the 100th day), the Court will select two additional Group A1 or Group A2 cases for discovery and trial. These two cases will also proceed through discovery and trial as set out in "Step 5 A-E."

7.  Eighty days after database completion is required for Groups A1 and A2 (the 170th day), entire Database completion is due for Group A3.

---

[†] There are no specific criteria for this selection. The rationale is to enable various types of cases to be chosen for discovery and trial.
[‡] A computer program will perform the random selection.

8. Five days later (the 175th day), plaintiffs' Liason Counsel and defendants' Liason Counsel shall each have identified two Group A3 cases for discovery only.

9. Five days later (the 180th day), the Court will select two additional A3 cases for discovery only.

10. The protocol in Steps 2 through 9 shall be repeated for Groups B through E. Each Group will begin this process 40 days after the previous Group begins.

11. The entire Database will be completed for Groups A4, B4, C4, D4, and E4 on or before January 1, 2011.

12. The onset date ("Day 1" for purposes of the attached schedule) is January 1, 2009. Weekends and legal holidays are included even when set time periods are brief.

13. If a case chosen for discovery settles significantly prior to the date upon which discovery must conclude, plaintiffs or defendants may ask the Court to substitute another case from the same subgroup.

14. Database Fields 313 – 328 (relating to insurance information) will be populated by defendants' Liason Counsel, fully and truthfully, under oaths by February 27, 2009.

SO ORDERED.

Date:     February 18, 2009
          New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

3

# ATTACHMENT 3

| | DAY | 40 | 50 | 80 | 90 | 95 | 100 | 120 | 130 | 135 | 140 | 160 | 170 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Group A (Index #s: 1-2000)** A1 — 200 cases ranked most severe | | Severity and Other Fields Finished for Group A | Special Masters have determined 200 cases ranked most severe (A1); selected a set of 25 additional cases (A2); and selected a set of 400 additional cases at random (A3). Remaining cases are in Group A4. | | Completed Database on A1 | Each Party has chosen 2 cases for discovery and trial from A1. | Court to choose 2 more cases from A1 and/or A2 for discovery and trial. | | | | | | |
| A2 — 25 selected cases | | | | | Completed Database on A2 | | | | | | | | |
| A3 — 400 randomly selected cases | | | | | | | | | | | | | Completed Database on A3 |
| A4 — remaining cases | | | | | | | | | | | | | |
| **Group B (Index #s: 2001-4000)** B1 — 200 cases ranked most severe | | | | Severity and Other Fields Finished for Group B | Special Masters have determined 200 cases ranked most severe (B1); selected a set of 25 additional cases (B2); and selected a set of 400 additional cases at random (B3). Remaining cases are in Group B4. | | | | Completed Database on B1 | Each Party has chosen 2 cases for discovery and trial from B1. | Court to choose 2 more cases from B1 and/or B2 for discovery and trial. | | |
| B2 — 25 selected cases | | | | | | | | | Completed Database on B2 | | | | |
| B3 — 400 randomly selected cases | | | | | | | | | | | | | |
| B4 — remaining cases | | | | | | | | | | | | | |
| C1 — 200 cases ranked most severe (Index #s: 0) | | | | | | | | | Special Masters have determined 200 cases ranked most | | | | Completed Database on C1 |

**Group C (Index #s: 4001-600)**

| C2 25 selected cases | C3 400 randomly selected cases | C4 remaining cases |
|---|---|---|
| Severity and Other Fields Finished for Group C | severe (C1); selected a set of 25 additional cases (C2); and selected a set of 400 additional cases at random (C3). Remaining cases are in Group C4. | Completed Database on C2 |

**Group D (Index #s: 6001-8000)**

| D1 200 cases ranked most severe | D2 25 selected cases | D3 400 randomly selected cases | D4 remaining cases |
|---|---|---|---|
| | Severity and Other Fields Finished for Group D | | Special Masters have determined 200 cases ranked most severe (D1); selected a set of 25 additional cases (D2); and selected a set of 400 additional cases at random (D3). Remaining cases are in Group D4. |

**Group E (Index #s: 8001-end)**

| E1 200 cases ranked most severe | E2 25 selected cases | E3 400 randomly selected cases | E4 remaining cases |
|---|---|---|---|
| | | | |

