UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE WORLD TRADE CENTER
DISASTER SITE LITIGATION

---

THIS DOCUMENT RELATES TO *Frank Malone v. City of New York*, 05 CV 4111 and ALL CASES INVOLVING NEW YORK CITY FIREFIGHTERS AND FIRE OFFICERS

---

21 MC 100 (AKH)

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS PURSUANT TO FRCP 37 FOR THE CITY OF NEW YORK'S ADMITTED SUPPRESSION OF EVIDENCE FOR SIX YEARS

Sullivan Papain Block McGrath & Cannavo P.C.
120 Broadway
Suite 18
New York, New York 10271
(212) 732-9000

**Table of Contents**

|  |  | Page |
|---|---|---|
| Table of Authorities |  | iii |
| Introduction |  | 1 |
| Statement of Facts: Relevance of the Respiratory Protection Program to 21 MC 100 |  | 9 |
| I. | Building Collapses Are Foreseeable Emergencies that FDNY Members Respond to, and 29 CFR § 1910.134(1) Mandates Appropriate Respiratory Protection for Building Collapse Responses | 9 |
| II. | According to FDNY Chiefs, Headley Does Not Have Skills Required for Success as FDNY OSH Director | 12 |
| III. | FDNY OSH Director Headley Did Not Know His Job Responsibilities Encompassed the Occupational Safety of Firefighters and Did Not Bother to Review a Written Job Description until after Taking Office | 13 |
| IV. | Director Headley Remained Unaware of FDNY RPP and His Formal Role as Program Administrator Until 2002, after the Events of September 11, 2001 | 14 |
| V. | Although FDNY OSH was Created to Ensure FDNY Compliance with Federal Regulations, Including those Governing Respiratory Protection Programs, Director Headley Remained Unaware of RPP Non-Compliance | 18 |
| VI. | The RPP is Evidence of Systemic Respiratory Protection Failure at the FDNY Pre-9/11 | 20 |
| Argument |  |  |
| A. | The RPP is Relevant | 24 |
| B. | The City Failed to Assert a Privilege or Seek a Protective Order in Connection with Suppression of the RPP, thereby Depriving the Plaintiffs of the Opportunity to Learn of its Existence |  |
| C. | The Law Governing FRCP 37 Sanctions | 27 |
| D. | Remedy Sought | 29 |

<u>Table of Authorities</u>

Page

<u>Ashkinazi v. Sapir</u>  2005 WL 937597,
4 (S.D.N.Y.,2005)                                                        29

<u>Daval Steel Products, a Div. of Francosteel Corp. v. M/V Fakredine</u>,
951 F.2d 1357, 1367 (2nd Cir., 1991)                            29

<u>McGee v. Adams Paper & Twine Co.</u>, 271 N.Y.S.2d 698 (1st Dep't 1966),
<u>aff'd</u>, 20 N.Y.2d 921, 286 N.Y.S.2d 274 (1967)                        25

<u>McGovern v. City of New York,</u>  742 N.Y.S.2d 218, 220
(App. Div., 1st Dept., 2002)                                   26

<u>Nat'l Hockey League v. Metro. Hockey Club, Inc.</u>, 427 U.S. 639, 643 (1976)   29

<u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99,
(2nd Cir. 2002).                                                         2, 9, 28

<u>In re September 11th Liability Insurance Coverage Cases</u>, 243 F.R.D. 114,
125 (S.D.N.Y. 2007)                                                       2, 9, 28

<u>In re World Trade Center Disaster Site Litigation</u> , 521 F.3d 169, 173
(2nd Cir. 2008)                                                 3, 11

# Introduction

Firefighter and fire officer plaintiffs in 21 MC 100 contend that defendant City of New York ("the City") failed to provide them with appropriate respiratory protection throughout the World Trade Center rescue and recovery effort, resulting in pulmonary injuries. On the eve of trial, after multiple Case Management Orders mandated the disclosure by the City of documents concerning respiratory protection, the City now acknowledges that for the past six years it willfully withheld from discovery one of the documents most relevant to this central contention: the Fire Department of New York ("FDNY") respiratory protection policy covering all members from 1998 through at least 2002.

As detailed below, plaintiffs' counsel recently identified the document through happenstance as the City willfully suppressed the document and then disregarded its obligation to identify it as a withheld document. In 2004, the City unilaterally deemed the document "irrelevant," and, as a result, failed to disclose its existence for six years. The City never moved for a protective order or formally asserted a legal privilege to shield the document from disclosure. The City did not even take the informal step of simply writing to the Court of its position, thereby alerting plaintiffs to the document's existence.[1]  Employing stealth as a discovery tactic, contrary to fundamental principles of fairness and the intent of the Federal Rules of Civil Procedure ("FRCP"), has no place in litigation and should be punished severely.

Pursuant to FRCP 37, the plaintiffs request a sanctions hearing for this unjustified, unilateral and admitted willful suppression of evidence. Plaintiffs seek testimony from Tennyson Headley, the Director of Occupational Safety and Health of the Fire Department of New York

---

[1] It was only through the inadvertent review of a 2003 FDNY memorandum, annexed as **Exhibit 6**, recommending the termination of Director Headley that counsel learned of the existence of the FDNY's division of Occupational Safety and Health ("FDNY OSH") and the subject policy.

("FDNY OSH" or "FDNY OSHA"),[2] and all attorneys from the Law Department of the City, the FDNY, Latham & Watkins and/or Patton Boggs LLP,[3] who participated in the decision to deem certain documents "irrelevant" and then exclude them from disclosure in 21 MC 100. The plaintiffs also request that the answer of the City be stricken in all 21 MC 100 cases involving members of the FDNY. The basis for this application is the uncontroverted, indeed, admitted willfulness of the conduct at issue. Moreover, we request that the Court inquire as to the quantity and identity of other documents, shrouded from disclosure through the City's unilateral designation of "irrelevant." The identification of other relevant documents, similarly suppressed, may give rise to additional sanctions hearings as the other affected plaintiffs, non-firefighters, ascertain the prejudice their cases sustained as a result.

