UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE WORLD TRADE CENTER DISASTER SITE LITIGATION | 21 MC 100 (AKH) |
| THIS DOCUMENT RELATES TO ALL CASES | |

# CERTIFICATION OF ANDREW J. CARBOY IN FURTHER SUPPORT OF THE APPLICATION OF SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO P.C. FOR REIMBURSEMENT OF COMMON BENEFIT EXPENSES AND IN RESPONSE TO THE NAPOLI FIRM'S OBJECTIONS

Andrew J. Carboy, an attorney duly admitted to practice law in the State of New York and the Southern District of New York, being duly sworn, deposes and says as follows:

1. I am a member of the law firm of Sullivan Papain Block McGrath & Cannavo P.C. ("Sullivan Papain"), a firm serving as Co-Liaison Counsel for the plaintiffs in 21 MC 100.

2. This certification is submitted in further support of Sullivan Papain's July 27, 2010 application, pursuant to the Court's June 25, 2010 Order, for reimbursement of expenses incurred on behalf of all plaintiffs in the docket ("Common Benefit Expenses"). The amount of Common Benefit Expenses incurred by Sullivan Papain totals $222,063.63. We anticipate submission of an additional $25,000.00 in such expenses,

shortly, for categories of costs submitted by the Napoli firm, but not yet claimed by this office.[1]

3. The 689 plaintiffs represented by Sullivan Papain are but a tiny fraction (6.4%) of the 10,771 total cases in 21 MC 100; however, the work performed over the past six years by Sullivan Papain was quite substantial, well in excess of the firm's proportionate share of clients, and beneficial to all plaintiffs.[2] For example, twenty-five percent (25%) of the twelve (12) bellwether cases that were selected to go to trial in May 2010 are represented by Sullivan Papain - *Estate of Hauber* (05 CV 9141), *Frank Malone* (04 CV 8746), and *Harold Valencia* (07 CV 6461). In addition, another seven (7) Sullivan Papain cases were designated for full discovery.

4. Sullivan Papain has made other critical contributions throughout this litigation which have benefited all plaintiffs in the 21 MC 100 litigation, including, but not limited to: drafting briefs at both the trial and appellate levels on all dispositive and otherwise important motions; conducting, defending and/or appearing at over 90 depositions; consulting with over 60 medical, environmental and science experts; conducting intensive discovery in our bellwether trial cases; and serving as an integral part of the two-year long settlement negotiations and drafting of the 104-page settlement agreement. We performed this work in a docket flooded with over 2,500 uninjured Napoli firm clients, as detailed below. The inclusion of these "cases" complicated both the Court's management of the docket, increased the amount of work borne by all parties as the Court imposed increasingly stringent disclosure requirements to ascertain the

---

[1] This additional submission would include online legal research charges.

[2] Sullivan Papain will be submitting, at the appropriate time, a comprehensive memorandum setting forth all of the work it performed in the 21 MC 100 litigation in objection to the Napoli firm's claim for Common Benefit Fees from this firm.

2

nature of the cases filed, and became a flash point in the media and among injured plaintiffs.

5. As evidenced by its recent filings concerning its bid to recoup interest and other expenses, the Napoli firm took on the 21 MC 100 litigation with neither the money to pay for it nor sufficient attorney staffing. Accordingly, the Napoli firm outsourced much of the legal work, then financed, with outside loans, tens of millions of dollars in claimed costs, and now seeks to pass the resulting extra charges on to injured 9/11 workers.

6. Unlike the Napoli firm, Sullivan Papain did not need to take loans to finance its cases and pass exorbitant interest on to World Trade Center responders. Because Sullivan Papain is staffed with skilled, experienced attorneys who were able to perform all of the work they were hired to do, Sullivan Papain did not need to hire "specialized" outside counsel and pass the legal fees of those additional attorneys on to its plaintiffs as "expert costs," over and above the agreed-to and Court-approved 25% contingency fee. We do have, however, certain Common Benefit Expenses eligible for reimbursement.

