USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/27/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x
                                                              :

IN RE WORLD TRADE CENTER DISASTER   :
SITE LITIGATION                                      :

----------------------------------------------------------------- :

                                                              :

IN RE WORLD TRADE CENTER LOWER      :
MANHATTAN DISASTER SITE LITIGATION  :

----------------------------------------------------------------- x

**ORDER DENYING MOTION TO ENLARGE SETTLEMENT ELIGIBILITY DATE**

21 MC 100 (AKH)
21 MC 102 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        On June 10, 2010, I approved as fair and reasonable the World Trade Center Settlement Process Agreement ("Settlement Agreement"), which provides for a settlement of claims against the City of New York and many contractor defendants in more than ten thousand cases involved and coordinated in the 21 MC 100, 21 MC 102, and 21 MC 103 Master Calendars. The Settlement Agreement provides that plaintiffs are eligible to settle if they filed complaints on or before April 12, 2010. Settlement Agreement § VI.A. Twenty-three plaintiffs ("Moving Plaintiffs") who filed claims after April 12, 2010, but before June 10, 2010, now move for an enlargement of the eligibility date to allow them to participate in the Settlement Agreement. For the reasons that follow, the motion is denied.

        Moving Plaintiffs have not identified a source of authority for their motion, but I will treat it as a motion under Local Civil Rule 6.3 to reconsider a court order – specifically, my previous order approving the Settlement Agreement as fair and reasonable. Local Rule 6.3 requires the party seeking reconsideration to "[set] forth concisely the matters or controlling decisions which counsel believes the court has overlooked." S.D.N.Y. R. 6.3. "The standard for granting a motion for reconsideration is strict, and reconsideration

1

generally will be denied unless the moving party can point to controlling decisions or data that the court over looked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). Put simply, "reconsideration may be appropriate to correct a clear error or prevent manifest injustice." Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782, 789 (2d Cir. 1983) (internal quotation omitted). Moving Plaintiffs fail to meet this standard.

On March 19, 2010, I rejected the first proposed settlement submitted by liaison counsel for plaintiffs and defendants and for the WTC Captive Insurance Company ("WTC Captive"), largely because it did not provide sufficient funds to the settling plaintiffs, individually or in the aggregate. Transcript of Record at 54-55, In Re World Trade Center Disaster Site Litigation, 21 MC 100, 21 MC 102, 21 MC 103 (S.D.N.Y. March 19, 2010). Aided by additional funds added by the WTC Captive, and by substantial monetary concessions from the City and plaintiffs' liaison counsel, the agreement improved to the point of being fair and reasonable, which I so held.

The Settlement Agreement represents an effort to settle a body of coordinated mass-tort litigation that is staggering in both volume and complexity. Ten thousand cases stand to have claims settled. These cases may be coordinated into Master Calendars for pre-trial purposes, but they remain individual lawsuits. I denied clas action status because the cases are too varied to meet the class-certification requirements of Federal Rule of Civil Procedure 23, which requires elements of commonality, typicality, and adequate representation of the class by the named plaintiff. Fed. R. Civ. P. 23(a). Each case contemplates a variety of factors relevant to both liability and remedy, such as varying risks at the different job sites; the level of harm potentially incurred in individual work activity;

2

the mitigation or exacerbation of harm by varying supervision; the level of exposure to a wide variety of toxic substances; and personal factors such as medical and smoking histories.

After completion of lengthy and elaborate structured discovery procedures and selection of cases for early trials, see Opinion Discussing Methodology for Discovery and Trials of Sample Cases, In re World Trade Center Disaster Site Litigation, 21 MC 100 (Doc. No. 1138) (S.D.N.Y. Feb. 19, 2009), the Special Masters and the parties came to categorize the numerous illnesses and injuries experienced by the plaintiffs as indicated in sworn responses provided to questionnaires developed by the Special Masters. The Special Masters used this information to prepare a report analyzing the complexity of the various cases, the array of injuries experienced, the number of people who lack any objective indication of an injury, and other relevant issues. The report has been shared with liaison counsel for plaintiffs and defendants and for the WTC Captive, and is now made part of the public record as an exhibit attached to this Order. The report allowed for valuation of each case, as well as for an aggregate valuation of the cases, and was integral for negotiating the Settlement Agreement. Absent a settlement, these issues will have to be reconsidered in the course of individual trials.

