UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
IN RE WORLD TRADE CENTER DISASTER      :     21 MC 100 (AKH)
SITE LITIGATION                                          :     (All Cases)
                                                                       :
-----------------------------------------------------------------x
IN RE WORLD TRADE CENTER LOWER         :     21 MC 102 (AKH)
MANHATTON DISASTER SITE LITIGATION  :     (All Cases)
                                                                       :
-----------------------------------------------------------------x
IN RE COMBINED WORLD TRADE CENTER   :     21 MC 103 (AKH)
AND LOWER MANHATTAN DISASTER SITE  :     (All Cases)
LITIGATION (straddler plaintiffs)                  :
                                                                       :
-----------------------------------------------------------------x

**MEMORANDUM OF LAW AND FACTS IN SUPPORT**

On June 23, 2010 this Court approved the World Trade Center Litigation Settlement Process Agreement, As Amended ("SPA") as fair, reasonable, adequate, just and in the best interest of the parties. The SPA did not become finalized until January 5, 2011, once the parties executed Exhibit R to the SPA, the "Affirmation of Final Settlement Agreement." At that time, the parties agreed that more than ninety five percent (95.0%) of the Primary Plaintiffs on the Eligible Plaintiff List have executed Releases and Covenants Not To Sue to satisfy the Opt-In Threshold as described in Section V.D. of the SPA. Accordingly, the WTC Captive Insurance Company, Inc. ("WTC Captive") has not exercised its right to void the settlement as described in Section VI.D. of the SPA. Since then, twenty-one eligible plaintiffs have executed their Releases expressing their desire to opt-in and participate. The total settlement amount of the SPA will increase by approximately $2,625,000.00 with these additional opt-in plaintiffs

As this Court has acknowledged in recent court conferences and orders, our office has made diligent efforts since approval of the SPA to contact each of our clients and providing them with adequate information and counseling about the SPA and obtain all of the necessary

documentation from those clients who decided to opt-in to the settlement. In this endeavor, we have had the assistance of Special Masters Aaron Twerski and James Henderson, who met with certain plaintiffs and answered their questions about the settlement and Special Master Roy Simon, who also assisted us in providing clear, concise and sufficient information to our clients in our settlement communications. In that regard, we thank all of the Special Masters for their assistance and time in communicating with those plaintiffs who sought their advice.

In furtherance of Court's desire to make sure that all eligible plaintiffs were adequately informed about the SPA, following a Court conference held on November 18, 2010 (sealed transcript) this Court appointed Special Counsel Michael Hoenig, Esq., in order to make one last effort to reach a small group of our clients who, for various reasons or no stated reason at all, had refused or failed to respond to our many attempts to obtain a clear answer from them about the SPA and/or to execute the necessary settlement documents. *See* Order of November 24, 2010, which is attached hereto as Exhibit "1". Shortly after Mr. Hoenig's appointment, his team of attorneys and staff embarked on an intense campaign effort to communicate with each client of ours who had up until that time been unclear in their decisions about the SPA. Mr. Hoenig later presented his report to this Court on the progress his office has made under the Court's mandate. At a conference before this Court on December 22, 2010, this Court heard and accepted Mr. Hoenig's Report of his findings, again noting on the record that Mr. Hoenig had received the full cooperation of this firm and its attorneys in achieving the goals this Court set out in its November 24, 2010 order.

As a result of Mr. Hoenig's exhaustive efforts to assist these straggling plaintiffs in reviewing their options and to arrive at a decision in their best interests, Mr. Hoenig's report stated certain plaintiff's intentions with regard to the SPA. Some plaintiffs remained undecided;

2

some decided to opt-in and some remained beyond the reach of Mr. Hoenig. Mr. Hoenig's report is annexed to this motion as Exhibit "2".

Upon this Court's receipt and review of Mr. Hoenig's report, this Court asked Mr. William H. Groner of our office if we would be able to follow-up with the forty-four plaintiffs who had advised Mr. Hoenig (and through him, this Court) that they desired to opt-in, in order to obtain the executed settlement documents necessary for their inclusion in the SPA. Mr. Groner agreed to do so and this Court asked him to collect the necessary documents from those plaintiffs by January 7, 2011 (*see* December 22, 2010 Transcript at p. 9) A copy of the December 22, 2010 transcript is attached hereto as Exhibit "3". A few moments later in the conference, this Court amended that deadline to January 14 (*see* December 22, 2010 Transcript at p. 11).

