# EXHIBIT A

```
                                                    1                                                      2
 1   UNITED STATES DISTRICT COURT                        1         APPEARANCES CONTINUED
 1   SOUTHERN DISTRICT OF NEW YORK                       2
 2   ------------------------------x                     2   PATTON BOGGS LLP
 2   IN RE WORLD TRADE CENTER                            3       Attorneys for Defendants
 3   DISASTER SITE LITIGATION                            3       The City of New York and
 3   ------------------------------x  21 MC 100(AKH)     4       contractors
 4   IN RE LOWER MANHATTAN DISASTER    21 MC 102(AKH)    4       The Legal Center
 4   SITE LITIGATION                   21 MC 103(AKH)    5       One Riverfront Plaza
 5   ------------------------------x                     5       Newark, New Jersey  07102
 5   IN RE COMBINED WORLD TRADE CENTER                   6   BY: JAMES E. TYRRELL, JR.
 6   DISASTER SITE AND LOWER MANHATTAN                   6       JOSEPH E. HOPKINS
 6   DISASTER SITE LITIGATION                            7
 7   ------------------------------x                     7   McDERMOTT WILL & EMERY LLP
 7             New York, N.Y.                            8       Attorneys for Defendants
 8                                                       8       WTC Captive Insurance Co.
 8             March 22, 2011                            9       600 Thirteenth St, N.W.
 9             2:41 p.m.                                 9       Washington, D.C.  20005-3096
 9                                                      10   BY: MARGARET H. WARNER
10   Before:                                            11        - also present -
10                                                      12   KREINDLER & KREINDLER LLP
11             HON. ALVIN K. HELLERSTEIN,               12       750 Third Avenue
11                                                      13       32nd Floor
12                  District Judge                      13       New York, New York  10017
12                                                      14   BY: NOAH KUSHLEFSKY
13                  APPEARANCES                         15   And Special Masters, et al.
13                                                      16               oOo
14   WORBY GRONER EDELMAN & NAPOLI BERN, LLP            17
14       Attorneys for Plaintiffs                       18
15       350 Fifth Avenue                               19
15       New York, New York  10118                      20
16   BY: WILLIAM GRONER                                 21
16       CHRISTOPHER R. LOPALO                          22
17       BRIAN CROSBY                                   23
18   SULLIVAN PAPAIN BLOCK McGRATH & CANNAVO P.C.       24
18       Attorneys for Plaintiffs                       25
19       120 Broadway
19       New York, New York  10271
20   BY: ANDREW J. CARBOY
20       FRANK V. FLORIANI
21
21   SCHIFF HARDIN LLP
22       Attorneys for Defendant
22       The Port Authority of NY and NJ
23       900 Third Avenue
23       New York, New York  10022
24   BY: BETH D. JACOB
24       ROBERT H. RILEY
25
```

```
                                                    3                                                      4
 1       THE COURT:  Be seated, everyone.  Good afternoon.    1   and Mr. Beester for reviewing the list of cases, and we have
 2       ALL COUNSEL:  Good afternoon, your Honor.            2   this list and I'll put this on the web page, the list of
 3       THE COURT:  As customary, I've distributed on the Web 3   opt-out plaintiffs.  And I have been looking at them.  There
 4   site, and by e-mail to liaison counsel, an agenda for today's 4  are 85 in number.  The earliest case that's been filed is a
 5   discussion and, to fill out one part of the discussion, a    5   case brought by Alexandros Anastassatos in 2003, 03 Civil
 6   suggested calendar leading to trials.  And, again, as our    6   08812.  That client is represented by the firm of Brecher
 7   custom has developed, anyone who wants to add or modify any of 7  Fishman.
 8   the items will be welcome to do so.  So on the agenda I have 8       That's the only 2003 cases I have noted.  There are a
 9   outlined seven major points, and I'll proceed in the order that 9  few cases going back to 2004 and so on.  And I recognize some
10   I set out.                                                  10   of the names on these lists because they have been active in
11       First is what to do with the opt-out cases, those      11   the various meetings that we have had since the settlement
12   people who have decided they did not wish to enter into the 12   process agreement was agreed to and approved.
13   settlement process agreement, presumably because they wanted to 13       So that's the question, what to do with these people.
14   have their cases tried, or perhaps there are other reasons why 14       I thought very hard about it.  I think both counsel
15   they thought that the proposed settlements as far as they were 15   for the plaintiffs and for the defendants have suggested that
16   concerned were not adequate.                               16   we might wait, that let's see what the Administration comes up
17       I've heard two sets of comments with regard to this    17   with.  The Administration is required to propagate regulations
18   group of people.  One is we should see what the administration 18   by September.  So why don't we wait until September?
19   of the Zadroga Bill will promise, and wait and let these people 19       The problem with waiting is that we really can't have
20   have another chance, in effect, to decide whether to enter that 20   a high degree of confidence that our questions will be answered
21   kind of a settlement, or to continue on the Court's calendar 21   by September.  Assuming that the regulations are put together,
22   towards trial; and the second would be to set up a schedule 22   which is a large assumption, and that a special master is
23   contemplating trial of those cases.                        23   appointed -- I think we'll have a special master appointed, but
24       Counsel -- and I thank Mr. Napoli and Mr. Papain and   24   as of now I've heard various names still being considered --
25   their colleagues, and Mr. Tyrrell, Mr. Hopkins and Ms. Warner 25   there then has to be some kind of procedure by which the
```

