USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/8/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE WORLD TRADE CENTER DISASTER SITE LITIGATION

IN RE LOWER MANHATTAN DISASTER SITE LITIGATION

IN RE COMBINED WORLD TRADE CENTER AND LOWER MANHATTAN DISASTER SITE LITIGATION

**SUMMARY ORDER DENYING OBJECTION TO BONUS PAYMENTS**

21 MC 100 (AKH)
21 MC 102
21 MC 103

ALVIN K. HELLERSTEIN, U.S.D.J.:

In my Order of December 30, 2010, I noted that more than 98 percent of Plaintiffs eligible to settle their lawsuits in these Master Calendars had opted to settle under the Settlement Process Agreement, As Amended ("SPA"), and that under the SPA, bonus payments were payable. Order Accepting Report of Special Counsel and Providing for Effectiveness of Settlement, In re World Trade Center Disaster Site Litig., No. 21 MC 100 (Doc. No. 2269) (S.D.N.Y. Dec. 30, 2010). The World Trade Center Captive Insurance Company and the City of New York objected. I have considered the objection, the terms of the SPA, and various features of the litigation concerning fairness, freedom from conflicts, and other relevant aspects of the relationships between Plaintiffs and the counsel who were parties to the creation of the SPA.

The objection is denied. This Summary Order presents my findings and conclusions in abbreviated format, but is final and may be relied on by the Allocation Neutral in issuing settlement amounts to settling Plaintiffs.

## I. Findings

1. The SPA was approved by this Court as fair, reasonable, and adequate on June 10, 2010. On July 26, 2010, and August 3, 2010, this Court conducted town-hall meetings in Queens and in Staten Island to answer questions and address concerns

of the Plaintiffs eligible to settle their cases by accepting the SPA's terms. The Court also, on a pair of evenings in November 2010, made the Special Masters available for Plaintiffs to ask questions directly.

2. The effective deadline for opting into the settlement, as provided by the SPA, was September 30, 2010. See SPA § XXII.A.

   a. The effective deadline was twice extended, first to October 30, 2010, and then to November 16, 2010, to give more time for sufficient Plaintiffs to ratify the SPA by satisfying the needed op-in threshold, which could be achieved if 95 percent of Plaintiffs eligible to settle in fact did so. See SPA § VI.

   b. To satisfy the threshold, on the eve of the November 16, 2010, deadline, Plaintiffs' Liaison Counsel, Defendants' Liaison Counsel, and counsel for the WTC Captive signed seven successive stipulations of voluntary dismissal pursuant to Federal Rule of Civil Procedure 41, to dismiss 185 eligible Plaintiffs and remove them from the list of Plaintiffs eligible to settle, thereby increasing the percentage of those who had chosen to opt into the settlement. Three of these stipulations, permitting dismissal of approximately half the 185 Plaintiffs, were docketed before I noticed the purpose and pattern of the dismissals.

   c. I then ordered an *in camera* hearing to ascertain if Plaintiffs' Liaison Counsel was sufficiently authorized to stipulate to dismiss cases. See Transcript of Status Conference, In re World Trade Center Disaster Site Litig., 21 MC 100 (S.D.N.Y. Nov. 18, 2010). I found that the Plaintiffs' authorizations to dismiss were unclear, that the scope of the dismissals was excessive, and that

they were potentially executed against the interests of the dismissing Plaintiffs and in favor of the settling Plaintiffs. Id. (By separate Order, I now order the transcript of the hearing to become a publicly-filed document.)

d. I permitted those stipulations which had been docketed to be effective, but held the remaining stipulations for further inquiry.

e. On November 19, 2010, the Allocation Neutral informed me that more than 95 percent of the eligible Plaintiffs had chosen to accept the SPA. Of 10,563 Plaintiffs eligible to settle, 10,043 had chosen to do so. See Doc. No. 2256, 21 MC 100 (S.D.N.Y. Nov. 19, 2010). I accepted the Allocation Neutral's report. Id. Because of my determination of effectiveness, the 95 percent threshold was achieved and the settlement became effective.

