UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

IN RE WORLD TRADE CENTER DISASTER     :     **ORDER AND OPINION DENYING**
SITE LITIGATION                       :     **OBJECTION OF WTC CAPTIVE**
                                            **INSURANCE TO PAYING BONUSES**
------------------------------------------------- :     **PROVIDED BY THE SPA**
IN RE LOWER MANHATTAN DISASTER        :
SITE LITIGATION                       :

------------------------------------------------- :     21 MC 100 (AKH)
IN RE COMBINED WORLD TRADE CENTER     :     21 MC 102
AND LOWER MANHATTAN DISASTER SITE     :     21 MC 103
LITIGATION                            :

------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

On September 8, 2011, I issued an "abbreviated" but "final" order overruling the

World Trade Center Captive Insurance Company's objection to having to pay bonus payments

under its settlement agreement. Summary Order Denying Objection to Bonus Payments, In re

World Trade Center Disaster Site Litig. (Doc. No. 2523) (S.D.N.Y. Sept. 8, 2011). This

Opinion, supplementing the findings and conclusions issued on September 8, 2011, provides the

fuller explanation that I promised in that Order.

The issue, now as before, is whether the objection of the City of New York, its

indemnified contractors, and the World Trade Center Captive Insurance Company ("WTC

Captive"), seeking to draw a distinction in contract interpretation between voluntary and

involuntary dismissals of Plaintiffs, is legally sound. At issue is the WTC Captive's obligation

to make bonus payments to severely injured Plaintiffs under the Settlement Process Agreement

As Amended ("SPA"), an obligation based on the high percentage of Plaintiffs who chose to

enter the SPA, 99.4 percent. The issue arose because a substantial number of Plaintiffs of those

eligible to settle were not communicating with, or accepting communications from, their counsel,

and therefore would not, or could not, exercise choice whether to settle or continue with their

1

lawsuits. After notice and considerable effort to reach these Plaintiffs, directly and through a specially appointed counsel, I dismissed them from the lawsuit because they had given up being parties, if, indeed, they had ever been real parties.

The WTC Captive argues that because I dismissed these Plaintiffs involuntarily, they should be counted in the pool with Plaintiffs eligible to settle who actively chose not to settle. This has the effect of increasing the total eligible Plaintiff pool and thereby reducing the percentage of Plaintiffs who chose to settle, adversely affecting the WTC Captive's bonus obligations. It also has the effect of treating involuntary dismissals differently from voluntary dismissals. I hold that this distinction advanced by the WTC Captive is not sound. Whether voluntary or involuntary, a dismissal of a Plaintiff has exactly the same effect, for a dismissed Plaintiff, since he was dismissed with prejudice however he was dismissed, cannot again file suit on a claim that was alleged or that could have been alleged against the City and its contractors. The City and its contractors are equally protected by both dismissals, and equally obligated to pay settlement bonus payments reflecting the removal of all dismissed Plaintiffs from the list of those who were eligible to settle. The involuntarily dismissed Plaintiffs do not belong in the calculation of Plaintiffs who chose to participate in the SPA. Whether involuntary or voluntary, the distinction has no difference.

I.    **Background**

a.  **The Funding of the Settlement: FEMA and the Billion Dollars Provided to the WTC Captive Insurance Company**

The 10,500 cases filed in this Court by the responders to the events of September 11, 2001—the policemen, firemen, medical personnel, construction workers, and volunteers who conducted the search, rescue and clean-up operations in the World Trade Center sites—could not practically have settled under the law prevailing at the time the lawsuits were filed. That law, the

2

Air Transport Safety and System Stabilization Act ("ATSSSA"), 49 U.S.C. § 40101 et seq., limited the liability of the City of New York—the principal Defendant in these cases—to the greater of either the extent of its insurance coverage, or $350 million, ATSSSA § 408(a)(3). Probably, neither amount would have been enough for the mass settlement.[1]

The provision for federal funding changed the complexion of the litigation. In or about February 2003, Congress appropriated $1 billion to the Federal Emergency Management Agency ("FEMA") "to establish a captive insurance company or other appropriate insurance mechanism for claims arising from [World Trade Center] debris removal, which may include claims made by city employees." Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 517-18 (2003). Upon the announcement of the event, counsel for both Plaintiffs and Defendants initially expressed agreement with the Court that a settlement of all cases now could be achieved, and soon. However, Plaintiffs' counsel soon sought more, stating that one billion dollars was not enough to compensate the injured and that it would be necessary to invade the insurance coverage of the City's contractors. Transcript of Status Conference of November 3, 2006 at 31-39, In re World Trade Center Disaster Site Litig. (Doc. No. 552) (S.D.N.Y Nov. 3, 2006).

### b. The Proceedings and Discovery That Were Prelude to Settlement

Settlement did not come as easily as I had hoped; intensive pre-trial proceedings and discovery followed the introduction of the WTC Captive. Rather than select a sample from an unknown field of cases for advancement to trial, I ordered instead that the essential facts of each case and each defense (including the insurance coverage of each Defendant) first should be developed, efficiently, reliably, and uniformly. I appointed special masters with the help and

---

[1] The City had only $77 million of insurance protection, provided in layers by various insurers. See WTC Captive Ins. Co., Inc. v. Liberty Mutual Fire Ins. Co., 537 F. Supp. 2d 619, 621-22 (S.D.N.Y. 2008).

agreement of the parties, and I ordered a set of 368 court-ordered interrogatories—core discovery questions that each and every Plaintiff and Defendant had to answer personally and under oath as required by Federal Rule of Civil Procedure 33. Memorandum and Order Appointing Special Masters, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 551) (S.D.N.Y. Dec. 12, 2006).

