UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

IN RE: WORLD TRADE CENTER
DISASTER SITE LITIGATION

THIS DOCUMENT APPLIES TO ALL
IN RE WORLD TRADE CENTER
DISASTER SITE LITIGATION

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION
TO MODIFY SUBPOENA
ISSUED TO FIRE
DEPARTMENT OF THE
CITY OF NEW YORK AND
FOR PROTECTIVE ORDER**

21 MC 100 (AKH)

--------------------------------------------------------

## Preliminary Statement

A subpoena *duces tecum*, issued on behalf of a number of defendants in these actions, has been served on the Fire Department of the City of New York ("FDNY"), seeking medical information from studies conducted of nearly 15,000 firefighters and EMS rescue workers. Only a small handful of the subjects are plaintiffs in this litigation. Full compliance with the subpoena would divulge information protected by New York's doctor-patient privilege and federal statutes governing the confidentiality of medical information. It would also be contrary to a Certificate of Confidentiality issued to the FDNY by the U.S. Department of Health and Human Services and informed-consent forms signed by the study participants that were approved in accordance with federal rules by an independent Institutional Review Board for the protection of human research subjects.

Counsel for the involved parties have had discussions in an attempt to resolve this dispute. While the parties were unable to reach agreement on all

issues, they have narrowed the issues with regard to the data that the City feels it must withhold to maintain the participants' medical confidentiality.[1]

The City has agreed to produce all of the medical data sought in the subpoena, subject to a protective order proposed by the City. A copy of the proposed order is attached as Exhibit C to the Declaration of Kenneth Becker in support of this motion. At issue is whether the City must produce identifying data for the study participants, such as street address, birth date, date of hire, date of retirement, date of death, sex, race, and height. As explained below, the City is constrained by federal and state law from providing the identifying information.

The City therefore respectfully requests, in accordance with Federal Rules of Civil Procedure 26(b)(1), (c)(1) and 45(c)(3)(a)(iii), that this Court enter an order (1) modifying the subpoena by deleting the requests for the following personally identifying information: name, Social Security number, address, place of residence, sex, race, and height, and the following identifying dates: date of birth, date of death, hire date, and retirement date, (2) allowing the City to produce the year, instead of the exact date, for dates of birth, death, hire, and retirement; and (3) entering a protective order that provides for confidential treatment of the information turned over by the City and prohibits any recipient of the data from taking any steps to attempt to identify any of the study participants.

---

[1] Counsel for the subpoenaing parties have stated that they have no objection to the City withholding the name and Social Security number of study participants who were never plaintiffs in the 21 M.C. 100 litigation. *See* Letter dated December 20, 2011, from Kenneth Becker to counsel for the subpoenaing parties confirming the parties' discussions with regard to the subpoena, attached as Exhibit B to the Declaration of Kenneth Becker in support of the City's motion.

## Statement of Facts

On November 23, 2011, the FDNY was served with a subpoena seeking medical information of nearly 15,000 New York City firefighters and EMS rescue workers who had participated in a number of federally funded studies of the health impacts of 9/11 conducted by Dr. Prezant. A copy of the subpoena is attached as Exhibit A to the Becker Declaration. Dr. Prezant is the Chief Medical Officer of the FDNY and the Special Advisor to the Fire Commissioner for Health Policy. He is also a Professor of Medicine at Albert Einstein College of Medicine. Dr. Prezant's *curriculum vitae* is attached as Exhibit A to his affidavit.

The subpoena seeks "[a]ll data sets and/or compilations used in writing any research paper . . . regarding exposures and health effects related to the World Trade Center terrorist attacks . . . including, but not limited to, any data sets involving [FDNY] firefighters . . . and any other data received from another organization . . . that has since been altered or edited." The subpoena identifies 28 research articles for which the underlying medical data is sought. Each of the articles was based on one of the studies that Dr. Prezant participated in. Prezant Aff. ¶ 11. The subpoena also seeks "all drafts, work papers, . . . peer-review comments and/or reviews, critiques and/or editorial suggestions, materials concerning design and study protocol, and any and all communications, including electronic mail correspondence, sent or received regarding these articles." The articles were written based on studies that were funded by federal grants awarded by the Centers for Disease Control's National Institute of Occupational Safety and

