21 mc 100

U.S. DISTRICT COURT
FILED
MAR 1 9 2010

# WORLD TRADE CENTER LITIGATION SETTLEMENT PROCESS AGREEMENT

The WTC Captive Insurance Company, Inc. ("WTC Captive") and all of its insureds identified on the attached Exhibit A ("Insureds"), on the one hand, and all Primary Plaintiffs (as defined below) and Derivative Plaintiffs (as defined below) (collectively, "Plaintiffs" and singularly, "Plaintiff") with Debris Removal Claims (as defined below) against the Insureds or any of them, on the other hand, hereby agree to the process set forth in this binding and enforceable World Trade Center Litigation Settlement Process Agreement ("Agreement") for settling Debris Removal Claims against the Insureds or any of them. For purposes of this Agreement, the WTC Captive, the Insureds, and Plaintiffs shall be referred to collectively as "Parties" and singularly as "Party." This Agreement shall take effect on the day upon which the last counsel to a Party executes this Agreement ("Effective Date").

## TABLE OF CONTENTS

I.      DEFINITIONS ................................................................................2

II.     SETTLEMENT AMOUNT ..............................................................10

III.    SETTLEMENT AMOUNT ADMINISTRATION ...............................15

IV.     CONTINGENT PAYMENTS ..........................................................17

V.      RECIPROCAL RELEASES, PLAINTIFFS' COVENANTS NOT TO SUE AND PLAINTIFFS' WAIVER OF PUTATIVE "SECOND INJURY" CLAIMS ...................22

VI.     OPT-IN THRESHOLD ..................................................................25

VII.    ELIGIBILITY FOR PAYMENTS AND ELIGIBILITY TO ENROLL IN THE CANCER INSURANCE POLICY ................................................29

VIII.   ALLOCATION AND PAYMENT TIERS .........................................31

IX.     PRELIMINARY PAYMENTS .........................................................35

X.      FINAL DISTRIBUTIONS TO TIER 4 PLAINTIFFS .........................37

XI.     ALLOCATION NEUTRAL AND ALLOCATION PROCESS GENERALLY .............38

XII.    MEDICAL PROOF CRITERIA ......................................................48

XIII.   TIER 4 POINT SYSTEM ...............................................................60

XIV.    RECONSIDERATION REQUESTS ................................................67

XV.     FINAL DISTRIBUTION CALCULATIONS AND PROCEDURES FOR TIER 4 ........70

XVI.    PERMANENT DISABILITY FUND ...............................................71

XVII.  CANCER INSURANCE POLICY ...............................................................79

XVIII. QUALIFYING SURGERY AND MIXED ORTHOPEDIC INJURY PAYMENTS ......79

XIX.  LIENS, ASSIGNMENT RIGHTS AND OTHER THIRD-PARTY PAYOR CLAIMS ..81

XX.   INTERIM STAY..............................................................................................83

XXI.  MISCELLANEOUS PROVISIONS ...........................................................85

XXII. FINAL SETTLEMENT AGREEMENT PROVISIONS ...............................................91

I.   **<u>DEFINITIONS</u>**

    **A.**   **"Accelerated Final Payment"** shall mean the payments made to Plaintiffs who opt into the Final Settlement Agreement and who the Allocation Neutral determines satisfy the Tier 2 or Tier 3 proof requirements set forth in Section VIII.C and VIII.D of this Agreement, respectively.

    **B.**   **"Adjudicatory Body"** shall mean those pension, disability or workers' compensation boards authorized by statute or otherwise to render binding permanent disability determinations not subject to further administrative review or other process before their disability determination becomes final and disability benefits become due as identified on Exhibit G to this Agreement**.**

    **C.**   **"Adjustment Factors"** shall mean those factors that, pursuant to Section XIII.B of this Agreement, the Allocation Neutral must consider in adjusting the Base Points awarded to each Verified Tier 4 Primary Plaintiff.

    **D.**   **"Allocation Neutral"** shall mean the person identified in Section XI.A of this Agreement who shall perform all actions reasonably necessary for the efficient and timely administration of the Allocation Process as set forth in this Agreement.

    **E.**   **"Allocation Neutral Agreement"** shall mean a contract between the Parties and the Allocation Neutral setting forth, *inter alia*, the Allocation Neutral's duties consistent in all material respects with this Agreement.

    **F.**   **"Allocation Pool"** shall mean the Point System applicable to the portion of Settlement Amount principal, together with any interest earned thereupon, allocated in Section II.B.i.a through Section II.B.i.c of this Agreement to each Master Docket.

    **G.**   **"Allocation Process"** shall mean the process required by this Agreement to determine each Plaintiff's Preliminary Payments and Final Distribution, if any.

H.      **"Base Points"** shall mean the points assigned to each Qualifying Injury for purposes of the Tier 4 Allocation Process as set forth on the Settlement Grid attached as Exhibit C to this Agreement.

I.      **"Cancer Insurance Policy"** shall mean the insurance product issued by the Metropolitan Life Insurance Company ("MetLife") and described in Section XVII of this Agreement. The draft MetLife policy and certificate forms, which remain subject to regulatory approval, are appended to this Agreement as Exhibit E.

J.      **"Claim Form"** shall mean the form that each Primary Plaintiff who claims eligibility for any payment under the Final Settlement Agreement must submit to the Allocation Neutral, signed under penalty of perjury and submitted together with any Qualifying Medical Records and other documents, if any, regarding the Primary Plaintiff's asserted compliance with the Work Verification Procedure, setting forth, among other matters, the predicate information to establish the Primary Plaintiff's and corresponding Derivative Plaintiff's, if any, eligibility to participate in the settlement pursuant to Section VII of this Agreement and the Primary Plaintiff's contentions that he or she satisfies the proof requirements of his or her allocation and payment tier as set forth in Section VIII of this Agreement. The Tier 1 Claim Form, the Tier 2 Claim Form, the Tier 3 Claim Form and the Tier 4 Claim Form are appended hereto as Exhibits L, M, N and O, respectively.

K.      **"Contingent Payment"** shall mean the payment, if any, in addition to the Settlement Amount, made to Verified Tier 4 Primary Plaintiffs upon the satisfaction of specified conditions precedent set forth in Section IV of this Agreement.

L.      **"Debris Removal Claims"** shall mean all claims, causes of action, notices of claims, notices of suits, suits, and actions relating in any way to or arising out of the rescue, recovery, and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001, pending or received as of fifteen (15) days after the Effective Date, including without limitation all Plaintiffs' claims against the Insureds or any of them in Master Docket Nos. 21 MC 100, 21 MC 102, and 21 MC 103 in the United States District Court for the Southern District of New York and in any similar state court proceedings.

M.      **"Defendant Insureds' Counsel"** shall mean James E. Tyrrell, Jr., Esquire and Patton Boggs LLP.

N.      **"Deficiency Notice"** shall mean written notice provided by the Allocation Neutral to counsel for a Primary Plaintiff whose Claim Form and/or supporting documentation, including Qualifying Medical Records and/or other records submitted, if necessary, regarding the Work Verification Process, are deemed by the Allocation Neutral to be deficient in any respect.

O.   **"Derivative Plaintiff"** shall mean the lawfully married spouse or former spouse of a Primary Plaintiff as verified according to the procedures provided in Section VII.B of this Agreement.

P.   **"Eligible Plaintiff List"** shall mean the list of all Plaintiffs eligible to opt in to the Final Settlement Agreement, as set forth in Section VI.A of this Agreement and in the form provided as Exhibit U to this Agreement.

Q.   **"Final Distribution"** shall mean the amount, if any, determined by the Allocation Neutral to be payable in accordance with Section XV.A of this Agreement to each Verified Tier 4 Primary Plaintiff and corresponding Derivative Plaintiff, if any.

R.   **"Final Distribution Calculation Notice"** shall mean the Allocation Neutral's written communication to Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive or its designee of each Primary Plaintiff's Final Total Score and each Plaintiff's Final Distribution, if any, pursuant to Section XV.B of this Agreement.

S.   **"Final Settlement Agreement"** shall mean this Agreement upon satisfaction of the conditions set forth in Section XXII.A of this Agreement and the Parties' execution of the Affirmation of Final Settlement Agreement described in Section XXII.A of this Agreement and appended to this Agreement as Exhibit R.

T.   **"Final Settlement Agreement Effective Date"** shall mean the date on which the Affirmation of Final Settlement Agreement described in Section XXII.A of this Agreement and attached hereto as Exhibit R is executed.

U.   **"Final Total Score"** shall mean the final and binding Total Score calculated pursuant to Section XIII.C of this Agreement of each Verified Tier 4 Primary Plaintiff and corresponding Derivative Plaintiff that is not subject to a Reconsideration Request pursuant to Section XIV of this Agreement or that has been adjusted, if at all, pursuant to a timely Reconsideration Request that the Allocation Neutral determined to be valid, for purposes of calculating a Plaintiff's Final Distribution, if any, as set forth in Sections X and XV.A of this Agreement.

V.   **"Ineligible Records"** shall mean medical records that are not Qualifying Medical Records and, therefore, are ineligible for consideration for any purpose by the Allocation Neutral.

W.   **"Initial Payment"** shall mean the amount paid to each Plaintiff who opts in to the Final Settlement Agreement, as provided by Section IX.A of this Agreement, and who the Allocation Neutral determines meets the payment eligibility requirements set forth in Section VII of this Agreement.

X.      **"Interim Payment"** shall mean the partial distribution made pursuant to Section IX.C of this Agreement to each Verified Tier 4 Primary Plaintiff and corresponding Derivative Plaintiff, if any, upon receipt of his or her Final Total Score prior to the Allocation Neutral's calculation of the Final Point Value for the Allocation Pool for his or her Master Docket.

Y.      **"Interim Stay"** shall mean a court-ordered stay applicable to all actions and all parties in all Master Dockets, as described more fully in Sections XX.A through XX.D of this Agreement.

Z.      **"London Marine Insurers"** shall mean those underwriters subscribing to the London Marine Policies.

AA.     **"London Marine Policies"** shall mean marine liability insurance policy numbers HF0728A00, HF9604A00, 02-0923-01 and 02-0918-01, as identified on Schedule 2 to the WTC Captive's Policy.

BB.     **"Master Docket"** shall mean all Debris Removal Claims against the Insureds or any of them in one of the following consolidated dockets in the United States District Court for the Southern District of New York:  21 MC 100; 21 MC 102; or 21 MC 103; provided, however, that for purposes of this Agreement and the Final Settlement Agreement only, the 21 MC 100 Master Docket shall include, without limitation, all Debris Removal Claims against the Insureds or any of them in any state court and unfiled Debris Removal Claims which have been submitted as notices of claims to the City of New York.

CC.     **"Medical Proof Criteria"** shall mean the applicable diagnostic and impairment criteria that the Allocation Neutral must apply to verify the existence of any Primary Plaintiff's Primary Qualifying Injury, if any, and Primary Plaintiff's Secondary Qualifying Injury, if any, as set forth in Sections XII and XIII.B.i of this Agreement, respectively.

DD.     **"Mixed Orthopedic Injury"** shall mean, in addition to the Mixed Orthopedic Plaintiff's Qualifying Injury, an orthopedic injury, burn, laceration, cut or other similar bodily injury occurring during a Mixed Orthopedic Plaintiff's work or volunteer service at the WTC Site or other locations at which he or she alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, as set forth in Section XVIII.A of this Agreement.

EE.     **"Mixed Orthopedic Plaintiff"** shall mean a Primary Plaintiff who demonstrates in the Allocation Neutral's judgment a Mixed Orthopedic Injury and one or more Qualifying Injuries, as set forth in Section XVIII.A of this Agreement, and whose name appears on Exhibit I to this Agreement.

FF.     **"New Debris Removal Claims"** shall mean all Debris Removal Claims filed, or asserted for the first time against the Insureds or any of them in a complaint, an amended complaint, a summons with notice, or a notice of claim served after the Eligible Plaintiff List due date as set forth in Section VI.A of this Agreement;

provided, however, that for purposes of this definition only the requirement that Debris Removal Claims be "pending or received as of fifteen (15) days after the Effective Date" as set forth in Section I.L of this Agreement shall not apply.  For purposes of counting New Debris Removal Claims, (i) all Debris Removal Claims filed or asserted against the Insureds or any of them by one Primary Plaintiff and a corresponding Derivative Plaintiff, if any, shall count as a single New Debris Removal Claim; (ii) each Primary Plaintiff identified as a party in an action against the Insureds or any of them in which Debris Removal Claims are alleged shall constitute one New Debris Removal Claim, regardless of whether the caption of such action identifies all parties thereto; (iii) in the event that a putative class action including Debris Removal Claims and/or Debris Removal Claims and other claims is filed against the Insureds or any of them, the number of putative class representatives named in that action and who plead Debris Removal Claims shall constitute the number of New Debris Removal Claims relating to that putative class action; (iv) in the event that any class including Debris Removal Claims and/or New Debris Removal Claims, and/or Debris Removal Claims and/or New Debris Removal Claims and other claims, is certified against the Insureds or any of them, such certified class shall be deemed to constitute seven hundred (700) New Debris Removal Claims for purposes of this Agreement, unless such certified class is limited by court order to fewer than seven hundred (700) class members and class representatives asserting Debris Removal Claims against the Insureds or any of them, in which case the court order shall be used to determine the number of New Debris Removal Claims; and (v) all Debris Removal Claims filed or otherwise asserted against the City of New York at any time before September 15, 2009, but re-filed or otherwise asserted again pursuant to New York General Municipal Law § 50-i, subsection (4) (also known as "Jimmy Nolan's Law") during the period beginning September 16, 2009, and ending September 16, 2010 shall not count as New Debris Removal Claims if the Primary Plaintiff and any corresponding Derivative Plaintiff were included on the Eligible Plaintiff List.

GG.    **"Notice of Ineligible Records"** shall mean written notice by the WTC Captive, its counsel or its non-attorney designee to the Allocation Neutral that medical records submitted by a Plaintiff to the Allocation Neutral are Ineligible Records. All Notices of Ineligible Records shall by accessible by counsel for the Plaintiff(s) to whom they relate.

HH.    **"Opt-In Period"** shall mean the period of time following the Effective Date for Plaintiffs to elect to participate in the Final Settlement Agreement by executing a Release and Covenant Not to Sue as provided in Section VI.B of this Agreement.

II.    **"Opt-In Threshold"** shall mean the percentages of Plaintiffs on the Eligible Plaintiff List and in the sub-categories specified in Sections VI.D.ii through VI.D.iv of this Agreement who must opt into the Final Settlement Agreement in order for the Final Settlement Agreement to take effect as set forth in Sections VI.E and XXII of this Agreement.

**JJ.**    **"Other Defendants"** shall mean persons or entities not identified on Exhibit A that are defendants in any action in which Debris Removal Claims against the Insureds or any of them are asserted, including without limitation in Master Dockets 21 MC 100, 21 MC 102 and 21 MC 103.

**KK.**    **"Permanent Disability Fund"** shall mean that portion of the Settlement Amount paid exclusively to those Primary Plaintiffs who (i) as of the date that the Allocation Neutral directs the distribution of the Permanent Disability Fund, have received a final determination of permanent disability from an Adjudicatory Body, or a preliminary determination of permanent disability pending final action from an Adjudicatory Body, that finds the Primary Plaintiff's disabling injury(ies) to be related in whole or in part to his or her alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, as set forth in Section XVI of this Agreement; or (ii) who the Allocation Neutral determines have a "H1" or "H2" Qualifying Injury, as set forth in Section XVI.B.ii.e of this Agreement.

**LL.**    **"Physician Diagnosis"** shall mean an affirmative statement by a licensed physician that a Primary Plaintiff has a Qualifying Injury, including DSM-IV codes, physician assessments, and physician generated problem lists; provided, however, that a Physician Diagnosis shall not include: (i) a written statement memorializing oral or other self reports by a patient to his or her physician; (ii) physician impressions that in the Allocation Neutral's judgment do not constitute an affirmative diagnostic statement; (iii) indications for an examination or procedure which, if rendered, may or may not confirm the presence of a disease; (iv) differential diagnoses that in the Allocation Neutral's judgment do not constitute an affirmative diagnostic statement; (v) except with respect to Qualifying Injury "H1," any statement describing a medical condition as "possible," "suggestive" of a Qualifying Injury, or "questionable;" or (vi) any other qualified statement that in the Allocation Neutral's judgment is ambiguous as to whether an actual diagnosis was made by a licensed physician.

**MM.**    **"Plaintiffs' Liaison Counsel"** shall mean Paul J. Napoli, Esquire and William H. Groner, Esquire of Worby Groner Edelman & Napoli Bern LLP, and Nicholas Papain, Esquire and Andrew J. Carboy, Esquire of Sullivan Papain Block McGrath & Cannavo P.C., together with their respective firms.

**NN.**    **"Point System"** shall mean the metric to be utilized by the Allocation Neutral in each Master Docket to determine, pursuant to Section XV of this Agreement, the relative recoveries for Verified Tier 4 Primary Plaintiffs and their corresponding Derivative Plaintiffs.

**OO.**    **"Pre-Existing Injury"** shall mean a Qualifying Injury first diagnosed by a licensed physician (i) prior to the Primary Plaintiff's first date of alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them; (ii) pursuant to the Diagnostic Criteria component of the Medical Proof

Criteria; and (iii) in the same Disease Group as a Qualifying Injury claimed by the Primary Plaintiff in a Tier 4 Claim Form.

PP.  **"Preliminary Payments"** shall mean all Initial Payments, Accelerated Final Payments, and Interim Payments made to Plaintiffs before Final Distributions, if any, as provided in Section IX of this Agreement.

QQ.  **"Primary Plaintiff"** shall mean a Plaintiff whose Debris Removal Claims relate to his or her rescue, recovery, or debris removal work or volunteer service.

RR.  **"Primary Qualifying Injury"** shall mean each Primary Plaintiff's Qualifying Injury, if any, with the highest Tier placement, as set forth in Section VIII of this Agreement, or highest Base Point value on the Settlement Grid attached as Exhibit C to this Agreement, relative to the same Primary Plaintiff's other Qualifying Injuries, if any, after application of all Adjustment Factors for Verified Tier 4 Primary Plaintiffs.

SS.  **"Qualifying Injuries"** shall mean those injuries (i) verified by the Allocation Neutral based upon a Primary Plaintiff's Claim Form and Qualifying Medical Records and (ii) listed in the chart in Section XII of this Agreement.

TT.  **"Qualifying Surgeries"** shall mean those actual or recommended surgical procedures listed on Exhibit D to this Agreement, subject to the limitations and requirements specified therein, and which warrant the payments specified in Exhibit D to those Primary Plaintiffs who satisfy the requirements of Section XVIII.B of this Agreement.

UU.  **"Qualifying Medical Records"** shall mean medical records generated by the Effective Date and (i) produced by Plaintiffs to Defendant Insureds' Counsel by the Final Settlement Agreement Effective Date; (ii) produced by Defendant Insureds' Counsel to Plaintiffs at any time, including records in the possession, custody or control of the City of New York (including without limitation Express Scripts, Inc. pharmaceutical records for Primary Plaintiffs who received medical care directly from the City of New York) produced pursuant to Section XI.H of this Agreement; or (iii) required to be produced under Section XI.H of this Agreement; provided, however, that records reflecting the fact of the death of a Primary Plaintiff, medical records reflecting that a Primary Plaintiff underwent (or, in the case of a recommended single or double lung transplant, the recommendation that the Primary Plaintiff undergo) any Qualifying Surgery(ies), and disability determinations by an Adjudicatory Body shall be deemed Qualifying Medical Records even if generated after the Effective Date. In addition, Pulmonary Function Tests and spirometries that satisfy the forgoing requirements of this definition shall not constitute Qualifying Medical Records if they contain statements to the effect that the test results (i) are not reproducible, reliable, acceptable, valid, or satisfactory; (ii) represent poor effort or lack of cooperation on the part of the Primary Plaintiff, or include any indication that he or she is unable to perform acceptable maneuvers; and/or (iii) are compromised

by the Primary Plaintiff's acute respiratory condition or illness other than a Qualifying Injury at the time of the test (*e.g.*, a upper respiratory infection, pneumonia or acute bronchitis).

VV.     **"Reconsideration Request"** shall mean a Primary Plaintiff's request that the Allocation Neutral reconsider (i) the Primary Plaintiff's placement by the Allocation Neutral in Tier 1, Tier 2 or Tier 3 pursuant to Section XIV.A of this Agreement; (ii) its denial of, or the amount of its award of, a Mixed Orthopedic Injury payment made allegedly without regard to the requirements of Section XVIII.A of this Agreement; (iii) its denial of, or the amount of its award of, a Qualifying Surgery payment made allegedly without regard to the requirements of Section XVIII.B of this Agreement; (iv) its application or alleged misapplication of the Work Verification Procedure in Exhibit B to this Agreement to the Primary Plaintiff's claims; (v) its application or alleged misapplication of the Permanent Disability Fund provisions in Section XVI of this Agreement to the Primary Plaintiff's claims; or (vi) the Allocation Neutral's determination for purposes of the Tier 4 Point System of the Primary Plaintiff's Total Score pursuant to Section XIII.C of this Agreement.

WW.     **"Release and Covenant Not to Sue"** shall mean the document in the form attached as Exhibit P to this Agreement which all Plaintiffs must execute in order to opt-in to the Final Settlement Agreement as provided in Section V.A of this Agreement.

XX.     **"Secondary Qualifying Injury"** shall mean, for those Verified Tier 4 Primary Plaintiffs who the Allocation Neutral determines have more than one Qualifying Injury, such Primary Plaintiff's Qualifying Injury with the second highest Base Point value on the Settlement Grid relative to the same Primary Plaintiff's Primary Qualifying Injury and his or her other Qualifying Injuries, if any, after application of all Adjustment Factors.

YY.     **"Settlement Amount"** shall mean the aggregate amount set forth in Section II.A of this Agreement that the WTC Captive shall pay, in addition to any Contingent Payment(s) due as provided in Section IV of this Agreement and any further payment required under Section VI.E of this Agreement, on behalf of all of the Insureds, to settle all Debris Removal Claims against the Insureds or any of them by those Plaintiffs who opt-in to the Final Settlement Agreement as provided in Section VI.B of this Agreement. The Settlement Amount does not include interest earned thereupon.

ZZ.     **"Settlement Grid"** shall mean the document appended hereto as Exhibit C which specifies the Base Points for each Qualifying Injury for purposes of the Tier 4 Point System set forth in Section XIII of this Agreement.

AAA.    **"Total Score"** shall mean the product of the Allocation Neutral's adjustments pursuant to Section XIII.C of this Agreement to Base Points, if any, awarded by

the Allocation Neutral to each Verified Tier 4 Primary Plaintiff in any Master Docket.

BBB.  **"Verified Tier 4 Primary Plaintiff"** shall mean a Primary Plaintiff who submits a Tier 4 Claim Form and who the Allocation Neutral determines meets the Tier 4 proof requirements set forth in Section VIII.E of this Agreement, including without limitation the Medical Proof Criteria for one or more Tier 4 Qualifying Injuries as forth in Section XII of this Agreement.

CCC.  **"Work Verification Procedure"** shall mean the process described in Exhibit B to this Agreement and which is required to verify a Primary Plaintiff's employment or volunteer status at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them.

DDD.  **"WTC Site"** shall mean: (a) the secured area in New York City bounded by Broadway on the east, Albany Street and Thames Street on the south, Chambers Street on the north and the Hudson River on the west; (b) the loading areas in New York City at the West Side Highway and Chambers Street, as well as Pier 92 and the Heliport at 59th Street and Hamilton Avenue; (c) the Brooklyn Marine Transfer Stations where trucks dropped off debris and debris was loaded onto barges; (d) barges in transit on the Hudson River and other waterways, together with adjacent piers, on which such barges operated; (e) trucks in transit between the World Trade Center and any location involved in the transportation of debris including such locations in Brooklyn and Staten Island/Fresh Kills; (f) debris loading and unloading areas, including those in Brooklyn and Staten Island/Fresh Kills; and (g) debris sorting/sifting areas at Staten Island/Fresh Kills.

## II.  <u>SETTLEMENT AMOUNT</u>

A.  **The Settlement Amount and Other Payments Potentially Due Under This Agreement**

Within ninety (90) days after the Effective Date, the WTC Captive shall place in a separate account Five Hundred Seventy-Five Million Dollars and No Cents ($575,000,000.00) as the Settlement Amount.

In addition to the Settlement Amount, the WTC Captive is potentially obligated under this Agreement (i) to pay Contingent Payments of up to Twenty-Five Million Dollars and No Cents ($25,000,000.00) subject to the terms and conditions of Section IV of this Agreement and (ii) to pay two percent (2%) of the Settlement Amount for each one percent (1%) of all Primary Plaintiffs across all Master Dockets who opt into the Final Settlement Agreement in excess of the Section VI.D.i Opt-In Threshold, as set forth in Section VI.E of this Agreement. The Settlement Amount and these two types of potential additional payments may total up to Six Hundred Fifty-Seven Million Five Hundred Thousand Dollars and

No Cents ($657,500,000.00) subject to the terms, conditions and limitations of Sections IV and VI.E of this Agreement.

**B.    Exclusive Components of the Settlement Amount**

The Settlement Amount shall consist of:

i.      All Preliminary Payments and Final Distributions to all Plaintiffs who opt into the Final Settlement Agreement by signing Releases and Covenants Not To Sue as described in Section VII of this Agreement, respectively, as follows:

      a.      Four Hundred Seventy-Seven Million Seven Hundred Twenty-Nine Thousand Dollars and No Cents ($477,729,000.00) for all Preliminary Payments and Final Distributions to all Plaintiffs who opt into the Final Settlement Agreement and whose Debris Removal Claims against the Insureds or any of them are pending as of the Final Settlement Agreement Effective Date in Master Docket No. 21 MC 100 in the United States District Court for the Southern District of New York or in any state court;

      b.      Three Million Four Hundred Seventy-One Thousand Dollars and No Cents ($3,471,000.00) for all Preliminary Payments and Final Distributions to all Plaintiffs who opt into the Final Settlement Agreement and whose Debris Removal Claims against the Insureds or any of them are pending as of the Final Settlement Agreement Effective Date in Master Docket No. 21 MC 102 in the United States District Court for the Southern District of New York; and

      c.      Twelve Million Nine Hundred Thousand Dollars and No Cents ($12,900,000.00) for all Preliminary Payments and Final Distributions to all Plaintiffs who opt into the Final Settlement Agreement and whose Debris Removal Claims against the Insureds or any of them are pending as of the Final Settlement Agreement Effective Date in Master Docket No. 21 MC 103 in the United States District Court for the Southern District of New York.

ii.     Payment of the premium for the Cancer Insurance Policy in the amount of Twenty Three Million Four Hundred Thousand Dollars and No Cents ($23,400,000.00) as described in Section XVII of this Agreement; provided, however, that if the final premium for the Cancer Insurance Policy as negotiated by Plaintiffs' Liaison Counsel, the WTC Captive, and MetLife as issuer of the Cancer Insurance Policy differs from the amount specified in this Section II.B.ii, any such difference, whether in excess of or less than the amount specified here, shall be applied proportionately against or added to, as the case may be, the portions of the Settlement

Amount allocated to each Master Docket as set forth in Sections II.B.i.a through II.B.i.c of this Agreement; and

iii.    Capitalization of the Permanent Disability Fund in the amount of Fifty-Seven Million Five Hundred Thousand Dollars and No Cents ($57,500,000.00) as described in Section XVI of this Agreement.