**In re World Trade Center Disaster Site Litigation, 21 MC 100 (AKH)**

## Case Management Schedule

**Pursuant to Court Order of February 18, 2009**

| 175 | 180 | 200 | 210 | 215 | 220 | 250 | 255 | 260 | 290 | 295 | 300 | 325 | 330 |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | | | | | | | | | Discovery is concluded | |
| | | | | | | | | | | | | | |
| Each Party has chosen 2 cases for discovery from A3. | Court to choose 2 cases for discovery from A3. | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | Completed Database on B3 | Each Party has chosen 2 cases for discovery from B3. | Court to choose 2 cases for discovery from B3. | | | | | | | | |
| | | | | | | | | | | | | | |
| Each Party has chosen 2 cases for discovery and trial from C1. | Court to choose 2 more cases from C1 and/or C2 for | | | | | | | | | | | | |

discovery and trial.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Completed Database on C3 | Each Party has chosen 2 cases for discovery from C3. | Court to choose 2 cases for discovery from C3. | | | |
| | | | | | | | | | |
| | | Completed Database on D1 | Each Party has chosen 2 cases for discovery and trial from D1. | Court to choose 2 more cases from D1 and/or D2 for discovery and trial. | | | | | |
| | | Completed Database on D2 | | | | | | | |
| | | | | | | Completed Database on D3 | Each Party has chosen 2 cases for discovery from D3. | Court to choose 2 more cases from D3. | |
| | | | | | | | | | |
| | Severity and Other Fields Finished for Group E | Special Masters have determined 200 cases ranked most severe (E1); selected a set of 25 additional cases (E2); and selected a set of 400 additional cases at random (E3). Remaining cases are in Group E4. | | Completed Database on E1 | Each Party has chosen 2 cases for discovery and trial from E1. | Court to choose 2 more cases from E1 and/or E2 for discovery and trial. | | | |
| | | | | Completed Database on E2 | | | | | |
| | | | | | | | | | Completed Database on E3 |

| 335 | 340 | 365 | 370 | 400 | 405 | 410 | 435 | 440 | 445 | 465 | 475 | 485 | 501 | 730 |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
|  |  |  | All Motions Filed | Motions Argued |  |  |  |  |  |  |  |  | Trials to Begin |  |
|  |  | Discovery is concluded |  |  |  | All Motions Filed |  | Motions Argued |  |  |  |  | Trials to Begin |  |
|  |  | Discovery is concluded |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  | Completed Database on A4 |
|  |  | Discovery is concluded |  |  |  | All Motions Filed |  | Motions Argued |  |  |  |  | Trials to Begin |  |
|  |  |  |  |  | Discovery is concluded | All Motions Filed |  | Motions Argued |  |  |  |  | Trials to Begin |  |
|  |  |  |  |  | Discovery is concluded |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  | Completed Database on B4 |
|  |  |  |  |  | Discovery is concluded |  | All Motions Filed |  |  | Motions Argued |  |  | Trials to Begin |  |
|  |  |  |  |  |  |  |  |  | Discovery |  | All | Motions | Trials |  |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | is concluded | | Motions Filed | Argued | to Begin | |
| | | | | | | | Discovery is concluded | | | | | |
| | | | | | | | | | | | | Completed Database on C4 |
| | | | | | | | Discovery is concluded | | All Motions Filed | Motions Argued | Trials to Begin | |
| | | | | | | | Discovery is concluded | | All Motions Filed | Motions Argued | Trials to Begin | |
| | | | | | | | Discovery is concluded | | | | | |
| | | | | | | | | | | | | Completed Database on D4 |
| | | | | | | | Discovery is concluded | | All Motions Filed | Motions Argued | Trials to Begin | |
| | | | | | | | Discovery is concluded | | All Motions Filed | Motions Argued | Trials to Begin | |
| Each Party has chosen 2 cases for discovery from E3. | Court to choose 2 cases for discovery from E3. | | | | | | Discovery is concluded | | | | | |
| | | | | | | | | | | | | Completed Database on E4 |