As demonstrated herein, the plaintiffs satisfy the criteria for the imposition of sanctions. To meet this burden in the Second Circuit, the moving party must establish "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." In re September 11th Liability Insurance Coverage Cases, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2nd Cir. 2002).

On February 5, 2010, FDNY OSH Director Headley and Patton Boggs LLP admitted to deliberately withholding an important 25 page document with singular relevance: the federally mandated written respiratory protection program ("RPP") in effect for all FDNY personnel from the years 1998 through at least 2002. (**Exhibit 1**: New York City Fire Department Respiratory

---

[2] FDNY OSH or "FDNY OSHA"  is a division of the City, and is not to be confused with the United States Occupational Safety and Health Administration or "OSHA."
[3] Latham & Watkins and Patton Boggs LLP are the City's former and current private counsel.

Protection Program [version July 30, 1998], disclosed on February 4, 2010 with accompanying email correspondence from Patton Boggs; *see* also **Exhibit 5**: Headley dep. tr. at pp. 323-325 and p. 334).

29 CFR § 1910.134 mandates that a fire department RPP make available to firefighters the appropriate respiratory protection for all reasonably foreseeable emergencies, such as building collapses.

As a result of the collapse of the World Trade Center buildings, recovery workers, some 10,000 City firefighters among them, "*were exposed to toxic fumes and gases and other hazardous conditions, and that they suffered respiratory injuries due to the failure of the City...to provide them with adequate safety equipment, and/or to warn them of the hazards.*" In re World Trade Center Disaster Site Litigation, 521 F.3d 169, 173 (2nd Cir. 2008). Plaintiffs contend and demonstrate herein that building collapses were reasonably foreseeable emergencies to the FDNY, long before the World Trade Center collapse, and that the City did not stock an appropriate form of respiratory protection, namely air purifying respirators or "APRs," in advance of the World Trade Center operations.

Since 2005, the City has produced in excess of thirteen million documents in discovery, many completely unrelated to respiratory protection or even the City's World Trade Center response, while deliberately concealing the RPP, perhaps the most important document identified to date. The RPP and its shortcomings – it failed, for example, to address the reasonably foreseeable emergency response of building collapses – as well the circumstances under which it remained deficient and disregarded by the FDNY evidence negligent conduct taking place before September 11, 2001 which resulted in injury to World Trade Center responders.

Drafted three years <u>before</u> the collapse of the World Trade Center buildings, the RPP outlines the actions the FDNY determined necessary to comply with implementing regulations of the federal Occupational Safety and Health Act concerning respiratory protection codified at 29 CFR § 1910.134.

As set forth below, however:

A. Director Headley and FDNY OSH took <u>none</u> of these mandated actions, leaving World Trade Center first responders without any APRs; and

B. Director Headley and FDNY OSH, specifically designated as responsible for the update, enforcement and administration of the RPP, admit being unaware of the plan's existence until 2002, months after the events of September 11, 2001.

### Director Headley and Counsel for the City Suppress the RPP

Director Headley explained that, in 2004, the City determined the RPP to be *"not relevant"* to any of the issues in this lawsuit. Accordingly, the City and its attorneys willfully excluded the RPP from disclosure. Plaintiffs were never advised that the document was being withheld. At the same time, the following orders and requests mandated production of the RPP:

A) Case Management Order No. 3, dated February 7, 2005: required the City's disclosure of "reasonably ascertainable documents" and detailed chronologies concerning, among other things, respiratory protection and the provision of respirators to World Trade Center Site responders[4] (the RPP was known to the City for at least a year at that time);

B) Letter of Plaintiffs' Counsel to Court and parties, dated February 28, 2005, specifying, again, that the City <u>and the FDNY</u> were to produce all documents concerning their planned dispositive motions set forth in Case Management Order No. 3;[5]

---

[4] CMO No. 3 is submitted as **Exhibit 9.** The Court describes an "extensive course of discovery" focusing on the anticipated defenses of immunity taken pursuant to CMO No. 3.

[5] The February 28, 2005 letter, sent pursuant to CMO No. 3, is submitted with **Exhibit 9.**

    **C)**    Clarifying Order Regulating Discovery, dated November 27, 2007: directing disclosure of instructions, directions and training provided by the City to firefighters for usage of respirators[6] (the RPP was known to the City for three years at that time); and, most recently,

    **D)**    Plaintiff Frank Malone's First Request for Production of Documents from the City, dated June 4, 2009, demanding: all documents concerning training by the FDNY in usage of personal protective equipment and dual-cartridge respirators.[7]

In 2004, City attorneys directed Director Headley to locate and turn over to them all documents relevant to the World Trade Center response. (**Exhibit 5**: Headley dep. tr. at pp. 140-142.) As he first explained at deposition, he unilaterally chose not to disclose the RPP: *"I did not because that document is not relevant to WTC."* (*Id.* at p. 334.) Director Headley later back-pedaled, and blamed a shadowy unit of the FDNY, known as "Document Control" for the suppression of the RPP:

> A:    It was not my responsibility to turn over that document.
>
> Q.    Whose responsibility, if anyone's, was it?
>
> A.    There is a unit in the Fire Department called Document Control. (*Id.* at pp. 445-446.)

Elissa Glasband, Esq., a member of Patton Boggs, outside counsel for the City further explained the RPP's deliberate omission, on the record at Director Headley's deposition:

> *This document (RPP) is irrelevant. It was not the policy, the respiratory policy for the World Trade Center. It is a completely irrelevant document.* (*Id.* at p. 352.)

---

[6] The Clarifying Order Regulating Discovery is submitted as **Exhibit 10**.
[7] The *Malone* request is submitted as **Exhibit 11**. Other plaintiffs designated for full discovery in 21 MC 100, including: Firefighters *Hauber; Valencia; Quinn; Traver;* and *Mills* served identical requests.

In response to questions about the six-year failure to disclose, Ms. Glasband of Patton Boggs brazenly <u>admitted</u> withholding the document intentionally:

> *If you want to know why it wasn't produced, it is because it is completely irrelevant to this case. If you want we can stay here and talk about it, but it is a waste of time... my time and particularly the witness's time.* (*Id*. at p. 409.)