7. We respond to the August 25, 2010 objections of the Napoli firm to our application. Specifically, the Napoli firm contends that work performed by Sullivan Papain on the sample trial cases and many of the discovery cases did not meaningfully contribute to the settlement for all plaintiffs, and that "the effect of any cases set for trial was minimal." (Napoli objection at par. 7) However, this assessment of the value of the Court's trial bellwether program is contradicted by previous statements issued by the

3

Napoli firm, including the following, posted on one of its websites, 1-877-WTC HERO. COM:

> *these first...cases will pave the way for hundreds of other cases to reach out of court settlements and thereby avoid having to wait years for their respective court trials*

8. In addressing the Napoli firm's unsubstantiated objections to our claimed Common Benefit Expenses, we first provide the following factual overview of our firm's involvement in 21 MC 100.

9. Sullivan Papain began representing firefighters with World Trade Center illnesses in November 2001, when it first served Notices of Claim against the City of New York ("City").[3] Thereafter, we commenced actions in the Southern District of New York. Today, this office now has one of the oldest cases in the 21 MC 100 docket, *Ralph Pepe* (02 CV 10270).

10. With the single exception of the *Pepe* action, Sullivan Papain's first wave of 21 MC 100 cases resolved in 2003, with most plaintiffs opting into the September 11th Victim Compensation Fund ("VCF").[4] Working in conjunction with the Uniformed Firefighters Association, the labor union representing 8,000 New York City firefighters ("UFA"), Sullivan Papain lobbied Congress to create the VCF.

11. On a completely *pro bono* basis, Sullivan Papain then represented 362 firefighters and families of deceased firefighters, recovering $265 million in compensation from the VCF, an effort that earned the firm the National Law Journal's

---

[3] In addition, in 2002, the firm brought several hundred applications for leave to file late Notices of Claim in New York State Supreme Court. All were granted.

[4] A small number of plaintiffs elected to discontinue their actions with a reservation of rights to bring a lawsuit in the future in the event that they became stricken with a new, debilitating illness or injury or developed the signs or symptoms of a disease, as is allowed under CPLR § 214-c.

2004 *Pro Bono* Award. Because of our advocacy on behalf of workers with World Trade Center-related illnesses, specifically, respiratory ailments such as asthma and reactive airways dysfunction, injured first responders continued to seek our representation, even after the expiration of the VCF deadline for claims submission, December 22, 2003. Accordingly, our role in the World Trade Center litigation that continues today arose directly from our Victim Compensation Fund work.

12. In May 2004, five months after the closure of the VCF, Sullivan Papain initiated its second wave of applications for leave to file late Notices of Claim for injured World Trade Center responders, on behalf of firefighters *John Miskanic* (04 CV 8288) and *Robert Gallagher* (04 CV 8283). Shortly thereafter, Sullivan Papain began filing new complaints in the Southern District of New York.

13. On September 8, 2004, the Court appointed Sullivan Papain, along with the Napoli firm, as Plaintiffs' liaison counsel in 21 MC 100. Appropriately, much of the work completed by this office benefited all plaintiffs in the 21 MC 100 docket, including the prosecution of the bellwether trial cases. These cases were not "individual" cases in the strict sense, as the Napoli firm argues, but rather were a means to reach an ultimate settlement. Accordingly, costs incurred by Sullivan Papain in the prosecution of those cases are properly treated as Common Benefit Expenses.

## I. Representing Less than 7% of the Docket, Sullivan Papain Represented 25% of the Bellwether Plaintiffs

14. As set forth above, twenty-five percent (25%) of the twelve (12) bellwether cases that were selected to go to trial in May, 2010 are represented by Sullivan Papain, with another seven (7) Sullivan Papain cases designated for full discovery.