As the characteristics of this litigation indicate, the Settlement Agreement represents a delicate balance of compromises made in response both to competing litigation interests and the requirements of this Court, and achieved through hard-fought negotiation by many able attorneys. The April 12, 2010 eligibility date is a critical component of this balance, for it defines the set of eligible plaintiffs and, by extension, the amount of benefits that can be made available. To now add new cases would upset this balance, reducing settlement recoveries to the participating plaintiffs and injecting uncertainty and doubt into

3

the settlement process. A new negotiation would be necessary, for if the WTC Captive did not add still more money into the settlement pool, each plaintiff would experienced a reduced recovery. Further, even more non-eligible planitiffs would wish to participate, and it defies logic to find a new eligibility date in principled fashion. When compared to the potential harm that could be done to the Settlement Agreement, any harm asserted by Moving Plaintiffs by my refusal to grant their motion is insufficient to make a showing of manifest injustice under Rule 6.3.

Moving Plaintiffs nevertheless contend that I possess equitable power to control aspects of settlement in this coordinated litigation, and could enlarge the eligibility date. They note that I have previously intervened in the settlement process to ensure ongoing fairness in several ways, such as holding a fairness hearing, rejecting the first proposed settlement, and regulating counsel's expenses. They therefore suggest I exercise this power to rewrite a key term of the Settlement Agreement after I have already approved it. I doubt that I have the power to rewrite a material term of the Settlement Agreement. However, for reasons already provided, I decline to disturb the Settlement Agreement in this fashion after I have already found it to be fair and reasonable.

The motion is denied. The Clerk shall mark the motion (Doc. No. 2185) terminated.

SO ORDERED.

Dated: September 27, 2010
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

**Memorandum**

| | |
|---|---|
| **From:** | **James A. Henderson, Jr.** |
| | **Aaron D. Twerski** |
| **To:** | **Judge Alvin K. Hellerstein** |
| **Re:** | **Patterns of Injuries Apparent in Database Responses: First Impressions** |
| **Date:** | **August 24, 2009** |

## I.   General Overview

This memorandum provides our first impressions of the parties' responses to the database. To date we have received responses from 9,019 plaintiffs for the "Severity Chart and Other Fields" (SOF) and responses from 1,700 plaintiffs and defendants for the entire database. For the most part this memorandum reflects the injuries specifically identified in the Severity Chart, including GERD. The SOF fields also provide gross data on claims for deaths, cancers, and heart attacks even though these conditions are not included in the Severity Chart. In addition, plaintiffs complain of a host of injuries that do not involve death, cancer, or heart attack and that are not accounted for in the Severity Chart. Because the SOF fields do not provide data on the severity of those injuries, we do not consider them specifically in this preliminary report. Although we offer some observations based on the 1,700 responses to the entire database received thus far, we await greater numbers responses before engaging in more detailed analysis. This memorandum focuses primarily on what we have been able to learn from the SOF responses about the patterns of injury. It does not address fault, causation, plaintiff-conduct or other elements that presumably will be relevant for recovery.

We have spent many hours with Ned Adams (TCDI) and Tim Opsitnick (Jurinov) in compiling these statistics. Except in a few instances which we flag in our comments, we have not made cross-category comparisons of the severity of the claims or their potential evaluation for damages. We include several diagrams setting forth the relevant data and a commentary on

1

their significance. It will be recalled that plaintiffs' Liaison Counsel expanded upon the injuries that were originally agreed to be part of the Severity Chart to include plaintiffs who had scored on the tests set forth on the Severity Chart even though the diseases were not enumerated on the Severity Chart. At the risk of overstating the numbers and percentages of injured plaintiffs, Diagram 1, below, includes all plaintiffs who took and received a score on the Severity Chart tests whether or not those plaintiffs claim injuries that are formally included in the Chart itself. Based on discussions with the Court, this seems the wiser course in framing first impressions regarding overall patterns of injury.