Thus, on December 22, 2010 and as confirmed in this Court's Order accepting Mr. Hoenig's report, the Special Counsel appointed by this Court, this Court, the Defendants and the Captive's counsel Ms. Warner, all present that day in court, were aware that forty four additional plaintiffs intended to opt-in to the settlement and that their counsel, our office, would pursue the properly executed settlement documents to achieve that goal. Indeed, Ms. Warner, appearing for the Captive, asked that she be provided the list of 44 plaintiffs:

> MS. WARNER: Your Honor, I think that would be most helpful. If Mr. Hoenig could give a list of the names, we certainly can then check that against the list of plaintiffs who have formally opted into the settlement. That will reduce the number and will then tell us how many verbal potential, which of course we do not have access to. You'll get that done by January 7th and we'll know exactly how many opt ins we have. (*Id.,* at p. 10).

Mr. Hoenig's list of the plaintiffs who had expressed their desire to opt-in to the SPA was later provided to Ms. Warner's office for her review on the Captive's behalf.

Following the December 22, 2010 conference, specifically, on December 30, 2010, this Court issued several Orders. Among them, this Court noted that forty-five (45) Plaintiffs had stated their intentions to be added to the list of Plaintiffs opting into the settlement, that the Special Counsel had provided this information to our office and our office, in turn, had transmitted the appropriate paperwork for those Plaintiffs to Ms. Warner, as counsel for the WTC Captive Insurance Company, so that those Plaintiffs could be included in the settlement. Two other orders were issued on December 30, 2010. In one, this Court dismissed with prejudice the claims of 48 plaintiffs who expressed to Mr. Hoenig or this office their intention to discontinue their litigation claims. In a separate order the same day, this Court also dismissed the claims of 409 plaintiffs for failing to prosecute their claims, noting that if those plaintiffs desired to vacate these dismissals:

> on the basis of conditions coming into effect if the James Zadroga 9/11 Health and Compensation Act of 2010, H.R. 847, 111th Congress (2010), becomes law, *or for any other reason*, may seek such relief by an appropriate motion within 30 days of this Order. *See* Fed. R. Civ. P. 60(b)(6). (Emphasis added).

Immediately upon receipt of those dismissal orders, a letter went to each affected plaintiff over the signature of Worby Groner Edelman & Napoli Bern, LLP's General Counsel, Denise A. Rubin. Ms. Rubin's letter advised each affected plaintiff of the dismissal order and asked the individuals to call us immediately if they believed these dismissals had been mistakenly ordered in their particular case. We had a fair number of clients call in to our office advise that their cases should not have been included in the non-responsive plaintiffs' list, because they had

4

already communicated their intent to opt out of the matter and continue their litigation to Mr. Hoenig or to my office. At this Court's directive, the appropriate motions were prepared and filed to address those individuals. Those motions are currently pending. A number of other persons called Ms. Rubin to say that they had not responded due to illness or an inability to understand the papers they received or to fully appreciate the gravity of the settlement and opt-in deadlines. Thus, several persons who had previously ignored our many and repeated entreaties or who had previously opted out, now asked if they could still opt-in and accept the SPA settlement.

Ultimately we were left with a list of twenty-one plaintiffs who indicated their desire to opt-in to the SPA and whose papers were proffered to the WTC Captive through the Allocation Neutral. Attached to this motion as Exhibit "4" is the list of those twenty-one plaintiffs. Each of these twenty-one plaintiffs were initially rejected by the WTC Captive upon Ms. Warner's statement that the cut-off for delivering completed opt in papers was January 5, 2011 and no exceptions would be made. Clearly, the Captive's stated position in this regard does not comport with this Court's statements and the agreements made at the December 22, 2010 conference when we were given until January 14, 2011 to gather those papers *without objection by Ms. Warner*. As a result of discussions since the weekend of January 22-23 and after a "meet and confer" discussion on February 8, 2011, the Captive has since agreed to accept the papers proffered for only three of those twenty-one plaintiffs.