### Page 29

1  Now, assuming we follow this schedule -- and, as I
2  say, it is only a suggested schedule -- the knowledge gained
3  from what the experts will say will fit very well into the
4  period given by the Zadroga Bill for making up one's mind.
5  People will gain a better perspective of what confidence level
6  they should have about going forward towards trial or taking
7  advantage, in whatever way they can take advantage, and gain
8  certain knowledge under the regulations promulgated under
9  Zadroga. So I'm not sure and I think, to the contrary,
10  discovery will advance the state of knowledge and quality of
11  decision making on the part of this group of 85, this group
12  that I'm concerned about.
13  That brings us to the issues on Daubert, which will
14  also be within this period, and I would contemplate that by the
15  end of July, with all going well -- which is a very large
16  assumption -- everyone will have the benefit of my decision on
17  the Daubert issues.
18  In short, there is a lot of advantage in going ahead.
19  The major disadvantages are expense and inconvenience; those
20  are very important disadvantage considerations. But the
21  considerations of advancing towards the ultimate resolution,
22  gaining knowledge that could help either this patient with
23  Zadroga or moving forward to trial, then that consideration is
24  substantially well advanced, and we avoid that inertia that I
25  fear of a long and indefinite delay without doing anything.

### Page 30

1  I think I'm persuaded that we should go ahead.
2  Mr. Tyrrell.
3  MR. TYRRELL: Your Honor, you know we disagree with
4  the bottom line, but let me go to the scheduling and sort of
5  talk about things --
6  THE COURT: This is for discussion, Mr. Tyrrell.
7  MR. TYRRELL: This is just discussion, yes, your
8  Honor.
9  THE COURT: It is an aggressive schedule, as the
10  previous schedule was aggressive, but I did it out of my own
11  head. I don't know the practicalities that are implicit in
12  having to do these things within your law firms, and I need a
13  lot of input and advice to really fix a schedule that all of us
14  can live under.
15  MR. TYRRELL: Your Honor, if I can sort of start here?
16  The question now is let's assume we are going ahead. The issue
17  that, I guess, is the first step is where do we start when we
18  go ahead. And that is framed by a few things that I think are
19  worth noting.
20  The first is that we have none of the benefits of all
21  the work that we did on the 60.
22  THE COURT: I'm sorry. None of the benefits?
23  MR. TYRRELL: We have none of the detailed discovery
24  available that we did on the 60 --
25  THE COURT: They are all gone because you have not