f. Of the 520 eligible Plaintiffs who had not chosen to settle their cases under the SPA, the vast majority had not made an affirmative decision whether to settle or to continue litigating their cases. This reflected a reality first learned at the *in camera* hearing, that many Plaintiffs had ceased to communicate with their counsel, Worby Groner Edelman & Napoli Bern, LLP. I appointed a Special Counsel, Michael Hoenig of Herzfeld & Rubin, P.C., to speak with Plaintiffs who refused to speak to their counsel, in order to determine if such Plaintiffs wished, in light of the full facts and after consultation with conflict-free counsel, to settle, continue to prosecute their cases towards trial, or voluntarily dismiss their cases. Plaintiffs were to be advised that if they were unwilling to choose, their cases would be involuntarily dismissed. Order Appointing

Special Counsel, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2257) (S.D.N.Y. Nov. 24, 2010).

g. The report of Special Counsel, dated December 21, 2010, is filed with the records of this case. See Order Accepting Report of Special Counsel and Providing for Effectiveness of Settlement. As a result of the Special Counsel's efforts, 44 more Plaintiffs opted into the settlement; 31 opted to continue with their cases; and 47 chose to dismiss their cases voluntarily, with prejudice, to the extent that New York law permits, see Golod v. Hoffman La Roche, 964 F. Supp. 841 (S.D.N.Y. 1997) (Plaintiffs who dismiss cases retain the right to bring claims based on new, "second" injuries arising from the same set of facts or occurrences). In addition, 409 Plaintiffs failed to respond to the Special Counsel's inquiries, and were dismissed involuntarily by the Court for failure to prosecute. Order Dismissing Cases for Failure to Prosecute, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2268) (S.D.N.Y. Dec. 30, 2010). These dismissals were under identical terms as those Plaintiffs who dismissed their cases voluntarily. See Order Dismissing Cases with Prejudice, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2267) (S.D.N.Y. Dec. 30, 2010).

3. As a result of the additional opt-ins following the work of the Special Counsel, 10,087 Plaintiffs opted into the settlement (the numerator of the fraction), the number of eligible Plaintiffs was reduced to 10,147 (the denominator of the fraction), and the resulting percentage of settling plaintiffs to all those eligible was approximately 99.4 percent.

4. Under the SPA, if the percentage of settling Plaintiffs is 99.4 percent, the amount of the settlement is as follows:

   (i) A base amount of $625,000,000, see SPA § II.A., plus

   (ii) Potential bonus payments of $55,000,000, because the settling percentage was in excess of 95 percent and amounts to approximately 99.4 percent, see SPA § VI.E; and thus

   (iii) Total payments payable by Allocation Neutral of $680,000,000, together with contingency payments that may come due under SPA § IV.

5. The SPA provides for a list of Plaintiffs eligible to settle, defined as all those who provided a notice of claim or filed suit against the City of New York by April 12, 2010, alleged qualifying injuries, and had not previously accepted compensation in the Victim Compensation Fund. SPA § VI.A.

   a. Plaintiffs' Liaison Counsel and counsel for the WTC Captive kept the list to themselves, and did not file the list in Court or give a copy to the Court.

   b. Approximately 57 of the Plaintiffs who had filed timely complaints or notices of claim had taken compensation from the original Victim Compensation Fund and so released their claims, see Air Transportation Safety and System Stabilization Act ("ATSSSA") § 405(c)(3), 49 U.S.C. § 40101 et seq., but had sued nevertheless because of increasing and unexpected severity of the illnesses they allegedly incurred by reason of their work at the World Trade Center site. When the WTC Captive objected to allowing any of these Plaintiffs to settle, Plaintiffs' Liaison Counsel deleted them from the list of Plaintiffs eligible to settle, even though he also represented them. See Order

Denying Motion to Vacate Order Appointing Counsel, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2383) (S.D.N.Y. March 11, 2011).

c. The SPA provided that Plaintiffs who voluntarily dismissed their cases and gave a release in the form attached as Exhibit S to the SPA would be eliminated from the Eligible Plaintiff List. The WTC Captive and Plaintiffs' Liaison Counsel eliminated these Plaintiffs from the list. Pursuant to Court ruling, these releases were narrower in scope than the text of Exhibit S provided. See Transcript of Status Conference at 29-30, In re World Trade Center Disaster Site Litig., 21 MC 100 (S.D.N.Y. Nov. 18, 2010). Specifically, Exhibit S purported to release "[a]ll claims by Plaintiffs against all Defendant(s) or against any Defendant arising out of or relating in any way to World Trade Center-related rescue, discovery, and/or debris removal operations and/or clean-up at any location on and/or after September 11, 2001." SPA, Ex. S. I ruled, however, and counsel for the WTC Captive and the City acknowledged, that releases could not bar second-injury claims. Transcript of Status Conference at 29-30, In re World Trade Center Disaster Site Litig., 21 MC 100.