By my Order of February 8, 2009, I organized the field of Plaintiffs into 5 "waves" for core discovery purposes. Plaintiffs were required first to answer 35 core discovery questions, supplying their answers to a computerized database accessible to the Court and counsel. By their answers, the Plaintiffs would disclose who they were; when, where, and for whom they worked; the nature and degree of their injuries as measured objectively by medically-recognized tests; and various other items of information. Defendants were required to answer their own sets of core questions. Order Discussing Methodology for Discovery and Trials for Sample Cases, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 1138) (S.D.N.Y. Feb. 19, 2008). Upon this essential information, Plaintiffs, Defendants, and the Court selected sample cases for intensive depositions, medical history discovery, and trial on specific dates.

Up to this point, there had been uncertainty as to how many cases had been filed and were pending against the City. Most of the cases had been filed first in New York Supreme Court and were then removed to this Court. The mass captions accepted in the Supreme Court had to be amended so that each Plaintiff would have a separate index number. Some Plaintiffs had had filings made for them in both Supreme Court and this Court. Different counsel had filed cases for the same Plaintiffs. And the notice-of-claim and preliminary deposition procedures required under state law for suing the City brought about additional identification issues. The

4

result was a redundancy of identical claims and a confusion about how many lawsuits existed. In addition, in a number of cases, it became unclear if the Plaintiffs actually named in the complaints had authorized themselves to be named as Plaintiffs.

The court-ordered discovery was intended to end this confusion. I rejected an application that would allow Plaintiffs' answers to the court-ordered interrogatories to be answered as and when ready, and required strict adherence to the sequence of index numbers, in order that failures to prosecute cases would be evident, leading to dismissals from the litigation. Order, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 1139) (S.D.N.Y. February 19, 2009). I warned counsel that strict adherence to procedures and schedules was critical to the efficient administration of these cases, and failures to answer timely and responsively would be cause for involuntary dismissals.

As a result of these rulings, over 1,000 cases dropped away, reducing the field of Plaintiffs from approximately 10,500 to 9,019. See Order, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 1160) (S.D.N.Y. March 3, 2009) (dismissing cases for failure to comply with court-ordered discovery deadlines); Memorandum from Special Masters, Order Denying Motion to Enlarge Settlement Eligibility Date, In re World Trade Center Disaster Site Litig., In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2192) (S.D.N.Y. Sept. 27, 2010) (Attachment). And as to this reduced number, it appeared from later proceedings that not even all these intended to prosecute their cases, and more involuntary dismissals were to follow.

By late 2009, enough information had been provided to enable the Special Masters to draw preliminary evaluations. The Special Masters' report, at my direction, was

confidentially delivered to me and to Liaison Counsel for Plaintiffs and for Defendants, and subsequently filed as a public document.[2]

The Special Masters' report showed:

- The responders had incurred 387 diseases, and many reported multiple diseases.
- Over 70 percent of the Plaintiffs did not manifest serious injuries; of these, 42.5 percent, 3825 Plaintiffs, did not identify any objective manifestation of an injury arguably related to their work at the WTC site.
- Approximately 10 percent of Plaintiffs (871) had serious injuries that could lead to significant recoveries.[3]

The process was overtaken by the parties' own negotiations. On March 19, 2010, Liaison Counsel for Plaintiffs and Defendants announced that they had come to an agreement, the Settlement Process Agreement. However, my study of the settlement caused me to reject it, as not fair and adequate, and for providing too much money for the lawyers, for reserving too much money for unlikely claims in the future, and for providing too little money for the settling Plaintiffs, and because its terms were unfair and purported to be judicially unreviewable and unaccountable. See Transcript of Status Conference of March 19, 2010 at 54-64, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2037) (S.D.N.Y. March 19, 2010)

### c. The Settlement Process Agreement That Became Effective

Several weeks later, negotiations between the WTC Captive and Plaintiffs' Liaison Counsel produced an amended settlement agreement, the Settlement Process Agreement

---

[2] The report was made public as an attachment to the Order Denying Motion to Enlarge Settlement Eligibility Date, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2192) (S.D.N.Y. Sept. 27, 2010).

[3] These injuries included debilitating lung disease and asthma.

As Amended ("SPA"), signed on June 10, 2010. The SPA added an additional $150 million of value to the settlement, made up as follows:

- An additional contribution of $50 million by the WTC Captive, providing an aggregate settlement amount to the settling Plaintiffs of $625 million to $716 million.

- An agreed reduction of Plaintiffs attorneys' contingent fees from $33\frac{1}{3}$ percent to 25 percent, adding another $50 million of value.

- Agreement by the City and by workman's compensation and disability insurers to forgive their liens, adding further value to the settlement worth another $50 million-$75 million.

The settlement by the WTC Captive also was expected to provide a path for settlement by other Defendants—the Port Authority of New York and New Jersey, Inc.; the London insurers who insured the barges carrying Trade Center debris to Staten Island; the contractors who operated at Fresh Kills, Staten Island; and other Defendants. And the revised settlement agreement provided a measure of procedural fairness—appointment by the Court of officials who would be responsible for administering the settlement, an internal appeals process, and other improved procedures.