Health under the authority of 42 U.S.C. § 241. *Id.*

As Dr. Prezant explains in his affidavit, the data at issue was provided by individuals participating in the Medical Monitoring and Treatment Program ("MMTP") carried out by the FDNY to monitor the medical condition of, and treat, active and retired firefighters and EMS personnel who participated in the rescue and recovery efforts on and after 9/11. *Id.* ¶ 12. The program provides for medical monitoring as well as medical treatment, mental health services, and prescription drugs. *Id.* There is some overlap, Dr. Prezant explains, between the MMTP program and FDNY's performance of medical monitoring to assess the fitness for duty of its personnel and, when necessary, authorize treatment for other line-of-duty service-related injuries or illnesses. *Id.* ¶ 13. Any information that is shared between these functions is treated as confidential. *Id.*

Dr. Prezant and his colleagues gave the study participants oral and written promises of medical confidentiality. *Id.* ¶¶ 14-15. These assurances were made during the initial evaluation of each study participant. The assurances were also contained in the individual informed-consent forms signed by the study participants. *Id.* ¶ 15. The individual consent forms were part of a consent process required by federal regulations, which also require approval of the forms and monitoring by an independent Institutional Review Board for the Protection of Human Subjects ("IRB"). *Id.* (Sample consent forms are attached to Dr. Prezant's Affidavit as Exhibits B-D.) As an example of the confidentiality assurances provided to the participants, the consent form for the study entitled *Airway*

*Hyperreactivity in NYC Fire Department Employees Exposed to the World Trade Center Collapse* states, "Records of this study will be kept confidential and will not become part of your FDNY medical record. . . . No published or unpublished report . . . will include any material that will permit your identification as a subject to any person other than to the named investigators and to the Montefiore Medical Center Institutional Review Board for the Protection of Human Subjects (IRB)." Prezant Aff. ¶ 15.

In addition, the study of stress-related health disorders is subject to a Confidentiality Certificate issued by the Department of Health and Human Services. (A copy of the Certificate is attached to Dr. Prezant's Affidavit as Exhibit E.) This Certificate authorizes the FDNY, Montefiore Medical Center, and Albert Einstein College of Medicine, "to protect the privacy of individuals who are the subject of that research by withholding their names and other identifying characteristics from all persons not connected with the conduct of that research." Prezant Aff. ¶ 16. It further states that these entities "may not be compelled in any Federal, State, or local civil, criminal, administrative, legislative, or other proceedings to identify such individuals." *Id.*

The City has served a written objection to the subpoena in accordance with Federal Rule of Civil Procedure 45(c)(2)(B), on the grounds that it seeks confidential medical data that is protected from disclosure by New York State's physician-patient privilege (N.Y. C.P.L.R. § 4504(a)) and to the extent it calls for the production of medical data that is confidential under the following federal statutes

and their implementing regulations: 42 U.S.C. § 289 and 42 U.S.C. § 241(d). The City also objected on the grounds that the subpoena calls for the production of identifying demographic information about individuals that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. (A copy of the City's written objections is attached to the Becker Declaration as Exhibit D.)

This brief is submitted in accordance with instructions from the Court at a conference held on November 22, 2011 and in accordance with the briefing schedule set by the Court. (A copy of the Court's Endorsed Order setting the briefing schedule is attached to the Becker Declaration as Exhibit E.)

## Relief Requested and Choice of Law

Rule 26 of the Federal Rules of Civil Procedure limits the scope of discovery to "any nonprivileged matter that is relevant," Fed. R. Civ. P. 26(b)(1), and permits this Court to "issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense, . . . forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(a), (d). Similarly, Rule 45 permits the court to quash or modify a subpoena that "requires disclosure of privileged or other protected matter if no exception or waiver applies." Fed. R. Civ. P. 45(c)(3)(A)(iii). In accordance with those sections, the City seeks to modify the subpoena and protective relief to withhold the indirectly identifying information collected from the firefighters and EMS rescue workers participating in the studies.