This Section II.B sets forth the exclusive permissible allocation of the Settlement Amount among the Master Dockets, to fund the Cancer Insurance Policy premium and to capitalize the Permanent Disability Fund.

## C.    The Settlement Amount Cannot Be Increased for Any Reason

The Settlement Amount shall not be increased for any reason.

## D.    The Settlement Amount Is a Reasonable Compromise

Each Party agrees to support the Settlement Amount, including without limitation the Cancer Insurance Policy funded thereby as referenced in Section XVII of this Agreement, together with the recovery from or assignment of rights against the London Marine Insurers as set forth in Section II.F of this Agreement, as a reasonable resolution of all Plaintiffs' Debris Removal Claims against the Insureds.  In no circumstances shall the reasonableness and/or adequacy of the Settlement Amount be challenged by: (i) any Plaintiff who opts into the Final Settlement Agreement by executing the Release and Covenant Not to Sue; or (ii) any signatory to this Agreement.

## E.    Funding from Defendants Not Insured By the WTC Captive

The Settlement Amount, the Contingent Payment(s), if any, and the further payment due under Section VI.E of this Agreement, if any, will be paid by the WTC Captive on behalf of the Insureds only.  Accordingly, nothing in this Agreement shall terminate Plaintiffs' rights, if any, against Other Defendants.

The Final Settlement Agreement shall be subject to N.Y. GOL § 15-108.  In addition, to the extent that Plaintiffs who opt in to the Final Settlement Agreement or any of them are awarded judgment(s) against the Other Defendants or any of them with respect to Debris Removal Claims, such Plaintiffs agree to reduce those judgment(s) to the full extent of any and all such Other Defendants' contribution and indemnity claims, if any, against the Insureds or any of them.  In addition, such Plaintiffs and each of them agree that after the Effective Date they shall not settle any Debris Removal Claims with Other Defendant(s) without all settling Other Defendants' written agreement to release all claims based upon an actual or alleged written indemnification agreement, if any, that they have against the Insureds or any of them arising out of or relating to such Other Defendant's or Other Defendants' settlement with such Plaintiff(s).

F.    **Insurance Assets Other Than the Settlement Amount**

Except with respect to the London Marine Insurers as described in this Section II.F and Plaintiffs' releases of the WTC Captive as set forth in executed Releases and Covenants Not to Sue, the Parties do not assign, modify, transfer, waive, release or relinquish their respective rights, if any, against any insurers or insurance policies, including without limitation those insurers and insurance policies identified on Schedule 2 to the WTC Captive's Policy ("Underlying Insurers"). All such rights are expressly reserved and preserved.

If at any time the London Marine Insurers agree to settle with and on behalf of their insureds, the City of New York and Weeks Marine, Inc., Debris Removal Claims alleging liabilities potentially covered by the London Marine Policies, and contribute to the settlement memorialized in this Agreement in an amount acceptable to Plaintiffs, then the WTC Captive shall release and waive any and all rights and claims of the WTC Captive against the London Marine Insurers for contribution, subrogation or other reimbursement for the Settlement Amount, the Contingent Payments, if any, premium paid for the Cancer Insurance Policy and the WTC Captive's costs of defending the City of New York and Weeks Marine, Inc. to the extent that the Settlement Amount, the Contingent Payments, if any, premium for the Cancer Insurance Policy and such costs of defense are covered by the London Marine Policies or either of them.

Alternatively, if the London Marine Insurers do not agree to settle with and on behalf of their insureds, the City of New York and Weeks Marine, Inc., Debris Removal Claims alleging liabilities potentially covered by the London Marine Policies, and do not contribute to the settlement memorialized in this Agreement in an amount acceptable to Plaintiffs, then the WTC Captive shall assign to the settling Plaintiffs any and all rights and claims of the WTC Captive against the London Marine Insurers for contribution, subrogation or other reimbursement relating to the Settlement Amount, the Contingent Payments, if any, premium paid for the Cancer Insurance Policy and the WTC Captive's costs of defending the City of New York and Weeks Marine, Inc. to the extent that the Settlement Amount, the Contingent Payments, if any, premium for the Cancer Insurance Policy and such costs of defense are covered by the London Marine Policies or either of them.

The Parties agree that any funds recovered from the London Marine Insurers under the provisions of this Section II.F shall be apportioned among Primary Plaintiffs who opt into the Final Settlement Agreement by executing the Release and Covenant Not to Sue and whose Debris Removal Claims against the Insureds or any of them derive in whole or in part from alleged exposure on the barges and/or piers covered potentially by the London Marine Policies (hereinafter, "Marine Primary Plaintiffs"). In addition, all funds recovered from the London Marine Insurers shall be apportioned among the Marine Primary Plaintiffs in proportion to the sum of their respective Initial Payments, Accelerated Final Payments, Interim Payments and Final Distributions, if any, under the Final

Settlement Agreement. Any expense incurred by the Allocation Neutral relating to the apportionment among the Marine Primary Plaintiffs of any recovery from the London Marine Insurers shall be paid exclusively by those Plaintiffs and/or their respective counsel.

Without limiting in any way the forgoing provisions of this Section II.F, Plaintiffs' Liaison Counsel shall consult with the WTC Captive and its counsel on a regular basis, but at least every thirty (30) days following the Effective Date, concerning the timing of this assignment. Throughout these consultations and in any related negotiations including Plaintiffs and/or the WTC Captive, on the one hand, and the London Marine Insurers, on the other hand, the WTC Captive and Plaintiffs shall cooperate and use their respective best efforts to obtain a mutually acceptable recovery from the London Marine Insurers. If no such recovery is obtained within one hundred and eighty (180) days after the Effective Date, however, Plaintiffs shall have the right to send the WTC Captive a written demand that it consummate the assignment described in this Section II.F. Within five (5) business days of its receipt of such a demand, the WTC Captive shall effectuate the assignment described in this Section II.F.

**G.    Attorneys' Fees, Costs and Expenses**

The Settlement Amount and the Contingent Payment, if any, shall include all of Plaintiffs' Liaison Counsel's fees, costs and expenses and the fees, costs and expenses of all other counsel engaged by any Plaintiff or Plaintiffs with respect to Debris Removal Claims against the Insureds or any of them or any matter relating thereto. Plaintiffs' attorneys' fees, costs and expenses, and all other costs or expenses paid or incurred by Plaintiffs or their counsel relating to Debris Removal Claims against the Insureds or any of them, shall not increase the Settlement Amount or the Contingent Payment, if any, for any reason.

Without affecting in any way the limitations on the Settlement Amount and the Contingent Payment, if any, as stated in the preceding paragraph of this Agreement, the Parties acknowledge as follows:

i.      Plaintiffs' Liaison Counsel has expended time, effort and resources litigating numerous and complex issues of law and fact, managing and advancing Debris Removal Claims against the Insureds, and structuring a comprehensive settlement of Debris Removal Claims against the Insureds, including without limitation the negotiation, preparation and implementation of this Agreement;

ii.     The Settlement Amount and the Contingent Payment, if any, represent an extraordinary recovery for Plaintiffs given their alleged injuries and the anticipated difficulty of establishing the Insureds' liability, if any, at trial; and

iii.   Plaintiffs' Liaison Counsel, including their respective law firms and the individual attorneys within those firms involved in the litigation and settlement of Debris Removal Claims against the Insureds, have the professional experience and reputation and are possessed of sufficient skills and ability to perform the services required by the scope of and issues in this litigation and arising under this Agreement.

Each Plaintiff is solely responsible for payment of his or her respective attorneys' fees, costs and expenses relating in any way to Debris Removal Claims against the Insureds or any of them under the existing terms of the Plaintiff's contract with his or her respective counsel.

## III.   SETTLEMENT AMOUNT ADMINISTRATION

### A.   Placement of the Settlement Amount in the Separate Account

Within ninety (90) days after the Effective Date, the WTC Captive shall place the Settlement Amount in a separate account to be held in the WTC Captive's name at the Bank of New York pursuant to an account agreement among the WTC Captive, the Bank of New York and the Allocation Neutral (the "Separate Account"). The WTC Captive shall remain the tax owner of the Settlement Amount until such funds are disbursed from the Separate Account pursuant to this Agreement. The WTC Captive shall provide a copy of this account agreement to Plaintiffs' Liaison Counsel upon execution.

The Separate Account shall be modified or terminated only upon joint direction of the WTC Captive and the Allocation Neutral.

### B.   Investment of the Settlement Amount Prior to Its Distribution

While the Settlement Amount remains in the Separate Account, the WTC Captive shall direct investment of the Settlement Amount through its independent financial advisors according to reasonable, prudent and conservative criteria to be established by the WTC Captive and its independent financial advisors. Furthermore, beginning thirty (30) days after the Settlement Amount is placed in the Separate Account, the Bank of New York shall send monthly written statements to Plaintiffs' Liaison Counsel regarding the Settlement Amount balance, the investment allocation and performance of the Settlement Amount, any and all payments to Plaintiffs, and all reasonable costs, fees and expenses of the Allocation Neutral charged against the Settlement Amount in accordance with Section XI.D of this Agreement.

### C.   Permissible Uses of Any Income Earned On the Settlement Amount

Although the WTC Captive shall remain the owner of the Separate Account for income tax purposes, any income (*e.g.*, interest) earned on the Settlement Amount before it is fully disbursed as set forth in this Agreement shall be apportioned among the Master Dockets and to the Permanent Disability Fund in proportion to

the allocation of Settlement Amount principal to those Master Dockets and to the Permanent Disability Fund as set forth in Sections II.B.i and II.B.iii of this Agreement.  Likewise, the Allocation Neutral shall apportion all of its reasonable costs, fees and expenses among each of the Master Dockets and the Permanent Disability Fund in proportion to the allocation of the Settlement Amount among each of the Master Dockets and the Permanent Disability Fund set forth in Sections II.B.i and II.B.iii of this Agreement.

Subject to the apportionment of income (*e.g.*, interest) earned on the Settlement Amount and of the Allocation Neutral's reasonable costs, fees and expenses as provided in the preceding paragraph, income (*e.g.*, interest) on the Settlement Amount shall be first used to satisfy the Allocation Neutral's reasonable costs, fees and expenses, as set forth in Section XI.D of this Agreement.  The WTC Captive shall direct the release of funds for this purpose.  Furthermore, at the conclusion of the Allocation Process and after satisfaction of all of the Allocation Neutral's reasonable costs, fees and expenses, any remaining income (*e.g.*, interest) earned on the Settlement Amount shall be applied to each Master Docket and to the Permanent Disability Fund in proportion to the allocation of the Settlement Amount among each of the Master Dockets and the Permanent Disability Fund set forth in Sections II.B.i and II.B.iii of this Agreement and, within each Master Docket, interest shall be incorporated into the amount allocated to the Plaintiffs in that Master Docket who receive a Final Distribution pursuant to Section XV of this Agreement.

**D.**     **Disbursement of the Settlement Amount**

Pursuant to instructions from the Allocation Neutral, the WTC Captive or its designee shall direct the release of the Settlement Amount, in pertinent part, to satisfy its Preliminary Payment obligation to individual Plaintiffs in the time and manner as set forth in Section IX of this Agreement.  Following the satisfaction of the WTC Captive's entire Preliminary Payment obligations and subject to all other payments by the WTC Captive required pursuant to this Agreement, the WTC Captive or its designee shall direct the release of the remainder of Settlement Amount by check or wire to individual Plaintiffs (or their designees) and their respective counsel in the amounts, if any, directed by the Allocation Neutral as Final Distributions in the time and manner as set forth in Section XV.C of this Agreement.

**E.**     **Limited Circumstances Under Which the WTC Captive Shall Retain the Settlement Amount and Any Income Earned Thereon**

If this Agreement is voided pursuant to Section VI.E or XX.E of this Agreement, the WTC Captive shall retain the entire Settlement Amount and any income earned thereon after satisfaction of the Allocation Neutral's reasonable costs, fees and expenses incurred, if any, prior to the exercise of any such right to void this Agreement. Thereafter, the Settlement Amount and all such remaining income

thereupon shall be remitted from the Separate Account to any account designated by the WTC Captive.

## IV.  CONTINGENT PAYMENTS

### A.  Nature of Contingent Payments

In addition to the Settlement Amount, the WTC Captive may in the future make additional payments to Plaintiffs on behalf of the Insureds ("Contingent Payments"). These Contingent Payments shall become due only if certain contingencies are satisfied, and it is possible under the terms herein that no Contingent Payments will ever become due. As set forth specifically in Sections IV.B and IV.C below, whether Contingent Payments become due, and the amount(s) of such Contingent Payments, if any, shall be dependent upon:

i.      The number of New Debris Removal Claims;

ii.     The amount of money, if any, paid by the WTC Captive on behalf of the Insureds or any of them to satisfy judgments or fund the settlement(s) of Debris Removal Claims filed, received or noticed prior to the Eligible Plaintiff List due date by Plaintiffs who do not opt into the Final Settlement Agreement ("Opt-Out Costs"); and

iii.    The amount of money, if any, paid by the WTC Captive on behalf of the Insureds or any of them to satisfy judgments or fund the settlements of suits or claims against the Insureds or any of them by Other Defendants for indemnification of judgments, settlements, costs and/or expenses against or incurred by Other Defendants arising out of Debris Removal Claims settled as part of the Final Settlement Agreement ("Indemnification Costs").

The amount due under Section VI.E of this Agreement, if any, shall not constitute Opt-Out Costs or Indemnifications Costs for purposes of this Section IV.

### B.  Contingent Payment Determinations—Timing

The Contingent Payments, should they become due, shall be paid in five (5) annual installments. Each date on which Contingent Payment is determined to be due, and if so, in what amount, shall be a "Contingent Payment Determination Date."

The First Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus one year. The First Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

The Second Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus two years. The Second Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

The Third Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus three years. The Third Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

The Fourth Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus four years. The Fourth Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

The Fifth Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus five years. The Fifth Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

## C.    Contingent Payment Determinations—Criteria

Each annual installment of Contingent Payment, if any, shall be determined solely upon the following conditions as of the relevant Contingent Payment Determination Date:

i.    First Contingent Payment

The First Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| **Number of New Debris Removal Claims Filed as of First Contingent Payment Determination Date** | **First Contingent Payment** (subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|
| 120 or less | $5,000,000.00 |
| 121 to 219 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 120th New Debris Removal Claim filed as of the First Contingent Payment Determination Date |
| 220 or more | $0.00 |

The First Contingent Payment due, if any, as reflected in the table immediately above shall be reduced if, from the Effective Date to the First Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Seven Million Dollars and No Cents ($7,000,000.00). If this occurs, the First Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed $7,000,000, up to the entire amount

of Contingent Payment that otherwise would be due. The First Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Seven Million Dollars and No Cents ($7,000,000.00) as of the First Contingent Payment Determination Date, then the First Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

ii.    Second Contingent Payment

The Second Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| **Number of New Debris Removal Claims Filed as of Second Contingent Payment Determination Date** | **Second Contingent Payment Due**<br><br>(subject to the Opt-Out Costs and Indemnification Costs provisions below) |
| --- | --- |
| 240 or less | $5,000,000.00 |
| 241 to 339 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 240th New Debris Removal Claim filed as of the Second Contingent Payment Determination Date |
| 340 or more | $0.00 |

The Second Contingent Payment due, if any, as reflected in the table immediately above shall be reduced if, from the Effective Date to the Second Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Fourteen Million Dollars and No Cents ($14,000,000.00). If this occurs, the Second Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Fourteen Million Dollars and No Cents ($14,000,000.00), up to the entire amount of Contingent Payment that otherwise would be due. The Second Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Fourteen Million Dollars and No Cents ($14,000,000.00) as of the Second Contingent Payment Determination Date, then the Second Contingent

Payment due, if any, shall be determined pursuant to the table immediately above.

iii.    Third Contingent Payment

The Third Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| **Number of New Debris Removal Claims Filed as of Third Contingent Payment Determination Date** | **Third Contingent Payment Due**<br><br>(subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|
| 360 or less | $5,000,000.00 |
| 361 to 459 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 360th New Debris Removal Claim filed as of the Third Contingent Payment Determination Date |
| 460 or more | $0.00 |

The Third Contingent Payment due, if any, as reflected in the table immediately above shall be reduced if, from the Effective Date to the Third Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Twenty-One Million Dollars and No Cents ($21,000,000).  If this occurs, the Third Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Twenty-One Million Dollars and No Cents ($21,000,000), up to the entire amount of Contingent Payment that otherwise would be due.  The Third Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Twenty-One Million Dollars and No Cents ($21,000,000) as of the Third Contingent Payment Determination Date, then the Third Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

iv.    Fourth Contingent Payment

The Fourth Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| **Number of New Debris Removal Claims Filed as of Fourth Contingent Payment Determination Date** | **Fourth Contingent Payment Due**<br><br>(subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|
| 480 or less | $5,000,000.00 |
| 481 to 579 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 480th New Debris Removal Claim filed as of the Fourth Contingent Payment Determination Date |
| 580 or more | $0.00 |

The Fourth Contingent Payment, if any, due as reflected in the table immediately above shall be reduced if, from the Effective Date to the Fourth Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Twenty-Eight Million Dollars and No Cents ($28,000,000.00). If this occurs, the Fourth Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Twenty-Eight Million Dollars and No Cents ($28,000,000.00), up to the entire amount of Contingent Payment that otherwise would be due. The Fourth Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Twenty-Eight Million Dollars and No Cents ($28,000,000.00) as of the Fourth Contingent Payment Determination Date, then the Fourth Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

v.     Fifth Contingent Payment

The Fourth Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| **Number of New Debris Removal Claims Filed as of Fifth Contingent Payment Determination Date** | **Fifth Contingent Payment Due**<br><br>(subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|

| 600 or less | $5,000,000.00 |
|---|---|
| 601 to 699 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 600th New Debris Removal Claim filed as of the Fifth Contingent Payment Determination Date |
| 700 or more | $0.00 |

The Fifth Contingent Payment due, if any, as reflected in the table immediately above shall be reduced if, from the Effective Date to the Fifth Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Thirty-Five Million Dollars and No Cents ($35,000,000.00). If this occurs, the Fifth Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Thirty-Five Million Dollars and No Cents ($35,000,000.00), up to the entire amount of Contingent Payment that otherwise would be due. The Fifth Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Thirty-Five Million Dollars and No Cents ($35,000,000.00) as of the Fifth Contingent Payment Determination Date, then the Fifth Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

### D.    Plaintiffs Entitled to Pro Rata Share of Contingent Payments

Verified Tier 4 Primary Plaintiffs shall be entitled to *pro rata* shares of each Contingent Payment, if any, in proportion to their respective payments under the Final Settlement Agreement.

## V.    RECIPROCAL RELEASES, PLAINTIFFS' COVENANTS NOT TO SUE AND PLAINTIFFS' WAIVER OF PUTATIVE "SECOND INJURY" CLAIMS

### A.    Plaintiffs' Releases and Covenants Not to Sue

Plaintiffs who opt into the Final Settlement Agreement and their heirs, beneficiaries, successors and assigns, if any, will execute Releases and Covenants Not to Sue in the form attached hereto as Exhibit P. In the Releases and Covenants Not to Sue, Plaintiffs and their heirs, beneficiaries, successors and assigns, if any, will release each and all of their known or unknown, filed or un-filed, matured or un-matured, manifested or latent, and past, present or future Debris Removal Claims and/or New Debris Removal Claims against the WTC

Captive, the Insureds, and their respective affiliates, subsidiaries, parents, predecessors, successors, assigns, officers, directors, employees, consultants, attorneys and other agents. In addition, in the Releases and Covenants Not to Sue, Plaintiffs and their heirs, beneficiaries, successors and assigns, if any, will covenant not to sue the WTC Captive, the Insureds, and their respective affiliates, subsidiaries, parents, predecessors, successors, assigns, officers, directors, employees, consultants, attorneys and other agents with respect to each and all of Plaintiffs' known or unknown, filed or un-filed, matured or un-matured, and past, present or future Debris Removal Claims and/or New Debris Removal Claims. The Releases and Covenants Not to Sue shall apply to all of the Insureds identified on Exhibit A, but shall not apply to defendants that are neither identified on Exhibit A nor parties to the Final Settlement Agreement.

**B.**     **The Insureds' and the WTC Captive's Releases of Settling Plaintiffs**

Upon Affirmation of the Final Settlement Agreement as provided in Section XXII.A of this Agreement, the WTC Captive, the Insureds, and their respective affiliates, subsidiaries, parents, predecessors, successors, assigns, officers, directors, employees, consultants, attorneys and other agents will release each and all of their known or unknown, filed or un-filed, matured or un-matured, manifested or latent, and past, present or future claims against Plaintiffs and their heirs, beneficiaries, successors and assigns, if any, arising out of or relating to those Debris Removal Claims settled by the Final Settlement Agreement. In the event that any Plaintiff's Release and Covenant to Sue is rescinded, limited, nullified and/or rendered void or unenforceable for any reason, (i) the Insureds' and the WTC Captive's releases of that Plaintiff shall be similarly rescinded, limited, nullified, void and/or unenforceable and (ii) that Plaintiff shall return to the WTC Captive all amounts awarded to him or her pursuant to the Final Settlement Agreement.

**C.**     **Plaintiffs Have Not Assigned Any of Their Claims**

Plaintiffs represent and warrant that, unless otherwise disclosed to the WTC Captive in writing prior to the Effective Date, they have not assigned or otherwise transferred any of the claims to be released pursuant to this Agreement. To the extent that any Plaintiff has assigned or otherwise transferred any of the claims to be released pursuant to this Agreement, all such Plaintiffs and their respective Assignees must opt into the Final Settlement Agreement in order to participate in this settlement.

**D.**     **Plaintiffs Agree to Release and Covenant Not to Sue the Insureds With Respect to Plaintiffs' Putative "Second Injury" Claims**

Plaintiffs understand and have consulted with their respective counsel regarding the putative effect of New York's "second injury" rule. In addition, Plaintiffs understand that in this Section V they are agreeing to release and have covenanted not to sue the Insureds with respect to future, unknown, latent and/or un-matured

injuries relating in any way to or arising out of 9/11-related work or volunteer service, including without limitation claims based upon future, unknown, latent and/or un-matured injuries related or unrelated in whole or in part to Plaintiffs' current actual or alleged injuries, if any. Furthermore, as of the Effective Date, Plaintiffs acknowledge that they may not know the full extent of any or all of their injuries, if any, relating in any way to the Insureds' or any Insured's rescue, recovery and debris removal operations or other alleged conduct, misconduct, errors, omissions or negligence at the WTC Site or at other locations at which Plaintiffs allege exposure giving rise to their respective Debris Removal Claims against the Insureds or any of them. Nonetheless, Plaintiffs who opt into the Final Settlement Agreement agree to release knowingly and voluntarily, and to covenant not to sue the Insureds or any of them with respect to, all such future, unknown, latent and/or un-matured injuries, if any.

**E.    Plaintiffs Waiver of Their Right to Contest Their Releases and Covenants Not to Sue**

Without limiting in any way any of the other provisions in this Section V, Plaintiffs who opt into the Final Settlement Agreement do so voluntarily and knowingly relinquish any right to contest any aspect of their Releases and Covenants Not to Sue.

**F.    Second Injury Letter to All Plaintiffs**

Notwithstanding and without limiting in any way Plaintiffs' understandings and acknowledgements as set forth elsewhere in this Section V, Plaintiffs' counsel shall send each of their respective clients except deceased Primary Plaintiffs the letter attached as Exhibit H hereto. This letter explains to individual Plaintiffs the effect of the Release and Covenant Not to Sue and states, as plainly as reasonably possible, that the Release and Covenant Not to Sue and, if applicable in a particular Primary Plaintiff's circumstances, the Cancer Insurance Policy are intended to extinguish Plaintiffs' claims against the Insureds and the WTC Captive with respect to all future, unknown, latent and/or un-matured injuries arising out of Debris Removal Claims, regardless of whether any particular Plaintiff is eligible to participate in the Cancer Insurance Policy. In order to participate in the Final Settlement Agreement, each Primary Plaintiff except deceased Primary Plaintiffs must countersign this letter, have his or her signature attested by a licensed notary public, and return it to his or her counsel, who shall provide a true and correct copy of the countersigned, notarized letter to the WTC Captive and the Defendant Insureds' Counsel together with Plaintiff's Release and Covenant Not to Sue.

**G.    Limitations on Putative "Second Injury" Claims**

Without limiting in any way any of the forgoing provisions of this Section V, if any Plaintiff who executes a Release and Covenant Not to Sue brings future action(s), claim(s) or suit(s) against any of the Insureds and/or the WTC Captive

in which Plaintiff contends that the Release and Covenant Not to Sue is ineffective with respect to any alleged future, unknown, latent and/or un-manifested injury(ies) arising out of or relating in any way to Debris Removal Claims and/or New Debris Removal Claims, such Plaintiff(s) agree:

i.  That the exclusive forum for all such future action(s), claim(s) or suit(s) against the Insureds and/or the WTC Captive shall be the United States District Court for the Southern District of New York;

ii.  That the Final Settlement Agreement, the executed Release and Covenant Not to Sue, and the executed letter described in Section V.F of this Agreement constitute the sole expression of their respective intent regardless of any alleged change in circumstances or claimed misunderstanding by Plaintiffs or any of them with respect to those documents or any of their terms; and

iii.  To pay the Insureds' and WTC Captive's reasonable costs and expenses, including without limitation their reasonable attorneys' fees, in any action(s), claim(s) or suit(s) in which the Insureds, the WTC Captive and/or any of them prevail on any basis relating to the enforcement of the Release and Covenant Not to Sue and/or the Final Settlement Agreement.

**H.    Parties' Right to Enforce This Agreement**

Nothing in this Section V shall affect any Party's or Parties' right to sue another Party or Parties to enforce this Agreement.

## VI.    OPT-IN THRESHOLD

**A.    List of Plaintiffs Eligible to Opt Into Final Settlement Agreement**

Fifteen (15) days after the Effective Date, Plaintiffs' Liaison Counsel shall provide to Defendant Insureds' Counsel a complete list of all Plaintiffs asserting Debris Removal Claims against the Insureds or any of them ("Eligible Plaintiff List"). Only Plaintiffs with Debris Removal Claims filed against the Insureds or any of them, including in any Master Docket, by fifteen (15) days after the Effective Date or who have instituted Debris Removal Claims against the Insureds or any of them through other legal process recognized by New York law (*e.g.*, a notice of claim submitted to the City of New York) by fifteen (15) days after the Effective Date shall be eligible for inclusion on the Eligible Plaintiff List; provided, however, that such Plaintiffs who dismiss with prejudice, and without exception, their Debris Removal Claims against the Insureds by executing the Stipulation of Dismissal With Prejudice attached as Exhibit S to this Agreement need not be included on the Eligible Plaintiff List; provided, further, however, that any Primary Plaintiff who is named in Appendix A to Case Management Order No. 1 in Master Docket 21 MC 100 need not be included on the Eligible Plaintiff List unless he or she has amended his or her complaint to allege any Qualifying Injury(ies). As set forth more fully in Section VII of this

Agreement, no person omitted from the Eligible Plaintiff List shall be entitled to any payment under this Agreement.