# ATTACHMENT 4

63382

## CHART ONE: SEVERITY CLASSIFICATIONS WITHIN DISEASE CATEGORIES FOR CLAIMS INVOLVING CURRENT IMPAIRMENT
### LOWER RESPIRATORY DISEASES

| DISEASE | FOUR | THREE | TWO | ONE | ZERO |
|---|---|---|---|---|---|
| Chronic bronchitis/COPD Emphysema | Satisfies AMA Criteria for Rating Impairment Due to Pulmonary Dysfunction (Table 5-4), Class 4; objective tests' row only | Satisfies AMA Criteria for Rating Impairment Due to Pulmonary Dysfunction (Table 5-4), Class 3; objective tests' row only | Satisfies AMA Criteria for Rating Impairment Due to Pulmonary Dysfunction (Table 5-4), Class 2; objective tests' row only | Satisfies AMA Criteria for Rating Impairment Due to Pulmonary Dysfunction (Table 5-4), Class 1; objective tests' row only | Satisfies AMA Criteria for Rating Impairment Due to Pulmonary Dysfunction (Table 5-4), Class 0; objective tests' row only |
| Interstitial Lung Disease | Pulmonary Function Testing demonstrating: TLC < 50%; FEV1/FVC >70%; and FVC < 50% | Pulmonary Function Testing demonstrating: TLC 50-59%; FEV1/FVC > 70%; and FVC 50-59% | Pulmonary Function Testing demonstrating: TLC 60-69%; FEV1/FVC > 70%; and FVC 60-69% | Pulmonary Function Testing demonstrating: TLC 70-79%; FEV1/FVC > 70%; and FVC 70-79% | Pulmonary Function Testing demonstrating: TLC > 80%; FEV1/FVC > 70%; and FVC > 80% |

| DISEASE | FOUR | THREE | TWO | ONE | ZERO |
|---|---|---|---|---|---|
| Asthma | Satisfies American Thoracic Society Criteria for Impairment Rating in a Patient with Asthma, Class V (not controlled despite maximal treatment) or AMA Criteria for Rating Impairment Due to Asthma (Table 5-5), Class 4 | Satisfies American Thoracic Society Criteria for Impairment Rating in a Patient with Asthma, Class IV (score of 10 or 11) or AMA Criteria for Rating Impairment Due to Asthma (Table 5-5), Class 3 | Satisfies American Thoracic Society Criteria for Impairment Rating in a Patient with Asthma, Class III (score of 7 to 9) or AMA Criteria for Rating Impairment Due to Asthma (Table 5-5), Class 2 | Satisfies American Thoracic Society Criteria for Impairment Rating in a Patient with Asthma, Class I or II (score of 1 to 6) or AMA Criteria for Rating Impairment Due to Asthma (Table 5-5), Class 1 | Satisfies American Thoracic Society Criteria for Impairment Rating in a Patient with Asthma, Class 0 (score of zero) or AMA Criteria for Rating Impairment Due to Asthma (Table 5-5), Class 0 |
| Reactive Airways Dysfunction Syndrome (RADS) | | | | | |

63382

# CHART ONE: SEVERITY CLASSIFICATIONS WITHIN DISEASE CATEGORIES FOR CLAIMS INVOLVING CURRENT IMPAIRMENT
## UPPER RESPIRATORY DISEASES

| DISEASE | FOUR | THREE | TWO | ONE | ZERO |
|---|---|---|---|---|---|
| Laryngitis or Pharyngitis | Satisfies AMA Criteria for Rating Impairment Due to Voice and Speech Impairment (Table 11-8), Class 4 | Satisfies AMA Criteria Due to Voice and Speech Impairment, (Table 11-8), Class 3 | Satisfies AMA Criteria for Rating Impairment Due to Voice and Speech Impairment (Table 11-8), Class 2 | Satisfies AMA Criteria for Rating Impairment Due to Voice and Speech Impairment (Table 11-8), Class 1 | Satisfies AMA Criteria for Rating Impairment Due to Voice and Speech Impairment (Table 11-8), Class 0 |

| DISEASE | FOUR | THREE | TWO | ONE | ZERO |
|---|---|---|---|---|---|
| Chronic Rhinosinusitis | Satisfies AMA Criteria for Rating Impairment Due to Air Passage Deficits (Table 11-6), Class 4: "diagnostic or other objective findings" row only. | Satisfies AMA Criteria for Rating Impairment Due to Air Passage Deficits (Table 11-6), Class 3: "diagnostic or other objective findings" row only. | Satisfies AMA Criteria for Rating Impairment Due to Air Passage Deficits (Table 11-6), Class 2: "diagnostic or other objective findings" row only. | Satisfies AMA Criteria for Rating Impairment Due to Air Passage Deficits (Table 11-6), Class 1: "diagnostic or other objective findings" row only. | Satisfies AMA Criteria for Rating Impairment Due to Air Passage Deficits (Table 11-6), Class 0: "diagnostic or other objective findings" row only. |