It is extraordinary to have to argue, in the context of a discovery dispute, that the RPP, governing respiratory protection of FDNY personnel and in effect from 1998 through at least 2002, is relevant to the claims of FDNY firefighters who contend they were denied respiratory protection by the FDNY at the World Trade Center Site in 2001; however, the City has chosen, disingenuously, to take the position that it is not for reasons explained below.

Director Headley had every reason to prevent the disclosure of the RPP. In 2003, the FDNY recommended his termination, based upon his failure to revise and update the very same RPP. (*See* **Exhibit 6:** October 9, 2003 Memo from FDNY Chief Hay to Commissioner Scoppetta, recommending Headley's termination and outlining his failure to update the 1998 RPP.)

The City, too, had a deep interest in the suppression of the RPP. The available evidence, summarized herein, demonstrates that up until the time of the World Trade Center collapses, the FDNY suffered from systemic, deeply rooted dysfunction in the provision of respiratory protection and enforcement of federal OSHA regulations. The potential embarrassment and resulting liability flowing from the disclosure of a bungling FDNY OSH unit, unaware of its designated lead role in the enforcement of federal regulations and the development of compliant respiratory protection policies, all before September 11, 2001, are enormous.

Simply and unilaterally deeming the RPP to be "irrelevant" achieved the City's goal, making the document vanish for six years, notwithstanding a comprehensive discovery program designed by the Court and the diligent efforts of plaintiffs' counsel. Moreover, with respect to the RPP, the City ignored its legal obligation either to move for a protective order pursuant to FRCP 26(c) or assert a privilege and describe the nature of the RPP in a privilege log pursuant to FRCP 26 (b)(5)(A). This "stealth" tactic greatly prejudiced firefighter plaintiffs, and leaves them guessing as to what other relevant documents await disclosure six years into discovery.

## Prejudice Resulting from the Suppression of the RPP

The purposeful exclusion of the RPP from discovery, for over five years, is prejudicial as it prevented plaintiffs' counsel from questioning at least eight (8) witnesses, high ranking FDNY personnel, about the program's existence, its scope, and its deficiencies.[8] The scope of depositions was compromised with the result that firefighter plaintiffs scheduled for May 2010 trials have now lost the opportunity to develop their theories of liability around the RPP, its shortcomings, and the ineptitude of FDNY OSH.

The exclusion also raises serious questions about the integrity of the City's disclosure to date: what other critical documents are being withheld, even now, because the City and its so-called "document control unit" deemed them to be not relevant? For example, many of Director Headley's email communications remain withheld on similar, now suspicious "relevance" grounds (*Id.* at pp. 447-448)

A hearing is requested to determine the quantity and identity of documents, concerning the provision of respiratory protection to firefighters, withheld by the FDNY and attorneys representing the City. Plaintiffs also request that any deposition of FDNY personnel be reopened

---

[8]Because of the exclusion of the RPP, deponents not questioned about the document include, but are not limited to: FDNY Chief Hayden; former Chief (now Commissioner) Cassano; former Chief (now Deputy Commissioner) Cruthers; Chief Mundy; Chief Steinman; Chief Norman; Captain Sautner; and Chief Spadafora.

immediately, and that the City, and all responsible parties, be subject to a substantial monetary sanction, to be determined by the Court.   In addition, because of the unexcused and willful misconduct of the City, plaintiffs request that the City's answer be stricken in all 21 MC 100 cases involving members of the FDNY.

The RPP, in place before the World Trade Center response, states clearly that "*it is the policy of the FDNY to provide its employees with the personal protective equipment necessary to perform their specific work duties*." (**Exhibit 1; Exhibit 5** at p. 356).   Had the FDNY updated and adhered to its plan, as it was required to under federal law, the appropriate respiratory protection would have been available for all of its members during and immediately after the tower collapses.   Among other things, an updated plan would have addressed the foreseeability of building collapses, as acknowledged by FDNY Chiefs at deposition, and ensured that the appropriate respiratory protection, APRs, were stocked for all members.

Failing to devise and administer an effective written respiratory protection plan, as required by federal regulations, in advance of the World Trade Center building collapses, is not conduct immunized by virtue of an emergency or disaster.

The discovery process may be manipulated or rendered a farce if a party lacks integrity. The untimely production of the RPP, cavalierly explained away by the City's 2004 determination that the document was "irrelevant," is sanctionable.   As no reasonable attorney could view the RPP as "irrelevant," it is axiomatic that considerable dishonesty and bad faith were employed in its designation as such.   As this Court has noted in related litigation:

> Discovery is run largely by attorneys, and the court and the judicial process depend upon honesty and fair dealing among attorneys. Thus the court may impose appropriate sanctions on a party that, without substantial justification, fails to disclose information required by Rule 26(a) or 26(e)(2). *See* Fed.R.Civ.P. 37(c)(1). A failure to disclose under Rule 37

encompasses both the destruction of evidence, or spoliation, *and untimely production of documents and information required to be produced.*

In re September 11th Liability Insurance Coverage Cases, 243 F.R.D. 114, 125 (S.D.N.Y. 2007), citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2nd Cir. 2002).

## <u>Statement of Facts</u>: Relevance of the Respiratory Protection Program to 21 MC 100

The facts concerning the City's efforts to suppress the RPP, and the resulting prejudice to firefighter plaintiffs, are recited in detail in the introduction, and will not be repeated here. This section addresses the relevance of the RPP and the FDNY OSH unit to the contentions in 21 MC 100.

I.      Building Collapses Are Foreseeable Emergencies that FDNY Members Respond to, and 29 CFR § 1910.134(1) Mandates Appropriate Respiratory Protection for Building Collapse Responses

<u>Before</u>, during, and after the September 11th, 2001 collapse of the World Trade Center buildings, 29 CFR § 1910.134(1) and (1)(iv) mandated that the FDNY *"establish and implement a written respiratory protection program with worksite specific procedures… and procedures for proper use of respirators in routine and **reasonably foreseeable** emergency situations."* (Emphasis added.) As senior FDNY personnel acknowledged, building collapses, with dust inhalation hazards, <u>are</u> reasonably foreseeable emergency situations that firefighters respond to. If drafted in compliance with federal regulations, the RPP would have provided for the fit testing and provision of respiratory protection appropriate for firefighters when responding to building collapses.