5

As this Court noted on June 10, 2010, in the context of the settlement:

*We had a discovery process that worked the lawyers very, very hard, ending with cases that were sampled and ready for trial.*

Counsel for the WTC Captive Insurance Company, too, observed:

*Your Honor well knows that because these cases are so difficult, you could only schedule 12 cases for trial, only 12 cases out of 10,000 were scheduled for trial beginning on May 16.*

15.     There can be no dispute that the pressures of the discovery and bellwether trial program, culminating in dispositive motion practice and anticipated Daubert hearings and jury trials, precipitated the settlement agreements negotiated in March and June of 2010 that benefited all plaintiffs. On its website, the Napoli firm characterized the common benefit of the bellwether trial program as follows:

> *favorable verdicts and settlements in these first 30 cases[5]* **will pave the way for hundreds of other cases to reach out of court settlements** *and thereby avoid having to wait years for their respective court trials.*

16.     Treating disbursements incurred on the development of bellwether cases as Common Benefit Expenses is well-established. For example, in *Genetically Modified Rice Litigation*, 2010 WL 716190 at *5 (E.D. Mo. 2010), the Court granted the establishment of a common cost fund, finding:

> the (attorney) leadership group's work in discovery, motion practice, and the **bellwether** trials has provided a foundation for all of the cases involved in the litigation. Evidence about what Bayer did in developing and distributing the genetically modified rice is central to the proof on all the claims in this litigation. This evidence was exclusively within Bayer's control, and the only realistic way for the evidence to be developed was through the type of centralized discovery that the leadership group conducted. It would not have been possible for thousands of plaintiffs to separately obtain discovery from Bayer, and that, of course, is part of the reason the cases were combined.

---

[5] The bellwether trial program was later modified by the Court to a smaller number of twelve (12) cases.

The Court is also referred to *In re Bausch & Lomb Contact Lens Solution Products Liability Litigation,* 2008 WL 2330571 at *3 (D.S.C. 2008) ("payments may be made from the Common Benefit Fund to attorneys who provide services or incur expenses for the joint and common benefit of plaintiffs ... including services provided and expenses incurred in preparation and trial of the **bellwether** cases.")

17. There can be little doubt that the Napoli firm, too, benefited from the disproportionate inclusion of Sullivan Papain plaintiffs in the bellwether program. All of our bellwether clients had injuries, and documented World Trade Center service as members of the FDNY. In contrast, as investigated by the Associated Press and reported on February 8, 2010, Mr. Napoli's cases were fraught with problems so extreme that a reasonable attorney might conclude that their inclusion threatened ultimate global settlement. According to news reports, the Napoli firm trial cases included:

> *One demolition worker who said he developed health problems after toiling for six months in the toxic ruins of the World Trade Center has actually been severely ill since the 1990s. In a previous medical malpractice case, he said he was so sick between 2000 and 2003 that he couldn't work regularly. He never mentioned 9/11 during his testimony in that lawsuit.*
>
> *Lawyers for a police officer from northern New Jersey who died in 2006 claimed in a court filing that he spent nearly 300 days handling debris at ground zero, but his work records indicate that his actual time and duties related to 9/11 were far more limited. During the months the lawyers said the man worked at ground zero, he was recording full-time shifts in Cresskill, N.J.*
>
> *Another police officer who was listed by her lawyers as having lung cancer, doesn't have cancer at all. Her actual illness involves something akin to chronic asthma. She insists her lawyers were mistaken*
>
> See, Associated Press, *As 9/11 Health Trials Loom, First Cases Include Some with Credibility Problems,* February 8, 2010, David B. Caruso.

7

We note that fewer than 50% of the Napoli firm's clients are ranked as Tier 4, the most seriously injured level in the proposed settlement. 26% of the docket, some 2,600 individuals all represented by the Napoli firm, are ranked as Tier 1 or non-injured. In contrast, 88% of Sullivan Papain's clients are ranked as Tier 4; ***none*** of our clients are ranked as Tier 1.