## DIAGRAM 1

| Plaintiff's Status | Number of Plaintiffs | Percentage of all Plaintiffs (9,019) |
|---|---|---|
| Severity Chart rank 4 (most seriously impaired) | 587 | 6.5% |
| Severity Chart rank 3 (no 4s) | 284 | 3.1% |
| Severity Chart rank 2 (no 4s or 3s) | 788 | 8.7% |
| Severity Chart rank 1 (no 4s, 3s, or 2s) | 1,801 | 20.0% |
| Severity Chart rank 0 (tested, but no 4s, 3s, 2s, or 1s) | 891 | 9.9% |
| Death, Cancer, and Heart Attack (no Severity Chart rank 4 or 3) | 843 | 9.3% |
| GERD, (no Severity Chart rank 4, 3, 2, 1, or 0 and no Death, Cancer, or Heart Attack) | 907 | 10.1% |
| Residuum (plaintiffs not already included above) | 2,918 | 32.4% |
| Totals | 9,019 | 100.0% |

Diagram 1 sets forth the number of persons who have been tested under the Severity Chart and how they rank according to AMA criteria. It also shows the number of persons who suffered death, cancer, or heart attack and who have not otherwise received severity chart rankings of either 4 or 3 in any other category. The diagram also shows how many plaintiffs not already

2

ranked 4-1 have been tested for GERD. For the purposes of Diagram 1 we assume that death, cancer, and heart attack are of such severity that they would rank either 4 or 3 for severity (more on this later). This "Death, Heart Attack" cohort amount to 978 plaintiffs. However 135 of these plaintiffs are already counted as relatively seriously injured (4 or 3) for other injuries on the Severity Chart. This leaves 843 plaintiffs who have suffered deaths, cancers, and heart attacks and have not already been accounted for in a relatively serious injury category (4 or 3). When one adds together all of the plaintiffs tested for some injury in the Severity Chart, including GERD, and the deaths, cancers, and heart attacks, the total comes to 6,101 plaintiffs. Of the full cohort of 9,019 plaintiffs, a residuum of 2,918 plaintiffs have not been tested nor ranked in any category of the Severity Chart, nor have they reported death, cancer, or heart attack.

The subsections that follow address some of the more important issues surrounding Diagram 1.

### A. Plaintiffs Suffering Injury in More Than One Category

Regarding the plaintiffs who have been tested according to the Severity Chart criteria and who rank 4-1, it should be borne in mind that many of them rank 4-1 for more than one type of injury. Thus, those with a certain level of Severity-Chart ranking can, to some extent, be ranked within themselves according to the combination of rankings they present. In any event, such intramural rankings should not change the absolute numbers of plaintiffs who fall into the tested-and-ranked category; nor should they change (very much) one's thinking about how plaintiffs might be comparatively ranked within the tested-and-ranked group. Thus a plaintiff with a 4 for COPD and a 3 for asthma should presumably be considered to be more seriously injured than one with only a 4 for COPD; but a plaintiff with a 3 for COPD and a 2 for asthma may or may not deserve to be considered more seriously injured than one with only a 4 for COPD.

B.  **Deaths, Cancers, and Heart Attacks**

As noted above, the responses to the Severity Chart reveal 978 plaintiffs who suffered either death (61plaintiffs), cancer (807) or heart attack (110). Of the cancers, 251 plaintiffs report suffering from more than one cancer and 556 plaintiffs report suffering a single cancer. Of the 978 plaintiffs in the "Death, Cancer, and Heart Attack" group, we found that 135 are already ranked as either 4 or 3 in severity in other injury categories and are already listed in those categories in Diagram 1. Thus, in attempting to identify those plaintiffs with serious injuries they have already been taken into account.

The 807 plaintiffs suffering from cancer constitute 8.9% of the total plaintiff population. Any assumption that all cancers belong in the 4 or 3 severity category is probably not accurate. Some forms of cancer are not necessarily serious. For example, many skin cancers and most thyroid cancers are not life-threatening and may not seriously affect quality of life. We note that 188 plaintiffs report skin cancers and 51 plaintiffs report thyroid cancers. See Diagram 2. Careful scrutiny of the list of cancers reported by plaintiffs in field 134 of the database will be necessary to determine how many of the cancers do not belong in a 4 or 3 severity category.