For each of the case-specific reasons below, we respectfully request the Court to direct that the remaining eighteen plaintiffs on the list annexed here as Exhibit "5" be accepted by the WTC Captive for inclusion in the SPA. The plaintiffs at issue were always listed on the Eligible Plaintiff List. Thus the WTC Captive was unquestionably aware of their eligibility to participate

5

in the SPA. There is certainly no utility for the Captive continuing to litigate the claims of these seventeen individuals who were not only eligible to settle, but who have evidenced their desire and intent to accept the settlement and have executed their settlement papers and proffered them to the WTC Captive.

Each of these seventeen cases are unique and the reasons for the delay in their opt-in documents are described below.

### CARLOS ASMAL (07CV1462)

Mr. Asmal was an asbestos handler who worked at various buildings surrounding the World Trade Center site. Our office and Mr. Hoenig's office had difficulty locating Mr. Asmal. It was discovered in late November that Mr. Asmal moved to Ecuador. On January 10, 2011, Mr. Asmal's Uncle, Luis Asmal, who has power of attorney for Mr. Asmal's affairs, came to our office and executed the opt-in documents on Mr. Asmal's behalf.  The executed opt-in documents and Power Of Attorney for Mr. Asmal are attached to these papers as Exhibit "6". Today our office has been informed that both Carlos Asmal and Luis Asmal are both currently in Ecuador. Further details are described in a draft affidavit attached as Exhibit "26".  Mr. Asmal has a Tier 1 claim in the SPA valued at $3,250.00 and the Met Life Cancer Insurance Policy.

### KENNETH BERTOSEN (06CV10544)

Mr. Bertosen was an Operating Engineer for the New York City Department of Transportation who worked at the World Trade Center site and the Fresh Kills landfill. Mr. Bertosen claims that he was too sick to digest and complete the settlement paperwork in a timely fashion.  Mr. Bertosen's main concentration was on his WTC-related health problems. Eventually Mr. Bertosen completed his opt-in documents and they were provided to the Allocation Neutral on January 14, 2011. Mr. Bertosen's opt-in documents are attached as Exhibit "7".  Further details are described in Mr. Bertosen's February 9, 2011 Affidavit which is attached

as Exhibit "8". Mr. Bertosen has a Tier 1 claim in the SPA valued at $3,250.00 and the Met Life Cancer Policy.

### RICHARD BIGLIN (06CV13620)

Mr. Biglin was a detective for the New York Police Department and worked at the Morgue and the Fresh Kills landfill. Mr. Biglin wanted the time to review and make sure that all of the information on his settlement documents including all of the data on his claim form was accurate before he completed any opt-in documents for the SPA. Mr. Biglin completed his opt-in paperwork once he felt comfortable that the information on his Claim Form was accurate. Mr. Biglin's opt-in documents were provided to the Allocation Neutral on January 19, 2011. Mr. Biglin's opt-in documents are attached as Exhibit "9". Further details are explained in Mr. Biglin's February 9, 2011 Affidavit which is attached as Exhibit "10". Mr. Biglin has a Tier 1 claim in the SPA valued at $3,250.00 and the Met Life Cancer Policy. Mr. Biglin as a Tier 1 claim in the SPA valued at $3,250.00 and the Met Life Cancer Policy.

### RONALD BOWERS (08CV00616)

Mr. Bowers was a Mechanic and Truck Tire Repairman for the Fire Department of New York. Mr. Bowers originally did not understand all of the settlement paperwork with which he was provided.  The settlement paperwork is quite voluminous and Mr. Bowers did not want to opt-in to the SPA until he had several meetings and conversations with attorneys and other representatives of our office along with conversations with attorneys that represent his union, and thereby reached a complete understanding of the SPA. Mr. Bowers eventually opted in to the SPA on January 10, 2011 after he had time to digest his options. Mr. Bowers' opt-in documents are attached as Exhibit "11". Mr. Bowers has a Tier 4 Claim n the SPA with an estimated value between $32,627.00 and $39,873.00 and the Met Life Cancer Policy.