### Page 31

1  taken depositions.
2  MR. TYRRELL: Right.
3  THE COURT: But, really, what you are missing,
4  practically speaking, is knowledge about the particular
5  plaintiffs.
6  MR. TYRRELL: Absolutely. And that's where I am
7  starting. And that's what we here, and I think everybody
8  knows, we call CMO 10.
9  And if I can be very, very candid about a very
10  important point? When my client agreed to pay more than $600
11  million, an important part of what it bargained for, and the
12  plaintiffs and defendants agreed upon, were what we called then
13  long fine orders, what became CMO 10 that your Honor entered.
14  But it really was an attempt to accomplish what your Honor
15  worked at from the beginning of the litigation, which was
16  providing details so that we know where people worked, exactly
17  what their medical conditions were, that we had medical
18  records, that we had an up-front affidavit at least saying that
19  there was plausible connection between what they claimed to
20  have and the events of 9/11, etc. It's all packaged in CMO 10.
21  The big problem -- and from our clients' perspective,
22  we paid dearly for that. Your Honor was burdened a lot with
23  how to do it. You remember we started out doing it in one way.
24  We then converted it, in discussions with your Honor, to
25  pleadings. We then became concerned that the pleadings might

### Page 32

1  run afoul of some Supreme Court decision, so you asked us to go
2  back and still do it but put it together in CMO 10.
3  So although you are going to talk about CMO 10 later,
4  I suggest to you it is the things that CMO 10 requires that you
5  would have to start off with --
6  THE COURT: You wanted in CMO 10, and I wanted since
7  the beginning of the case, reliable information on just the
8  points you have mentioned. And that was the single purpose for
9  the discovery that was worked out between the special masters
10  and you and plaintiffs' counsel. And it seems to me we have
11  that information.
12  What we don't have are experts
13  MR. TYRRELL: No. That's the problem. That's what I
14  wanted to say to you. Because now you have to look at it as to
15  whether you have it and to what degree as to the 85 opt outs.
16  So although we only focused on this today, and I don't have all
17  the details, we went back to our team before court and got what
18  the computer can tell us. And here's what we have.
19  As to 21 of the opt outs in the 100 case, so
20  25 percent of them, eight of them have no TCDI database
21  response whatsoever.
22  THE COURT: I will dismiss the cases for failure on
23  discovery issues.
24  MR. TYRRELL: 17 have not --
25  THE COURT: As you know, when that has been brought to

### Page 33

1  my attention during the course of discovery, the prompt result
2  was an order dismissing those cases.
3      Why wasn't I told about that when that happened?
4      MR. TYRRELL: The answer is because when we had 11,000
5  cases, basically there were a bunch of holes and we were
6  concentrating on 60.
7      THE COURT: Well, there were 2,000 cases in each
8  tranche.
9      MR. TYRRELL: Right.
10     THE COURT: And you have identified a number of them,
11 and I dismissed those cases. Sometime we re-let them in when
12 discovery was a little bit slow. But if there was no
13 discovery, we would not have progressed with their cases; they
14 would have been dismissed instantly.
15     MR. TYRRELL: And so if you remember --
16     THE COURT: I still could do it.
17     MR. TYRRELL: Right.
18     If you remember the way we structured the tranches, we
19 never really got to the people who filed late and never got put
20 into a tranche; so they fell through a crack in your orders.
21 I'm not saying these are; I haven't had enough time to look at
22 it. But in terms of your thinking through, are we ready for
23 experts, can the special masters and we make an intelligent
24 choice out of the 85 cases as to what would be appropriate to
25 tee up for early trial, I suggest to you, unfortunately, we are