d. The SPA did not provide for involuntary dismissals of cases, or what effect they should have on the list of eligible plaintiffs. There is no indication in the SPA or in the records of Court proceedings that eligible Plaintiffs would refuse to choose between settling their cases or continuing with litigation. The relevant provision of the SPA provides:

> Only Plaintiffs with Debris Removal Claims filed against the Insureds or any of them, including in any Master Docket, on or before April 12, 2010, or who have instituted Debris Removal Claims against the Insureds or any of them through other legal process recognized by New York law . . . on or before April 12, 2010 shall be eligible for inclusion on the Eligible Plaintiff list; provided, however, that such Plaintiffs who dismiss with prejudice, and without exception, their Debris Removal Claims against the Insureds . . . need not be included on the Eligible Plaintiff List; provided, further, however, that any Primary Plaintiff who is named in Appendix A to Case Management Order No. 1 in Master Docket 21 MC 100 need not be included on the Eligible Plaintiff List unless he or she has amended his or her complaint to allege any Qualifying Injury(ies). Plaintiffs who dismiss all of their Debris Removal Claims against the Insureds with prejudice by filing the Stipulation of Dismissal with Prejudice . . . at any time before the Final Settlement Agreement Effective Date shall not be counted for purposes of determining compliance with the Opt-in Threshold. In addition, Primary Plaintiffs identified on Exhibit I may be excluded from the Eligible Plaintiff List, or shall be excluded from the Opt-In Threshold calculations in this Section VI of this Agreement even if listed on the Eligible Plaintiff List, only if they dismiss with prejudice all of the claims relating to Qualifying Injuries such that the Primary Plaintiff's only remaining Debris Removal Claims against the Insureds are orthopedic in nature. For those Plaintiffs who do not opt into the Final Settlement Agreement, the identification of alleged Primary Qualifying Injury required by Section VI.A. of this Agreement shall be deemed an answer to an interrogatory and pursuant to Federal Rule of Civil Procedure 35(c) may be used to the extent allowed by the Federal Rules of Evidence.

SPA § VI.A. As the City and the Captive concede, "[a]lthough the negotiating parties were well aware that some number of the over 10,000 individual Plaintiffs would ultimately drop out during the settlement process, the parties made no provision in their contract for altering the participation percentage for individuals who would ultimately be involuntarily dismissed."

Def's Brief at *6. Under the proceedings that I had ordered, the "drop out" of Plaintiffs resulting from involuntary dismissals of Plaintiffs refusing to choose whether to settle or not, and refusing to communicate with their lawyers, was the equivalent, in consequence and intent, to voluntary dismissals.

e. Where the language of SPA § VI.A has spoken to the question whether Plaintiffs are eligible to settle, this Court has enforced it according to its plain meaning. See Order Denying Motion to Enlarge Settlement Eligibility Date, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2192) (S.D.N.Y. Sept. 27, 2010).

f. There is no legal distinction, in consequence or intent, between a voluntary and an involuntary dismissal, particularly in the circumstances recited above. Both are subject to the same terms, as permitted by New York law. As I previously described them,

> [Plaintiffs'] dismissal is with prejudice for all claims that could have been brought in relation to plaintiffs' existing pleadings, but without prejudice in relation to a second injury to the extent permitted by New York State law, see, e.g., Golod v. Hoffman La Roche, 964 F. Supp. 841 (S.D.N.Y. 1997) ("Under [New York's] two-injury rule, 'diseases that share a common cause may nonetheless be held separate and distinct where their biological manifestations are different and where the presence of one is not necessarily a predicate for the other's development.'" (internal quotation marks omitted)), and as may be defined by any court having jurisdiction over any such later-filed complaint.

Order, Dunne v. World Trade Center Props, LLC, In re World Trade Center Disaster Cite Litig., 05 Civ. 1578 (21 MC 101), Doc. No. 9) (S.D.N.Y. Feb. 22, 2010).

## II. Conclusions

6. Nothing in the language of the SPA supports the argument of the WTC Captive and the City that they are not obligated to remove involuntarily dismissed Plaintiffs from the list of Plaintiffs eligible to settle. As they concede in their briefing, the parties' agreement shows that they contemplated only that Plaintiffs would choose to settle their cases or continue litigating. The situation presented differs from those in which the language of the SPA has spoken to the issue. The absence of choice was an unforeseen contingency, which requires judicial consideration.