I approved this amended settlement on June 23, 2010, ruling that it was fair and reasonable, although not perfect. Order, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2091) (S.D.N.Y. June 23, 2010). As previously, the settlement was made between the WTC Captive, for the City and its contractors; and co-Liaison Counsel for the Plaintiffs, Worby Groner Edelman & Napoli Bern, LLP, representing more than 90 percent of the Plaintiffs, and Sullivan Papain Block McGrath & Cannavo, P.C., representing 963 firefighters.

7

The aggregate consideration provided under the SPA was $625 million to $716 million, depending on the percentage of Plaintiffs in excess of 95 percent who agreed to settle. The settling Plaintiffs were to be grouped in four tiers, according to the category and severity of the injuries caused by their work at the World Trade Center. The Plaintiffs in Tiers I to III were to be paid fixed amounts, according to the Tiers in which they were to be categorized, ranging from $3,250 to $9,750. In addition, each Plaintiff was to receive a five-year, extendable, paid-up insurance policy of up to $100,000 if, after their settlements, they incurred certain types of cancer.

The Tier IV Plaintiffs, those most severely and lastingly injured, were to receive variable payments, varying according to the severity, lasting effect, and relation of their injuries to the toxins at the World Trade Center site. An Allocation Neutral was appointed to evaluate the proofs of each Tier IV Plaintiff's injury, and to assign an appropriate number of "points" to that Plaintiff. Each Tier IV Plaintiff's points, relative to the total, then were to be applied against the aggregate settlement amount remaining after the Tier I, Tier II, and Tier III Plaintiffs were paid their flat amounts. And, in addition, if more than 95 percent of Plaintiffs opted into the settlement, bonus payments were to be added to the amount allocated to the Tier IV Plaintiffs.

### d. The Terms of the SPA Relating to the 95 Percent Threshold of Effectiveness, and to Bonuses

The SPA provided an effective date of April 12, 2010; all Plaintiffs in cases pending as of that date, or who had filed notices of claims against the City by that date, were eligible to settle.

Section VI.A of the SPA provided:

> Only Plaintiffs with Debris Removal Claims filed against the Insureds or any of them, including in any Master Docket, on or before April 12, 2010, or who have instituted Debris Removal

8

> Claims against the Insureds or any of them through other legal
> process recognized by New York law . . . on or before April 12,
> 2010 shall be eligible for inclusion on the Eligible Plaintiff list;

The SPA provided two exceptions: Plaintiffs who dismissed their cases with

prejudice, and Plaintiffs whose injuries did not qualify for the settlement.  Section VI continued:

> [P]rovided, however, that such Plaintiffs who dismiss with
> prejudice, and without exception, their Debris Removal Claims
> against the Insureds . . . need not be included on the Eligible
> Plaintiff List; provided, further, however, that any Primary
> Plaintiff who is named in Appendix A to Case Management Order
> No. 1 in Master Docket 21 MC 100 need not be included on the
> Eligible Plaintiff List unless he or she has amended his or her
> complaint to allege any Qualifying Injury(ies).[4]

Section VI.A provided also:

> Plaintiffs who dismiss all of their Debris Removal Claims against
> the Insureds with prejudice by filing the Stipulation of Dismissal
> with Prejudice . . . at any time before the Final Settlement
> Agreement Effective Date shall not be counted for purposes of
> determining compliance with the Opt-in Threshold.  In addition,
> Primary Plaintiffs identified on Exhibit I may be excluded from the
> Eligible Plaintiff List, or shall be excluded from the Opt-In
> Threshold calculations in this Section VI of this Agreement even if
> listed on the Eligible Plaintiff List, only if they dismiss with
> prejudice all of the claims relating to Qualifying Injuries such that
> the Primary Plaintiff's only remaining Debris Removal Claims
> against the Insureds are orthopedic in nature.[5]

The SPA provided a form for the dismissal, requiring the Plaintiffs to release not

only claims that they pleaded, but also to release "all claims . . . arising out of or relating in any

way to World Trade Center-related" work.  See Ex. S of the SPA.[6]

---

[4] Certain of these Plaintiffs had suffered physical injuries (such as orthopedic injuries) that were not covered by the SPA.

[5] Another group of Plaintiffs, also represented by Worby Groner, approximately 112 in number, had entered the original VCF and had signed releases.  Claiming that the injuries they sustained were much more serious than what had appeared to have happened to them in 2001 and 2002, they asked to be included in the settlement.  I appointed Special Counsel to counsel them.  Most, if not all, have dismissed their cases and intend to enter the re-opened VCF.

As for bonus payments, Section VI.E of the SPA provided for bonuses if the rate

of acceptance exceeded 95 percent.

> [I]f during the Opt-In Period or any extension thereof by the WTC
> Captive, actual op-in experience . . . exceeds ninety-five percent
> (95%), the WTC Captive shall pay two percent (2%) of the
> Settlement Amount set forth in Section II.A. of this Agreement for
> every one percent (1%) in excess of the ninety-five (95%)
> requirement; provided, however, that if actual opt-in
> experience . . . exceeds ninety-eight percent (98%), the WTC
> Captive shall pay one fifth of one percent (0.20%) of the
> Settlement Amount set forth in Section II.A. of this Agreement for
> every tenth of one percent (0.10%) above the ninety-five percent
> (95%) requirement.

Thus, if the ratio of settling Plaintiffs to the eligible whole was 95 percent, the SPA would

became effective, and the WTC Captive would be obligated to pay the base amount, $625

million. If the ratio of acceptances was 96 percent, a bonus payment of $12.5 million would be

added, and similar $12.5 million bonus payments at 97 and at 98 percent rates of acceptances.

After 98 percent, the bonus to be paid by the WTC Captive was to grow by $1.25 million for

every tenth of a percent above 98 percent.

The ratio of acceptances of the SPA, as of its final tally, was 99.4 percent. That

meant that the WTC Captive's settlement obligation was $680 million, calculated by adding $55

million of bonuses to the $625 million base amount. The WTC Captive acknowledges liability

of $637.5 million, on the basis of a 96.3 percent acceptance rate. The difference, $42.5 million,

is the subject of this Opinion.

### e.  Educating the Plaintiffs About the SPA

The SPA was a long and complicated document of 104 pages and 20 exhibits

containing approximately an additional 130 pages. Normally, lawyers advise clients as to the

---

[6] I struck this provision that precluded all future claims as unfair, and provided that Plaintiffs' releases and
dismissals should be limited to release only claims that were alleged or which could have been alleged. See Section
1.f. below.

meaning and consequences of a complicated document and are in turn authorized and instructed by their clients how to act on their behalves. However, this model did not fit the mass tort litigation before me, with 9,000 Plaintiffs represented by a single law firm and numerous potential conflicts among them and between them and their law firm.

Because of the potential conflicts, I appointed an ethics counsel, Professor Roy T. Simon of Hofstra University Law School, to assist and monitor written communications between Worby Groner and Plaintiffs. I also conducted two public hearings at sites convenient to Plaintiffs, one on July 26, 2010 in Staten Island and one on August 3, 2010 in Queens, at which all counsel, the Court, and the officials appointed to administer the settlement presented the settlement to Plaintiffs and answered their questions about it.

### f.  The Impending Effective Date and the 95 Percent Threshold

As the effective date for settlement approached—September 10, 2010—it appeared that the 95 percent threshold might not be satisfied. Twice, at the requests of the WTC Captive and Plaintiffs' Liaison Counsel, the effective date was extended, first to November 8, 2010 and then to November 16, 2010. See Order Regulating Proceedings, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2252) (S.D.N.Y. Nov. 16, 2010) (forbidding further extensions).

As November 16, 2010 approached, Plaintiffs' Liaison Counsel and Defendants presented seven stipulations to the Clerk of Court, purporting to dismiss 185 Plaintiffs from the litigation, with prejudice. Three stipulations, covering approximately 85 Plaintiffs, had been docketed before I noticed a pattern and stopped the process. I ordered a hearing, *in camera*, to learn what was happening and if the Plaintiffs had actually authorized their lawyers to dismiss their cases. It was hard to understand why, after years of litigation and so soon after swearing to

11

interrogatory answers disclosing their ailments, Plaintiffs in such numbers were suddenly

dismissing their cases. I could not understand why, if they truly were no longer interested in

pressing their cases, they would choose to dismiss with prejudice rather than settle and receive

money and a paid-up $100,000 insurance policy to protect against cancer.

At the conference, Plaintiffs' Liaison Counsel advised that some of his clients had

stopped communicating with him, and that the authorizations to dismiss cases were mostly not in

writing and frequently inferred from their silence after admonitions that their refusal to respond

would be considered authorizations to dismiss their cases with prejudice.

The stipulation of dismissal signed by Plaintiffs' counsel also was troubling. The

terms of dismissal, conforming to Exhibit S of the SPA, provided that Plaintiffs would be barred

from suing on *any* claims that might arise from the events of September 11, and not just the ones

they had brought, or could have brought, in their complaints. Plaintiffs' Liaison Counsel

conceded that he accepted the demand by the WTC Captive for this broad language, barring even

claims of second and independent injuries that New York law allows, even though it was

contrary to the interest of his clients whose cases were being dismissed.[7]

Plaintiffs' Liaison Counsel had signed this release provision even though I had

ruled previously that it was excessive and would not be allowed. As I had ruled,

> [Plaintiffs'] dismissal is with prejudice for all claims that could
> have been brought in relation to plaintiffs' existing pleadings, but

---

[7] See Transcript of Status Conference of November 18, 2010 at 26-29, In re World Trade Center Disaster Site Litig.,
21 MC 100 (Doc. No. 2543) (S.D.N.Y. Nov. 18, 2010):

THE COURT: Why wasn't the dismissal in the same format of my order, which would have not prejudiced
your client in the future?
MR. NAPOLI [Plaintiffs' Counsel]: Because Ms. Warner wouldn't agree to that.

Plaintiffs' Counsel Paul Napoli expressed belief that the WTC Captive would not consider the settlement effective
unless future claims were also precluded by the dismissal. Thus Mr. Napoli was willing to accede to WTC Captive
demands for broad dismissal—even if it was to the detriment of these dismissed Plaintiffs—because this was the
only path to settlement for the remaining Plaintiffs. Mr. Napoli represented both Plaintiffs whose cases were being
dismissed and Plaintiffs who were settling.

> without prejudice in relation to a second injury to the extent
> permitted by New York State law, see, e.g., Golod v. Hoffman La
> Roche, 964 F. Supp. 841 (S.D.N.Y. 1997) ("Under [New York's]
> two-injury rule, 'diseases that share a common cause may
> nonetheless be held separate and distinct where their biological
> manifestations are different and where the presence of one is not
> necessarily a predicate for the other's development.'" (internal
> quotation marks omitted)), and as may be defined by any court
> having jurisdiction over any such later-filed complaint.

Order, Dunne v. World Trade Center Props, LLC, In re World Trade Center Disaster Cite Litig.,

05 Civ. 1578 (21 MC 101), Doc. No. 9 (S.D.N.Y. Feb. 22, 2010); See Transcript of Status

Conference of November 18, 2010 at 29-30, In re World Trade Center Disaster Site Litig., 21

MC 100 (Doc. No. 2543) (S.D.N.Y. Nov. 18, 2010).

      Notwithstanding misgivings, since without the dismissals already entered the

approval rate was less than 95 percent and the settlement could not become effective, I so

ordered the dismissals already filed, and ordered the balance held in abeyance. I considered that

the proceedings that I now initiated (discussed below) would clarify the events and allow me to

issue such orders as would be just, including any corrective orders that might be appropriate. As

of that date and allowing for 85 fewer Plaintiffs in the denominator of the fraction of

acceptances, the Allocation Neutral reported that 95.077 percent of the eligible Plaintiffs had

settled. Report of the Allocation Neutral, In re World Trade Center Disaster Site Litig., 21 MC

100 (Doc. No. 2256) (S.D.N.Y. Nov. 19, 2010).

### g. Appointing a Special Counsel to Communicate with Uncooperating Plaintiffs

      Of the 10, 563 Plaintiffs on the Eligible Plaintiffs List, 520 Plaintiffs had not

accepted the settlement. Of these, fewer than 100 had given actual instructions to continue with

their cases towards trial. That meant that 420 Plaintiffs had not responded at all to Liaison

Counsel's repeated inquiries, including most of the 185 Plaintiffs for whom stipulations of

13

voluntary dismissal had been filed. Had the 420 Plaintiffs really wanted to file suit as Plaintiffs?
Had they sworn to interrogatories or, as may have been the case, were unsworn answers—or
answers sworn to by attorneys—delivered to the data processing center? Had they grown weary
of communications with counsel and refused to communicate further? I appointed an
independent Special Counsel to communicate with the missing Plaintiffs, instructing that all
these Plaintiffs should be advised of their rights and options, and be assisted in deciding whether
to accept the SPA, continue with their cases, voluntarily dismiss, or—if they were to do
nothing—suffer an involuntary dismissal. <u>Order Appointing Special Counsel</u>, In re World Trade
Center Disaster Site Litig., 21 MC 100 (Doc. No. 2257) (S.D.N.Y. Nov. 24, 2010).[8]

Special Counsel, Michael Hoenig, Esq. of Herzfeld & Rubin, P.C., with Worby
Groner's cooperation, located and sought out as many Plaintiffs as possible, 546 in number (the
numbers are not consistent). In December 2010, Michael Hoenig submitted his report. Through
Special Counsel's efforts, 44 more Plaintiffs settled, 31 chose to continue with their lawsuits
rather than settle, and 47 chose to dismiss their cases. However, 421 Plaintiffs failed to respond
at all. I ordered all these 421 dismissed with prejudice.[9] Rule 41(b), Fed. R. Civ. P.; Order
Dismissing Cases with Prejudice for Failure to Prosecute, <u>In re World Trade Center Disaster Site</u>
Litig., 21 MC 100 (Doc. No. 2268) (S.D.N.Y. Dec. 30, 2010). The dismissals provided the same
"with prejudice" language as did the voluntary dismissals. <u>See id.</u> My order provided that any

---

[8] My order provided that the Plaintiffs who were involuntarily dismissed, see R. 41(b), Fed. R. Civ. P., were to be
"stricken from the Eligible Plaintiff List." <u>Id.</u> The WTC Captive did not object at that time, although it did so later,
to a later order.

[9] The 421 later were reduced to 409.

14

Plaintiff who felt aggrieved by that order could seek reinstatement of his case within 30 days. Id. None did.[10]

The parties agreed that the work of Special Counsel would be included in the settlement. Counting the 44 additional settlements, the 31 additional decisions not to settle, the 47 additional voluntary dismissals, and the 409 involuntary dismissals, the ratio of acceptances of the SPA came to 99.4 percent, an extraordinary rate. I ordered the WTC Captive to pay the required bonuses. The amount added $55 million to the base amount of $625 million, for a total of $680 million. In practical effect, the extra money will add to the settlement payments of those most severely and tangibly injured from the work at the World Trade Center—the Tier IV settling Plaintiffs.

The City and the WTC Captive objected. By my order of September 8, 2011, I overruled the objection. This opinion provides a fuller explanation of my reasons.

## II.    Discussion

### a. Payments of Bonuses Are Contract Obligations

It is a familiar proposition of contract law that courts enforce the intentions of the parties to a contract, and that the best expression of the parties' intent is their writing. E.g., Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (N.Y. 2002). Thus, where a contract is clear on its face, the court's obligation is to enforce it according to its terms. E.g., W.W.W. Assoc. v. Giancontieri, 77 N.Y.2d 157, 162 (N.Y. 1990). But where a contract is not capable of straightforward interpretation, whether because it is ambiguous or because it is silent, the court must honor the intentions of the parties, construing the agreement against the drafter. Guardian

---

[10] Rule 60(b) and (c), Fed. R. Civ. P., provide that a party seeking to be relieved of a final order or judgment because of, for example, "mistake, inadvertence, surprise, or excusable neglect," has a "reasonable time" and "no more than a year" to make his motion. The elaborate proceeding that I ordered, and the need for parties to proceed with the settlement, barred any motion beyond the 30 day period that I allowed.

Life Ins. Co. of Am. v. Schaefer, 70 N.Y.2d 888, 890 (N.Y. 1987). Although contractual silence does not always make a contract unclear, Evans v. Famous Music Corp., 1 N.Y.3d 452, 458 (N.Y. 2004), silence is capable of creating a gap that requires the court to construe the terms in light of the parties' intentions. See Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199 (N.Y. 2001). This is an expression of the broader rule that "the understanding of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Rowe v. Great Atlantic & Pac. Tea Co., Inc., 46 N.Y.2d 62, 69 (N.Y. 1978) (quoting 5 Williston on Contracts § 1293 (rev. ed. 1937)).

The question, what "a reasonable person in the position of the promisee" would understand, is the key issue of contract obligation. The promisees are those who held "Debris Removal Claims filed against the Insureds" and, particularly, the Tier IV Plaintiffs, for the Tier IV Plaintiffs were the only Plaintiffs who could benefit from the bonus payments.[11] They had a reasonable right to understand that the percentage of the Debris Removal Claimants who chose to settle would be calculated by dividing the number who chose to enter the SPA by the sum of that group and the group of Debris Removal Claimants who chose to continue with their lawsuits and not settle. A Plaintiff who had taken himself out of eligibility, either because he had eliminated himself from eligibility by dismissing his claim, or because he had chosen to be indifferent to the entire process and to allow the court to dismiss his claim, should not to be counted as a Plaintiff. Any Plaintiff who either voluntarily dismissed his claim or allowed his claim to be involuntarily dismissed could never sue again for the claims that he, or the court, had dismissed, for either by the terms of his stipulation of dismissal, or by the court order providing for dismissal, the dismissal "operates as an adjudication on the merits." R. 41(b), Fed. R. Civ. P.

---

[11] Tier I to Tier III Plaintiffs, because they were to receive fixed amounts, could not benefit from the bonuses. The Tier IV Plaintiffs were to share in the amount left, after paying the Tiers I-III Plaintiffs. That meant that the bonuses would be payable only to the Tier IV Plaintiffs.

16

A dismissed Plaintiff should not be counted at all, not in the numerator and not in the denominator of the fraction between those who choose to settle and those who chose to continue with their lawsuits.

As the SPA provided, "only plaintiffs with Debris Removal Claims filed against the Insureds or any of them . . . on or before April 12, 2010 . . . shall be eligible for inclusion on the Eligible Plaintiff list . . . ." SPA, § VI.A. A claim dismissed because the claimant did not wish to be a Plaintiff and dismissed his claim, or was indifferent to the obligation of prosecuting his claim with all others, knowing that the court would dismiss his claim, cannot legitimately be called a "Debris Removal Claim[ant]."

A contract is to be understood in relation to the manifest intention of the parties. See Four Seasons Hotels v. Vinnik, 127 A.D.2d 310, 317 (N.Y. App. Div. 1st Dep't 1987) ("This means that the manifestation of a party's intention rather than the actual or real intention is ordinarily controlling, for a contract is an obligation attached, by the mere force of law, to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent.") The intention and purpose of the WTC Captive was to eliminate the exposure of the City and its contractors to 9/11 litigation. The exposure was most acute in relation to the Tier IV Plaintiffs, for they had the potential of winning large judgments if they opted to continue with their cases rather than settle. The SPA provided that not only 95 percent of all Plaintiffs had to agree to settle, but also that 95 percent of the Plaintiffs in each of the 14 most serious, or "High Threshold," injury categories—i.e. the most seriously injured of the Tier IV Plaintiffs—had to settle, or the settlement would not become effective. SPA, § VI.D.iii. It was a critical goal of the WTC Captive to gain in the settlement not only 95 percent of the entire group of Plaintiffs, but also 95 percent of the Tier IV Plaintiffs.

17

The City and its contractors, via the WTC Captive, achieved their objective, as 99.4 percent of the Debris Removal Plaintiffs chose to settle. Indeed, only 35 cases now remain, the balance having chosen to dismiss their cases and to file their claims in the re-opened Victims Compensation Fund, re-opened by the Zadroga Act, Pub. L. 111-347.

The WTC Captive clearly has achieved its purpose. It would be receiving an unneeded windfall if it were to be allowed to renege on its contractual obligation to pay the bonus payment provided by the SPA to induce Tier IV Plaintiffs to opt into the settlement rather than continue their cases against the City and its contractors.

The WTC Captive objects that only those who voluntarily dismissed their claims can be excluded from the list of Eligible Plaintiffs. It argues that an involuntarily dismissed Plaintiff can more easily re-file his claim, and thus reinstate the City's exposure to liability. That is nonsense. The terms of dismissal are identical, whether the claim is dismissed voluntarily or involuntarily; in either case, the dismissal is of claims "that were brought or could have been brought in the individual Plaintiffs' existing pleadings . . . ." Order Dismissing Cases with Prejudice for Failure to Prosecute, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2268) (S.D.N.Y. Dec. 30, 2010). Rule 41(b) explicitly provides that the dismissal "operates as an adjudication on the merits." And much more than a "reasonable time" has passed since I issued my dismissal orders. More than a year has passed, and not one involuntarily dismissed Plaintiff has moved to be relieved of the court order dismissing his case. The special and intensive proceedings pursued in this case, appointing a Special Counsel to communicate with each and every Plaintiff who ceased to communicate with, or receive communications from, his lawyer, assured that orders of dismissal would be final, and not

18

subject to motions for relief because of "mistake, inadvertence, . . . or excusable neglect." R.
60(b), (c), Fed. R. Civ. P.

The WTC Captive argues that the SPA mentions only voluntarily dismissed
claims as those that "need not be included on the Eligible Plaintiff List." But silence does not
mean that an involuntarily dismissed claim should also "not be included." Nor does the clause
mean that the WTC Captive should grant to itself arbitrary discretion to decide who may be
included and who may be excluded for the purpose of determining if it has to honor its full
obligation to pay Tier IV Plaintiffs.

This entire issue arises from the confusion of seven stipulations covering 185
Plaintiffs filed at the last minute in a concerted effort by Plaintiffs' Liaison Counsel and the
WTC Captive to satisfy the 95 percent threshold required by the SPA. The stipulations were
filed without advising me. Without these dismissals, the 95 percent threshold for settlement
would not have been satisfied. And it soon became clear, upon inquiry at a special, in camera
conference,[12] that the authorizations upon which Plaintiffs' Liaison Counsel filed his dismissals
were problematic, making it completely arbitrary which dismissals were actually authorized.

As a result of the work of Special Counsel, Michael Hoenig, Esq., the true
intentions of the Plaintiffs refusing to choose whether or not to settle were clarified. A number
made clear their desire to quit the litigation, and voluntary dismissals were confirmed or entered.
Another large group, knowing, from multiple advices and warnings by court orders and letters
from Mr. Hoenig, that their refusals to state their preferences would lead to court-ordered
dismissals, also had their cases dismissed. See Order Accepting Report of Special Counsel and
Providing for Effectiveness of Settlement, In re World Trade Center Disaster Site Litig., 21 MC

---

[12] The transcript of the conference was unsealed upon my rejection of the WTC Captive's objections. Summary
Order Unsealing Transcript of Hearings, In re World Trade Center Disaster Site Litig. (Doc. No. 2525) (S.D.N.Y.
Sept. 8, 2011).

100 (Doc. No. 2269) (S.D.N.Y. Dec. 30, 2010) (Attachment). I provided, in my order appointing

Mr. Hoenig Special Counsel, that Plaintiffs who declined to cooperate and to prosecute their

cases would be dismissed with prejudice, and that the dismissed cases were to be "stricken from

the Eligible Plaintiffs List." Order Appointing Special Counsel, In re World Trade Center

Disaster Site Litig., 21 MC 100 (Doc. No. 2257) (S.D.N.Y. Nov. 24, 2010). Yet, the WTC

Captive did not object to that order, but only later when it decided not to pay bonuses. The WTC

Captive lacks rational basis to distinguish between one group of Plaintiffs on whose behalves

stipulations of dismissal were filed, and another group of Plaintiffs who were dismissed by court

order.

The objections of the WTC Captive would elevate a canon to help interpretation,

expressio unius est exclusio alterius, into a rule of law. The WTC Captive argues that mention in

the SPA "that such Plaintiffs who dismiss with prejudice . . . need not be included on the Eligible

Plaintiff List," necessarily means that those who are dismissed by the Court with prejudice

cannot be included, for "the inclusion of one thing is the exclusion of another." See Black's Law

Dictionary 620 (8th ed. 2004).[13]   Had the drafters of the SPA intended to make a distinction, they

could have added a provision that specifically provided for the separate treatment of

involuntarily dismissed Plaintiffs. The SPA has no such provision. And it has no such provision

because no one expected that hundreds of Plaintiffs would simply refuse to communicate with

their attorneys and abandon their cases altogether.

The fair interpretation of the SPA is to require payment of the bonuses. The

objection of the WTC Captive is overruled.

**b. The Court's Supervisory Authority May Be Exercised in Favor of the Fair**
**Understanding of the Settling Plaintiffs**

---

[13] Canons of interpretation are not "mandatory rules. They are guides that need not be conclusive." Chickasaw
Nation v. United States, 534 U.S. 84 (2001).

The parties to a lawsuit, if all are involved, may dismiss or settle their own lawsuit; in general, a judge does not have to be involved. See R. 41(a), Fed. R. Civ. P. In a class action, in contrast, a dismissal or settlement is not effective unless, after hearing the parties and any appearing members of the class who object, a judge finds settlement fair and reasonable, in the interests of the settling class. See R. 23(e), Fed. R. Civ. P.

This litigation, although fitting neither paradigm—individual or class— substantially resembles a class action. It was litigated like a class action, with all of the thousands of lawsuits being litigated on a common basis under close judicial management at every stage. The settlement recited in the SPA was a mass settlement in an aggregate amount, like a class settlement, with the settlement amount subject to subdivision among sub-classes. The SPA was negotiated and executed not with Plaintiffs who individually instructed or authorized their lawyers to accept or reject specific amounts offered in settlement, or even a committee of Plaintiffs, but with the law firm representing the large majority of the Plaintiffs, approximately 9,000 of the whole. Plaintiffs did not instruct their lawyers; nor did they have choice about terms, conditions, or amounts. Their assent was to be manifested, as in class settlements, by an after-the-fact ratification of 95 percent or more of them. For the same reasons requiring a judge to review and approve class settlements for fairness, a district judge must review a mass tort settlement such as that now before me. See In re Zyprexa Prods. Liab. Litig., 451 F. Supp. 2d 458 (E.D.N.Y. 2006).

There is another compelling reason requiring judicial review of the settlement, and that is the potential conflicts among the Plaintiffs represented by Plaintiffs' Liaison Counsel, and between Plaintiffs' Liaison Counsel and those Plaintiffs. Since one law firm, Worby Groner Edelman and Napoli Bern LLP, Plaintiffs' Liaison Counsel, represented the substantial majority

21

of the Plaintiffs, and since a normal attorney-client relationship cannot function where one lawyer represents so many clients[14], each with varying and diverse interests, judicial review must exist to assure fairness and to prevent overreaching. This certainly was the case here. Approximately a third of the Plaintiffs had little or no objective injury traceable to their work at the WTC site, and were in the lowest settlement tiers. They may have had little or no option except to settle. Other Plaintiffs, despite contracting serious cancers, were facing the possibility of small settlement recoveries because of difficulties in proving causal relation with the toxins at the WTC site,[15] and thus might nevertheless have wished to proceed to take their chances with Daubert motions and trial.[16] The Tier IV Plaintiffs, those with serious and lasting ailments

---

[14] See N.Y. Rules of Prof'l. Conduct, R. 1.7 (2009):

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either:
(1) the representation will involve the lawyer in representing differing interests; . . .

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
(2) the representation is not prohibited by law;
(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
(4) each affected client gives informed consent, confirmed in writing.

See N.Y. Rule of Prof'l Conduct, R. 1.7 Comment 23 (2009). ( "[S]imultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (a)(1). A conflict may exist by reason of . . . the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. . . . [An example is that] in which a lawyer is asked to represent . . . co-plaintiffs or co-defendants in a personal injury case . . . . [M]ultiple representation of persons having similar interests in civil litigation is proper if the requirements of paragraph (b) are met.")

[15] For example, the SPA gave ten times more points to Plaintiffs with serious Interstitial Lung Disease than to those with respiratory cancers.  See SPA at 64 and Exhibit C.

[16] Plaintiffs faced substantial obstacles in proving their cases, in particular overcoming Daubert challenges to their expert testimony linking their cleanup work and illnesses. See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592-593 (1993). ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) (extending the Daubert standard to non-scientific expert testimony).  The settlement occurred before the stage of Daubert hearings had been reached.

strongly related to their work at the WTC site, although well compensated under the SPA relative to others, also reasonably could have opted in favor of trial rather than settlement. Faced with difficult and complicated choices, the Plaintiffs needed unconflicted attorneys with whom to consult and be advised.

Worby Groner, the law firm of all these Plaintiffs, itself had a compelling interest to settle. Worby Groner had carried on eight years of strenuous litigation and two appeals without any compensation. It had borrowed heavily, and incurred a large interest expense. Transcript of Status Conference of August 27, 2010 at 7, In re World Trade Center Disaster Site Litig., 21 MC 100 (Doc. No. 2170) (S.D.N.Y. Aug 27, 2010). The prospect of settlement and a fee of $250 million gave the firm an interest that may not have been in line with many of its clients' interests.

None of this should be taken to mean that Worby Groner did not effectively prosecute this lawsuit. But it does show the need for the district judge's involvement in all phases of the litigation, including settlements and the agreements among counsel providing for settlements.

The Tier IV Plaintiffs posed the greatest exposure to the City and its contractors, for the injuries of those in this group could have resulted in sizeable jury awards. The WTC Captive was particularly interested in acceptances from this group—hence, the offer of bonuses, for only this group could benefit from bonuses.[17] When, later, my approval was sought of settlement agreements with the Port Authority and with other Defendants, and I expressed concern that they disproportionately favored Tiers I to III Plaintiffs, thereby reducing payments to Tier IV Plaintiffs, it was argued to me that the Tier IV Plaintiffs would benefit more by the bonus payments payable to them if a higher rate of acceptances resulted from the lower tier

---

[17] See discussion in Section I.c. above.

Plaintiffs. Thus, I gave my approvals to the changed ratios of Plaintiffs' recoveries with those Defendants.[18]

It is eminently unfair that sham Plaintiffs now be counted to defeat the payment of bonuses. Plaintiffs who were not interested in prosecuting their cases and who were dismissed with prejudice should not be counted in determining the proportion of Plaintiffs choosing to settle. The Plaintiffs who were dismissed with prejudice do not present an exposure to the City, and should not be a pretext to allow the WTC Captive to renege on a promise on which the Tier IV Plaintiffs reasonably relied.

The Air Transportation Safety and System Stabilization Act gave this court exclusive jurisdiction to preside over all cases arising from, or related to, the terrorist-related aircraft crashes of September 11, 2001.[19] There is a public purpose inhering in these cases that supports judicial involvement in all its stages to assure fairness to all parties. The fact that public money, through FEMA, entirely funds these settlements and, as well, the defense of the City and its contractors, emphasizes that public purpose. The fiction expressed by the WTC Captive, that its settlement with the attorneys for Plaintiffs is a private matter, not subject to the court's approval, is entirely inappropriate.

The WTC Captive's objection to honoring its contractual obligation to pay bonuses consistent with the 99.4 percent rate of acceptance of the settlement is overruled. The fair interpretation of the SPA requires it to pay the bonuses it agreed to pay, approximately $55 million, in addition to the aggregate base amount of $625 million, for a total of $680 million.

---

[18] Another $106 million, approximately, was provided, adding to the settlement with the WTC Captive (for the City and its contractors): approximately $50 million from the Port Authority of New York and New Jersey; $28 million from Lloyd's of London on behalf of Weeks Marine, Inc; $24.3 million from Phillips & Jordan, EE&G, and Taylor Recycling (the "Fresh Kills Defendants"); and $4.1 million from Survivair, Inc.

[19] ATSSSA § 408, 49 U.S.C. § 40101.

24

### III.   Conclusion

The objection of the WTC Captive is overruled.  The Clerk shall mark Document

No. 2214 as having been terminated.

SO ORDERED.

Dated:       December **20**, 2011
             New York, New York

                  ALVIN K. HELLERSTEIN
                United States District Judge