New York law governing privileges applies to the subpoenaed data. Under §

408(b)(2) of the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101, et seq. ("ATSSSA"), absent preemption by federal law, the substantive law for decision in this litigation is derived from New York State law, "the State in which the crash occurred." *World Trade Center Properties L.L.C. v. Certain Underwriters at Lloyd's of London*, 650 F.3d 145, 151 (2d Cir. 2011) (quotation marks) (citation omitted). Whether information is privileged is a question of substantive law. *United States v. Mackey*, 405 F. Supp. 854, 857-58 (E.D.N.Y. 1975). Furthermore, Rule 501 of the Federal Rules of Evidence provides that "with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." In addition to the New York law of privilege, there are federal statutes and regulations which also restrict the City's ability to disclose the information sought by the subpoena. As set forth below, these include 42 U.S.C. § 289, governing federally funded research on human subjects, and 42 U.S.C. § 241(d), authorizing the Secretary of Health and Human Services to protect the confidentiality of research subjects. The City's position is also informed by The Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. §§ 1320d *et seq*.

## Legal Argument

There are a number of confidentiality and privacy laws which, as discussed below in turn, form the basis for the City's request for the relief requested. These laws include the following: (1) New York's doctor-patient privilege, N.Y. C.P.L.R. §

4504(a); (2) 42 U.S.C. § 289 and its implementing regulations found in 45 C.F.R. §§ 46.101 *et seq.*; and (3) 42 U.S.C. § 241(d).

### 1. New York's Doctor-Patient Privilege Applies to the Subpoenaed Data and Requires Withholding Indirectly Identifying Information

New York was the first state to depart from the common law rule—that there is no doctor-patient privilege—when in 1828 it adopted the privilege by statute. *See Dillenbeck v. Hess*, 73 N.Y.2d 278, 284, 539 N.Y.S.2d 707, 711 (1989) (citation omitted). The doctor-patient privilege, now codified in N.Y. C.P.L.R. § 4504(a), is as follows:

> Unless the patient waives the privilege, a person authorized to practice medicine . . . shall not be allowed to disclose any information which he acquired in attending a patient . . . and which was necessary to enable him to act in that capacity.

New York adopted the privilege based on "the value placed on privacy, manifested both by general concerns for privacy and by the specific concerns for an individual's bodily integrity found in constitutional, statutory, and common law doctrines, suggests a strong policy basis for the privilege." *Dillenbeck v. Hess*, 73 N.Y.2d at 285, 539 N.Y.S.2d at 712 (quotation marks omitted) (citation omitted).

The privilege applies to "hospital and medical records, which, logically are drafted based on communications imparted by the patient to the treating physician," *In re D'Agostino,* 181 Misc. 2d 710, 712, 695 N.Y.S.2d 473, 476 (Sup. Ct., Richmond Co. 1999), as well as to information acquired by physicians in administering tests, since such information is "the product of professional skill and knowledge and would not have been apparent to a layman uninitiated in the

medical arts." *Dillenbeck v. Hess*, 73 N.Y.2d at 284 n.4, 539 N.Y.S.2d at 711 n.4.

The subpoena seeks information that is covered by the privilege. It demands "data . . . regarding exposures and health effects related to the World Trade Center terrorist attacks . . . involving [FDNY] firefighters." Dr. Prezant's affidavit makes clear that much of the data sought by the subpoena falls within New York's doctor-patient privilege. The data was collected by Dr. Prezant and other licensed physicians to monitor and provide treatment for specific medical conditions that may be related to World Trade Center exposures including medical examinations, testing, and as necessary, treatment and prescription benefits for those conditions. Prezant Aff. ¶ 12. Accordingly, because the data sought by the subpoena was "acquired in attending a patient" and "necessary to enable him to act in that capacity," (N.Y. C.P.L.R. 4504(a)) it is protected by the privilege.[2]

Individuals who are current plaintiffs in this lawsuit have, of course, waived that privilege by placing their medical condition at issue. *Cynthia B. v. New Rochelle Hosp. Med. Ctr.*, 60 N.Y.2d 452, 456-57, 470 N.Y.S.2d 122, 125 (1983). But those who have not sued have not waived that privilege. Nor have the participants

---

[2] The fact that some of the medical data from the MMTP is shared with those charged with determining whether firefighters are fit for duty, *see* Prezant Aff. ¶ 13, is not inconsistent with the doctor-patient privilege. *See Juric v. Bergstraesser*, 44 A.D.3d 1186, 1188, 844 N.Y.S.2d 465, 467 (3d Dep't 2007) (physician's disclosure of mental-health-related information to warn patient's wife of possible danger may be justified upon a showing of circumstances necessitating such disclosure); *People v. Bierenbaum*, 301 A.D.2d 119, 142, 748 N.Y.S.2d 563, 581-82 (1st Dep't 2002) (psychiatrist's disclosures in a warning letter to wife were permissible under exception to doctor-patient privilege where "clear and present danger to a third party" exists); *MacDonald v. Clinger*, 84 A.D.2d 482, 487, 446 N.Y.S.2d 801, 805 (4th Dep't 1982) (policy favoring privilege may be overcome by "countervailing public interest . . . where a patient may be a danger to himself or others"); *see also* 29 C.F.R. § 1630.14(c), (d) (a regulation implementing the Americans with Disabilities Act, 42 U.S.C. §§ 12212 *et seq.*, which permits employers to perform job-related medical examinations but requires information obtained from such exams to "be treated as a confidential medical record"); N.Y. PUBLIC HEALTH LAW § 18 (restricting access to patient information "including an assessment for employment or insurance purposes").

who were formerly plaintiffs in the litigation and opted into the global settlement waived the confidentiality of their medical information for purposes of the current actions in which they are not parties. Having opted to settle their cases rather than proceed with litigation that would have subjected their medical condition to scrutiny, the medical condition of those participants who settled their cases is no longer in dispute. *See Kohn v. Fisch*, 262 A.D.2d 535, 535, 692 N.Y.S.2d 429, 429 (2d Dep't 1999) (affirming order that "plaintiff's psychiatric records were not subject to disclosure once [he] withdrew his claims based upon psychological injuries"); *Strong v. Brookhaven Mem'l Hosp.*, 240 A.D.2d 726, 727, 659 N.Y.S.2d 104, 105 (2d Dep't 1997) (holding that medical records relating to withdrawn claims for mental anguish and fear of dying "were no longer relevant to a condition at issue in this action").

The privilege requires withholding the data that could be used to identify the study participants. *See Seaman v. Wyckoff Hgts. Med. Ctr.*, 25 A.D.3d 596, 597, 807 N.Y.S.2d 409, 410-11 (2d Dep't 2006) (ordering non-party patient records "be provided with all identifying patient information redacted and with a protective order confining distribution of the records to only the parties, their counsel, and their expert witnesses"); *Calabrese v. PHF Life Ins. Co.*, 190 A.D.2d 1069, 1070, 594 N.Y.S.2d 1016, 1016 (4th Dep't 1993) (ordering non-party patient records "to be produced in redacted form by deleting the patients' names and addresses and *any other identifying information* to comport with the doctor-patient privilege afforded by CPLR 4504") (emphasis added); *Stahl v. Rhee*, 136 A.D.2d 539, 540, 523 N.Y.S.2d

159, 161 (2d Dep't 1988) (ordering records to be produced with redaction of patients' identities because "the identity of a patient who is a stranger to this lawsuit in connection with a disease or side effect of the medication at issue is a confidential communication covered by the privilege"); *cf. Boddy v. Parker*, 45 A.D.2d 1000, 1001, 358 N.Y.S.2d 218, 219 (2d Dep't 1974) (holding that records concerning medical procedures performed on persons other than the plaintiff were privileged confidential communications under CPLR 4504, which the defendant hospital could not disclose); *Brandes v. N. Shore Univ. Hosp.*, 1 A.D.3d 551, 552, 767 N.Y.S.2d 648, 648 (2d Dep't 2003) (the plaintiff was not entitled to disclosure of medical information "regarding the diagnoses, treatments, and medical and surgical procedures listed on the operating room log for the nonparty patients"); *Ramirez v. Costagliola*, 300 A.D.2d 559, 559-60, 752 N.Y.S.2d 535, 535 (2d Dep't 2002) (reversing the trial court's order which required disclosure to the plaintiff of the records of 15 nonparty patients, even though the order had called for redaction of the names, addresses, and other identifying information of the non-party patients).

The above state-court cases requiring redaction of identifying information are consistent with the Second Circuit's decision in *In re American Tobacco Company*, where the court held that the New York doctor-patient privilege "can be adequately protected by a court order that prohibits disclosure of the patient's identity." 880 F.2d 1520, 1530-31 (2d Cir. 1989), citing the New York Court of Appeals in *Hyman v. Jewish Chronic Disease Hospital*, 15 N.Y.2d 317, 258 N.Y.S.2d 397 (1965).[3] The

---

[3] In *Hyman v. Jewish Chronic Disease Hospital*, the Court of Appeals reviewed the trial court's order permitting a hospital director to inspect his own hospital's records to investigate alleged illegal

appeal was from the Southern District court's ruling on a motion by Mt. Sinai and the American Cancer Society to quash a subpoena calling for the production of medical data of approximately 11,000 asbestos workers, which formed the basis of two articles concerning the relationship between cigarette smoking and asbestos exposure in developing cancer. *In re Am. Tobacco Co.*, 880 F.2d at 1522-23. Recognizing the existence of the doctor-patient privilege, and assuming but not deciding the existence of a scholar's privilege, the Second Circuit upheld the lower court's order requiring production of the asbestos workers' medical information under a protective order that (1) provided for redaction of "the names of the subjects of the two studies . . . and their street addresses, town or village of residence, names of employers, social security numbers and union registration numbers"; and (2) barred any attempt to identify subjects of the study from certain other data, *i.e.*, counties of residence, union local data, and birth and death dates. *Id.* at 1525-31.

There are important differences between the data at issue here and that which was ordered produced in *American Tobacco* that necessitate even greater redactions than were required for the asbestos-worker studies. The subpoenaed data comes from a known, discrete population of FDNY personnel, virtually all of whom responded to the WTC attacks on and after 9/11. The data in *American Tobacco*, in contrast, came from a diverse population of asbestos workers. In

---

human experimentation. 15 N.Y.2d at 322-23, 258 N.Y.S.2d at 399. With regard to the argument that the doctor-patient privilege prohibited the director from doing so, the court stated that a protective order would suffice to maintain the privilege, but also observed that "the supposed strict secrecy does not really exist" because "[n]o one seriously questions the right and obligation of a . . . director to keep himself informed as to the corporation's policies and activities so that he may do his duties and carry his responsibilities." *Id.*

*American Tobacco*, the court did not permit disclosure of the asbestos workers' employers. Here that information is already known.

The FDNY population is thus at an increased risk of identification requiring a greater redaction of data than was ordered in *American Tobacco*. As stated above, the *American Tobacco* court required redaction of street address, and town or village of residence. It also required redaction of names of employers, social security numbers and union registration numbers, but declined to order further redaction. It reasoned that "it might be possible for the tobacco companies to determine the identities of some of the research participants . . . [but] the court has enjoined them [in the protective order] from doing so . . . ." *Id.* Here, however, because the participants' employer is already known, the Court should order that the following identifiers (in addition to names and Social Security numbers) be withheld from the data produced in response to the subpoena: address, sex, race, height, and the following identifying dates: date of birth, date of death, hire date, and retirement date. To protect the identity of the participants in the studies, the City should be allowed to produce the year, rather than the date, of these events.

And as Dr. Prezant explains in his affidavit, it is not apparent that the subpoenaing parties need information about a participant's height, sex, and race. That information was used only to determine the participant's predicted pulmonary measurements. Researchers calculate this based on an objective formula that incorporates those variables. Since the City will provide the predicted pulmonary measurements for each participant, the subpoenaing parties will have the

information they require. To the extent that the subpoenaing parties are concerned that the researchers accurately and properly applied the formula, the City has proposed allowing the subpoenaing parties to attempt to replicate the results for a statistically meaningful sample of the study population.

Likewise, the subpoenaing parties have not shown a scientific need for the other identifying data the City is requesting to withhold (address, date of birth, date of death, hire date, and retirement date). Dr. Prezant states in his affidavit that these fields are not necessary to analyze the accuracy and methodology of the pulmonary research he conducted as long as the City provides the predicted lung capability of the study participants. Prezant Aff. ¶¶ 23-25. Given that the data is governed by New York's doctor-patient privilege, and because the subpoenaing parties have not established a need for it, the City should not be compelled to turn it over.

2.  **42 U.S.C. § 289 Regarding Institutional Review Boards**

As detailed in Dr. Prezant's affidavit, the data sought by the subpoena was derived from studies that were funded by grants awarded by the CDC's NIOSH under the authority of 42 U.S.C. § 241. Institutions seeking federal funding for biomedical or behavioral research involving human subjects are required under 42 U.S.C. § 289(a) to establish an Institutional Review Board to review the entity's research to "to protect the rights of the human subjects." Among other things, the regulations implementing the statute require IRB approval of the individual consent forms provided to research participants. The forms must contain "[a]

statement describing the extent, if any, to which confidentiality of records identifying the subject will be maintained." 45 C.F.R. § 116 (2011).

As noted above, the IRB-approved consent forms promise the participants that "[y]our name will not be identified . . . therefore, you can not be identified" (*Airway Hyperreactivity* study); "[r]ecords of this study will be kept confidential and will NOT be part of your FDNY medical record" and "no published or unpublished report . . . will include any material that will permit your identification as a subject to any person other than to the named investigators" (*Stress Related Health Problems* study); and "[r]ecords of this research study will be kept confidential and you will not be identified in any written or verbal reports . . . ." (*Medical Surveillance* study). Samples of the consent forms are attached to Dr. Prezant's affidavit as Exhibits B-D. Given the assurances of confidentiality made to the subjects of the study, and because the subpoenaing parties have not established a need for the information the City proposes to redact, this Court should not require release of any data from which a subject's identity could be determined.

3.  **42 U.S.C. § 241(d) Regarding Privacy of Research Subjects**

In accordance with 42 U.S.C. § 241(d), "the Secretary [of Health and Human Services] may authorize persons engaged in biomedical, behavioral, clinical, or other research . . . to protect the [participants'] privacy . . . by withholding . . . the names ***or other identifying characteristics*** of such individuals." 42 U.S.C. § 241(d) (emphasis added). Moreover, "[p]ersons so authorized to protect the privacy of such individuals may not be compelled in any Federal, State, or local, civil,

criminal, administrative, legislative, or other proceedings to identify such individuals." *Id.* FDNY obtained a Confidentiality Certificate under this provision for the study of stress-related health disorders. Thus the consent form covering that research informed the participants that "a Certificate of Confidentiality from the Federal Government . . . protects against the involuntary release of information about you collected during the course of this study" and "anything you tell us will not have to be given out to anyone, even if a court orders us to do so . . . ." In light of the Certificate of Confidentiality, this Court should not permit disclosure of the data provided by the subjects in connection with this study.

### 4. HIPAA Considerations

HIPAA and its implementing regulations provide a national standard for protecting health information. As Dr. Prezant explains in his affidavit in support of this motion, FDNY has adopted a confidentiality policy for its medical records that is consistent with the principles embodied in the HIPAA privacy standards.

HIPAA restricts the use and disclosure of "individually identifiable health information," which includes "demographic information" relating to "the provision of health care to an individual" and which "identifies the individual; or . . . [gives] a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103. In contrast, HIPAA does not restrict "de-identified" health information. 45 C.F.R. § 164.502. De-identified health information "does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual." 45 C.F.R. §

164.514(a), (b).

To de-identify data, one must remove an individual's name, address, birth date, Social Security number, as well as "[a]ll elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 . . . ." 45 C.F.R. § 164.514(b)(2)(i)(C). The regulations also require removing "[a]ll geographic subdivisions smaller than a State, including street address, city, county, precinct, [and] zip code," and "[a]ny other unique identifying . . . characteristic" 45 C.F.R. §§ 164.514(b)(2)(i)(B), (R). The City proposes to de-identify the data in accordance with these provisions in responding to the subpoena. The City's response to the subpoena would not include names, Social Security numbers, street addresses, places of residence, race, sex, or height. It would also modify specific dates to years. And it would not provide any information from which an individual's identity could be determined.[4]

### 5. Any Identifying Data That This Court Directs the FDNY to Produce Should Be Subject to a Protective Order

While the Court has already entered an order, Protective Order No. 3 (July

---

[4] HIPAA does permit "protected health information" to be produced in discovery, either in response to a court order, or, if the discovering party has made reasonable efforts to obtain "a qualified protective order," in response to a discovery request without a court order, 45 C.F.R. §§ 164.512(e)(1)(i)-(ii). A qualified protective order is "an order of a court . . . or a stipulation by the parties . . . that: (A) [p]rohibits the parties from using or disclosing the protected health information for any purpose other than the litigation . . . and (B) [r]equires the return . . . or destruction of the protected health information . . . at the end of the litigation." §§ 164.512(e)(1)(v)(A)-(B).

Such disclosure, however, should not include information made confidential by independent statutory protections. *See State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.*, No. 2007-0051, 2007 U.S. Dist. LEXIS 34410, at *2 (E.D.N.Y. May 10, 2007) (stating that with regard to the confidentiality of patient health information "New York state law is more stringent than the law under HIPAA"); *see also* N.Y. PUBLIC HEALTH LAW § 18(10) (2011) ("nothing contained in this section shall restrict, expand or in any way limit the disclosure of any information pursuant to . . . the civil practice law and rules.").

15, 2009), governing the disclosure of parties' and non-parties' confidential medical information (defined as "including, but not limited to, medical history, treatment, exam or laboratory results, diagnosis" etc. ¶ 2.1.)[5], the City has submitted a proposed protective order making clear that order applies to the data used in the FDNY studies. (A copy of Protective Order No. 3 is attached to the Becker Declaration as Exhibit F.) The proposed order also provides somewhat greater protection for the data than Protective Order No. 3. First, it limits distribution of the data to the firm issuing the subpoena and liaison counsel for Plaintiffs and Defendants and their experts. Second, it explicitly prohibits any recipient of the data from taking any steps to attempt to identify any individual whose data is provided. *See In re Am Tobacco Co.*, 880 F.2d at 1530-31. A copy of the proposed protective order is attached to the Becker Declaration as Exhibit C.

## Conclusion

The City is prepared to produce all of the medical data sought by the subpoena. But in light of New York's doctor-patient privilege and federal statutes regarding patient privacy, the City is prevented from producing demographic information that can be used to personally identify some of the studies' participants, such as name, Social Security number, address, place of residence, sex, race, height, and the following identifying dates: date of birth, date of death, hire date, and

---

[5] The protections contained in Protective Order No. 3 include the following: (1) limits access to "Counsel" defined as "counsel representing the Parties . . . and their insurers" and the parties' experts (¶¶ 2.2-2.3); (2) prohibits use for any purpose other than the current litigation (¶ 6.1); and (3) provides for the return or destruction of the information by the receiving party within ninety days of the conclusion of the litigation and that the Court will continue to have jurisdiction to enforce the order (¶ 7).

retirement date. As to data concerning dates, the City is prepared to redact the data so that only the year is provided.

The City therefore requests that the Court (1) modify the subpoena to permit the City to redact the data identified above that could be used to identify the participants in the FDNY's studies, including name, Social Security number, address, place of residence, sex, race, height, date of birth, date of death, hire date, and retirement date; (2) allow the City to produce the year, rather than the date, for birth, death, hire, and retirement; and (3) enter the proposed protective order, which limits the individuals who may see any produced data, requires recipients of any data to use it solely for the current litigation and to return it at its conclusion, and prohibits recipients of the data from taking any steps to identify any individual participant in the study.

Dated: New York, New York
       December 21, 2011

Respectfully submitted

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Respondent*
The City of New York
100 Church Street
New York, New York 10007
(212) 788-0514
kbecker@law.nyc.gov

By: _____
    Kenneth A. Becker (KB-0940)

Case 1:21-mc-00100-AKH   Document 2683   Filed 12/21/11   Page 20 of 20