For each Primary Plaintiff, the Eligible Plaintiff List shall identify in the form attached hereto as Exhibit U each of the following items:

i.      The full name of the Primary Plaintiff and any corresponding Derivative Plaintiff;

ii.     The case number(s) of any and all actions brought on behalf of the Primary Plaintiff and any corresponding Derivative Plaintiff;

iii.    The consolidated Master Docket Number in which each Plaintiff's claim is pending (21 MC 100; 21 MC 102; 21 MC 103; or Not Applicable);

iv.     The law firm(s) representing each Plaintiff;

v.      The alleged Primary Qualifying Injury of each Primary Plaintiff;

vi.     Whether the Primary Plaintiff claims eligibility to recover from the Permanent Disability Fund;

vii.    Whether the Primary Plaintiff has undergone a Qualifying Surgery; and

viii.   Whether the Primary Plaintiff claims eligibility to recover for a Mixed Orthopedic Injury.

Thereafter, Defendant Insureds' Counsel will certify that the Eligible Plaintiff List is accurate and complete with respect to Sections VI.A.i, VI.A.ii, and VI.A.iii of this Agreement.  Following this certification by Defendant Insureds' Counsel, an attorney with each law firm representing any Plaintiff or Plaintiffs on the Eligible Plaintiff List shall attest in writing that the Eligible Plaintiff List is accurate and complete as to all of the law firm's clients to the best of the attorney's information and belief.  In addition, each law firm representing any Plaintiff(s) shall provide to Plaintiffs' Liaison Counsel, the WTC Captive and Defendant Insureds' Counsel under separate cover the name of the attorney(s) to contact regarding all Plaintiff(s) represented by his or her law firm, as well as each such attorney's business address, telephone and facsimile numbers, and e-mail address. After this certification and attestation are complete, the Eligible Plaintiff List shall be used to determine compliance with the Opt-In Threshold.

Plaintiffs who dismiss  all of their claims with prejudice by filing the Stipulation of Dismissal with Prejudice attached as Exhibit S to this Agreement at any time before the Final Settlement Agreement Effective Date shall not be counted for purposes of determining compliance with the Opt-In Threshold.  In addition, Primary Plaintiffs identified on Exhibit I may be excluded from the Eligible Plaintiffs List, or shall be excluded from the Opt-In Threshold calculations in this Section VI of this Agreement even if listed on the Eligible Plaintiffs List, only if

they dismiss with prejudice all of the claims relating to Qualifying Injuries such that the Primary Plaintiff's only remaining claims are orthopedic in nature.

For those Plaintiffs who do not opt into the Final Settlement Agreement, the identification of alleged Primary Qualifying Injury required by Section VI.A.v of this Agreement shall be deemed an answer to an interrogatory and pursuant to Federal Rule of Civil Procedure 33(c) may be used to the extent allowed by the Federal Rules of Evidence.

**B.**     **Opting Into the Final Settlement Agreement**

Plaintiffs desiring to opt into the Final Settlement Agreement shall do so by signing the Release and Covenant Not to Sue in the form attached to this Agreement as Exhibit P. Until the Final Settlement Agreement Effective Date, the Parties agree that this Agreement is binding and enforceable. Accordingly, without limiting in any way the forgoing provisions of this Section VI.B or the provisions of Section VI.C of this Agreement, the Parties agree that any and all executed Release(s) and Covenant(s) Not to Sue executed prior to the Affirmation of the Final Settlement Agreement described in Section XXII.A of this Agreement shall have no force or effect and shall not bind any Plaintiff until the Final Settlement Agreement Effective Date.

Plaintiffs shall have ninety (90) days from the Effective Date to opt into the Final Settlement Agreement (the "Opt-In Period"); provided, however, that the WTC Captive shall have, at its sole discretion, the right to extend the Opt-In Period. If the WTC Captive exercises this right, the WTC Captive shall provide written notice to Plaintiffs' Liaison Counsel.

**C.**     **Return of Releases**

If this Agreement is voided pursuant to Section VI.E or XX.E of this Agreement, any and all executed Releases and Covenants Not to Sue shall have no force or effect and shall be returned to Plaintiffs' Liaison Counsel.

**D.**     **Opt-In Threshold**

The Opt-In Threshold is as follows:

i.      At least ninety-five percent (95%) of all Primary Plaintiffs on the Eligible Plaintiff List execute Releases and Covenants Not to Sue (Primary Plaintiffs with corresponding Derivative Plaintiffs on the Eligible Plaintiff List will not be deemed to have opted in unless the Derivative Plaintiff also opts in by executing his or her own Release and Convent Not to Sue);

ii.     At least ninety-five percent (95%) of all Primary Plaintiffs who claim on the Eligible Plaintiff List eligibility for the Permanent Disability Fund execute Releases and Covenants Not to Sue;

iii.   At least ninety-five percent (95%) of all Primary Plaintiffs who claim on the Eligible Plaintiff List any of the following Primary Qualifying Injuries execute Releases and Covenants Not to Sue:  A3, A4, B1, B2, B3, B4, C1, C2, C3, C4, H1, H2, and I2 ("High Threshold Primary Qualifying Injury Categories"); provided further, for clarity, that this Section VI.D.iii requires that at least ninety-five percent (95%) of all Primary Plaintiffs in *each* of the High Threshold Primary Qualifying Injury Categories execute Releases and Covenants Not to Sue; provided, however, that if the percentage of Primary Plaintiffs in any particular High Threshold Primary Qualifying Injury Category that executes Releases and Covenants Not to Sue is less than ninety-five percent (95%) as a result of three (3) or fewer such Primary Plaintiffs not executing Releases and Covenants Not to Sue, then the WTC Captive shall have, at its sole discretion, the right to execute the Affirmation of Final Settlement Agreement referenced in Section XXII.A of this Agreement, and in the event that such right is exercised, this Agreement shall remain binding and enforceable;

iv.    At least ninety percent (90%) of each of the following categories of Primary Plaintiffs on the Eligible Plaintiff List execute Releases and Covenants Not to Sue:

a.    All Primary Plaintiffs in each Primary Qualifying Injury category according to the Eligible Plaintiff List not set forth in Section VI.D.iii of this Agreement; provided, however, that if the percentage of Primary Plaintiffs in any single Primary Qualifying Injury category on the Eligible Plaintiff List who execute Releases and Covenants Not to Sue is less than ninety percent (90%) as a result of ten (10) or fewer such Primary Plaintiffs not executing Releases and Covenants Not to Sue, then the WTC Captive shall have, at its sole discretion, the right to execute the Affirmation of Final Settlement Agreement referenced in Section XXII.A of this Agreement and, in the event that such right is exercised, this Agreement shall remain binding and enforceable; and

b.    All Primary Plaintiffs in each consolidated Master Docket (21 MC 100; 21 MC 102; and 21 MC 103); and

c.    All Primary Plaintiffs who are clients of each law firm representing one hundred and fifty (150) or more Primary Plaintiffs identified on the Eligible Plaintiff List.

## E.    Actions Upon Satisfaction of the Opt-In Threshold

If the Opt-In Threshold is satisfied during the Opt-In Period or any extension by the WTC Captive thereof, the Final Settlement Agreement shall become effective in accordance with and subject to the other requirements of Section XXII.A of this Agreement; provided, however, that even if the Opt-In Threshold is satisfied,

the WTC Captive shall retain the exclusive right to void this Agreement at any time prior to the Final Settlement Agreement Effective Date if more than one hundred and twenty (120) New Debris Removal Claims are first asserted against the Insureds or any of them by the filing or service of complaints, receipt of notices of claim, or other legal process after the Eligible Plaintiff List due date but before the Final Settlement Agreement Effective Date.

In addition, if during the Opt-In Period or any extension thereof by the WTC Captive, actual opt-in experience for purposes of Section VI.D.i of this Agreement exceeds ninety-five percent (95%), the WTC Captive shall pay two percent (2%) of the Settlement Amount set forth in Section II.A of this Agreement for every one percent (1%) in excess of the ninety-five percent (95%) requirement in Section VI.D.i of this Agreement; provided, however, that if actual opt-in experience for purposes of Section VI.D.i of this Agreement exceeds ninety-eight percent (98%), the WTC Captive shall pay one-fifth of one percent (0.20%) of the Settlement Amount set forth in Section II.A of this Agreement for every tenth of one percent (0.10%) above the ninety-five percent (95%) requirement set forth in Section VI.D.i of this Agreement.   Any such payment in addition to the Settlement Amount pursuant to this Section VI.E shall be applied to each Master Docket and to the Permanent Disability Fund in proportion to the allocation of the Settlement Amount among each of the Master Dockets and the Permanent Disability Fund set forth in Sections II.B.i and II.B.iii of this Agreement. Furthermore, the WTC Captive shall deposit in the Separate Account referenced in Section III.A of this Agreement any additional payment due pursuant to this Section VI.E within ten (10) days following execution of the Affirmation of the Final Settlement Agreement referenced in Section XXII.A of this Agreement.

## VII.   ELIGIBILITY FOR PAYMENTS AND ELIGIBILITY TO ENROLL IN THE CANCER INSURANCE POLICY

### A.   Primary Plaintiff Eligibility for Payments and Eligibility to Enroll in the Cancer Insurance Policy

A Primary Plaintiff must be listed on the Eligible Plaintiff List to be eligible for any payment and to enroll in the Cancer Insurance Policy, subject to its terms, conditions and exclusions, pursuant to the Final Settlement Agreement.   In addition, no Primary Plaintiff shall be eligible to receive any payment or to enroll in the Cancer Insurance Policy, subject to its terms, conditions and exclusions, pursuant to the Final Settlement Agreement until after (i) he or she opts into the Final Settlement Agreement pursuant to Section V.A of this Agreement by signing a Release and Covenant Not to Sue; (ii) the Final Settlement Agreement Effective Date; (iii) his or her work or volunteer service  at the WTC Site, and/or at other locations where his or her work or volunteer service gave rise to his or her Debris Removal Claims against the insureds or any of them, is verified by the Allocation Neutral pursuant to the Work Verification Procedure set forth in Exhibit B to this Agreement, including, without limitation, by verifying that his or her name appears on the "pre-approved" list referenced in that Exhibit B; and (iv)

he or she returns to Defendant Insureds' Counsel and the WTC Captive a countersigned and notarized letter in the form of Exhibit H hereto. Furthermore, any Plaintiff who received an award from the September 11th Victim Compensation Fund is ineligible to receive any payment referenced in this Agreement and ineligible to enroll in the Cancer Insurance Policy.

**B.      Derivative Plaintiff Eligibility for Payments**

Derivative Plaintiffs must be listed on the Eligible Plaintiff List to be eligible for any payment pursuant to the Final Settlement Agreement. In addition, Derivative Plaintiffs will only be eligible for payments under the Final Settlement Agreement if (i) the related Primary Plaintiff's Claim Form references the Derivative Plaintiff; (ii) that Claim Form includes sworn attestations that (a) the Primary and Derivative Plaintiffs lawfully married before September 11, 2001 and (b) the Primary and Derivative Plaintiffs remained lawfully married and co-habitating as of the date after September 11, 2001 on which the Primary Plaintiff was first diagnosed with a Qualifying Injury or, if the Primary Plaintiff alleges no Qualifying Injury, the last day of the Primary Plaintiff's work or volunteer service at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the insureds or any of them; (iii) the Derivative Plaintiff opts into the Final Settlement Agreement pursuant to Section V.A of this Agreement by executing the Release and Covenant Not to Sue; and (iv) the Allocation Neutral determines that the corresponding Primary Plaintiff is eligible  pursuant to the requirements of Section VII.A of this Agreement.

Derivative Plaintiffs will be eligible to receive a Final Distribution, subject to the other requirements of this Agreement, only if the Allocation Neutral finds that an eligible Primary Plaintiff lawfully married the Derivative Plaintiff before September 11, 2001, based upon that Primary Plaintiff's Claim Form. All payments to Derivative Plaintiffs shall be within the Settlement Amount.

**C.      Personal Representatives Entitled to Receive Payments on Behalf of Deceased Primary Plaintiffs**

In the event that a deceased Primary Plaintiff is entitled to receive any payment pursuant to the Final Settlement Agreement, the WTC Captive or its designee shall make such payment(s) jointly to the decedent's counsel and to the personal representative(s) of the deceased Primary Plaintiff's estate consistent with a court order or other comparable record designating the personal representative(s) of the estate. Plaintiffs' counsel shall be responsible for, and shall bear the expense of, providing such documents to the Allocation Neutral as attachments to the Claim Form and the information shall thereby be provided to the WTC Captive or its designee.   All payments to Personal Representatives of deceased Primary Plaintiffs shall be within the Settlement Amount.

All rights, duties, obligations and other provisions of this Agreement applicable to a Primary Plaintiff also shall be applicable to the Personal Representative of a deceased Primary Plaintiff's estate, subject to the preceding requirements of this Section VII.C with respect to confirmation of the identity and designation of the Personal Representative.

**D.    Structured Settlement Payments to Plaintiffs**

Any Plaintiff eligible to receive payments under this Agreement may elect to receive some or all of his or her payments in the form of a structured settlement. Plaintiffs and/or their respective counsel shall bear the burden and expense of providing the Allocation Neutral with structured settlement payment instructions for Plaintiffs who elect to receive payment(s) in this fashion.  Upon receipt of such written instructions, the Allocation Neutral shall direct the WTC Captive or its designee to make certain or all payments due to a Plaintiff under this Agreement to a structured settlement provider on the Plaintiff's behalf.  The WTC Captive agrees to comply with all such requests provided that they are received from the Allocation Neutral at least ten (10) days before the payment is due under this Agreement.

**VIII.   ALLOCATION AND PAYMENT TIERS**

**A.    Tier Participation by Each Eligible Primary Plaintiff**

Each Primary Plaintiff who meets the eligibility requirements of Section VII.A of this Agreement shall participate in one of four allocation process and payment tiers described in Sections VIII.B through VIII.E below (hereinafter, "Tier" or "Tiers" or, respectively, "Tier 1," "Tier 2," "Tier 3," and "Tier 4").  In addition, each Derivative Plaintiff who meets the eligibility requirements of Section VII.B of this Agreement shall be treated as though in the same Tier in which the Primary Plaintiff upon which the Derivative Plaintiff's Debris Removal Claims are based participates.   In each Tier, the amounts of payments to eligible Derivative Plaintiffs shall be determined in accordance with Sections IX and X of this Agreement only after the Allocation Neutral determines that the Primary Plaintiff satisfies the proof requirements set forth in this Section VIII for a given Tier.

Except with respect to a Primary Plaintiff's election to participate in Tier 1, no Primary Plaintiff's claimed participation in any Tier shall be binding upon the Allocation Neutral.  Instead, the Allocation Neutral shall retain full authority consistent with this Agreement to place a Primary Plaintiff in the appropriate Tier based upon the requirements for that Tier, the Primary Plaintiff's Claim Form, Qualifying Medical Records submitted to the Allocation Neutral, if any, and the other provisions of this Agreement.  In addition, within Tier 4, the Allocation Neutral shall retain full authority to determine a Verified Tier 4 Primary Plaintiff's Qualifying Injury, including his or her impairment level within a Disease Group for purposes of assigning Base Points, based upon the

requirements of the Medical Proof Criteria in Section XII of this Agreement, the information in Verified Tier 4 Primary Plaintiff's Claim Form, his or her Qualifying Medical Records submitted to the Allocation Neutral and the other provisions of this Agreement.

**B.      Tier 1**

Tier 1 shall consist of Primary Plaintiffs who claim no Qualifying Injury.  Any Primary Plaintiff may elect to participate in Tier 1, including without limitation Primary Plaintiffs whose only alleged injury is fear that they may become sick in the future as a result of their work or volunteer service at the WTC Site or other alleged exposure giving rise to their respective Debris Removal Claims.  Because Qualifying Medical Records are required to establish all Qualifying Injuries, all Primary Plaintiffs with no Qualifying Medical Records must participate in Tier 1.

Primary Plaintiffs who elect or must participate in Tier 1 shall be (1) entitled to the Initial Payment set forth in Section IX.A of this Agreement for the Primary Plaintiff's Master Docket and (2) required to apply for the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

**C.      Tier 2**

The Tier 2 Qualifying Injuries are: D0; E0; F0; G0; H0; I0-I1; J0-J2; and K0.

Primary Plaintiffs who claim one of the Tier 2 Qualifying Injuries as their Primary Qualifying Injury shall submit a Tier 2 Claim Form together with the Qualifying Medical Record(s) necessary to satisfy the Medical Proof Criteria delineated in Section XII of this Agreement.

If the Allocation Neutral determines that a Primary Plaintiff submitting a Tier 2 Claim Form meets the eligibility requirements of Section VII of this Agreement, that Primary Plaintiff shall be (1) entitled to the Initial Payment set forth in Section IX.A of this Agreement for the Primary Plaintiff's Master Docket and (2) required to apply for the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

Then, the Allocation Neutral must determine if the Primary Plaintiff's Claim Form and one or more Qualifying Medical Records demonstrate that he or she has satisfied the Medical Proof Criteria for his or her Tier 2 Qualifying Injury and was diagnosed with that Tier 2 Qualifying Injury, on or after September 11, 2001.

A Primary Plaintiff who participates in Tier 2 and who the Allocation Neutral determines satisfies the Tier 2 proof requirements set forth in this Section VIII.C shall be further entitled to the Tier 2 Accelerated Final Payment for the Primary Plaintiff's Master Docket, as set forth in Section IX.B of this Agreement.  If the Allocation Neutral determines that a Primary Plaintiff who submitted a Tier 2

Claim Form does not satisfy the Tier 2 proof requirements set forth in this Section VIII.C, however, the Primary Plaintiff and any corresponding Derivative Plaintiff shall receive no additional payments under this Agreement, but shall be entitled to retain their Initial Payments and shall still be required to enroll in the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

**D.    Tier 3**

The Tier 3 Qualifying Injuries are: A0; D1; E1; F1; G1; and K1.

Primary Plaintiffs who claim one of the Tier 3 Qualifying Injuries as their Primary Qualifying Injury shall submit a Tier 3 Claim Form together with the Qualifying Medical Record(s) necessary to satisfy the Medical Proof Criteria for their respective Tier 3 Qualifying Injury(ies) set forth in Section XII of this Agreement, as well as a HIPAA-compliant release as required by Section XI.L of this Agreement.

If the Allocation Neutral determines that a Primary Plaintiff submitting a Tier 3 Claim Form meets the eligibility requirements of Section VII of this Agreement, that Primary Plaintiff shall still be (1) entitled to the Initial Payment set forth in Section IX.A of this Agreement for the Primary Plaintiff's Master Docket and (2) required to apply for the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

Then, the Allocation Neutral must determine if the Primary Plaintiff's Claim Form and Qualifying Medical Record(s) demonstrate that he or she satisfied the Medical Proof Criteria for his or her Tier 3 Qualifying Injury and was diagnosed with that Tier 3 Qualifying Injury, on or after September 11, 2001.

A Primary Plaintiff who submits a Tier 3 Claim Form and who the Allocation Neutral determines satisfies the Tier 3 proof requirements set forth in this Section VIII.D shall be further entitled to the Tier 3 Accelerated Final Payment for the Primary Plaintiff's Master Docket, as set forth in Section IX.B of this Agreement. If the Allocation Neutral determines that a Primary Plaintiff who submits a Tier 3 Claim Form does not satisfy the Tier 3 proof requirements set forth in this Section VIII.D, however, the Primary Plaintiff and any corresponding Derivative Plaintiff shall receive no additional payments under this Agreement, unless the Allocation Neutral determines, for reasons other than material misrepresentation(s), material omission(s) or material concealment detected through an audit pursuant to Section XI.M or XI.N of this Agreement, qualifies only for Tier 2, in which case Section VIII.C of this Agreement will govern the Plaintiffs' entitlement to Preliminary Payments.

E.    **Tier 4**

The Tier 4 Qualifying Injuries are: A1-A4; B0-B4; C0-C4; D2-D3; E2-E3; F2; G2; H1-H2; I2; and K2-K3.

Primary Plaintiffs who claim one of the Tier 4 Qualifying Injuries shall submit a Tier 4 Claim Form together with the Qualifying Medical Record(s) necessary to satisfy the Medical Proof Criteria delineated in Section XII of this Agreement, and otherwise establish eligibility to recover under Tier 4, as provided below. In addition, Primary Plaintiffs who claim one of the Tier 4 Qualifying Injuries shall submit a HIPAA-compliant release as required by Section XI.L of this Agreement

If the Allocation Neutral determines that a Primary Plaintiff submitting a Tier 4 Claim Form meets the eligibility requirements of Section VII of this Agreement, that Primary Plaintiff shall be (1) entitled to the Initial Payment set forth in Section IX.A of this Agreement for the Primary Plaintiff's Master Docket and (2) required to apply for the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

Then, the Allocation Neutral must determine if the Primary Plaintiff's Claim Form and Qualifying Medical Records demonstrate that he or she can satisfy the Medical Proof Criteria as set forth in Section XII of this Agreement with respect to a claimed Tier 4 Qualifying Injury, including a diagnosis of such Qualifying Injury on or after the Primary Plaintiff's first date of alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them (referred to herein as "Verified Tier 4 Primary Plaintiffs"). If so, the Allocation Neutral shall determine the Verified Tier 4 Primary Plaintiff's Total Score by applying the Adjustment Factors set forth in Section XIII.B of this Agreement to the Base Points set forth on Exhibit C for the Primary Plaintiff's Tier 4 Primary Qualifying Injury.

If the Allocation Neutral determines that a Primary Plaintiff who submits a Tier 4 Claim Form does not satisfy the Tier 4 proof requirements set forth in this Section VIII.E, that Primary Plaintiff and any corresponding Derivative Plaintiff shall receive no additional payments under this Agreement, unless the Allocation Neutral determines, for reasons other than material misrepresentation(s), material omission(s) or material concealment detected through an audit pursuant to Section XI.M or XI.N of this Agreement, that the Primary Plaintiff qualifies only for Tier 2 or Tier 3. If so, Sections VIII.C or VIII.D of this Agreement for Tier 2 and Tier 3, respectively, will govern the amount of the payments due to the Primary Plaintiff and any corresponding Derivative Plaintiff under the Final Settlement Agreement, except that such Primary Plaintiffs will have their respective Accelerated Final Payments reduced by Two Hundred and Fifty Dollars and No Cents ($250.00) to reflect the increased Allocation Neutral fees, costs and expenses occasioned by their rejected Tier 4 claims.

A Verified Tier 4 Primary Plaintiff shall be entitled to an Interim Payment and a Final Distribution, if any, as set forth in Sections IX.C and XV.B of this Agreement, respectively.

## IX.    PRELIMINARY PAYMENTS

### A.    Initial Payments

All Primary Plaintiffs and personal representatives of deceased Primary Plaintiffs' estates who meet the requirements of Sections VII.A or VII.C of this Agreement shall receive an Initial Payment in the amount of Three Thousand Two Hundred and Fifty Dollars and No Cents ($3,250.00) within twenty (20) days after the latter of the Final Settlement Agreement Effective Date or the date upon which the Allocation Neutral determines that they meet those requirements.

Likewise, each corresponding Derivative Plaintiff who satisfies the eligibility requirements of Section VII.B of this Agreement shall receive an Initial Payment equal to three and one-half percent (3.5%) of the Initial Payment to the corresponding Primary Plaintiff twenty (20) days after the latest of (i) the Final Settlement Agreement Effective Date; (ii) the date upon which the Allocation Neutral determines that the corresponding Primary Plaintiff meets the requirements of Section VII.A of this Agreement; or (iii) the date upon which the Allocation Neutral determines that the Derivative Plaintiff meets the requirements of Section VII.B of this Agreement.

### B.    Accelerated Final Payments

Primary Plaintiffs who meet the eligibility requirements of Section VII of this Agreement and who satisfy the Tier 2 or Tier 3 proof requirements set forth in Sections VIII.C and VIII.D of this Agreement, respectively, shall be entitled, in addition to their respective Initial Payments, to the following Accelerated Final Payments within ten (10) days of the Allocation Neutral's expedited determination that those proof requirements are met and the Primary Plaintiff is eligible for an Accelerated Final Payment:

|  | Accelerated Final Payment for Master Docket 21 MC 100 | Accelerated Final Payment for Master Docket 21 MC 102 | Accelerated Final Payment for Master Docket 21 MC 103 |
|---|---|---|---|
| Tier 1 | Not applicable | Not applicable | Not applicable |
| Tier 2 | $3,250.00 | $1,085.00 | $1625.00 |
| Tier 3 | $6,500.00 | $2,170.00 | $3,250.00 |
| Tier 4 | Not applicable | Not applicable | Not applicable |

Verified Tier 4 Primary Plaintiffs and corresponding Derivative Plaintiffs shall not be entitled to any Accelerated Final Payment.

Each Derivative Plaintiff who satisfies the eligibility requirements of Section VII.B of this Agreement shall receive an Accelerated Final Payment equal to three and one-half percent (3.5%) of the Accelerated Final Payment to the corresponding Primary Plaintiff within ten (10) days of the Allocation Neutral's determination that the proof requirements are met.

C.    **Interim Payments for Plaintiffs with Final Total Scores**

All Verified Tier 4 Primary Plaintiffs are eligible for Interim Payments as described in this Section IX.C.  Consistent with the procedure provided in Section XIII of this Agreement, the Allocation Neutral will determine a Total Score for each Verified Tier 4 Primary Plaintiff, which will become a Final Total Score once the Allocation Neutral determines that the provisions pertaining to audits and reconsideration requests provided in Sections IX.D and IX.E of this Agreement, respectively, do not apply to that Verified Tier 4 Primary Plaintiff. The Allocation Neutral will notify all Parties when it has established Final Total Scores for forty percent (40%) of all Verified Tier 4 Primary Plaintiffs in a given Allocation Pool.  Thereafter, if, in the Allocation Neutral's judgment, a sufficient number of those Verified Tier 4 Primary Plaintiffs have been evaluated by the Allocation Neutral to permit a reasonably accurate prediction of the monetary value of a Base Point for that Allocation Pool, the Allocation Neutral shall direct the WTC Captive to make Interim Payments to the Verified Tier 4 Primary Plaintiffs with Final Total Scores in that Allocation Pool and to corresponding Derivative Plaintiffs in the amount of forty percent (40%) of the projected value of each such Verified Tier 4 Primary Plaintiff's Final Distribution and corresponding Derivative Plaintiff's Final Distribution.  Thereafter, the WTC Captive or its designee will have twenty (20) days from the date it receives this notification from the Allocation Neutral to make an Interim Payment equal to forty percent (40%) of the projected value of the Verified Tier 4 Primary Plaintiff's Final Distribution and the corresponding Derivative Plaintiff's Final Distribution.

During the Allocation Process, the Allocation Neutral will continuously reassess the projected value of a Base Point for each Allocation Pool, and will notify Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive every two weeks of his/her revised projections.  All Interim Payments will be based upon the Allocation Neutral's projection of the value of a Base Point for a given Verified Tier 4 Primary Plaintiff's Allocation Pool at the time an Interim Payment is made and, once made, Interim Payments shall not be subject to adjustment other than through the Final Distribution, if any.

**D.    Audit Limitation to Receipt of Accelerated Final Payments and Interim Payments**

Notwithstanding any of the forgoing provisions of this Section IX, any Primary Plaintiff whose claims are selected by the Allocation Neutral for an audit pursuant to Section XI.M or XI.N of this Agreement shall not be entitled to an Accelerated Final Payment or an Interim Payment, if any, until completion of the audit as it pertains to that Primary Plaintiff.

**E.    Reconsideration Request Limitation to Receipt of Accelerated Final Payments and Interim Payments**

Notwithstanding any of the forgoing provisions of this Section IX, any Primary Plaintiff who notifies the Allocation Neutral of his or her intent to submit a Reconsideration Request pursuant to Section XV of this Agreement shall not be entitled to receive an Accelerated Final Payment or an Interim Payment, if any, until the Allocation Neutral has received the Primary Plaintiff's Reconsideration Request and has responded with a reconsidered Final Total Score within the time afforded by the Allocation Timeline attached as Exhibit J to this Agreement.

**F.    Preliminary Payment Logistics**

The WTC Captive or its designee shall pay jointly to Plaintiffs and to their respective counsel all Preliminary Payments required by this Section IX.  Each Preliminary Payment shall be applied against that portion of the Settlement Amount allocated to the Master Docket to which the Preliminary Payment relates.

**X.    FINAL DISTRIBUTIONS TO TIER 4 PLAINTIFFS**

**A.    Eligibility for Final Distributions**

Only Verified Tier 4 Primary Plaintiffs together with any corresponding Derivative Plaintiffs shall be eligible for Final Distributions.

**B.    Amount of Final Distributions**

Final Distributions to Verified Tier 4 Primary Plaintiffs entitled to receive Final Distributions as set forth in Section X.A of this Agreement shall be calculated according to the Point System set forth in Section XV of this Agreement.

With respect to Tier 4, a Derivative Plaintiff's Final Distribution, if any, shall be three and one-half percent (3.5%) of the Final Distribution, if any, to the corresponding Primary Plaintiff.

## XI.    ALLOCATION NEUTRAL AND ALLOCATION PROCESS GENERALLY

### A.    Identity of the Allocation Neutral

The Parties' counsel shall cooperate to select a mutually agreed and qualified Allocation Neutral. At a minimum, the Allocation Neutral:

i.    Shall be an attorney with experience in mass toxic tort claims resolution; and

ii.    Shall not be engaged as of the Effective Date by the WTC Captive or by Plaintiffs unless agreed upon and retained jointly by the WTC Captive and Plaintiffs; and

The Garretson Firm Resolution Group, Inc. ("Garretson") shall assist the Allocation Neutral with respect to the Allocation Process set forth in this Agreement. The Allocation Neutral and Garretson shall retain within forty-five (45) days of the Effective Date a panel of at least three (3) licensed physicians selected jointly by Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel, and the WTC Captive (i) to establish together with the Allocation Neutral and Garretson a protocol to apply as part of the Allocation Process the Medical Proof Criteria set forth in Section XII of this Agreement and the Adjustment Factors set forth in Section XIII.B of this Agreement and (ii) to assist the Allocation Neutral and Garretson when medical expertise is required to apply the Medical Proof Criteria set forth in Section XII of this Agreement and the Adjustment Factors set forth in Section XIII.B of this Agreement in the context of particular Primary Plaintiffs' respective submissions to the Allocation Neutral of Claim Forms and Qualifying Medical Records.

### B.    Allocation Neutral Duties

The Allocation Neutral shall have the authority to perform all actions deemed by the Parties to be reasonably necessary for the efficient and timely administration of the Allocation Process. The Allocation Neutral shall carry out the Allocation Process in accordance with the timeline attached hereto as Exhibit J. The Parties shall enter into an Allocation Neutral Agreement    The Allocation Neutral Agreement shall authorize the Allocation Neutral to carry out the following tasks, in accordance with this Agreement:

i.    **Claim Review and Evaluation:**  Establish evidentiary review procedures to detect and prevent the submission of fraudulent evidence; verify and evaluate Claim Forms and Qualifying Medical Records; apply Medical Proof Criteria, apply Adjustment Factors where warranted as set forth in this Agreement, and implement the Point System; and determine each Plaintiff's Preliminary Payments and Final Distribution, if any;

ii.    **Data Management:**  Create and maintain a database to maintain all relevant data regarding each Plaintiff, including but not limited to Claim

Forms, Qualifying Medical Records, Total Score calculation and rationale, Preliminary Payments, Final Distribution, if any, communications to/from Plaintiffs (including but not limited to Deficiency Notices, Reconsideration Requests, and notices of Total Score and Final Distribution), and any other data deemed relevant by the Parties and/or the Allocation Neutral;

iii.    **Communication:**  Coordinate and communicate as necessary with the Parties, their counsel, and others as directed by the Parties; design and maintain an official settlement website that provides the Parties and their respective counsel secure access to Allocation Process data; and coordinate with the Parties in drafting form letters for use in conveying Deficiency Notices, Preliminary Payments, notices of Total Score, and Final Distributions, if any, to Plaintiffs;

iv.    **Calculation of Interim Payments and Final Distributions:**  Calculate Interim Payments and Final Distributions based upon the Medical Proof Criteria, Adjustment Factors where warranted as set forth in this Agreement, and application of the Point System; and

v.    **Administration of Settlement Proceeds:**  Coordinate with the WTC Captive and Plaintiffs' Liaison Counsel to render Preliminary Payments and Final Distributions, if any, to Plaintiffs; manage disbursement data; obtain information from Plaintiffs identifying lien holders and government payors that have paid for and/or reimbursed Plaintiffs for expenses or losses related to Debris Removal Claims, and confirm that all such liens or other claims have been satisfied by the Plaintiff; remit payment of service provider fees and costs as approved by the Parties; perform necessary tax accounting; and respond to the Parties' requests for financial data.

This list of tasks is not exhaustive, and the Allocation Neutral may develop a final, exhaustive list of procedures required to carry out the efficient and timely administration of the Allocation Process consistent with this Agreement, including but not limited to the Allocation Process Timeline attached hereto as Exhibit J.

**C.    Limitations on the Allocation Neutral's Duties**

The Allocation Neutral shall not provide any legal advice to any Party or Parties, including with respect to:

i.    The merits and/or terms of this Agreement and/or the Final Settlement Agreement; or

ii.    The nature, value and/or sufficiency of the Settlement Amount, the Cancer Insurance Policy, the Permanent Disability Fund and/or any Contingent Payments described in this Agreement and/or in the Final Settlement Agreement.

Nothing in this Agreement shall relieve any counsel of his or her sole responsibility, or otherwise alter or transfer that responsibility, to advise his or her respective client or clients concerning all matters set forth in Agreement, including without limitation all notices from and determinations by the Allocation Neutral with respect to Plaintiffs or to any Plaintiff.

**D.      Allocation Neutral Expenses to Be Shared Equally By the WTC Captive and Plaintiffs**

The Allocation Neutral's reasonable costs, fees and expenses shall be paid first from any interest earned on the Settlement Amount following the Effective Date, as provided in Section II.A of this Agreement, and subject to apportionment of Settlement Amount principal, any interest earned thereupon, and the Allocation Neutral's reasonable costs, fees and expenses as set forth in this Agreement. Thereafter, for each Master Docket the WTC Captive, on the one hand, and Plaintiffs' Liaison Counsel, on the other, shall each pay fifty percent (50%) of the Allocation Neutral's reasonable costs, fees and expenses; provided, however, that Plaintiffs' collective fifty percent (50%) share of such reasonable costs, fees and expenses shall be allocated among individual Plaintiffs who execute a Release and Covenant Not to Sue in proportion to their respective payments from within the Settlement Amount.  The Parties shall exercise best efforts to limit the Allocation Neutral's reasonable costs, fees and expenses to the interest earned on Settlement Amount principal allocated to each Master Docket.

To the extent any costs, fees or expenses of the Allocation Neutral are allocated to any Plaintiff in the manner set forth in the preceding paragraph, all such allocated costs, fees and expenses shall be designated as an appropriate disbursement relating to the Plaintiff's case and shall be deducted from any payment(s) due to the Plaintiff by virtue of the Final Settlement Agreement.  If the Parties agree in writing to retain the Allocation Neutral before the Final Settlement Agreement Effective Date, the WTC Captive shall pay in full any retainer or other reasonable expense of the Allocation Neutral before that date.  After the Final Settlement Agreement Effective Date and notwithstanding any other provision in this Agreement, any interest earned on any Settlement Amount principal shall first be used to reimburse the WTC Captive for any such retainer and other costs in the proportion that such retainer or other costs relate to each Master Docket.

**E.      Allocation Neutral Hold Harmless Agreement**

The Allocation Neutral Agreement shall hold the Allocation Neutral and his or her staff harmless with respect to any and all determinations of Plaintiffs' respective payments, if any, under the Final Settlement Agreement and shall require the Parties to defend and indemnify the Allocation Neutral and his or her staff in the event of any claims against them or any of them relating in any way to this Agreement, the Final Settlement Agreement and/or to the Allocation Neutral Agreement.

F.      **Allocation Neutral Website**

The Parties shall establish a secure website to facilitate the transmission of and access to all submissions to and communications from the Allocation Neutral consistent with this Agreement.   The website shall be hosted in a secure environment by a reputable web hosting firm.   The Parties shall make all submissions to the Allocation Neutral, and the Allocation Neutral shall communicate with the Parties, by uploading or transferring electronic documents to the server to the extent required by this Agreement.

G.      **Electronic Communications with the Allocation Neutral**

All submissions to the Allocation Neutral and all notices and other communications from the Allocation Neutral to the Parties and/or their respective counsel shall be transmitted electronically for sake of efficiency and to reduce costs, and shall be deemed confidential.  Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive shall have reasonable access to all such submissions, notices and communications.

H.      **City of New York Production of Additional Medical, Pharmaceutical and Accidental Disability Records and Confirmation of Date(s) of WTC Service**

With respect to Primary Plaintiffs (i) who allege employment by the City of New York giving rise to their respective Debris Removal Claims, (ii) who allege on the Eligible Plaintiffs List a Tier 4 Qualifying Injury, (iii) whose name, social security number and alleged employing City agency or department information is listed in a letter sent by Plaintiffs' Liaison Counsel to Defendant Insureds' Counsel on or before the Eligible Plaintiff List due date set forth in Section VI.A of this Agreement, (iv) who execute Releases and Covenant Not to Sue in the form attached as Exhibit P to this Agreement, and (v) for whom the City of New York has not provided through its discovery responses in any Master Docket the information necessary for the Primary Plaintiff to affirm in his or her respective Claim Form his or her first and last date and duration of alleged exposure, the City of New York shall within sixty (60) days of the Final Settlement Agreement Effective Date (a) provide such information to Plaintiffs' Liaison Counsel or (b) state that despite a diligent search it failed to locate any record of the Primary Plaintiff's alleged employment.  If a Primary Plaintiff claims that the City of New York failed to comply with the requirements of this paragraph, notwithstanding the Interim Stay required by Section XX of this Agreement that Primary Plaintiff shall have the right to subpoena, by service on Defendant Insureds' Counsel, the referenced information.   In addition, the City's confirmation of a Primary Plaintiff's dates of 9/11-related employment pursuant to this paragraph shall satisfy the Work Verification Procedure set forth in Exhibit B to this Agreement with respect to that Primary Plaintiff.   Furthermore, with respect to Primary Plaintiffs who satisfy the requirements of only clauses (i) and (iii)-(v) of this paragraph, the City of New York shall confirm its employment, if any, of the Primary Plaintiff with respect to his or her alleged work giving rise to his or her

Debris Removal Claims. Such confirmation, if any, shall constitute a primary source for purposes of the Work Verification Procedure set forth in Exhibit B to this Agreement.

With respect to Primary Plaintiffs (i) who received medical care directly from the City of New York relating to their alleged Qualifying Injury(ies), (ii) whose name, social security number and alleged employing City agency or City department information is listed in a letter sent by Plaintiffs' Liaison Counsel to Defendant Insureds' Counsel on or before the Eligible Plaintiff List due date as set forth in Section VI.A of this Agreement, (iii) who within forty-five (45) days of the Effective Date provide HIPAA-compliant releases to Defendant Insureds' Counsel authorizing the City of New York to release all of the Primary Plaintiff's medical records in its possession, custody or control, (iv) who execute Releases and Covenant Not to Sue in the form attached as Exhibit P to this Agreement, and (v) for whom the City of New York has not produced in any Master Docket any medical records concerning the Primary Plaintiff, the City of New York shall within sixty (60) days of the Final Settlement Agreement Effective Date (a) produce all medical and pharmaceutical records in its possession, custody or control to the Plaintiffs' Liaison Counsel or (b) state that despite a diligent search it failed to locate any such records in its possession, custody or control. If a Primary Plaintiff claims that the City of New York failed to comply with the requirements of this paragraph, notwithstanding the Interim Stay that Primary Plaintiff shall have the right to subpoena, by service on Defendant Insureds' Counsel, the referenced records. In addition, for Primary Plaintiffs who satisfy all of the requirements of this paragraph except clause (v), the City of New York shall seek to cause Express Scripts, Inc. to produce all pharmaceutical records in its possession relating to the Primary Plaintiff and, if Express Scripts, Inc. fails to do so, notwithstanding the Interim Stay required by Section XX of this Agreement such Primary Plaintiff may subpoena Express Scripts, Inc. directly.

With respect to Primary Plaintiffs (i) who were employed by the City of New York at the time of their alleged exposure giving rise to their respective Debris Removal Claims, (ii) who have applied for accidental disability benefits or line of duty death benefits or who receive (or, in the case of line of duty death benefits, whose heirs or assigns receive) such benefits if the Primary Plaintiff claims the benefits relate, in whole or in part, to his or her Debris Removal Claims, (iii) whose name, social security number and alleged employing City agency or City department information is listed in a letter sent by Plaintiffs' Liaison Counsel to Defendant Insureds' Counsel on or before the Eligible Plaintiff List due date as set forth in Section VI.A of this Agreement, (iv) who within forty-five (45) days of the Effective Date provide a HIPAA-compliant release authorizing the release all of the Primary Plaintiff's accidental disability or line of duty death benefits documentation, (v) who execute Releases and Covenant Not to Sue attached as Exhibit P to this Agreement, and (vi) who claim eligibility for the Permanent Disability Fund on the Eligible Plaintiff List, the City of New York shall cooperate with the Primary Plaintiffs' reasonable efforts to secure the production by the New York City Fire Department Pension Fund or the Police Pension Fund

of the Police Department of the City of New York of all of their respective files concerning the Primary Plaintiffs' accidental disability or line of duty death benefits or the application for those benefits, including with respect to subpoenas issued by such Primary Plaintiffs' respective counsel to the New York City Fire Department Pension Fund or to the Police Pension Fund of the Police Department of the City of New York pursuant to Section XX.B of this Agreement.

**I.    Claim Form and Qualifying Medical Records**

Counsel for each Primary Plaintiff who claims eligibility for any Tier will submit to the Allocation Neutral a Claim Form on behalf of the Primary Plaintiff and any corresponding Derivative Plaintiff. Plaintiffs (including Derivative Plaintiffs and Personal Representatives of deceased Primary Plaintiffs, where applicable) shall sign their respective Claim Forms under penalty of perjury before a notary public.

The purpose of the Claim Form is to simplify and streamline the Allocation Neutral's work to the extent reasonably possible and, together with the Medical Proof Criteria, to ensure consistency of awards among individual Plaintiffs. Claim Forms will be submitted in the form of Exhibits L (Tier 1 Claim Form), M (Tier 2 Claim Form), N (Tier 3 Claim Form), and O (Tier 4 Claim Form) to this Agreement. The Claim Forms shall include as attachments separate schedules to be completed by those Primary Plaintiffs who claim to satisfy the requirements set forth in this Agreement for a Permanent Disability Fund award, for a Mixed Orthopedic Injury payment, and/or for a Qualifying Surgery payment.

Plaintiffs who meet the eligibility requirements of Section VII of this Agreement but who fail, or who elect not, to submit a Claim Form will receive an Initial Payment, but are not entitled to receive any other payment under this Agreement or to enroll in the Cancer Insurance Policy; provided, however, that Primary Plaintiffs who received an award from the September 11 Victim Compensation Fund shall not be eligible for Initial Payments as set forth in Section VII.A of this Agreement.

Each Claim Form shall list any Qualifying Injuries claimed by the Primary Plaintiff and attach Qualifying Medical Records to enable the Allocation Neutral to verify each such Qualifying Injury. Claim Forms shall only attach, and the Allocation Neutral shall only consider, Qualifying Medical Records. In addition, Primary Plaintiffs who seek recovery for a Qualifying Surgery or Mixed Orthopedic Injury shall address those claims on Schedule B to their Claim Form and attach Qualifying Medical Records, together with any other records necessary to establish that the alleged Mixed Orthopedic Injury occurred in the course of employment or other volunteer service at the WTC Site. Separately, Primary Plaintiffs who submit Tier 4 Claim Forms must provide all reasonably available information relevant to the Allocation Neutral's evaluation and application of the Adjustment Factors identified in Section XIII.B of this Agreement.

All Claim Forms shall identify all known lien holders and other claims by third party payors as required by Section XVIII of this Agreement.  Plaintiffs shall represent and warrant by submitting their Claim Form that any liens or other claims identified above have been or will be satisfied, compromised or otherwise resolved by the Plaintiff.

Primary Plaintiffs who claim eligibility for the Permanent Disability Fund shall address all eligibility criteria for the Permanent Disability Fund as set forth in Section XVII of this Agreement in Schedule A to their respective Claim Forms; and

Finally, each Claim Form shall state whether the Primary Plaintiff ever received a monetary award from the September 11th Victim Compensation Fund for purposes of determining the Primary Plaintiff's eligibility, if any, for payments pursuant to Section VII.A.

A Plaintiff's Claim Form, including the Qualifying Medical Records submitted with the Claim Form, shall constitute a Plaintiff's entire submission to the Allocation Neutral.  For sake of efficiency and to ensure fairness and objectivity, no Plaintiff shall be entitled to a live hearing with the Allocation Neutral or to communicate with the Allocation Neutral in any manner not set forth in this Agreement.

**J.    Notice of Ineligible Records**

Fifteen (15) days after receiving any Claim Form, the WTC Captive, its counsel or its non-attorney designee shall provide a Notice of Ineligible Records, if applicable, to the Allocation Neutral and counsel for the Plaintiff(s) affected by such Notice of Ineligible Records.  Notices of Ineligible Records shall identify all medical record(s) submitted with any Claim Form that do not constitute Qualifying Medical Records; however, no Notice of Ineligible Records shall be used for any other purpose or contain any other information.  The affected Plaintiff's counsel shall then have an opportunity to respond to such a Notice of Ineligible Records, but only by providing additional Qualifying Medical Records and/or by demonstrating to the Allocation Neutral's satisfaction that the records previously produced meet the definition of Qualifying Medical Records.  The Allocation Neutral shall decide the outcome of any such dispute concerning a Notice of Ineligible Records; provided, however, that the Allocation Neutral shall do so consistent with the principle that Plaintiffs have agreed that records that do not meet the definition of Qualifying Medical Records shall not be considered by the Allocation Neutral for determining any Primary Plaintiff's Qualifying Injury(ies), if any.

**K.    Deficiency Notices**

If the Allocation Neutral considers any Primary Plaintiff's Claim Form, including some or all of the Qualifying Medical Records, to be deficient in any respect, the

Allocation Neutral shall provide a Deficiency Notice to the Primary Plaintiff's counsel, with copies to the WTC Captive and Defendant Insureds' Counsel. Following receipt of a Deficiency Notice, a Primary Plaintiff's counsel shall have fifteen (15) days to respond to the Allocation Neutral. This response shall be limited to a revised Claim Form, if appropriate in the Primary Plaintiff's counsel's judgment, additional Qualifying Medical Records, if available, and/or additional records pertaining to the Work Verification Procedure. A Primary Plaintiff who fails to timely respond to a Deficiency Notice and/or who timely responds but who, in the Allocation Neutral's judgment, fails to address some or all of the deficiencies identified in the Deficiency Notice shall not be entitled to any payment under this Agreement to which the deficiency relates, in whole or in part, other than his or her respective Initial Payment if that Initial Payment was issued prior to issuance of the Deficiency Notice.

**L.    HIPAA-Compliant Release Forms**

Together with their respective Claim Forms, all Primary Plaintiffs electing to participate in the Allocation Process for Tier 3 or Tier 4 shall provide a HIPAA-compliant release authorizing the Allocation Neutral to collect any and all medical records pertaining to the Primary Plaintiff. This HIPAA-compliant release shall not be limited to specific medical providers or by the date that the Primary Plaintiff's medical records were generated. Such HIPAA-compliant releases shall only be used in conjunction with audit(s) conducted pursuant to Sections XI.M and XI.N of this Agreement, and shall be destroyed at the conclusion of the Allocation Process. A Primary Plaintiff who claims eligibility for Tier 3 or Tier 4, but who fails to submit to the Allocation Neutral this HIPAA-compliant release by the deadlines for submission of Tier 3 Claim Forms and Tier 4 Claim Forms as set forth in Exhibit J, shall not be eligible for any Accelerated Final Payment, Interim Payment or Final Distribution until he or she submits the required HIPAA-compliant release. The Allocation Neutral shall provide written notice to Primary Plaintiffs who fail to comply with this Section XI.L and thereafter shall afford such Primary Plaintiffs a reasonable opportunity to cure such non-compliance. Failure to so cure shall result in the Primary Plaintiff's waiver of any payments otherwise due under the Final Settlement Agreement, but shall not affect in any way the validity of such Primary Plaintiff's Release and Covenant Not to Sue.

**M.    Tier 3 and Tier 4 Random Audits**

No audits shall be conducted with respect to Tier 1 or Tier 2 claims.

Primary Plaintiffs electing Tier 3 or Tier 4 are subject to audit, as set forth in this Section XI.M. To select Tier 3 and Tier 4 Primary Plaintiffs for audit, the Allocation Neutral shall draw a random sample of (i) five percent (5%) of all Primary Plaintiffs who submit Tier 3 Claim Forms and (ii) five percent (5%) of all Primary Plaintiffs who submit Tier 4 Claim Forms. Upon selecting a Tier 3 or Tier 4 Primary Plaintiff for audit in this fashion, the Allocation Neutral shall:

i.      Notify Plaintiffs' Liaison Counsel of the audit and direct that, within twenty (20) days, the affected Primary Plaintiff submit to the Allocation Neutral all of the Primary Plaintiff's medical records in his or her and in his or her counsel's possession;

ii.     Direct that Primary Plaintiff's counsel provide a list of all medical providers seen by the Primary Plaintiff since 1995; and

iii.    Exercise to the extent reasonably necessary in the Allocation Neutral's judgment the rights provided in the HIPAA-compliant release to obtain the audited Primary Plaintiffs' medical records from health care providers.

The Allocation Neutral shall upload or transfer to the secure website, as provided in Section XI.F of this Agreement, any medical records received in conjunction with an audit. All records received in connection with the audit process shall be considered Qualifying Medical Records for purposes of calculating the audited Primary Plaintiffs' respective Total Scores.

Tier 3 audits shall be limited to assessing whether the statements in the Primary Plaintiff's Claim Form and Qualifying Medical Records materially misrepresent, materially omit or materially conceal facts that affect the Primary Plaintiff's ability to meet the Tier 3 proof requirements set forth in Section VIII.D of this Agreement. Tier 3 audits shall be conducted by the Allocation Neutral as quickly as reasonably possible, consistent with the expedited nature of Tier 3 review, as set forth in Exhibit J.

Tier 4 audits shall be limited to assessing whether the statements in the Primary Plaintiff's Claim Form and Qualifying Medical Records materially misrepresent, materially omit or materially conceal facts that affect the Primary Plaintiff's Total Score. Tier 4 audits shall be conducted within the timeframe for completion of the Tier 4 Allocation Process as set forth in Exhibit J.

Subject to the limitations of two proceeding paragraphs with respect to Tier 3 and Tier 4 audits, if as a result of any Tier 3 or Tier 4 audit the Allocation Neutral determines that material misrepresentation, material omission or material concealment has occurred that is not attributable to any clerical error or other inadvertent act or omission, the Allocation Neutral shall (a) direct that no Accelerated Final Payment, Interim Payment or Final Distribution, to the extent otherwise due, be made to the affected Primary Plaintiff and corresponding Derivative Plaintiff, if any; (b) notify the Insureds and the WTC Captive, which shall have the right, if any, to bring a claim against the affected Primary Plaintiff and corresponding Derivative Plaintiff, if any, for damages, including return of any payments already made to him or her; and (c) report the Primary Plaintiff to the authorities responsible for bringing perjury charges and send those authorities all documents that the Allocation Neutral considers evidence of perjury. Plaintiffs agree that the consequences of any audit shall in no way affect the validity of their Releases and Covenants Not to Sue.

All of the Allocation Neutral's reasonable costs, fees and expenses pertaining to Tier 3 and Tier 4 random audits shall be paid in accordance with Section XI.D of this Agreement.

**N.**     **Tier 3 and Tier 4 Targeted Audits**

If more than ten percent (10%) of Tier 3 and/or Tier 4 claims selected for random audits as provided in Section XI.M of this Agreement result in findings by the Allocation Neutral of material misrepresentation, material omission or material concealment of the type delineated in Section XI.M of this Agreement, the Allocation Neutral shall conduct a further audit of another five percent (5%) of the affected Tier or Tiers. To select Primary Plaintiffs for these further audit(s), if any, the Allocation Neutral shall target Primary Plaintiffs for whom the Allocation Neutral determines, based upon his or her experience with the Allocation Process, the Claim Forms, the Medical Proof Criteria, and the application of Adjustment Factors, that additional medical records are likely to disclose material misrepresentations, material omissions or material concealment affecting Tier 4 Plaintiffs' Total Scores or satisfaction of Tier 3's proof requirements. These non-random, targeted audits, if any, will be conducted in the same manner and with the same consequences as the random audits conducted pursuant to Section XI.M of this Agreement; provided, however, that if either of these targeted audit(s) results in the findings of material misrepresentations, material omissions or material concealment affecting greater than 10% of the targeted Primary Plaintiffs' claims, all of the Allocation Neutral's reasonable costs, fees and expenses resulting from the targeted audit(s) shall be applied against Settlement Amount principal.

**O.**     **Timing of the Allocation Process**

The Allocation Neutral shall complete the Allocation Process, all random audits required by Section XI.M of this Agreement, and the targeted audit(s), if any, authorized pursuant to Section XI.N of this Agreement within one (1) year after the Final Settlement Agreement Effective Date, subject to a reasonable extension of time if Plaintiffs' Liaison Counsel and the WTC Captive agree in writing to such an extension. The Parties will cooperate with the Allocation Neutral in all respects to complete the Allocation Process and all audits within the time for doing so proscribed in the Allocation Process timeline appended hereto as Exhibit J. To the extent practicable, the Allocation Neutral shall follow the Allocation Process timeline appended hereto as Exhibit J.

The Allocation Neutral's determinations with respect to Primary Plaintiffs who submit Tier 1, Tier 2, and Tier 3 Claim Forms shall proceed on an expedited basis after the Final Settlement Agreement Effective Date, as set forth more fully in the Allocation Process timeline appended hereto as Exhibit J. Consistent with Exhibit J, the Allocation Neutral's Tier 1, Tier 2, and Tier 3 determinations and all Initial Payments and Accelerated Final Payments to Plaintiffs determined by the

Allocation Neutral to qualify for Tier 1, Tier 2, or Tier 3, except payments to Tier 3 or Tier 4 Plaintiffs selected for any audit, shall proceed on an expedited basis.

**P.     Confidentiality of the Allocation Process**

All communications with the Allocation Neutral, including without limitation all Primary Plaintiffs' submissions to the Allocation Neutral of Claim Forms and Qualifying Medical Records, shall remain confidential and are subject to Federal Rule of Evidence 408 and all similar state evidentiary rules governing the admissibility of settlement communications; provided, however, that all communications with the Allocation Neutral shall be available to the WTC Captive and the Insureds and can be used for any purpose in connection with the Allocation Process and/or in any litigation resulting from or arising out of a material misrepresentation, material omission or material concealment by a Plaintiff and/or his or her counsel that is detected in any audit authorized by Sections XI.M or XI.N of this Agreement; provided further, however, that this Section XI.P shall not limit in any way the WTC Captive's, the Insureds', Other Defendants' and/or any of their use of any Primary Plaintiff's responses to the Federal Rule of Civil Procedure 33 interrogatories referenced in Sections VI.A and XIII.B.viii of this Agreement.

## XII.     MEDICAL PROOF CRITERIA

The Allocation Neutral shall apply the Medical Proof Criteria set forth in the tables below to verify Tier 2 Qualifying Injuries as set forth in Section VIII.C of this Agreement, Tier 3 Qualifying Injuries as set forth in Section VIII.D of this Agreement, and Tier 4 Qualifying Injuries as set forth in Section VIII.E of this Agreement.  For organizational purposes, the tables below group all Qualifying Injuries into disease groups ("Disease Groups").

With the exception of Mixed Orthopedic Injuries and Qualifying Surgeries, the evaluation of which are governed by Sections  XVIII.A and XVIII.B of this Agreement, respectively, when the Allocation Neutral is evaluating a Primary Plaintiff's Claim Form and Qualifying Medical Records in connection with the Allocation Process, the Allocation Neutral shall credit only those injuries and impairment allegations alleged in the Claim Form and verified according to the Medical Proof Criteria through an evaluation of Qualifying Medical Records provided by the Primary Plaintiff, as required under Section XI.I of this Agreement.

To constitute a Qualifying Injury, an alleged injury must satisfy all three of the following components of the Medical Proof Criteria:  (i) it must be one of the "Qualifying Injuries" listed expressly in the tables immediately below; (ii) it must meet the "Diagnostic Criteria" applicable to the Disease Group in which the Qualifying Injury is listed in the tables immediately below; and (iii) it must satisfy the "Impairment Criteria" for the Disease Group in which the Qualifying Injury is listed in the tables immediately below.

The Medical Proof Criteria tables are set forth below:

# Chronic Obstructive Pulmonary Disease

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are COPD, Chronic Bronchitis, Emphysema, Bullous Lung Disease, Small Airway(s) Disease and Obstructive Airway(s) Disease.

Obstructive Lung Defect, Small Obstructive Lung Defect, Ground Glass Syndrome, Peripheral Airway(s) Dysfunction, WTC Cough and Chronic Cough are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Medical Verification Requirements |
|---|---|
| A0 & A1 | Physician Diagnosis of Qualifying Injury in the COPD disease group. |
| A2 to A4 | **Spirometry tests:**<br>  Post-bronchodilator $FEV_1/FVC \leq 0.7$ ($\leq 70\%$) (use post-BD when possible; otherwise, use pre-BD value)<br>  *Source: European Respiratory Society/American Thoracic Society COPD Guidelines – 2005*<br><br>***OR***<br><br>For Emphysema only, a CT Scan that states as a conclusion any or all of the following: Emphysema (panlobular, panacinar or paraseptal), Bullous disease, or giant bullae; provided, however, that conclusions on a CT Scan reflecting mild or minor emphysematous changes, air-trapping, pneumatoceles, cysts or cystic disease, and/or bronchiectasis shall not qualify. |

## 3. Impairment Criteria

| Severity Level | Criteria |
|---|---|
| A0 | No further requirements. |
| A1 | **Pulmonary Function Test results showing:**<br>  FVC $\leq 79\%$ of predicted ***or*** $FEV_1$ of $\leq 79\%$ of predicted; ***OR***<br>**Carbon Monoxide Diffusion Capacity Test results showing:**<br>  DLCO of $\leq 74\%$ of predicted; ***OR***<br>**Cardio-Pulmonary Stress Test results showing:**<br>  $VO_2$ max of $\leq 25$ml/(kg·min) ***or*** $VO_2$ max of $\leq 7.1$ METs. |

**To prove impairment for Severity Levels exceeding A1:**

A Primary Plaintiff must submit the results from any two Pulmonary Function Test(s) ("PFTs"), Carbon Monoxide Diffusion Capacity Test(s), and/or Cardio-Pulmonary Stress Test(s). The Primary Plaintiff's most recent test must be included among those two tests and must meet the Impairment Criteria for Severity Level A2, A3 or A4. The other test must be at least three months prior to the most recent test, and must satisfy, at a minimum, the Impairment Criteria for Severity Level A1. To determine the Base Points for such a Primary Plaintiff's Qualifying Injury, the Allocation Neutral shall average the Base Points specified on Exhibit C to this Agreement for these two tests.

The preceding paragraph shall not apply to deceased Primary Plaintiffs, however. Deceased Primary Plaintiffs may satisfy the Impairment Criteria for Severity Level A2, A3 or A4, respectively, by submitting the results of any one (1) test that complies with the requirements for the claimed Severity Level as set forth below.

| A2 | **Pulmonary Function Test results showing:**<br>FVC 60% to 69% of predicted *or* $FEV_1$ 55% to 64% of predicted; *OR*<br>**Carbon Monoxide Diffusion Capacity Test results showing:**<br>DLCO of 55% to 64% of predicted; *OR*<br>**Cardio-Pulmonary Stress Test results showing:**<br>$VO_2$ max of 18 to 21ml/(kg·min) *or* $VO_2$ max of 5.1 to 6.0 METs. |
|---|---|
| A3 | **Pulmonary Function Test results showing:**<br>FVC 50% to 59% of predicted *or* $FEV_1$ 45% to 54% of predicted; *OR*<br>**Carbon Monoxide Diffusion Capacity Test results showing:**<br>DLCO of 45% to 54% of predicted; *OR*<br>**Cardio-Pulmonary Stress Test results showing:**<br>$VO_2$ max of 15 to 17ml/(kg·min) *or* $VO_2$ max of 4.3 to 5.0 METs. |
| A4 | **Pulmonary Function Test results showing:**<br>FVC less than 50% of predicted *or* $FEV_1$ less than 45% of predicted; *OR*<br>**Carbon Monoxide Diffusion Capacity Test results showing:**<br>DLCO of less than 45% of predicted; *OR*<br>**Cardio-Pulmonary Stress Test results showing:**<br>$VO_2$ max of <15ml/(kg·min) *or* $VO_2$ max of <4.3 METs. |

# Interstitial Lung Disease

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group include Chemical Pneumonitis, BOOP, Eosinophilic or other Granulomatosis, Hypersensitivity Pneumonitis, Sarcoidosis, Silicosis, Asbestosis, Pulmonary or Interstitial Fibrosis, Interstitial Lung Disease, Pneumoconiosis and Wegener's Granulomatosis.

Restrictive Lung Defect is an example of a medical condition, finding or observation that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Medical Verification Requirements |
|---|---|
| B0 to B4 | Chest CT or X-ray finding supporting such diagnosis, such as bibasilar reticular abnormalities (*e.g.*, increased interstitial markings, honey-combing, hazy opacifications that are worse in the subpleural and inferior regions) with or without ground glass opacities or a lung biopsy that supports said diagnosis.<br><br>*Source: ATS/ERS Criteria for Diagnosis of Idiopathic Pulmonary Disease in Absence of Surgical Lung Biopsy* |

## 3. Impairment Criteria

| Severity Level | Required Testing and Results |
|---|---|
| B0 | No further requirements. |
| B1 | **Full Pulmonary Function Test** showing:<br>TLC less than or equal to 79% predicted; ***and***<br>FVC less than or equal to 79% predicted; ***and***<br>$FEV_1/FVC$ (%)>70% predicted. |

**To prove impairment for Severity Levels exceeding B1:**

Except with respect to the separate Impairment Criteria for Sarcoidosis at the B3 and B4 Severity Levels, a Primary Plaintiff must submit the results from two full PFTs. The Primary Plaintiff's most recent full PFT, or any other full PFT within one year prior to the Effective Date, must be included among those two tests and must meet the Impairment Criteria for Severity Level B2, B3 or B4. The other PFT must be at least three months prior to the PFT referenced above and must satisfy, at a minimum, the Impairment Criteria for Severity Level B1. To determine the Base Points for such a Primary Plaintiff's Qualifying Injury, the Allocation Neutral shall average the Base Points specified on Exhibit C to this Agreement for these two tests.

The preceding paragraph shall not apply to deceased Primary Plaintiffs, however. Deceased Primary Plaintiffs may satisfy the Impairment Criteria for Severity Level B2, B3 or B4, respectively, by submitting the results of any one (1) test that complies with the requirements for the claimed Severity Level as set forth below. In addition, the preceding paragraph shall not apply to Primary Plaintiffs who submit the results of one (1) full PFT satisfying the Impairment Criteria for B2, B3 or B4 and the results of one (1) high resolution CT Scan that the Allocation Neutral determines confirms impairment at the B2, B3 or B4 Severity Levels.

| | |
|---|---|
| **B2** | **Full Pulmonary Function Test** showing:<br>TLC less than or equal to 69% predicted; ***and***<br>FVC less than or equal to 69% predicted; ***and***<br>$FEV_1$/FVC (%)>70% predicted |
| **B3** | **Full Pulmonary Function Test** showing:<br>TLC less than or equal to 59% predicted; ***and***<br>FVC less than or equal to 59% predicted; ***and***<br>$FEV_1$/FVC (%)>70% predicted.<br><br>***OR***, for Sarcoidosis only, a CT Scan and/or X-ray showing diffuse interstitial infiltrates without hilar adenopathy (this is the equivalent of Stage III radiographic Sarcoidosis staging). |
| **B4** | **Full Pulmonary Function Test** showing:<br>TLC lower than 50% predicted; ***and***<br>FVC lower than 50% predicted; ***and***<br>$FEV_1$/FVC (%)>70% predicted.<br><br>***OR***, for Sarcoidosis only, a CT Scan and/or X-ray showing diffuse fibrosis, often associated with fibrotic-appearing conglomerate masses, traction bronchiectasis, and traction cysts (this is the equivalent of Stage IV radiographic Sarcoidosis staging). |

# Asthma/RADS

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are Asthma, Reactive Airway(s) Disease ("RADS"), Chronic Asthmatic Bronchitis, Asthma Exacerbation, Airway(s) Hyperreactivity, and Hyperreactive Airway(s).

Hyperresponsiveness, Bronchospasm, and WTC Syndrome are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Medical Verification Requirements |
|---|---|
| C0 & C1 | Physician Diagnosis of Qualifying Injury in the Asthma/RADS disease group. |
| C2 to C4 | **Pulmonary Function Test (PFT)**:<br>    Pre-bronchodilator $FEV_1$ <80% predicted, *and*<br>    Post-bronchodilator $FEV_1$ improvement of 12% or 250 cc;<br>***OR***<br><br>**Positive Methacholine Challenge Test (MCT)**: ≥20% decrease in $FEV_1$ at or below 8 mg/ml<br><br>*Sources: Global Initiative for Asthma/World Health Organization; American College of Chest Physicians Consensus Statement* |

## 3. Impairment Criteria

| Severity Level | Criteria |
|---|---|
| C0 | No further requirements. |
| C1 | MCT response (*i.e.*, ≥20% decrease in $FEV_1$) at between 3 and 5 mg/ml; ***OR***<br>PFT with Post-BD $FEV_1$ of ≤80% of predicted; ***OR***<br>Pharmacy records or physician notes of any steroid or bronchodilator use; ***OR***<br>Plaintiff can satisfy the scoring criteria set forth in Exhibit Q through a combination of MCT, Post-BD $FEV_1$ and medication use to achieve a score of 1-6. |
| C2 | MCT response (*i.e.*, ≥20% decrease in $FEV_1$) at greater than 0.5 and up to and including 3 mg/ml; ***OR***<br>Plaintiff can satisfy the scoring criteria set forth in Exhibit Q through a combination of MCT, Post-BD $FEV_1$ and medication use to achieve a score of 7-9. |
| C3 | MCT response (*i.e.*, ≥20% decrease in $FEV_1$) at 0.25 or greater and up to and including 0.5 mg/ml; ***OR***<br>Plaintiff can satisfy the scoring criteria set forth in Exhibit Q through a combination of MCT, Post-BD $FEV_1$ and medication use to achieve a score of 10-11. |
| C4 | MCT response (*i.e.*, ≥20% decrease in $FEV_1$) at up to 0.25 mg/ml; ***OR***<br>Physician statement that Asthma not controlled despite maximal treatment (*i.e.*, daily oral steroid use, including without limitation ≥20 mg prednisone per day) |

**Alternative Base Points for Primary Plaintiffs who qualify for C1:**

For Primary Plaintiffs who (i) satisfy the Impairment Criteria for C1 and (ii) who submit a PFT that satisfies the requirements of the PFT Impairment Table (as defined below) in the PFT Only Criteria (as defined below) at PFT Impairment Level 2, Level 3 or Level 4 as specified in the PFT Impairment Table (collectively, "the Additive PFT"), the Allocation Neutral shall add to Base Points for Qualifying Injury C1 as set forth in Exhibit C to this Agreement 1250 Base Points for an Additive PFT that satisfies the requirements of Level 2 in the PFT Impairment Table, 2500 Base Points for an Additive PFT that satisfies the requirements of Level 3 in the PFT Impairment Table, or 3750 Base Points for an Additive PFT that satisfies the requirements of Level 4 in the PFT Impairment Table (collectively, "Additive PFT Base Points"). Notwithstanding any other provision of this Agreement, the sum of Base Points for Qualifying Injury C1 and any Additive PFT Base Points shall be deemed the Primary Plaintiff's Base Points.

**Alternative proof of impairment for Severity Levels exceeding C1 (hereinafter, "PFT Only Criteria"):**

In addition to satisfying the Impairment Criteria set forth above, a Primary Plaintiff may demonstrate impairment exceeding Severity Level C1 by submitting the results from three PFTs. For Primary Plaintiffs who rely upon three PFTs to establish such impairment, the Allocation Neutral shall calculate Base Points according to the following table:

### PFT Impairment Table

| PFT Impairment Level | Requirements | Base Points |
|---|---|---|
| Level 1 | PFT with Post-BD $FEV_1$ of 70% to 80% of predicted | Base Points 7,500 |
| Level 2 | PFTs with Post-BD $FEV_1$ of 60% to 69% of predicted | Base Points 25,000 |
| Level 3 | PFT with Post-BD $FEV_1$ of 50% to 59% of predicted | Base Points 60,000 |
| Level 4 | PFT with Post-BD $FEV_1$ below 50% of predicted | Base Points 85,000 |

Two of the three PFTs submitted must satisfy the requirements of PFT Impairment Level 2, PFT Impairment Level 3 or PFT Impairment Level 4 in the PFT Impairment Table. The three PFTs must be at least three months apart from one another. To determine how many Base Points to award, the Allocation Neutral shall average the Base Points set forth in the PFT Impairment Table for each PFT.

Notwithstanding the forgoing requirements of this PFT Only Criteria, a Primary Plaintiff with two (2) PFTs one of which is at PFT Impairment Level 2, PFT Impairment Level 3 or PFT Impairment Level 4, the Primary Plaintiff's Base Points shall be calculated by summing the Base Points associated with each PFT set forth in the PFT Impairment Table and dividing the total by three (3).

**Alternative proof of impairment for Severity Levels exceeding C0:**

Any Primary Plaintiff also may satisfy the Impairment Criteria for Severity Levels C1, C2, C3 or C4, respectively, through a single positive MCT response that produces a $\geq 20\%$ decrease in $FEV_1$ within the methacholine dosage specified above in mg/ml. Where the dosage that produces a 20% decrease in $FEV_1$ is not apparent from the face of a Primary Plaintiff's Qualifying Medical Record(s) submitted to the Allocation Neutral, however, the Allocation Neutral may determine whether the Primary Plaintiff satisfies the Impairment Criteria in C1, C2, C3 or C4, respectively, by interpolating according to the following formula the actual methacholine dosage in mg/ml that would have produced the requisite 20% decrease:

$$PC_{20} = \text{anti} \log \left[ \log C_1 + \frac{(\log C_2 - \log C_1)(20 - R_1)}{R_2 - R_1} \right]$$

For purposes of applying this formula:

$C_1$ = second-to-last methacholine concentration (prior to $\geq 20\%$ decrease in $FEV_1$)
$C_2$ = final methacholine concentration (resulting in $\geq 20\%$ decrease in $FEV_1$)
$R_1$ = percent decrease in $FEV_1$ (from baseline or post-diluent if a diluent step is used, whichever is higher) after $C_1$
$R_2$ = percent decrease in $FEV_1$ (from baseline or post-diluent if a diluent step is used, whichever is higher) after $C_2$
$PC_{20}$ = the methacholine dose (in mg/ml) required to produce 20% decrease in $FEV_1$ for purposes of placing the Primary Plaintiff into Severity Level C1, C2, C3 or C4, if applicable

In order for the Allocation Neutral to interpolate, the Primary Plaintiff must submit all data necessary to calculate $PC_{20}$ from a single Qualifying Medical Record. The Allocation Neutral shall not interpret based upon data from different Qualifying Medical Records.

# Laryngitis/Pharyngitis

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are Chronic Laryngitis and Chronic Pharyngitis. In addition, the Qualifying Injuries in this disease group shall include Laryngitis or Pharyngitis occurring with such frequency that it amounts to a chronic disease in the Allocation Neutral's judgment based upon the Primary Plaintiff's submission to the Allocation Neutral of Qualifying Medical Records.

Acute Laryngitis, Acute Pharyngitis, and Upper Respiratory Infections ("URI") are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Medical Verification Requirements |
|---|---|
| D0 & D1 | Physician Diagnosis of Qualifying Injury in the Laryngitis/Pharyngitis disease group. |

| D2 to D3 | Physical examination or endoscopy, including Laryngoscopy or Pharyngoscopy finding redness, inflammation and/or swelling of pharyngeal or laryngeal mucosal membranes. |
|---|---|

| **3. Impairment Criteria** | |
|---|---|
| **Severity Level** | **Required Testing and Results** |
| D0 | No further requirements. |
| D1 | Physician evaluation of audibility, intelligibility, and functional efficiency meet many needs of everyday speech; **OR** Strobovideolaryngoscopy ("SVL"), objective voice and speech measures, and Voice Handicap Index ("VHI") are mildly to moderately abnormal. |
| D2 | SVL, objective voice and speech measures, and VHI are moderately to severely abnormal. |
| D3 | SVL, objective voice and speech measures, and VHI are severely abnormal. |

# Chronic Rhinosinusitis

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are Chronic Rhinosinusitis, Chronic Rhinitis, Chronic Sinusitis and Vocal Cord Dysfunction. In addition, the Qualifying Injuries in this disease group shall include Rhinosinusitis, Rhinitis, or Sinusitis occurring with such frequency that it amounts to a chronic disease in the Allocation Neutral's judgment based upon the Primary Plaintiff's submission to the Allocation Neutral of Qualifying Medical Records.

Allergic Rhinitis, Acute Sinusitis, and Acute Rhinitis are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| **Severity Level** | **Medical Verification Requirements** |
|---|---|
| E0 & E1 | Physician Diagnosis of a Qualifying Injury in the Chronic Rhinosinusitis disease group. |
| E2 to E3 | Evidence of sinus mucosal disease on CT or MRI; **OR** Evidence of sinus mucosal disease from nasal endoscopy. *Source: British Society for Allergy and Clinical Immunology guidelines for the management of rhinosinusitis and nasal polyposis. Scadding GK; Durham SR; Mirakian R; Jones NS; Drake-Lee AB; Ryan D; Dixon TA; Huber PA; Nasser SM - Clin Exp Allergy. 2008 Feb; 38(2):260-75. Epub 2007 Dec 20.* |

## 3. Impairment Criteria

| **Severity Level** | **Required Testing and Results** |
|---|---|
| E0 | No further requirements. |
| E1 | Endoscopy, Sinus CT or MRI shows mild to moderate mucosal thickening, mild to moderate obstruction of nasopharynx or opharynx; **OR** Laryngoscopy shows mild to moderate alteration in vocal fold (cord) function. |
| E2 | Sinus CT or MRI shows moderately severe mucosal thickening or moderately severe turbinate swelling, moderately severe obstruction of nasopharynx or oropharynx; **OR** Laryngoscopy shows moderately severe alteration in vocal fold (cord) function |
| E3 | Sinus CT or MRI shows diffuse severe mucosal thickening or severe turbinate swelling, severe obstruction of nasopharynx or oropharynx; **OR** Laryngoscopy shows severe alteration in vocal fold (cord) function such as bilateral paralysis. |

# Upper Digestive

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are Gastroesophageal Reflux Disease (GERD), Barrett's Esophagus, Esophagitis, Esophageal Reflux, Esophageal Ulcer and Esophageal Stricture, and GI Stricture.  In addition, the Qualifying Injuries in this disease group shall include Acid Reflux occurring with such frequency that it amounts to a chronic disease in the Allocation Neutral's judgment based upon the Primary Plaintiff's submission to the Allocation Neutral of Qualifying Medical Records.

Heartburn, Chronic Heartburn, Laryngeal Reflux, Gastric Ulcer, Gastric Regurgitation and Gastritis are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Criteria |
| --- | --- |
| F0 to F2 | Physician Diagnosis of a Qualifying Injury in the Upper Digestive disease group. |

## 3. Impairment Criteria

| Severity Level | Criteria |
| --- | --- |
| F0 | No further requirements. |
| F1 | Endoscopy reveals mild or moderate findings in the esophagus such as inflammation, esophagitis, erosions, and mucosal breaks. |
| F2 | Endoscopy reveals severe findings in the esophagus such as Barrett's esophagus, benign peptic esophageal stricture, ulcers, hemorrhage, or severe esophagitis. |

# Sleep Disorders

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group include Obstructive Sleep Apnea, Sleep Apnea or other Sleep Disordered Breathing.

Symptoms of sleep disorders (*e.g.*, snoring or insomnia) are examples of findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Criteria |
| --- | --- |
| G0 to G2 | Records documenting Physician Diagnosis of Qualifying Injury in the Sleep Disorders disease group. |

## 3. Impairment Criteria

| Severity Level | Criteria |
| --- | --- |
| G0 | No further requirements. |
| G1 | Polysomnography demonstrating obstructive sleep apnea. |
| G2 | Polysomnography demonstrating obstructive sleep apnea *AND* medical records of treatment with CPAP *or* need to have CPAP titration. |

| Death | |
|---|---|
| **1. Qualifying Criteria** | |
| Death of the Primary Plaintiff on or before the Final Settlement Agreement Effective Date. | |
| **2. Diagnostic Criteria** | |
| **Level** | **Criteria** |
| **H0 to H2** | Death of the Primary Plaintiff established by a certificate, hospital notes, or other authoritative document (*e.g.*, physician letter) confirming death. |
| **3. Impairment Criteria** | |
| **Level** | **Criteria** |
| **H0** | ***Death Unrelated to WTC Exposure*** – No further requirements. |
| **H1** | ***Death Potentially Related to WTC Exposure*** – Based upon the Claim Form and Qualifying Medical Records, the Allocation Neutral: <br><br>(i) determines that the Primary Plaintiff: <br><br>    a.  satisfies the Medical Proof Criteria for Qualifying Injuries B2, B3, or B4 in the Interstitial Lung Disease Disease Group; ***or*** <br><br>    b.  satisfies the Medical Proof Criteria for Qualifying Injuries C2, C3, or C4 in the Asthma/RADS Disease Group; ***or*** <br><br>    c.  satisfies the Medical Proof Criteria for Qualifying Injury I2 (Blood Cancer) in the Cancer Disease Group; ***AND*** <br><br>(ii) determines that the Qualifying Injury referenced in the proceeding clause (i).a, (i).b or (i).c did not pre-exist the Primary Plaintiff's alleged exposure giving rise to his or her Debris Removal Claims; ***AND*** <br><br>(iii) cannot rule out a causal relationship between the Primary Plaintiff's death and the Qualifying Injury referenced in the proceeding clause (i).a, (i).b or (i).c. |

| H2 | ***Death Related to WTC Exposure*** – Based upon the Claim Form and Qualifying Medical Records, the Allocation Neutral |
|----|----|
| | (i) determines that Primary Plaintiff: |
| | a. satisfies the Diagnostic Criteria and the Impairment Criteria for B2, B3, or B4 in the Interstitial Lung Disease Disease Group; ***or*** |
| | b. satisfies the Diagnostic Criteria and the Impairment Criteria for C2, C3, or C4 in the Asthma/RADS Disease Group; ***AND*** |
| | (ii) determines that the Qualifying Injury referenced in the proceeding clause (i).a or (i).b did not pre-exist the Primary Plaintiff's alleged exposure giving rise to his or her Debris Removal Claims; ***AND*** |
| | (iii) concludes, in the Allocation Neutral's judgment, that the Primary Plaintiff's death is causally related to the Qualifying Injury referenced in the proceeding clause (i).a or (i).b. In making this determination regarding causation, the Allocation Neutral shall consider, but shall not be bound by, argumentative, conclusory and/or unverified findings by a physician or other medical professional in Qualifying Medical Record(s) with respect to cause of death. |

# Cancer

## 1. Qualifying Injury

Diagnosis of cancer or pre-cancerous condition by a qualified physician.

Pre-cancerous conditions (I0) shall consist of dysplasia, pre-malignant, preneoplasia, intraepithelial neoplasia, adenomatous colon polyps or actinic keratosis conditions. Pre-cancerous conditions (I0) shall not include benign tumors, brain lesions, enlarged lymph nodes, lung nodules, polyps (*e.g.*, nasal, laryngeal, throat, sinus or vocal cord), cysts or benign skin lesions (*e.g.*, seborrheic keratosis, lipoma, dermatofibroma, pyogenic granuloma, epidermoid cyst or papilloma).

## 2. Diagnostic Criteria

| Level | Criteria |
|-------|----------|
| I0 to I2 | Histopathology report documenting pre-cancerous or cancerous condition; ***OR*** Physician documentation of diagnosis of or treatment for pre-cancerous or cancerous condition. |

## 3. Impairment Criteria

| Level | Criteria |
|-------|----------|
| I0 | Pre-Cancerous Condition – No requirements other than physician documentation of diagnosis of or treatment for a pre-cancerous condition. |
| I1 | Solid Tumor Cancer – Physician documentation of diagnosis of or treatment for a solid tumor cancer. |
| I2 | Blood Cancer – Physician documentation of diagnosis of or treatment for a blood cancer. |

# Cardiac

| 1. Qualifying Injury |
|---|
| Diagnosis of a cardiac condition by a qualified physician.<br><br>Miscellaneous cardiac conditions (J0), shall not include: congenital heart defects (*e.g.*, septal defects, valve defects, or other malformations); heart conditions caused by infectious diseases (*e.g.*, bacterial, viral, fungal or parasitic conditions); and heart conditions caused by autoimmune diseases (*e.g.*, lupus). |

| 2. Diagnostic Criteria | |
|---|---|
| **Level** | **Criteria** |
| **J0 to J2** | Physician documentation of diagnosis of or treatment for hypertension, heart attack, or miscellaneous cardiac condition. |

| 3. Impairment Criteria | |
|---|---|
| **Level** | **Criteria** |
| **J0** | No further requirements. |
| **J1** | Physician documentation of diagnosis of or treatment for hypertension. |
| **J2** | Physician documentation of diagnosis of or treatment for a heart attack. |

# Restrictive Lung Disease

| 1. Qualifying Injury |
|---|
| The only Qualifying Injury in this disease group is Restrictive Lung Disease. |

| 2. Diagnostic Criteria | |
|---|---|
| **Level** | **Criteria** |
| **K0 & K1** | Physician Diagnosis of Restrictive Lung Disease, to the extent that such Physician Diagnosis is not attributable to obesity in the Allocation Neutral's judgment (*i.e.*, the Primary Plaintiff's Body Mass Index is below 30) |
| **K2 to K3** | Physician Diagnosis of Restrictive Lung Disease, based upon Restrictive Pulmonary Function Tests, to the extent that such Physician Diagnosis is not attributable to obesity in the Allocation Neutral's judgment (*i.e.*, the Primary Plaintiff's Body Mass Index is below 30); no or normal imaging studies. |

| 3. Impairment Criteria | |
|---|---|
| **Severity Level** | **Required Testing and Results** |
| **K0** | No further requirements |
| **K1** | **Full Pulmonary Function Test** showing:<br>TLC less than or equal to 79% predicted; *and*<br>FVC less than or equal to 79% predicted; *and*<br>$FEV_1/FVC$ (%)>70% predicted. |
| **K2** | **Full Pulmonary Function Test** showing:<br>TLC less than or equal to 59% predicted; *and*<br>FVC less than or equal to 59% predicted; *and*<br>$FEV_1/FVC$ (%)>70% predicted. |
| **K3** | **Full Pulmonary Function Test** showing:<br>TLC lower than 50% predicted; *and*<br>FVC lower than 50% predicted; *and*<br>$FEV_1/FVC$ (%)>70% predicted. |

## XIII.  TIER 4 POINT SYSTEM

### A.  Point System for Each Master Docket

Although the Allocation Neutral will use the same Base Points as provided on Exhibit C to this Agreement in each Master Docket and the same series of Adjustment Factors to modify those Base Points for all Verified Tier 4 Primary Plaintiffs in each Master Docket, the Allocation Neutral will calculate the Final Total Score for Primary Plaintiffs with Tier 4 Qualifying Injuries based upon the portions of the Settlement Amount allocated to the Primary Plaintiffs' Master Docket as set forth in Section II.B.i of this Agreement.

For Plaintiffs in all Master Dockets, the Point System shall consist of two parts:

i.      Base Points assigned to each Primary Plaintiff's most highly-valued Tier 4 Qualifying Injury, as reflected in the "Base Points" column on the Settlement Grid attached hereto as Exhibit C; and

ii.     Adjustments to Base Points, up and/or down, as set forth in Section XIII.B of this Agreement ("Adjustment Factors") and applied in the manner set forth in Section XIII.C of this Agreement.

The point value assigned on the Settlement Grid to a Primary Plaintiff's Tier 4 Primary Qualifying Injury shall constitute the Base Point component of the Plaintiff's Total Score.

If the Allocation Neutral determines that a Primary Plaintiff has more than one Qualifying Injury, the Allocation Neutral shall identify the ranking of those Qualifying Injuries that would result in the most favorable treatment under the Point System as Primary and Secondary Qualifying Injuries, after consideration of the effects of the injury-specific Adjustment Factors, namely, the adjustments for Pre-Existing Injuries, and Timing of Diagnosis, as set forth in Sections XIII.B.ii and XIII.B.iii of this Agreement, respectively.       A Verified Tier 4  Primary Plaintiff's Total Score as determined by the Allocation Neutral based upon his or her Primary Qualifying Injury and Secondary Qualifying Injury, if any, and any adjustments thereto by the Allocation Neutral pursuant to Section XIII.C of this Agreement shall, once final, be used by the Allocation Neutral to determine each Primary Plaintiff's Final Distribution, if any.

### B.  Adjustment Factors

With respect to Verified Tier 4 Primary Plaintiffs, the Allocation Neutral shall adjust each Primary Plaintiff's Base Points by taking into consideration the following Adjustment Factors.    A Primary Plaintiff's Base Points, after application of the Adjustment Factors, shall constitute that Primary Plaintiff's Total Score.

The Allocation Neutral shall consider each of the Adjustment Factors to the full extent applicable to a Primary Plaintiff's case. To permit this assessment, each Primary Plaintiff who seeks eligibility for Tier 4 shall submit a Tier 4 Claim Form that addresses each Adjustment Factor, to the extent applicable, and each Primary Plaintiff shall attach any needed Qualifying Medical Records containing true, correct and complete information regarding each applicable Adjustment Factor.

The Adjustment Factors shall not apply in Tier 1, Tier 2 or Tier 3 as set forth in Section VIII of this Agreement.

The Adjustment Factors are as follows:

i.    Secondary Qualifying Injuries

Except with respect to Primary Plaintiffs who satisfy the Medical Proof Criteria for Qualifying Injury "H2," the Allocation Neutral shall credit a Primary Plaintiff's Secondary Qualifying Injury, if any, as an upward adjustment to the Primary Plaintiff's Base Points in the amount of Base Points provided for the Secondary Qualifying Injury; provided, however, that no Primary Plaintiff shall receive credit for both a Primary and Secondary Qualifying Injury in the same Disease Group, or for both (a) "A" Disease Group (Chronic Obstructive Pulmonary Disease) and "C" Disease Group (Asthma/RADS) Qualifying Injuries or (b) "B" Disease Group (Interstitial Lung Disease) and "K" Disease Group (Restrictive Lung Disease) Qualifying Injuries.

Each Primary Plaintiff's Base Points attributable solely to the Primary Qualifying Injury will remain the basis for calculating the permissible range for adjustment, as provided in Section XIII.C of this Agreement.

ii.    Pre-Existing Injuries

If the Allocation Neutral determines that a Primary Plaintiff's Primary Qualifying Injury is also a Pre-Existing Injury, the Allocation Neutral shall discount the Primary Plaintiff's Base Points for that Primary Qualifying Injury by multiplying the Base Points by 0.25, effectively reducing Base Points for that Qualifying Injury by seventy-five percent (75%).

This adjustment multiplier shall be increased to 0.65, effectively reducing Base Points for that Primary Qualifying Injury by thirty-five percent (35%), if the Primary Plaintiff (i) states in his or her Tier 4 Claim Form that his or her work or volunteer service at the WTC Site or other location at which the Primary Plaintiff alleged exposure giving rise to his or her Debris Removal Claims exacerbated his or her Pre-Existing Injury resulting in a Qualifying Injury that is more severe than, but otherwise is the same Qualifying Injury in the same Disease Group as the Primary Plaintiff's Pre-Existing Injury, and (ii) provides the Allocation Neutral

with Qualifying Medical Records that the Allocation Neutral determines demonstrate exacerbation of the Primary Plaintiff's Pre-Existing Injury after the Primary Plaintiff's alleged exposure giving rise to his or her Debris Removal Claims after the Primary Plaintiff's alleged exposure.

Primary Plaintiffs who the Allocation Neutral determines materially misrepresented, materially omitted or materially concealed the existence or extent of a Pre-Existing Injury on their Tier 4 Claim Form despite claiming a Qualifying Injury in the same Disease Group shall be entitled to no Final Distribution.

Furthermore, if the Allocation Neutral determines that a Primary Plaintiff has a Secondary Qualifying Injury that is a Pre-Existing Injury, that pre-existing Secondary Qualifying Injury shall not be a basis for upward adjustment of the Primary Plaintiff's Base Points under Section XIII.B.i of this Agreement unless the Primary Plaintiff demonstrates that his or her pre-existing Secondary Qualifying Injury worsened after he or she began work or volunteer service at the WTC Site or other location at which he or she alleges exposure giving rise to his or her Debris Removal Claims, as provided in the forgoing paragraph, in which case the Base Points for the Second Qualifying Injury shall be multiplied by 0.25, effectively reducing Base Points for the Secondary Qualifying Injury by seventy-five percent (75%).

iii.    Timing of Diagnosis of Qualifying Injuries

The Allocation Neutral shall consider the date of earliest diagnosis (i) of a Primary Plaintiff's Primary Qualifying Injury as an adjustment to the Base Points for that Primary Qualifying Injury and (ii) of a Primary Plaintiff's Secondary Qualifying Injury, if any, when determining to what extent, if any, to increase the Base Points for the Secondary Qualifying Injury. These dates of earliest diagnosis shall be determined by the Allocation Neutral based upon evidence of any diagnosis that satisfies the Diagnostic Criteria component of the Medical Proof Criteria and which appears in the Primary Plaintiff's Qualifying Medical Records accompanying his or her Tier 4 Claim Form.  The Allocation Neutral shall apply these adjustments as follows:

a.    Base Points awarded for Qualifying Injuries in the Asthma/RADS, Upper Digestive, Laryngitis/Pharyngitis, and Chronic Rhinosinusitis Disease Groups, shall be multiplied by 1.30 (increased by thirty percent (30%)) if the Primary Plaintiff's Qualifying Medical Records and/or any documents generated by an Adjudicatory Body establish that the Diagnostic Criteria for the Qualifying Injury in any of these Disease Groups were satisfied within seven (7) months of the last day of the Primary Plaintiff's

debris removal work or volunteer service forming the basis of his or her Debris Removal Claims.

b. Base Points awarded for Qualifying Injuries in the Chronic Obstructive Pulmonary Disease and Interstitial Lung Disease Groups, shall be multiplied by 1.30 (increased by thirty percent (30%)) if the Primary Plaintiff's Qualifying Medical Records or any documents generated by an Adjudicatory Body establish that the Diagnostic Criteria for the Qualifying Injury in either of those Disease Groups were first satisfied two and one-half (2.5) years or more after the Primary Plaintiff's last day of debris removal work or volunteer service forming the basis of his or her Debris Removal Claims.

iv. Age

To take into account the Primary Plaintiffs' respective ages on September 11, 2001, the Allocation Neutral shall derive each Primary Plaintiff's age from his or her birth date as provided in the Claim Form and apply the appropriate multiplier provided in the Age Adjustment Factor Table appended as Exhibit F to this Agreement in accordance with Section XIII.C of this Agreement. This factor shall operate generally to increase the scores of younger Primary Plaintiffs and decrease the scores of older Primary Plaintiffs.

v. Last Day of Alleged Exposure

To take into account the Primary Plaintiff's last date of alleged exposure at the WTC Site or other location giving rise to his or her Debris Removal Claims, as attested by the Primary Plaintiff in his or her Tier 4 Claim Form, the Allocation Neutral shall apply the appropriate multiplier set forth in the table below in accordance with Section XIII.C of this Agreement:

Last Day of Alleged Exposure Multipliers

| Last date of alleged exposure | Multiplier |
|---|---|
| September 11, 2001 | 0.50 |
| September 12-14, 2001 | 0.75 |
| September 15, 2001 or later | 1.00 |

vi. Duration of Alleged Exposure

To take into account the Primary Plaintiff's duration of alleged exposure during work or volunteer service at the WTC Site and/or other locations at which Primary Plaintiff alleged exposure giving rise to his or her Debris Removal Claims, as attested by the Primary Plaintiff in his or her Tier 4

Claim Form, the Allocation Neutral shall apply the appropriate multiplier from the table below in accordance with Section XIII.C of this Agreement.

Duration of Alleged Exposure Multipliers

| Total days of alleged exposure | Multiplier |
|---|---|
| Up to and including 56 hours (or the equivalent of seven (7) eight-hour days or less) | 0.75 |
| More than 56 hours (or the equivalent of more than seven (7) eight-hour days) | 1.00 |

vii.    Smoking History

To account for a Primary Plaintiff's smoking history, the Allocation Neutral shall review his or her Tier 4 Claim Form and apply the appropriate multiplier from the table below in accordance with Section XIII.C of this Agreement.

| Smoking History Multipliers | | |
|---|---|---|
| Category | Description | Multiplier |
| *Heavy smoker* | Any Primary Plaintiff who has a cigarette smoking history of twenty (20) pack years (*i.e.*, the product of years smoked times average pack(s) of cigarettes smoked per day during that period) or more | 0.65 |
| *Current smoker* | Any Primary Plaintiff who is not a Heavy smoker, but who has smoked cigarettes within one (1) year of the date he or she completes the Tier 4 Claim Form | 0.80 |
| *Former smoker* | Any Primary Plaintiff who is not a Current smoker or a Heavy smoker, but who smoked cigarettes within five (5) years of the date he or she completes the Tier 4 Claim Form | 0.90 |
| *Non-smoker* | Any Primary Plaintiff who does not fall into the above categories. | 1.00 |

viii.    Location of Alleged Exposure

For Primary Plaintiffs in the Allocation Pool for Master Docket No. 21 MC 102, the Allocation Neutral shall credit only the percentage of time that he or she performed the work or volunteer service which is the basis for his or her Debris Removal Claims against the Insureds or any of them, as opposed to the time spent working at other locations which forms the

basis for his or her Debris Removal Claims against Other Defendants, for the period from September 11, 2001, to the present, as explained in Section XIII.C.iv of this Agreement.

For Primary Plaintiffs in the Allocation Pool for Master Docket No. 21 MC 103, the Allocation Neutral shall credit only the percentage of time that he or she performed rescue, recovery and/or debris removal work or volunteer service which is the basis for his or her Debris Removal Claims against the Insureds or any of them, as opposed to time spent working at other locations which forms the basis for his or her Debris Removal Claims against Other Defendants, for the period between September 11, 2001, to the present, as explained in Section XIII.C.iv of this Agreement.

In the Allocation Pool for Master Docket No. 21 MC 100, the Allocation Neutral shall not make any adjustment to reflect any Primary Plaintiff's location(s) of alleged exposure.

Each Primary Plaintiff with Debris Removal Claims in Master Docket 21 MC 102 and Master Docket 21 MC 103 shall set forth in his or her Claim Form the information necessary for the Allocation Neutral to apply this Location of Alleged Exposure Adjustment Factor.  To ensure that this information is accurately represented in such Primary Plaintiffs' respective Claims Forms, this information shall be deemed an answer to an interrogatory and pursuant to Federal Rule of Civil Procedure 33(c) may be used, including without limitation by Other Defendants in Master Docket 21 MC 102 and Master Docket 21 MC 103, to the extent allowed by the Federal Rules of Evidence.

## C.    Adjustment Factor Application and Total Score Calculation

For all Verified Tier 4 Primary Plaintiffs, the Allocation Neutral shall calculate a Total Score through the application of the Adjustment Factors as follows:

*First*, the Allocation Neutral shall take the Base Points for the Verified Tier 4 Primary Plaintiff's Primary Qualifying Injury and apply, if applicable, either the Pre-Existing Qualifying Injury Adjustment Factor or the Timing of Diagnosis Adjustment Factor set forth in Sections XIII.B.ii and XIII.B.iii of this Agreement, respectively;

*Second*, the Allocation Neutral shall take the Base Points for the Verified Tier 4 Primary Plaintiff's Secondary Qualifying Injury, and pursuant to Section XIII.B.i of this Agreement, apply, if applicable, either the Pre-Existing Qualifying Injury Adjustment Factor or the Timing of Diagnosis Adjustment Factor set forth in Sections XIII.B.ii and XIII.B.iii of this Agreement, respectively;

*Third*, the Allocation Neutral shall combine the points determined by the first two steps to establish the Verified Tier 4 Primary Plaintiff's Preliminary Total Score; however, the Base Points for the Verified Tier 4 Primary Plaintiffs' Primary

Qualifying Injury shall remain the baseline for the application of the percentage limitations described in this Section XIII.C;

*Fourth*, the Allocation Neutral shall adjust the Verified Tier 4 Primary Plaintiff's Preliminary Total Score through the multiplicative application of the following Adjustment Factors:

i.     The Verified Tier 4 Primary Plaintiff's Age, as set forth in Section XIII.B.vi of this Agreement;

ii.    The Verified Tier 4 Primary Plaintiff's Smoking History, as set forth in Section XIII.B.vii of this Agreement;

iii.   The Verified Tier 4 Primary Plaintiff's Last Day of Alleged Exposure, as set forth in Section XIII.B.v of this Agreement; and

iv.    The Verified Tier 4 Primary Plaintiff's Duration of Alleged Exposure, as set forth in Section XIII.B.vi of this Agreement;

*Fifth*, if the net effect of the calculations in the first four steps is a product more than fifty percent (50%) larger than the Primary Plaintiff's Base Points, the Allocation Neutral shall reduce the product to one hundred and fifty percent (150%) of Base Points. If the net effect of the calculations in the first four steps is a product equal to or less than one hundred and fifty percent (150%) but greater than or equal to fifty percent (50%) of the Verified Tier 4 Primary Plaintiff's Base Points, the Allocation Neutral shall not adjust the figure. Furthermore, if the net effect of the calculations in the first four steps is a product that is less than fifty percent (50%) of the Verified Tier 4 Primary Plaintiff's Base Points, the Allocation Neutral shall increase the product to fifty percent (50%) of Base Points unless the Pre-Existing Condition Adjustment Factor applies to the Verified Tier 4 Primary Plaintiff's Primary Qualifying Injury, in which case the Allocation Neutral shall ensure only that that the product not be less than twenty-five percent (25%) of Base Points. The result of this fifth step shall be referred to as the Verified Tier 4 Primary Plaintiff's "Docket-Neutral Base Points."

*Sixth*, having made appropriate adjustments for the minima and maximum in accordance with the fifth step, the Allocation Neutral shall take the Verified Tier 4 Primary Plaintiff's Docket-Neutral Base Points and apply the Location of Alleged Exposure Adjustment Factor set forth in Section XIII.B.viii of this Agreement for Verified Tier 4 Primary Plaintiffs in Master Docket 21 MC 102 and Master Docket 21 MC 103 only. The Location of Alleged Exposure Adjustment Factor shall reduce the Verified Tier 4 Primary Plaintiff's Docket-Neutral Base Points by one percent (1%) for each percentage of non-qualifying time, unless the Verified Tier 4 Primary Plaintiff's calculated reduction would exceed seventy-five percent (75%) of the Verified Tier 4 Primary Plaintiff's Docket-Neutral Base Points, in which case the Allocation Neutral shall award the

Verified Tier 4 Primary Plaintiff twenty-five percent (25%) of his or her Docket-Neutral Base Points.

The result of the foregoing calculations shall be the Verified Tier 4 Primary Plaintiff's Total Score; provided, however, that the Allocation Neutral retains the discretion to award any Verified Tier 4 Primary Plaintiff no Final Distribution if the Allocation Neutral concludes that the Verified Tier 4 Primary Plaintiff has materially misrepresented, materially omitted or materially concealed facts in his or her Claim Form and/or in the Qualifying Medical Records submitted therewith.

## XIV.  RECONSIDERATION REQUESTS

### A.  Tier 1, Tier 2 and Tier 3 Reconsideration Requests

Any Primary Plaintiff who claims eligibility for Tier 2 or Tier 3 may request that the Allocation Neutral reconsider its determination with respect to his or her placement in Tier 1, Tier 2, or Tier 3 (collectively, "Tier 1-3 Reconsideration Requests").

The substance of all Tier 1-3 Reconsideration Requests shall be limited to the Primary Plaintiff's contention that the Allocation Neutral (i) misapplied the proof requirements for the pertinent Tier with respect to the Primary Plaintiff's claims as set forth in his or her Claim Form and his or her Qualifying Medical Records; (ii) failed to award a Mixed Orthopedic Plaintiff a Mixed Orthopedic payment pursuant to the requirements of Section XVIII.A of this Agreement; (iii) failed to award the Primary Plaintiff a Qualifying Surgery payment pursuant to the requirements of Section XVIII.B of this Agreement; (iv) misapplied the Work Verification Procedure to the Primary Plaintiff's case; and/or (v) misapplied the Permanent Disability Fund provisions in Section XVI of this Agreement to the Primary Plaintiff's case.

Tier 1-3 Reconsideration Requests shall consist of a letter to the Allocation Neutral of no more than two (2) pages setting forth the Primary Plaintiff's alleged grounds for reconsideration, together with any Qualifying Medical Records supporting those contentions.  Tier 1-3 Reconsideration Requests must be submitted no later than fifteen (15) days after the date that the affected Primary Plaintiff or his or her counsel receives the Allocation Neutral's determination with respect to any Tier 1, Tier 2 or Tier 3 placement.  All Tier 1-3 Reconsideration Requests shall be signed by Primary Plaintiff's counsel and are subject to the Primary Plaintiff's attestations in his or her Claim Form.

Following the Allocation Neutral's evaluation of each Tier 1-3 Reconsideration Request, the Allocation Neutral shall issue a notice to the affected Primary Plaintiff's counsel, with a copy to the WTC Captive, informing the Primary Plaintiff of the Allocation Neutral's action, if any, based upon the Tier 1-3 Reconsideration Request, including, if warranted pursuant to the Allocation Neutral's application of the Tier proof requirements in this Agreement, placement

of the Primary Plaintiff in a lower Tier than originally designated. Once the deadline to submit a Tier 1-3 Reconsideration Request has lapsed, or upon issuance of the Allocation Neutral's notice responding to a timely Tier 1-3 Reconsideration Request, the Allocation Neutral's determinations with respect to all Primary Plaintiffs who the Allocation Neutral concludes are properly in Tier 1, Tier 2 or Tier 3 shall be final and binding on all Parties, and all such Plaintiffs agree that their respective final Tier 1, Tier 2 and Tier 3 placements and other payments, if any, authorized by this Agreement shall be not be appealable by any means other than the Reconsideration Request process described in this Section XIV.

In addition, any Primary Plaintiff submitting a Tier 1-3 Reconsideration Request shall pay to the Allocation Neutral a refundable application fee in the amount of Two Hundred and Fifty Dollars and No Cents ($250.00). The Allocation Neutral shall not consider any Tier 1-3 Reconsideration Request submitted without this refundable application fee. If a Tier 1-3 Reconsideration Request does not result in an upward adjustment by the Allocation Neutral of the Primary Plaintiff's Tier placement, the Primary Plaintiff shall forfeit the application fee and it will be applied against the Allocation Neutral's reasonable costs, fees and expenses for that Plaintiff's Master Docket Allocation Pool that would otherwise be billed to the Plaintiffs and/or the WTC Captive pursuant to this Agreement. If, however, a Tier 1-3 Reconsideration Request results in an upward adjustment by the Allocation Neutral of a Primary Plaintiff's Tier placement, the application fee shall be refunded fully to the Primary Plaintiff together with his or her Accelerated Final Payment.

**B.    Tier 4 Reconsideration Requests**

Following the Allocation Neutral's calculation of the Total Score for a Primary Plaintiff who submitted a Tier 4 Claim Form, the Allocation Neutral shall notify Plaintiffs' Liaison Counsel and the WTC Captive of the Verified Tier 4 Primary Plaintiff's Total Score determination or, for other Primary Plaintiffs, their respective placements by the Allocation Neutral in Tier 1, Tier 2 or Tier 3. The Verified Tier 4 Primary Plaintiff or other affected Primary Plaintiff through his or her counsel shall have thirty (30) days from the date of such notice to request reconsideration by the Allocation Neutral of the Verified Tier 4 Primary Plaintiff's Total Score or other affected Primary Plaintiff's placement by the Allocation Neutral in Tier 1, Tier 2 or Tier 3 (hereinafter, a "Tier 4 Reconsideration Request"). Any Tier 4 Reconsideration Request shall be based solely upon the Tier 4 Claim Form (including any revised Tier 4 Claim Form responding to a Deficiency Notice), the Qualifying Medical Records submitted with the Tier 4 Claim Form (including any Qualifying Medical Records submitted in response to a Deficiency Notice) and/or any additional Qualifying Medical Records that a Plaintiff elects to submit in support of his or her Tier 4 Reconsideration Request. Tier 4 Reconsideration Requests shall consist of a letter of no more than five (5) pages signed by the Primary Plaintiff's counsel and subject to the attestations by the Primary Plaintiff in his or her Claim Form.

The substance of all Tier 4 Reconsideration Requests shall be limited to the Verified Tier 4 Primary Plaintiff's or Primary Plaintiff's contention that the Allocation Neutral (i) misapplied the Tier 4 proof requirements with respect to the Primary Plaintiff's claims as set forth in his or her Claim Form and his or her Qualifying Medical Records; (ii) misapplied, or failed to apply, the Adjustment Factors or any of them; (iii) failed to award a Mixed Orthopedic Plaintiff a Mixed Orthopedic payment pursuant to the requirements of Section XVIII.A of this Agreement; (iv) failed to award the Primary Plaintiff a Qualifying Surgery payment pursuant to the requirements of Section XVIII.A of this Agreement; (v) misapplied the Work Verification Procedure to the Primary Plaintiff's case; (vi) failed to calculate correctly the Primary Plaintiff's Total Score; and/or (vii) misapplied the Permanent Disability Fund provisions in Section XVI of this Agreement to the Primary Plaintiff's case.

Following the Allocation Neutral's receipt and evaluation of a Tier 4 Reconsideration Request, the Allocation Neutral shall notify Plaintiffs' Liaison Counsel and the WTC Captive of any change to a Verified Tier 4 Primary Plaintiff's Total Score or other change to a Primary Plaintiff's placement in Tier 1, Tier 2 or Tier 3. The Allocation Neutral may adjust the Verified Tier 4 Primary Plaintiff's Total Score or a Primary Plaintiff's Tier placement up or down based upon his or her Tier 4 Reconsideration Request. After the Allocation Neutral rules upon a Verified Tier 4 Primary Plaintiff's or Primary Plaintiff's Tier 4 Reconsideration Request, however, no further Reconsideration Requests pertaining to that Plaintiff shall be permitted. Total Scores not subject to a Tier 4 Reconsideration Request or as adjusted, if appropriate, as the result of a timely Tier 4 Reconsideration Request shall be final and binding as the Final Total Score for purposes of calculating a Verified Tier 4 Primary Plaintiff's Final Distribution, if any, as set forth in Sections XIII and XV.A of this Agreement. This Tier 4 Reconsideration Request procedure shall be the only means of appeal of the Allocation Neutral's initial Total Score calculation for a Primary Plaintiff who claims eligibility for Tier 4, as well all such Primary Plaintiff's means of appeal of all other payments, if any, awarded by the Allocation Neutral under this Agreement, and all such Primary Plaintiffs agree that their respective Final Total Scores and amount, if any, of their other payments under this Agreement, if any, are binding and not appealable by any other means.

In addition, any Primary Plaintiff submitting a Tier 4 Reconsideration Request shall pay to the Allocation Neutral a refundable application fee in the amount of Two Hundred and Fifty Dollars and No Cents ($250.00). The Allocation Neutral shall not consider any Tier 4 Reconsideration Request submitted without this refundable application fee. If a Primary Plaintiff's Reconsideration Request does not result in an upward adjustment of his or her Total Score by the Allocation Neutral, the Primary Plaintiff shall forfeit the application fee. At that point, the application fee will be applied against the Allocation Neutral's reasonable costs, fees and expenses for that Plaintiff's Master Docket Allocation Pool that would otherwise be paid pursuant to this Agreement. If, however, a Primary Plaintiff's Tier 4 Reconsideration Request results in any upward adjustment by the

Allocation Neutral to the Primary Plaintiff's Total Score, the application fee shall be refunded fully as part of the Primary Plaintiff's Final Distribution.

## XV.    FINAL DISTRIBUTION CALCULATIONS AND PROCEDURES FOR TIER 4

### A.    Final Distribution Formula

Separately within the Allocation Pool for each Master Docket as set forth in Section XIII.A and subject to the allocation of (i) the Settlement Amount among the Master Dockets as set forth in Sections II.B.i.a through II.B.i.c of this Agreement, (ii) income on the portion of the Settlement Amount allocated to each Master Docket pursuant to Section III.C of this Agreement, and (iii) allocation of the Allocation Neutral's reasonable costs, fees and expenses among the Master Dockets as set forth in Section III.C of this Agreement, the Allocation Neutral shall calculate each Plaintiff's Final Distribution, if any, as follows:

*First*, the Allocation Neutral shall determine the Final Total Scores for all Verified Tier 4 Primary Plaintiffs in the Allocation Pool;

*Second*, the Allocation Neutral shall determine the Final Total Scores for all Derivative Plaintiffs in the Allocation Pool by multiplying the Final Total Scores of their respective corresponding Primary Plaintiffs by three and one-half percent (3.5%);

*Third*, having established Final Total Scores for all Plaintiffs qualified to participate in a given Allocation Pool, the Allocation Neutral will sum all of those Final Total Scores to determine the total points for that Allocation Pool ("Aggregate Final Score");

*Fourth*, the Allocation Neutral shall determine the aggregate amount of money in the Allocation Pool for all Verified Tier 4 Primary Plaintiffs and their corresponding Derivative Plaintiffs eligible for payments under Section VII.B of this Agreement as follows:

i.    Add the portion of the Settlement Amount allocated to the Master Docket and all interest earned thereupon pursuant to Section III.B of this Agreement;

ii.    Subtract from the sum referenced in the preceding clause (i) the Allocation Neutral's reasonable costs, fees and expenses allocated to that Master Docket to the extent, if any, that such costs, fees and expenses exceed the interest on the Settlement Amount allocated to that Master Docket;

iii.    Subtract further all Preliminary Payments to Plaintiffs in Tiers 1-3 for that Master Docket; and

iv.    Subtract further all Qualifying Surgery payments and Mixed Orthopedic Injury payments, if any, to Plaintiffs in that Master Docket, the result of which shall be the "Net Allocation Pool Amount";

*Fifth*, the Allocation Neutral will divide the Net Allocation Pool Amount for each Allocation Pool by the Aggregate Final Score for that Allocation Pool to determine the final value of each point within the Allocation Pool ("Final Point Value").

*Sixth*, for each Plaintiff in the Allocation Pool with a Final Total Score, the Allocation Neutral shall multiply each such Plaintiff's Final Total Score by the Final Point Value for that Plaintiff's Allocation Pool ("Anticipated Total Payment").

*Seventh*, the Allocation Neutral shall reduce each such Plaintiff's Anticipated Total Payment by the sum of his or her Preliminary Payments to determine the amount of his or her Final Distribution; provided, however, that if the total of all such Plaintiffs' Final Distributions in a particular Allocation Pool differs from the Net Allocation Pool Amount less the sum of (i) all Initial Payments and Interim Payments to all Verified Tier 4 Primary Plaintiffs in that Allocation Pool and (ii) all Initial Payments and Interim Payments to corresponding Derivative Plaintiffs, the difference shall be apportioned *pro rata*.

**B.    Notice to Plaintiffs of Final Distribution**

Once the Allocation Neutral has conducted the calculation set forth in Section XV.A of this Agreement for Plaintiffs in a given Allocation Pool, the Allocation Neutral shall send to Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive a notice setting forth the Final Total Score for each Primary Plaintiff and Derivative Plaintiff participating in that Allocation Pool; the Aggregate Total Score for all Plaintiffs in a given Allocation Pool; and the amount of each such Primary Plaintiff's and Derivative Plaintiff's Final Distribution, if any, (collectively, "Final Distribution Calculation Notice").

**C.    Final Distribution Logistics**

Thirty (30) days after the WTC Captive receives the Final Distribution Calculation Notice for any Allocation Pool, the WTC Captive or its designee shall distribute jointly to each Plaintiff in that Allocation Pool and his or her counsel each such Plaintiff's Final Distribution, if any. All Final Distributions shall be applied against and within the Settlement Amount.

**XVI.  PERMANENT DISABILITY FUND**

The WTC Captive shall capitalize fully from within the Settlement Amount a Permanent Disability Fund in the amount specified in Section II.B.iii of this Agreement. The Permanent Disability Fund shall be subject to the following terms and conditions:

A.    **Application Criteria for a Permanent Disability Fund Award**

To apply for an award from the Permanent Disability Fund, a Primary Plaintiff must:

i.      Claim eligibility for the Permanent Disability Fund in the Eligible Plaintiff List, unless the Primary Plaintiff receives a disability award and/or a line of duty death benefit after the submission of the Eligible Plaintiff List, in which case the Primary Plaintiff is entitled to make a Permanent Disability Fund Award application to the Allocation Neutral consistent with the other requirements of this Section XVI;

ii.     Execute the Release and Covenant Not to Sue;

iii.    Have satisfied the requirements of the Work Verification Procedure (as evidenced by the Primary Plaintiff's inclusion on the "pre-approved list" or by the Allocation Neutral's determination pursuant to the requirements set forth in Exhibit B to this Agreement);

iv.    Submit a Claim Form with Schedule A (Permanent Disability Fund) attached thereto alleging eligibility to participate in the Permanent Disability Fund;

v.     Submit with his or her Claim Form all documents pertaining to Permanent Disability Fund eligibility as set forth in Section XVI.B of this Agreement and calculation of Permanent Disability Fund awards as set forth in Section XVI.D of this Agreement; and

vi.    With respect to all Primary Plaintiffs who are or were employed by the Fire or Police Departments of the City of New York, the Primary Plaintiff must have received a determination of accidental disability pursuant to New York City Administrative Code §§ 13-252, 13-258, 13-353, 13-364 or 13-366 or R.S.S.L. § 507 (but not an ordinary disability determination pursuant to New York City Administrative Code §§ 13-251, 13-257, 13-352, 13-362 or 13-363 or R.S.S.L. § 506), a line of duty death determination or, subject to the other requirements of this Section XVI, the Primary Plaintiff has applied for such an accidental disability determination or line of duty death determination and has received a Police or Fire Department medical board determination recommending that the determination be granted; provided, however, that all such Primary Plaintiffs deemed "eligible for light duty" but who do not have a subsequent accidental disability determination by a pension board pursuant to New York City Administrative Code §§ 13-252, 13-258, 13-353, 13-364 or 13-366 or R.S.S.L. § 507 shall not be eligible to recover from the Permanent Disability Fund.

**B.    Eligibility to Recover an Award from the Permanent Disability Fund**

Primary Plaintiffs who meet the application criteria provided in Section XVI.A of this Agreement shall be eligible for an award from the Permanent Disability Fund only if:

i.    The disability or line of duty death benefit documentation appended to the Primary Plaintiff's Claim Form (including without limitation a report from the Fire Department of New York Bureau of Health Services Committee setting forth recommendations concerning the Primary Plaintiff's disability or line of duty death benefit application) relates, by statutory presumption or otherwise, in whole or in part to his or her work or volunteer service at the WTC Site or other locations at which the Primary Plaintiff alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them as demonstrated either by:

a.    Express reference(s) in that documentation to Section 363(g) of the Retirement and Social Security Law, also known as the WTC Bill, the World Trade Center Bill, the World Trade Center Disability Law, and Chapter 93 of the Laws of 2005 (hereinafter, the "WTC Bill") or to an asserted relationship between the Primary Plaintiff's disabling injury(ies) and/or death, on the one hand, and his or her work or volunteer service at the WTC Site and/or at other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims, on the other hand.  If a Primary Plaintiff claims that an "asserted relationship" as used in the preceding sentence satisfies the eligibility requirements of this Section XVI.B.i.a, the Allocation Neutral may consider, among other documents available to it that it considers relevant to such an "asserted relationship," if any, (1) a comparison in the Primary Plaintiff's disability or line of duty death benefit documentation to the lack of symptoms before and the presence of symptoms on or after September 11, 2001; (2) a comparison in the Primary Plaintiff's disability or line of duty death benefit documentation to symptoms existing before and after, or to symptoms worsening after, September 11, 2001, in which case the Primary Plaintiff's Baseline PDF Score shall be reduced by fifty percent (50%) pursuant to Section XVI.D.iii of this Agreement; (3) any statement in the Primary Plaintiff's disability documentation submitted to the Allocation Neutral which refers to the Primary Plaintiff's development of symptoms and/or illness during work or volunteer service at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them; or (4) references in the Primary Plaintiff's disability or line of duty death benefit documentation to the Primary Plaintiff's presence at, and/or to his or her exposure to dust, toxins, contaminants, smoke and/or

products of combustion at, the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, but only if the Allocation Neutral concludes based upon the totality of the information available to it that such reference(s) constitute a affirmative statement connecting the Primary Plaintiff's disabling injury(ies) or line of duty death benefit to his or her work or volunteer service at the WTC Site or at other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims; or

b.      With respect to Social Security disability determinations only, by the Allocation Neutral's determination that the Primary Plaintiff was disabled based upon or died because of a Qualifying Injury presumed by virtue of the WTC Bill to be causally related to exposures at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to Debris Removal Claims against the Insureds or any of them;

provided, however, that any Primary Plaintiff disabled or who received a line of duty death benefit exclusively due to Post Traumatic Stress Disorder and/or other psychological condition shall be ineligible to participate in the Permanent Disability Fund regardless of any asserted and/or statutorily presumed relationship of such condition(s) to the Primary Plaintiff's alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them;

ii.      The Allocation Neutral determines that:

a.      The Primary Plaintiff received a final permanent disability determination or a line of duty death benefit from an Adjudicatory Body on or before the date upon which the Allocation Neutral distributes the assets in the Permanent Disability to the Primary Plaintiffs eligible to participate in that distribution as set forth in this Section XVI.B; or

b.      The Primary Plaintiff's employer, its workers' compensation carrier, or any licensed physician retained by such employer or workers' compensation carrier has supported in writing the Primary Plaintiff's application for permanent disability benefits which is still pending as of the date the Allocation Neutral reviews the Primary Plaintiff's Claim Form; or

c.      The Primary Plaintiff is or was employed by the Fire Department of the City of New York, and the 1-b medical board of the New York City Fire Department Pension Fund has approved his or her application for permanent disability benefits or line of duty death

benefits; provided, however, that no Primary Plaintiff whose application for permanent disability or line of duty death benefit has been rejected by the Fire Department of the City of New York Pension Board as of the date of the Allocation Neutral's distribution of the Permanent Disability Fund awards shall be eligible; or

d.    The Primary Plaintiff is or was employed by the Police Department of the City of New York, and the Medical Board of the Police Pension Fund of the Police Department of the City of New York has approved his or her application for permanent accidental disability benefits or line of duty death benefits; provided, however, that no Primary Plaintiff whose application for permanent accidental disability or line of duty death benefit has been rejected by the Police Department of the City of New York Pension Board as of the date of the Allocation Neutral's distribution of Permanent Disability Fund awards shall be eligible; or

e.    The Primary Plaintiff is deceased as of the Final Settlement Agreement Effective Date and:

(i)    The Allocation Neutral determines, based upon the Primary Plaintiff's Claim Form and Qualifying Medical Records, that the Primary Plaintiff's death was potentially related or related to his or her exposure at the WTC Site or other locations at which Primary Plaintiff alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, such that the Primary Plaintiff satisfies the Medical Proof Criteria for "H1" or "H2" on the Settlement Grid; or

(ii)    The Primary Plaintiff's heirs or assigns received WTC-related death benefits, established by documentation confirming such benefits submitted to the Allocation Neutral with the deceased Primary Plaintiff's Claim Form; and

(iii)    For Primary Plaintiffs employed by the Fire or Police Departments of the City of New York, (a) the Primary Plaintiff receives or has been recommended by a Police or Fire Department medical board for accidental disability benefits pursuant to New York City Administrative Code §§ 13-252, 13-258, 13-353, 13-364 or 13-366 or R.S.S.L. § 507, but not ordinary disability benefits pursuant to New York City Administrative Code §§ 13-251, 13-257, 13-352, 13-362 or 13-363 or R.S.S.L. § 506; (b) the Primary

Plaintiff's heirs or assigns receive or received a line of duty death benefit relating to the Primary Plaintiff's work giving rise to his or her Debris Removal Claims; or (c) a medical board of the Fire or Police Department of the City of New York has recommended the Primary Plaintiff for line of duty death benefits relating to his or her work giving rise to his or her Debris Removal Claims.

**C.     Verification of Eligibility**

Within thirty (30) days after its receipt of the Eligible Plaintiff List, the WTC Captive shall consult with Plaintiffs' Liaison Counsel concerning which Primary Plaintiffs satisfy the Permanent Disability Fund's eligibility requirements. Within fifteen (15) days thereafter, the WTC Captive shall provide the Allocation Neutral and Plaintiffs' Liaison Counsel with a list of all Primary Plaintiffs who the WTC Captive and Plaintiffs' Liaison Counsel agree are eligible for an award from the Permanent Disability Fund. All Primary Plaintiffs on the WTC Captive's list shall be eligible for the Permanent Disability Fund unless the Allocation Neutral determines otherwise. In addition, within fifteen (15) days after the WTC Captive's submission, Plaintiffs' Liaison Counsel may provide the Allocation Neutral with a supplemental list of additional Primary Plaintiffs, including without limitation Disability Applicants, who Plaintiffs' Liaison Counsel contend satisfy the Permanent Disability Fund's eligibility requirements as set forth in this Agreement. Together with that supplemental list, Plaintiffs' Liaison Counsel shall submit to the Allocation Neutral true and correct copies of all final disability determinations from an Adjudicatory Body and any other documentation forming the basis or bases of Plaintiffs' Liaison Counsel's supplemental eligibility contentions. After considering Plaintiffs' Liaison Counsel's submission and all supporting documentation, the Allocation Neutral shall determine which Primary Plaintiffs, if any, from Plaintiffs' Liaison Counsel's supplemental list shall be eligible for an award from the Permanent Disability Fund. This determination shall be final and binding upon all Parties unless it is the subject of a timely Reconsideration Request pursuant to Section XIV of this Agreement.

**D.     Calculation of Individual Permanent Disability Fund Awards**

For purposes of calculating individual Permanent Disability Fund awards, all Primary Plaintiffs who apply for an award from the Permanent Disability Fund as set forth in Section XVI.A of this Agreement and who the Allocation Neutral determines pursuant to Section XVI.B of this Agreement are eligible for such an award will be awarded 100 Points (hereinafter, the "Baseline PDF Score") irrespective of their Qualifying Injuries or Final Total Scores. The Allocation Neutral shall distribute the Permanent Disability Fund among eligible applicants after making the following adjustments to the Baseline PDF Score to establish an "Adjusted PDF Score," as follows:

i.    Add five percent (5%) to the Baseline PDF Score for each year younger than 35 the Primary Plaintiff was as of September 11, 2001 (up by a maximum of fifty percent (50%)), such that, for example, a Primary Plaintiff who was 30 on September 11, 2001, would have an adjusted Baseline PDF Score of 125; or decrease the Baseline PDF Score by five percent (5%) for each year older than 45 the Primary Plaintiff was as of September 11, 2001 (down by a maximum of fifty percent (50%)), such that, for example, a Primary Plaintiff who was 50 on September 11, 2001, would have a PDF Score of 75;

ii.    Reduce the product of step i by sixty-six and two-thirds percent (66.67%) if the Primary Plaintiff is in the Allocation Pool for Master Docket 21 MC 102, or reduce the product of Step i by fifty percent (50%) if the Primary Plaintiff is in the Allocation Pool for Master Docket 21 MC 103;

iii.    Reduce the product of step ii by one half (a fifty percent (50%) reduction) if the Allocation Neutral determines that an eligible Primary Plaintiff's final permanent disability award relates to or includes injuries pre-dating, and/or other injuries or conditions unrelated to, the Primary Plaintiff's work or volunteer service at the WTC Site or other work or volunteer service giving rise to his or her Debris Removal Claims against the Insureds or any of them.  This fifty percent (50%) decrease also shall apply to any Primary Plaintiff who was first disabled due to injuries or conditions other than those specified in the Cancer Bill (R.S.S.L. § 363-d) or the Lung Bill (R.S.S.L. § 363-f) and which the Allocation Neutral determines are unrelated to the Primary Plaintiff's work or volunteer service at the WTC Site (*e.g.*, a disabling off-site orthopedic injury) or other work or volunteer service giving rise to his or her Debris Removal Claims against the Insureds or any of them, but who was subsequently granted disability under the WTC Bill;

iv.    Reduce the product of step iii by one-half (a fifty percent (50%) reduction) if the Primary Plaintiff qualifies for the Permanent Disability Fund under Sections XVI.B.ii.b, XVI.B.ii.c or XVI.B.ii.d of this Agreement;

v.    Reduce the product of step iv by one-half (a fifty percent (50%) reduction) if the Primary Plaintiff qualifies for the Permanent Disability Fund only because the Allocation Neutral determines that his or her death was potentially related to alleged exposure during work or volunteer service at the WTC Site or other locations at which he or she alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them such that the Primary Plaintiff satisfies the Medical Proof Criteria for "H1" on the Settlement Grid; and

vi.     Increase the points after step v by one-fifth (a twenty percent (20%) increase) if the Allocation Neutral finds that the Primary Plaintiff meets the Medical Proof Criteria for Qualifying Injuries B3, B4, C3, C4 and/or I2.

If the net result of the above calculations reduces an eligible Primary Plaintiff's Adjusted PDF Score to less than twenty-five (25) Points for those Primary Plaintiffs in Master Docket 21 MC 100, eight and one-third (8.33) Points for those Primary Plaintiffs in Master Docket 21 MC 102, and twelve and one-half (12.5) Points for those Primary Plaintiffs in Master Docket 21 MC 103 (collectively, Master Docket-Specific PDF Score Floor), the Allocation Neutral shall increase that Plaintiff's Adjusted PDF Score to his or her Master Docket-Specific PDF Score Floor.

After completing the above Adjusted PDF Score calculation for each Primary Plaintiff who applied and who is eligible to recover from the Permanent Disability Fund, the Allocation Neutral shall determine the sum of all eligible Primary Plaintiffs' Adjusted PDF Scores (hereinafter, the "Aggregate PDF Score").

The Allocation Neutral shall then determine the amount of money available for allocation among Primary Plaintiffs eligible to recover from the Permanent Disability Fund as set forth in Section XVI.B by taking the amount allocated to the Permanent Disability Fund as set forth in Section II.B.iii of this Agreement, subtracting from that amount the amount of the Allocation Neutral's reasonable costs, fees and expenses allocated to the Permanent Disability Fund pursuant to Section III.C of this Agreement, and adding the income (*e.g.*, interest) on the Settlement Amount allocated to the Permanent Disability Fund ("Net PDF Aggregate Amount"). The Allocation Neutral shall then divide the Net PDF Aggregate Amount by the Aggregate PDF Score to determine the value of each Point for purposes of the Permanent Disability Fund awards (hereinafter, the "PDF Point Value"). By multiplying the PDF Point Value by each Primary Plaintiff's Adjusted PDF Score, the Allocation Neutral shall determine the Permanent Disability Fund award to each eligible applicant for such an award.

The Allocation Neutral's calculation of each eligible Primary Plaintiff's award from the Permanent Disability Fund shall be final and binding upon all Parties, unless it is the subject of a timely Reconsideration Request pursuant to Section XIV of this Agreement.

E.      **Expedited Disbursement of Permanent Disability Fund Awards**

The Parties intend that the Allocation Neutral will expedite, to the extent practicable, awards from the Permanent Disability Fund. To this end, the Allocation Neutral may cause awards from the Permanent Disability Fund to be distributed before determining all Plaintiffs' Final Distributions. Moreover, the Allocation Neutral may expedite review of Claim Forms for Primary Plaintiffs found eligible for the Permanent Disability Fund who claim eligibility for a B3,

B4, C3, C4 and/or I2 Qualifying Injury, as that determination will play a role in the overall distribution of Permanent Disability Awards.

## XVII. CANCER INSURANCE POLICY

The WTC Captive agrees to fund the purchase of the Cancer Insurance Policy attached as Exhibit E to this Agreement. The WTC Captive shall fund the Cancer Insurance Policy premium from within the Settlement Amount at the amount specified in Section II.B.ii of this Agreement. This Cancer Insurance Policy shall be available to all Primary Plaintiffs (i) who execute the Release and Covenant Not to Sue appended to the Final Settlement Agreement; (ii) who have complied with the Work Verification Procedure (as evidenced by the Plaintiff's inclusion on the "pre-approved list" or by the Allocation Neutral's determination, as set forth more fully in Exhibit B to this Agreement); and (iii) who are otherwise eligible for coverage according to the Cancer Insurance Policy's insuring agreement and other terms, conditions and exclusions. The WTC Captive has no duties or obligations with respect to the Cancer Insurance Policy other than as set forth expressly in this Agreement.

## XVIII. QUALIFYING SURGERY AND MIXED ORTHOPEDIC INJURY PAYMENTS

In addition to all other payments authorized under this Agreement, the Allocation Neutral shall pay those Primary Plaintiffs who demonstrate, in the Allocation Neutral's judgment, a Mixed Orthopedic Injury and/or one or more Qualifying Surgeries as set forth in this Section XVIII.

### A. Mixed Orthopedic Injury Payments

For those Primary Plaintiffs:

i.     Who allege in Schedule B appended to their respective Claim Forms, in addition to one or more Qualifying Injuries, an orthopedic injury, burn, laceration, cut or other similar bodily injury while working or performing volunteer service at the WTC Site or during other work or volunteer services giving rise to the Primary Plaintiff's Debris Removal Claims against the Insureds or any of them (hereinafter, a "Mixed Orthopedic Injury"); and

ii.    Whose names appear on Exhibit I to this Agreement or who are identified on the Eligible Plaintiff List submitted pursuant to Section VI.A of this Agreement as having a Mixed Orthopedic Injury ("Mixed Orthopedic Plaintiff"),

the Allocation Neutral shall direct that the WTC Captive or its designee pay from within the portion of the Settlement Amount allocated to the Mixed Orthopedic Plaintiff's Master Docket as set forth in Section II.B.i of this Agreement up to Ten Thousand Dollars and No Cents ($10,000.00), or any lesser amount that the Allocation Neutral determines is reasonable redress for the particular Mixed Orthopedic Injury at issue. In determining the amount of any such Mixed

Orthopedic Injury payment, the Allocation Neutral shall take into account the nature, severity and temporary or permanent consequences, if any, of the Mixed Orthopedic Plaintiff's Mixed Orthopedic Injury.

Payments to Mixed Orthopedic Plaintiffs shall be in addition to their respective Preliminary Payments, Final Distributions, enrollment in the Cancer Insurance Policy, and Permanent Disability Fund awards, if any.   Payments to Mixed Orthopedic Plaintiffs also shall only apply if the Mixed Orthopedic Plaintiff alleges a Mixed Orthopedic Injury in his or her Claim Form and submitted with that Claim Form Qualifying Medical Records and/or employment records establishing, in the Allocation Neutral's judgment that:

i.      The Mixed Orthopedic Injury transpired while the Primary Plaintiff was present at the WTC Site or during other work or volunteer services giving rise to his or her Debris Removal Claims against the Insureds or any of them;

ii.     Conditions at the WTC Site or at other locations at which the Primary Plaintiff performed World Trade Center-related work or volunteer services caused the Primary Plaintiff's Mixed Orthopedic Injury; and

iii.    The Primary Plaintiff filed suit against the Insureds or any of them, or provided written notice of claim to the City of New York, within three years of the date of the Primary Plaintiff's Mixed Orthopedic Injury, unless the Primary Plaintiff filed a notice of claim against the City of New York on or after September 16, 2009, but before the due date for the Eligible Plaintiff List specified in Section VI.A of this Agreement.

**B.    Qualifying Surgery Payments**

For a Primary Plaintiff who:

i.      Alleges in Schedule B to his or her Claim Form that he or she underwent one or more of the surgical procedures listed on Exhibit D to this Agreement ("Qualifying Surgeries");

ii.     Demonstrates, in the Allocation Neutral's judgment, through Qualifying Medical Records submitted with his or her Claim Form the existence of one of the Qualifying Injury(ies) associated with a Qualifying Surgery as specified in Exhibit D;

iii.    Demonstrates, in the Allocation Neutral's judgment, that his or Qualifying Surgery is not most likely explained by a condition or incident separate and apart from his or her pertinent Qualifying Injury in the Allocation Neutral's judgment; and

iv.    Demonstrates, in the Allocation Neutral's judgment, that the Qualifying Injury that necessitated the Qualifying Surgery did not pre-date the Plaintiff's work or volunteer service giving rise to his or her Debris Removal Claims,

the Allocation Neutral shall direct the WTC Captive or its designee to pay to the Primary Plaintiff from within the amount of the Settlement Amount allocated to the Primary Plaintiff's Master Docket as set forth in Section II.B.i of this Agreement the payment indicated for the Primary Plaintiff's Qualifying Surgery as listed on Exhibit D.

## XIX.   LIENS, ASSIGNMENT RIGHTS AND OTHER THIRD-PARTY PAYOR CLAIMS

Each Plaintiff shall identify to the Allocation Neutral on his or her Claim Form all known lien holders with claims against any payment to be received by the Plaintiff under the Final Settlement Agreement, including without limitation all third-party public or private payors that have paid for and/or reimbursed Plaintiffs for medical expenses, pharmacy expenses, disability benefits, or any other costs and expenses incurred due to or arising out of injuries alleged in the Disaster Site Litigation. The Allocation Neutral shall develop procedures with respect to Plaintiffs' duty to identify all such lien holders.

### A.    Federal Medicare (Parts A and B)

The Allocation Neutral's procedures shall include the appointment of Garretson as Lien Resolution Administrator to perform certain functions pursuant to this Section XIX.A in connection with claims that may be asserted by federal Medicare (Parts A and B) ("Medicare"). Each Plaintiff participating in the Allocation Process shall identify to the Lien Resolution Administrator on his or her Claim Form all Medicare obligations known to them with respect to all payments they receive by virtue of the Final Settlement Agreement, through procedures and protocols to be established by the Lien Resolution Administrator. Plaintiffs and their counsel must cooperate with the procedures and protocols established by the Lien Resolution Administrator.

The Lien Resolution Administrator shall exercise reasonable efforts to confirm the Medicare claim information provided by Plaintiffs, and to identify any additional Medicare claims not reported on Plaintiffs' Claim Forms. The Lien Resolution Administrator shall resolve all claims that have been or may be asserted by Medicare based upon the provision of medical care or treatment provided to the Plaintiff connected with or alleged to be connected with Debris Removal Claims settled pursuant to the Final Settlement Agreement; provided that nothing herein is intended to create a right of reimbursement where none would otherwise exist under applicable state or federal tort recovery statutes.

Within ninety (90) days after the Final Settlement Agreement Effective Date, or within any reasonable extension of that ninety (90) days agreed to in writing by

Plaintiffs' Liaison Counsel and the WTC Captive, the Lien Resolution Administrator shall as to each Plaintiff certify whether any reimbursement claim is being asserted by Medicare as to such Plaintiff and, where any such claim is determined to exist, either: (1) the amount to resolve such claim as established by the agreement of the Lien Resolution Administrator and the Medicare agency ("Final Medicare Lien Amount"); or (2) the "holdback" amount or other mechanism agreed to by the Medicare agency under which said agency has agreed to finally resolve its claim for reimbursement of past and/or future Medicare payments ("Resolution Amount").

In addition to resolution of reimbursement claims defined in this Section XIX.A, the appointed Lien Resolution Administrator shall cooperate with the WTC Captive and its outside service providers and respond to their reasonable requests for information required to fulfill the settlement reporting duties associated with Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007.

The Allocation Neutral/Lien Resolution Administrator shall not be responsible for identifying or resolving any liens other than the Medicare reimbursement claims described herein, and all other liens shall remain Plaintiffs' sole responsibility. No Plaintiff or Plaintiffs' Counsel shall have any rights or defenses based upon or arising out of any act or omission of WTC Captive and/or the Lien Resolution Administrator and/or the Allocation Neutral with respect to these provisions. Plaintiffs will satisfy, indemnify, repay, and hold the WTC Captive harmless from any and all such claims, liens, and rights to payment, including attorneys' fees.

The costs, fees and expenses incurred by the Lien Resolution Administrator shall be the sole responsibility of Plaintiffs, and such costs, fees and expenses shall not be included in the Allocation Neutral's reasonable costs, fees and expenses to be paid first from interest on the Settlement Amount, and thereafter shared equally by the WTC Captive and Plaintiffs' Liaison Counsel pursuant to Section XI.D of this Agreement. The WTC Captive and the Insureds shall have no responsibility for payment of the Lien Resolution Administrator's costs, fees and expenses.

**B.    Workers' Compensation Liens**

The WTC Captive shall exercise best efforts (i) to assist Plaintiffs who opt into the Final Settlement Agreement to obtain consent from the City of New York and Liberty Mutual Fire Insurance Company to the Final Settlement Agreement for purposes of the Workers' Compensation Law only and (ii) otherwise to obtain waivers or compromises of Workers' Compensation liens against all payments to Plaintiffs, if any, under the Final Settlement Agreement; provided, however, that resolution of all Workers' Compensation liens shall remain Plaintiffs' sole responsibility. Plaintiffs will satisfy, indemnify, repay, and hold the WTC Captive harmless from any and all such claims, liens, and rights to payment, including attorneys' fees.

C.     **All Other Liens, Assignment Rights and Other Third-Party Payor Claims**

In addition to the foregoing provisions, all other liens, assignment rights and other third party payor claims – including, without limitation, all liens by all other third-party payors, all subrogation claims, liens, or other rights to payment relating to medical treatment or lost wages, or any liens based on any legal expenses, bills, or costs that have been or may be asserted by any health care provider, insurer, employer, attorney or other person or entity – shall remain Plaintiffs' sole responsibility.   Plaintiffs will satisfy, indemnify, repay, and hold the WTC Captive harmless from any and all such claims, liens, and rights to payment, including attorneys' fees.

D.     **Plaintiffs' Representations and Warranties Regarding All Liens, Assignment Rights and Other Third-Party Payor Claims**

Prior to receiving any Preliminary Payment or Final Distribution, each Plaintiff shall represent and warrant to the Allocation Neutral that any liens or other claims identified above have been or will be satisfied by the Plaintiff.  The Allocation Neutral shall be under no obligation to cause any payment to be made to a Plaintiff who fails to provide satisfactory proof to the Allocation Neutral that all such liens have been or will be satisfied or compromised.

XX.   **INTERIM STAY**

A.     **Motion for an Interim Stay**

Within ten (10) days after the Effective Date, Plaintiffs and the Insureds shall apply jointly for an interim stay of all Debris Removal Claims in all Master Dockets ("Interim Stay").  The Parties agree to cooperate with respect to their joint applications for an Interim Stay, including without limitation by resisting jointly any opposition to those applications.

Prior to seeking formally the Interim Stay but after the Effective Date, however, the Parties anticipate disclosing this Agreement *in camera* to Hon. Alvin K. Hellerstein to notify him of this Agreement and its terms and to consult with him concerning the purpose and proposed scope and length of the Interim Stay.

B.     **Scope and Length of Interim Stay**

In their application for the Interim Stay, and except with respect to subpoenas authorized expressly pursuant to the Section XI.H of this Agreement and other subpoenas seeking and, if necessary, motions to compel the production of a Primary Plaintiff's medical records in the possession, custody or control of any entity other than the Insureds, the Parties shall request jointly that the court stay all actions in Master Dockets 21 MC 100, 21 MC 102 and 21 MC 103 as to all parties in those actions, including without limitation Plaintiffs and the Insureds, for a period of ninety (90) days.  The Parties also agree that the Interim Stay shall apply to all Debris Removal Claims pending in state court as of the Effective

Date, except with respect to subpoenas for the production of documents authorized expressly pursuant to the Section XI.H of this Agreement. The City of New York also agrees (i) that all examinations of Primary Plaintiffs pursuant to N.Y. General Municipal Law § 50-h are stayed while the Interim Stay is in effect and (ii) that all deadlines relating to such stayed § 50-h examinations are tolled during the period of the Interim Stay.

In addition, notwithstanding the Interim Stay, Primary Plaintiffs who have applied for and/or who receive accidental disability benefits pursuant to New York City Administrative Code §§ 13-252, 13-258, 13-353, 13-364 or 13-366 or R.S.S.L. § 507 may subpoena the New York City Fire Department Pension Fund or the Police Pension Fund of the Police Department of the City of New York for any and all accidental disability records relating to them, provided that such Primary Plaintiffs include a HIPAA-compliant release together with their respective subpoenas.

The Plaintiffs intend to use this ninety (90) day Interim Stay period to attempt to negotiate settlements with Other Defendants consistent with the terms of this Agreement other than the Settlement Amount. Following the expiration of this ninety (90) day period, or at any other time agreed to by the Parties and the court, the Parties will request that the Interim Stay be lifted as to all Debris Removal Claims in Master Dockets 21 MC 100, 21 MC 102 and 21 MC 103 that remain unresolved by the Final Settlement Agreement.

**C.      Interim Stay Is Without Prejudice**

The Parties agree that the Interim Stay shall be without prejudice to any Party's rights in the litigation: (i) should the Final Settlement Agreement not become effective due to the failure to satisfy all of the prerequisites set forth in Section XXII.A of this Agreement; or (ii) should the court lift the Interim Stay for any reason.

**D.      Limited Rights to Apply to Lift the Interim Stay**

If this Agreement is voided pursuant to Section VI.E or XX.E of this Agreement, the Plaintiffs and the Insureds agree to apply jointly to the court to lift the Interim Stay within fifteen (15) days thereafter.

**E.      Each Provision of This Agreement Is Essential and Non-Severable**

Each of the terms, provisions, sections and sub-sections of this Agreement are material and essential to the Parties' meeting of the minds, and are non-severable. If prior to the Final Settlement Agreement Effective Date any court of competent jurisdiction voids, refuses to enforce, or requires the modification or deletion of any provision or provisions hereof, the Parties shall:

i.        Cooperate in presenting argument and evidence to the court in support of a request for reconsideration of the court's order or other directive; and

      ii.     If the request for reconsideration is denied, or the Parties agree that such a request would be futile, the Parties shall in good faith attempt to negotiate mutually agreeable provisions of this Agreement for the sole purpose of addressing the court's stated concerns.

If within sixty (60) days after the date of the court's order or other directive that voids, refuses to enforce, or requires the modification or deletion of any provision or provisions of this Agreement, the Parties are unable to obtain relief or otherwise agree to modify the Agreement pursuant to (ii) above, then any Party shall have the right to void this Agreement and in such circumstances no Party shall oppose the termination of the Interim Stay, if it is then in effect.

## XXI.   <u>MISCELLANEOUS PROVISIONS</u>

### A.    **Entry of Case Management Orders**

On or after the Effective Date, the Insureds will move the court in each Master Docket for entry of the Case Management Order for that Master Docket appended hereto as Exhibit K.  Plaintiffs shall not oppose this application.  Plaintiffs expressly agree to join this motion.

### B.    **Authority to Enter Into This Agreement**

Each counsel signing this Agreement on his or her client's or clients' behalf represents and warrants that he or she is authorized to enter into this Agreement. In addition, each counsel signing this Agreement represents and warrants that, in exercising his or her independent professional judgment, he or she will recommend to each of his or her clients that each participate in the Final Settlement Agreement.

### C.    **No Effect on Parties' Rights Against Non-Parties**

Except as provided in Section II.E of this Agreement, nothing in this Agreement shall affect any rights or claims any Party has or may later have against a non-party to this Agreement.

### D.    **No Admissions**

Except with respect to any action by a Party or Parties to compel another Party or Parties to enter into Final Settlement Agreement consistent with this Agreement in the event that the Opt-In Threshold as described in Section VI of this Agreement is satisfied, no Party is admitting liability or conceding any position or fact, including causation of injury or lack thereof, in this Agreement. Furthermore, none of the Allocation Neutral's determinations shall be accorded collateral estoppel effect in any case in any Master Docket or in any other pending or future litigation.

**E.      Admissibility of this Agreement**

This Agreement is subject to Federal Rule of Evidence 408 and analogous protections under all U.S. states' rules of evidence; provided, however, that this Agreement shall be admissible for any purpose in any action brought by any Party or Parties to enforce this Agreement and/or to compel any other Party or Parties to enter into a Final Settlement Agreement consistent with this Agreement in the event that the Opt-In Threshold as described in Section VI of this Agreement is satisfied.

Consistent with this understanding, no Party and no counsel to any Party to this Agreement shall seek to introduce or offer the terms of this Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Agreement, or any statements in the documents delivered in connection with this Agreement, in any judicial proceeding, except as rendered admissible by the foregoing provisions.

**F.      Governing Law**

This Agreement shall be governed in all respects by the laws of the State of New York without regard to choice of law principles.

**G.      Exclusive Venue and Jurisdiction in the Event of Any Disputes**

The Parties agree that any dispute regarding this Agreement shall be venued in the United States District Court for the Southern District of New York.  In addition, no Party shall contest the jurisdiction of the United States District Court for the Southern District of New York to hear any dispute regarding this Agreement.

**H.      Lobbying Restrictions**

As of the Effective Date, the Parties and their respective counsel agree not to lobby any member of the United States Congress, any such member's staff, or the media in a manner that undermines or disparages, or could reasonably be construed to undermine or disparage, any pending or future legislation limiting the Insureds' potential liability with respect to Debris Removal Claims and/or New Debris Removal Claims.  Nothing in this Section XXI.H shall restrict, or shall be construed to restrict, any Party's counsel's ability to practice law.

**I.      No Oral Modifications**

This Agreement may be modified only by a writing signed (i) by all of the Parties; or (ii) by Plaintiffs' Liaison Counsel, the WTC Captive's counsel, and the Defendant Insureds' Counsel.

J.    **Merger Clause**

This Agreement constitutes the Parties' entire agreement as respects its subject matter.  All discussions and any and all oral or written agreements previously entered into or entertained by Parties or any of them concerning this Agreement or any of its subject matter are hereby merged into this Agreement.

K.    **Confidentiality**

The Parties anticipate the *in camera* disclosure of this Agreement to Hon. Alvin K. Hellerstein as contemplated in Section XX.A of this Agreement.  Prior to that *in camera* disclosure, this Agreement and all of its terms and conditions shall remain strictly confidential and its contents or existence shall not be disclosed by any Party for any reason.  After that *in camera* disclosure, this Agreement shall not be confidential and may be disclosed without limitation by any Party; provided, that nothing in this Section XXI.K shall void or otherwise affect the Parties' continuing obligations under the Confidentiality and Non-Disclosure Agreement ("Confidentiality Agreement") effective as of September 6, 2007, to maintain the confidentiality of Confidential Information as defined by the Confidentiality Agreement; provided, further, that because Exhibit I ("List of Plaintiffs Potentially Eligible for Mixed Orthopedic Injury Payments") includes certain Primary Plaintiffs' names, it may only be disclosed with all names redacted.

L.    **Statements to the Media**

No Party shall make any statement to the media concerning this Agreement or any of its terms prior to the *in camera* disclosure of this Agreement to Hon. Alvin K. Hellerstein as contemplated in Section XX.A of this Agreement. Following that *in camera* disclosure, however, the Parties may issue press release(s) announcing this Agreement and may without limitation make public statements or comments to any member of the media regarding this Agreement; provided, however, that in making such public statements or comments no Party shall disparage another with respect to this Agreement, any aspect of the negotiation of this Agreement, or Debris Removal Claims generally.  Nothing in this Section XXI.L shall affect in any way counsel's private consultations with their respective clients; provided however, that counsel hereby covenant not to make any misrepresentations with respect to the Agreement in communications with their clients.

M.    **Sanctions for Breach of This Agreement's Confidentiality, Lobbying and/or Media Statement Provisions**

The Parties and their counsel agree that any breach of Sections XXI.K (confidentiality), XXI.H (lobbying), and/or XXI.L (media) of this Agreement by any Party or Parties or by any of their respective counsel shall subject the offending Party(ies) and its or their counsel to liquidated damages in the amount of Fifty Thousand Dollars and No Cents ($50,000.00), to be awarded in the Hon.

Alvin K. Hellerstein's discretion upon application to him filed under seal by counsel for any non-breaching Party or Parties. In addition, any Party and/or its counsel found by the Hon. Alvin K. Hellerstein to have breached willfully Sections XXI.K (confidentiality), XXI.H (lobbying), and/or XXI.L (media) of this Agreement shall pay the non-breaching Party's or Parties' costs and expenses, including reasonable attorneys' fees, relating to the liquidated damages application described in this Section XXI.M.

**N.    Arm's Length Negotiations**

This Agreement is the product of arm's length negotiations between and among the Parties. All of the Parties have been represented by, and have conferred with, their respective counsel regarding all aspects of this Agreement.

**O.    No Contingencies Except the Opt-In Threshold, Entry of the Case Management Order, and Non-Severability**

Except as provided in (i) Section VI.E of this Agreement with respect to the WTC Captive's exclusive right to void this Agreement, (ii) Section XXI.A of this Agreement with respect to entry by the court of the Case Management Orders in each Master Docket, and (iii) Section XX.E of this Agreement regarding non-severability, each Party represents and warrants that there are no pending conditions, agreements, transactions or negotiations that would render this Agreement or any part thereof void, voidable or unenforceable.

**P.    Other Defendants that Become Parties to the Final Settlement Agreement**

The Parties acknowledge that Plaintiffs have asserted Debris Removal Claims against Other Defendants. Other Defendants may become signatory(ies) to the Final Settlement Agreement, subject to negotiations with them concerning their respective reasonable financial contributions to the settlement, including without limitation such Other Defendants' contributions to the Allocation Neutral's reasonable costs, fees and expenses such that all Parties' obligations hereunder with respect to those costs, fees and expenses are reduced proportionately, and the other terms and conditions of their participation as parties to the Final Settlement Agreement. To the extent that Other Defendants join the Final Settlement Agreement as parties, the Parties will use their best efforts to incorporate those Other Defendants' respective financial contributions to the final settlement in a manner consistent with this Agreement.

**Q.    WTC Captive as Party to This Agreement**

Notwithstanding any other provision of this Agreement or any other provision of law, the Parties acknowledge that (i) the WTC Captive entered voluntarily into this Agreement as a Party for the sole purpose of resolving the Debris Removal Claims against its Insureds and (ii) by virtue of its status as a Party to this Agreement or otherwise, nothing in this Agreement waives, alters, or amends any

of the terms or conditions of the WTC Captive's Policy, and all of the WTC Captive' rights and defenses under its Policy are reserved expressly.

Furthermore, without limiting the forgoing provisions of this Section XXI.Q and notwithstanding any other provision of this Agreement or any other provision of law, the WTC Captive's obligations under this Agreement are limited solely to (i) payment of the Settlement Amount; (ii) payment of interest on the Settlement Amount as provided in Section III.B of this Agreement; and (iii) payment of the Contingent Payment, if any, in accordance with Section IV of this Agreement. Plaintiffs and each of them shall have no other claims or rights of any kind against the WTC Captive by virtue of this Agreement.  In addition, to the extent that Plaintiffs or any of them commence any proceeding(s) against the WTC Captive that is determined to violate the limitations of this Section XXI.Q, the WTC Captive shall be entitled to recover its costs of defending that proceeding, including without limitation its attorneys' fees, from the Plaintiff(s) that commenced such proceeding.

Nothing in this Section XXI.Q shall limit or otherwise affect in any way any of the Plaintiffs' duties and/or obligations set forth anywhere in this Agreement.

**R.  Joint Drafting of This Agreement**

The Parties jointly prepared this Agreement and the language of all parts of this Agreement shall be construed as a whole according to its meaning and not strictly for or against any Party.  Without limiting the forgoing provisions of this Section XXI.R, none of the provisions in this Agreement shall be construed strictly against the WTC Captive or any of the Insureds because of their status as insurance companies, if applicable.

**S.  Headings are for Convenience Only**

Section and paragraph headings in this Agreement are for convenience only and shall not affect the meaning of any aspect of this Agreement.

**T.  Application of Deadlines**

All deadlines and other time periods in this Agreement, including those set forth in Exhibit J, are measured in calendar days, but if any deadline or the expiration of any other time period falls on a non-business day, such deadline or other time period is extend by virtue of this Section XXI.T until the next business day.  For purposes of this Agreement, business days are all days, other than Saturday, Sunday, or any other day on which commercial banks in the City of New York are required or authorized by law to be closed.

U.    **Notice**

All notices required by this Agreement as between and among the Parties or any of their respective counsel shall be deemed provided when received, and shall be sent only in the following manner:

i.      Certified or registered mail, return receipt requested;

ii.     Overnight delivery; or

iii.    Hand delivery.

A copy of each such notice also shall be sent to the recipient by e-mail or facsimile.

All notices required by this Agreement shall be sent to the following:

On behalf of the WTC Captive:

Margaret H. Warner, Esquire
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
Main: 212.547.5400
Direct:  202.756.8228
Facsimile: 202.591.2764
E-mail: mwarner@mwe.com

On behalf of the Insureds:

James E. Tyrrell, Jr., Esquire
Patton Boggs LLP
One Riverfront Plaza, 6th Floor
Newark, NJ 07102
Main: 973.848.5600
Direct: 973.848.5620
Facsimile: 973.848.5601
E-mail: jtyrrell@pattonboggs.com

<u>On behalf of Plaintiffs or any of them:</u>

Paul J. Napoli, Esquire
Worby Groner Edelman & Napoli Bern, LLP
350 5th Avenue, Suite 7413
New York, NY 10118
Main: 212.267.3700
Facsimile: 212.587.0031
E-mail: pnapoli@napolibern.com

**V.     Manner of Execution of This Agreement**

This Agreement may be executed in counterpart originals with the same force and effect as if fully and simultaneously executed as a single document. Facsimile or e-mailed signatures shall have the same force and effect as original signatures.

**W.     Amendments**

This Agreement may not be amended or modified, except in writing signed by the WTC Captive, Defendant Insureds' Counsel on behalf of the Insureds, Plaintiffs' Liaison Counsel on all Plaintiffs' behalf, and by other parties, if any, to this Agreement or their respective counsel.

**X.     Non-Waiver**

Except where a specific period for action or inaction is provided herein, no waiver of a right, power or privilege provided by this Agreement shall be implied or inferred from any Party's delay, failure to exercise, incomplete exercise or partial waiver of such right, power or privilege.

**XXII.  FINAL SETTLEMENT AGREEMENT PROVISIONS**

**A.     Affirmation of Final Settlement Agreement**

This Agreement shall be deemed the Final Settlement Agreement upon satisfaction of the following prerequisites:

i.      Satisfaction of the Opt-In Threshold as set forth in Section VI.D of this Agreement; and

ii.     The WTC Captive does not exercise its exclusive right to void this Agreement pursuant to Section VI.E of this Agreement; and

iii.    Entry of the Case Management Orders pursuant to Section XXI.A of this Agreement; and

iv.     No Party exercises its right to void this Agreement pursuant to Section XX.E of this Agreement; and

v.    The Parties acknowledge that this Agreement shall be deemed the Final Settlement Agreement by executing the Affirmation of Final Settlement Agreement attached as Exhibit R to this Agreement.  The Parties shall execute the Affirmation of Final Settlement Agreement within ten (10) days after satisfaction of subsections i-iv, above.

In addition to confirming satisfaction of the Opt-In Threshold set forth in Section VI.D, the Affirmation of Final Settlement Agreement shall specify the actual Section VI.D.i aggregate opt-in percentage achieved for purposes of calculating the amount of any additional payment due to Plaintiffs under Section VI.E of this Agreement.

Sections XXII.B to XXII.D shall be given effect immediately upon the Final Settlement Agreement Effective Date but shall have no effect until that time.  In addition, immediately upon the Final Settlement Agreement Effective Date, this Agreement shall be referred to thereafter as the Final Settlement Agreement.

**B.    Dismissal With Prejudice**

Within fifteen (15) days after the Final Settlement Agreement Effective Date, Plaintiffs who opted into the settlement shall dismiss with prejudice, and without exception, all of their Debris Removal Claims against the Insureds using the form of Stipulated Order of Dismissal With Prejudice Pursuant to Final Settlement Agreement attached as Exhibit T to this Agreement.

**C.    Dismissal of *Walcott* Action**

Within fifteen (15) days after the Final Settlement Agreement Effective Date, Plaintiffs shall dismiss with prejudice their complaint in *Walcott, et al. v. WTC Captive Ins. Co., et al.*, No. 07 Civ. 7072 (S.D.N.Y. 2007), as against all defendants in that action.

**D.    Enforceability**

Section XX.E of this Agreement ("Each Provision of This Agreement Is Essential and Non-Severable") is deleted from the Final Settlement Agreement and is replaced with the following:

Each of the provisions of this Final Settlement Agreement shall be deemed to be severable in the event any provision or provisions of this Final Settlement Agreement are deemed or become voided or unenforceable, in which event the remaining provision or provisions shall remain in full force and effect unless the provision(s) rendered void or unenforceable cause this Final Settlement Agreement to fail in any of its essential purposes.

**[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the Parties, through their respective counsel, have executed this Agreement on the date(s) indicated below.


**On behalf of the WTC Captive Insurance Company, Inc.**


_____

Margaret H. Warner, Esquire
McDermott Will & Emery LLP
*Counsel to the WTC Captive Insurance Company, Inc.*

Date: _____

Witness signature:     _____

Witness name:          _____



**On behalf of the Insureds as defined in this Agreement**


_____

James E. Tyrrell, Jr., Esquire
Patton Boggs LLP
*Counsel to the Insureds*

Date: _____

Witness signature:     _____

Witness name:          _____

**On behalf of all Plaintiffs as defined in this Agreement**

_____
Paul J. Napoli, Esquire
Worby Groner Edelman & Napoli Bern, LLP
*Plaintiffs' Liaison Counsel*

Date: _____

Witness signature:     _____

Witness name:     _____

_____
William H. Groner, Esquire
Worby Groner Edelman & Napoli Bern, LLP
*Plaintiffs' Liaison Counsel*

Date: _____

Witness signature:     _____

Witness name:     _____

_____
Nicholas Papain, Esquire
Andrew J. Carboy, Esquire
Sullivan Papain Block McGrath & Cannavo P.C.
*Plaintiffs' Liaison Counsel*

Date: _____

Witness signature:     _____

Witness name:     _____

## SCHEDULE OF EXHIBITS

**Exhibit A:**    List of WTC Captive Insureds

**Exhibit B:**    Work Verification Procedure

**Exhibit C:**    Settlement Grid

**Exhibit D:**    Qualifying Surgeries

**Exhibit E:**    Cancer Insurance Policy

**Exhibit F:**    Age Adjustment Factor Table

**Exhibit G:**    List of Adjudicatory Bodies

**Exhibit H:**    Second Injury Letter

**Exhibit I:**    List of Plaintiffs potentially eligible for Mixed Orthopedic Injury Payments

**Exhibit J:**    Allocation Process timeline

**Exhibit K:**    Case Management Orders for each Master Docket

**Exhibit L:**    Tier 1 Claim Form

**Exhibit M:**    Tier 2 Claim Form

**Exhibit N:**    Tier 3 Claim Form

**Exhibit O:**    Tier 4 Claim Form

**Exhibit P:**    Release and Covenant Not to Sue

**Exhibit Q:**    Asthma Impairment Criteria

**Exhibit R:**    Affirmation of Final Settlement Agreement

**Exhibit S:**    Stipulation of Dismissal With Prejudice

**Exhibit T:**    Stipulated Order of Dismissal With Prejudice Pursuant to Final Settlement Agreement

**Exhibit U:**    Eligible Plaintiff List Template