**CHART ONE: SEVERITY CLASSIFICATIONS WITHIN DISEASE CATEGORIES FOR CLAIMS INVOLVING CURRENT IMPAIRMENT**

*UPPER DIGESTIVE TRACT DISEASES*

| DISEASE | TWO | ONE | ZERO |
|---|---|---|---|
| Gastroesophageal reflux disease | Endoscopy reveals severe findings such as Barrett's Esophagus, benign peptic esophageal stricture, ulcers, hemorrhage, or severe esophagitis | Endoscopy reveals mild/moderate findings such as inflammation, esophagitis, erosions, mucosal breaks. | Daily medication taken. |
| Barrett's Esophagus | | | |
| Gastritis | | | |
| Esophagitis and GI stricture | | | |

# ATTACHMENT 5

**Introduction to Severity Charts**

Chart One ranks the relative severities of current physical impairments of WTC plaintiffs who claim to suffer from certain enumerated diseases. It ranks severities only within each enumerated disease category, and does not compare or rank severities across the disease categories for which rankings are provided. Thus, for example, while a rank-four emphysema impairment claim is more severe than a rank-three emphysema claim, it may or may not be more severe – measured by negative impacts on the plaintiff – than a rank-three asthma claim. Comparisons across disease categories are left to a later date. Chart One relies on clearly stated criteria that do not make cross-disease comparisons.

Chart One does not purport to test the factual accuracy of plaintiffs' assertions that they suffer from particular diseases or, for that matter, that those diseases were caused or aggravated by exposures to WTC conditions. For example, Chart One does not require, as do the relevant AMA guidelines, plaintiffs to show they have been examined and diagnosed by a qualified physician. This information will be included in the database. To succeed with a claim for which Chart One provides relative rankings of severity of current impairment, a plaintiff will be required to satisfy proof requirements on all elements of traditional tort claims.

Chart One does not purport, even within the enumerated disease categories, to measure the relative monetary values of claims. To be sure, relative severity of impairment is a relevant consideration to monetary value; but so also are other considerations not included in the chart. Indeed, claims that do not qualify for an impairment ranking in Chart One may have significant monetary value. It also follows that the "Zero" column on Chart One does not necessarily connote claims that have no value, but rather refers to claims that currently do not satisfy the

1

criteria for an impairment ranking of "One" or higher.

Chart Two deals with claims that do not currently satisfy the criteria applied in Chart One for ranking impairment. When impairments that satisfied Chart One criteria are alleged to have existed previously but have subsequently been completely resolved, the previous impairment will be ranked according to the criteria in Chart One even though such impairment is not current within the terms employed in Chart One. Thus, a plaintiff who previously suffered from a relatively severe impairment that has been completely resolved and thereby eliminated (by medication, or otherwise), may have a valuable tort claim even though the plaintiff's claim does not belong on Chart One. For example, a patient suffering from GERD who underwent anatomy-altering surgery leaving no residual impairment may be entitled to damages reflecting that reality. In cases involving partial resolutions of previous, higher-level impairments, any residual, post-resolution impairment will be treated as a separate claim for impairment under Chart One.

Chart Three asserts that claims for impairments based on diseases enumerated in Chart One for which the tests referred to in Chart one have not been performed will not be ranked for severity.

2

CHART TWO: CLAIMS FOR IMPAIRMENTS
REFERRED TO IN CHART ONE THAT OCCURRED PREVIOUSLY,
BUT HAVE BEEN RESOLVED

I.  Previous impairments under Chart One that have been resolved completely will be

    ranked by impairment severity levels under Chart One reached before resolution.

II. Regarding previous impairments under Chart One that have been resolved partially,

    leaving current residual impairments under Chart One:

    A. Previous impairments will be ranked by impairment severity levels under Chart

       One reached before partial resolution.

    B. Current residual impairments will be ranked by impairment severity levels

       under Chart One.

3

## CHART THREE: CLAIMS FOR IMPAIRMENTS REFERRED TO IN CHART ONE THAT HAVE NOT YET BEEN DEMONSTRATED BY TESTS DESCRIBED IN CHART ONE

Claimed impairments referred to in Chart One for which the tests for impairment described in Chart One have not been performed, whether or not otherwise valid for recovery purposes, will not be ranked for severity.