Chief Ingram testified that building collapses are an "*expected response*" for firefighters, and that dust inhalation is a "*known hazard*" of building collapses. (**Exhibit 2**: FDNY Chief Ingram dep. tr. at pp. 7-8.)   Special Operations Chief Norman testified that "*every building collapse presents a dust inhalation hazard to responders.*" (**Exhibit 3**: FDNY Chief Norman dep. tr. at p. 35.)   According to Chief Norman, building collapses and resulting dust conditions take place most often in urban environments like New York City. (**Exhibit 3**: p. 79.)   Building collapses "*result from a variety of causes,*" and the vast majority does not arise from terrorism. Chief Norman provided a list of well-known events and circumstances triggering building collapses:

> *Fires;*
> *Earthquakes;*
> *Gas explosions;*
> *Tornadoes;*
> *Hurricanes;*
> *Aging structures;*
> *Faulty construction;*
> *Renovations made inappropriately;*
> *Construction to an adjacent property;*
> *Undermining due to damaged sewer or*
> *water mains;*
> *Overloading of roofs; and*
> *Vibrations.*

(**Exhibit 3**: pp. 79-82.)

An APR, utilizing cartridge filters to purify ambient air, rather than a self-contained breathing apparatus ("SCBA"), which is cumbersome and heavy with a limited air supply contained in a metal cylinder, is the optimum protective measure for prolonged work in a dust inhalation hazard.   Chief Norman explained that "*the long duration of a building collapse compared to a structural fire makes the use of continued respiratory protection beneficial which the SCBA does not provide.*" (**Exhibit 3**: pp. 82-83.)

This was true before September 11, 2001, and remains true, today.   In the year 2000, the FDNY equipped firefighters with APRs to conduct building collapse operations over the course of several days at a location on State Street, Brooklyn. (**Exhibit 3**: pp. 68-69.)  The RPP itself describes the usage of APRs by firefighters *"for protection against dust."* (**Exhibit 1.**)  Chief Spadafora testified that the collapse conditions at the World Trade Center made APRs the most appropriate form of respiratory protection.  In contrast, usage of heavy and limited SCBAs "*in regard to debris removal was inappropriate based on the amount of time that the members were working on the pile.*" (**Exhibit 4**: FDNY Chief Ronald Spadafora dep. tr. at pp. 13, 15-18.)  Chief Ingram, too, testified that weight of SCBAs and their limited duration were "hindrances" for WTC building collapse response. (**Exhibit 2**: pp. 62-63.)

Given the above, the FDNY should have had APRs, available at the low cost of $20 or $25 per mask,[9] for every single one of its 11,000 members on September 11, 2001, much as it provided all members with helmets, boots, and protective outerwear. These respirators would have afforded the necessary respiratory protection.  However, the FDNY admits that it only had 600 APRs in stock for the World Trade Center building collapses, and only for a handful of special units, not rank and file firefighters.  (**Exhibit 2**: FDNY Chief Ingram dep. tr. at pp. 22-23: only 600 out of 11,000 FDNY members had APRs issued to them before September 11, 2001.)

Because of this deficiency, the FDNY was left in a position of "catching up" on the day of the collapses and had to purchase thousands of APRs to create the inventory it should have had:

> *Within hours of the collapse, the FDNY advised its employees that respirators should be worn at the site and placed an order for over 5,000 respirators and 10,000 cartridges to provide its employees with the necessary respiratory protection.*

In re World Trade Center Disaster Site Litigation, 456 F.Supp.2d 520, 530-531 (S.D.N.Y. 2006).

---

[9] **Exhibit 5:**  Director Headley dep. tr. at p. 394.

This shortage of APRs caused thousands of firefighters to inhale highly caustic World Trade Center dust, and develop respiratory ailments.

## II.     According to FDNY Chiefs, Headley Does Not Have Skills Required for Success as FDNY OSH Director

One of the likely explanations for the FDNY's failure to stock an adequate supply of APRS given the likelihood of building collapses, attendant dust inhalation hazards, and its extensive experience with them, is incompetence on the part of the FDNY OSH unit.

In 2003, the FDNY sought the termination of Director Headley for, among other issues, his ongoing failure to update the subject RPP. (**Exhibit 6:** October 9, 2003 Memo from FDNY Chief Allen Hay to FDNY Commissioner Scoppetta, outlining Director Headley's failure to update the 1998 RPP.)  Chief Hay recommended that Headley "be terminated from his position." *Id.*  Chief Hay noted that federal law requires "*this Department have a written Respiratory Protection Program.  The program was written in 1998 and has not been updated since…I don't believe that he (Headley) was aware of the existence of this document for the first two years in his position.  The program has still not been updated….*" *Id.*

Frank Cruthers, the FDNY Chief of the Department concurred with the recommendation to fire Director Headley.  "*I concur with Chief Hay's decision and recommendation that Mr. Headley be removed from the position of OSHA Director. Headley does not demonstrate the skills required for success as OSHA Director.*" *Id.*

III.   **FDNY OSH Director Headley Did Not Know His Job Responsibilities Encompassed the Occupational Safety of Firefighters and Did Not Bother to Review a Written Job Description until after Taking Office**

Tennyson Headley became the Director of FDNY OSH on March 12, 2001. (**Exhibit 5** at p. 7.) Director Headley, who previously worked for the City Health & Hospitals Corporation (*id.* at p. 19) did not have any experience at any fire department. The FDNY tasked Director Headley with ensuring that all federal regulations protecting firefighters were complied with; however, Director Headley did not even understand, in March 2001, that his job encompassed uniformed personnel of the FDNY, as opposed to civilian workers. At the outset, Headley, who was never interviewed by a uniformed member of the FDNY, understood the Director's position to encompass only the protection of *civilian* employees, like secretaries:

> Q.   Were you made to understand, Director, that your responsibilities as the head of the Occupational Safety and Health Unit at FDNY would include responsibilities with respect to the uniformed personnel of the FDNY?
>
> A.   No, I was never told that.

(**Exhibit 5**: Headley dep. tr. at pp. 14-18.)

Headley never reviewed a written description of the FDNY OSH Director's position and duties (**Exhibit 8**: Written description of FDNY OSH Director's position) until he was in place, on the job.

> Q.   Director, have you ever seen this document before?
>
> A.   Yes, I have.

13

> Q.     When did you first see it?
>
> A.     Some time after I started with the
>        department in March of 2001.

(**Exhibit 5** at p. 212)

The job description states unequivocally that the Director is to *"manage the FDNY OSH and be responsible to ensure that all FDNY facilities and work environments are free of recognized hazards and unsafe conditions for **all employees**."* (**Exhibit 8**) (emphasis added).  In addition, the Director was to "insure the Department's compliance with all governmental safety and health rules, regulations, policies and procedures." *Id*.  Significantly, for the purposes of this motion, one such body of regulations was United States 29 CFR § 1910.134, governing respiratory protection for firefighters. It was not until the summer of 2001, some four months later, that Headley understood his job responsibilities to include uniformed members of the FDNY. (**Exhibit 5** at p. 38)

## IV.    Director Headley Remained Unaware of FDNY RPP and His Formal Role as Program Administrator Until 2002, after the Events of September 11, 2001

Director Headley also admitted that he was <u>unaware of the existence of the RPP until some point in the year 2002</u>, well after the response to September 11, 2001 (*Id*. at pp. 326) even though tasked with ensuring that the FDNY complied with federal Occupational Safety and Health regulations, regulations mandating an effective and updated respiratory protection program. Headley explained that, *"the question of reviewing polices at that time for me was secondary…this was something that was on the side."* (**Exhibit 5** at p. 66.)

> Q.     Did it occur to you back in March of
>        2001 when you assumed the

14

directorship of the Fire Department's
OSH Unit to search for and review,
to the extent that it existed, a written
Respiratory Protection Program?

A.      No, it did not.

(*Id.* at p. 114.)

Q:      When did you first see this document
(RPP)?

A:      Some time in 2002, late 2001, 2002.

Q:      After the events of September 11,
2001, correct?

A:      Yes, I believe so.

(*Id.* at p. 326; see also pp. 73-76.)

Director Headley was similarly <u>unaware in 2001 that, as FDNY OSH Director, he was supposed to be the RPP administrator</u>.  (*Id.* at pp. 360-361).  Reviewing the RPP at deposition, Director Headley acknowledged that the plan designated the FDNY OSH Director to be the Respiratory Protection Program Director.   Headley was unaware of this important assignment until 2002, and his reaction to learning this assignment was "concern":

> *I had a concern because there are two jobs here.  The Director's role is so involved that there is no way a Director could also be designated the Respiratory Protection Program Director.  (Id. at p. 361.)*

<u>As RPP Director, Headley was tasked with, but did not execute the following responsibilities,</u> delineated in the RPP:

A.      4.1     Develop and implement a written respiratory protection
program;

B.      4.1.2   Oversee the maintenance of all employee respirator fit
testing and training;

C.     4.1.3   Ensure that all employees receive appropriate medical evaluation and clearance before using a respirator;

D.     4.1.4   Conduct a hazard assessment to determine the need for respirator usage; and

E.     4.1.5   (A) Develop respirator specific guidelines...for type of respirator required based on hazard assessment.

(**Exhibit 1** at Sec. 4; **Exhibit 5:** Headley dep. tr. at pp. 368-374.)

Director Headley admitted that he did <u>none</u> of these important things in the year 2001, steps that would have protected firefighters responding to the World Trade Center building collapses. (*Id.* at pp. 368-374, in which Director Headley responds, serially, *"I did not"* when asked if he performed items A through E, above.)

In the context of assessment of hazards encountered by firefighters when responding to emergencies, RPP obligation 4.1.5 (A), Director Headley acknowledged that he never bothered to learn what those hazards, such as dust inhalation, would include.

Q.     Had you made in the year 2001 before September 11, 2001 any sort of assessment of the hazards firefighters encounter when responding to calls?

A.     No, I did not.

(**Exhibit 5**: Headley dep. tr. at pp. 349-350.)

Q.     During that initial six-month period of time of your tenure as Director, before the events of September 11th, did you come to have a working understanding or familiarity with the types of emergency situations that uniformed FDNY personnel would respond to?

16

> A.     No, I did not.

> (*Id.* at pp. 69-70.)

Director Headley worked in ignorance of one of the most common hazards faced by firefighters, as he was not even *"generally aware that firefighters often respond to situations regarding building collapses."* (*Id.* at p. 70.)  By taking the depositions of Chiefs Norman and Ingram, who confirm that responding to building collapses is essentially routine, Plaintiff's counsel has learned more about the foreseeability of building collapse responses for firefighters in several months than Headley has learned in nearly a decade of service as FDNY OSH Director.

Director Headley acknowledged ignorance of the type of work performed by the FDNY members he was supposed to protect:

> Q.     How much do you know about firefighting?

> A.     Not very much.   (*Id.* at p. 451.)

This lack of knowledge is inexplicable given the responsibilities of the FDNY OSH Director position and the requirements of 29 CFR § 1910.134 for respiratory protection programs. The federal regulations mandate that the FDNY, as "the employer shall designate a program administrator who is qualified by appropriate training or experience that is commensurate with the complexity of the program to administer or oversee the respiratory protection program." 29 CFR § 1910.134(3).

It is astonishing, then, that this same individual was entrusted with the respiratory protection, safety, health and lives of New York City firefighters. It is almost as shocking that

Director Headley, alone or in conjunction with City attorneys, made determinations as to what disclosures concerning respiratory protection were relevant in the 21 MC 100 litigation.

> ## V. Although FDNY OSH Was Created to Ensure FDNY Compliance with Federal Regulations, Including Those Governing Respiratory Protection Programs, Director Headley Remained Unaware of RPP Non-Compliance

FDNY OSH was created at the time of Headley's hiring in 2001 (**Exhibit 5** at p. 8) to bring the FDNY into compliance with federal OSHA regulations. (**Exhibit 7**: August 2003 FDNY memo from Chief Hay to Chief Cruthers.) Headley acknowledged that one of the mandates of his office was to provide FDNY members with the personal protective equipment needed to perform their work duties. (**Exhibit 5**: Headley dep. tr. at p. 359.) By August 2003, Chief Hay determined it apparent that Director Headley was not "*capable of bringing this Department into compliance with the myriad OSHA rules as specified in CFR 1910.*" (**Exhibit 7**.) Among other things, Chief Hay noted, the FDNY remained non-compliant with respect to a Respiratory Protection Program, last updated in 1998: "*Presently, this Department is not in accord with the OSHA requirements regarding a written Hazard Communications Policy, a* **Respiratory Protection Program** *and site specific Emergency Response plans.*" *Id.*

The conclusions of Chief Hay concerning the non-compliance of the RPP, and, therefore, the FDNY, with 29 CFR § 1910.34 no doubt astonished Director Headley, who testified as follows:

> Q.     Director Headley, at any point during your tenure as Director at FDNY, were you ever told that an FDNY written Respiratory Protection Program was not in compliance with Federal OSHA regulations?
>
> A.     No, I was not.

> Q.   Director Headley, were you ever
> made aware by any mechanism that
> an FDNY written Respiratory
> Protection Program was not in
> compliance with OSHA regulations?
>
> A.   No, I was not.
>
> Q.   In your capacity as FDNY OSH
> Director, did you at any point in time
> since March 12, 2001 yourself
> determine that the written
> Respiratory Protection Plan of the
> FDNY did not comply with OSHA
> requirements?
>
> A.   No, I did not.
>
> (**Exhibit 5** at pp. 53-54)

At the same time, given his training in occupational safety and health, Director Headley

was aware that 29 CFR § 1910 mandated the review and update of respiratory protection

programs as warranted, notwithstanding that he never performed such a review and update:

> Q.   Are written Respiratory Protection
> Programs mandated, as far as you
> understand, by OSHA Section 1910?
>
> A.   Yes.
>
> Q.   Is the periodic re-evaluation and
> reassessment of the written
> Respiratory Protection Programs
> mandated by OSHA Section 1910?
>
> A.   Yes, it is.
>
> (*Id.* at p. 109.)

Director Headley also admitted that, in 2001, the FDNY remained in violation of OSHA regulations by not having appropriate fit testing of APRs available.   Although issued an APR shortly after joining FDNY, Director Headley could not get fit tested:

> Q.   If an employer is providing any of its employees with an air purifying respirator, should that employer to comply with OSHA regulations have a fit testing program?
>
> A.   Yes, according to the law.
>
> Q.   So the air purifying respirator that you referred to driving around in your vehicle, that was actually given to you by the FDNY?
>
> A.   Yes.
>
> Q.   Would you have been able to get that APR fit tested at the FDNY had you chosen to?
>
> A.   I doubt very much.
>
> Q.   What makes you say you doubt very much?
>
> A.   Because there was nobody there to do it and by that, I mean qualified to do it.  They would do it, but they weren't qualified to do that.
>
> (*Id*. at pp. 111-113.)

## VI.   The RPP is Evidence of Systemic Respiratory Protection Failure at the FDNY Pre-9/11

As set forth above, and described further below, the state of respiratory protection at the FDNY before September 11, 2001 can only be described as chaotic and in violation of federal OSHA standards.   Director Headley, the designated administrator and compliance officer for

respiratory protection admitted total unawareness of the existence of the RPP and his primary responsibilities concerning its administration until well after 2001.   This exceedingly high level of disorganization, although an imminent threat to the health and safety of FDNY personnel, is simply not the type of "emergency" that the State Defense Emergency Act and other statutes invoked by the defendants immunize.   The FDNY should not be immunized from liabilities arising from its dysfunctional respiratory protection "system."

Given what has been learned, in the past week, about the devastating impact caused by the failure of the FDNY to update and maintain a comprehensive, OSHA compliance respiratory protection program, Plaintiffs must be given the opportunity to depose, again, all FDNY witnesses to examine them about the RPP.

For example, *Section 1.1* of the RPP states, plainly, that Director Headley was to *"designate"* a section of the FDNY, known as the *"Mask Service Unit ("MSU") to implement and administer the program for members using self contained breathing apparatus."* (**Exhibit 1** at pp. CITY 21 MC 100 13444751.)  The MSU Officer in Charge was to ensure compliance and oversee the program, to the extent it concerned SCBA, for all FDNY units, including *"Divisions, Battalions, Ladder Companies, and Engine Companies."*

Captain James Carpenter served as the MSU Officer in Charge in the years 2000 through 2003.  Although in charge of SCBA issuance and maintenance, Captain Carpenter had no training or certification in industrial hygiene or occupational safety and health.

> Q.   Have you taken any classes in the field known as industrial hygiene?
>
> A.   No.
>
> Q.   Have you taken any classes in occupational safety and health?

A.      No.

(**Exhibit 12**: Captain Carpenter dep. tr. at p. 68.)

Carpenter demonstrated true unfamiliarity with respiratory protection at his deposition.

Q.      Have you heard of air purifying respirators referred to as APR's?

A.      I would say I heard of them and I had somewhat I guess knowledge of seeing some of these at some point, but I didn't have a lot of knowledge.

(*Id.* at p. 8.)

At no time during Captain Carpenter's tenure as the officer in charge of the MSU, did FDNY OSH communicate with him.  During his tenure, he was not aware of the existence of the RPP.  At no time did he execute the duties and responsibilities of the RPP.  He had never even seen the RPP until his deposition, on February 12, 2010:

Q.      Are you familiar with something known as the OSHA Unit of the Fire Department of New York?

A.      I have heard of it.

Q.      As best you can recall, Captain, can you tell me when you first heard of the OSHA Unit of the FDNY?

A.      No.

Q.      Did you at any point in your capacity as Commanding Officer of the Mask Service Unit meet with anyone from the FDNY OSHA Unit?

A.      No, not that I know of.

> Q.    Did you at any point during your
>        tenure as Commanding Officer of the
>        Mask Service Unit receive any
>        memoranda or bulletins from a unit
>        identifying itself as FDNY OSHA?
>
> A.    I don't recall.
>
> Q.    Are you familiar with something at
>        the FDNY as it existed back in the
>        year 2000 known as a Respiratory
>        Protection Program?
>
> A.    I don't recall.
>
> Q.    The same question for 2001.  During
>        that year, did you ever review or read
>        something known as a written
>        Respiratory Protection Program of
>        the FDNY?
>
> A.    Not that I recall.

(*Id.* at pp. 27-28.)

Finally, shown the RPP in effect during his tenure, Captain Carpenter acknowledged never having seen it until 2010:

> Q:    Have you ever seen this document
>        (**Exhibit 1**: RPP)  before today?
>
> A.    This document, no, not that I recall.

(**Exhibit 12** at p. 34.)

Carpenter then admitted he did not carry out the responsibilities of the RPP, delineated as his duties in **Exhibit 1** at p. 013444751, for the following units (i.e., essentially, the entire FDNY):

> *FDNY Haz-Mat;*
> *Rescue Companies;*
> *Squad Companies;*

> *Support units;*
> *Divisions;*
> *Battalions;*
> *Ladder Companies;*
> *Engine Companies; and*
> *Support Units.*
>
> (*Id.* at p. 40-46.)

Of course, too, Captain Carpenter did not even know who FDNY OSH Director Tennyson Headley was.  (*Id.* at p. 30.)

# ARGUMENT

## A.    The RPP is Relevant

It is extraordinary to have to argue, in the context of a discovery dispute, that the RPP, governing respiratory protection of FDNY personnel and in effect from 1998 through at least 2002, is relevant to the claims of FDNY firefighters who contend they were denied respiratory protection by the FDNY at the World Trade Center Site in 2001; however, the City has chosen, disingenuously, to take the position that it is not.  FRCP 26 includes within the scope of discovery materials "relevant to any party's claim or defense" as well as materials "reasonably calculated to lead to the discovery of admissible evidence."    Accordingly, whether a document is relevant or not is not the end of the inquiry. Whether its disclosure might lead to the discovery of relevant materials is also a consideration.  It is inconceivable that an attorney, proceeding in good faith, could possibly claim that the RPP has no bearing, directly or indirectly, on the respiratory protection issues raised in 21 MC 100.

Moreover, as the RPP concerns compliance with or breaches of federal OSHA regulations, is uniquely relevant to plaintiffs' claims brought pursuant to Section 205-a of New York's General Municipal Law.

Plaintiffs allege causes of action under Section 205-a of the General Municipal Law against the City, which provides:

> SECTION 205-a.   ADDITIONAL RIGHT OF ACTION TO CERTAIN INJURED OR REPRESENTATIVES OF CERTAIN DECEASED FIREMEN.
>
> In addition to any other right of action or recovery under any other provision of law, in the event any accident causing injury, death . . . occurs directly or indirectly as a result of any neglect, omission, willful or culpable negligence of any person or persons in failing to comply with the requirements of any of the statutes, ordinances, rules, orders and requirements of the federal, state, county, village, town or city governments, or of any and all their departments, divisions and bureaus, the person or persons guilty of said neglect, omission, willful or culpable negligence at the time of such injury or death shall be liable to pay any officer, members, agent or employee of any fire department injured or whose life may be lost while in the discharge or performance at any time or place of any duty imposed by the Fire Commissioner, Fire Chief or other superior officer of the fire department, or to pay to the wife and children or to pay to the parents, or to pay to the brothers and sisters, being the surviving heirs at law of any deceased person thus having lost his life, a sum of money, in case of injury to person, not less than ten thousand dollars, and in case of death not less than forty thousand dollars, such liability to be determined and such sums recovered in an action to be instituted by any person injured, or the family or relatives to any person killed as aforesaid.

Under this statute, any person, whether an owner of property or an employer, as here, who violates any statute, ordinance, rule, order or regulation, and such violation causes, either directly or indirectly, injury to a firefighter, that person is absolutely liable to the firefighter.  McGee v. Adams Paper & Twine Co., 271 N.Y.S.2d 698 (1st Dep't 1966), aff'd, 20 N.Y.2d 921, 286 N.Y.S.2d 274 (1967).

The imposition of liability based on Section 205-a of the General Municipal Law arises as a result of the violation of an underlying statute, ordinance or rule.  Moreover, the responsible party need not have been actually cited for a violation at the time of the occurrence.  Rather, the existence of an uncorrected violation alone triggers liability.

25

OSHA regulations, such as 29 CFR § 1910.134 are a predicate for a claim under GML § 205-a:

> The OSHA regulations that require protective clothing for a firefighter's head, body and extremities (29 CFR 1910.156[e][2] and [3] ) can serve as a predicate to a claim under GML § 205-a because they are part of a well developed body of law and regulation and they impose a clear legal duty (*see, Gonzalez v. Iocovello,* 93 N.Y.2d 539, 551, 693 N.Y.S.2d 486, 715 N.E.2d 489; *see also, New York City Transit Authority v. New York State Department of Labor,* 88 N.Y.2d 225, 228, 644 N.Y.S.2d 463, 666 N.E.2d 1336; Labor Law § 27-a[4]; 12 NYCRR 800.3). The duty is no less clear because the City may choose one or the other given method of compliance, *i.e.,* either a fire-resistive coat with fully extended boots or a fire-resistive coat with protective trousers (29 CFR 1910.156[e][3][I] ). Either way, the ultimate objective is to provide full body protection.

> <u>McGovern v. City of New York</u>, 742 N.Y.S.2d 218, 220 ( App. Div., 1st Dept. 2002).

In 21 MC 100, available evidence demonstrates that the City violated 29 CFR § 1910.134 in myriad ways including: A) the failure to update the RPP as was necessary; B) the failure to provide for the respiratory protection of firefighters; C) the failure to have a qualified and competent respiratory protection program administrator; D) the failure to assess reasonably foreseeable emergency situations and determine the appropriate respiratory protection; E) the failure to conduct hazard assessment evaluations to determine the need for respirator use; F) the failure to develop respirator-specific guidelines that included, but were not limited to: i) type of respirator required (based upon hazard assessment); ii) training and fit-testing criteria; iii) maintenance and cleaning procedures; and iv) guidelines for use.[10]

---

[10] 29 CFR § 1910.134 provides: (1) In any workplace where respirators are necessary to protect the health of employees...the employer shall establish and implement a written respiratory protection program with worksite specific procedures. *The program shall be updated as necessary to reflect those changes in workplace conditions that affect respirator use.* The employer shall include in the program... (iv) procedures for proper use of respirators in reasonably foreseeable emergency circumstances; (3) The employer shall designate a program administrator who is qualified by appropriate training or experience that is commensurate with the complexity of the program to administer or oversee the respiratory protection program and conduct the required evaluations of program effectiveness; (4)(d)(iii) the employer shall identify and evaluate the respiratory hazards in the workplace.

Accordingly, the RPP should have been produced to plaintiffs years ago or, at minimum, as set forth below, properly flagged by the City for exclusion from discovery and identified, with precision, to plaintiffs.

### B. The City Failed to Assert a Privilege or Seek a Protective Order in Connection with Suppression of the RPP, Thereby Depriving the Plaintiffs of the Opportunity to Learn of Its Existence

The City ignored its legal obligation either to move for a protective order pursuant to FRCP 26(c) or assert a privilege and describe the nature of the RPP in a privilege log pursuant to FRCP 26(b)(5)(A).   Such proper steps would have identified the document to plaintiffs' counsel, and enabled them to prepare counter-arguments for the RPP's disclosure.   Instead, the City dishonestly and unilaterally deemed the RPP "irrelevant" and chose to deny its existence altogether.   This tactic rendered the RPP, and countless other materials, "stealth documents" that do not appear on the radar screen of discovery.

### C. The Law Governing FRCP 37 Sanctions

The discovery process may be manipulated or rendered a farce if a party lacks integrity. The untimely production of the RPP, cavalierly explained away by the City's 2004 determination that the document was "irrelevant," is sanctionable.   As no reasonable attorney could view the RPP as "irrelevant," it is axiomatic that considerable dishonesty and bad faith were employed in its designation as such.   As this Court has noted:

> Discovery is run largely by attorneys, and the court and the judicial process depend upon honesty and fair dealing among attorneys. Thus the court may impose appropriate sanctions on a party that, without substantial justification, fails to disclose information required by Rule 26(a) or 26(e)(2). *See* Fed.R.Civ.P. 37(c)(1). A failure to disclose under

> Rule 37 encompasses both the destruction of evidence, or spoliation, *and untimely production of documents and information required to be produced.*
>
> In re September 11th Liability Insurance Coverage Cases, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2nd Cir. 2002).

The criteria this Court examined to assess sanctions in the World Trade Center insurance disputes may be employed here.

> The moving party bears the burden of showing that its adversary failed timely to disclose information required by Rule 26. To meet this burden, the moving party must establish "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id.*

As set forth above, the RPP is responsive to two Court orders, one discovery notice, and, in addition, the disclosure requirements of FRCP 26. The production of the RPP, coming on February 4, 2010, is nothing but untimely, coming a full five years after discovery began, and six years after it was first identified, deemed "irrelevant" by the City and suppressed.

The plaintiffs demonstrate that, at minimum, the City and its attorneys conducted discovery in bad faith by shielding this document from public view, until nearly the eve of trial, with the simple, disingenuous label of "not relevant." Accordingly, the "culpable state of mind" element is satisfied by a showing that "a party has breached a discovery obligation ... through bad faith or gross negligence [or] ordinary negligence." *Id.*

Moreover, "bad faith" is not even required for the imposition of FRCP 37 sanctions. "Since Rule 37(c)(1) by its terms does not require a showing of bad faith, we now hold that such a requirement should not be read into the Rule. With respect to the third element, a finding that a

party breached its discovery obligations in bad faith is sufficient to establish the relevance of untimely produced or destroyed evidence as a matter of law; a finding that a party breached its obligations through gross negligence is 'frequently' sufficient." *See* <u>Residential Funding</u>, 306 F.3d at 109.

### D.    Remedy Sought

In addition to a hearing and monetary sanctions, the plaintiffs request that the answer of the City be stricken in all 21 MC 100 cases involving members of the FDNY. The basis for this application is the willfulness of the conduct at issue. Moreover, we request that the Court inquire as to the quantity and identity of other documents, shielded from disclosure through the designation "irrelevant." The revelations of other relevant documents, similarly suppressed, may give rise to additional sanctions hearings as other affected plaintiffs, non-firefighters, come to ascertain the prejudice their cases sustained as a result. This Court has broad discretion in imposing discovery sanctions. "Discovery under the Federal Rules of Civil Procedure is designed to function free from the delay and costs of court intervention." <u>Ashkinazi v. Sapir</u>, 2005 WL 937597 at *4 (S.D.N.Y. 2005). Severe sanctions are appropriate "[w]hen a party seeks to frustrate this design by disobeying discovery orders." <u>Daval Steel Products, a Div. of Francosteel Corp. v. M/V Fakredine</u>, 951 F.2d 1357, 1367 (2nd Cir. 1991). Severe sanctions may include entry of a default judgment or the striking of an answer. *Id*., citing <u>Nat'l Hockey League v. Metro. Hockey Club, Inc.</u>, 427 U.S. 639, 643 (1976) "Severe sanctions are justified…when the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable." <u>Daval Steel Products</u>, 951 F.2d at 1367.

29

## CONCLUSION

For the reasons set forth above, the Plaintiffs respectfully request that a hearing be held to determine the quantity and identity of documents, concerning the provision of respiratory protection to firefighters and fire officers, withheld by the FDNY and attorneys representing the City. Plaintiffs also request that any deposition of FDNY personnel be reopened immediately, and that the City, and all responsible parties, be subject to a substantial monetary sanction, to be determined by the Court. In addition, because of the unexcused and willful misconduct of the City, plaintiffs request that its answer be stricken in all 21 MC 100 cases involving members of the FDNY.

Dated: New York, New York
       February 16, 2010

                              Respectfully submitted,

                              SULLIVAN PAPAIN BLOCK MCGRATH
                              & CANNAVO P.C.

                              Andrew J. Carboy (AC 2147)
                              Attorneys for Plaintiffs
                              120 Broadway
                              New York, New York 10271
                              (212) 732-9000