### Other Common Benefit Work Performed by Sullivan Papain
### <u>Justifying Reimbursement of Common Benefit Expenses</u>

18. Sullivan Papain, on behalf of all plaintiffs, briefed all important dispositive, discovery and other motions in the Southern District of New York. At the appellate level, this office:

> A. Briefed the issue of whether Air Transportation Safety and System Stabilization Act of 2001 ("ATSSSA") (codified as amended at 49 U.S.C. § 40101), created a federal cause of action over which the federal court had exclusive jurisdiction, and thus preempted plaintiffs' New York State common law claims. *In re WTC Disaster Site,* 414 F.3d 352 (2d Cir. 2005);

> B. Briefed whether ATSSSA preempted the City's assertion of various immunity defenses to the claims raised in 21 MC 100, and, assuming arguendo, that there was no such preemption, opposed the application of the immunity defenses. *In re World Trade Center Disaster Site Litigation,* 521 F.3d 169 (2d Cir. 2008); and

> C. Moved to reargue, as *amicus curiae,* the Appellate Division, First Department's decision in *Felder v. City of New York,* 842 N.Y.S.2d 404 (1st Dept. 2007), that the Southern District of New York was the appropriate venue in which to bring a late notice of claim application, notwithstanding that this Court previously ruled that such applications were to be made in New York State Supreme Court. The First Department's original decision left the 21 MC 100

plaintiffs with no venue to bring a late notice of claim application. In direct consequence of our briefing, the Appellate Division reversed itself, vacating its previous decision. *Felder v. City of New York*, 862 N.Y.S.2d 36, 37 (1st Dept. 2008) recognized that New York State Supreme Court is the appropriate venue for late notice of claim applications.

19. During merits discovery of the bellwether cases, which commenced in June 2009, Sullivan Papain conducted *all* of the discovery concerning the respiratory protection that the Fire Department of New York ("FDNY") provided to its members at the World Trade Center Site. We deposed knowledgeable commissioners, chiefs, fire officers and civilian employees. Also, because the FDNY served as overall "Incident Commander" of World Trade Center rescue and recovery, its responsibilities with respect to environmental safety and health encompassed not just firefighters but every worker at the site; accordingly, discovery taken from the FDNY benefited *all* 21 MC 100 plaintiffs, firefighters and non-firefighters alike.

20. During the first phase of discovery, in 2005 and 2006, this office worked extensively to investigate the City and other defendant's claimed defenses of immunity, taking depositions and reviewing documents. Our involvement was so extensive at that stage that we co-authored the seventy (70) page Federal Rule of Civil Procedure 56 factual statement with the Napoli firm **(Exhibit 1)** and the over one hundred (100) page memorandum of law in opposition to defendants' motion for dismissal based upon immunity grounds. **(Exhibit 2)** Because our work in opposing the motion to dismiss benefited all plaintiffs in 21 MC 100, many costs we incurred are Common Benefit Expenses, including transcripts of depositions we either took or obtained and then reviewed in preparing the aforementioned submissions

9

Parenthetically, we note that one of the counsel who co-authored the brief (**Exhibit 2**), David Ruescher, also appeared for oral argument of the motion. He is even listed as plaintiffs' co-counsel in this Court's 2006 decision. *In re World Trade Center Disaster Site Litigation*, 456 F. Supp. 2d 520, 523 (S.D.N.Y. 2006). Attorney Ruescher's legal fees are now improperly claimed to be a Common Benefit Expense by the Napoli firm.

## II. Charges Incurred in Prosecution of Bellwether Cases are Common Benefit Expenses

21. Notwithstanding its reasonable and substantiated conclusion, posted on its website, that the bellwether trial cases *"paved the way for hundreds of cases to reach out of court settlements,"* the Napoli firm now disputes that bellwether cases, at least those prosecuted by Sullivan Papain resulted in any common benefit. Instead, the Napoli firm contends that the costs we incurred in preparing such cases are actually individual case costs. Not only is this incorrect-the bellwether cases were the engine that drove the global settlement-the Napoli firm holds itself to a double-standard, and seeks substantial reimbursement for costs associated with *its* bellwether cases. Of the $1.392 Million sought by the Napoli firm in Common Benefit Expenses, nearly fifty percent, $608,894.51, was expended since June 1, 2009, the start of bellwether discovery.

22. Sullivan Papain does not seek reimbursement in any case of: individual medical records; employment records and past expert review of the case. Such expert reviews, for example, were conducted for the applications to file a late Notice of Claim against the City. Instead, we seek reimbursement for expenses incurred retaining and

10

consulting with experts in various medical and scientific disciplines for the bellwether cases only.

23. The Court and the Napoli firm were provided with an unredacted list of the experts retained by Sullivan Papain during bellwether discovery. Many of the experts retained were experts hired by Sullivan Papain and shared with the Napoli firm during bellwether discovery. From a review of the Excel spreadsheets submitted by the two firms, the Court will note that <u>most of the experts hired during the bellwether discovery program were hired by Sullivan Papain</u>. During 2009 and early 2010, regular conference calls and meetings were held with experts, Sullivan Papain and Napoli firm attorneys. Several live presentations by leading scientists were held at our office, and Mr. Napoli and his associate attended these. In some instances, as in the case of Dr. Kamelhar[6], both offices retained the same experts, and both offices seek reimbursement of those experts' costs.

24. For many of these experts to complete their work as consultants and potential witnesses, they needed to examine our bellwether plaintiffs and review discovery taken in their cases.

25. With respect to the depositions taken in the Sullivan Papain bellwether cases, the dates of which and the identity of the witnesses are set forth in detail in our initial application, we note the following. First, in many instances, the Napoli firm fails in any meaningful way to describe the depositions it seeks reimbursement for. For example, PDF link #572 is described as a 2010 bill for over $24,000 in deposition transcripts. No information is provided as to the identity of the witnesses. Second, this

---

[6] The Napoli firm was provided with a list of Sullivan Papain-retained experts in confidence; however, it has seen fit to reveal the names of the experts in a public filing.

11

office seeks reimbursement of deposition costs totaling roughly 50% of that sought by the Napoli firm. Like the Napoli firm, we seek reimbursement of video recordings of witnesses. There is nothing improper about these charges

### III. Depositions are Common Benefit Expenses

26. Mr. Napoli makes much of the fact that this office seeks reimbursement of deposition transcripts as a Common Benefit Expense. This is hardly "shocking." As noted above, this office was instrumental in preparing, back in 2005, opposition to the defendants' motions concerning immunities. *See* Exhibits 1 and 2. Three Sullivan Papain Members, Brian J. Shoot, Frank V. Floriani, and myself worked full time in the preparation of these submissions. This work entailed detailed review of all deposition transcripts by our attorneys, irrespective of the identity of the firm which took the testimony. Accordingly, the purchase and usage of all of the deposition transcripts were for the common benefit of all plaintiffs.

27. Given the Napoli firm's *90% plus share* of the docket, it is hardly surprising that, at the end of the day, it may have taken more depositions than this office. That fact, if established, is of no moment as Sullivan Papain completed work far out of proportion to its clients' representation in the docket. Moreover, all of this work by was completed by Sullivan Papain attorneys themselves.

28. In addition, this office took dozens of depositions in these cases, including, as set forth above, almost all of the decision-making personnel of the FDNY. The reason for this is obvious: most of our clients are firefighters or fire officers, as were

all of our bellwether cases. This later work, in 2009 and 2010, was completed during bellwether discovery.

29. As for the contention that the claimed expenses lack indicia of reliability, we note that supporting documentation for the charges remains available to Mr. Napoli should he wish to review same. In addition, Sullivan Papain provided far greater detail about each of its claimed expenses than the Napoli firm. For example, <u>we provided the identity of every witness whose deposition transcript was claimed as a Common Benefit Expense. The Napoli firm does not</u>.

30. As for the objection to Sullivan Papain seeking reimbursement of printing costs, we respond as follows. The City disclosed in excess of ten million documents in this litigation by producing computer hard drives. There was no reasonable way for Sullivan Papain attorneys to prepare for depositions of City witnesses, at which large numbers of the documents were to be marked as exhibits, other than to have the documents printed commercially.

## Conclusion

31. Sullivan Papain's subject Common Benefit Expenses, detailed above and in our previous submission, are appropriately reimbursed by this Court.

Dated: New York, New York
       August 27, 2010

Respectfully submitted,

SULLIVAN PAPAIN BLOCK
MCGRATH & CANNAVO P.C.

By: _____
    Andrew J. Carboy (AC 2147)
Attorneys for Plaintiffs
120 Broadway
New York, New York 10271
(212) 732-9000

14