**DIAGRAM 2**

| | |
|---|---|
| Skin Cancer | 188 |
| Lung Cancer | 107 |
| Lymphoma | 95 |
| Prostate Cancer | 68 |
| Liver Cancer | 66 |
| Colon Cancer | 58 |
| Thyroid Cancer | 51 |
| Testicular Cancer | 44 |
| Leukemia | 37 |
| Melanoma | 34 |
| Brain Cancer | 32 |
| Kidney Cancer | 32 |
| Bone Cancer | 30 |

| Throat Cancer | 26 |
|---|---|
| Breast Cancer | 25 |
| Cancer | 22 |
| Stomach Cancer | 20 |
| Laryngeal Cancer | 19 |
| Tongue Cancer | 18 |
| Rectal Cancer | 17 |
| Esophageal Cancer | 16 |
| Myeloma | 15 |
| Pancreatic Cancer | 15 |
| Sarcoma | 14 |
| Tonsillar Cancer | 13 |
| Sinus/Nasal Cancer | 11 |
| Gallbladder Cancer | 8 |
| Neurologic Cancer | 8 |
| Cervical Cancer | 7 |
| Eye Cancer | 7 |
| Adenocarcinoma of the Esophagus | 6 |
| Benign Brain Cancer | 6 |
| Musculoskeletal Cancer | 6 |
| Anal Cancer | 5 |
| Digestive/Gastrointestinal Cancer | 4 |
| Mesothelioma | 4 |
| Ovarian Cancer | 4 |
| Parotid Cancer | 4 |
| Small Intestine Cancer | 4 |
| Appendix Cancer | 3 |
| Parathyroid Cancer | 2 |
| Penile Cancer | 2 |
| Pituitary Cancer | 2 |
| Urethral Cancer | 2 |
| Benign Lung Cancer | 1 |
| Bladder Cancer | 1 |
| Colorectal cancer | 1 |
| Distal and metastatic gastric cancer | 1 |
| Endocrine Cancer | 1 |
| Gastroesophageal cancer | 1 |
| Genitourinary Cancer | 1 |
| Gynecological Cancer | 1 |
| lymphoma (lymphocytic cancer) | 1 |
| Malignant tumors near liver and lymph notes | 1 |
| Nasopharyngeal Cancer | 1 |
| Vaginal Cancer | 1 |
| Vulvar Cancer | 1 |

As for heart attacks, responses for field 134 reveal 110 plaintiffs who claim to have suffered heart attacks. However, some plaintiffs report some other forms of cardiac problems. We have no way of assessing the severity of these complaints and have not included the broader category of "cardiac problems" in Diagram 1.

## C. GERD

GERD involves rankings of 2, 1, and 0. The parties agreed on these rankings and did not rely on the AMA ranking system. Rankings of zero for GERD are ambiguous regarding whether or not tests for GERD have been taken; all that a zero indicates is that a plaintiff is taking medication for GERD. If we focus on plaintiffs who claim to suffer from GERD and no other category in the Severity Chart and who do not claim to suffer from death, cancer, or heart attack, the number is 907 plaintiffs or 10.1 % of the total plaintiff population of 9, 019. (Bear in mind that many of these plaintiffs may claim other injuries not included in the Severity Chart or Death, etc., categories.) Of these 907 plaintiffs complaining of GERD, 364 report a zero ranking (4% of the total plaintiff population).

## D. Residuum

The 2,918 plaintiffs included in the residuum reflect those who have not ranked 4-0 in any impairment category on the Severity Chart; who have not reported death, cancer, or heart attack; and who have no ranking for GERD. At this juncture we are left to speculate regarding the severity of the injuries to this residual group of 2,918 plaintiffs. One might surmise that their injuries are, on the whole, less serious than those for whom tests have been performed under the AMA criteria. If their conditions were of equal severity one might expect that their physicians would have subjected them to more rigorous testing. But one is left to speculate on these matters.

## II.   Some Further Observations Not Directly Related to Patterns of Injuries

### A. Length and Timing of Plaintiffs' Exposures at the WTC Site

The role of exposures is interesting. From the outset, we had reasonably assumed that a plaintiff's exposure to the site, both when it occurred and how long it lasted, would significantly affect both the likelihood and severity of injury. We assumed that this would not be evident in every individual case, but that it would certainly bear out over many cases. Surprisingly, the data do not support this thesis. Based on our database searches, it appears that the dates on which plaintiffs were exposed (early only, early and late, or late only) and the total lengths of exposure (20 hours or 2,000 hours) do not correlate significantly with the likelihood or seriousness of injury. The rates of arguably serious injury are essentially flat across groups of plaintiffs distinguished on the basis of when they started and how long they worked on the site. See Diagram 3.

**DIAGRAM 3**

**Plaintiffs with a 3 or a 4 (No Restrictions By Disease)**

| | # of PE's with Start Date 9/11 | 3-4 | % | # of PE's with Start Date 9/12 | 3-4 | % | # of PE's with Start Date 9/13 | 3-4 | % | # of PE's with Start Date 9/14 - 9/30 | 3-4 | % | # of PE's with Start Date 10/1 - 10/31 | 3-4 | % | # of PE's with Start Date 11/1 - 12/31 | 3-4 | % | # of PE's with Start Date 1/1 - 3/31 | 3-4 | % | # of PE's with Start Date 4/1 - 7/31 | 3-4 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # of PE's | 4730 | | | 1968 | | | 680 | | | 1154 | | | 228 | | | 122 | | | 48 | | | 25 | | |
| End 9/11 | 101 | 12 | 11.88% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 9/12 | 86 | 3 | 3.49% | 42 | 2 | 4.76% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 9/13 | 62 | 7 | 11.29% | 57 | 6 | 10.53% | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 9/30 | 605 | 53 | 8.76% | 499 | 41 | 8.22% | 181 | 11 | 6.08% | 276 | 24 | 8.70% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 10/31 | 499 | 47 | 9.42% | 276 | 21 | 7.61% | 110 | 9 | 8.18% | 164 | 17 | 10.37% | 33 | 2 | 6.06% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 12/31 | 935 | 90 | 9.63% | 333 | 18 | 5.41% | 119 | 9 | 7.56% | 232 | 16 | 6.90% | 62 | 4 | 6.45% | 27 | 2 | 7.41% | 0 | 0 | 0 | 0 | 0 | 0 |
| End 3/31 | 892 | 104 | 11.66% | 299 | 26 | 8.70% | 115 | 8 | 6.96% | 197 | 16 | 8.12% | 46 | 5 | 10.87% | 29 | 3 | 10.34% | 14 | 1 | 7.14% | 0 | 0 | 0 |
| End 7/31 | 929 | 79 | 8.50% | 261 | 30 | 11.49% | 77 | 5 | 6.49% | 185 | 16 | 8.65% | 56 | 2 | 3.57% | 42 | 2 | 4.76% | 18 | 3 | 16.67% | 15 | 0 | 0.00% |
| | 4109 | 395 | 9.61% | 1767 | 144 | 8.15% | 616 | 32 | 5.19% | 1054 | 89 | 8.44% | 197 | 13 | 6.60% | 98 | 7 | 7.14% | 32 | 4 | 12.50% | 15 | 0 | 0.00% |

**Plaintiffs that have 0, 1 or 2 (excludes the above plaintiffs that had a 3 or a 4) (No Restriction By Disease)**

| | # of PE's with Start Date 9/11 | 0-2 | % | # of PE's with Start Date 9/12 | 0-2 | % | # of PE's with Start Date 9/13 | 0-2 | % | # of PE's with Start Date 9/14 - 9/30 | 0-2 | % | # of PE's with Start Date 10/1 - 10/31 | 0-2 | % | # of PE's with Start Date 11/1 - 12/31 | 0-2 | % | # of PE's with Start Date 1/1 - 3/31 | 0-2 | % | # of PE's with Start Date 4/1 - 7/31 | 0-2 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # of PE's | 4730 | | | 1968 | | | 680 | | | 1154 | | | 228 | | | 122 | | | 48 | | | 25 | | |
| End 9/11 | 101 | 33 | 32.67% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 9/12 | 86 | 26 | 30.23% | 42 | 12 | 28.57% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 9/13 | 62 | 21 | 33.87% | 57 | 15 | 26.32% | 14 | 3 | 21.43% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 9/30 | 605 | 247 | 40.83% | 499 | 198 | 39.68% | 181 | 76 | 41.99% | 276 | 101 | 36.59% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 10/31 | 499 | 225 | 45.09% | 276 | 120 | 43.48% | 110 | 48 | 43.64% | 164 | 55 | 33.54% | 33 | 10 | 30.30% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End 12/31 | 935 | 395 | 42.25% | 333 | 138 | 41.44% | 119 | 47 | 39.50% | 232 | 88 | 37.93% | 62 | 29 | 46.77% | 27 | 5 | 18.52% | 0 | 0 | 0 | 0 | 0 | 0 |
| End 3/31 | 892 | 390 | 43.72% | 299 | 122 | 40.80% | 115 | 48 | 41.74% | 197 | 87 | 44.16% | 46 | 19 | 41.30% | 29 | 8 | 27.59% | 14 | 7 | 50.00% | 0 | 0 | 0 |
| End 7/31 | 929 | 391 | 42.09% | 261 | 109 | 41.76% | 77 | 34 | 44.16% | 185 | 80 | 43.24% | 56 | 29 | 51.79% | 42 | 16 | 38.10% | 18 | 5 | 27.78% | 15 | 7 | 46.67% |
| | 4109 | 1728 | 42.05% | 1767 | 714 | 40.41% | 616 | 256 | 41.56% | 1054 | 411 | 38.99% | 197 | 87 | 44.16% | 98 | 29 | 29.59% | 32 | 12 | 37.50% | 15 | 7 | 46.67% |

8

## B. History of Tobacco Use

The data gathered thus far reveal a correlation (albeit arguably more modest than might have been expected) between tobacco use and injury. The relevant data come from the 1,700 responses to the entire database. See Diagram 4. Of the 761 plaintiffs who answered "yes" to tobacco use, 544 ranked 4-1 on the Severity Chart (71.5%). Of the 942 who answered "no" to tobacco use, 576 ranked 4-1 on the Severity Chart (61.1%). When one limits consideration to rankings of 4 and 3 on the Severity Chart, of the 761 plaintiffs who were tobacco users, 258 meet these higher rankings (33.9%); whereas of the 942 non-users, 278 ranked 4 or 3 (29.5%).

### DIAGRAM 4

|  | 0 | 1 | 2 | 3 | 4 |  |
|---|---|---|---|---|---|---|
| NO to 63 | 68 | 167 | 131 | 95 | 183 | 644 |

942 PE's answered NO to question 63.

68 were F only PE's
1 had N/A in 207/208
213 had no data in 207/208 - Only chart 3 injuries
16 had no data in 207/208

644 PE's answered NO to 63 and had relevant data in 207/208.

|  | 0 | 1 | 2 | 3 | 4 |  |
|---|---|---|---|---|---|---|
| YES to 63 | 65 | 163 | 123 | 78 | 180 | 609 |

761 PE's answered YES to question 63.

39 were F only PE's
0 had N/A in 207/208
106 had no data in 207/208 - Only chart 3 injuries
7 had no data in 207/208

609 PE's answered YES to 63 and had relevant data in 207/208.

9

## C. Numbers of Plaintiffs Who Were at the WTC Site Only for Relatively Short Periods of Time Immediately Following September 11, 2001

The issue of immunity for defendants during the immediate aftermath of 9/11 is vexing. We thought it important to ascertain how many plaintiffs would be affected if immunity were granted to defendants over various periods between 9/11/01 and 10/10/01. We inquired regarding how many plaintiffs had as their last date on the WTC site any date between 9/11/01 and 10/10/01. See Diagram 5. Thus, for example, if immunity were to extend for 10 days, from 9/11/01 through 9/20/01, 541 plaintiffs would be barred from recovery. If immunity were to extend for 15 days, 707 plaintiffs would be barred. And if immunity were to extend through 10/10/01, then 1,066 plaintiffs would be barred. We express no opinion as to whether immunity is applicable to the WTC disasters, or for how long after 9/11/01 it should extend. But the Court may find it useful to know how many plaintiffs would be affected if, and for how long, immunity should apply.

## DIAGRAM 5

| | | \*\*\*A-E injuries only. No F only PE's | | | | |
|---|---|---|---|---|---|---|
| | | 4 | 3 (no 4) | 2 (no 4 or 3) | 1 (no 4, 3 or 2) | 0 (no 4,3,2, or 1) | Total |
| Reported data for field 73 - What was PE's Last Day Present at the WTC Site | 11-Sep | 9 | 3 | 9 | 13 | 11 | 45 |
| | 12-Sep | 3 | 2 | 6 | 22 | 11 | 44 |
| | 13-Sep | 12 | 1 | 6 | 19 | 14 | 52 |
| | 14-Sep | 8 | 4 | 11 | 22 | 21 | 66 |
| | 15-Sep | 2 | 5 | 15 | 37 | 11 | 70 |
| | 16-Sep | 14 | 0 | 10 | 30 | 15 | 69 |
| | 17-Sep | 1 | 3 | 6 | 26 | 13 | 49 |
| | 18-Sep | 6 | 5 | 10 | 21 | 13 | 55 |
| | 19-Sep | 4 | 3 | 4 | 19 | 6 | 36 |
| | 20-Sep | 6 | 7 | 7 | 19 | 16 | 55 |
| | 21-Sep | 4 | 1 | 4 | 21 | 7 | 37 |
| | 22-Sep | 3 | 0 | 4 | 15 | 9 | 31 |
| | 23-Sep | 3 | 1 | 1 | 11 | 2 | 18 |
| | 24-Sep | 4 | 4 | 5 | 15 | 7 | 35 |
| | 25-Sep | 3 | 1 | 14 | 18 | 9 | 45 |
| | 26-Sep | 2 | 2 | 11 | 13 | 13 | 41 |
| | 27-Sep | 4 | 3 | 5 | 10 | 11 | 33 |
| | 28-Sep | 1 | 2 | 6 | 10 | 9 | 28 |
| | 29-Sep | 3 | 2 | 3 | 11 | 6 | 25 |
| | 30-Sep | 11 | 7 | 13 | 15 | 12 | 58 |
| | 1-Oct | 3 | 1 | 9 | 23 | 11 | 47 |
| | 2-Oct | 3 | 3 | 2 | 13 | 2 | 23 |
| | 3-Oct | 2 | 1 | 6 | 6 | 0 | 15 |
| | 4-Oct | 3 | 0 | 2 | 5 | 1 | 11 |
| | 5-Oct | 0 | 1 | 3 | 11 | 4 | 19 |
| | 6-Oct | 0 | 1 | 0 | 2 | 3 | 6 |
| | 7-Oct | 1 | 0 | 1 | 3 | 1 | 6 |
| | 8-Oct | 1 | 0 | 2 | 4 | 4 | 11 |
| | 9-Oct | 2 | 0 | 2 | 2 | 2 | 8 |
| | 10-Oct | 3 | 0 | 6 | 11 | 8 | 28 |

Total 1066

## Conclusion

This memorandum provides a first look at some of the information provided by the database. Its focus is on patterns of plaintiffs' injuries. As noted earlier, this analysis does not address causation, fault, and a host of other issues relevant to establishing liability. Much more can be done to derive important information from the database. For example, the cancers

identified in field 134 can be segregated according to type and age of the plaintiff. For each cancer type and age group it is possible to compare the reported frequency of the cancer for that cohort against the known background risk of contracting that form of cancer to determine whether those exposed to the WTC site reveal a higher incidence of contacting the disease. Similar statistics may be available for other injuries captured by the severity chart. In addition, we have yet to examine in any detail responses to other questions in the database (e.g., incidents of pre-existing conditions and availability and use of personal protection equipment) to determine whether significant correlations exist between those responses and injuries suffered. We await further direction from the Court before proceeding with these sorts of inquiries.