### JAMES BRUNO (07CV10115)

Mr. Bruno is a Sergeant in the United States Army and performed military related tasks around the World Trade Center site following the attacks on September 11, 2001. Since September 11, 2001, many of this nation's military personnel have been engaged in active combat overseas. *In re Templehoff*, 339 B.R. 49 (Bankr. S.D.N.Y. 2005). To benefit and protect our service men and women abroad from an array of civil obligations and deadlines, Congress amended the Soldiers' and Sailors' Civil Relief Act ("SSCRA"), which is now referred to as the Servicemember's Civil Relief Act ("SCRA").  50 U.S.C. App. § 501 *et seq.* (2003).

The SCRA is intended to "provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service." *Savarese v. United States HUD*, 2205 US Dist. LEXIS 2281 (S.D.N.Y. 2005) *citing* 50 U.S.C. App. § 502; *see, e.g., Conroy v. Aniskoff,* 507 U.S. 511 (1993) ("The [Relief Act] . . . suspends various civil liabilities of persons in military service."); *Engstrom v. First Nat'l Bank of Eagle Lake,* 47 F.3d 1459, 1462 (5th Cir. 1995) ("The purpose of the Relief Act is to suspend enforcement of civil liabilities of persons in the military service of the United States in order to enable such persons to devote their entire energy to the defense needs of the Nation."). *See* H.R. REP. 108-81, at 32 (2003) ("With hundreds of thousands of servicemembers fighting in the war on terrorism and the war in Iraq, many of them mobilized from the reserve components, the Committee believes the Soldiers' and Sailors' Civil Relief Act (SSCRA) should be restated and strengthened to ensure that its protections meet their needs in the 21st century.")

Among other things, the SCRA provides for protection against default judgments against servicemembers (50 U.S.C. App. § 521), provides for a stay of any proceedings involving servicemembers for the period including military service (50 U.S.C. App. 522),  provides for

8

waiver of fines and other penalties for failure to comply with terms of a contract (50 U.S.C. App. 523), provides for stays of executions, judgments, attachments and garnishments (50 U.S.C. App. 524) and provides for the tolling of statutes of limitations and other legally proscribed time limits (50 U.S.C. App. 526).

     For example, in cases where a service member fails to "perform an obligation arising under a contract (here the SPA) and a penalty (inability to comprise his legal claims) is incurred arising from that nonperformance, a court may reduce or waive the fine or penalty" so long as the service member was in military service and the military service affected the ability of the service member to perform his or her obligations. 50 U.S.C. App. 523.  Based on the recitation of facts below, it is clear that Mr. Bruno's military service is the sole reason for his inability to comply with the opt in deadline and therefore, his failure to meet the initial deadlines should be excused.

     Upon information and belief, from February of 2009 to the current time, Sergeant James Bruno has been on active military duty, serving the United States in the War on Terror. However, Mr. Bruno has not seen an active battlefield in Afghanistan during that time period. Instead, Mr. Bruno has been laid up in a hospital bed at Fort Belvoir, Virginia, as part of the Wounded Warrior Project for the last two years.  The severe injuries he sustained in combat and his need for constant medical attention have not allowed him to leave the hospital.  His severe injuries have impacted his life in unimaginable ways, including the fact that they have hampered the ability to communicate with his attorneys and prosecute his action.

     As a result of his active duty military status, coupled with the difficulties engendered by his severe injuries and the liberal construction of the SCRA, Mr. Bruno's untimely settlement documents should be accepted.  The express purpose of the SCRA is to ensure that active

9

servicemembers are excused from complying with certain legal deadlines which would adversely affect their rights. Mr. Bruno's non-compliance with the opt-in deadline as a result of his military service and injuries should not adversely affect his rights. He desires to opt-in to the SPA and precluding him from voluntarily settling his case runs directly contra to the intended and express purpose of the SCRA. Mr. Bruno's opt-in documents are attached hereto as Exhibit "12". Also attached as Exhibit "13" are documents concerning Mr. Bruno's military service and medical treatment as a result of his military service. Mr. Bruno's supporting medical records are attached as Exhibit "14". Mr. Bruno has a Tier 4 Claim in the SPA with an estimated value between $40,634.00 and $49,658.00 and the Met Life Cancer Policy.

### CHARLES DEMATTEO (05cv9952)

Mr. DeMatteo was employed by the New York City Department of Transportation. Mr. DeMatteo worked at the World Trade Center site, the Barge and the Fresh Kills landfill following the attacks of September 11, 2001. Mr. DeMatteo completed his opt-in documents on January 7, 2011. Mr. DeMatteo did not want to opt-in to the SPA until references of epilepsy as opposed to "seizure disorders" were referenced in his file. Furthermore, Mr. DeMatteo did not want to complete his opt in documents until he had an understanding why his seizure disorder is not recognized as a qualifying injury in the SPA. Mr. DeMatteo's opt-in documents are attached hereto as Exhibit "15". Further details of Mr. DeMatteo's situation are described in his affidavit which is attached as Exhibit "34" Mr. DeMatteo has a Tier 3 Claim in the SPA valued at $11,000.00 and the Met Life Cancer Policy.

### FREDERICK DOW (06CV14615)

Mr. Dow was a police officer for the New Jersey State Police who worked at the World Trade Center site following the attacks of September 11, 2001. Mr Dow was originally unresponsive to our office's numerous attempts and Mr. Hoenig's office's attempts to contact

him, however Mr. Dow eventually sent our office his opt-in documents. Mr. Dow's opt-in documents were provided to the Allocation Neutral on January 27, 2011. Mr. Dow claims that he had trouble receiving his mail due to his marriage situation and the fact that he took a vacation to a rural areas. Mr. Dow's opt-in documents are attached hereto as Exhibit "16". Further details are explained in Mr. Dow's February 9, 2011 Affidavit attached as Exhibit "17". Mr. Dow has a Tier 1 Claim in the SPA valued at $3,250.00 and the Met Life Cancer Policy.

### STEPHEN GADRY (06cv11186)

Mr. Gadry was a police officer with the New York Police Department and worked at the World Trade Center site. When he contacted our office in response to Ms. Rubin's letter, Mr. Gadry informed us that his sister has been battling cancer and that his attention has been directed toward his concerns for her well-being, thus distracting him from all of the settlement paperwork he has received from our office and Mr. Hoenig's office. Although Mr. Gadry originally was unresponsive to our office and Mr. Hoenig's office he eventually returned his executed settlement paperwork to our office which was then provided to the Allocation Neutral on January 31, 2011. A copy of Mr. Gadry's opt-in documents are attached as Exhibit "18". Mr. Gadry has a Tier 3 Claim in the SPA valued at $11,000.00 and the Met Life Cancer Policy.

### EDWIN GOMEZ (06CV12106)

Mr. Gomez was a detective for the New York Police Department who worked at the World Trade Center site and the Morgue following the attacks of September 11, 2001. Mr. Gomez was originally unresponsive to our office's and Mr. Hoenig's attempts to contact him however Mr. Gomez eventually returned his settlement paperwork to our office and it was provided to the Allocation Neutral on February 3, 2011. Mr. Gomez's opt-in documents are attached as Exhibit "19". Mr. Gomez has a Tier 1 Claim in the SPA valued at $3,250.00 and the Met Life Cancer policy.

### CHRIS HARMON (06Cv13938)

Mr. Harmon was a Field Technician for Verizon and worked at the World Trade Center site and its surrounding buildings following the attacks of September 11, 2001. Mr. Harmon originally wanted to discontinue his lawsuit but later decided to opt-in to the settlement. Mr. Harmon's opt-in documents, which are attached as Exhibit "20" were provided to the Allocation Neutral on January 7, 2010.  Mr. Harmon has a Tier 1 Claim in the SPA valued at $3,250.00 and the Met Life Cancer policy.

### DANIEL HOLDER (09CV2751)

Mr. Holder as a correction officer for the Suffolk County Police Department. Mr. Holder was originally unresponsive to our office's numerous attempts and Mr. Hoenig's office's attempts to contact him however Mr. Holder eventually sent our office his opt-in documents. Mr. Holders' opt-in documents were provided to the Allocation Neutral on January 20, 2011. A copy of Mr. Holder's opt-in documents are attached as Exhibit "21". Mr. Holder has a Tier 2 Claim in the SPA valued at $7,500.00 and the Met Life Cancer Policy.

### DOUG HORNING (05CV1063)

Mr. Horning volunteered his time to help assist the operations at the World Trade Center site. Mr. Horning indicated to Mr. Hoenig in writing that he wanted to opt-in to the SPA.  A copy of Mr. Horning's written notification to Mr. Hoenig is attached here as Exhibit "22". Mr. Horning's case was also included as a written opt-in in Mr. Hoenig's report to this Court. Mr. Horning is currently being treated for his medical condition at a lung clinic in a rural area in Mexico; his presence there has contributed to the delay in the return of his opt-in documents. In fact, Mr. Horning's opt-in documents are dated December 31, 2010, prior to the January 14, 2010 bar date imposed by the Court at the December 22, 2010 conference. Mr. Horning's opt-in documents were eventually received by our office and provided to the Allocation Neutral on

January 25, 2011. A copy of Mr. Horning's opt-in documents are attached here as Exhibit "23". Further information about Mr. Horning's situation is described in detail in his email affidavit attached as Exhibit "24". Mr. Horning has a Tier 4 Claim in the SPA with an estimated value between $61,288.00 and $74,898.00 and the Met Life Cancer Policy.

### GREGORY HOWARD (06CV10780)

Mr. Howard was a police officer for the Port Authority of New York and New Jersey and worked at the World Trade Center site following the attacks on September 11, 2001. Mr. Howard recently moved his residence and our office was unware of his whereabouts. Eventually our office located Mr. Howard and was able to confer with him about the SPA. Mr. Howard eventually decided to opt-in to the SPA once he was fully informed. Mr. Howard's opt-in documents were provided to the Allocation Neutral on January 20, 2011. A copy of Mr. Howard's opt-in document are attached her as Exhibit "25". Mr. Howard has a Tier 1 Claim in the SPA valued at $3,250.00 and the Met Life Cancer Policy.

### TAREK OTERO (07CV05033)

Mr. Otero was a pilot for the New York Police Department and worked at the World Trade Center site following the attacks on September 11, 2001. Mr. Otero did not want to opt-in to the SPA until he fully understood the criteria for the qualifying injuries. Once Mr. Otero understood the criteria he decided to opt-in to the SPA. Mr. Otero's opt-in documents were provided to the Allocation Neutral on January 14, 2011. A copy of Mr. Otero's opt-in documents are attached hereto as Exhibit "27". Further details describing Mr. Otero's situation is described in his affidavit attached as Exhibit "28". Mr. Otero has a Tier 1 Claim in the SPA valued at $3,250.00 and the Met Life Cancer policy.

### WILLIAM ROZAKIS (07CV05033)

Mr. Rozakis was a police officer for the New York Police Department and worked at the World Trade Center site following the attacks of September 11, 2001. Mr. Rozakis communicated to Mr. Hoenig in writing that he wanted to opt-in to the SPA. A copy of Mr. Rozakis' communication with Mr. Hoenig is attached as Exhibit "29". Mr. Rozaskis' opt-in documents were received by our office and provided to the Allocation Neutral on January 24, 2011. A copy of Mr. Rozakis' opt-in documents are attached as Exhibit "30". Mr. Rozakis has a Tier 1 Claim in the SPA valued at $3,250.00 and the Met Life Cancer policy.

### FERNANDO SANCHEZ (06CV12484)

Mr. Sanchez was a detective for the New York Police Department who worked at the World Trade Center site and the Fresh Kills landfill following the attacks on September 11, 2001. Mr. Sanchez was under the impression that he returned his opt-in documents to our office in November, but for reasons unknown, our office never received Mr. Sanchez's opt-in document until January 7, 2011 when it was also promptly provided to the Allocation Neutral. A copy of Mr. Sanchez's opt-in documents are attached hereto as Exhibit "31". Mr. Sanchez has a Tier 1 Claim valued at $3,250.00 and the Met Life Cancer policy.

### ARDIAN SYKU (06CV9727)

Mr. Syku was a laborer for Tully Construction Company who worked at the World Trade Center site following the attacks of September 11, 2001. Our office and Mr. Hoenig's office originally had difficulty reaching Mr. Syku. Through multiple house visits and telephone calls our office was informed by Mr. Syku's family, all of whom speak very little English that Mr. Syku was out of the country for an extended period of time. Our office eventually received Mr. Syku's opt-in paperwork on January 14, 2011 when it was also provided to the Allocation

Neutral. A copy of Mr. Syku's opt-in documents are attached hereto as Exhibit "32". Mr. Syku has a Tier 1 Claim in the SPA valued at $3,250.00 and the Met Life Cancer Policy.

### JOSEPH WNEK (06cv15142)

Mr. Wnek volunteered his time at the World Trade Center site following the attacks on September 11, 2001. Mr. Wnek was originally unresponsive to our office's Mr. Hoenig's communications and attempts to contact him. Our office eventually received Mr. Wnek's opt-in documents on January 20, 2011 when they were also provided to the allocation neutral. A copy of Mr. Wnek's opt-in documents are attached hereto as Exhibit "33". Mr. Wnek has a Tier 4 Claim in the SPA with an estimated value between $43,717.00 and $53,425.00 and the Met Life Cancer policy.

### THE EFFECT THESE 18 OPT INS WILL HAVE ON THE SETTLEMENT AMOUNT

Each of the eighteen (18) Plaintiffs referenced above has expressed a desire to opt-in to the SPA. This is a result of this Court's continuous efforts through Special Counsel Michael Hoenig, Esq. and this office to communicate with these Plaintiffs because this Court expressed its desire that no plaintiff's action should be dismissed or voluntarily discontinued without the Court knowing the plaintiff's true desires in that regard. All of the plaintiffs addressed in this motion were finally able to review their settlement paperwork and confer with their attorneys before making an informed decision to opt-in to the SPA. Each of these Plaintiffs was originally included on the Eligible Plaintiff List. Therefore, there is no prejudice to the WTC Captive Insurance Company, Inc. or to any other Eligible Plaintiff by their inclusion in the SPA.

In fact, if these 18 Plaintiffs are allowed to opt-in and participate in the SPA, the total global Settlement Amount will actually increase for the benefit of all participating eligible Plaintiffs. The SPA provides that the Settlement Amount of $625,000,000.00 can increase up to

15

$687,500,00.00 if certain opt-in thresholds are met. There are approximately 10,000 Plaintiffs who are eligible to participate in the SPA. The WTC Captive is required to increase the settlement amount if certain opt-in percentage thresholds greater than ninety-five percent (95%) are reached.

Specifically, pursuant to Section VI. of the SPA, the WTC Captive shall pay two percent (2%) of the Settlement Amount set forth in Section II.A of the SPA for every one percent (1%) in excess of the ninety-five percent (95%) requirements in Section VI.D.i. of the Agreement; provided however that if actual opt-in experience for purposes of Section VI.D.i. of the SPA exceeds nine-eight (98%), the WTC Captive shall pay one-fifth of one percent (0.20%) of the Settlement Amount set for in Section II.A of the SPA for every tenth of one percent (.10%) above the ninety-five percent (95%) requirement set for in Section VI.D.i of the SPA. Thus, assuming that there are approximately 10,000 Plaintiffs who are eligible to participate in the SPA, the WTC Captive will be required to increase the Settlement Amount by $12,500,000.00 if ninety-six percent (96%) of the eligible Plaintiffs opt in to the SPA (approximately 100 opt-ins in excess of ninety-five percent (95%)), and another $12,500,000.00 if ninety-seven percent (97%) of the eligible plaintiffs opt in to the SPA (approximately 100 opt-ins in excess of ninety-six percent (96%)), and yet another $12,500,000.00 if ninety-eight percent (98%) of the eligible plaintiffs opt in to the SPA (approximately 100 opt-ins in excess of ninety-seven percent (97%)). Once the number of Plaintiffs who opt-in exceeds ninety-eight percent (98%), the WTC Captive is required to pay one-fifth of once percent (0.20%) of the Settlement Amount, or **$1,250,000**, for every tenth of one percent (0.10%) above the ninety-five (95%) opt-in threshold (10 additional opt ins). This works out to an approximately $125,000 increase in the Settlement Amount for each opt-in in excess of ninety-five (95%). As a result, the net effect of these 18 plaintiffs opting

16

in to the settlement is an increase in the Settlement Amount – to the benefit of the most seriously injured of all settling plaintiffs -- of approximately **$2,250,00.00**.

## CONCLUSION

The eighteen (18) eligible plaintiffs should be allowed to participate in the SPA since they were always included on the Eligible Plaintiff List, they all have their own unique reason for the delay in the execution of their opt-in documents and their participation in the SPA may result in a $2,250,000.00 increase in the total settlement amount for the benefit of not just these eighteen plaintiffs but to the sickest eligible plaintiffs who are participating in this settlement. These heroes need this money now and it should not be denied to them especially when these plaintiffs and this compensation was always contemplated for in the SPA.

WHEREFORE, Worby Groner Edelman & Napoli Bern, LLP respectfully requests that this Court compel the WTC Captive Insurance Company, Inc. to allow certain eligible plaintiffs to participate in the World Trade Center Litigation Settlement Process Agreement, As Amended.

Dated: February 9, 2011

/s/ Christopher R. LoPalo_____
Christopher R. LoPalo (CL-6466)
Worby Groner Edelman & Napoli Bern, LLP
350 Fifth Avenue, Suite 7413
New York, New York 10118
(212) 267-3700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
IN RE WORLD TRADE CENTER DISASTER  :   21 MC 100 (AKH)
SITE LITIGATION                    :   (All Cases)
                                   :
-------------------------------------------------------------x
IN RE WORLD TRADE CENTER LOWER     :   21 MC 102 (AKH)
MANHATTON DISASTER SITE LITIGATION :   (All Cases)
                                   :
-------------------------------------------------------------x
IN RE COMBINED WORLD TRADE CENTER  :   21 MC 103 (AKH)
AND LOWER MANHATTAN DISASTER SITE  :   (All Cases)
LITIGATION (straddler plaintiffs)  :
                                   :
-------------------------------------------------------------x

## PROPOSED ORDER

The plaintiffs in the list attached to this Order have expressed their desire to opt-in to the World Trade Center Litigation Settlement Process Agreement, As Amended and have signed a Release and executed Releases and Covenants Not To Sue. The WTC Captive Insurance Company, Inc. shall allow these plaintiffs to participate in the World Trade Center Litigation Settlement Process Agreement, As Amended

SO ORDERED

Dated: _____/_____2011

                                   _____
                                   ALVIN K. HELLERSTEIN
                                   United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE WORLD TRADE CENTER DISASTER : 21 MC 100 (AKH)
SITE LITIGATION : (All Cases)
 :
------------------------------------------------------------x
IN RE WORLD TRADE CENTER LOWER : 21 MC 102 (AKH)
MANHATTON DISASTER SITE LITIGATION : (All Cases)
 :
------------------------------------------------------------x
IN RE COMBINED WORLD TRADE CENTER : 21 MC 103 (AKH)
AND LOWER MANHATTAN DISASTER SITE : (All Cases)
LITIGATION (straddler plaintiffs) :
 :
------------------------------------------------------------x

**DECLARATION OF SERVICE**

     Christopher R. LoPalo, an attorney duly licensed to practice before the Courts of the State of New York, hereby declares that on February 9, 2011, I served the within Motion upon all counsel of record through the Court's Electronic Filing system.

February 9, 2010

                                            /s/ Christopher R. LoPalo_____
                                            Christopher R. LoPalo (CL-6466)
                                            Worby Groner Edelman & Napoli Bern, LLP
                                            350 Fifth Avenue, Suite 7413
                                            New York, New York 10118
                                            (212) 267-3700