### Page 34

1  not ready.
2      17 of the 85 have not produced any medical records
3  whatsoever  Seven have produced no core discovery  Eight of
4  that group have produced neither medical records nor core
5  discovery.
6      THE COURT: I repeat, Mr. Tyrrell, bring a motion to
7  dismiss for failure to prosecute the case in accordance with
8  the orders of the Court  This time the motion will be granted.
9  The list will not be 85; it will be appreciably less.
10     MR. TYRRELL: So let's go on to the ones who have
11 something in the record.
12     THE COURT: Then those people can then decide very
13 quickly that they would rather go to Zadroga.
14     MR. TYRRELL: Right. Where we have some in the
15 record, let's assume it is 60, what do we have in the record?
16 We have very, very limited information and nothing updated.
17     So what they put into core discovery -- now they have
18 had medical treatment, presumably, and everything over the
19 year, the last year, which will be very relevant to what your
20 experts have to say -- none of that has been updated.
21     THE COURT: Mr. Tyrrell, this is a dynamic case.
22 People's health is dynamic  We are confronted every day with
23 people who get sick, who die, and who recover. That's inherent
24 in the cases.
25     And if we're picking a list again, we'll pick a list

### Page 35

1  of ten of the cases that are ready. People who have not made
2  their cases ready don't deserve to be selected.
3      MR. TYRRELL: Let's assume we pick the ten best. I am
4  suggesting to you, based on the work that we have done, that in
5  the absence of giving us time as to (a) it's hard to pick which
6  ten are best, but we don't have the medical records to be able
7  to --
8      THE COURT: I will give you a suggestion. If you find
9  that there are not ten good cases, we'll pick five. If you
10 find that there are not five good cases, we will pick three.
11 And if you find that there are no good cases, none will be
12 advanced and we'll find out some other appropriate remedy.
13     MR. TYRRELL: Your Honor, I feel that is a Biblical
14 story.
15     THE COURT: I've worked these cases to be trial ready.
16 I did that with the original group of 10,000; I will do that
17 now with this group of 85. If they are not discharging of
18 their discovery obligations, they do not deserve the attention
19 of the Court and they will be dismissed.  Just bring a motion.
20     MR. TYRRELL: What I'm talking about is as to the ones
21 that don't reach the level of being dismissed --
22     THE COURT: Those that have satisfied their
23 obligations.
24     MR. TYRRELL: Right.
25     THE COURT: We know a lot but may not know

### Page 36

1  100 percent, but we may know a lot.
2      MR. TYRRELL: That is the problem. We don't, as to
3  the ones that are beyond dismissal, know anywhere near what we
4  knew as to the ones that we went through and selected out of
5  the tranches.
6      THE COURT: It will be a short discovery period to
7  require that to be satisfied, and we can talk about discovery,
8  and it is appropriate for these cases. That should not hamper
9  our being able to select ten, or some appropriate number of
10 cases, to be advanced.
11     MR. TYRRELL: Let's assume --
12     THE COURT: Let's just say, as you say, there are only
13 seven or eight that have any kind of severity about them and
14 that the great bulk are cases which have no reportable
15 injuries, no objective condition of injuries and are just
16 concerned that they might get an injury later on, our work will
17 be made a lot simpler. We don't know who they are, and that's
18 what I need to know. I need to know who they are. I need to
19 know what level of severity they have. And I don't know that
20 information. I would like to know.
21     MR. TYRRELL: Let me make two suggestions, with one
22 observation.
23     Your Honor is suggesting that it's really now about
24 experts and Daubert and what have you and it might coincide
25 with the time period and help people in connection with

37

1   Zadroga. My own view is that that's probably not going to
2   happen, because before you can truly unleash experts and
3   prepare an expert report, at least from the defense
4   perspective, the first thing your expert asks you is a lot of
5   information about their medical records, a great deal of which
6   we don't have.
7        So I'm all for it, if we are going to go forward with
8   this schedule, giving us time to get it so the experts can be
9   prepared at the same time.
10       THE COURT: I'll give you this amendment. If you look
11  at the suggested calendar, we can discharge 1(i), 1(ii) and
12  1(iii) and meet again to learn about these cases, identify
13  these cases, and decide what's appropriate to be done about
14  these cases.
15       If these cases show some level of severity, if these
16  cases are the kinds of cases that suggest an appropriateness
17  toward moving them forward to earlier disposition because they
18  have been around a long time and the injuries are severe, that
19  would be one thing. If, however, these cases are
20  run-of-the-mind case, people who are concerned that one day
21  they might get sick, or they are cases where discovery
22  obligations have been indifferently satisfied and should be
23  dismissed for lack of prosecution, that is another thing.
24       Right now we have a state of too much absence of
25  knowledge to make intelligent decisions on my part. It is not

38

1   a Zadroga issue lack of intelligence, it is a lack of
2   intelligence to make appropriate orders given the way that you
3   and Mr. Carboy and Mr. Groner have expressed themselves.
4        Let's learn more about this. Let's go through 1(i),
5   1(ii) and 1(iii) and have a conference in the second week or so
6   of April.
7        MR. TYRRELL: Your Honor, the suggestion I was going
8   to make is the special masters did a great job of working with
9   us in screening this before we took it to your Honor, including
10  writing a report for you on various things. Maybe the right
11  thing to do, though I hate to burden them with additional work,
12  is to suggest that before we meet with you, we meet with them,
13  we lay this out, we let them get an opportunity to see and then
14  recommend to you so you have not only our arguments at the
15  conference but their input as well.
16       THE COURT: I like that.
17       Special masters, what do you think?
18       (The special masters indicated affirmatively)
19       THE COURT: Yes. We could do that.
20       Let me give you a date so that we'll have some target.
21       (Pause)
22       Excuse me.
23       (The Court conferred with the special masters)
24       THE COURT: I'm suggesting that we have our next
25  conference April 15 at 2 o'clock, which is a Friday, and that

39

1   the special masters will make time for you and you'll make time
2   for the special masters in anticipation of that meeting, and we
3   will see where we go from there.
4        Is that satisfactory?
5        MR. TYRRELL: Yes, your Honor.
6        MR. GRONER: Your Honor, is it possible to make it the
7   following Tuesday or Wednesday?
8        THE COURT: No. I will be away.
9        MR. GRONER: Oh, that is Passover week.
10       THE COURT: Right. That is Passover. That is the
11  last workday I have before Passover. I am taking time off.
12       MR. TYRRELL: Your Honor, one thing in terms of moving
13  things forward. I assume that there will be no problem, if we
14  don't have them -- we have to check the record, we don't know,
15  but if we don't have them, which I think is likely, releases
16  for medical records contemporaneous with what you previously
17  ordered for the 60, that we will expeditiously be given those
18  releases for the 85 so that we may move forward and supplement.
19       THE COURT: I think so. Mr. Groner? Mr. Carboy?
20       MR. GRONER: Yes, your Honor.
21       MR. CARBOY: Yes.
22       THE COURT: Whatever court orders you need, just ask
23  for them.
24       I would suggest using court orders liberally to get
25  these records. OK.

40

1        MR. GRONER: Your Honor, if I may?
2        THE COURT: Yes.
3        MR. GRONER: I didn't speak about discovery that the
4   plaintiffs would choose to seek against the defendants, and I
5   think it is something we could bring up with the special
6   masters. But I would be remiss in not mentioning that it is
7   something that is obviously important to us --
8        THE COURT: Mr. Groner, this is a suggested calendar.
9   I'm sure I've not thought about many other things that you will
10  be thinking about, both sides. So the meeting on the 15th will
11  be to discuss how we go forward.
12       MR. GRONER: Fine.
13       THE COURT: We should have more information -- more
14  definite information to give us a better idea of how to go
15  forward.
16       MR. GRONER: Thank you, your Honor.
17       THE COURT: But I think we should think to go forward
18  on these cases. I think things will resolve themselves as we
19  go forward and we will preserve more flexibility and give more
20  benefits to the people involved. They will have a better idea
21  of where to go.
22       All right. Now, with regard to item 2 on the --
23  sorry, we still have item 1(iii) on the agenda.
24       There have been some comments that I received that we
25  don't need TCDI anymore. I think we very much need TCDI. That