7. The objection of the WTC Captive and the City to bonus payments has no principled basis, and breaches a material obligation on their part to be performed under the SPA. Requiring the WTC Captive to make bonus payments accords with the objective intention of the parties, as expressed in the SPA and as communicated to, and objectively understood by, the settling Plaintiffs, that the WTC Captive and the City are to pay settlement funds commensurate with the number of eligible Plaintiffs who chose to settle their cases.

8. Apart from the terms of the SPA, the City and the WTC Captive are not free to offer and agree to a bonus payment according to the percentage of settling Plaintiffs to the whole, and then to renege on the obligation.

    a. Since, from the perspective of the City and the WTC Captive, the legal consequence and effect of involuntary dismissals is the same as voluntary dismissals, the WTC Captive would obtain a windfall if it were freed of its obligation to pay bonus payments.

b. The settling Plaintiffs' acceptances were in response to communications that the settlement would include bonus payments according to percentages of acceptances in excess of 95 percent.

c. The Court approved the settlement on the basis that bonus payments would be payable upon a rate of acceptance exceeding 95 percent, and helped the parties obtain such ratification by extending Court sessions to Staten Island and Queens, to spread understanding and acceptance of a settlement that it determined to be fair and equitable.

9. Because the settlement was made in the aggregate and not in respect of individual cases, it is the equivalent of a class settlement and not an aggregate of individual settlements. The Court has jurisdiction and responsibility to review the terms of the settlement and to determine its fairness and reasonableness. Congress vested this Court with the power to manage and supervise these cases when it consolidated all litigation in the United States District Court for the Southern District of New York, which has exclusive jurisdiction over all cases arising from the terrorist-related aircraft crashes of September 11, 2001. See ATSSSA § 408(b)(1), (3). Congress, in consolidating this entire litigation in this Court, contemplated that it should exercise such control, and should manage these cases to achieve a just and satisfactory resolution, just for Defendants as well as for Plaintiffs.

10. Further, because of the number of conflicts and potential conflicts among the group of Plaintiffs, and between the Plaintiffs and their counsel, the Court must

assume jurisdiction and responsibility to assure fairness with respect to all proceedings, including settlement proceedings.

a. The City and the WTC Captive were aware of these conflicts. The bonus and incentive arrangements exacerbated such conflicts by creating an incentive to Plaintiffs' counsel to advocate the settlement to all clients, even those who might prefer to continue with their cases, and to minimize the intensity of proceedings of continuing cases. See SPA § IV (describing additional contingency payments that turn on how much litigation activity occurs in these cases in the future). The City and the WTC Captive also required the stipulation of dismissal, Exhibit S to the SPA, to be too broad on its face to be legitimate. The Court has jurisdiction and responsibility to assure that the potential for co-option resulting from these features does not compromise fairness.

b. The conflicts and potential conflicts among the Plaintiffs, and between the Plaintiffs and their counsel, led to distrust between client and attorney and refusal by many to respond to their lawyer, or to instruct the lawyer regarding the material aspects of the case. This feature, also, justifies judicial involvement to assure fairness—for example, the appointment of a Special Counsel to locate and consult with Plaintiffs who no longer trusted their lawyer but could not practically displace him with another lawyer.

Since, in consideration of fairness and proper contract interpretation, the WTC Captive should make the bonus payments as promised, the Allocation Neutral is hereby instructed to include such payments in the sums payable to settling plaintiffs. The Court

understands that all, or the bulk of, these bonus payments will be payable to Tier IV settling Plaintiffs, those with the most serious injuries.

The question remains whether Plaintiffs' counsel should obtain a percentage of the bonus payments in addition to their fee. The Court has previously observed that Plaintiffs' counsel is entitled to a 25 percent contingency fee, net of expenses. All told, the settlements of these lawsuits have accumulated approximately $725,000,000, across the series of settlements with the City of New York, its indemnified contractors, and additional Defendants such as the Port Authority of New York and New Jersey. Plaintiffs' counsel therefore stand to recover approximately $187,500,000, after expenses are paid by the Plaintiffs. Such fees, taken after Plaintiffs' counsel have had all their expenses paid out of the settlement funds, are more than sufficient to compensate counsel for their representation. Plaintiffs' counsel shall not recoup a fee from the bonus payments now ordered to be paid.

SO ORDERED.

Dated: September 8, 2011
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge