21mc100

U.S. DISTRICT COURT
FILED
JUN 2 3 2010
S.D. OF N.Y.

# WORLD TRADE CENTER LITIGATION
## SETTLEMENT PROCESS AGREEMENT, AS AMENDED

The WTC Captive Insurance Company, Inc. ("WTC Captive") and all of its insureds identified on the attached Exhibit A ("Insureds"), on the one hand, and all Primary Plaintiffs (as defined below) and Derivative Plaintiffs (as defined below) (collectively, "Plaintiffs" and singularly, "Plaintiff") with Debris Removal Claims (as defined below) against the Insureds or any of them, on the other hand, hereby agree to the process set forth in this binding and enforceable World Trade Center Litigation Settlement Process Agreement, As Amended ("Agreement") for settling Debris Removal Claims against the Insureds or any of them. For purposes of this Agreement, the WTC Captive, the Insureds, and Plaintiffs shall be referred to collectively as "Parties" and singularly as "Party." This Agreement shall take effect on the day upon which the last counsel to a Party executes this Agreement ("Effective Date"). On the Effective Date, this Agreement will supersede the World Trade Center Litigation Settlement Process Agreement executed by the Parties on March 11, 2010.

## TABLE OF CONTENTS

I. DEFINITIONS .................................................................................................. 2

II. SETTLEMENT AMOUNT ............................................................................. 11

III. SETTLEMENT AMOUNT ADMINISTRATION ......................................... 16

IV. CONTINGENT PAYMENTS ......................................................................... 17

V. RECIPROCAL RELEASES, PLAINTIFFS' COVENANTS NOT TO SUE AND PLAINTIFFS' WAIVER OF PUTATIVE "SECOND INJURY" CLAIMS ................... 23

VI. OPT-IN THRESHOLD .................................................................................. 26

VII. ELIGIBILITY FOR PAYMENTS AND ELIGIBILITY TO ENROLL IN THE CANCER INSURANCE POLICY ................................................................. 30

VIII. ALLOCATION AND PAYMENT TIERS ..................................................... 32

IX. PRELIMINARY PAYMENTS ....................................................................... 36

X. FINAL DISTRIBUTIONS TO TIER 4 PLAINTIFFS .................................. 39

XI. THE CLAIMS APPEAL NEUTRAL, THE ALLOCATION NEUTRAL, THE MEDICAL PANEL AND THE ALLOCATION PROCESS GENERALLY ................. 40

XII. MEDICAL PROOF CRITERIA ..................................................................... 53

XIII. TIER 4 POINT SYSTEM ............................................................................... 66

XIV. RECONSIDERATION REQUESTS AND APPEALS .................................. 73

XV.    FINAL DISTRIBUTION CALCULATIONS AND PROCEDURES FOR TIER 4 ....... 77

XVI.   PERMANENT DISABILITY FUND ............................................................................. 79

XVII.  CANCER INSURANCE POLICY .................................................................................. 87

XVIII. QUALIFYING SURGERY AND MIXED ORTHOPEDIC INJURY PAYMENTS ...... 87

XIX.   LIENS, ASSIGNMENT RIGHTS AND OTHER THIRD-PARTY PAYOR CLAIMS . 89

XX.    INTERIM STAY ............................................................................................................. 92

XXI.   MISCELLANEOUS PROVISIONS .............................................................................. 94

XXII.  FINAL SETTLEMENT AGREEMENT PROVISIONS ............................................... 100

## I.    **DEFINITIONS**

A.    **"Accelerated Final Payment"** shall mean the payments made to Plaintiffs who opt into the Final Settlement Agreement and who the Allocation Neutral determines satisfy the Tier 2 or Tier 3 proof requirements set forth in Section VIII.C and VIII.D of this Agreement, respectively.

B.    **"Adjudicatory Body"** shall mean those pension, disability or workers' compensation boards authorized by statute or otherwise to render binding permanent disability determinations not subject to further administrative review or other process before their disability determination becomes final and disability benefits become due as identified on Exhibit G to this Agreement.

C.    **"Adjustment Factors"** shall mean those factors that, pursuant to Section XIII.B of this Agreement, the Allocation Neutral must consider in adjusting the Base Points awarded to each Verified Tier 4 Primary Plaintiff.

D.    **"Allocation Costs"** shall mean the reasonable fees, costs and expenses of the Allocation Neutral, the Lien Resolution Administrator, the Medical Panel and Feinberg Rozen, LLP as set forth in Section XI.D of this Agreement.

E.    **"Allocation Neutral"** shall mean Matthew L. Garretson, Esquire and the Garretson Firm Resolution Group, Inc. (collectively, "Garretson"), as identified in Section XI.A of this Agreement, who together with the Claims Appeal Neutral and the Medical Panel shall perform actions reasonably necessary for the efficient and timely administration of the Allocation Process as set forth in this Agreement.

F.    **"Allocation Neutral Agreement"** shall mean a contract between the Parties and the Allocation Neutral setting forth, *inter alia*, the Allocation Neutral's duties consistent in all material respects with this Agreement.

G.    **"Allocation Pool"** shall mean the Point System applicable to the portion of Settlement Amount principal, together with any interest earned thereupon, allocated in Section II.B.i.a through Section II.B.i.c of this Agreement to each Master Docket.

H.    **"Allocation Process"** shall mean the process required by this Agreement to determine each Plaintiff's Preliminary Payment(s), Final Distribution, Permanent Disability Fund award, Qualifying Surgery payment(s), and Mixed Orthopedic Injury payment, if any.

I.    **"Appeal"** shall mean the process set forth in Section XIV.C of this Agreement whereby a Primary Plaintiff can seek review by the Claims Appeal Neutral of the Allocation Neutral's determination(s) regarding his or her timely Reconsideration Request.

J.    **"Base Points"** shall mean the points assigned to each Qualifying Injury for purposes of the Tier 4 Allocation Process as set forth on the Settlement Grid attached as Exhibit C to this Agreement.

K.    **"Cancer Insurance Policy"** shall mean the insurance product issued by the Metropolitan Life Insurance Company ("MetLife") and described in Section XVII of this Agreement. The draft MetLife policy and certificate forms, which remain subject to regulatory approval, are appended to this Agreement as Exhibit E.

L.    **"Claim Form"** shall mean the form that each Primary Plaintiff who claims eligibility for any payment under the Final Settlement Agreement must submit to the Allocation Neutral, signed under penalty of perjury and submitted together with any Qualifying Medical Records and other documents, if any, regarding the Primary Plaintiff's asserted compliance with the Work Verification Procedure, setting forth, among other matters, the predicate information to establish the eligibility of the Primary Plaintiff and any corresponding Derivative Plaintiff to participate in the settlement pursuant to Section VII of this Agreement and the Primary Plaintiff's contentions that he or she satisfies the proof requirements of his or her allocation and payment tier as set forth in Section VIII of this Agreement. The Claim Form is appended hereto as Exhibit L.

M.    **"Claims Appeal Neutral"** shall mean Kenneth R. Feinberg, Esquire, as identified in Section XI.A of this Agreement, who, together with staff from Feinberg Rozen, LLP or otherwise, shall decide Appeals submitted pursuant to Section XIV.C of this Agreement.

N.    **"Contingent Payment"** shall mean the payment, if any, in addition to the Settlement Amount, made to Verified Tier 4 Primary Plaintiffs upon the satisfaction of specified conditions precedent set forth in Section IV of this Agreement.

O.    **"Debris Removal Claims"** shall mean all claims, causes of action, notices of claims, notices of suits, suits, and actions relating in any way to or arising out of

the rescue, recovery, and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001, pending or received on or before April 12, 2010, including without limitation all Plaintiffs' claims against the Insureds or any of them in any Master Docket.

P.   **"Defendant Insureds' Counsel"** shall mean James E. Tyrrell, Jr., Esquire and Patton Boggs LLP.

Q.   **"Deficiency Notice"** shall mean written notice provided by the Allocation Neutral to counsel for a Primary Plaintiff whose Claim Form and/or supporting documentation, including Qualifying Medical Records and/or other records submitted, if necessary, regarding the Work Verification Process, are deemed by the Allocation Neutral to be deficient in any respect.

R.   **"Derivative Plaintiff"** shall mean the lawfully married spouse or former spouse of a Primary Plaintiff as verified according to the procedures provided in Section VII.B of this Agreement.

S.   **"Eligible Plaintiff List"** shall mean the list of all Plaintiffs eligible to opt in to the Final Settlement Agreement, as set forth in Section VI.A of this Agreement and in the form provided as Exhibit U to this Agreement.

T.   **"Final Distribution"** shall mean the amount, if any, determined by the Allocation Neutral to be payable in accordance with Section XV.A of this Agreement to each Verified Tier 4 Primary Plaintiff and any corresponding Derivative Plaintiff.

U.   **"Final Distribution Calculation Notice"** shall mean the Allocation Neutral's written communication to Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive or its designee of Final Total Scores for each Verified Tier 4 Primary Plaintiff and corresponding Derivative Plaintiffs and each such Plaintiff's Final Distribution, if any, pursuant to Section XV.B of this Agreement.

V.   **"Final Settlement Agreement"** shall mean this Agreement upon satisfaction of the conditions set forth in Section XXII.A of this Agreement and the Parties' execution of the Affirmation of Final Settlement Agreement described in Section XXII.A of this Agreement and appended to this Agreement as Exhibit R.

W.   **"Final Settlement Agreement Effective Date"** shall mean the date on which the Affirmation of Final Settlement Agreement described in Section XXII.A of this Agreement and attached hereto as Exhibit R is executed.

X.   **"Final Total Score"** shall mean the final and binding Total Score calculated pursuant to Section XIII.C of this Agreement of each Verified Tier 4 Primary Plaintiff and any corresponding Derivative Plaintiff that is not subject to a Reconsideration Request or Appeal pursuant to Section XIV of this Agreement or that has been adjusted, if at all, pursuant to a timely Reconsideration Request

and/or timely Appeal for purposes of calculating a Plaintiff's Final Distribution, if any, as set forth in Sections X and XV.A of this Agreement.

Y.    **"Ineligible Records"** shall mean medical records that are not Qualifying Medical Records and, therefore, are ineligible for consideration for any purpose by the Allocation Neutral or the Claims Appeal Neutral.

Z.    **"Initial Payment"** shall mean the amount paid to each Plaintiff who opts in to the Final Settlement Agreement, as provided by Section IX.A of this Agreement, and who the Allocation Neutral determines meets the payment eligibility requirements set forth in Section VII of this Agreement.

AA.    **"Interim Payment"** shall mean the partial distribution made pursuant to Section IX.C of this Agreement to each Verified Tier 4 Primary Plaintiff and any corresponding Derivative Plaintiff following the Allocation Neutral's calculation of the Primary Plaintiff's Final Total Score but prior to the Allocation Neutral's calculation of the Final Point Value for the Allocation Pool for the Primary Plaintiff's Master Docket.

BB.    **"Interim Stay"** shall mean a court-ordered stay applicable to all actions and all parties in all Master Dockets, as described more fully in Sections XX.A through XX.D of this Agreement.

CC.    **"London Marine Insurers"** shall mean those underwriters subscribing to the London Marine Policies.

DD.    **"London Marine Policies"** shall mean marine liability insurance policy numbers HF0728A00, HF9604A00, 02-0923-01 and 02-0918-01, as identified on Schedule 2 to the WTC Captive's Policy.

EE.    **"Master Docket"** shall mean all Debris Removal Claims against the Insureds or any of them in one of the following consolidated dockets in the United States District Court for the Southern District of New York:  21 MC 100; 21 MC 102; or 21 MC 103; provided, however, that for purposes of this Agreement and the Final Settlement Agreement only, the 21 MC 100 Master Docket shall include, without limitation, all Debris Removal Claims against the Insureds or any of them in any other court and unfiled Debris Removal Claims which have been submitted as notices of claims to the City of New York, unless the Plaintiff has a separate Debris Removal Claim against Other Defendants in Master Docket 21 MC 102 or Master Docket 21 MC 103, in which case they will be part of that Master Docket.

FF.    **"Medical Panel"** shall mean a panel of at least three (3) physicians selected jointly by Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel, and the WTC Captive to assist the Allocation Neutral and Claims Appeal Neutral in the Allocation Process in the manner set forth in Section XI.A of this Agreement.

GG.    **"Medical Proof Criteria"** shall mean the applicable diagnostic and impairment criteria that the Allocation Neutral must apply to verify the existence of each

Primary Plaintiff's Primary Qualifying Injury, if any, and each Verified Tier 4 Primary Plaintiff's Secondary Qualifying Injury, if any, as set forth in Sections XII and XIII.B.i of this Agreement, respectively.

HH. **"Mixed Orthopedic Injury"** shall mean, in addition to the Mixed Orthopedic Plaintiff's Qualifying Injury, an orthopedic injury occurring during a Mixed Orthopedic Plaintiff's work or volunteer service at the WTC Site or other locations at which he or she alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, as set forth in Section XVIII.A of this Agreement.

II. **"Mixed Orthopedic Plaintiff"** shall mean a Primary Plaintiff who (i) demonstrates in the Allocation Neutral's judgment a Mixed Orthopedic Injury and one or more Qualifying Injuries and (ii) whose name appears on Exhibit I to this Agreement; provided, however, that additional Primary Plaintiffs who satisfy the requirements of clause (i), but not clause (ii), of this definition may qualify as Mixed Orthopedic Plaintiffs if the Primary Plaintiff submits to the Allocation Neutral proof that before March 11, 2010, he or she alleged a Mixed Orthopedic Injury in a court filing or notice of claim as the basis for a claim against the Insureds or any of them.

JJ. **"New Debris Removal Claims"** shall mean all Debris Removal Claims filed, or asserted for the first time against the Insureds or any of them in a complaint, an amended complaint, a summons with notice, or a notice of claim served on or after April 13, 2010, as set forth in Section VI.A of this Agreement; provided, however, that for purposes of this definition only the requirement that Debris Removal Claims be "pending or received on or before April 12, 2010" as set forth in Section I.O of this Agreement shall not apply. For purposes of counting New Debris Removal Claims, (i) all Debris Removal Claims filed or asserted against the Insureds or any of them by one Primary Plaintiff and any corresponding Derivative Plaintiff shall count as a single New Debris Removal Claim; (ii) each Primary Plaintiff identified as a party in an action against the Insureds or any of them in which Debris Removal Claims are alleged shall constitute one New Debris Removal Claim, regardless of whether the caption of such action identifies all parties thereto; (iii) in the event that a putative class action including Debris Removal Claims is filed against the Insureds or any of them, the number of putative class representatives named in that action and who plead Debris Removal Claims shall constitute the number of New Debris Removal Claims relating to that putative class action; (iv) in the event that any class including Debris Removal Claims is certified against the Insureds or any of them, such certified class shall be deemed to constitute seven hundred (700) New Debris Removal Claims for purposes of this Agreement, unless such certified class is limited by court order to fewer than seven hundred (700) class members and class representatives asserting Debris Removal Claims against the Insureds or any of them, in which case the court order shall be used to determine the number of New Debris Removal Claims; and (v) all Debris Removal Claims filed or otherwise asserted against the City of New York at any time before September 15, 2009, but

re-filed or otherwise asserted again pursuant to New York General Municipal Law § 50-i, subsection (4) (also known as "Jimmy Nolan's Law") during the period beginning September 16, 2009, and ending September 16, 2010 shall not count as New Debris Removal Claims if the Primary Plaintiff and any corresponding Derivative Plaintiff were included on the Eligible Plaintiff List.

KK. **"Notice of Ineligible Records"** shall mean written notice by the WTC Captive, its counsel or its non-attorney designee to the Allocation Neutral and the affected Primary Plaintiff's counsel that medical records submitted by a Plaintiff to the Allocation Neutral are Ineligible Records. All Notices of Ineligible Records shall by accessible by counsel for the Plaintiff(s) to whom they relate.

LL. **"Opt-In Period"** shall mean the period of time following the Effective Date for Plaintiffs to elect to participate in the Final Settlement Agreement by executing a Release and Covenant Not to Sue as provided in Section VI.B of this Agreement.

MM. **"Opt-In Threshold"** shall mean the percentages of Plaintiffs on the Eligible Plaintiff List as specified in Section VI.D.i of this Agreement and in the sub-categories specified in Sections VI.D.ii through VI.D.iv of this Agreement who must opt into the Final Settlement Agreement in order for the Final Settlement Agreement to take effect as set forth in Sections VI.E and XXII of this Agreement.

NN. **"Other Defendants"** shall mean persons or entities not identified on Exhibit A that are defendants in any action in which Debris Removal Claims against the Insureds or any of them are asserted, including without limitation in any Master Docket.

OO. **"Permanent Disability Fund"** shall mean that portion of the Settlement Amount paid exclusively to those Primary Plaintiffs who (i) as of the date that the Allocation Neutral directs the distribution of the Permanent Disability Fund, have received a final determination of permanent disability from an Adjudicatory Body, or a preliminary determination of permanent disability pending final action from an Adjudicatory Body, that finds the Primary Plaintiff's disabling injury(ies) to be related in whole or in part to his or her alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, as set forth in Section XVI of this Agreement; or (ii) who are deceased and who satisfy the requirements of Section XVI.B.ii.e of this Agreement.

PP. **"Physician Diagnosis"** shall mean an affirmative statement by a licensed physician that a Primary Plaintiff has a Qualifying Injury, including DSM-IV codes, physician assessments, and physician generated problem lists; provided, however, that a Physician Diagnosis shall not include: (i) a written statement memorializing oral or other self reports by a patient to his or her physician; (ii) physician impressions that in the Allocation Neutral's judgment do not constitute an affirmative diagnostic statement; (iii) indications for an examination or procedure which, if rendered, may or may not confirm the presence of a disease;

(iv) differential diagnoses that in the Allocation Neutral's judgment do not constitute an affirmative diagnostic statement; (v) except with respect to Qualifying Injury "H1," any statement describing a medical condition as "possible," "suggestive" of a Qualifying Injury, or "questionable;" or (vi) any other qualified statement that in the Allocation Neutral's judgment is ambiguous as to whether an actual diagnosis was made by a licensed physician.

QQ.    **"Plaintiffs' Liaison Counsel"** shall mean Paul J. Napoli, Esquire and William H. Groner, Esquire of Worby Groner Edelman & Napoli Bern LLP, and Nicholas Papain, Esquire and Andrew J. Carboy, Esquire of Sullivan Papain Block McGrath & Cannavo P.C., together with their respective firms.

RR.    **"Point System"** shall mean the metric to be utilized by the Allocation Neutral in each Master Docket to determine, pursuant to Section XIII of this Agreement, the relative recoveries for Verified Tier 4 Primary Plaintiffs and their corresponding Derivative Plaintiffs.

SS.    **"Pre-Existing Injury"** shall mean a Qualifying Injury first diagnosed by a licensed physician (i) prior to the Primary Plaintiff's first date of alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them; (ii) pursuant to the Diagnostic Criteria component of the Medical Proof Criteria; and (iii) in the same Disease Group as a Qualifying Injury claimed by the Primary Plaintiff in his or her Claim Form.

TT.    **"Preliminary Payments"** shall mean all Initial Payments, Accelerated Final Payments, and Interim Payments made to Plaintiffs before Final Distributions, if any, as provided in Section IX of this Agreement.

UU.    **"Primary Plaintiff"** shall mean a Plaintiff whose Debris Removal Claims relate to his or her rescue, recovery, or debris removal work or volunteer service.

VV.    **"Primary Qualifying Injury"** shall mean each Primary Plaintiff's Qualifying Injury, if any, with the highest Tier placement, as set forth in Section VIII of this Agreement, or highest Base Point value on the Settlement Grid attached as Exhibit C to this Agreement, relative to the same Primary Plaintiff's other Qualifying Injuries, if any, after application of all Adjustment Factors for Verified Tier 4 Primary Plaintiffs.

WW.    **"Qualifying Injuries"** shall mean those injuries (i) verified by the Allocation Neutral based upon a Primary Plaintiff's Claim Form and Qualifying Medical Records and (ii) listed in the chart in Section XII of this Agreement.

XX.    **"Qualifying Surgeries"** shall mean those actual or recommended surgical procedures listed on Exhibit D to this Agreement, subject to the limitations and requirements specified therein, and which warrant the payments specified in Exhibit D to those Primary Plaintiffs who satisfy the requirements of Section XVIII.B of this Agreement.

**YY.** **"Qualifying Medical Records"** shall mean medical records generated by March 11, 2010 and (i) produced by Plaintiffs to Defendant Insureds' Counsel by the Final Settlement Agreement Effective Date; (ii) produced by Defendant Insureds' Counsel to Plaintiffs at any time, including records in the possession, custody or control of the City of New York (including without limitation Express Scripts, Inc. pharmaceutical records for Primary Plaintiffs who received medical care directly from the City of New York) produced pursuant to Section XI.H of this Agreement; or (iii) required to be produced under Section XI.H of this Agreement; provided, however, that records reflecting the fact of the death of a Primary Plaintiff, medical records reflecting that a Primary Plaintiff underwent (or, in the case of a recommended single or double lung transplant, the recommendation that the Primary Plaintiff undergo) any Qualifying Surgery(ies), and disability determinations by an Adjudicatory Body shall be deemed Qualifying Medical Records even if generated after March 11, 2010. In addition, Pulmonary Function Tests and spirometries that satisfy the forgoing requirements of this definition shall not constitute Qualifying Medical Records if they contain statements to the effect that the test results (i) are not reproducible, reliable, acceptable, valid, or satisfactory; (ii) represent poor effort or lack of cooperation on the part of the Primary Plaintiff, or include any indication that he or she is unable to perform acceptable maneuvers; and/or (iii) are compromised by the Primary Plaintiff's acute respiratory condition or illness other than a Qualifying Injury at the time of the test (*e.g.*, a upper respiratory infection, pneumonia or acute bronchitis).

**ZZ.** **"Reconsideration Request"** shall mean a Primary Plaintiff's request that the Allocation Neutral reconsider (i) the Primary Plaintiff's placement by the Allocation Neutral in Tier 1, Tier 2 or Tier 3 pursuant to Section XIV.A of this Agreement; (ii) its denial of, or the amount of its award of, a Mixed Orthopedic Injury payment made allegedly without regard to the requirements of Section XVIII.A of this Agreement; (iii) its denial of a Qualifying Surgery payment made allegedly without regard to the requirements of Section XVIII.B of this Agreement; (iv) its application of the Work Verification Procedure in Exhibit B to this Agreement to the Primary Plaintiff's claims; (v) its application of the Permanent Disability Fund provisions in Section XVI of this Agreement to the Primary Plaintiff's claims; or (vi) its determination for purposes of the Tier 4 Point System of the Primary Plaintiff's Total Score pursuant to Section XIII.C of this Agreement.

**AAA.** **"Release and Covenant Not to Sue"** shall mean the document in the form attached as Exhibit P to this Agreement which all Plaintiffs must execute in order to opt-in to the Final Settlement Agreement as provided in Section V.A of this Agreement.

**BBB.** **"Secondary Qualifying Injury"** shall mean, for those Verified Tier 4 Primary Plaintiffs who the Allocation Neutral determines have more than one Qualifying Injury, such Primary Plaintiff's Qualifying Injury with the second highest Base Point value on the Settlement Grid relative to the same Primary Plaintiff's

Primary Qualifying Injury and his or her other Qualifying Injuries, if any, after application of all Adjustment Factors.

CCC. **"Settlement Amount"** shall mean the aggregate amount set forth in Section II.A of this Agreement that the WTC Captive shall pay, in addition to any Contingent Payment(s) due as provided in Section IV of this Agreement, any further payment required under Section VI.E of this Agreement and Allocation Costs as paid pursuant to Section XI.D of this Agreement, on behalf of all of the Insureds, to settle all Debris Removal Claims against the Insureds or any of them by those Plaintiffs who opt-in to the Final Settlement Agreement as provided in Section VI.B of this Agreement. The Settlement Amount does not include interest earned thereupon.

DDD. **"Settlement Grid"** shall mean the document appended hereto as Exhibit C which specifies the Base Points for each Qualifying Injury for purposes of the Tier 4 Point System set forth in Section XIII of this Agreement.

EEE. **"Total Score"** shall mean the product of the Allocation Neutral's adjustments pursuant to Section XIII.C of this Agreement to Base Points awarded by the Allocation Neutral to each Verified Tier 4 Primary Plaintiff in any Master Docket.

FFF. **"Verified Tier 4 Primary Plaintiff"** shall mean a Primary Plaintiff who submits a Claim Form alleging a Tier 4 Qualifying Injury and who the Allocation Neutral determines meets the Tier 4 proof requirements set forth in Section VIII.E of this Agreement, including without limitation the Medical Proof Criteria for one or more Tier 4 Qualifying Injuries set forth in Section XII of this Agreement.

GGG. **"Work Verification Procedure"** shall mean the process described in Exhibit B to this Agreement and which is required to verify a Primary Plaintiff's employment or volunteer status at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them.

HHH. **"WTC Site"** shall mean: (a) the secured area in New York City bounded by Broadway on the east, Albany Street and Thames Street on the south, Chambers Street on the north and the Hudson River on the west; (b) the loading areas in New York City at the West Side Highway and Chambers Street, as well as Pier 92 and the Heliport at 59th Street and Hamilton Avenue; (c) the Brooklyn Marine Transfer Stations where trucks dropped off debris and debris was loaded onto barges; (d) barges in transit on the Hudson River and other waterways, together with adjacent piers, on which such barges operated; (e) trucks in transit between the World Trade Center and any location involved in the transportation of debris including such locations in Brooklyn and Staten Island/Fresh Kills; (f) debris loading and unloading areas, including those in Brooklyn and Staten Island/Fresh Kills; and (g) debris sorting/sifting areas at Staten Island/Fresh Kills.

## II.    SETTLEMENT AMOUNT

### A.    The Settlement Amount and Other Payments Potentially Due Under This Agreement

Within ninety (90) days after the Effective Date, the WTC Captive shall place in a separate account Six Hundred and Twenty-Five Million Dollars and No Cents ($625,000,000.00) as the Settlement Amount.

In addition to the Settlement Amount, the WTC Captive will pay Three Million Five Hundred Thousand Dollars and No Cents ($3,500,000.00) toward Allocation Costs pursuant to Section XI.D of this Agreement and is potentially obligated under this Agreement (i) to pay Contingent Payments of up to Twenty-Five Million Dollars and No Cents ($25,000,000.00) subject to the terms and conditions of Section IV of this Agreement and (ii) to pay two percent (2%) of the Settlement Amount for each one percent (1%) of all Primary Plaintiffs across all Master Dockets who opt into the Final Settlement Agreement in excess of the Section VI.D.i Opt-In Threshold, as set forth in Section VI.E of this Agreement. Collectively, these payments may total up to Seven Hundred Sixteen Million Dollars and No Cents ($716,000,000.00) subject to the terms, conditions and limitations of Sections IV, VI.E and XI.D of this Agreement.

### B.    Exclusive Components of the Settlement Amount

The Settlement Amount shall consist of:

i.    All Preliminary Payments and Final Distributions to all Plaintiffs who opt into the Final Settlement Agreement by signing Releases and Covenants Not to Sue as described in Section V of this Agreement, respectively, as follows:

   a.    Five Hundred Fourteen Million Eight Hundred Thousand Dollars and No Cents ($514,800,000.00) for all Preliminary Payments, Final Distributions, Mixed Orthopedic Injury payments, and Qualifying Surgery payments to all Plaintiffs who opt into the Final Settlement Agreement and whose Debris Removal Claims against the Insureds or any of them are pending as of the Final Settlement Agreement Effective Date in Master Docket 21 MC 100;

   b.    Six Million One Hundred Thousand Dollars and No Cents ($6,100,000.00) for all Preliminary Payments, Final Distributions, Mixed Orthopedic Injury payments, and Qualifying Surgery payments to all Plaintiffs who opt into the Final Settlement Agreement and whose Debris Removal Claims against the Insureds or any of them are pending as of the Final Settlement Agreement Effective Date in Master Docket 21 MC 102; and

       c.      Eighteen Million Two Hundred Thousand Dollars and No Cents ($18,200,000.00) for all Preliminary Payments, Final Distributions, Mixed Orthopedic Injury payments, and Qualifying Surgery payments to all Plaintiffs who opt into the Final Settlement Agreement and whose Debris Removal Claims against the Insureds or any of them are pending as of the Final Settlement Agreement Effective Date in Master Docket 21 MC 103.

    ii.    Payment of the premium for the Cancer Insurance Policy in the amount of Twenty Three Million Four Hundred Thousand Dollars and No Cents ($23,400,000.00) as described in Section XVII of this Agreement; provided, however, that if the final premium for the Cancer Insurance Policy as negotiated by Plaintiffs' Liaison Counsel, the WTC Captive, and MetLife as issuer of the Cancer Insurance Policy differs from the amount specified in this Section II.B.ii, any such difference, whether in excess of or less than the amount specified here, shall be applied proportionately against or added to, as the case may be, the portions of the Settlement Amount allocated to each Master Docket as set forth in Sections II.B.i.a through II.B.i.c of this Agreement; and

    iii.   Capitalization of the Permanent Disability Fund in the amount of Sixty-Two Million Five Hundred Thousand Dollars and No Cents ($62,500,000.00) as described in Section XVI of this Agreement.

This Section II.B sets forth the exclusive permissible allocation of the Settlement Amount among the Master Dockets, to fund the Cancer Insurance Policy premium and to capitalize the Permanent Disability Fund.

## C.    The Settlement Amount Cannot Be Increased for Any Reason

The Settlement Amount shall not be increased for any reason.

## D.    The Settlement Amount Is a Reasonable Compromise

Each Party agrees to support the Settlement Amount, including without limitation the Cancer Insurance Policy funded thereby as referenced in Section XVII of this Agreement, together with the recovery from or assignment of rights against the London Marine Insurers as set forth in Section II.F of this Agreement, as a reasonable resolution of all Plaintiffs' Debris Removal Claims against the Insureds.  In no circumstances shall the reasonableness and/or adequacy of the Settlement Amount be challenged by: (i) any Plaintiff who opts into the Final Settlement Agreement by executing the Release and Covenant Not to Sue; or (ii) any signatory to this Agreement.

## E.    Funding from Defendants Not Insured By the WTC Captive

The Settlement Amount, the Contingent Payment(s), if any, the payment due under Section VI.E of this Agreement, if any, and the WTC Captive's

contribution toward Allocation Costs pursuant to Section XI.D of this Agreement will be paid by the WTC Captive on behalf of the Insureds only. Accordingly, nothing in this Agreement shall terminate Plaintiffs' rights, if any, against Other Defendants.

The Final Settlement Agreement shall be subject to N.Y. GOL § 15-108. In addition, to the extent that Plaintiffs who opt in to the Final Settlement Agreement or any of them are awarded judgment(s) against the Other Defendants or any of them with respect to Debris Removal Claims, such Plaintiffs agree to reduce those judgment(s) to the full extent of any and all such Other Defendants' contribution and indemnity claims, if any, against the Insureds or any of them. In addition, such Plaintiffs and each of them agree that after the Effective Date they shall not settle any Debris Removal Claims with Other Defendant(s) without securing from all settling Other Defendants' their written agreement to release all actual or alleged indemnification claims, if any, that they have against the Insureds or any of them arising out of or relating to such Other Defendant's or Other Defendants' settlement with such Plaintiff(s).

**F.      Insurance Assets Other Than the Settlement Amount**

Except with respect to the London Marine Insurers as described in this Section II.F and Plaintiffs' releases of the WTC Captive as set forth in executed Releases and Covenants Not to Sue, the Parties do not assign, modify, transfer, waive, release or relinquish their respective rights, if any, against any insurers or insurance policies, including without limitation those insurers and insurance policies identified on Schedule 2 to the WTC Captive's Policy ("Underlying Insurers"). All such rights are expressly reserved and preserved.

If at any time the London Marine Insurers agree to settle with and on behalf of their insureds, the City of New York and Weeks Marine, Inc., Debris Removal Claims alleging liabilities potentially covered by the London Marine Policies, and contribute to the settlement memorialized in this Agreement in an amount acceptable to Plaintiffs, then the WTC Captive shall release and waive any and all rights and claims of the WTC Captive against the London Marine Insurers for contribution, subrogation or other reimbursement for the Settlement Amount, the Contingent Payments, if any, and the WTC Captive's costs of defending the City of New York and Weeks Marine, Inc. to the extent that the Settlement Amount, the Contingent Payments, if any, and such costs of defense are covered by the London Marine Policies or either of them.

Alternatively, if the London Marine Insurers do not agree to settle with and on behalf of their insureds, the City of New York and Weeks Marine, Inc., Debris Removal Claims alleging liabilities potentially covered by the London Marine Policies, and do not contribute to the settlement memorialized in this Agreement in an amount acceptable to Plaintiffs, then the WTC Captive shall assign to the settling Plaintiffs any and all rights and claims of the WTC Captive against the London Marine Insurers for contribution, subrogation or other reimbursement

relating to the Settlement Amount, the Contingent Payments, if any, and the WTC Captive's costs of defending the City of New York and Weeks Marine, Inc. to the extent that the Settlement Amount, the Contingent Payments, if any, and such costs of defense are covered by the London Marine Policies or either of them.

The Parties agree that any funds recovered from the London Marine Insurers under the provisions of this Section II.F shall be apportioned among Primary Plaintiffs who opt into the Final Settlement Agreement by executing the Release and Covenant Not to Sue and whose Debris Removal Claims against the Insureds or any of them derive in whole or in part from alleged exposure on the barges and/or piers covered potentially by the London Marine Policies (hereinafter, "Marine Primary Plaintiffs"). In addition, all funds recovered from the London Marine Insurers shall be apportioned among the Marine Primary Plaintiffs in proportion to the sum of their respective Initial Payments, Accelerated Final Payments, Interim Payments and Final Distributions, if any, under the Final Settlement Agreement. Any expense incurred by the Allocation Neutral relating to the apportionment among the Marine Primary Plaintiffs of any recovery from the London Marine Insurers shall be paid exclusively by those Plaintiffs and/or their respective counsel.

Without limiting in any way the forgoing provisions of this Section II.F, Plaintiffs' Liaison Counsel shall consult with the WTC Captive and its counsel on a regular basis, but at least every thirty (30) days following the Effective Date, concerning the timing of this assignment. Throughout these consultations and in any related negotiations including Plaintiffs and/or the WTC Captive, on the one hand, and the London Marine Insurers, on the other hand, the WTC Captive and Plaintiffs shall cooperate and use their respective best efforts to obtain a mutually acceptable recovery from the London Marine Insurers. If no such recovery is obtained within one hundred and eighty (180) days after the Effective Date, however, Plaintiffs shall have the right to send the WTC Captive a written demand that it consummate the assignment described in this Section II.F. Within five (5) business days of its receipt of such a demand, the WTC Captive shall effectuate the assignment described in this Section II.F.

## G.    Attorneys' Fees, Costs and Expenses

The Settlement Amount, the Contingent Payment(s), if any, and any payment due pursuant to Section VI.E of this Agreement shall include all of Plaintiffs' Liaison Counsel's fees, costs and expenses and the fees, costs and expenses of all other counsel engaged by any Plaintiff or Plaintiffs, including without limitation the fees, costs and expenses of all Plaintiffs' counsel's vendors, consultants and experts, with respect to Debris Removal Claims against the Insureds or any of them or any matter relating thereto. Plaintiffs' attorneys' fees, costs and expenses, and all other costs or expenses paid or incurred by Plaintiffs or their counsel relating to Debris Removal Claims against the Insureds or any of them, including without limitation the fees, costs and expenses of all Plaintiffs' counsel's vendors, consultants and experts, shall not increase the Settlement

Amount, the Contingent Payment(s), if any, or any payment due pursuant to Section VI.E of this Agreement for any reason.

Without affecting in any way the limitations on the Settlement Amount, the Contingent Payment(s), if any, and any payment due pursuant to Section VI.E of this Agreement as stated in the preceding paragraph of this Agreement, the Parties acknowledge as follows:

i.     Plaintiffs' Liaison Counsel has expended time, effort and resources litigating numerous and complex issues of law and fact, managing and advancing Debris Removal Claims against the Insureds, and structuring a comprehensive settlement of Debris Removal Claims against the Insureds, including without limitation the negotiation, preparation and implementation of this Agreement;

ii.    The Settlement Amount and the Contingent Payment, if any, represent an extraordinary recovery for Plaintiffs given their alleged injuries and the anticipated difficulty of establishing the Insureds' liability, if any, at trial; and

iii.   Plaintiffs' Liaison Counsel, including their respective law firms and the individual attorneys within those firms involved in the litigation and settlement of Debris Removal Claims against the Insureds, have the professional experience and reputation and are possessed of sufficient skills and ability to perform the services required by the scope of and issues in this litigation and arising under this Agreement.

Each Plaintiff is solely responsible for payment of his or her respective attorneys' fees, costs and expenses relating in any way to Debris Removal Claims against the Insureds or any of them under the existing terms of the Plaintiff's contract with his or her respective counsel.

Furthermore, except with respect to premium paid for and benefits later received from the Cancer Insurance Policy, Plaintiffs' attorneys' voluntarily agree to reduce their fees to twenty-five percent (25%) of all payments to Plaintiffs or claimants whose Debris Removal Claims against the Insureds or any of them are settled by this Agreement net of Plaintiffs' counsel's reimbursable expenses, including without limitation any and all Contingent Payments which become due pursuant to Section IV of the Agreement and any and all payments which become due pursuant to Section VI.E of the Agreement. Plaintiffs' counsel voluntarily agree to take no attorneys' fees on any part of the premium paid for the Cancer Insurance Policy as set forth in Section II.B.ii of this Agreement or on any Cancer Insurance Policy benefits Plaintiffs or any of them receive in the future.

Neither the WTC Captive, the Insureds nor any of them shall have any decisional authority relating in any way to the allocation of attorneys' fees and/or expenses among Plaintiffs and/or their respective counsel. To the extent that the Allocation

Neutral oversees Plaintiffs' counsel's disbursements to individual Plaintiffs and audits the application by Plaintiffs' counsel of attorneys' fees and general and case-specific expenses to calculate disbursements to Plaintiffs net of those fees and expenses, the first One Hundred Thousand Dollars and No Cents ($100,000.00) of such Allocation Neutral expense shall be included within Allocation Costs and paid in accordance with Section XI.D of this Agreement. Any such Allocation Neutral expense in excess of this first One Hundred Thousand Dollars and No Cents ($100,000.00) shall not be treated as Allocation Costs.

## III.   SETTLEMENT AMOUNT ADMINISTRATION

### A.    Placement of the Settlement Amount in the Separate Account

Within ninety (90) days after the Effective Date, the WTC Captive shall place the Settlement Amount in a separate account to be held in the WTC Captive's name at the Bank of New York pursuant to an account control agreement between the WTC Captive and the Bank of New York (the "Separate Account"). The WTC Captive shall remain the tax owner of the Settlement Amount until such funds are disbursed from the Separate Account pursuant to this Agreement. The WTC Captive shall provide to Plaintiffs' Liaison Counsel a copy of this account control agreement once it is executed.

Interest on the Settlement Account shall begin to accrue upon the Effective Date and shall be used in accordance with Section XI.D of this Agreement.

### B.    Investment of the Settlement Amount Prior to Its Distribution

While the Settlement Amount remains in the Separate Account, the WTC Captive shall direct investment of the Settlement Amount through its independent financial advisors according to reasonable, prudent and conservative criteria to be established by the WTC Captive and its independent financial advisors. Furthermore, beginning thirty (30) days after the Settlement Amount is placed in the Separate Account, the Bank of New York shall send monthly written statements to Plaintiffs' Liaison Counsel regarding the Settlement Amount balance, the investment allocation and performance of the Settlement Amount, any and all payments to Plaintiffs, and all Allocation Costs charged against the Settlement Amount in accordance with Section XI.D of this Agreement.

### C.    Permissible Uses of Any Income Earned On the Settlement Amount

Although the WTC Captive shall remain the owner of the Separate Account for income tax purposes, any income (*e.g.*, interest) earned on the Settlement Amount before it is fully disbursed as set forth in this Agreement shall be used to satisfy Allocation Costs as set forth in Section XI.D of this Agreement. The WTC Captive shall release funds from the Separate Account for this purpose. Any income on the Settlement Amount remaining after satisfaction of Allocation Costs

shall be apportioned among the Master Dockets and to the Permanent Disability Fund in as set forth in Section XI.D of this Agreement.

**D.    Disbursement of the Settlement Amount**

Pursuant to instructions from the Allocation Neutral and subject to all of the terms and conditions of this Agreement, the WTC Captive or its designee shall disburse funds from the Separate Account to satisfy each of the WTC Captive's Preliminary Payment, Final Distribution, Qualifying Surgery, Mixed Orthopedic Injury and Permanent Disability Fund award obligations hereunder.  Each such disbursement shall occur at the time authorized by this Agreement and shall be made by check payable to each Plaintiff or Plaintiffs who are the subject of the Allocation Neutral's payment instruction and their respective counsel or, if the instruction so provides, by wire, including without limitation aggregated amounts for multiple plaintiffs, to Plaintiffs' counsel for disbursement consistent with the Allocation Neutral's payment instruction and all of the provisions of this Agreement.  In addition, if instructed to do so pursuant to Section VII.D of this Agreement, the WTC Captive or its designee will issue from the Separate Account Interim Payments and Final Distributions to structured settlement providers on behalf of Verified Tier 4 Primary Plaintiffs upon completion of the necessary documentation.  The WTC Captive's payment of premium for the Cancer Insurance Policy in the amount set forth in Section II.B.ii of this Agreement shall be paid directly to MetLife from the Separate Account.

**E.    Limited Circumstances Under Which the WTC Captive Shall Retain the Settlement Amount and Any Income Earned Thereon**

If this Agreement is voided pursuant to Section VI.E or XX.E of this Agreement, the WTC Captive shall retain the entire Settlement Amount and any income earned thereon after satisfaction of any Allocation Costs incurred, if any, prior to the exercise of any such right to void this Agreement. Thereafter, the Settlement Amount and all such remaining income thereupon shall be remitted from the Separate Account to any account designated by the WTC Captive.

**IV.    CONTINGENT PAYMENTS**

**A.    Nature of Contingent Payments**

In addition to the Settlement Amount, the WTC Captive may in the future make additional payments to Plaintiffs on behalf of the Insureds ("Contingent Payments").  These Contingent Payments shall become due only if certain contingencies are satisfied, and it is possible under the terms herein that no Contingent Payments will ever become due.  As set forth specifically in Sections IV.B and IV.C below, whether Contingent Payments become due, and the amount(s) of such Contingent Payments, if any, shall be dependent upon:

i.    The number of New Debris Removal Claims;

ii.   The amount of money, if any, paid by the WTC Captive on behalf of the Insureds or any of them to satisfy judgments or fund the settlement(s) of Debris Removal Claims by Plaintiffs who do not opt into the Final Settlement Agreement ("Opt-Out Costs"); and

iii.  The amount of money, if any, paid by the WTC Captive on behalf of the Insureds or any of them to satisfy judgments or fund the settlements of suits or claims against the Insureds or any of them by Other Defendants for indemnification of judgments, settlements, costs and/or expenses against or incurred by Other Defendants arising out of Debris Removal Claims settled as part of the Final Settlement Agreement ("Indemnification Costs").

The amount due under Section VI.E of this Agreement, if any, shall not constitute Opt-Out Costs or Indemnifications Costs for purposes of this Section IV.

## B.   Contingent Payment Determinations—Timing

The Contingent Payments, should they become due, shall be paid in five (5) annual installments.  Each date on which Contingent Payment is determined to be due, and if so, in what amount, shall be a "Contingent Payment Determination Date."

The First Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus one year.  The First Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

The Second Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus two years.  The Second Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

The Third Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus three years.  The Third Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

The Fourth Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus four years.  The Fourth Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

The Fifth Contingent Payment Determination Date shall be the Final Settlement Agreement Effective Date plus five years.  The Fifth Contingent Payment, if any, shall be paid fifteen (15) days thereafter.

## C.   Contingent Payment Determinations—Criteria

Each annual installment of Contingent Payment, if any, shall be determined solely upon the following conditions as of the relevant Contingent Payment Determination Date:

i.    First Contingent Payment

The First Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| Number of New Debris Removal Claims Filed or Submitted to the City of New York as of First Contingent Payment Determination Date | First Contingent Payment (subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|
| 120 or less | $5,000,000.00 |
| 121 to 219 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 120th New Debris Removal Claim filed as of the First Contingent Payment Determination Date |
| 220 or more | $0.00 |

The First Contingent Payment due, if any, as reflected in the table immediately above shall be reduced if, from the Effective Date to the First Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Seven Million Dollars and No Cents ($7,000,000.00).  If this occurs, the First Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Seven Million Dollars and No Cents ($7,000,000.00), up to the entire amount of Contingent Payment that otherwise would be due.  The First Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Seven Million Dollars and No Cents ($7,000,000.00) as of the First Contingent Payment Determination Date, then the First Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

ii.    Second Contingent Payment

The Second Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| Number of New Debris Removal Claims Filed or Submitted to the City of New York as of Second Contingent Payment Determination Date | Second Contingent Payment Due (subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|
| 240 or less | $5,000,000.00 |
| 241 to 339 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 240th New Debris Removal Claim filed as of the Second Contingent Payment Determination Date |
| 340 or more | $0.00 |

The Second Contingent Payment due, if any, as reflected in the table immediately above shall be reduced if, from the Effective Date to the Second Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Fourteen Million Dollars and No Cents ($14,000,000.00). If this occurs, the Second Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Fourteen Million Dollars and No Cents ($14,000,000.00), up to the entire amount of Contingent Payment that otherwise would be due. The Second Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Fourteen Million Dollars and No Cents ($14,000,000.00) as of the Second Contingent Payment Determination Date, then the Second Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

iii.    Third Contingent Payment

The Third Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| Number of New Debris Removal Claims Filed or Submitted to the City of New York as of Third Contingent Payment Determination Date | Third Contingent Payment Due (subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|

| 360 or less | $5,000,000.00 |
|---|---|
| 361 to 459 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 360th New Debris Removal Claim filed as of the Third Contingent Payment Determination Date |
| 460 or more | $0.00 |

The Third Contingent Payment due, if any, as reflected in the table immediately above shall be reduced if, from the Effective Date to the Third Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Twenty-One Million Dollars and No Cents ($21,000,000).  If this occurs, the Third Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Twenty-One Million Dollars and No Cents ($21,000,000), up to the entire amount of Contingent Payment that otherwise would be due.  The Third Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Twenty-One Million Dollars and No Cents ($21,000,000) as of the Third Contingent Payment Determination Date, then the Third Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

iv.    Fourth Contingent Payment

The Fourth Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| **Number of New Debris Removal Claims Filed or Submitted to the City of New York as of Fourth Contingent Payment Determination Date** | **Fourth Contingent Payment Due** <br><br> (subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|
| 480 or less | $5,000,000.00 |

| 481 to 579 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 480th New Debris Removal Claim filed as of the Fourth Contingent Payment Determination Date |
|---|---|
| 580 or more | $0.00 |

The Fourth Contingent Payment, if any, due as reflected in the table immediately above shall be reduced if, from the Effective Date to the Fourth Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Twenty-Eight Million Dollars and No Cents ($28,000,000.00). If this occurs, the Fourth Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Twenty-Eight Million Dollars and No Cents ($28,000,000.00), up to the entire amount of Contingent Payment that otherwise would be due. The Fourth Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Twenty-Eight Million Dollars and No Cents ($28,000,000.00) as of the Fourth Contingent Payment Determination Date, then the Fourth Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

v.    Fifth Contingent Payment

The Fifth Contingent Payment, if any, shall be calculated based upon the number of New Debris Removal Claims, as follows:

| **Number of New Debris Removal Claims Filed or Submitted to the City of New York as of Fifth Contingent Payment Determination Date** | **Fifth Contingent Payment Due** (subject to the Opt-Out Costs and Indemnification Costs provisions below) |
|---|---|
| 600 or less | $5,000,000.00 |
| 601 to 699 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 600th New Debris Removal Claim filed as of the Fifth Contingent Payment Determination Date |

| 700 or more | $0.00 |
|---|---|

The Fifth Contingent Payment due, if any, as reflected in the table immediately above shall be reduced if, from the Effective Date to the Fifth Contingent Payment Determination Date, cumulative Opt-Out Costs and Indemnification Costs exceed Thirty-Five Million Dollars and No Cents ($35,000,000.00). If this occurs, the Fifth Contingent Payment shall be reduced by one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed Thirty-Five Million Dollars and No Cents ($35,000,000.00), up to the entire amount of Contingent Payment that otherwise would be due. The Fifth Contingent Payment cannot be less than Zero Dollars and No Cents ($0.00).

If cumulative Opt-Out Costs and Indemnification Costs do not exceed Thirty-Five Million Dollars and No Cents ($35,000,000.00) as of the Fifth Contingent Payment Determination Date, then the Fifth Contingent Payment due, if any, shall be determined pursuant to the table immediately above.

**D.      Plaintiffs Entitled to Pro Rata Share of Contingent Payments**

Verified Tier 4 Primary Plaintiffs shall be entitled to *pro rata* shares of each Contingent Payment, if any, in proportion to their respective payments under the Final Settlement Agreement.

## V.    RECIPROCAL RELEASES, PLAINTIFFS' COVENANTS NOT TO SUE AND PLAINTIFFS' WAIVER OF PUTATIVE "SECOND INJURY" CLAIMS

**A.      Plaintiffs' Releases and Covenants Not to Sue**

Plaintiffs who opt into the Final Settlement Agreement will do so by executing Releases and Covenants Not to Sue in the form attached hereto as Exhibit P. In the Releases and Covenants Not to Sue, Plaintiffs and their successors, assigns, heirs and beneficiaries, if any, and, for deceased Plaintiffs, the executor, administrator or personal representative of the Plaintiff's estate, will release, each and all of their known or unknown, filed or un-filed, matured or un-matured, manifested or latent, and past, present or future Debris Removal Claims and/or New Debris Removal Claims against the WTC Captive, the Insureds, and their respective affiliates, subsidiaries, parents, predecessors, successors, assigns, officers, directors, employees, consultants, attorneys and other agents. In addition, in the Releases and Covenants Not to Sue, Plaintiffs and their successors, assigns, heirs and beneficiaries, if any, and, for deceased Plaintiffs, the executor, administrator or personal representative of the Plaintiff's estate, will covenant not to sue the WTC Captive, the Insureds, and their respective affiliates, subsidiaries, parents, predecessors, successors, assigns, officers, directors, employees, consultants, attorneys and other agents with respect to each and all of

Plaintiffs' known or unknown, filed or un-filed, matured or un-matured, and past, present or future Debris Removal Claims and/or New Debris Removal Claims. The Releases and Covenants Not to Sue shall apply to all of the Insureds identified on Exhibit A, but shall not apply to defendants that are neither identified on Exhibit A nor parties to the Final Settlement Agreement.

**B.      The Insureds' and the WTC Captive's Releases of Settling Plaintiffs**

Upon Affirmation of the Final Settlement Agreement as provided in Section XXII.A of this Agreement, the WTC Captive, the Insureds, and their respective affiliates, subsidiaries, parents, predecessors, successors, assigns, officers, directors, employees, consultants, attorneys and other agents will release each and all of their known or unknown, filed or un-filed, matured or un-matured, manifested or latent, and past, present or future claims against Plaintiffs and their successors and assigns, if any, and, for deceased Primary Plaintiffs, the Primary Plaintiff's estate arising out of or relating to those Debris Removal Claims settled by the Final Settlement Agreement.  In the event that any Plaintiff's Release and Covenant Not to Sue is rescinded, limited, nullified and/or rendered void or unenforceable for any reason, (i) the Insureds' and the WTC Captive's releases of that Plaintiff shall be similarly rescinded, limited, nullified, void and/or unenforceable and (ii) that Plaintiff shall return to the WTC Captive all amounts awarded to him or her pursuant to the Final Settlement Agreement.

**C.      Plaintiffs Have Not Assigned Any of Their Claims**

Plaintiffs represent and warrant that, unless otherwise disclosed to the WTC Captive in writing prior to the Effective Date, they have not assigned or otherwise transferred any of the claims to be released pursuant to this Agreement.  To the extent that any Plaintiff has assigned or otherwise transferred any of the claims to be released pursuant to this Agreement, all assignees must consent in writing to the Plaintiff's decision to opt into the Final Settlement Agreement in order for the Plaintiff to participate in this settlement.

**D.      Plaintiffs Agree to Release and Covenant Not to Sue the Insureds With Respect to Plaintiffs' Putative "Second Injury" Claims**

Plaintiffs understand and have consulted with their respective counsel regarding the putative effect of New York's "second injury" rule.  In addition, Plaintiffs understand that in this Section V they are agreeing to release and have covenanted not to sue the Insureds with respect to future, unknown, latent and/or un-matured injuries relating in any way to or arising out of 9/11-related work or volunteer service, including without limitation claims based upon future, unknown, latent and/or un-matured injuries related or unrelated in whole or in part to Plaintiffs' current actual or alleged injuries, if any.  Furthermore, as of the Effective Date, Plaintiffs acknowledge that they may not know the full extent of any or all of their injuries, if any, relating in any way to the Insureds' or any Insured's rescue, recovery and debris removal operations or other alleged conduct, misconduct,

errors, omissions or negligence at the WTC Site or at other locations at which Plaintiffs allege exposure giving rise to their respective Debris Removal Claims. Nonetheless, Plaintiffs who opt into the Final Settlement Agreement agree to release knowingly and voluntarily, and to covenant not to sue the Insureds or any of them with respect to, all such future, unknown, latent and/or un-matured injuries, if any.

**E.    Plaintiffs' Waiver of Their Right to Contest Their Releases and Covenants Not to Sue**

Without limiting in any way any of the other provisions in this Section V, Plaintiffs who opt into the Final Settlement Agreement do so voluntarily and knowingly relinquish any right to contest any aspect of their Releases and Covenants Not to Sue.

**F.    Second Injury Letter to All Plaintiffs**

Notwithstanding and without limiting in any way Plaintiffs' understandings and acknowledgements as set forth elsewhere in this Section V, Plaintiffs' counsel shall send on their letterhead to each of their respective clients except deceased Primary Plaintiffs the letter attached as Exhibit H hereto.  This letter explains to individual Plaintiffs the effect of the Release and Covenant Not to Sue and states, as plainly as reasonably possible, that the Release and Covenant Not to Sue and, if applicable in a particular Primary Plaintiff's circumstances, the Cancer Insurance Policy are intended to extinguish Plaintiffs' claims against the Insureds and the WTC Captive with respect to all future, unknown, latent and/or un-matured injuries arising out of Debris Removal Claims, regardless of whether any particular Plaintiff is eligible to participate in the Cancer Insurance Policy.  In order to participate in the Final Settlement Agreement, each living Primary Plaintiff must countersign this letter, have his or her signature attested by a licensed notary public, and return it to his or her counsel, who shall provide a true and correct copy of the countersigned, notarized letter to the WTC Captive and the Defendant Insureds' Counsel together with Plaintiff's Release and Covenant Not to Sue.

**G.    Limitations on Putative "Second Injury" Claims**

Without limiting in any way the forgoing provisions of this Section V, if any Plaintiff who executes a Release and Covenant Not to Sue brings future action(s), claim(s) or suit(s) against any of the Insureds and/or the WTC Captive in which Plaintiff contends that the Release and Covenant Not to Sue is ineffective with respect to any alleged future, unknown, latent and/or un-manifested injury(ies) arising out of or relating in any way to Debris Removal Claims and/or New Debris Removal Claims, such Plaintiff(s) agree:

    i.        That the exclusive forum for all such future action(s), claim(s) or suit(s) against the Insureds and/or the WTC Captive shall be the United States District Court for the Southern District of New York;

    ii.       That the Final Settlement Agreement, the executed Release and Covenant Not to Sue, and the executed letter described in Section V.F of this Agreement constitute the sole expression of their respective intent regardless of any alleged change in circumstances or claimed misunderstanding by Plaintiffs or any of them with respect to those documents or any of their terms; and

    iii.      To pay the Insureds' and WTC Captive's reasonable costs and expenses, including without limitation their reasonable attorneys' fees, in any action(s), claim(s) or suit(s) in which the Insureds, the WTC Captive and/or any of them prevail on any basis relating to the enforcement of the Release and Covenant Not to Sue and/or the Final Settlement Agreement.

**H.    Parties' Right to Enforce This Agreement**

Nothing in this Section V shall affect any Party's or Parties' right to sue another Party or Parties to enforce this Agreement.

**VI.    <u>OPT-IN THRESHOLD</u>**

**A.    List of Plaintiffs Eligible to Opt Into Final Settlement Agreement**

On April 12, 2010, Plaintiffs' counsel provided to Defendant Insureds' Counsel and the WTC Captive a list of Plaintiffs asserting Debris Removal Claims against the Insureds or any of them ("Eligible Plaintiff List"). Before Defendant Insureds' Counsel certifies the Eligible Plaintiff List as set forth below in this Section VI.A, Plaintiffs' counsel shall update the Eligible Plaintiff List to include all known Debris Removal Claims pending against or submitted to the Insureds or any of them on or before April 12, 2010, and otherwise to conform it to the requirements of this Agreement.

Only Plaintiffs with Debris Removal Claims filed against the Insureds or any of them, including in any Master Docket, on or before April 12, 2010 or who have instituted Debris Removal Claims against the Insureds or any of them through other legal process recognized by New York law (*e.g.*, a notice of claim submitted to the City of New York) on or before April 12, 2010 shall be eligible for inclusion on the Eligible Plaintiff List; provided, however, that such Plaintiffs who dismiss with prejudice, and without exception, their Debris Removal Claims against the Insureds by executing the Stipulation of Dismissal With Prejudice attached as Exhibit S to this Agreement need not be included on the Eligible Plaintiff List; provided, further, however, that any Primary Plaintiff who is named in Appendix A to Case Management Order No. 1 in Master Docket 21 MC 100 need not be included on the Eligible Plaintiff List unless he or she has amended his or her complaint to allege any Qualifying Injury(ies). As set forth more fully

in Section VII of this Agreement, no person omitted from the Eligible Plaintiff List shall be entitled to any payment under this Agreement.

For each Primary Plaintiff, the Eligible Plaintiff List shall identify in the form attached hereto as Exhibit U each of the following items:

i.       The full name of the Primary Plaintiff and any corresponding Derivative Plaintiff;

ii.      The case number(s) of any and all actions including Debris Removal Claims against the Insureds or any of them brought by or on behalf of Primary Plaintiff(s) and any corresponding Derivative Plaintiff(s);

iii.     The consolidated Master Docket Number in which each Plaintiff's Debris Removal Claims are pending (21 MC 100; 21 MC 102; 21 MC 103; or Not Applicable);

iv.      The law firm(s) representing each Plaintiff;

v.       The alleged Primary Qualifying Injury of each Primary Plaintiff;

vi.      Whether the Primary Plaintiff claims eligibility to recover from the Permanent Disability Fund;

vii.     Whether the Primary Plaintiff has undergone a Qualifying Surgery; and

viii.    Whether the Primary Plaintiff claims eligibility to recover for a Mixed Orthopedic Injury.

Thereafter, Defendant Insureds' Counsel will certify that the Eligible Plaintiff List is accurate and complete with respect to Sections VI.A.i, VI.A.ii, and VI.A.iii of this Agreement, including without limitation by adding to the Eligible Plaintiff List the information required by Sections VI.A.i, VI.A.ii, and VI.A.iii of this Agreement with respect to any Plaintiff with Debris Removal Claims against the Insureds or any of them who are absent from the Eligible Plaintiff List. Following this certification by Defendant Insureds' Counsel, an attorney with each law firm representing any Plaintiff or Plaintiffs on the Eligible Plaintiff List shall (i) supply the information required by Sections VI.A.iv through VI.A.viii of this Agreement with respect to any Plaintiffs added to the Eligible Plaintiff List as part of Defendant Insureds' Counsel's certification, as set forth immediately above, and (ii) attest in writing that the Eligible Plaintiff List is accurate and complete as to all of the law firm's clients to the best of the attorney's information and belief.  In addition, each law firm representing any Plaintiff(s) shall provide to Plaintiffs' Liaison Counsel, the WTC Captive and Defendant Insureds' Counsel under separate cover the name of the attorney(s) to contact regarding all Plaintiff(s) represented by his or her law firm, as well as each such attorney's business address, telephone and facsimile numbers, and e-mail address.  After this

certification and attestation are complete, the Eligible Plaintiff List shall be used to determine compliance with the Opt-In Threshold.

Plaintiffs who dismiss all of their Debris Removal Claims against the Insureds with prejudice by filing the Stipulation of Dismissal with Prejudice attached as Exhibit S to this Agreement at any time before the Final Settlement Agreement Effective Date shall not be counted for purposes of determining compliance with the Opt-In Threshold. In addition, Primary Plaintiffs identified on Exhibit I may be excluded from the Eligible Plaintiff List, or shall be excluded from the Opt-In Threshold calculations in this Section VI of this Agreement even if listed on the Eligible Plaintiff List, only if they dismiss with prejudice all of the claims relating to Qualifying Injuries such that the Primary Plaintiff's only remaining Debris Removal Claims against the Insureds are orthopedic in nature.

For those Plaintiffs who do not opt into the Final Settlement Agreement, the identification of alleged Primary Qualifying Injury required by Section VI.A.v of this Agreement shall be deemed an answer to an interrogatory and pursuant to Federal Rule of Civil Procedure 33(c) may be used to the extent allowed by the Federal Rules of Evidence.

**B.    Opting Into the Final Settlement Agreement**

Plaintiffs desiring to opt into the Final Settlement Agreement shall do so by signing the Release and Covenant Not to Sue in the form attached to this Agreement as Exhibit P. Until the Final Settlement Agreement Effective Date, the Parties agree that this Agreement is binding and enforceable. Accordingly, without limiting in any way the forgoing provisions of this Section VI.B or the provisions of Section VI.C of this Agreement, the Parties agree that any and all Release(s) and Covenant(s) Not to Sue executed prior to the Affirmation of the Final Settlement Agreement described in Section XXII.A of this Agreement shall have no force or effect and shall not bind any Plaintiff until the Final Settlement Agreement Effective Date.

Plaintiffs shall have ninety (90) days from the Effective Date to opt into the Final Settlement Agreement (the "Opt-In Period"); provided, however, that the WTC Captive shall have, at its sole discretion, the right to extend the Opt-In Period. If the WTC Captive exercises this right, the WTC Captive shall provide written notice to Plaintiffs' Liaison Counsel.

**C.    Return of Releases**

If this Agreement is voided pursuant to Section VI.E or XX.E of this Agreement, any and all executed Releases and Covenants Not to Sue shall have no force or effect and shall be returned to Plaintiffs' Liaison Counsel.

**D.    Opt-In Threshold**

The Opt-In Threshold is as follows:

i.  At least ninety-five percent (95%) of all Primary Plaintiffs on the Eligible Plaintiff List execute Releases and Covenants Not to Sue;

ii.  At least ninety-five percent (95%) of all Primary Plaintiffs who claim on the Eligible Plaintiff List eligibility for the Permanent Disability Fund execute Releases and Covenants Not to Sue;

iii.  At least ninety-five percent (95%) of all Primary Plaintiffs who claim on the Eligible Plaintiff List any of the following Primary Qualifying Injuries execute Releases and Covenants Not to Sue:  A3, A4, B1, B2, B3, B4, C1, C2, C3, C4, H1, H2, I2 and I3 ("High Threshold Primary Qualifying Injury Categories"); provided further, for clarity, that this Section VI.D.iii requires that at least ninety-five percent (95%) of all Primary Plaintiffs in *each* of the High Threshold Primary Qualifying Injury Categories execute Releases and Covenants Not to Sue; provided, however, that if the percentage of Primary Plaintiffs in any particular High Threshold Primary Qualifying Injury Category that executes Releases and Covenants Not to Sue is less than ninety-five percent (95%) as a result of three (3) or fewer such Primary Plaintiffs not executing Releases and Covenants Not to Sue, then the WTC Captive shall have, at its sole discretion, the right to execute the Affirmation of Final Settlement Agreement referenced in Section XXII.A of this Agreement, and in the event that such right is exercised, this Agreement shall remain binding and enforceable;

iv.  At least ninety percent (90%) of each of the following categories of Primary Plaintiffs on the Eligible Plaintiff List execute Releases and Covenants Not to Sue:

a.  All Primary Plaintiffs in each Primary Qualifying Injury category according to the Eligible Plaintiff List not set forth in Section VI.D.iii of this Agreement; provided, however, that if the percentage of Primary Plaintiffs in any single Primary Qualifying Injury category on the Eligible Plaintiff List who execute Releases and Covenants Not to Sue is less than ninety percent (90%) as a result of ten (10) or fewer such Primary Plaintiffs not executing Releases and Covenants Not to Sue, then the WTC Captive shall have, at its sole discretion, the right to execute the Affirmation of Final Settlement Agreement referenced in Section XXII.A of this Agreement and, in the event that such right is exercised, this Agreement shall remain binding and enforceable; and

b.  All Primary Plaintiffs in each consolidated Master Docket (21 MC 100; 21 MC 102; and 21 MC 103); and

c.  All Primary Plaintiffs who are clients of each law firm representing one hundred and fifty (150) or more Primary Plaintiffs identified on the Eligible Plaintiff List.

For purposes of the Opt-In Threshold as set forth above, Primary Plaintiffs with corresponding Derivative Plaintiffs on the Eligible Plaintiff List will not be deemed to have opted in unless the Derivative Plaintiff also opts in by executing the Release and Convent Not to Sue.

E.    **Actions Upon Satisfaction of the Opt-In Threshold**

If the Opt-In Threshold is satisfied during the Opt-In Period or any extension by the WTC Captive thereof, the Final Settlement Agreement shall become effective in accordance with and subject to the other requirements of Section XXII.A of this Agreement; provided, however, that even if the Opt-In Threshold is satisfied, the WTC Captive shall retain the exclusive right to void this Agreement at any time prior to the Final Settlement Agreement Effective Date if more than one hundred and twenty (120) New Debris Removal Claims are first asserted against the Insureds or any of them by the filing or service of complaints, receipt of notices of claim, or other legal process before the Final Settlement Agreement Effective Date.

In addition, if during the Opt-In Period or any extension thereof by the WTC Captive, actual opt-in experience for purposes of Section VI.D.i of this Agreement exceeds ninety-five percent (95%), the WTC Captive shall pay two percent (2%) of the Settlement Amount set forth in Section II.A of this Agreement for every one percent (1%) in excess of the ninety-five percent (95%) requirement in Section VI.D.i of this Agreement; provided, however, that if actual opt-in experience for purposes of Section VI.D.i of this Agreement exceeds ninety-eight percent (98%), the WTC Captive shall pay one-fifth of one percent (0.20%) of the Settlement Amount set forth in Section II.A of this Agreement for every tenth of one percent (0.10%) above the ninety-five percent (95%) requirement set forth in Section VI.D.i of this Agreement.  Any such payment in addition to the Settlement Amount pursuant to this Section VI.E shall be applied to each Master Docket and to the Permanent Disability Fund in proportion to the allocation of the Settlement Amount among each of the Master Dockets and the Permanent Disability Fund set forth in Sections II.B.i and II.B.iii of this Agreement. Furthermore, the WTC Captive shall deposit in the Separate Account referenced in Section III.A of this Agreement any additional payment due pursuant to this Section VI.E within ten (10) days following execution of the Affirmation of the Final Settlement Agreement referenced in Section XXII.A of this Agreement and attached hereto as Exhibit R.

VII.    <u>**ELIGIBILITY FOR PAYMENTS AND ELIGIBILITY TO ENROLL IN THE CANCER INSURANCE POLICY**</u>

A.    **Primary Plaintiff Eligibility for Payments and Eligibility to Enroll in the Cancer Insurance Policy**

A Primary Plaintiff must be listed on the Eligible Plaintiff List to be eligible for any payment and to enroll in the Cancer Insurance Policy, subject to its terms,

conditions and exclusions, pursuant to the Final Settlement Agreement. In addition, no Primary Plaintiff shall be eligible to receive any payment or to enroll in the Cancer Insurance Policy, subject to its terms, conditions and exclusions, pursuant to the Final Settlement Agreement until after (i) he or she opts into the Final Settlement Agreement pursuant to Section V.A of this Agreement by signing a Release and Covenant Not to Sue; (ii) the Final Settlement Agreement Effective Date; (iii) his or her work or volunteer service at the WTC Site, and/or at other locations where his or her work or volunteer service gave rise to his or her Debris Removal Claims against the Insureds or any of them, is verified by the Allocation Neutral pursuant to the Work Verification Procedure set forth in Exhibit B to this Agreement, including, without limitation, by verifying that his or her name appears on the "pre-approved" list referenced in that Exhibit B; (iv) he or she returns to Defendant Insureds' Counsel and the WTC Captive a countersigned and notarized letter in the form of Exhibit H hereto; and (v) the Allocation Neutral confirms that there are no liens or reimbursement claims against the Primary Plaintiff's payments under this Agreement or that all such liens or reimbursement claims have been resolved. Furthermore, any Plaintiff who received an award from the September 11th Victim Compensation Fund is ineligible to receive any payment referenced in this Agreement and ineligible to enroll in the Cancer Insurance Policy.

**B.      Derivative Plaintiff Eligibility for Payments**

Derivative Plaintiffs must be listed on the Eligible Plaintiff List to be eligible for any payment pursuant to the Final Settlement Agreement. In addition, Derivative Plaintiffs will only be eligible for payments under the Final Settlement Agreement if (i) the related Primary Plaintiff's Claim Form references the Derivative Plaintiff; (ii) that Claim Form includes sworn attestations that (a) the Primary and Derivative Plaintiffs lawfully married before September 11, 2001 and (b) the Primary and Derivative Plaintiffs remained lawfully married and co-habitating as of the date after September 11, 2001 on which the Primary Plaintiff was first diagnosed with a Qualifying Injury or, if the Primary Plaintiff alleges no Qualifying Injury, the last day of the Primary Plaintiff's work or volunteer service at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them; (iii) the Derivative Plaintiff opts into the Final Settlement Agreement pursuant to Section V.A of this Agreement by executing the Release and Covenant Not to Sue; and (iv) the Allocation Neutral determines that the corresponding Primary Plaintiff is eligible pursuant to the requirements of Section VII.A of this Agreement.

Derivative Plaintiffs will be eligible to receive a Final Distribution, subject to the other requirements of this Agreement, only if the Allocation Neutral finds that an eligible Primary Plaintiff lawfully married the Derivative Plaintiff before September 11, 2001, based upon that Primary Plaintiff's Claim Form. All payments to Derivative Plaintiffs shall be within the Settlement Amount.

C.    **Personal Representatives Entitled to Receive Payments on Behalf of Deceased Plaintiffs**

In the event that a deceased Plaintiff is entitled to receive any payment pursuant to the Final Settlement Agreement, the WTC Captive or its designee shall make such payment(s) jointly to the decedent's counsel and to the personal representative(s) of the deceased Plaintiff's estate consistent with a court order or other comparable record designating the personal representative(s) of the estate. Plaintiffs' counsel shall be responsible for, and shall bear the expense of, providing such documents to the Allocation Neutral as attachments to the Claim Form and the information shall thereby be provided to the WTC Captive or its designee. All payments to Personal Representatives of deceased Plaintiffs shall be within the Settlement Amount.

All rights, duties, obligations and other provisions of this Agreement applicable to a Plaintiff also shall be applicable to the Personal Representative of a deceased Plaintiff's estate, subject to the preceding requirements of this Section VII.C with respect to confirmation of the identity and designation of the Personal Representative.

D.    **Structured Settlement Payments to Verified Tier 4 Primary Plaintiffs**

Any Verified Tier 4 Primary Plaintiff eligible to receive an Interim Payment and Final Distribution under this Agreement may elect to receive either or both of those payments in the form of structured settlement(s), rather than as lump sum payment(s). Verified Tier 4 Primary Plaintiffs who elect such structured settlement payments and/or their respective counsel shall bear the burden and expense of providing the Allocation Neutral with structured settlement payment instructions. Upon receipt of such written instructions, the Allocation Neutral shall direct the WTC Captive or its designee to make the payments at issue to a structured settlement provider on the Verified Tier 4 Primary Plaintiff's behalf. The WTC Captive agrees to comply with all such requests provided that they are received from the Allocation Neutral at least ten (10) days before the payment is due under this Agreement.

## VIII.    ALLOCATION AND PAYMENT TIERS

A.    **Tier Participation by Each Eligible Primary Plaintiff**

Each Primary Plaintiff who meets the eligibility requirements of Section VII.A of this Agreement shall participate in one of four allocation process and payment tiers described in Sections VIII.B through VIII.E below (hereinafter, "Tier" or "Tiers" or, respectively, "Tier 1," "Tier 2," "Tier 3," and "Tier 4"). In addition, each Derivative Plaintiff who meets the eligibility requirements of Section VII.B of this Agreement shall be treated as though in the same Tier in which his or her corresponding Primary Plaintiff participates. In each Tier, the amounts of payments to eligible Derivative Plaintiffs shall be determined in accordance with

Sections IX and X of this Agreement only after the Allocation Neutral determines that the Primary Plaintiff satisfies the proof requirements set forth in this Section VIII for a given Tier.

Except with respect to a Primary Plaintiff's election to participate in Tier 1, no Primary Plaintiff's claimed participation in any Tier (whether as part of the Eligible Plaintiff List, his or her Claim Form or otherwise) shall be binding upon the Allocation Neutral. Instead, the Allocation Neutral shall retain full authority consistent with this Agreement to place a Primary Plaintiff in the appropriate Tier based upon the requirements for that Tier, the Primary Plaintiff's Claim Form, Qualifying Medical Records submitted to the Allocation Neutral, if any, and the other provisions of this Agreement. In addition, within Tier 4, the Allocation Neutral shall retain full authority to determine a Verified Tier 4 Primary Plaintiff's Primary Qualifying Injury and Secondary Qualifying Injury, including his or her impairment level within a Disease Group for purposes of assigning Base Points, based upon the requirements of the Medical Proof Criteria in Section XII of this Agreement, the information in Verified Tier 4 Primary Plaintiff's Claim Form, his or her Qualifying Medical Records submitted to the Allocation Neutral and the other provisions of this Agreement.

**B.    Tier 1**

Tier 1 shall consist of Primary Plaintiffs who claim no Qualifying Injury. Any Primary Plaintiff may elect to participate in Tier 1, including without limitation Primary Plaintiffs whose only alleged injury is fear that they may become sick in the future as a result of their work or volunteer service at the WTC Site or other location at which they allege exposure giving rise to their respective Debris Removal Claims. Because Qualifying Medical Records are required to establish all Qualifying Injuries, all Primary Plaintiffs with no Qualifying Medical Records must participate in Tier 1.

Primary Plaintiffs who elect or must participate in Tier 1 shall be (1) entitled to the Initial Payment set forth in Section IX.A of this Agreement and (2) required to apply for the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

**C.    Tier 2**

The Tier 2 Qualifying Injuries are: D0; E0; F0; G0; H0; I0; J0-J2; and K0.

Primary Plaintiffs who claim one of the Tier 2 Qualifying Injuries as their Primary Qualifying Injury shall submit a Claim Form together with the Qualifying Medical Record(s) necessary to satisfy the Medical Proof Criteria delineated in Section XII of this Agreement for their respective Tier 2 Qualifying Injury(ies).

If the Allocation Neutral determines that a Primary Plaintiff submitting a Claim Form alleging a Tier 2 Qualifying Injury as his or her Primary Qualify Injury meets the eligibility requirements of Section VII of this Agreement, that Primary Plaintiff shall be (1) entitled to the Initial Payment set forth in Section IX.A of this Agreement and (2) required to apply for the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

Then, the Allocation Neutral must determine if the Primary Plaintiff's Claim Form and one or more Qualifying Medical Records demonstrate that he or she has satisfied the Medical Proof Criteria for his or her Tier 2 Qualifying Injury and was diagnosed with that Tier 2 Qualifying Injury on or after September 11, 2001.

A Primary Plaintiff who alleges in his or her Claim Form a Tier 2 Qualifying Injury as his or her Primary Qualifying Injury and who the Allocation Neutral determines satisfies the Tier 2 proof requirements set forth in this Section VIII.C shall be further entitled to the Tier 2 Accelerated Final Payment for the Primary Plaintiff's Master Docket, as set forth in Section IX.B of this Agreement.  If the Allocation Neutral determines that a Primary Plaintiff who alleges in his or her Claim Form a Tier 2 Qualifying Injury as his or her Primary Qualifying Injury does not satisfy the Tier 2 proof requirements set forth in this Section VIII.C, however, the Primary Plaintiff and any corresponding Derivative Plaintiff shall receive no additional payments under this Agreement, but shall be entitled to retain their Initial Payments and the Primary Plaintiff shall still be required to enroll in the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

**D.    Tier 3**

The Tier 3 Qualifying Injuries are: A0; D1; E1; F1; G1; and K1.

Primary Plaintiffs who claim one of the Tier 3 Qualifying Injuries as their Primary Qualifying Injury shall submit a Claim Form together with the Qualifying Medical Record(s) necessary to satisfy the Medical Proof Criteria for their respective Tier 3 Qualifying Injury(ies) set forth in Section XII of this Agreement, as well as a HIPAA-compliant release as required by Section XI.L of this Agreement.

If the Allocation Neutral determines that a Primary Plaintiff submitting a Claim Form alleging a Tier 3 Qualifying Injury as his or her Primary Qualifying Injury meets the eligibility requirements of Section VII of this Agreement, that Primary Plaintiff shall still be (1) entitled to the Initial Payment set forth in Section IX.A of this Agreement and (2) required to apply for the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

Then, the Allocation Neutral must determine if the Primary Plaintiff's Claim Form and Qualifying Medical Record(s) demonstrate that he or she satisfied the Medical Proof Criteria for his or her Tier 3 Qualifying Injury and was diagnosed with that Tier 3 Qualifying Injury on or after September 11, 2001.

A Primary Plaintiff who alleges in his or her Claim Form a Tier 3 Qualifying Injury as his or her Primary Qualifying Injury and who the Allocation Neutral determines satisfies the Tier 3 proof requirements set forth in this Section VIII.D shall be further entitled to the Tier 3 Accelerated Final Payment for the Primary Plaintiff's Master Docket, as set forth in Section IX.B of this Agreement. If the Allocation Neutral determines that a Primary Plaintiff who alleges in his or her Claim Form a Tier 3 Qualifying Injury as his or her Primary Qualifying Injury does not satisfy the Tier 3 proof requirements set forth in this Section VIII.D, however, the Primary Plaintiff and any corresponding Derivative Plaintiff shall receive no additional payments under this Agreement but shall be entitled to retain their Initial Payments and the Primary Plaintiff shall still be required to enroll in the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E, provided, however, that if the Allocation Neutral determines, for reasons other than material misrepresentation(s), material omission(s) or material concealment detected through an audit pursuant to Section XI.M or XI.N of this Agreement, that the Primary Plaintiff qualifies for Tier 2, Section VIII.C of this Agreement will govern the Plaintiffs' entitlement to Preliminary Payments.

**E.    Tier 4**

The Tier 4 Qualifying Injuries are: A1-A4; B0-B4; C0-C4; D2-D3; E2-E3; F2; G2; H1-H2; I1-I3; and K2-K3.

Primary Plaintiffs who claim one of the Tier 4 Qualifying Injuries shall submit a Claim Form together with the Qualifying Medical Record(s) necessary to satisfy the Medical Proof Criteria delineated in Section XII of this Agreement, and otherwise establish eligibility to recover under Tier 4, as provided below. In addition, Primary Plaintiffs who claim one of the Tier 4 Qualifying Injuries shall submit a HIPAA-compliant release as required by Section XI.L of this Agreement

If the Allocation Neutral determines that a Primary Plaintiff submitting a Claim Form alleging a Tier 4 Qualifying Injury as his or her Primary Qualifying Injury meets the eligibility requirements of Section VII of this Agreement, that Primary Plaintiff shall be (1) entitled to the Initial Payment set forth in Section IX.A of this Agreement and (2) required to apply for the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E.

Then, the Allocation Neutral must determine if the Primary Plaintiff's Claim Form and Qualifying Medical Records demonstrate that he or she can satisfy the Medical Proof Criteria as set forth in Section XII of this Agreement with respect

to a claimed Tier 4 Qualifying Injury, including a diagnosis of such Qualifying Injury on or after the Primary Plaintiff's first date of alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them (referred to herein as "Verified Tier 4 Primary Plaintiffs"). If so, the Allocation Neutral shall determine the Verified Tier 4 Primary Plaintiff's Total Score by applying the Adjustment Factors set forth in Section XIII.B of this Agreement to the Base Points set forth on Exhibit C for the Primary Plaintiff's Tier 4 Primary Qualifying Injury.

If the Allocation Neutral determines that a Primary Plaintiff who submits a Claim Form alleging a Tier 4 Qualifying Injury does not satisfy the Tier 4 proof requirements set forth in this Section VIII.E, that Primary Plaintiff and any corresponding Derivative Plaintiff shall receive no additional payments under this Agreement but shall be entitled to retain their Initial Payments and the Primary Plaintiff shall still be required to enroll in the Cancer Insurance Policy, subject to its terms, conditions and exclusions, as set forth more fully in Section XVII of this Agreement and Exhibit E, unless the Allocation Neutral determines, for reasons other than material misrepresentation(s), material omission(s) or material concealment detected through an audit pursuant to Section XI.M or XI.N of this Agreement, that the Primary Plaintiff qualifies for Tier 2 or Tier 3. If so, Section VIII.C or VIII.D of this Agreement for Tier 2 and Tier 3, respectively, will govern the amount of any Preliminary Payments due to the Primary Plaintiff and any corresponding Derivative Plaintiff under the Final Settlement Agreement, except that such Primary Plaintiffs will have their respective Accelerated Final Payments reduced by Two Hundred and Fifty Dollars and No Cents ($250.00) to reflect the increased Allocation Costs occasioned by their rejected Tier 4 claims.

A Verified Tier 4 Primary Plaintiff shall be entitled to an Interim Payment and a Final Distribution, if any, as set forth in Sections IX.C and XV.B of this Agreement, respectively. All Verified Tier 4 Primary Plaintiffs whose Primary Qualifying Injury is not a Pre-Existing Injury shall receive a Final Distribution that brings their respective combined Interim Payment and Final Distribution to at least One Thousand Dollars and No Cents ($1,000.00) more than the Accelerated Final Payment for Primary Plaintiffs in Tier 3 of their Master Docket; provided, however, that as set forth in Section XIII.C of this Agreement, the Allocation Neutral retains the discretion to award any Verified Tier 4 Primary Plaintiff no Final Distribution if the Allocation Neutral concludes that the Verified Tier 4 Primary Plaintiff has materially misrepresented, materially omitted or materially concealed facts in his or her Claim Form and/or in the Qualifying Medical Records submitted therewith.

## IX.  PRELIMINARY PAYMENTS

### A.  Initial Payments

All Primary Plaintiffs and personal representatives of deceased Primary Plaintiffs' estates who meet the requirements of Sections VII.A or VII.C of this Agreement

shall receive an Initial Payment in the amount of Three Thousand Two Hundred and Fifty Dollars and No Cents ($3,250.00) within twenty (20) days after the later of the Final Settlement Agreement Effective Date or the date upon which the Allocation Neutral determines that they meet those requirements.

Likewise, each corresponding Derivative Plaintiff who satisfies the eligibility requirements of Section VII.B of this Agreement shall receive an Initial Payment equal to three and one-half percent (3.5%) of the Initial Payment to the corresponding Primary Plaintiff twenty (20) days after the latest of (i) the Final Settlement Agreement Effective Date; (ii) the date upon which the Allocation Neutral determines that the corresponding Primary Plaintiff meets the requirements of Section VII.A of this Agreement; or (iii) the date upon which the Allocation Neutral determines that the Derivative Plaintiff meets the requirements of Section VII.B of this Agreement.

**B.    Accelerated Final Payments**

Primary Plaintiffs and personal representatives of deceased Primary Plaintiffs' estates who meet the requirements of Sections VII.A or VII.C of this Agreement, respectively, and who satisfy the Tier 2 or Tier 3 proof requirements set forth in Sections VIII.C and VIII.D of this Agreement, respectively, shall be entitled, in addition to their respective Initial Payments, to the following Accelerated Final Payments within twenty-five (25) days of the later of the Final Settlement Agreement Effective Date or the Allocation Neutral's expedited determination that those proof requirements are met and the Primary Plaintiff is eligible for an Accelerated Final Payment, unless the Primary Plaintiff waives in a signed writing his or her right to submit a Reconsideration Request pursuant to Section XIV of this Agreement, in which case the following Accelerated Final Payments shall be paid within ten (10) days of the later of the Final Settlement Agreement Effective Date, the Allocation Neutral's expedited determination that the proof requirements are met, or the Allocation Neutral's receipt of such written waiver:

|        | Accelerated Final Payment for Master Docket 21 MC 100 | Accelerated Final Payment for Master Docket 21 MC 102 | Accelerated Final Payment for Master Docket 21 MC 103 |
|--------|-------------------------------------------------------|-------------------------------------------------------|-------------------------------------------------------|
| Tier 1 | Not applicable                                        | Not applicable                                        | Not applicable                                        |
| Tier 2 | $4,250.00                                             | $1,085.00                                             | $1625.00                                              |
| Tier 3 | $7,750.00                                             | $2,170.00                                             | $3,250.00                                             |
| Tier 4 | Not applicable                                        | Not applicable                                        | Not applicable                                        |

Verified Tier 4 Primary Plaintiffs and corresponding Derivative Plaintiffs shall not be entitled to any Accelerated Final Payment.

Each Derivative Plaintiff who satisfies the eligibility requirements of Section VII.B of this Agreement shall receive an Accelerated Final Payment equal to three and one-half percent (3.5%) of the Accelerated Final Payment to the corresponding Primary Plaintiff on the date of the Accelerated Final Payment to the corresponding Primary Plaintiff.

**C.    Interim Payments for Plaintiffs with Final Total Scores**

All Verified Tier 4 Primary Plaintiffs and personal representatives of deceased Verified Tier 4 Primary Plaintiffs' estates who meet the requirements of Sections VII.A or VII.C of this Agreement, respectively, are eligible for Interim Payments as described in this Section IX.C. Consistent with the procedure provided in Section XIII of this Agreement, the Allocation Neutral will determine a Total Score for each Verified Tier 4 Primary Plaintiff, which will become a Final Total Score once the Allocation Neutral determines that the provisions pertaining to audits, Reconsideration Requests and Appeals in Sections IX.D and IX.E of this Agreement, respectively, do not apply to that Verified Tier 4 Primary Plaintiff. The Allocation Neutral will notify all Parties when it has established Final Total Scores for forty percent (40%) of all Primary Plaintiffs who claim Tier 4 Qualifying Injuries in a given Allocation Pool. Thereafter, if, in the Allocation Neutral's judgment, a sufficient number of those Primary Plaintiffs claiming Tier 4 Qualifying Injuries have been evaluated by the Allocation Neutral and, where applicable, the Claims Appeal Neutral to permit a reasonably accurate prediction of the monetary value of a Base Point for that Allocation Pool, the Allocation Neutral shall direct the WTC Captive to make Interim Payments to the Verified Tier 4 Primary Plaintiffs with Final Total Scores in that Allocation Pool and to corresponding Derivative Plaintiffs in the amount of forty percent (40%) of the projected value of each such Verified Tier 4 Primary Plaintiff's Final Distribution and corresponding Derivative Plaintiff's Final Distribution. Thereafter, the WTC Captive or its designee will have twenty (20) days from the date it receives this notification from the Allocation Neutral to make an Interim Payment equal to forty percent (40%) of the projected value of the Verified Tier 4 Primary Plaintiff's Final Distribution and the corresponding Derivative Plaintiff's Final Distribution.

During the Allocation Process, the Allocation Neutral will continuously reassess the projected value of a Base Point for each Allocation Pool, and will notify Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive every two weeks of the revised projections. All Interim Payments will be based upon the Allocation Neutral's projection of the value of a Base Point for a given Verified Tier 4 Primary Plaintiff's Allocation Pool at the time an Interim Payment is made and, once made, Interim Payments shall not be subject to adjustment other than through the Final Distribution, if any.

**D.     Audit Limitation to Receipt of Accelerated Final Payments and Interim Payments**

Notwithstanding any of the forgoing provisions of this Section IX, any Primary Plaintiff whose claims are selected by the Allocation Neutral for an audit pursuant to Section XI.M or XI.N of this Agreement shall not be entitled to an Accelerated Final Payment or an Interim Payment, if any, until completion of the audit as it pertains to that Primary Plaintiff.

**E.     Reconsideration Request and Appeal Limitation on Receipt of Accelerated Final Payments and Interim Payments**

Notwithstanding any of the forgoing provisions of this Section IX, any Primary Plaintiff who submits a Reconsideration Request, or a Reconsideration Request and subsequent Appeal, pursuant to Section XIV of this Agreement shall not be entitled to receive an Accelerated Final Payment or an Interim Payment, if any is otherwise due hereunder, until the Allocation Process is final and binding as respects that Primary Plaintiff as set forth in Section XIV of this Agreement. Nothing in this Section IX.E shall prevent any Plaintiff from providing to the Allocation Neutral a signed waiver of his or her right to submit a Reconsideration Request in order to expedite his or her receipt of an Accelerated Final Payment or Interim Payment otherwise due under this Agreement.

**F.     Preliminary Payment Logistics**

The WTC Captive or its designee shall pay jointly to Plaintiffs and to their respective counsel all Preliminary Payments required by this Section IX. Each Preliminary Payment shall be applied against that portion of the Settlement Amount allocated to the Master Docket to which the Preliminary Payment relates.

**X.     FINAL DISTRIBUTIONS TO TIER 4 PLAINTIFFS**

**A.     Eligibility for Final Distributions**

Only Verified Tier 4 Primary Plaintiffs together with any corresponding Derivative Plaintiffs shall be eligible for Final Distributions.

**B.     Amount of Final Distributions**

Final Distributions to Verified Tier 4 Primary Plaintiffs entitled to receive Final Distributions as set forth in Section X.A of this Agreement shall be calculated according to the Point System and Final Distribution formula set forth in Sections XIII and XV.A of this Agreement, respectively.

With respect to Tier 4, a Derivative Plaintiff's Final Distribution, if any, shall be three and one-half percent (3.5%) of the Final Distribution, if any, to the corresponding Primary Plaintiff.

**XI.    THE CLAIMS APPEAL NEUTRAL, THE ALLOCATION NEUTRAL, THE MEDICAL PANEL AND THE ALLOCATION PROCESS GENERALLY**

A.    **Appointment of the Claims Appeal Neutral, the Allocation Neutral and the Medical Panel**

The Parties appoint Kenneth R. Feinberg, Esquire as the Claims Appeal Neutral. Mr. Feinberg shall serve as the Claims Appeal Neutral on a *pro bono* basis. The Claims Appeal Neutral will retain the services of temporary employees or an outside service provider to assist with Appeals on an as needed basis. The costs incurred for these services will be paid as Allocation Costs in accordance with Section XI.D of this Agreement. Parties also appoint Feinberg Rozen, LLP to assist the Claims Appeal Neutral with respect to Appeals submitted pursuant to Section XIV.C of this Agreement.

The Parties appoint Matthew L. Garretson, Esquire and the Garretson Firm Resolution Group, Inc. ("Garretson") as the Allocation Neutral.

After consultation with the Claims Appeal Neutral, the Allocation Neutral shall retain within thirty (30) days of the Effective Date a panel of at least three (3) licensed physicians selected jointly by Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel, and the WTC Captive ("Medical Panel"). The Medical Panel shall (i) establish with the Allocation Neutral a protocol to apply as part of the Allocation Process the Medical Proof Criteria set forth in Section XII of this Agreement and the Adjustment Factors set forth in Section XIII.B of this Agreement; (ii) assist the Allocation Neutral when physician expertise is required to apply the Medical Proof Criteria set forth in Section XII of this Agreement and/or the Adjustment Factors set forth in Section XIII.B of this Agreement in the context of particular Primary Plaintiffs' submissions to the Allocation Neutral; and (iii) assist the Claims Appeal Neutral with medical issues arising in the context of a Primary Plaintiff's Appeal pursuant to Section XIV.C of this Agreement if the Claims Appeal Neutral requests such assistance from the Medical Panel.

B.    **The Allocation Neutral's and Claims Appeal Neutral's Duties**

The Allocation Neutral shall have the authority to perform all actions deemed by the Parties to be reasonably necessary for the efficient and timely administration of the Allocation Process. The Allocation Neutral shall carry out the Allocation Process in accordance with the timeline attached hereto as Exhibit J. The Parties shall enter into an Allocation Neutral Agreement. The Allocation Neutral Agreement shall authorize the Allocation Neutral to carry out the following tasks, in accordance with this Agreement:

i.    **Claim Review and Evaluation:** Establish evidentiary review procedures to detect and prevent the submission of fraudulent evidence; verify and evaluate Claim Forms and Qualifying Medical Records; apply Medical

Proof Criteria, apply Adjustment Factors where warranted as set forth in this Agreement, and implement the Point System; and determine each Plaintiff's Preliminary Payment(s), Final Distribution, Permanent Disability Fund award, Mixed Orthopedic Injury payment, and Qualifying Surgery payment(s), if any;

ii.    **Data Management:**   Create and maintain a database to maintain all relevant data regarding each Plaintiff, including but not limited to Claim Forms; Qualifying Medical Records; Total Score calculation and rationale; any Preliminary Payments, Final Distribution, Permanent Disability Fund award, Mixed Orthopedic Injury payment, and Qualifying Surgery payment(s); communications to/from Plaintiffs (including but not limited to Notices of Ineligible Records, Deficiency Notices, Reconsideration Requests, Appeals, and notices of Total Score and Final Distribution); and any other data deemed relevant by the Parties, the Allocation Neutral, the Medical Panel and/or the Claims Appeal Neutral;

iii.    **Communication:**   Coordinate and communicate as necessary with the Parties, their counsel, and others as directed by the Parties; design and maintain an official settlement website that provides the Parties and their respective counsel secure access to Allocation Process data; and coordinate with the Parties in drafting form letters for use in conveying Deficiency Notices, Preliminary Payments, Permanent Disability Fund awards, Qualifying Surgery payments, Mixed Orthopedic Injury payments, notices of Total Score, and Final Distributions, if any, to Plaintiffs;

iv.    **Periodic Status Reports:**   Provide via its secure website regular reports to Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel, the WTC Captive and its counsel, and the Claims Appeal Neutral regarding all tasks performed by the Allocation Neutral in accordance with the Agreement, including (i) the status of the Allocation Neutral's claims review and determinations; (ii) the number of Deficiency Notices issued and the status of Plaintiffs' responses thereto; (iii) the status of Preliminary Payments, Final Distributions, Permanent Disability Fund awards, Qualifying Surgery payments, and Mixed Orthopedic Injury payments; (iv) the number and status of Reconsideration Requests; (v) the number and status of Appeals; (vi) the status of lien resolution by the Lien Resolution Administrator; (vii) the projected Final Point Value in each Master Docket; and (viii) the timing of the Allocation Process in compliance with Exhibit J to this Agreement.

v.    **Calculation of Interim Payments and Final Distributions:**   Calculate Interim Payments and Final Distributions based upon the Medical Proof Criteria, Adjustment Factors, and application of the Point System; and

vi.   **Administration of Settlement Proceeds:**   Coordinate with the WTC Captive and Plaintiffs' Liaison Counsel to render Preliminary Payments, Permanent Disability Fund awards, Qualifying Surgery payments, Mixed Orthopedic Injury payments, and Final Distributions, if any, to Plaintiffs; manage disbursement data; obtain information from Plaintiffs identifying lien holders and government payors that have paid for and/or reimbursed Plaintiffs for expenses or losses related to Debris Removal Claims, and confirm that all such liens or other claims have been satisfied by the Plaintiff; remit payment of service provider fees and costs as approved by the Parties; perform necessary tax accounting; and respond to the Parties' requests for financial data.

This list of tasks is not exhaustive, and the Allocation Neutral may develop a final, exhaustive list of procedures required to carry out the efficient and timely administration of the Allocation Process consistent with this Agreement, including but not limited to the Allocation Process Timeline attached hereto as Exhibit J.

The Claims Appeal Neutral's duties are specified in Section XIV.C of this Agreement.

**C.   Limitations on the Allocation Neutral's and Claims Appeal Neutral's Duties**

Neither the Allocation Neutral nor the Claims Appeal Neutral shall provide any legal advice to any Party or Parties, including with respect to:

i.    The merits and/or terms of this Agreement and/or the Final Settlement Agreement; or

ii.   The nature, value and/or sufficiency of the Settlement Amount, the Cancer Insurance Policy, the Permanent Disability Fund, any Contingent Payments and/or any other payments described in this Agreement and/or in the Final Settlement Agreement.

Nothing in this Agreement shall relieve any counsel of his or her sole responsibility, or otherwise alter or transfer that responsibility, to advise his or her respective client or clients concerning all matters set forth in Agreement, including without limitation all notices from and determinations by the Allocation Neutral and the Claims Appeal Neutral with respect to Plaintiffs or to any Plaintiff.

**D.   Payment of Allocation Costs**

In addition to the Settlement Amount and its other payments potentially due hereunder, the WTC Captive shall pay the reasonable fees, costs and expenses of the Allocation Neutral, the Lien Resolution Administrator, the Medical Panel and Feinberg Rozen, LLP (collectively, "Allocation Costs") up to and including Three Million Five Hundred Thousand Dollars and No Cents ($3,500,000.00).

Thereafter, if Other Defendants become parties to the Final Settlement Agreement pursuant to Section XXI.P of this Agreement or if Other Defendants or the London Marine Insurers otherwise participate in the Allocation Process or any aspect thereof pursuant to separate settlements with Plaintiffs in any Master Docket(s), as evidenced by a settlement agreement, memorandum of understanding, or other binding contract evidencing a commitment to so participate, executed on or before September 1, 2010, those Other Defendants and the London Marine Insurers shall pay to the Allocation Neutral a contribution towards Allocation Costs totaling (i) five percent (5%) of the first One Million Dollars and No Cents ($1,000,000.00) of their respective settlements with Plaintiffs plus (ii) one percent (1%) of the amount of their respective settlements with Plaintiffs exceeding the first One Million Dollars and No Cents ($1,000,000.00) thereof. Thereafter, if Other Defendants become parties to the Final Settlement Agreement pursuant to Section XXI.P of this Agreement or if Other Defendants or the London Marine Insurers otherwise participate in the Allocation Process or any aspect thereof pursuant to separate settlements with Plaintiffs in any Master Docket(s), those Other Defendants and the London Marine Insurers shall pay to the Allocation Neutral a contribution towards Allocation Costs totaling (i) ten percent (10%) of the first One Million Dollars and No Cents ($1,000,000.00) of their respective settlements with Plaintiffs plus (ii) five percent (5%) of the amount of their respective settlements with Plaintiffs exceeding the first One Million Dollars and No Cents ($1,000,000.00). These monies shall be in addition to the monies paid to Plaintiffs and not reduce their award in any way. The Allocation Neutral shall credit these funds against Allocation Costs solely as provided in this Section XI.D and, after the Effective Date, no Plaintiff shall settle with any Other Defendant or the London Marine Insurers without their respective written agreement to contribute to Allocation Costs in the manner specified in this Section XI.D. In addition to its contributions to Allocation Costs as set forth above, settling Other Defendants and London Marine Insurers shall pay all fees, costs and expenses relating to the allocation of their respective settlements that exceed the scope of the Allocation Process described herein, including without limitation fees, costs and expenses relating to adding litigants or claimants other than the Parties to the Allocation Process.

If the WTC Captive's payments and settling Other Defendants' and London Marine Insurers' contributions to Allocation Costs required by this Section XI.D exceed total Allocation Costs, at the end of the Allocation Process all such excess monies shall be apportioned by the Allocation Neutral among and paid to all Verified Tier 4 Primary Plaintiffs and corresponding Derivative Plaintiffs in proportion to their respective Final Distributions.

Alternatively, if any Allocation Costs remain after all payments by the WTC Captive and settling Other Defendants' and London Marine Insurers' contributions to Allocation Costs required by this Section XI.D, such remaining Allocation Costs shall be paid (i) with interest earned on the Settlement Amount from the Effective Date through the date that the Separate Account referenced in Section III.A is funded fully by the WTC Captive and, thereafter, (ii) with interest

earned on the balance held in that Separate Account through the end of the Allocation Process. Any interest described in this Section XI.D that remains after payment of all Allocation Costs shall be apportioned among the Master Dockets and the Permanent Disability Fund in proportion to the allocation of the Settlement Amount among the Master Dockets and the Permanent Disability Fund specified in Sections II.B.i and II.B.iii of this Agreement, respectively.

Allocation Costs also shall be fixed by separate retainer agreements with the Allocation Neutral (including the Lien Resolution Administrator), the Medical Panel and Feinberg Rozen, LLP, respectively. Under no circumstances shall the WTC Captive or the Insureds pay, nor shall any interest described in this Section XI.D be used to satisfy, any Allocation Costs exceeding these fixed amounts.

In addition, if the Parties retain the Allocation Neutral, the Lien Resolution Administrator, Feinberg Rozen, LLP and/or the Medical Panel before the Final Settlement Agreement Effective Date, the WTC Captive shall pay in full their respective retainer fee(s) due before that date; provided, however, that any such payment(s) by the WTC Captive prior to the Final Settlement Agreement Effective Date shall be credited against its obligation to pay Allocation Costs as set forth in this Section XI.D.

The Parties also acknowledge that Plaintiffs' counsel will retain an experienced legal ethics consultant to assist them develop appropriate written communications to Plaintiffs explaining this Agreement. The fees, costs and expenses of this consultant are not included within Allocation Costs and shall not otherwise be paid by the WTC Captive, the Insureds or any of them.

## E.    Allocation Neutral and Claims Appeal Neutral Retainer Agreements

The Parties shall enter into separate retainer agreements with the Allocation Neutral ("Allocation Neutral Agreement"), on the one hand, and with the Claims Appeal Neutral ("Claims Appeal Neutral Agreement"), on the other hand.

The Allocation Neutral Agreement and Claims Appeal Neutral Agreement shall require the Parties to hold harmless the Allocation Neutral and his or her staff and the Claims Appeal Neutral and his or her staff, respectively, with respect to any and all determinations of Plaintiffs' respective payments, if any, under the Final Settlement Agreement and shall require the Parties to defend and indemnify the Allocation Neutral and his or her staff and the Claims Appeal Neutral and his or her staff in the event of any claims against them or any of them relating in any way to this Agreement, the Final Settlement Agreement and/or to the Allocation Neutral Agreement or to the Claims Appeal Neutral Agreement.

## F.    Allocation Neutral Website

The Allocation Neutral shall establish a secure website to facilitate the transmission of and access to in electronic form all submissions to and communications from the Allocation Neutral and/or the Claims Appeal Neutral

authorized or required by this Agreement. This website shall be hosted in a secure environment. The Parties and their respective counsel shall make all submissions to the Allocation Neutral and to the Claims Appeal Neutral, and the Allocation Neutral and the Claims Appeal Neutral shall communicate with the Parties and their respective counsel, by uploading or transferring electronically documents to the secure website.

The Hon. Alvin K. Hellerstein of the United States District Court for the Southern District of New York (hereinafter, "Court") and the Court's judicial officers and staff, the Claims Appeal Neutral, the Medical Panel, Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive and its counsel shall have access to all postings to the Allocation Neutral's website; provided, however, that if a Plaintiff objects to such access by the Court and its judicial officers and staff on the basis of the Plaintiff's medical confidentiality or privacy rights, the Plaintiff's counsel shall submit a letter to the Allocation Neutral interposing the objection and the Allocation Neutral shall restrict the Court's and its judicial officers' and staff's access, in its sole discretion, to the least extent possible consistent with the Plaintiff's objection.

**G.    Electronic Communications with the Allocation Neutral and the Claims Appeal Neutral**

All submissions to the Allocation Neutral or the Claims Appeal Neutral and all notices and other communications from the Allocation Neutral or Claims Appeal Neutral to the Parties and/or their respective counsel shall be transmitted electronically for sake of efficiency and to reduce costs, and shall be deemed confidential. The Claims Appeal Neutral, the Allocation Neutral, Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive shall have reasonable access to all such submissions, notices and communications.

**H.    City of New York Production of Additional Medical, Pharmaceutical and Accidental Disability Records and Confirmation of Date(s) of WTC Service**

With respect to Primary Plaintiffs (i) who allege employment by the City of New York giving rise to their respective Debris Removal Claims, (ii) who allege on the Eligible Plaintiff List a Tier 4 Qualifying Injury, (iii) whose names, social security numbers and alleged employing City agency(ies) or department(s) information is listed in a letter sent by Plaintiffs' Liaison Counsel to Defendant Insureds' Counsel within ten (10) days after the Effective Date, (iv) who execute Releases and Covenants Not to Sue in the form attached as Exhibit P to this Agreement, and (v) for whom the City of New York has not provided through its discovery responses in any Master Docket the information necessary for the Primary Plaintiff to affirm in his or her respective Claim Form his or her first and last date and duration of alleged exposure, the City of New York shall within sixty (60) days of the Effective Date or thirty (30) days after the Primary Plaintiff provides an executed Release and Covenant Not to Sue, whichever is later, (a) provide such information to Plaintiffs' Liaison Counsel or (b) state that despite a diligent search

it failed to locate any record of the Primary Plaintiff's alleged employment.  If a Primary Plaintiff claims that the City of New York failed to comply with the requirements of this paragraph, notwithstanding the Interim Stay that Primary Plaintiff shall have the right to subpoena, by service on Defendant Insureds' Counsel, the referenced information.  In addition, the City of New York's confirmation of a Primary Plaintiff's dates of 9/11-related employment pursuant to this paragraph shall satisfy the Work Verification Procedure set forth in Exhibit B to this Agreement with respect to that Primary Plaintiff.  Furthermore, with respect to Primary Plaintiffs who satisfy the requirements of only clauses (i) and (iii)-(v) of this paragraph, the City of New York shall confirm its employment, if any, of the Primary Plaintiff with respect to his or her alleged work giving rise to his or her Debris Removal Claims.  Such confirmation, if any, shall constitute a primary source for purposes of the Work Verification Procedure set forth in Exhibit B to this Agreement.

With respect to Primary Plaintiffs (i) who received medical care directly from the City of New York relating to their alleged Qualifying Injury(ies), (ii) whose names, social security numbers and alleged employing City agency(ies) or City department(s) information is listed in a letter sent by Plaintiffs' Liaison Counsel to Defendant Insureds' Counsel with fifteen (15) days of the Effective Date, (iii) who within fifteen (15) days of the Effective Date provide HIPAA-compliant releases to Defendant Insureds' Counsel authorizing the City of New York to release all of the Primary Plaintiff's medical records in its possession, custody or control, (iv) who execute Releases and Covenants Not to Sue in the form attached as Exhibit P to this Agreement, and (v) for whom the City of New York has not produced in any Master Docket any medical records concerning the Primary Plaintiff, the City of New York shall within seventy-five (75) days of the Effective Date or thirty (30) days after the Primary Plaintiff provides an executed Release and Covenant Not to Sue, whichever is later, (a) produce all medical and pharmaceutical records in its possession, custody or control to the Plaintiffs' Liaison Counsel or (b) state that despite a diligent search it failed to locate any such records in its possession, custody or control.  If a Primary Plaintiff claims that the City of New York failed to comply with the requirements of this paragraph, notwithstanding the Interim Stay that Primary Plaintiff shall have the right to subpoena, by service on Defendant Insureds' Counsel, the referenced records.  In addition, for Primary Plaintiffs who satisfy all of the requirements of this paragraph except clause (v), the City of New York shall seek to cause Express Scripts, Inc. to produce all pharmaceutical records in its possession relating to the Primary Plaintiff and, if Express Scripts, Inc. fails to do so, notwithstanding the Interim Stay such Primary Plaintiff may subpoena Express Scripts, Inc. directly.

With respect to Primary Plaintiffs (i) who were employed by the City of New York at the time of their alleged exposure giving rise to their respective Debris Removal Claims, (ii) who have applied for accidental disability or accident disability benefits (hereinafter "accidental disability") or line of duty death benefits or who receive (or, in the case of death benefits, whose heirs or assigns receive) such benefits that the Primary Plaintiff claims relate, in whole or in part,

to his or her Debris Removal Claims, (iii) whose names, social security numbers and alleged employing City agency(ies) or City department(s) information is listed in a letter sent by Plaintiffs' Liaison Counsel to Defendant Insureds' Counsel on or before April 12, 2010, (iv) who within fifteen (15) days of the Effective Date provide a HIPAA-compliant release authorizing the release all of the Primary Plaintiff's accidental disability or line of duty death benefits documentation, (v) who execute Releases and Covenants Not to Sue attached as Exhibit P to this Agreement, and (vi) who claim eligibility for the Permanent Disability Fund on the Eligible Plaintiff List, the City of New York shall cooperate with the Primary Plaintiffs' reasonable efforts to secure the production by the New York City Fire Department Pension Fund or the Police Pension Fund of the Police Department of the City of New York of all of their respective files concerning the Primary Plaintiffs' accidental disability or line of duty death benefits or the application for those benefits, including with respect to subpoenas issued by such Primary Plaintiffs' respective counsel to the New York City Fire Department Pension Fund or to the Police Pension Fund of the Police Department of the City of New York pursuant to Section XX.B of this Agreement. Plaintiffs who have endeavored in good faith to satisfy the conditions in clauses (i) through (vi) of this paragraph also shall have the right to subpoena their respective New York City Fire Department Pension Fund or Police Pension Fund of the Police Department of the City of New York records notwithstanding the Interim Stay by service of such subpoena(s) on the New York City Fire Department Pension Fund or the Police Pension Fund of the Police Department of the City of New York.

In addition, for purposes of the Work Verification Procedure set forth in Exhibit B to this Agreement, the City of New York shall search Fire Department of New York records for copies of letters awarding ribbons commemorating the service of active and retired Fire Department of New York personnel during World Trade Center recovery operations (hereinafter, "FDNY WTC Ribbon Letters"). With respect to Primary Plaintiffs who are active or retired Fire Department of New York personnel but whose names are not listed on the "pre-approved list" referenced in Exhibit B to this Agreement, the City of New York shall produce to Plaintiffs' Liaison Counsel within seventy-five (75) days after the Effective Date copies of all FDNY WTC Ribbon Letters located as a result of this search, provided that Plaintiffs' Liaison Counsel sends a list of all such Plaintiffs to Defendant Insureds' Counsel within fifteen (15) days after the Effective Date.

I.    **Claim Form and Qualifying Medical Records**

Counsel for each Primary Plaintiff who claims eligibility for any Tier shall submit to the Allocation Neutral a Claim Form on behalf of the Primary Plaintiff and any corresponding Derivative Plaintiff. Plaintiffs (including Derivative Plaintiffs and Personal Representatives of deceased Plaintiffs' estates, where applicable) shall sign their respective Claim Forms under penalty of perjury before a notary public.

The purpose of the Claim Form is to simplify and streamline the Allocation Neutral's work to the extent reasonably possible and, together with the Medical

Proof Criteria, to ensure consistency of awards among individual Plaintiffs. Claim Forms will be submitted in the form of Exhibit L to this Agreement. In addition to claimed Qualifying Injury(ies), the Claim Forms shall address the requirements for a Permanent Disability Fund award, for a Mixed Orthopedic Injury payment, and/or for a Qualifying Surgery payment.

Each Claim Form shall list any Qualifying Injuries claimed by the Primary Plaintiff and attach Qualifying Medical Records to enable the Allocation Neutral to verify each such Qualifying Injury. Claim Forms shall only attach, and the Allocation Neutral shall only consider, Qualifying Medical Records. In addition, Primary Plaintiffs who seek recovery for a Qualifying Surgery or Mixed Orthopedic Injury shall address those claims in their respective Claim Forms and attach Qualifying Medical Records, together with any other records necessary to establish that the alleged Mixed Orthopedic Injury occurred in the course of the Primary Plaintiff's work or other volunteer service at the WTC Site or at another location at which he or she alleges exposure giving rise to his or her Debris Removal Claims. Separately, Primary Plaintiffs who submit Claim Forms alleging a Tier 4 Qualifying Injury must provide all reasonably available information relevant to the Allocation Neutral's evaluation and application of the Adjustment Factors identified in Section XIII.B of this Agreement.

All Claim Forms shall identify all known lien holders and other claims by third party payors as required by Section XVIII of this Agreement. Plaintiffs shall represent and warrant by submitting their Claim Form that any such liens or other claims have been or will be satisfied, compromised or otherwise resolved by the Plaintiff prior to receipt of any payments pursuant to this Agreement.

Primary Plaintiffs who claim eligibility for the Permanent Disability Fund shall address all eligibility criteria for the Permanent Disability Fund as set forth in Section XVII of this Agreement in their respective Claim Forms.

Each Claim Form shall state whether the Primary Plaintiff ever received a monetary award from the September 11th Victim Compensation Fund for purposes of determining the Primary Plaintiff's eligibility, if any, for payments pursuant to Section VII.A.

A Plaintiff's Claim Form, including the Qualifying Medical Records submitted with the Claim Form, shall constitute a Plaintiff's entire submission to the Allocation Neutral. For sake of efficiency and to ensure fairness and objectivity, no Plaintiff shall be entitled to a live hearing with the Allocation Neutral or the Claims Appeal Neutral, nor shall any Plaintiff communicate with the Allocation Neutral or Claims Appeal Neutral in any manner not set forth in this Agreement.

A Plaintiff's Claim Form may be submitted to the Allocation Neutral together with the Plaintiff's submission of an executed Release and Covenant Not to Sue, but shall be submitted to the Allocation Neutral on or before forty-five (45) days after the Final Settlement Agreement Effective Date.

**J.     Notice of Ineligible Records**

Fifteen (15) days after receiving any Claim Form, the WTC Captive, its counsel or its non-attorney designee shall provide a Notice of Ineligible Records, if applicable, to the Allocation Neutral and counsel for the Plaintiff(s) affected by such Notice of Ineligible Records. Notices of Ineligible Records shall identify all medical record(s) submitted with any Claim Form that do not constitute Qualifying Medical Records; however, no Notice of Ineligible Records shall be used for any other purpose or contain any other information. The affected Plaintiff's counsel shall then have an opportunity to respond to such a Notice of Ineligible Records, but only by providing additional Qualifying Medical Records and/or by demonstrating to the Allocation Neutral's satisfaction that the records previously produced meet the definition of Qualifying Medical Records. The Allocation Neutral shall decide the outcome of any such dispute concerning a Notice of Ineligible Records; provided, however, that the Allocation Neutral shall do so consistent with the principle that Plaintiffs have agreed that records that do not meet the definition of Qualifying Medical Records shall not be considered by the Allocation Neutral when evaluating any Primary Plaintiff's Qualifying Injury(ies), if any, or his or her eligibility, if any, for Qualifying Surgery payments, or Mixed Orthopedic Injury payments.

**K.     Deficiency Notices**

If the Allocation Neutral considers any Claim Form, including some or all of the Qualifying Medical Records submitted therewith, to be deficient in any respect, the Allocation Neutral shall provide a Deficiency Notice to the Primary Plaintiff's counsel, with copies to the WTC Captive and Defendant Insureds' Counsel, regardless of whether the deficiency pertains to the Primary Plaintiff and/or any corresponding Derivative Plaintiff. Following receipt of a Deficiency Notice, the Plaintiff's counsel shall have fifteen (15) days to respond to the Allocation Neutral. This response shall be limited to a revised Claim Form, if appropriate in the Plaintiff's counsel's judgment, additional Qualifying Medical Records, if available, and/or additional records pertaining to the Work Verification Procedure. A Plaintiff who fails to timely respond to a Deficiency Notice and/or who timely responds but who, in the Allocation Neutral's judgment, fails to address some or all of the deficiencies identified in the Deficiency Notice shall not be entitled to any payment under this Agreement to which the deficiency relates, in whole or in part, other than his or her respective Initial Payment if that Initial Payment was issued prior to issuance of the Deficiency Notice.

**L.     HIPAA-Compliant Release Forms**

Together with their respective Claim Forms, all Primary Plaintiffs electing to participate in the Allocation Process for Tier 3 or Tier 4 shall provide a HIPAA-compliant release authorizing the Allocation Neutral to collect any and all medical records pertaining to the Primary Plaintiff. This HIPAA-compliant release shall not be limited to specific medical providers or by the date that the

Primary Plaintiff's medical records were generated.   Such HIPAA-compliant releases shall only be used in conjunction with audit(s) conducted pursuant to Sections XI.M and XI.N of this Agreement, and shall be destroyed at the conclusion of the Allocation Process.  A Primary Plaintiff who claims a Tier 3 Qualifying Injury or Tier 4 Qualifying Injury, but who fails to submit to the Allocation Neutral this HIPAA-compliant release by the deadlines for submission of Claim Forms as set forth in Exhibit J, shall not be eligible for any Accelerated Final Payment, Interim Payment or Final Distribution until he or she submits the required HIPAA-compliant release.  The Allocation Neutral shall provide written notice to Primary Plaintiffs who fail to comply with this Section XI.L and thereafter shall afford such Primary Plaintiffs a reasonable opportunity to cure such non-compliance.  Failure to so cure shall result in the Primary Plaintiff's waiver of any payments otherwise due under the Final Settlement Agreement, but shall not affect in any way the validity of such Primary Plaintiff's Release and Covenant Not to Sue.

**M.     Tier 3 and Tier 4 Random Audits**

No audits shall be conducted with respect to Tier 1 or Tier 2 claims.

Primary Plaintiffs claiming a Tier 3 Primary Qualifying Injury or a Tier 4 Primary Qualifying Injury are subject to audit, as set forth in this Section XI.M.  To select Tier 3 and Tier 4 Primary Plaintiffs for audit, the Allocation Neutral shall draw a random sample of (i) five percent (5%) of all Primary Plaintiffs who submit Claim Forms alleging a Tier 3 Primary Qualifying Injury and (ii) five percent (5%) of all Primary Plaintiffs who submit Claim Forms alleging a Tier 4 Primary Qualifying Injury.  Upon selecting a Primary Plaintiff for audit in this fashion, the Allocation Neutral shall:

i.     Notify Plaintiffs' Liaison Counsel of the audit and direct that, within twenty (20) days, the affected Primary Plaintiff submit to the Allocation Neutral all of the Primary Plaintiff's medical records in his or her and in his or her counsel's possession;

ii.     Direct that Primary Plaintiff's counsel provide a list of all medical providers seen by the Primary Plaintiff since 1995; and

iii.     Exercise to the extent reasonably necessary in the Allocation Neutral's judgment the rights provided in the HIPAA-compliant release to obtain the audited Primary Plaintiff's medical records from health care providers.

The Allocation Neutral shall upload or transfer to the secure website, as provided in Section XI.F of this Agreement, any medical records received in conjunction with an audit.  All records received in connection with the audit process shall be considered Qualifying Medical Records for purposes of calculating the audited Primary Plaintiffs' respective Total Scores and evaluating their Qualifying Injuries, if any.

Tier 3 audits shall be limited to assessing whether the statements in the Primary Plaintiff's Claim Form and Qualifying Medical Records materially misrepresent, materially omit or materially conceal facts that affect the Primary Plaintiff's ability to meet the Tier 3 proof requirements set forth in Section VIII.D of this Agreement. Tier 3 audits shall be conducted by the Allocation Neutral as quickly as reasonably possible, consistent with the expedited nature of Tier 3 review, as set forth in Exhibit J.

Tier 4 audits shall be limited to assessing whether the statements in the Primary Plaintiff's Claim Form and Qualifying Medical Records materially misrepresent, materially omit or materially conceal facts that affect the Primary Plaintiff's Total Score. Tier 4 audits shall be conducted within the timeframe for completion of the Tier 4 Allocation Process as set forth in Exhibit J.

Subject to the limitations of two proceeding paragraphs with respect to Tier 3 and Tier 4 audits, if as a result of any Tier 3 or Tier 4 audit the Allocation Neutral determines that material misrepresentation, material omission or material concealment has occurred that is not attributable to any clerical error or other inadvertent act or omission, the Allocation Neutral shall (a) direct that no further payment otherwise due hereunder be made to the affected Primary Plaintiff and corresponding Derivative Plaintiff, if any; (b) notify the Insureds and the WTC Captive, which shall have the right, if any, to bring a claim against the affected Primary Plaintiff and corresponding Derivative Plaintiff, if any, for damages, including return of any payments already made to him or her; and (c) report the Primary Plaintiff to the authorities responsible for bringing perjury charges and send those authorities all documents that the Allocation Neutral considers evidence of perjury. Plaintiffs agree that the consequences of any audit shall in no way affect the validity of their Releases and Covenants Not to Sue.

All of the Allocation Neutral's reasonable costs, fees and expenses pertaining to Tier 3 and Tier 4 random audits shall be paid in accordance with Section XI.D of this Agreement.

**N.    Tier 3 and Tier 4 Targeted Audits**

If more than ten percent (10%) of Tier 3 and/or Tier 4 claims selected for random audits as provided in Section XI.M of this Agreement result in findings by the Allocation Neutral of material misrepresentation, material omission or material concealment of the type delineated in Section XI.M of this Agreement, the Allocation Neutral shall conduct a further audit of another five percent (5%) of the affected Tier or Tiers. To select Primary Plaintiffs for these further audit(s), if any, the Allocation Neutral shall target Primary Plaintiffs for whom the Allocation Neutral determines, based upon his or her experience with the Allocation Process, the Claim Forms, the Medical Proof Criteria, and the application of Adjustment Factors, that additional medical records are likely to disclose material misrepresentations, material omissions or material concealment affecting Tier 4 Plaintiffs' Total Scores or satisfaction of Tier 3's proof

requirements. These non-random, targeted audits, if any, will be conducted in the same manner and with the same consequences as the random audits conducted pursuant to Section XI.M of this Agreement; provided, however, that if either of these targeted audit(s) results in the findings of material misrepresentations, material omissions or material concealment affecting greater than 10% of the targeted Primary Plaintiffs' claims, all of the Allocation Costs resulting from the targeted audit(s) shall be applied against Settlement Amount principal.

**O.      Timing of the Allocation Process**

The Allocation Neutral and Claims Appeal Neutral shall use best efforts to complete the Allocation Process, all random audits required by Section XI.M of this Agreement, and the targeted audit(s), if any, authorized pursuant to Section XI.N of this Agreement on the schedule set forth in Exhibit J to this Agreement. The Parties will cooperate with the Allocation Neutral and the Claims Appeal Neutral in all respects to complete the Allocation Process and all audits within the time for doing so proscribed in Exhibit J hereto.

Consistent with Exhibit J, the Allocation Neutral's Tier 1, Tier 2, and Tier 3 determinations and all Initial Payments and Accelerated Final Payments, except payments to Plaintiffs selected for any audit, shall proceed on an expedited basis, subject to the requirements of Section IX of this Agreement.

**P.      Confidentiality of the Allocation Process**

All communications with the Allocation Neutral, including without limitation all Primary Plaintiffs' submissions to the Allocation Neutral of Claim Forms and Qualifying Medical Records, and all submissions to and determinations by the Claims Appeal Neutral shall remain confidential and are subject to Federal Rule of Evidence 408 and all similar state evidentiary rules governing the admissibility of settlement communications; provided, however, that all communications with the Allocation Neutral or the Claims Appeal Neutral shall be available to the WTC Captive and the Insureds and their respective counsel and can be used for any purpose in connection with the Allocation Process and/or in any litigation resulting from or arising out of a material misrepresentation, material omission or material concealment by a Plaintiff and/or his or her counsel that is detected by the Allocation Neutral and/or in any litigation to enforce this Agreement or a Plaintiff's Release and Covenant Not to Sue; provided further, however, that this Section XI.P shall not limit in any way the WTC Captive's, the Insureds', Other Defendants' and/or any of their use of any Primary Plaintiff's responses to the Federal Rule of Civil Procedure 33 interrogatories referenced in Sections VI.A and XIII.B.viii of this Agreement.

In addition, and without limiting any of the provisions of the preceding paragraph of this Section XI.P or the website access provisions in Section XI.F of this Agreement, neither the Allocation Neutral, the Claims Appeal Neutral, the Medical Panel, the WTC Captive, the Insureds or any of them, the Court or its

judicial officers or staff, nor any other person may disclose any individual Primary Plaintiff's name, Social Security Number, civil action number, Qualifying Medical Records, Qualifying Injury(ies) as determined by the Allocation Neutral and/or the Claims Appeal Neutral, or other information concerning a Primary Plaintiff to the extent that such disclosure would reveal to any other Plaintiff, other Plaintiff's counsel (other than Plaintiffs' Liaison Counsel), or to any other third parties a particular Primary Plaintiff's Qualifying Medical Records and/or Qualifying Injuries as determined by the Allocation Neutral or the Claims Appeal Neutral due to privacy issues, including the protections afforded to Primary Plaintiffs under the Health Insurance Portability and Accountability Act of 1996 (hereinafter, "HIPAA"); provided, however, that the Allocation Neutral, the WTC Captive and the Insureds shall be under no such obligations with respect to (i) any claim(s) or requests for medical records arising out of an audit referenced in Sections XI.M and XI.N of this Agreement; (ii) any action to enforce this Agreement; and/or (iii) any action to enforce a Primary Plaintiff's executed Release and Covenant Not to Sue.

## XII.  MEDICAL PROOF CRITERIA

The Allocation Neutral shall apply the Medical Proof Criteria set forth in the tables below to verify Tier 2 Qualifying Injuries as set forth in Section VIII.C of this Agreement, Tier 3 Qualifying Injuries as set forth in Section VIII.D of this Agreement, and Tier 4 Qualifying Injuries as set forth in Section VIII.E of this Agreement.  For organizational purposes, the tables below group all Qualifying Injuries into disease groups ("Disease Groups").

With the exception of Mixed Orthopedic Injuries and Qualifying Surgeries, the evaluation of which are governed by Sections  XVIII.A and XVIII.B of this Agreement, respectively, when the Allocation Neutral is evaluating a Primary Plaintiff's Claim Form and Qualifying Medical Records in connection with the Allocation Process, the Allocation Neutral shall credit only those injuries and impairment allegations alleged in the Claim Form and verified according to the Medical Proof Criteria through an evaluation of Qualifying Medical Records provided by the Primary Plaintiff, as required under Section XI.I of this Agreement.

To constitute a Qualifying Injury, an alleged injury must satisfy all three of the following components of the Medical Proof Criteria:  (i) it must be one of the "Qualifying Injuries" listed expressly in the tables below; (ii) it must meet the "Diagnostic Criteria" applicable to the Disease Group in which the Qualifying Injury is listed in the tables below; and (iii) it must satisfy the "Impairment Criteria" for the Disease Group in which the Qualifying Injury is listed in the tables below.

The Medical Proof Criteria tables are set forth below:

# Chronic Obstructive Pulmonary Disease

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are COPD, Chronic Bronchitis, Emphysema, Bullous Lung Disease, Small Airway(s) Disease and Obstructive Airway(s) Disease.

Obstructive Lung Defect, Small Obstructive Lung Defect, Ground Glass Syndrome, Peripheral Airway(s) Dysfunction, WTC Cough and Chronic Cough are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Medical Verification Requirements |
|---|---|
| A0 & A1 | Physician Diagnosis of Qualifying Injury in the COPD disease group. |
| A2 to A4 | **Spirometry tests:**<br>    Post-bronchodilator $FEV_1$/FVC ≤0.7 (≤70%) (use post-BD when possible; otherwise, use pre-BD value)<br>      *Source: European Respiratory Society/American Thoracic Society COPD Guidelines – 2005*<br><br>***OR***<br><br>For Emphysema only, a CT Scan that states as a conclusion any or all of the following: Emphysema (panlobular, panacinar or paraseptal), Bullous disease, or giant bullae; provided, however, that conclusions on a CT Scan reflecting mild or minor emphysematous changes, air-trapping, pneumatoceles, cysts or cystic disease, and/or bronchiectasis shall not qualify. |

## 3. Impairment Criteria

| Severity Level | Criteria |
|---|---|
| A0 | No further requirements. |
| A1 | **Pulmonary Function Test results showing:**<br>    FVC ≤79% of predicted **or** $FEV_1$ of ≤79% of predicted; ***OR***<br>**Carbon Monoxide Diffusion Capacity Test results showing:**<br>    DLCO of ≤74% of predicted; ***OR***<br>**Cardio-Pulmonary Stress Test results showing:**<br>    $VO_2$ max of ≤25ml/(kg·min) **or** $VO_2$ max of ≤7.1 METs. |

**To prove impairment for Severity Levels exceeding A1:**

A Primary Plaintiff must submit the results from any two Pulmonary Function Test(s) ("PFTs"), Carbon Monoxide Diffusion Capacity Test(s), and/or Cardio-Pulmonary Stress Test(s). The Primary Plaintiff's most recent test must be included among those two tests and must meet the Impairment Criteria for Severity Level A2, A3 or A4. The other test must be at least three months prior to the most recent test, and must satisfy, at a minimum, the Impairment Criteria for Severity Level A1. To determine the Base Points for such a Primary Plaintiff's Qualifying Injury, the Allocation Neutral shall average the Base Points specified on Exhibit C to this Agreement for these two tests.

The preceding paragraph shall not apply to deceased Primary Plaintiffs, however. Deceased Primary Plaintiffs may satisfy the Impairment Criteria for Severity Level A2, A3 or A4, respectively, by submitting the results of any one (1) test that complies with the requirements for the claimed Severity Level as set forth below.

| A2 | **Pulmonary Function Test results showing:**<br>    FVC 60% to 69% of predicted *or* FEV$_1$ 55% to 64% of predicted; *OR*<br>**Carbon Monoxide Diffusion Capacity Test results showing:**<br>    DLCO of 55% to 64% of predicted; *OR*<br>**Cardio-Pulmonary Stress Test results showing:**<br>    VO$_2$ max of 18 to 21ml/(kg·min) *or* VO$_2$ max of 5.1 to 6.0 METs. |
|:---:|:---|
| A3 | **Pulmonary Function Test results showing:**<br>    FVC 50% to 59% of predicted *or* FEV$_1$ 45% to 54% of predicted; *OR*<br>**Carbon Monoxide Diffusion Capacity Test results showing:**<br>    DLCO of 45% to 54% of predicted; *OR*<br>**Cardio-Pulmonary Stress Test results showing:**<br>    VO$_2$ max of 15 to 17ml/(kg·min) *or* VO$_2$ max of 4.3 to 5.0 METs. |
| A4 | **Pulmonary Function Test results showing:**<br>    FVC less than 50% of predicted *or* FEV$_1$ less than 45% of predicted; *OR*<br>**Carbon Monoxide Diffusion Capacity Test results showing:**<br>    DLCO of less than 45% of predicted; *OR*<br>**Cardio-Pulmonary Stress Test results showing:**<br>    VO$_2$ max of <15ml/(kg·min) *or* VO$_2$ max of <4.3 METs. |

# Interstitial Lung Disease

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group include Chemical Pneumonitis, BOOP, Eosinophilic or other Granulomatosis, Hypersensitivity Pneumonitis, Sarcoidosis, Silicosis, Asbestosis, Pulmonary or Interstitial Fibrosis, Interstitial Lung Disease, Pneumoconiosis and Wegener's Granulomatosis.

Restrictive Lung Defect is an example of a medical condition, finding or observation that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Medical Verification Requirements |
|:---:|:---|
| B0<br>to<br>B4 | Chest CT or X-ray finding supporting such diagnosis, such as bibasilar reticular abnormalities (*e.g.*, increased interstitial markings, honey-combing, hazy opacifications that are worse in the subpleural and inferior regions) with or without ground glass opacities or a lung biopsy that supports said diagnosis.<br><br>*Source: ATS/ERS Criteria for Diagnosis of Idiopathic Pulmonary Disease in Absence of Surgical Lung Biopsy* |

## 3. Impairment Criteria

| Severity Level | Required Testing and Results |
|:---:|:---|
| B0 | No further requirements. |
| B1 | **Full Pulmonary Function Test** showing:<br>    TLC less than or equal to 79% predicted; *and*<br>    FVC less than or equal to 79% predicted; *and*<br>    FEV$_1$/FVC (%)>70% predicted. |

**To prove impairment for Severity Levels exceeding B1:**

Except with respect to the separate Impairment Criteria for Sarcoidosis at the B3 and B4 Severity Levels, a Primary Plaintiff must submit the results from two full PFTs. The Primary Plaintiff's most recent full PFT, or any other full PFT within one year prior to March 12, 2010, must be included among those two tests and must meet the Impairment Criteria for Severity Level B2, B3 or B4. The other PFT must be at least three months prior to the PFT referenced above and must satisfy, at a minimum, the Impairment Criteria for Severity Level B1. To determine the Base Points for such a Primary Plaintiff's Qualifying Injury, the Allocation Neutral shall average the Base Points specified on Exhibit C to this Agreement for these two tests.

The preceding paragraph shall not apply to deceased Primary Plaintiffs, however. Deceased Primary Plaintiffs may satisfy the Impairment Criteria for Severity Level B2, B3 or B4, respectively, by submitting the results of any one (1) test that complies with the requirements for the claimed Severity Level as set forth below. In addition, the preceding paragraph shall not apply to Primary Plaintiffs who submit the results of one (1) full PFT satisfying the Impairment Criteria for B2, B3 or B4 and the results of one (1) high resolution CT Scan that the Allocation Neutral determines confirms impairment at the B2, B3 or B4 Severity Levels.

| | |
|---|---|
| **B2** | **Full Pulmonary Function Test** showing:<br>TLC less than or equal to 69% predicted; ***and***<br>FVC less than or equal to 69% predicted; ***and***<br>$FEV_1$/FVC (%)>70% predicted |
| **B3** | **Full Pulmonary Function Test** showing:<br>TLC less than or equal to 59% predicted; ***and***<br>FVC less than or equal to 59% predicted; ***and***<br>$FEV_1$/FVC (%)>70% predicted.<br><br>***OR***, for Sarcoidosis only, a CT Scan and/or X-ray showing diffuse interstitial infiltrates without hilar adenopathy (this is the equivalent of Stage III radiographic Sarcoidosis staging). |
| **B4** | **Full Pulmonary Function Test** showing:<br>TLC lower than 50% predicted; ***and***<br>FVC lower than 50% predicted; ***and***<br>$FEV_1$/FVC (%)>70% predicted.<br><br>***OR***, for Sarcoidosis only, a CT Scan and/or X-ray showing diffuse fibrosis, often associated with fibrotic-appearing conglomerate masses, traction bronchiectasis, and traction cysts (this is the equivalent of Stage IV radiographic Sarcoidosis staging). |

# Asthma/RADS

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are Asthma, Reactive Airway(s) Disease ("RADS"), Chronic Asthmatic Bronchitis, Asthma Exacerbation, Airway(s) Hyperreactivity, and Hyperreactive Airway(s).

Hyperresponsiveness, Bronchospasm, and WTC Syndrome are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Medical Verification Requirements |
|---|---|
| C0 & C1 | Physician Diagnosis of Qualifying Injury in the Asthma/RADS disease group. |
| C2 to C4 | **Pulmonary Function Test (PFT)**:<br>    Pre-bronchodilator $FEV_1$ of <80% predicted, **and**<br>    Post-bronchodilator $FEV_1$ improvement of 12% or 250 cc;<br>**OR**<br><br>**Positive Methacholine Challenge Test (MCT)**: ≥20% decrease in $FEV_1$ at or below 8 mg/ml<br><br>*Sources: Global Initiative for Asthma/World Health Organization; American College of Chest Physicians Consensus Statement* |

## 3. Impairment Criteria

| Severity Level | Criteria |
|---|---|
| C0 | No further requirements. |
| C1 | MCT response (*i.e.*, ≥20% decrease in $FEV_1$) at between 3 and 5 mg/ml; **OR**<br>PFT with Post-BD $FEV_1$ of ≤80% of predicted; **OR**<br>Pharmacy records or physician notes of any steroid or bronchodilator use; **OR**<br>Plaintiff can satisfy the scoring criteria set forth in Exhibit Q through a combination of MCT, Post-BD $FEV_1$ and medication use to achieve a score of 1-6. |
| C2 | MCT response (*i.e.*, ≥20% decrease in $FEV_1$) at greater than 0.5 and up to and including 3 mg/ml; **OR**<br>Plaintiff can satisfy the scoring criteria set forth in Exhibit Q through a combination of MCT, Post-BD $FEV_1$ and medication use to achieve a score of 7-9. |
| C3 | MCT response (*i.e.*, ≥20% decrease in $FEV_1$) at 0.25 or greater and up to and including 0.5 mg/ml; **OR**<br>Plaintiff can satisfy the scoring criteria set forth in Exhibit Q through a combination of MCT, Post-BD $FEV_1$ and medication use to achieve a score of 10-11. |

| C4 | MCT response (*i.e.*, $\geq 20\%$ decrease in $FEV_1$) at up to 0.25 mg/ml; **OR** Physician statement that Asthma is not controlled despite the Primary Plaintiff's ingestion of either: |
|---|---|

        (1)     $\geq 20$ mg prednisone per day, >16 mg methylprednisolone per day or >3 mg dexamethasone per day and Qualifying Medical Records, including without limitation prescription records, demonstrating such daily oral steroid use by the Primary Plaintiff for at least six (6) months; *or*

        (2)     at least four (4) courses of any of $\geq 20$ mg prednisone per day, >16 mg methylprednisolone per day or >3 mg dexamethasone per day within one year AND a physician statement that the Primary Plaintiff cannot tolerate such long-term daily oral steroid use;

provided, however, that in the Allocation Neutral's judgment such physician statement(s) were issued in the course and in furtherance of the Primary Plaintiff's medical care and not upon the Primary Plaintiff's or his or her counsel's request.

**Alternative Base Points for Primary Plaintiffs who qualify for C1:**

For Primary Plaintiffs who (i) satisfy the Impairment Criteria for C1 and (ii) who submit a PFT that satisfies the requirements of the PFT Impairment Table (as defined below) in the PFT Only Criteria (as defined below) at PFT Impairment Level 2, Level 3 or Level 4 as specified in the PFT Impairment Table (collectively, "the Additive PFT"), the Allocation Neutral shall add to Base Points for Qualifying Injury C1 as set forth in Exhibit C to this Agreement 1250 Base Points for an Additive PFT that satisfies the requirements of Level 2 in the PFT Impairment Table, 2500 Base Points for an Additive PFT that satisfies the requirements of Level 3 in the PFT Impairment Table, or 3750 Base Points for an Additive PFT that satisfies the requirements of Level 4 in the PFT Impairment Table (collectively, "Additive PFT Base Points"). Notwithstanding any other provision of this Agreement, the sum of Base Points for Qualifying Injury C1 and any Additive PFT Base Points shall be deemed the Primary Plaintiff's Base Points.

**Alternative proof of impairment for Severity Levels exceeding C1 (hereinafter, "PFT Only Criteria"):**

In addition to satisfying the Impairment Criteria set forth above, a Primary Plaintiff may demonstrate impairment exceeding Severity Level C1 by submitting the results from three PFTs. For Primary Plaintiffs who rely upon three PFTs to establish such impairment, the Allocation Neutral shall calculate Base Points according to the following table:

**PFT Impairment Table**

| PFT Impairment Level | Requirements | Base Points |
|---|---|---|
| Level 1 | PFT with Post-BD $FEV_1$ of 70% to 80% of predicted | Base Points 7,500 |
| Level 2 | PFT with Post-BD $FEV_1$ of 60% to 69% of predicted | Base Points 25,000 |
| Level 3 | PFT with Post-BD $FEV_1$ of 50% to 59% of predicted | Base Points 60,000 |
| Level 4 | PFT with Post-BD $FEV_1$ below 50% of predicted | Base Points 85,000 |

Two of the three PFTs submitted must satisfy the requirements of PFT Impairment Level 2, PFT Impairment Level 3 or PFT Impairment Level 4 in the PFT Impairment Table. The three PFTs must be at least three months apart from one another. To determine how many Base Points to award, the Allocation Neutral shall average the Base Points set forth in the PFT Impairment Table for each PFT.

Notwithstanding the forgoing requirements of this PFT Only Criteria, a Primary Plaintiff with two (2) PFTs one of which is at PFT Impairment Level 2, PFT Impairment Level 3 or PFT Impairment Level 4, the Primary Plaintiff's Base Points shall be calculated by summing the Base Points associated with each PFT set forth in the PFT Impairment Table and dividing the total by three (3).

**Alternative proof of impairment for Severity Levels exceeding C0:**

Any Primary Plaintiff also may satisfy the Impairment Criteria for Severity Levels C1, C2, C3 or C4, respectively, through a single positive MCT response that produces a ≥20% decrease in $FEV_1$ within the methacholine dosage specified above in mg/ml. Where the dosage that produces a 20% decrease in $FEV_1$ is not apparent from the face of a Primary Plaintiff's Qualifying Medical Record(s) submitted to the Allocation Neutral, however, the Allocation Neutral may determine whether the Primary Plaintiff satisfies the Impairment Criteria in C1, C2, C3 or C4, respectively, by interpolating according to the following formula the actual methacholine dosage in mg/ml that would have produced the requisite 20% decrease:

$$PC_{20} = \text{anti}\log\left[\log C_1 + \frac{(\log C_2 - \log C_1)(20 - R_1)}{R_2 - R_1}\right]$$

For purposes of applying this formula:

$C_1$ = second-to-last methacholine concentration (prior to ≥20% decrease in $FEV_1$)
$C_2$ = final methacholine concentration (resulting in ≥20% decrease in $FEV_1$)
$R_1$ = percent decrease in $FEV_1$ (from baseline or post-diluent if a diluent step is used, whichever is higher) after $C_1$
$R_2$ = percent decrease in $FEV_1$ (from baseline or post-diluent if a diluent step is used, whichever is higher) after $C_2$
$PC_{20}$ = the methacholine dose (in mg/ml) required to produce 20% decrease in $FEV_1$ for purposes of placing the Primary Plaintiff into Severity Level C1, C2, C3 or C4, if applicable

In order for the Allocation Neutral to interpolate, the Primary Plaintiff must submit all data necessary to calculate $PC_{20}$ from a single Qualifying Medical Record. The Allocation Neutral shall not interpret based upon data from different Qualifying Medical Records.

# Laryngitis/Pharyngitis

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are Chronic Laryngitis and Chronic Pharyngitis. In addition, the Qualifying Injuries in this disease group shall include Laryngitis or Pharyngitis occurring with such frequency that it amounts to a chronic disease in the Allocation Neutral's judgment based upon the Primary Plaintiff's submission to the Allocation Neutral of Qualifying Medical Records.

Acute Laryngitis, Acute Pharyngitis, and Upper Respiratory Infections ("URI") are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Medical Verification Requirements |
|---|---|
| D0 & D1 | Physician Diagnosis of Qualifying Injury in the Laryngitis/Pharyngitis disease group. |

| D2 & D3 | Physical examination or endoscopy, including Laryngoscopy or Pharyngoscopy finding redness, inflammation and/or swelling of pharyngeal or laryngeal mucosal membranes. |
|---|---|
| **3. Impairment Criteria** | |
| **Severity Level** | **Required Testing and Results** |
| D0 | No further requirements. |
| D1 | Physician evaluation of audibility, intelligibility, and functional efficiency meet many needs of everyday speech; *OR* <br> Strobovideolaryngoscopy ("SVL"), objective voice and speech measures, and Voice Handicap Index ("VHI") are mildly to moderately abnormal. |
| D2 | SVL, objective voice and speech measures, and VHI are moderately to severely abnormal. |
| D3 | SVL, objective voice and speech measures, and VHI are severely abnormal. |

# Chronic Rhinosinusitis

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are Chronic Rhinosinusitis, Chronic Rhinitis, Chronic Sinusitis and Vocal Cord Dysfunction. In addition, the Qualifying Injuries in this disease group shall include Rhinosinusitis, Rhinitis, or Sinusitis occurring with such frequency that it amounts to a chronic disease in the Allocation Neutral's judgment based upon the Primary Plaintiff's submission to the Allocation Neutral of Qualifying Medical Records.

Allergic Rhinitis, Acute Sinusitis, and Acute Rhinitis are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| **Severity Level** | **Medical Verification Requirements** |
|---|---|
| E0 & E1 | Physician Diagnosis of a Qualifying Injury in the Chronic Rhinosinusitis disease group. |
| E2 & E3 | Evidence of sinus mucosal disease on CT or MRI; *OR* <br><br> Evidence of sinus mucosal disease from nasal endoscopy. <br><br> *Source: British Society for Allergy and Clinical Immunology guidelines for the management of rhinosinusitis and nasal polyposis. Scadding GK; Durham SR; Mirakian R; Jones NS; Drake-Lee AB; Ryan D; Dixon TA; Huber PA; Nasser SM - Clin Exp Allergy. 2008 Feb; 38(2):260-75. Epub 2007 Dec 20.* |
| **3. Impairment Criteria** | |
| **Severity Level** | **Required Testing and Results** |
| E0 | No further requirements. |
| E1 | Endoscopy, Sinus CT or MRI shows mild to moderate mucosal thickening, mild to moderate obstruction of nasopharynx or opharynx; *OR* <br> Laryngoscopy shows mild to moderate alteration in vocal fold (cord) function. |
| E2 | Sinus CT or MRI shows moderately severe mucosal thickening or moderately severe turbinate swelling, moderately severe obstruction of nasopharynx or oropharynx; *OR* <br> Laryngoscopy shows moderately severe alteration in vocal fold (cord) function |
| E3 | Sinus CT or MRI shows diffuse severe mucosal thickening or severe turbinate swelling, severe obstruction of nasopharynx or oropharynx; *OR* <br> Laryngoscopy shows severe alteration in vocal fold (cord) function such as bilateral paralysis. |

# Upper Digestive

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group are Gastroesophageal Reflux Disease (GERD), Barrett's Esophagus, Esophagitis, Esophageal Reflux, Esophageal Ulcer and Esophageal Stricture, and GI Stricture. In addition, the Qualifying Injuries in this disease group shall include Acid Reflux occurring with such frequency that it amounts to a chronic disease in the Allocation Neutral's judgment based upon the Primary Plaintiff's submission to the Allocation Neutral of Qualifying Medical Records.

Heartburn, Chronic Heartburn, Laryngeal Reflux, Gastric Ulcer, Gastric Regurgitation and Gastritis are examples of medical conditions, findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Criteria |
|---|---|
| F0 to F2 | Physician Diagnosis of a Qualifying Injury in the Upper Digestive disease group. |

## 3. Impairment Criteria

| Severity Level | Criteria |
|---|---|
| F0 | No further requirements. |
| F1 | Endoscopy reveals mild or moderate findings in the esophagus such as inflammation, esophagitis, erosions, and mucosal breaks. |
| F2 | Endoscopy reveals severe findings in the esophagus such as Barrett's esophagus, benign peptic esophageal stricture, ulcers, hemorrhage, or severe esophagitis. |

# Sleep Disorders

## 1. Qualifying Injuries

The Qualifying Injuries in this disease group include Obstructive Sleep Apnea, Sleep Apnea or other Sleep Disordered Breathing.

Symptoms of sleep disorders (*e.g.*, snoring or insomnia) are examples of findings or observations that, in the absence of a Qualifying Injury, shall not be credited by the Allocation Neutral.

## 2. Diagnostic Criteria

| Severity Level | Criteria |
|---|---|
| G0 to G2 | Records documenting Physician Diagnosis of Qualifying Injury in the Sleep Disorders disease group. |

## 3. Impairment Criteria

| Severity Level | Criteria |
|---|---|
| G0 | No further requirements. |
| G1 | Polysomnography demonstrating obstructive sleep apnea. |
| G2 | Polysomnography demonstrating obstructive sleep apnea *AND* medical records of treatment with CPAP/BiPAP or need to have CPAP/BiPAP titration. |

| Death | |
|---|---|
| **1. Qualifying Criteria** | |
| Death of the Primary Plaintiff on or before the Final Settlement Agreement Effective Date. | |
| **2. Diagnostic Criteria** | |
| **Level** | **Criteria** |
| **H0**<br>**to**<br>**H2** | Death of the Primary Plaintiff established by a certificate, hospital notes, or other authoritative document (*e.g.*, physician letter) confirming death. |
| **3. Impairment Criteria** | |
| **Level** | **Criteria** |
| **H0** | ***Death Unrelated to WTC Exposure*** – No further requirements. |
| **H1** | ***Death Potentially Related to WTC Exposure*** – Based upon the Claim Form and Qualifying Medical Records, the Allocation Neutral:<br><br>(i) determines that the Primary Plaintiff:<br><br>    a.  satisfies the Medical Proof Criteria for Qualifying Injuries B2-B4 in the Interstitial Lung Disease Disease Group; ***or***<br><br>    b.  satisfies the Medical Proof Criteria for Qualifying Injuries C2-C4 in the Asthma/RADS Disease Group; ***or***<br><br>    c.  satisfies the Medical Proof Criteria for Qualifying Injury I3 (Blood Cancer) in the Cancer Disease Group; ***or***<br><br>    d.  is the subject of a writing by the Chief Medical Examiner of the City of New York concluding that the Primary Plaintiff died as the result of an injury caused by his or her work or volunteer service at the WTC Site or other location(s) at which the Primary Plaintiff's alleged exposure gave rise to his or her Debris Removal Claims against the Insureds or any of them; ***AND***<br><br>(ii) determines that the Qualifying Injury referenced in the proceeding clause (i).a, (i).b or (i).c or the cause of death referenced by the Chief Medical Examiner of the City of New York as set forth in (i).d did not pre-exist the Primary Plaintiff's alleged exposure giving rise to his or her Debris Removal Claims; ***AND***<br><br>(iii) cannot rule out a causal relationship between the Primary Plaintiff's death and the Qualifying Injury referenced in the proceeding clause (i).a, (i).b, (i).c or (i).d. |

| H2 | ***Death Related to WTC Exposure*** – Based upon the Claim Form and Qualifying Medical Records, the Allocation Neutral |
|---|---|
| | (i) determines that Primary Plaintiff: |
| |     a.  satisfies the Diagnostic Criteria and the Impairment Criteria for Qualifying Injuries B2-B4 in the Interstitial Lung Disease Disease Group; ***or*** |
| |     b.  satisfies the Diagnostic Criteria and the Impairment Criteria for Qualifying Injuries C2-C4 in the Asthma/RADS Disease Group; ***AND*** |
| | (ii) determines that the Qualifying Injury referenced in the proceeding clause (i).a or (i).b did not pre-exist the Primary Plaintiff's alleged exposure giving rise to his or her Debris Removal Claims; ***AND*** |
| | (iii) concludes, in the Allocation Neutral's judgment, that the Primary Plaintiff's death is causally related to the Qualifying Injury referenced in the proceeding clause (i).a or (i).b. In making this determination regarding causation, the Allocation Neutral shall consider, but shall not be bound by, argumentative, conclusory and/or unverified findings by a physician or other medical professional in Qualifying Medical Record(s) with respect to cause of death. |

# Cancer

## 1. Qualifying Injury

Diagnosis of cancer or pre-cancerous condition by a qualified physician.

For purposes of I0, "Pre-cancerous conditions" shall consist of dysplasia, pre-malignant, preneoplasia, intraepithelial neoplasia, adenomatous colon polyps or actinic keratosis condition, but shall not include benign tumors, brain lesions, enlarged lymph nodes, lung nodules, polyps (*e.g.,* nasal, laryngeal, throat, sinus or vocal cord), cysts or benign skin lesions (*e.g.,* seborrheic keratosis, lipoma, dermatofibroma, pyogenic granuloma, epidermoid cyst or papilloma).

## 2. Diagnostic Criteria

| Level | Criteria |
|---|---|
| I0 to I3 | Histopathology report documenting pre-cancerous or cancerous condition; ***OR*** Physician documentation of diagnosis of or treatment for pre-cancerous or cancerous condition. |

## 3. Impairment Criteria

| Level | Criteria |
|---|---|
| I0 | Pre-Cancerous Condition & Skin Cancers Except Melanoma – No requirements other than physician documentation of diagnosis of or treatment for (i) a pre-cancerous condition or (ii) any skin cancer other than melanoma, including without limitation basal cell carcinoma and squamous cell carcinoma. |
| I1 | Solid Tumor Cancer (Non-Respiratory) and Melanoma – Physician documentation of diagnosis of or treatment for a (i) solid tumor cancer that does not satisfy the Impairment Criteria for Qualifying Injury I2 or (ii) melanoma. |

| | |
|---|---|
| **I2** | Solid Tumor Cancer (Respiratory) – Physician documentation of diagnosis of or treatment for a solid tumor cancer originating (i) in the larynx (including cancers of the supraglottis, glottis and subglottis); (ii) in the airways or tissues of the lung(s) (including in the trachea, bronchi, or tracheobronchial tree); or (iii) in the mesothelium, including pleural mesothelioma, peritoneal mesothelioma and pericardial mesothelioma. |
| **I3** | Blood Cancer – Physician documentation of diagnosis of or treatment for a blood cancer. |

# Cardiac

| **1. Qualifying Injury** |
|---|
| Diagnosis of a cardiac condition by a qualified physician.<br><br>Miscellaneous cardiac conditions (J0), shall not include: congenital heart defects (*e.g.*, septal defects, valve defects, or other malformations); heart conditions caused by infectious diseases (*e.g.*, bacterial, viral, fungal or parasitic conditions); and heart conditions caused by autoimmune diseases (*e.g.*, lupus). |

| **2. Diagnostic Criteria** | |
|---|---|
| Level | Criteria |
| **J0**<br>**to**<br>**J2** | Physician documentation of diagnosis of or treatment for hypertension, heart attack, or miscellaneous cardiac condition. |

| **3. Impairment Criteria** | |
|---|---|
| Level | Criteria |
| **J0** | No further requirements. |
| **J1** | Physician documentation of diagnosis of or treatment for hypertension. |
| **J2** | Physician documentation of diagnosis of or treatment for a heart attack. |

# Restrictive Lung Disease

| **1. Qualifying Injury** |
|---|
| The only Qualifying Injury in this disease group is Restrictive Lung Disease. |

| **2. Diagnostic Criteria** | |
|---|---|
| Level | Criteria |
| **K0 & K1** | Physician Diagnosis of Restrictive Lung Disease, to the extent that such Physician Diagnosis is not attributable to obesity in the Allocation Neutral's judgment (*i.e.*, the Primary Plaintiff's Body Mass Index is below 30) |
| **K2 & K3** | Physician Diagnosis of Restrictive Lung Disease, based upon Restrictive Pulmonary Function Tests, to the extent that such Physician Diagnosis is not attributable to obesity in the Allocation Neutral's judgment (*i.e.*, the Primary Plaintiff's Body Mass Index is below 30); no or normal imaging studies. |

| **3. Impairment Criteria** | |
|---|---|
| Severity Level | Required Testing and Results |
| **K0** | No further requirements |
| **K1** | **Full Pulmonary Function Test** showing:<br>    TLC less than or equal to 79% predicted; ***and***<br>    FVC less than or equal to 79% predicted; ***and***<br>    $FEV_1$/FVC (%)>70% predicted. |

| | |
|---|---|
| **K2** | **Full Pulmonary Function Test** showing:<br>    TLC less than or equal to 59% predicted; *and*<br>    FVC less than or equal to 59% predicted; *and*<br>    $FEV_1$/FVC (%)>70% predicted. |
| **K3** | **Full Pulmonary Function Test** showing:<br>    TLC lower than 50% predicted; *and*<br>    FVC lower than 50% predicted; *and*<br>    $FEV_1$/FVC (%)>70% predicted. |

## XIII.   <u>TIER 4 POINT SYSTEM</u>

### A.    **Point System for Each Master Docket**

Although the Allocation Neutral will use the same Base Points as provided on Exhibit C to this Agreement in each Master Docket and the same series of Adjustment Factors to modify those Base Points for all Verified Tier 4 Primary Plaintiffs in each Master Docket, the Allocation Neutral will calculate the Final Total Score for Primary Plaintiffs with Tier 4 Qualifying Injuries based upon the portions of the Settlement Amount allocated to the Primary Plaintiffs' respective Master Docket as set forth in Section II.B.i of this Agreement.

For Plaintiffs in all Master Dockets, the Point System shall consist of two parts:

i.      Base Points assigned to each Primary Plaintiff's most highly-valued Tier 4 Qualifying Injury, as reflected in the "Base Points" column on the Settlement Grid attached hereto as Exhibit C; and

ii.     Adjustments to Base Points, up and/or down, as set forth in Section XIII.B of this Agreement ("Adjustment Factors") and applied in the manner set forth in Section XIII.C of this Agreement.

The point value assigned on the Settlement Grid to a Primary Plaintiff's Tier 4 Primary Qualifying Injury shall constitute the Base Point component of the Plaintiff's Total Score.

If the Allocation Neutral determines that a Primary Plaintiff has more than one Qualifying Injury, the Allocation Neutral shall identify the ranking of those Qualifying Injuries that would result in the most favorable treatment under the Point System as Primary and Secondary Qualifying Injuries, after consideration of the effects of the injury-specific Adjustment Factors, namely, the adjustments for Pre-Existing Injuries, and Timing of Diagnosis, as set forth in Sections XIII.B.ii and XIII.B.iii of this Agreement, respectively.   A Verified Tier 4 Primary Plaintiff's Total Score as determined by the Allocation Neutral based upon his or her Primary Qualifying Injury and Secondary Qualifying Injury, if any, and any adjustments thereto by the Allocation Neutral pursuant to Section XIII.C of this Agreement shall, once final, be used by the Allocation Neutral to determine each Primary Plaintiff's Final Distribution, if any.

**B.** **Adjustment Factors**

With respect to Verified Tier 4 Primary Plaintiffs, the Allocation Neutral shall adjust each Primary Plaintiff's Base Points by taking into consideration the following Adjustment Factors.    A Primary Plaintiff's Base Points, after application of the Adjustment Factors, shall constitute that Primary Plaintiff's Total Score.

The Allocation Neutral shall consider each of the Adjustment Factors to the full extent applicable to a Primary Plaintiff's case.  To permit this assessment, each Primary Plaintiff who seeks eligibility for Tier 4 shall submit a Claim Form that addresses each Adjustment Factor, to the extent applicable, and each Primary Plaintiff shall attach any needed Qualifying Medical Records containing true, correct and complete information regarding each applicable Adjustment Factor.

The Adjustment Factors shall not apply in Tier 1, Tier 2 or Tier 3 as set forth in Section VIII of this Agreement.

The Adjustment Factors are as follows:

i.     Secondary Qualifying Injuries

Except with respect to Primary Plaintiffs who satisfy the Medical Proof Criteria for Qualifying Injury "H2," the Allocation Neutral shall credit a Primary Plaintiff's Secondary Qualifying Injury, if any, as an upward adjustment to the Primary Plaintiff's Base Points in the amount of Base Points provided for the Secondary Qualifying Injury; provided, however, that no Primary Plaintiff shall receive credit for both a Primary and Secondary Qualifying Injury in the same Disease Group, or for both (a) "A" Disease Group (Chronic Obstructive Pulmonary Disease) and "C" Disease Group (Asthma/RADS) Qualifying Injuries or (b) "B" Disease Group (Interstitial Lung Disease) and "K" Disease Group (Restrictive Lung Disease) Qualifying Injuries.

Each Primary Plaintiff's Base Points attributable solely to the Primary Qualifying Injury will remain the basis for calculating the permissible range for adjustment, as provided in Section XIII.C of this Agreement.

ii.     Pre-Existing Injuries

Except with respect to Primary Qualifying Injuries I1, I2 and I3, if the Allocation Neutral determines that a Primary Plaintiff's Primary Qualifying Injury is also a Pre-Existing Injury, the Allocation Neutral shall discount the Primary Plaintiff's Base Points for that Primary Qualifying Injury by multiplying the Base Points by 0.25, effectively reducing Base Points for that Qualifying Injury by seventy-five percent (75%).  If the Allocation Neutral determines that a Primary Plaintiff's Primary Qualifying Injury is I1, I2 or I3 and also is a Pre-Existing Injury,

however, the Allocation Neutral shall not award the Primary Plaintiff any Base Points for that Primary Qualifying Injury.

This adjustment multiplier for Primary Qualifying Injuries other than Primary Qualifying Injuries I1, I2 and I3 shall be increased to 0.65, effectively reducing Base Points for that Primary Qualifying Injury by thirty-five percent (35%), if the Primary Plaintiff (i) states in his or her Claim Form that his or her work or volunteer service at the WTC Site or other location at which the Primary Plaintiff alleged exposure giving rise to his or her Debris Removal Claims exacerbated his or her Pre-Existing Injury resulting in a Qualifying Injury that is more severe than, but otherwise is the same Qualifying Injury in the same Disease Group as the Primary Plaintiff's Pre-Existing Injury, and (ii) provides the Allocation Neutral with Qualifying Medical Records that the Allocation Neutral determines demonstrate exacerbation of the Primary Plaintiff's Pre-Existing Injury after the Primary Plaintiff's alleged exposure giving rise to his or her Debris Removal Claims.

Primary Plaintiffs who the Allocation Neutral determines materially misrepresented, materially omitted or materially concealed the existence or extent of a Pre-Existing Injury on their Claim Form despite claiming a Qualifying Injury in the same Disease Group shall not be entitled to any payments under this Agreement.

Furthermore, except with respect to Secondary Qualifying Injuries I1, I2 and I3, if the Allocation Neutral determines that a Primary Plaintiff has a Secondary Qualifying Injury that is a Pre-Existing Injury, that pre-existing Secondary Qualifying Injury shall not be a basis for upward adjustment of the Primary Plaintiff's Base Points under Section XIII.B.i of this Agreement unless the Primary Plaintiff demonstrates that his or her pre-existing Secondary Qualifying Injury worsened after he or she began work or volunteer service at the WTC Site or other location at which he or she alleges exposure giving rise to his or her Debris Removal Claims, as provided in the forgoing paragraph, in which case the Base Points for the Second Qualifying Injury shall be multiplied by 0.25, effectively reducing Base Points for the Secondary Qualifying Injury by seventy-five percent (75%).  If the Allocation Neutral determines that a Primary Plaintiff's Secondary Qualifying Injury is I1, I2 or I3 and also is a Pre-Existing Injury, such Secondary Qualifying Injury shall not entitle the Primary Plaintiff to any upward adjustment to Base Points.

iii.    Timing of Diagnosis of Qualifying Injuries

The Allocation Neutral shall consider the date of earliest diagnosis (i) of a Primary Plaintiff's Primary Qualifying Injury as an adjustment to the Base Points for that Primary Qualifying Injury and (ii) of a Primary Plaintiff's Secondary Qualifying Injury, if any, when determining to what extent, if

any, to increase the Base Points for the Secondary Qualifying Injury. These dates of earliest diagnosis shall be determined by the Allocation Neutral based upon evidence of any diagnosis that satisfies the Diagnostic Criteria component of the Medical Proof Criteria and which appears in the Primary Plaintiff's Qualifying Medical Records accompanying his or her Claim Form. The Allocation Neutral shall apply these adjustments as follows:

a.    Base Points awarded for Qualifying Injuries in the Asthma/RADS, Upper Digestive, Laryngitis/Pharyngitis, and Chronic Rhinosinusitis Disease Groups, shall be multiplied by 1.30 (increased by thirty percent (30%)) if the Primary Plaintiff's Qualifying Medical Records and/or any documents generated by an Adjudicatory Body establish that the Diagnostic Criteria for the Qualifying Injury in any of these Disease Groups were satisfied within seven (7) months of the last day of the Primary Plaintiff's debris removal work or volunteer service forming the basis of his or her Debris Removal Claims.

b.    Base Points awarded for Qualifying Injuries in the Chronic Obstructive Pulmonary Disease and Interstitial Lung Disease Groups, shall be multiplied by 1.30 (increased by thirty percent (30%)) if the Primary Plaintiff's Qualifying Medical Records or any documents generated by an Adjudicatory Body establish that the Diagnostic Criteria for the Qualifying Injury in either of those Disease Groups were first satisfied two and one-half (2.5) years or more after the Primary Plaintiff's last day of debris removal work or volunteer service forming the basis of his or her Debris Removal Claims.

c.    Base Points awarded for Qualifying Injuries I1 and I2 shall be multiplied by 0.50 (decreased by fifty percent (50%)) if the Primary Plaintiff's Qualifying Medical Records or any documents generated by an Adjudicatory Body establish that the Impairment Criteria for Qualifying Injury I1 or I2 were first satisfied before January 1, 2007.

iv.    Age

To take into account the Primary Plaintiffs' respective ages on September 11, 2001, the Allocation Neutral shall derive each Primary Plaintiff's age from his or her birth date as provided in the Claim Form and apply the appropriate multiplier provided in the Age Adjustment Factor Table appended as Exhibit F to this Agreement in accordance with Section XIII.C of this Agreement. This factor shall operate generally to increase the scores of younger Primary Plaintiffs and decrease the scores of older Primary Plaintiffs.

v.    Last Day of Alleged Exposure

To take into account the Primary Plaintiff's last date of alleged exposure at the WTC Site or other location giving rise to his or her Debris Removal Claims, as attested by the Primary Plaintiff in his or her Claim Form, the Allocation Neutral shall apply the appropriate multiplier set forth in the table below in accordance with Section XIII.C of this Agreement:

Last Day of Alleged Exposure Multipliers

| Last date of alleged exposure | Multiplier |
|---|---|
| September 11, 2001 | 0.50 |
| September 12-14, 2001 | 0.75 |
| September 15, 2001 or later | 1.00 |

vi.    Duration of Alleged Exposure

To take into account the Primary Plaintiff's duration of alleged exposure during work or volunteer service at the WTC Site and/or other locations at which Primary Plaintiff alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, as attested by the Primary Plaintiff in his or her Claim Form, the Allocation Neutral shall apply the appropriate multiplier from the table below in accordance with Section XIII.C of this Agreement.

Duration of Alleged Exposure Multipliers

| Total days of alleged exposure | Multiplier |
|---|---|
| Up to and including 56 hours (or the equivalent of seven (7) eight-hour days or less) | 0.75 |
| More than 56 hours (or the equivalent of more than seven (7) eight-hour days) | 1.00 |

vii.    Smoking History

To account for a Primary Plaintiff's smoking history, the Allocation Neutral shall review his or her Claim Form and apply the appropriate multiplier from the table below in accordance with Section XIII.C of this Agreement.

Smoking History Multipliers

| Category | Description | Multiplier |
|---|---|---|

| *Heavy smoker* | Any Primary Plaintiff who has a cigarette smoking history of twenty (20) pack years (*i.e.*, the product of years smoked times average pack(s) of cigarettes smoked per day during that period) or more | 0.65 |
|---|---|---|
| *Current smoker* | Any Primary Plaintiff who is not a Heavy smoker, but who has smoked cigarettes within one (1) year of the date he or she completes his or her Claim Form | 0.80 |
| *Former smoker* | Any Primary Plaintiff who is not a Current smoker or a Heavy smoker, but who smoked cigarettes within five (5) years of the date he or she completes his or her Claim Form | 0.90 |
| *Non-smoker* | Any Primary Plaintiff who does not fall into the above categories. | 1.00 |

viii.   Location of Alleged Exposure

For Primary Plaintiffs in the Allocation Pool for Master Docket No. 21 MC 102, the Allocation Neutral shall credit only the percentage of time that he or she performed the work or volunteer service which is the basis for his or her Debris Removal Claims against the Insureds or any of them, as opposed to the time spent working at other locations which forms the basis for his or her Debris Removal Claims against Other Defendants, for the period from September 11, 2001, to the present, as explained in Section XIII.C.iv of this Agreement.

For Primary Plaintiffs in the Allocation Pool for Master Docket No. 21 MC 103, the Allocation Neutral shall credit only the percentage of time that he or she performed rescue, recovery and/or debris removal work or volunteer service which is the basis for his or her Debris Removal Claims against the Insureds or any of them, as opposed to time spent working at other locations which forms the basis for his or her Debris Removal Claims against Other Defendants, for the period between September 11, 2001, to the present, as explained in Section XIII.C.iv of this Agreement.

In the Allocation Pool for Master Docket No. 21 MC 100, the Allocation Neutral shall not make any adjustment to reflect any Primary Plaintiff's location(s) of alleged exposure.

Each Primary Plaintiff with Debris Removal Claims in Master Docket 21 MC 102 and Master Docket 21 MC 103 shall set forth in his or her Claim Form the information necessary for the Allocation Neutral to apply this Location of Alleged Exposure Adjustment Factor.  To ensure that this information is accurately represented in such Primary Plaintiffs' respective Claims Forms, this information shall be deemed an answer to an

interrogatory and pursuant to Federal Rule of Civil Procedure 33(c) may be used, including without limitation by Other Defendants in Master Docket 21 MC 102 and Master Docket 21 MC 103, to the extent allowed by the Federal Rules of Evidence.

**C.     Adjustment Factor Application and Total Score Calculation**

For all Verified Tier 4 Primary Plaintiffs, the Allocation Neutral shall calculate a Total Score through the application of the Adjustment Factors as follows:

*First*, the Allocation Neutral shall take the Base Points for the Verified Tier 4 Primary Plaintiff's Primary Qualifying Injury and apply, if applicable, either the Pre-Existing Qualifying Injury Adjustment Factor or the Timing of Diagnosis Adjustment Factor set forth in Sections XIII.B.ii and XIII.B.iii of this Agreement, respectively;

*Second*, the Allocation Neutral shall take the Base Points for the Verified Tier 4 Primary Plaintiff's Secondary Qualifying Injury, and pursuant to Section XIII.B.i of this Agreement, apply, if applicable, either the Pre-Existing Qualifying Injury Adjustment Factor or the Timing of Diagnosis Adjustment Factor set forth in Sections XIII.B.ii and XIII.B.iii of this Agreement, respectively;

*Third*, the Allocation Neutral shall combine the points determined by the first two steps to establish the Verified Tier 4 Primary Plaintiff's Preliminary Total Score; however, the Base Points for the Verified Tier 4 Primary Plaintiffs' Primary Qualifying Injury shall remain the baseline for the application of the percentage limitations described in this Section XIII.C;

*Fourth*, the Allocation Neutral shall adjust the Verified Tier 4 Primary Plaintiff's Preliminary Total Score through the multiplicative application of the following Adjustment Factors:

i.      The Verified Tier 4 Primary Plaintiff's Age, as set forth in Section XIII.B.iv of this Agreement;

ii.     The Verified Tier 4 Primary Plaintiff's Smoking History, as set forth in Section XIII.B.vii of this Agreement;

iii.    The Verified Tier 4 Primary Plaintiff's Last Day of Alleged Exposure, as set forth in Section XIII.B.v of this Agreement; and

iv.     The Verified Tier 4 Primary Plaintiff's Duration of Alleged Exposure, as set forth in Section XIII.B.vi of this Agreement;

*Fifth*, if the net effect of the calculations in the first four steps is a product more than fifty percent (50%) larger than the Primary Plaintiff's Base Points, the Allocation Neutral shall reduce the product to one hundred and fifty percent (150%) of Base Points.  If the net effect of the calculations in the first four steps is

a product equal to or less than one hundred and fifty percent (150%) but greater than or equal to fifty percent (50%) of the Verified Tier 4 Primary Plaintiff's Base Points, the Allocation Neutral shall not adjust the figure. Furthermore, if the net effect of the calculations in the first four steps is a product that is less than fifty percent (50%) of the Verified Tier 4 Primary Plaintiff's Base Points, the Allocation Neutral shall increase the product to fifty percent (50%) of Base Points unless the Pre-Existing Condition Adjustment Factor applies to the Verified Tier 4 Primary Plaintiff's Primary Qualifying Injury, in which case the Allocation Neutral shall ensure only that that the product not be less than twenty-five percent (25%) of Base Points. The result of this fifth step shall be referred to as the Verified Tier 4 Primary Plaintiff's "Docket-Neutral Base Points."

*Sixth*, having made appropriate adjustments for the minima and maximum in accordance with the fifth step, the Allocation Neutral shall take the Verified Tier 4 Primary Plaintiff's Docket-Neutral Base Points and apply the Location of Alleged Exposure Adjustment Factor set forth in Section XIII.B.viii of this Agreement for Verified Tier 4 Primary Plaintiffs in Master Docket 21 MC 102 and Master Docket 21 MC 103 only. The Location of Alleged Exposure Adjustment Factor shall reduce the Verified Tier 4 Primary Plaintiff's Docket-Neutral Base Points by one percent (1%) for each percentage of non-qualifying time, unless the Verified Tier 4 Primary Plaintiff's calculated reduction would exceed seventy-five percent (75%) of the Verified Tier 4 Primary Plaintiff's Docket-Neutral Base Points, in which case the Allocation Neutral shall award the Verified Tier 4 Primary Plaintiff twenty-five percent (25%) of his or her Docket-Neutral Base Points.

The result of the foregoing calculations shall be the Verified Tier 4 Primary Plaintiff's Total Score; provided, however, that the Allocation Neutral retains the discretion to award any Verified Tier 4 Primary Plaintiff no Final Distribution if the Allocation Neutral concludes that the Verified Tier 4 Primary Plaintiff has materially misrepresented, materially omitted or materially concealed facts in his or her Claim Form and/or in the Qualifying Medical Records submitted therewith.

## XIV. RECONSIDERATION REQUESTS AND APPEALS

### A. Tier 1, Tier 2 and Tier 3 Reconsideration Requests

Any Primary Plaintiff who submits a Claim Form alleging eligibility for Tier 1, Tier 2 or Tier 3 may request that the Allocation Neutral reconsider its determination(s) with respect to him or her (collectively, "Tier 1-3 Reconsideration Requests").

The substance of all Tier 1-3 Reconsideration Requests shall be limited to the Primary Plaintiff's contention that the Allocation Neutral (i) misapplied the proof requirements for the pertinent Tier with respect to the Primary Plaintiff's claims as set forth in his or her Claim Form and his or her Qualifying Medical Records; (ii) failed to award a Mixed Orthopedic Plaintiff a Mixed Orthopedic payment

pursuant to the requirements of Section XVIII.A of this Agreement; (iii) failed to award the Primary Plaintiff a Qualifying Surgery payment pursuant to the requirements of Section XVIII.B of this Agreement; (iv) misapplied the Work Verification Procedure to the Primary Plaintiff's case; and/or (v) misapplied the Permanent Disability Fund provisions in Section XVI of this Agreement to the Primary Plaintiff's case.

Tier 1-3 Reconsideration Requests shall consist of a letter to the Allocation Neutral of no more than two (2) pages setting forth the Primary Plaintiff's alleged grounds for reconsideration, together with any Qualifying Medical Records supporting those contentions. Tier 1-3 Reconsideration Requests must be submitted no later than fifteen (15) days after the date that the Allocation Neutral issues the determination forming the basis of the Reconsideration Request. All Tier 1-3 Reconsideration Requests shall be signed by Primary Plaintiff's counsel and are subject to the Primary Plaintiff's attestations in his or her Claim Form.

Following the Allocation Neutral's evaluation of each Tier 1-3 Reconsideration Request, the Allocation Neutral shall issue a notice to the affected Primary Plaintiff's counsel, with a copy to the WTC Captive, informing the Primary Plaintiff of the Allocation Neutral's action, if any, based upon the Tier 1-3 Reconsideration Request, including, if warranted pursuant to the Allocation Neutral's application of the Tier proof requirements in this Agreement, placement of the Primary Plaintiff in a lower Tier than originally designated. Once the deadline to submit a Tier 1-3 Reconsideration Request has lapsed, or upon issuance of the Allocation Neutral's notice responding to a timely Tier 1-3 Reconsideration Request, the Allocation Neutral's determinations with respect to all Primary Plaintiffs who the Allocation Neutral concludes are properly in Tier 1, Tier 2 or Tier 3 shall be final and binding on all Parties, unless the Primary Plaintiff submits an Appeal to the Claims Appeal Neutral pursuant to Section XIV.C of this Agreement.

**B.    Tier 4 Reconsideration Requests**

Any Primary Plaintiff who submits a Claim Form alleging eligibility for Tier 4 may request that the Allocation Neutral reconsider its determination(s) with respect to him or her ("Tier 4 Reconsideration Request").

Following the Allocation Neutral's evaluation of the claims by a Primary Plaintiff who submitted a Claim Form alleging a Tier 4 Qualifying Injury, the Allocation Neutral shall notify Plaintiffs' Liaison Counsel and the WTC Captive of its determinations regarding the Primary Plaintiff's claims. After receiving this notification, Primary Plaintiff shall have fifteen (15) days to submit a Tier 4 Reconsideration Request. Any Tier 4 Reconsideration Request shall be based solely upon the Claim Form (including any revised Claim Form responding to a Deficiency Notice), the Qualifying Medical Records submitted with the Claim Form (including any Qualifying Medical Records submitted in response to a Deficiency Notice) and/or any additional Qualifying Medical Records that a

Plaintiff elects to submit in support of his or her Tier 4 Reconsideration Request. Tier 4 Reconsideration Requests shall consist of a letter of no more than five (5) pages signed by the Primary Plaintiff's counsel and subject to the attestations in the Claim Form.

The substance of all Tier 4 Reconsideration Requests shall be limited to the Primary Plaintiff's contention that the Allocation Neutral (i) misapplied the Tier 4 proof requirements with respect to the Primary Plaintiff's claims as set forth in his or her Claim Form and Qualifying Medical Records; (ii) misapplied, or failed to apply, the Adjustment Factors or any of them; (iii) failed to award a Mixed Orthopedic Plaintiff a sufficient Mixed Orthopedic Injury payment pursuant to the requirements of Section XVIII.A of this Agreement; (iv) failed to award the Primary Plaintiff a Qualifying Surgery payment pursuant to the requirements of Section XVIII.B of this Agreement; (v) misapplied the Work Verification Procedure to the Primary Plaintiff's case; (vi) failed to calculate correctly the Primary Plaintiff's Total Score; and/or (vii) misapplied the Permanent Disability Fund provisions in Section XVI of this Agreement to the Primary Plaintiff's case.

Following the Allocation Neutral's receipt and evaluation of a Tier 4 Reconsideration Request, the Allocation Neutral shall notify Plaintiffs' Liaison Counsel and the WTC Captive of any change to a Verified Tier 4 Primary Plaintiff's Total Score, other change to a Primary Plaintiff's placement in Tier 1, Tier 2 or Tier 3, and/or the Allocation Neutral's determination(s) with respect to other aspects of the Tier 4 Reconsideration Request. The Allocation Neutral may adjust the Verified Tier 4 Primary Plaintiff's Total Score or a Primary Plaintiff's Tier placement up or down based upon his or her Tier 4 Reconsideration Request. After the Allocation Neutral rules upon a Tier 4 Reconsideration Request, however, no further Reconsideration Requests pertaining to that Plaintiff shall be permitted. Total Scores not subject to a Tier 4 Reconsideration Request or as adjusted, if appropriate, as the result of a timely Tier 4 Reconsideration Request shall be final and binding as the Final Total Score for purposes of calculating a Verified Tier 4 Primary Plaintiff's Final Distribution, if any, as set forth in Sections XIII and XV.A of this Agreement, unless the Verified Tier 4 Primary Plaintiff submits an Appeal to the Claims Appeal Neutral pursuant to Section XIV.C of this Agreement. Except as provided in Section XIV.C of this Agreement, this Tier 4 Reconsideration Request procedure shall be the only means of appeal of the Allocation Neutral's initial Total Score calculation for a Primary Plaintiff who claims eligibility for Tier 4, as well all such Primary Plaintiffs' means of appeal of all other payments, if any, awarded by the Allocation Neutral under this Agreement. All Primary Plaintiffs agree that their respective Final Total Scores and amount, if any, of their other payments under this Agreement, if any, are binding and not appealable by any means except as provided in Section XIV.C of this Agreement.

C.      **Appeals to the Claims Appeal Neutral**

Any Primary Plaintiff who submits a timely Reconsideration Request pursuant to Section XIV.A or XIV.B of this Agreement may appeal to the Claims Appeal Neutral the Allocation Neutral's determination with respect to that Reconsideration Request (hereinafter, an "Appeal").

Each Appeal shall consist of a letter from Plaintiff's counsel to the Claims Appeal Neutral not exceeding two (2) pages in length and setting forth the basis of the Appeal and the Primary Plaintiff's requested remedy(ies). The letter constituting the Appeal shall be subject to the attestations in the Claim Form. When deciding an Appeal, the Claims Appeal Neutral shall consider whether this letter, the Primary Plaintiff's Claim Form and Qualifying Medical Records available to the Allocation Neutral on its website, and the Allocation Neutral's decisions regarding the Primary Plaintiff demonstrate an abuse of discretion by the Allocation Neutral with respect to the application of its duties under this Agreement to any of the Primary Plaintiff's claims in the Allocation Process. Unless the Claims Allocation Neutral determines that such an abuse of discretion has occurred, it shall affirm the Allocation Neutral's determination(s) with respect to the Primary Plaintiff.

In the course of evaluating an Appeal, the Claims Appeal Neutral may, in its sole discretion, consult with the Allocation Neutral and/or the Medical Panel concerning the basis of the Appeal and the Primary Plaintiff's requested remedy(ies). The Claims Appeal Neutral also may consult with any or all of the Parties' respective counsel, but only if the Claims Appeal Neutral initiates such communications. The Parties and/or their respective counsel shall not communicate with the Claims Appeal Neutral other than through the procedures for Appeals set forth herein.

All Appeals must be in the form of a letter submitted to the Allocation Neutral's website within fifteen (15) days after the Allocation Neutral issues its determination with respect to the Primary Plaintiff's Reconsideration Request. The Claims Appeal Neutral shall issue its determinations with respect to each Appeal within sixty (60) days of its receipt by the Claims Appeal Neutral.

The Claims Appeal Neutral shall decide each timely Appeal in a writing submitted to the Allocation Neutral for uploading to its secure website. The Claims Appeal Neutral's determination with respect to all Appeals shall be final, binding and non-appealable by any means. Once the Claims Appeal Neutral has decided an Appeal in writing, the Allocation Neutral shall abide by that decision in all respects concerning all payments, if any, to the Primary Plaintiff and any corresponding Derivative Plaintiff due under this Agreement.

## XV.    FINAL DISTRIBUTION CALCULATIONS AND PROCEDURES FOR TIER 4

### A.    Final Distribution Formula

Separately within the Allocation Pool for each Master Docket as set forth in Section XIII.A of this Agreement and subject to the allocation among the Master Dockets of (i) the Settlement Amount as set forth in Sections II.B.i.a through II.B.i.c of this Agreement, (ii) any additional money allocated to the Master Docket pursuant to Section VI.E of this Agreement, and (iii) any income on these amounts remaining after satisfaction of Allocation Costs pursuant to Section XI.D of this Agreement, the Allocation Neutral shall calculate each Plaintiff's Final Distribution, if any, as follows:

*First*, the Allocation Neutral shall determine the Final Total Scores for all Verified Tier 4 Primary Plaintiffs in the Master Docket.

*Second*, the Allocation Neutral shall determine the Final Total Scores for all Derivative Plaintiffs in the Master Docket by multiplying the Final Total Scores of their respective corresponding Primary Plaintiffs by three and one-half percent (3.5%).

*Third*, having established Final Total Scores for all Plaintiffs qualified to participate in a given Allocation Pool, the Allocation Neutral will sum all of those Final Total Scores to determine the total points for that Allocation Pool ("Aggregate Final Score").

*Fourth*, the Allocation Neutral shall determine the aggregate amount of money in the Allocation Pool for all Verified Tier 4 Primary Plaintiffs and their corresponding Derivative Plaintiffs eligible for payments under Section VII.B of this Agreement as follows:

i.    Add the portion of the Settlement Amount allocated to the Master Docket, any money added to the Master Docket pursuant to Section VI.E of this Agreement, and all interest earned thereupon pursuant to Section III.B of this Agreement;

ii.    Subtract from the sum referenced in the preceding clause (i) all Preliminary Payments to Plaintiffs in Tiers 1-3 for that Master Docket;

iii.    Subtract further all Qualifying Surgery payments and Mixed Orthopedic Injury payments, if any, to Plaintiffs in that Master Docket; and

iv.    If applicable, subtract further all Initial Payments, Interim Payments and Final Distributions to Verified Tier 4 Primary Plaintiffs (and corresponding Derivative Plaintiffs) for that Master Docket whom the Allocation Neutral has already determined qualify for a minimum Final Distribution (together with the Interim Payment) of One Thousand Dollars

and No Cents ($1,000.00) more than the Accelerated Final Distributions for Tier 3 Primary Plaintiffs in the Master Docket.

The result of the foregoing calculations shall be the "Net Allocation Pool Amount."

*Fifth*, the Allocation Neutral will divide the Net Allocation Pool Amount for each Allocation Pool by the Aggregate Final Score for that Allocation Pool to determine the final value of each point within the Allocation Pool ("Final Point Value").

*Sixth*, for each Plaintiff in the Allocation Pool with a Final Total Score, the Allocation Neutral shall multiply each such Plaintiff's Final Total Score by the Final Point Value for that Plaintiff's Allocation Pool ("Anticipated Total Payment").

*Seventh*, the Allocation Neutral shall reduce each such Plaintiff's Anticipated Total Payment by the sum of his or her Preliminary Payments to determine the amount of his or her Final Distribution; provided, however, that if the total of all such Plaintiffs' Final Distributions in a particular Allocation Pool differs from the Net Allocation Pool Amount less the sum of (i) all Initial Payments and Interim Payments to all Verified Tier 4 Primary Plaintiffs in that Allocation Pool (except those who the Allocation Neutral previously awarded minimum Final Distributions pursuant to step eight (8) of this calculation) and (ii) all Initial Payments and Interim Payments to corresponding Derivative Plaintiffs, the difference shall be apportioned *pro rata*.

*Eighth*, the Allocation Neutral shall review the Final Distributions determined by the above calculation to determine if any Verified Tier 4 Primary Plaintiffs would receive less than One Thousand Dollars and No Cents ($1,000.00) more than the Accelerated Final Payment for Plaintiffs in Tier 3 in their Master Docket.  If any such Verified Tier 4 Primary Plaintiffs' Primary Qualifying Injuries are not pre-existing, and if those Verified Tier 4 Primary Plaintiffs did not materially misrepresent, materially omit or materially conceal facts in their Claim Forms and/or in the Qualifying Medical Records, the Allocation Neutral shall proceed as follows:  First, award such Primary Plaintiffs minimum Final Distributions (together with their Interim Payment) of One Thousand Dollars and No Cents ($1,000.00) more than the Accelerated Final Payment for Tier 3 Primary Plaintiffs in their Master Docket.  Second, award all corresponding Derivative Plaintiffs a Final Distribution equal to three and one half percent (3.5%) of that amount.  Third, repeat this calculation starting from step two (2) for the remaining Verified Tier 4 Primary Plaintiffs and corresponding Derivative Plaintiffs in their Allocation Pool, excluding those who receive minimum Final Distributions from the accounting referenced in this eighth (8th) step.

B.     **Notice to Plaintiffs of Final Distribution**

Once the Allocation Neutral has conducted the calculation set forth in Section XV.A of this Agreement for Plaintiffs in a given Allocation Pool, the Allocation Neutral shall send to Plaintiffs' Liaison Counsel, Defendant Insureds' Counsel and the WTC Captive a notice setting forth the Final Total Score for each Primary Plaintiff and Derivative Plaintiff participating in that Allocation Pool; the Aggregate Total Score for all Plaintiffs in a given Allocation Pool; and the amount of each such Primary Plaintiff's and Derivative Plaintiff's Final Distribution, if any (collectively, "Final Distribution Calculation Notice").

C.     **Final Distribution Logistics**

Thirty (30) days after the WTC Captive receives the Final Distribution Calculation Notice for any Allocation Pool, the WTC Captive or its designee shall distribute jointly to each Plaintiff in that Allocation Pool and his or her counsel each such Plaintiff's Final Distribution, if any.  All Final Distributions shall be applied against and within the Settlement Amount.

## XVI.  PERMANENT DISABILITY FUND

The WTC Captive shall capitalize fully from within the Settlement Amount a Permanent Disability Fund in the amount specified in Section II.B.iii of this Agreement.   The Permanent Disability Fund shall be subject to the following terms and conditions:

A.     **Application Criteria for a Permanent Disability Fund Award**

To apply for an award from the Permanent Disability Fund, a Primary Plaintiff must:

i.     Claim eligibility for the Permanent Disability Fund in the Eligible Plaintiff List, unless the Primary Plaintiff receives a disability award and/or a line of duty death benefit after the submission of the Eligible Plaintiff List, in which case the Primary Plaintiff is entitled to make a Permanent Disability Fund Award application to the Allocation Neutral consistent with the other requirements of this Section XVI;

ii.     Execute the Release and Covenant Not to Sue;

iii.     Have satisfied the requirements of the Work Verification Procedure (as evidenced by the Primary Plaintiff's inclusion on the "pre-approved list" or by the Allocation Neutral's determination pursuant to the requirements set forth in Exhibit B to this Agreement);

iv.     Submit a Claim Form alleging eligibility to participate in the Permanent Disability Fund;

v.      Submit with his or her Claim Form all documents pertaining to Permanent Disability Fund eligibility as set forth in Section XVI.B of this Agreement and to calculation of Permanent Disability Fund awards as set forth in Section XVI.D of this Agreement; and

vi.     With respect to all living Primary Plaintiffs who are or were employed by the Fire or Police Departments of the City of New York, the Primary Plaintiff must have received a determination of accidental disability in accordance with New York City Administrative Code §§ 13-252, 13-258, 13-353, 13-354, 13-364 or 13-366, Retirement and Social Security Law § 507 or General Municipal Law §§ 207-kk or 207-q regardless of whether any citation to any accidental disability code provision or statute appears on the face of the benefit determination (but not an ordinary disability determination in accordance with New York City Administrative Code §§ 13-251, 13-257, 13-352, 13-362 or 13-363 or Retirement and Social Security Law § 506 regardless of whether any citation to any ordinary disability benefit code provision or statute appears on the face of the benefit determination) or, subject to the other requirements of this Section XVI, the Primary Plaintiff has applied for such an accidental disability determination and has received a Police or Fire Department medical board determination that he or she is unfit for full duty; provided, however, that all such Primary Plaintiffs deemed "eligible for light duty" but who do not have a subsequent accidental disability determination by a pension board in accordance with New York City Administrative Code §§ 13-252, 13-258, 13-353, 13-354, 13-364 or 13-366 or Retirement and Social Security Law § 507 shall not be eligible to recover from the Permanent Disability Fund.

**B.    Eligibility to Recover an Award from the Permanent Disability Fund**

Primary Plaintiffs who meet the application criteria provided in Section XVI.A of this Agreement shall be eligible for an award from the Permanent Disability Fund only if:

i.     The disability or line of duty death benefit documentation appended to the Primary Plaintiff's Claim Form (including without limitation a report from the Fire Department of New York Bureau of Health Services Committee setting forth recommendations concerning the Primary Plaintiff's disability or line of duty death benefit application) relates, by statutory presumption or otherwise, in whole or in part to his or her work or volunteer service at the WTC Site or other locations at which the Primary Plaintiff alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them as demonstrated either by:

a.    Express reference(s) or citations in that documentation to the WTC Bill, also known as the World Trade Center Bill, the World Trade Center Disability Law, the WTC Disability Law, the World Trade

Center Presumption Law, the WTC Presumptive Bill, Chapter 93 of the Laws of 2005, World Trade Center Article 15 Disability, or Sections 63(g), 363(g) or 507(g) of New York's Retirement and Social Security Law (hereinafter collectively referred to as the "WTC Bill"), or to an asserted relationship between the Primary Plaintiff's disabling injury(ies) and/or death, on the one hand, and his or her work or volunteer service at the WTC Site and/or at other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, on the other hand. If a Primary Plaintiff claims that an "asserted relationship" as used in the preceding sentence satisfies the eligibility requirements of this Section XVI.B.i.a, the Allocation Neutral may consider, among other documents available to it that it considers relevant to such an "asserted relationship," if any, (1) a comparison in the Primary Plaintiff's disability or line of duty death benefit documentation to the lack of symptoms before and the presence of symptoms on or after September 11, 2001; (2) a comparison in the Primary Plaintiff's disability or line of duty death benefit documentation to symptoms existing before and after, or to symptoms worsening after, September 11, 2001, in which case the Primary Plaintiff's Baseline PDF Score shall be reduced by fifty percent (50%) pursuant to Section XVI.D.iii of this Agreement; (3) any statement in the Primary Plaintiff's disability documentation submitted to the Allocation Neutral which refers to the Primary Plaintiff's development of symptoms and/or illness during work or volunteer service at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them; or (4) references in the Primary Plaintiff's disability or line of duty death benefit documentation to the Primary Plaintiff's presence at, and/or to his or her exposure to dust, toxins, contaminants, smoke and/or products of combustion at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, but only if the Allocation Neutral concludes based upon the totality of the information available to it that such reference(s) constitute an affirmative statement connecting the Primary Plaintiff's disabling injury(ies) or line of duty death benefit to his or her work or volunteer service at the WTC Site or at other locations at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them; or

b.    With respect to Social Security disability determinations only, by the Allocation Neutral's determination that the Primary Plaintiff was disabled based upon or died because of a Qualifying Injury presumed by virtue of the WTC Bill to be causally related to

exposures at the WTC Site or other locations at which the Primary Plaintiff alleges exposure giving rise to Debris Removal Claims against the Insureds or any of them;

provided, however, that any Primary Plaintiff disabled or who received a line of duty death benefit exclusively due to Post Traumatic Stress Disorder and/or other psychological condition shall be ineligible to participate in the Permanent Disability Fund regardless of any asserted and/or statutorily presumed relationship of such condition(s) to the Primary Plaintiff's alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them;

ii.    The Allocation Neutral determines that:

a.    The Primary Plaintiff received a final permanent disability determination or a line of duty death benefit from an Adjudicatory Body on or before the date upon which the Allocation Neutral distributes the assets in the Permanent Disability Fund to the Primary Plaintiffs eligible to participate in that distribution as set forth in this Section XVI.B;

b.    The Primary Plaintiff's employer, its workers' compensation carrier, or any licensed physician retained by such employer or workers' compensation carrier has supported in writing the Primary Plaintiff's application for permanent disability benefits, and (i) the aforementioned application is still pending as of the date the Allocation Neutral reviews the Primary Plaintiff's Claim Form or (ii) the Primary Plaintiff subsequently entered into a "Section 32" agreement with the workers' compensation carrier under which the Primary Plaintiff received a lump sum settlement of his or her claim for permanent disability benefits;

c.    The Primary Plaintiff is or was employed by the Fire Department of the City of New York, and the 1-b medical board of the New York City Fire Department Pension Fund has found him or her unfit for duty; provided, however, that no Primary Plaintiff whose application for permanent disability or line of duty death benefit has been rejected by the Fire Department of the City of New York Pension Board as of the date of the Allocation Neutral's distribution of the Permanent Disability Fund awards shall be eligible;

d.    The Primary Plaintiff is or was employed by the Police Department of the City of New York, and the Medical Board of the Police Pension Fund of the Police Department of the City of New York has approved his or her application for permanent accidental disability benefits or line of duty death benefits; provided,

however, that no Primary Plaintiff whose application for permanent accidental disability or line of duty death benefit has been rejected by the Police Department of the City of New York Pension Board as of the date of the Allocation Neutral's distribution of Permanent Disability Fund awards shall be eligible; or

e.    The Primary Plaintiff is deceased as of the Final Settlement Agreement Effective Date and:

    (i)    The Allocation Neutral determines, based upon the Primary Plaintiff's Claim Form and Qualifying Medical Records, that the Primary Plaintiff's death was potentially related or related to his or her exposure at the WTC Site or other locations at which Primary Plaintiff alleged exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them, such that the Primary Plaintiff satisfies the Medical Proof Criteria for "H1" or "H2" on the Settlement Grid; or

    (ii)    The Primary Plaintiff's heirs or assigns received WTC-related death benefits, established by documentation confirming such benefits submitted to the Allocation Neutral with the deceased Primary Plaintiff's Claim Form; or

    (iii)    For Primary Plaintiffs who were employed by the Fire or Police Departments of the City of New York, (a) the Primary Plaintiff was recommended by a Police or Fire Department medical board for accidental disability benefits pursuant to New York City Administrative Code §§ 13-252, 13-258, 13-353, 13-354, 13-364 or 13-366, Retirement and Social Security Law § 507, or General Municipal Law §§ 207-kk or 207-q regardless of whether any citation to any accidental disability code provision or statute appears on the face of the benefit determination, but not ordinary disability benefits pursuant to New York City Administrative Code §§ 13-251, 13-257, 13-352, 13-362 or 13-363 or Retirement and Social Security Law § 506 regardless of whether any citation to any ordinary disability code provision or statute appears on the face of the benefit determination; (b) the Primary Plaintiff's heirs or assigns receive or received a line of duty death benefit relating to the Primary Plaintiff's work giving rise to his or her Debris Removal Claims against the Insureds or any of them; or (c) a medical board of the Fire or Police Department of the City of New York recommended the Primary Plaintiff for

line of duty death benefits relating to his or her work giving rise to his or her Debris Removal Claims against the Insureds or any of them.

### C.  Preliminary Verification of Permanent Disability Fund Claims

To reduce Allocation Costs, the Parties shall implement the following preliminary verification process for Permanent Disability Fund claims to confirm, subject to the Allocation Neutral's review and independent judgment consistent with Sections XVI.A and XVI.B of this Agreement, which Primary Plaintiffs are entitled to a Permanent Disability Fund award.

Within thirty (30) days after its receipt from Plaintiffs' counsel of the updated Eligible Plaintiff List required pursuant to Section VI.A of this Agreement, the WTC Captive shall consult with Plaintiffs' Liaison Counsel concerning which Primary Plaintiffs appear entitled to a Permanent Disability Fund award. Within thirty (30) days thereafter, the WTC Captive shall provide the Allocation Neutral and Plaintiffs' Liaison Counsel with a list of all Primary Plaintiffs who the WTC Captive and Plaintiffs' Liaison Counsel agree are entitled to a Permanent Disability Fund award. All Primary Plaintiffs on the WTC Captive's list shall receive a Permanent Disability Fund award unless the Allocation Neutral determines otherwise. As an additional component of this Permanent Disability Fund preliminary verification process, within fifteen (15) days after the WTC Captive's submission, Plaintiffs' Liaison Counsel may provide the Allocation Neutral with a supplemental list of Primary Plaintiffs who Plaintiffs' Liaison Counsel contend satisfy the Permanent Disability Fund's requirements as set forth in this Agreement. Together with that supplemental list, Plaintiff's counsel shall submit to the Allocation Neutral true and correct copies of all final disability determinations from an Adjudicatory Body and any other documentation forming the bases of all Plaintiffs' Permanent Disability Fund claims. Should the Parties disagree at the completion of this preliminary verification process whether a particular Primary Plaintiff is entitled to a Permanent Disability Fund award, that Primary Plaintiff may submit documentation to the Allocation Neutral alleging that he or she satisfies the requirements of Sections XVI.A and XVI.B of this Agreement and is therefore entitled to such an award.

No Primary Plaintiff shall be precluded from seeking a Permanent Disability Fund recovery solely by virtue of the non-binding preliminary verification provisions of this Section XVI.C.

### D.  Calculation of Individual Permanent Disability Fund Awards

For purposes of calculating individual Permanent Disability Fund awards, all Primary Plaintiffs who apply for an award from the Permanent Disability Fund as set forth in Section XVI.A of this Agreement and who the Allocation Neutral determines pursuant to Section XVI.B of this Agreement are eligible for such an award will be awarded 100 Points (hereinafter, the "Baseline PDF Score")

irrespective of their Qualifying Injuries or Final Total Scores. The Allocation Neutral shall distribute the Permanent Disability Fund among eligible applicants after making the following adjustments to the Baseline PDF Score for each Primary Plaintiff to establish an "Adjusted PDF Score," as follows:

i.   Add five percent (5%) to the Baseline PDF Score for each year younger than 35 the Primary Plaintiff was as of September 11, 2001 (up by a maximum of fifty percent (50%)), such that, for example, a Primary Plaintiff who was 30 on September 11, 2001, would have an adjusted Baseline PDF Score of 125; or decrease the Baseline PDF Score by five percent (5%) for each year older than 45 the Primary Plaintiff was as of September 11, 2001 (down by a maximum of fifty percent (50%)), such that, for example, a Primary Plaintiff who was 50 on September 11, 2001, would have a PDF Score of 75;

ii.  Reduce the product of step i by sixty-six and two-thirds percent (66.67%) if the Primary Plaintiff is in Master Docket 21 MC 102, or reduce the product of step i by fifty percent (50%) if the Primary Plaintiff is in Master Docket 21 MC 103;

iii. Reduce the product of step ii by one half (a fifty percent (50%) reduction) if the Allocation Neutral determines that an eligible Primary Plaintiff's final permanent disability award relates to or includes injuries pre-dating, and/or other injuries or conditions unrelated to, the Primary Plaintiff's work or volunteer service at the WTC Site or locations giving rise to his or her Debris Removal Claims against the Insureds or any of them. This fifty percent (50%) decrease also shall apply to any Primary Plaintiff who was first disabled due to injuries or conditions other than those specified in the Cancer Bill (Retirement and Social Security Law § 363-d and General Municipal Law § 207-kk) or the Lung Bill (Retirement and Social Security Law § 363-f, General Municipal Law § 207-q and N.Y.C. Admin. Code § 13-354) and which the Allocation Neutral determines are unrelated to the Primary Plaintiff's work or volunteer service at the WTC Site or other location giving rise to his or her Debris Removal Claims against the Insureds or any of them (e.g., a disabling off-site orthopedic injury) or other work or volunteer service giving rise to his or her Debris Removal Claims against the Insureds or any of them, but who was subsequently granted disability under the WTC Bill;

iv.  Reduce the product of step iii by one-half (a fifty percent (50%) reduction) if the Primary Plaintiff qualifies for the Permanent Disability Fund under Sections XVI.B.ii.b, XVI.B.ii.c or XVI.B.ii.d of this Agreement; provided, however, that this fifty percent (50%) reduction shall not apply to Primary Plaintiffs who were employed by the City of New York Police Department and who are eligible for the Permanent Disability Fund by reason of Section XVI.B.ii.d of this Agreement if the Police Department of the City of New York Pension Board verifies that such Primary Plaintiffs receive

WTC-related accidental disability benefits (such verification by the Police Department of the City of New York Pension Board shall be provided in writing to counsel for Primary Plaintiffs who meet the requirements of clauses (i) through (vi) of the third paragraph of Section XI.H of this Agreement and, if such verification is not provided by forty-five (45) days after the Effective Date, affected Primary Plaintiffs shall have the right to subpoena the Police Department of the City of New York Pension Board by service of a subpoena on it notwithstanding the Interim Stay);

v.    Reduce the product of step iv by one-half (a fifty percent (50%) reduction) if the Primary Plaintiff qualifies for the Permanent Disability Fund only because the Allocation Neutral determines that his or her death was potentially related to alleged exposure during work or volunteer service at the WTC Site or other locations at which he or she alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them such that the Primary Plaintiff satisfies the Medical Proof Criteria for "H1" on the Settlement Grid; and

vi.   Increase the points after step v by one-fifth (a twenty percent (20%) increase) if the Allocation Neutral finds that the Primary Plaintiff meets the Medical Proof Criteria for Qualifying Injuries B3-B4, C3-C4 and/or I3.

If the net result of the above calculations reduces an eligible Primary Plaintiff's Adjusted PDF Score to less than twenty-five (25) points for those Primary Plaintiffs in Master Docket 21 MC 100, eight and one-third (8.33) points for those Primary Plaintiffs in Master Docket 21 MC 102, and twelve and one-half (12.5) points for those Primary Plaintiffs in Master Docket 21 MC 103 (collectively, Master Docket-Specific PDF Score Floor), the Allocation Neutral shall increase that Plaintiff's Adjusted PDF Score to his or her Master Docket-Specific PDF Score Floor.

After completing the above Adjusted PDF Score calculation for each Primary Plaintiff who applied and who is eligible to recover from the Permanent Disability Fund, the Allocation Neutral shall determine the sum of all eligible Primary Plaintiffs' Adjusted PDF Scores (hereinafter, the "Aggregate PDF Score").

The Allocation Neutral shall then determine the amount of money available for allocation among Primary Plaintiffs eligible to recover from the Permanent Disability Fund as set forth in Section XVI.B by taking the amount allocated to the Permanent Disability Fund as set forth in Section II.B.iii of this Agreement, adding any additional money allocated to the Permanent Disability Fund pursuant to Section VI.E of this Agreement, and adding to that amount any income earned thereon after satisfying Allocation Costs as provided in Section XI.D of this Agreement ("Net PDF Aggregate Amount").  The Allocation Neutral shall then divide the Net PDF Aggregate Amount by the Aggregate PDF Score to determine the value of each point for purposes of the Permanent Disability Fund awards

(hereinafter, the "PDF Point Value").  By multiplying the PDF Point Value by each Primary Plaintiff's Adjusted PDF Score, the Allocation Neutral shall determine the Permanent Disability Fund award for each such Primary Plaintiff.

The Allocation Neutral's calculation of each eligible Primary Plaintiff's award from the Permanent Disability Fund shall be final and binding upon all Parties, unless it is the subject of a timely Reconsideration Request or Appeal pursuant to Section XIV of this Agreement.

E.    **Expedited Disbursement of Permanent Disability Fund Awards**

The Parties intend that the Allocation Neutral will expedite, to the extent practicable, awards from the Permanent Disability Fund.  To this end, the Allocation Neutral may cause awards from the Permanent Disability Fund to be distributed before determining all Plaintiffs' Final Distributions.  Moreover, the Allocation Neutral may expedite review of Claim Forms for Primary Plaintiffs who claim eligibility for a Permanent Disability Fund award.

## XVII.  CANCER INSURANCE POLICY

Within thirty (30) days after the Final Settlement Agreement Effective Date, the WTC Captive shall fund the purchase of the Cancer Insurance Policy attached as Exhibit E to this Agreement.  The WTC Captive shall fund the Cancer Insurance Policy premium from within the Settlement Amount at the amount specified in Section II.B.i of this Agreement.  This Cancer Insurance Policy shall be available to all Primary Plaintiffs (i) who execute the Release and Covenant Not to Sue appended as Exhibit P to this Agreement; (ii) who have complied with the Work Verification Procedure (as evidenced by the Primary Plaintiff's inclusion on the "pre-approved list" or by the Allocation Neutral's determination, as set forth more fully in Exhibit B to this Agreement); and (iii) who are otherwise eligible for coverage according to the Cancer Insurance Policy's insuring agreement and other terms, conditions and exclusions.  The WTC Captive has no duties or obligations with respect to the Cancer Insurance Policy other than as set forth expressly in this Agreement.

## XVIII.  QUALIFYING SURGERY AND MIXED ORTHOPEDIC INJURY PAYMENTS

In addition to all other payments authorized under this Agreement, the Allocation Neutral shall pay those Primary Plaintiffs who demonstrate, in the Allocation Neutral's judgment, a Mixed Orthopedic Injury and/or one or more Qualifying Surgeries as set forth in this Section XVIII.

A.    **Mixed Orthopedic Injury Payments**

For those Primary Plaintiffs:

i.    Who allege in their respective Claim Forms a Mixed Orthopedic Injury; and

ii.    Who qualify as a Mixed Orthopedic Plaintiff,

the Allocation Neutral shall direct that the WTC Captive or its designee pay from within the portion of the Settlement Amount allocated to the Mixed Orthopedic Plaintiff's Master Docket as set forth in Section II.B.i of this Agreement up to Ten Thousand Dollars and No Cents ($10,000.00), or any lesser amount that the Allocation Neutral determines is reasonable redress for the particular Mixed Orthopedic Injury at issue.  In determining the amount of any such Mixed Orthopedic Injury payment, the Allocation Neutral shall take into account the nature, severity and temporary or permanent consequences, if any, of the Mixed Orthopedic Plaintiff's Mixed Orthopedic Injury.

Payments to Mixed Orthopedic Plaintiffs shall be in addition to their respective Preliminary Payments, Final Distributions, enrollment in the Cancer Insurance Policy, Qualifying Surgery payments and Permanent Disability Fund awards, if any.  Payments to Mixed Orthopedic Plaintiffs also shall only apply if the Mixed Orthopedic Plaintiff alleges a Mixed Orthopedic Injury in his or her Claim Form and submitted with that Claim Form Qualifying Medical Records and/or employment records establishing, in the Allocation Neutral's judgment that:

i.    The Mixed Orthopedic Injury transpired while the Primary Plaintiff was present at the WTC Site or during other work or volunteer services giving rise to his or her Debris Removal Claims against the Insureds or any of them;

ii.    Conditions at the WTC Site or at other locations at which the Primary Plaintiff performed World Trade Center-related work or volunteer services caused the Primary Plaintiff's Mixed Orthopedic Injury;

iii.    The Mixed Orthopedic Injury was confirmed by objective medical tests and/or studies (*e.g.*, MRI, CT-Scan, X-Ray, etc.); and

iv.    The Primary Plaintiff filed suit against the Insureds or any of them, or provided written notice of claim to the City of New York, within three years of the date of the Primary Plaintiff's Mixed Orthopedic Injury and cited the injury as the basis for such suit or claim, unless the Primary Plaintiff filed a notice of claim against the City of New York on or after September 16, 2009, but on or before April 12, 2010.

Mixed Orthopedic Injury payments shall be issued upon completion of the Allocation Process with respect to all Mixed Orthopedic Plaintiffs but before any Plaintiff receives a Final Distribution.  Mixed Orthopedic Injury payments to all Mixed Orthopedic Plaintiffs in all Master Dockets shall not exceed One Million Forty Thousand Dollars and No Cents ($1,040,000.00) in the aggregate ("MOI Aggregate").  If the Allocation Neutral's preliminary assessments of the value of all Mixed Orthopedic Injury payments exceeds the MOI Aggregate, the Allocation Neutral shall reduce proportionally the amount of each Mixed

Orthopedic Injury payment so that the sum of all Mixed Orthopedic Injury payments equals the MOI Aggregate. Nothing in this paragraph shall require the Allocation Neutral to issue Mixed Orthopedic Injury payments totaling the MOI Aggregate if, in the Allocation Neutral's judgment, such payments are not warranted under the terms of this Section XVIII.A.

**B.**    **Qualifying Surgery Payments**

For a Primary Plaintiff who:

i.      Alleges in his or her Claim Form that he or she underwent one or more of the surgical procedures listed on Exhibit D to this Agreement ("Qualifying Surgeries");

ii.     Demonstrates, in the Allocation Neutral's judgment, through Qualifying Medical Records submitted with his or her Claim Form the existence of one of the Qualifying Injury(ies) associated with a Qualifying Surgery as specified in Exhibit D;

iii.    Demonstrates, in the Allocation Neutral's judgment, that his or Qualifying Surgery is not most likely explained by a condition or incident separate and apart from his or her pertinent Qualifying Injury; and

iv.     Demonstrates, in the Allocation Neutral's judgment, that the Qualifying Injury that necessitated the Qualifying Surgery did not pre-date the Plaintiff's work or volunteer service at the WTC Site or any other location at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them,

the Allocation Neutral shall direct the WTC Captive or its designee to pay to the Primary Plaintiff from within the amount of the Settlement Amount allocated to the Primary Plaintiff's Master Docket as set forth in Section II.B.i of this Agreement the payment indicated for the Primary Plaintiff's Qualifying Surgery as listed on Exhibit D.

A Primary Plaintiff's Qualifying Surgery payments, if any, shall be in addition to his or her Mixed Orthopedic Injury Payment, Preliminary Payments, Final Distributions, enrollment in the Cancer Insurance Policy, and Permanent Disability Fund award, if any.

**XIX.    LIENS, ASSIGNMENT RIGHTS AND OTHER THIRD-PARTY PAYOR CLAIMS**

Each Primary Plaintiff shall identify to the Allocation Neutral on his or her Claim Form all known lien holders with claims against any payment to be received by the Plaintiff under the Final Settlement Agreement, including without limitation all third-party public or private payors that have paid for and/or reimbursed him or her for medical expenses, pharmacy expenses, disability benefits, or any other costs and expenses incurred due to or

arising out of injuries alleged in any Master Docket. The Allocation Neutral shall develop procedures with respect to each Primary Plaintiff's duty to identify all such lien holders.

A.    **Federal Medicare (Parts A and B) and Medicaid**

The Allocation Neutral's procedures shall include the appointment of Garretson as Lien Resolution Administrator to perform certain functions pursuant to this Section XIX.A in connection with claims that may be asserted by federal Medicare (Parts A and B) ("Medicare") and Medicaid. Each Plaintiff participating in the Allocation Process shall identify to the Lien Resolution Administrator on his or her Claim Form all Medicare and Medicaid obligations known to them with respect to all payments they receive by virtue of the Final Settlement Agreement, through procedures and protocols to be established by the Lien Resolution Administrator. Plaintiffs and their counsel must cooperate with the procedures and protocols established by the Lien Resolution Administrator.

The Lien Resolution Administrator shall exercise reasonable efforts to confirm the Medicare and Medicaid claim information provided by Plaintiffs, and to identify any additional Medicare and Medicaid claims not reported on Plaintiffs' Claim Forms. The Lien Resolution Administrator shall resolve all claims that have been or may be asserted by Medicare or Medicaid based upon the provision of medical care or treatment provided to the Plaintiff connected with or alleged to be connected with Debris Removal Claims settled pursuant to the Final Settlement Agreement; provided that nothing herein is intended to create a right of reimbursement where none would otherwise exist under applicable state or federal tort recovery statutes.

Within ten (10) days after the Final Settlement Agreement Effective Date, or within any reasonable extension of that ten (10) days agreed to in writing by Plaintiffs' Liaison Counsel and the WTC Captive, the Lien Resolution Administrator shall as to each Plaintiff certify whether any reimbursement claim is being asserted by Medicare or Medicaid as to such Plaintiff and, where any such claim is determined to exist, either: (1) the amount to resolve such claim as established by the agreement of the Lien Resolution Administrator and the Medicare/Medicaid agency ("Final Medicare Lien Amount"); or (2) the "holdback" amount or other mechanism agreed to by the Medicare/Medicaid agency under which said agency has agreed to finally resolve its claim for reimbursement of past and/or future Medicare/Medicaid payments ("Resolution Amount").

In addition to resolution of reimbursement claims defined in this Section XIX.A, the appointed Lien Resolution Administrator shall cooperate with the WTC Captive and its outside service providers and respond to their reasonable requests for information required to fulfill the settlement reporting duties associated with Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007.

The Allocation Neutral/Lien Resolution Administrator shall not be responsible for identifying or resolving any liens other than the Medicare and Medicaid reimbursement claims described herein, and all other liens shall remain Plaintiffs' sole responsibility. No Plaintiff or Plaintiffs' counsel shall have any rights or defenses based upon or arising out of any act or omission of WTC Captive and/or the Lien Resolution Administrator and/or the Allocation Neutral with respect to these provisions. Plaintiffs will satisfy, indemnify, repay, and hold the WTC Captive harmless from any and all such claims, liens, and rights to payment, including attorneys' fees.

**B.      Release of Insureds' Workers' Compensation Liens**

As a result of the WTC Captive's best efforts to resolve September 11th service related workers' compensation liens arising out of the City of New York's WTC OCIP and held by an Insured against the payment(s), if any, to Primary Plaintiffs who opt into the Final Settlement Agreement, upon the Final Settlement Agreement Effective Date the City of New York and Liberty Mutual Fire Insurance Company, only in its capacity as the workers' compensation insurance carrier for the Insureds under the City of New York's WTC OCIP, (i) consent to the Final Settlement Agreement for purposes of all applicable workers' compensation laws and (ii) release their respective liens relating to all past, present and future workers' compensation benefits paid to Primary Plaintiffs who have filed workers' compensation claims and opt into the Final Settlement Agreement to the extent that those liens relate to workers' compensation benefits paid as a result of injuries alleged by such Primary Plaintiffs in their respective Debris Removal Claims. This release by Liberty Mutual Fire Insurance Company shall extend only to liens based upon benefits paid under policies it issued pursuant to the City of New York's WTC OCIP.

All Plaintiffs who receive the benefit of waivers of workers' compensation liens pursuant to this Section XIX.B shall be eligible to continue to receive their respective future workers' compensation benefits to which they are otherwise legally entitled to receive from the City of New York or Liberty Mutual Fire Insurance Company without interruption or reduction in amount for the credit.

Primary Plaintiffs shall bear the burden and expense of resolving any and all workers' compensation liens other than those held by the Insureds as set out above or any of them. By accepting any payment(s) due under the Final Settlement Agreement, each Primary Plaintiff represents and warrants that there are no unresolved workers' compensation liens against such payment(s). Any Primary Plaintiff who breaches this representation and warranty shall indemnify the WTC Captive and the Insureds and hold each of them harmless, including without limitation by paying their respective attorneys' fees, with respect to any claims against them or any of them arising from or relating to such unsatisfied workers' compensation lien(s).

**C.**    **All Other Liens, Assignment Rights and Other Third-Party Payor Claims**

In addition to the foregoing provisions, all other liens, assignment rights and other third-party payor claims – including, without limitation, all liens by all other third-party payors, all subrogation claims, liens, or other rights to payment relating to medical treatment or lost wages, or any liens based on any legal expenses, bills, or costs that have been or may be asserted by any health care provider, insurer, employer, attorney or other person or entity – shall remain Plaintiffs' sole responsibility. Plaintiffs will satisfy, indemnify, repay, and hold the WTC Captive harmless from any and all such claims, liens, and rights to payment, including attorneys' fees.

**D.**    **Plaintiffs' Representations and Warranties Regarding All Liens, Assignment Rights and Other Third-Party Payor Claims**

Prior to receiving any Preliminary Payment, Qualifying Surgery payment, Mixed Orthopedic Injury payment, Final Distribution, or Permanent Disability Fund award, each Plaintiff shall represent and warrant to the Allocation Neutral that any liens or other claims identified above have been or will be satisfied by the Plaintiff. The Allocation Neutral shall be under no obligation to cause any payment to be made to a Plaintiff who fails to provide satisfactory proof to the Allocation Neutral that all such liens have been or will be satisfied or compromised.

**E.**    **Information to Facilitate Reimbursement Claim and Lien Resolution**

To facilitate the resolution of reimbursement claims and liens pursuant to this Section XIX, counsel for each Primary Plaintiff identified on the Eligible Plaintiff List shall provide to the Allocation Neutral within thirty (30) days after the Effective Date the Social Security Number, date of birth, and state of domicile for each such Primary Plaintiff who he or she represents.

**XX.**    **INTERIM STAY**

**A.**    **Motion for an Interim Stay**

After the Effective Date, Plaintiffs and the Insureds shall apply jointly to extend the stay of Debris Removal Claims in all Master Dockets for one hundred and twenty (120) days ("Interim Stay"). The Parties agree to cooperate with respect to their joint applications for an Interim Stay, including without limitation by resisting jointly any opposition to those applications.

**B.**    **Scope and Length of Interim Stay**

In their application for an extension of the Interim Stay, and except with respect to subpoenas authorized expressly pursuant to the Section XI.H of this Agreement and other subpoenas seeking and, if necessary, motions to compel the production of a Primary Plaintiff's medical records in the possession, custody or control of

any entity other than the Insureds, the Parties shall request jointly that the Court stay all actions in each Master Docket as to all parties in those actions, including without limitation Plaintiffs and the Insureds, for a period of one hundred and twenty (120) days. The Parties also agree that the Interim Stay shall apply to all Debris Removal Claims pending in any other court as of the Effective Date, and will seek to have comparable stays entered in those proceedings, except with respect to subpoenas for the production of documents authorized expressly pursuant to the Section XI.H of this Agreement. The City of New York also agrees (i) that all examinations of Primary Plaintiffs pursuant to N.Y. General Municipal Law § 50-h are stayed while the Interim Stay is in effect and (ii) that all deadlines relating to such stayed § 50-h examinations are tolled during the period of the Interim Stay.

In addition, notwithstanding the Interim Stay, Primary Plaintiffs who have applied for and/or who receive accidental disability benefits pursuant to New York City Administrative Code §§ 13-252, 13-258, 13-353, 13-354, 13-364 or 13-366 or Retirement and Social Security Law § 507 may subpoena the New York City Fire Department Pension Fund or the Police Pension Fund of the Police Department of the City of New York for any and all accidental disability records relating to them, provided that such Primary Plaintiffs include a HIPAA-compliant release together with their respective subpoenas.

The Plaintiffs intend to use this one hundred and twenty (120) day Interim Stay period to attempt to negotiate settlements with Other Defendants consistent with the terms of this Agreement other than the Settlement Amount. Following the expiration of this one hundred and twenty (120) day period, or at any other time agreed to by the Parties and the court, the Parties will request that the Interim Stay be lifted as to all Debris Removal Claims in all Master Dockets that remain unresolved by the Final Settlement Agreement.

**C.    Interim Stay Is Without Prejudice**

The Parties agree that the Interim Stay shall be without prejudice to any Party's rights in the litigation: (i) should the Final Settlement Agreement not become effective due to the failure to satisfy all of the prerequisites set forth in Section XXII.A of this Agreement; or (ii) should the court lift the Interim Stay for any reason.

**D.    Limited Rights to Apply to Lift the Interim Stay**

If this Agreement is voided pursuant to Section VI.E or XX.E of this Agreement, the Plaintiffs and the Insureds agree to apply jointly to the Court to lift the Interim Stay within fifteen (15) days thereafter.

**E.    Each Provision of This Agreement Is Essential and Non-Severable**

Each of the terms, provisions, sections and sub-sections of this Agreement are material and essential to the Parties' meeting of the minds, and are non-severable.

If prior to the Final Settlement Agreement Effective Date any court of competent jurisdiction voids, refuses to enforce, or requires the modification or deletion of any provision or provisions hereof, the Parties shall:

i.      Cooperate in presenting argument and evidence to the court in support of a request for reconsideration of the court's order or other directive; and

ii.     If the request for reconsideration is denied, or the Parties agree that such a request would be futile, the Parties shall in good faith attempt to negotiate mutually agreeable provisions of this Agreement for the sole purpose of addressing the court's stated concerns.

If within sixty (60) days after the date of the court's order or other directive that voids, refuses to enforce, or requires the modification or deletion of any provision or provisions of this Agreement, the Parties are unable to obtain relief or otherwise agree to modify the Agreement pursuant to (ii) above, then any Party shall have the right to void this Agreement and in such circumstances no Party shall oppose the termination of the Interim Stay, if it is then in effect.

## XXI.   MISCELLANEOUS PROVISIONS

### A.   Entry of Case Management Orders

On or after the Effective Date, the Insureds will move the court in each Master Docket for entry of the Case Management Order for that Master Docket appended hereto as Exhibit K.  Plaintiffs shall not oppose this application.  Plaintiffs expressly agree to join this motion.

### B.   Authority to Enter Into This Agreement

Each counsel signing this Agreement on his or her client's or clients' behalf represents and warrants that he or she is authorized to enter into this Agreement. In addition, each counsel signing this Agreement represents and warrants that, in exercising his or her independent professional judgment, he or she will recommend to each of his or her clients that each participate in the Final Settlement Agreement.

### C.   No Effect on Parties' Rights Against Non-Parties

Except as provided in Section II.E of this Agreement, nothing in this Agreement shall affect any rights or claims any Party has or may later have against a non-party to this Agreement.

### D.   No Admissions

Except with respect to any action by a Party or Parties to compel another Party or Parties to enter into Final Settlement Agreement consistent with this Agreement in the event that the Opt-In Threshold as described in Section VI of this

Agreement is satisfied, no Party is admitting liability or conceding any position or fact, including causation of injury or lack thereof, in this Agreement. Furthermore, none of the Allocation Neutral's determinations shall be accorded collateral estoppel effect in any case in any Master Docket or in any other pending or future litigation.

**E.    Admissibility of this Agreement**

This Agreement is subject to Federal Rule of Evidence 408 and analogous protections under all U.S. states' rules of evidence; provided, however, that this Agreement shall be admissible for any purpose in any action brought by any Party or Parties to enforce this Agreement and/or to compel any other Party or Parties to enter into a Final Settlement Agreement consistent with this Agreement in the event that the Opt-In Threshold as described in Section VI of this Agreement is satisfied.

Consistent with this understanding, no Party and no counsel to any Party to this Agreement shall seek to introduce or offer the terms of this Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Agreement, or any statements in the documents delivered in connection with this Agreement, in any judicial proceeding, except as rendered admissible by the foregoing provisions.

**F.    Governing Law**

This Agreement shall be governed in all respects by the laws of the State of New York without regard to choice of law principles.

In addition, the Parties object to any actions of the Court purporting to exercise authority over the Agreement. The Parties do not consent to any jurisdiction of the Court, or of any other court, to approve, supervise, amend, alter, and/or modify the terms of this Agreement.

**G.    Exclusive Venue in the Event of Any Disputes**

The Parties agree that any dispute regarding this Agreement shall be venued in the United States District Court for the Southern District of New York.

**H.    Lobbying Restrictions**

As of the Effective Date, the Parties and their respective counsel agree not to lobby any member of the United States Congress, any such member's staff, or the media in a manner that undermines or disparages, or could reasonably be construed to undermine or disparage, any pending or future legislation limiting the Insureds' potential liability with respect to Debris Removal Claims and/or New Debris Removal Claims. Nothing in this Section XXI.H shall restrict, or shall be construed to restrict, any Party's counsel's ability to practice law.

**I.**    [This section was deleted intentionally.]

**J.**    **Merger Clause**

This Agreement constitutes the Parties' entire agreement as respects its subject matter.  All discussions and any and all oral or written agreements previously entered into or entertained by Parties or any of them concerning this Agreement or any of its subject matter are hereby merged into this Agreement.

**K.**    **Confidentiality**

Once executed, this Agreement shall not be confidential and may be disclosed without limitation by any Party; provided, however, that nothing in this Section XXI.K shall void or otherwise affect the Parties' continuing obligations under the Confidentiality and Non-Disclosure Agreement ("Confidentiality Agreement") effective as of September 6, 2007, to maintain the confidentiality of Confidential Information as defined by the Confidentiality Agreement.

**L.**    **Statements to the Media**

Following execution of this Agreement, any Party may issue press release(s) announcing this Agreement and may without limitation make public statements or comments to any member of the media regarding this Agreement; provided, however, that in making such public statements or comments no Party shall disparage another with respect to this Agreement, any aspect of the negotiation of this Agreement, or Debris Removal Claims generally.  Nothing in this Section XXI.L shall affect in any way counsel's private consultations with their respective clients; provided, however, that counsel hereby covenant not to make any misrepresentations with respect to the Agreement in communications with their clients.

**M.**    **Sanctions for Breach of This Agreement's Confidentiality, Lobbying and/or Media Statement Provisions**

The Parties and their counsel agree that any breach of Sections XXI.K (confidentiality), XXI.H (lobbying), and/or XXI.L (media) of this Agreement by any Party or Parties or by any of their respective counsel shall subject the offending Party(ies) and its or their counsel to liquidated damages in the amount of Fifty Thousand Dollars and No Cents ($50,000.00), to be awarded in the Hon. Alvin K. Hellerstein's discretion upon application to him filed under seal by counsel for any non-breaching Party or Parties.  In addition, any Party and/or its counsel found by the Hon. Alvin K. Hellerstein to have breached willfully Sections XXI.K (confidentiality), XXI.H (lobbying), and/or XXI.L (media) of this Agreement shall pay the non-breaching Party's or Parties' costs and expenses, including reasonable attorneys' fees, relating to the liquidated damages application described in this Section XXI.M.

**N.**    **Arm's Length Negotiations**

This Agreement is the product of arm's length negotiations between and among the Parties. All of the Parties have been represented by, and have conferred with, their respective counsel regarding all aspects of this Agreement.

**O.**    **No Contingencies Except the Opt-In Threshold, Entry of the Case Management Order, and Non-Severability**

Except as provided in (i) Section VI.E of this Agreement with respect to the WTC Captive's exclusive right to void this Agreement, (ii) Section XXI.A of this Agreement with respect to entry by the court of the Case Management Orders in each Master Docket, and (iii) Section XX.E of this Agreement regarding non-severability, each Party represents and warrants that there are no pending conditions, agreements, transactions or negotiations that would render this Agreement or any part thereof void, voidable or unenforceable.

**P.**    **Other Defendants that Become Parties to the Final Settlement Agreement**

The Parties acknowledge that Plaintiffs have asserted Debris Removal Claims against Other Defendants. Other Defendants may become signatory(ies) to the Final Settlement Agreement, subject to negotiations with them concerning their respective reasonable financial contributions to the settlement and the other terms and conditions of their participation as parties to the Final Settlement Agreement. To the extent that Other Defendants join the Final Settlement Agreement as parties, the Parties will use their best efforts to incorporate those Other Defendants' respective financial contributions to the final settlement in a manner consistent with this Agreement.

Notwithstanding the forgoing provisions of this Section XXI.P, nothing in this Section XXI.P shall alter any Party's obligation with respect to Other Defendants' contributions to Allocation Costs as set forth in Section XI.D of this Agreement.

**Q.**    **WTC Captive as Party to This Agreement**

Notwithstanding any other provision of this Agreement or any other provision of law, the Parties acknowledge that (i) the WTC Captive entered voluntarily into this Agreement as a Party for the sole purpose of resolving the Debris Removal Claims against its Insureds and (ii) by virtue of its status as a Party to this Agreement or otherwise, nothing in this Agreement waives, alters, or amends any of the terms or conditions of the WTC Captive's Policy, and all of the WTC Captive' rights and defenses under its Policy are reserved expressly.

Furthermore, without limiting the forgoing provisions of this Section XXI.Q and notwithstanding any other provision of this Agreement or any other provision of law, the WTC Captive's obligations under this Agreement are limited solely to (i) payment of the Settlement Amount; (ii) payment of Allocation Costs to the extent provided Section XI.D of this Agreement; (iii) payment of the Contingent

Payment(s), if any, in accordance with Section IV of this Agreement; and (iv) payment, if any, in addition to the Settlement Amount pursuant to Section VI.E of this Agreement. Plaintiffs and each of them shall have no other claims or rights of any kind against the WTC Captive by virtue of this Agreement. In addition, to the extent that Plaintiffs or any of them commence any proceeding(s) against the WTC Captive that is determined to violate the limitations of this Section XXI.Q, the WTC Captive shall be entitled to recover its costs of defending that proceeding, including without limitation its attorneys' fees, from the Plaintiff(s) that commenced such proceeding.

Nothing in this Section XXI.Q shall limit or otherwise affect in any way any of the Plaintiffs' duties and/or obligations set forth anywhere in this Agreement.

**R.     Joint Drafting of This Agreement**

The Parties jointly prepared this Agreement and the language of all parts of this Agreement shall be construed as a whole according to its meaning and not strictly for or against any Party. Without limiting the forgoing provisions of this Section XXI.R, none of the provisions in this Agreement shall be construed strictly against the WTC Captive or any of the Insureds because of their status as insurance companies, if applicable.

**S.     Headings are for Convenience Only**

Section and paragraph headings in this Agreement are for convenience only and shall not affect the meaning of any aspect of this Agreement.

**T.     Application of Deadlines**

All deadlines and other time periods in this Agreement, including those set forth in Exhibit J, are measured in calendar days, but if any deadline or the expiration of any other time period falls on a non-business day, such deadline or other time period is extend by virtue of this Section XXI.T until the next business day. For purposes of this Agreement, business days are all days, other than Saturday, Sunday, or any other day on which commercial banks in the City of New York are required or authorized by law to be closed.

**U.     Notice**

All notices required by this Agreement as between and among the Parties or any of their respective counsel shall be deemed provided when received, and shall be sent only in the following manner:

i.      Certified or registered mail, return receipt requested;

ii.     Overnight delivery; or

iii.    Hand delivery.

A copy of each such notice also shall be sent to the recipient by e-mail or facsimile.

All notices required by this Agreement shall be sent to the following:

On behalf of the WTC Captive:

Margaret H. Warner, Esquire
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
Main: 212.547.5400
Direct:  202.756.8228
Facsimile: 202.591.2764
E-mail: mwarner@mwe.com

On behalf of the Insureds:

James E. Tyrrell, Jr., Esquire
Patton Boggs LLP
One Riverfront Plaza, 6th Floor
Newark, NJ 07102
Main: 973.848.5600
Direct: 973.848.5620
Facsimile: 973.848.5601
E-mail: jtyrrell@pattonboggs.com

On behalf of Plaintiffs or any of them:

Paul J. Napoli, Esquire
Worby Groner Edelman & Napoli Bern, LLP
350 5th Avenue, Suite 7413
New York, NY 10118
Main: 212.267.3700
Facsimile: 212.587.0031
E-mail: pnapoli@napolibern.com

## V.    Manner of Execution of This Agreement

This Agreement may be executed in counterpart originals with the same force and effect as if fully and simultaneously executed as a single document.  Facsimile or e-mailed signatures shall have the same force and effect as original signatures.

## W.    Amendments

This Agreement may not be amended or modified, except in writing signed by the WTC Captive, Defendant Insureds' Counsel on behalf of the Insureds, Plaintiffs'

Liaison Counsel on behalf of all Plaintiffs, and by other parties, if any, to this Agreement or their respective counsel.

## X.    Non-Waiver

Except where a specific period for action or inaction is provided herein, no waiver of a right, power or privilege provided by this Agreement shall be implied or inferred from any Party's delay, failure to exercise, incomplete exercise or partial waiver of such right, power or privilege.

## XXII.  FINAL SETTLEMENT AGREEMENT PROVISIONS

### A.    Affirmation of Final Settlement Agreement

This Agreement shall be deemed the Final Settlement Agreement upon the later of September 30, 2010, or satisfaction of all of the following prerequisites:

i.      Satisfaction of the Opt-In Threshold as set forth in Section VI.D of this Agreement;

ii.     The WTC Captive's election not to exercise its exclusive right to void this Agreement pursuant to Section VI.E of this Agreement;

iii.    Entry of the Case Management Orders pursuant to Section XXI.A of this Agreement;

iv.     Entry in each Master Docket of a case management order or other order setting Plaintiffs' attorneys' fees at twenty-five percent (25%) consistent with the penultimate paragraph of Section II.G of this Agreement;

v.      No Party exercises its right to void this Agreement pursuant to Section XX.E of this Agreement; and

vi.     The Parties acknowledge that this Agreement shall be deemed the Final Settlement Agreement by executing the Affirmation of Final Settlement Agreement attached as Exhibit R to this Agreement.  The Parties shall execute the Affirmation of Final Settlement Agreement within ten (10) days after satisfaction of subsections i-iv, above.

In addition to confirming satisfaction of the Opt-In Threshold set forth in Section VI.D, the Affirmation of Final Settlement Agreement shall specify the actual Section VI.D.i aggregate opt-in percentage achieved for purposes of calculating the amount of any additional payment due to Plaintiffs under Section VI.E of this Agreement.

Sections XXII.B to XXII.D shall be given effect immediately upon the Final Settlement Agreement Effective Date but shall have no effect until that time.  In

addition, immediately upon the Final Settlement Agreement Effective Date, this Agreement shall be referred to thereafter as the Final Settlement Agreement.

**B.      Dismissal With Prejudice**

Within fifteen (15) days after the Final Settlement Agreement Effective Date, Plaintiffs who opted into the settlement shall dismiss with prejudice, and without exception, all of their Debris Removal Claims against the Insureds using the form of Stipulated Order of Dismissal With Prejudice Pursuant to Final Settlement Agreement attached as Exhibit T to this Agreement.

**C.      Dismissal of *Walcott* Action**

Within fifteen (15) days after the Final Settlement Agreement Effective Date, the plaintiffs in *Walcott, et al. v. WTC Captive Ins. Co., et al.*, No. 07 Civ. 7072 (S.D.N.Y. 2007), shall dismiss with prejudice their complaint as against all defendants in that action.

**D.      Enforceability**

Section XX.E of this Agreement ("Each Provision of This Agreement Is Essential and Non-Severable") is deleted from the Final Settlement Agreement and is replaced with the following:

Each of the provisions of this Final Settlement Agreement shall be deemed to be severable in the event any provision or provisions of this Final Settlement Agreement are deemed or become voided or unenforceable, in which event the remaining provision or provisions shall remain in full force and effect unless the provision(s) rendered void or unenforceable cause this Final Settlement Agreement to fail in any of its essential purposes.

**[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the Parties, through their respective counsel, have executed this Agreement on the date(s) indicated below.

**On behalf of the WTC Captive Insurance Company, Inc.**

Margaret H. Warner, Esquire
McDermott Will & Emery LLP
*Counsel to the WTC Captive Insurance Company, Inc.*

Date: _6/10/10_

Witness signature:

Witness name: Doris Sherrill

**On behalf of the Insureds as defined in this Agreement**

James E. Tyrrell, Jr., Esquire
Patton Boggs LLP
*Counsel to the Insureds*

Date: _6/16/10_

Witness signature:

Witness name: Doris Sherrill

**On behalf of all Plaintiffs as defined in this Agreement**

Paul J. Napoli, Esquire
Worby Groner Edelman & Napoli Bern, LLP
*Plaintiffs' Liaison Counsel*

Date: _June 10, 2010_
Witness signature: _Marsa M Bintz_
Witness name: _MARSA M BINTZ_

William H. Groner, Esquire
Worby Groner Edelman & Napoli Bern, LLP
*Plaintiffs' Liaison Counsel*

Date: _June 10, 2010_
Witness signature: _Doris Sherrill_
Witness name: _DORis Sherrill_

Nicholas Papain, Esquire
Andrew J. Carboy, Esquire
Sullivan Papain Block McGrath & Cannavo P.C.
*Plaintiffs' Liaison Counsel*

Date: _6/10/10_
Witness signature: _Marsa M Bintz_
Witness name: _MARSA BINTZ_

## SCHEDULE OF EXHIBITS

**Exhibit A:**     List of WTC Captive Insureds

**Exhibit B:**     Work Verification Procedure

**Exhibit C:**     Settlement Grid

**Exhibit D:**     Qualifying Surgeries

**Exhibit E:**     Cancer Insurance Policy

**Exhibit F:**     Age Adjustment Factor Table

**Exhibit G:**     List of Adjudicatory Bodies

**Exhibit H:**     Second Injury Letter

**Exhibit I:**     List of Mixed Orthopedic Plaintiffs

**Exhibit J:**     Allocation Process Timeline

**Exhibit K:**     Case Management Orders for each Master Docket

**Exhibit L:**     Claim Form

**Exhibit M:**     *Exhibit M has been deleted intentionally.*

**Exhibit N:**     *Exhibit N has been deleted intentionally.*

**Exhibit O:**     *Exhibit O has been deleted intentionally.*

**Exhibit P:**     Release and Covenant Not to Sue

**Exhibit Q:**     Asthma Impairment Criteria

**Exhibit R:**     Affirmation of Final Settlement Agreement

**Exhibit S:**     Stipulation of Dismissal With Prejudice

**Exhibit T:**     Stipulated Order of Dismissal With Prejudice Pursuant to Final Settlement Agreement

**Exhibit U:**     Eligible Plaintiff List Template

## EXHIBIT A – LIST OF WTC CAPTIVE INSUREDS

| |
|---|
| CITY OF NEW YORK, including the: |
|     BOARD OF EDUCATION OF THE CITY OF NEW YORK |
|     BOROUGH OF MANHATTAN COMMUNITY COLLEGE |
|     CITY UNIVERSITY OF NEW YORK |
|     NEW YORK CITY DEPARTMENT OF EDUCATION |
|     NEW YORK CITY SCHOOL CONSTRUCTION AUTHORITY |
| A RUSSO WRECKING |
| ACROW |
| ALLCOM ELECTRIC |
| AMEC CONSTRUCTION MANAGEMENT, INC. |
| AMEC EARTH AND ENVIRONMENTAL |
| ANTHONY CORTESE SPECIALIZED HAULING LLC |
| ASG PEST CONTROL |
| ATC GROUP SERV/DBA ATC ASSOCIATES |
| ATLANTIC HEYDT CORP. |
| ATLAS CONCRETE |
| AVANTI DEMOLITION & CARTING CORP. |
| BECHTEL CONSTRUCTION, INC. |
| BERGEN CONCRETE CUTTING |
| BERKEL & CO. CONTRACTORS, INC. |
| BIG APPLE WRECKING & CONSTRUCTION |
| BOVIS LEND LEASE LMB, INC. |
| BREEZE CARTING |
| BREEZE NATIONAL, INC. |
| BRER FOUR TRANSPORTATION |
| BURO HAPPOLD CONSULT ENG. |
| C & D FIREPROOFING |
| C & D PAINTING, INC. |
| C.B. CONTRACTING CORP. |
| CANRON CONSTRUCTION CORP. |
| CANTOR SEINUK GROUP |
| CERTIFIED FENCE CORP. |
| CIVETTA COUSINS |
| CLARCO ENTERPRISE CORP. |
| COMPONENT ASSEMBLY SYS |
| COORDINATED METALS, INC. |
| CORD CONTRACTING CO., INC. |
| CRAIG TEST BORING |

| |
|---|
| CRITICOM INTERNATIONAL CORP |
| DAKOTA DEMO-TECH |
| DESIMONE CONSULTING ENGINEERS, PLLC |
| DCM ERECTORS, INC. |
| DIAMOND POINT EXCAVATION CORP |
| DIEGO CONSTRUCTION |
| DIVERSIFIED CARTING |
| DMT ENTERPRISE |
| D'ONOFRIO GENERAL CONTRACTORS CORP. |
| EAGLE LEASING & INDUSTRIAL SUPPLY (SEASONS) |
| EAGLE ONE ROOFING CONTRACTORS, INC. |
| EAGLE SCAFFOLDING CO. (SEASONS) |
| EJ DAVIES, INC. |
| EN-TECH CORP. |
| ENTERTAINMENT PARTNERS |
| ET ENVIRONMENTAL |
| EVERGREEN RECYCLING OF CORONA (EROC) |
| EWELL W. FINLEY, P.C. |
| EXECUTIVE MED SERVICES, PC |
| F&G MECHANICAL CORPORATION |
| FELIX EQUITIES, INC. |
| FLEET TRUCKING |
| FRANCIS A. LEE EXTERIOR RESTORATION |
| FRANK MICELLI JR CONTRACTING |
| FTI TRUCKING |
| G & G CONTRACTING, INC. |
| GILSANZ, MURRAY, & STEFICEK |
| GINO CRACOLICI & SONS, INC. |
| GOLDSTEIN ASSOCIATES PLLC |
| GRACE INDUSTRIES |
| GUY NORDENSON AND ASSOCIATES |
| HALLEN WELDING SERVICE |
| HELMSMAN MANAGEMENT SERVICES, INC. |
| HGC CONTRACTING CORP. |
| HIGH RISE HOISTING AND SCAFFOLDING |
| HIGH-RISE ELECTRIC, INC. |
| HP ENVIRONMENTAL |
| JP EQUIPMENT RENTAL MATERIALS, INC. |
| KEVIN MCMANUS |

| |
|---|
| KOCH SKANSKA, INC. |
| LAQUILLA CONSTRUCTION, INC. |
| LASTRADA GENERAL CONTRACTING CORP. |
| LESLIE E. ROBERTSON ASSOCIATES |
| LIBERTY MUTUAL GROUP |
| LIRO |
| LOCKWOOD, KESSLER & BARTLETT (LKB) |
| LUCIUS PITKIN |
| LZA TECH-DIVISION OF THORTON TOMASETTI |
| M. G. MCLAREN, P.C. |
| MANAFORT BROTHERS, INC. |
| MAZZOCCHI WRECKING, INC. |
| MEDCOR, INC. |
| MENT BROTHERS |
| MERIDIAN CONSTRUCTION GROUP |
| MG MCLAREN P.C. |
| MORETRENCH AMERICAN, CORP. |
| MRA ENGINEERING, PC |
| MUESER RUTLEDGE CONSULTING ENGINEERS |
| MUSCO SPORTS LIGHTING, LLC |
| NACIREMA INDUSTRIES |
| NEW YORK CRANE & EQUIPMENT CORP. |
| NICHOLSON CONSTRUCTION CO. |
| NICHOLSON/HEYWOOD JOINT VENTURE |
| OFF ROAD WELDING, INC. |
| THE OFFICES OF JAMES RUDERMAN, LLP |
| OLYMPIC PLUMBING AND HEATING |
| OVE ARUP & PARTNERS |
| PARSON GROUP |
| PETER SCALAMANDRE & SONS |
| PINNACLE ENVIRONMENTAL |
| PLAZA CONSTRUCTION CORP. |
| PRO SAFETY SERVICES, LLC |
| PT & L CONTRACTING CORP. |
| REGIONAL SCAFFOLD & HOISTING CO, INC. |
| RICH MARK ENVIRONMENTAL SERVICES, INC. |
| ROBER SILMAN ASSOCIATES |
| ROBERT C STEWART |
| ROBERT ERRAT |

| |
|---|
| ROBERT L GEROSA |
| RODAR ENTERPRISES, INC. |
| ROYAL GM, INC. |
| SAB TRUCKING |
| SAFEWAY ENVIRONMENTAL |
| SEMCOR EQUIPMENT |
| SEVERUD ASSOCIATES CONSULTING ENGINEERS |
| SHELDRAKE ORGANIZATION, INC. |
| SILVERADO CONTRACTORS |
| SILVERITE CONTRACTING |
| SIMPSON, GUMPERTZ, & HEGER |
| SKIDMORE, OWINGS & MERRILL LLP |
| STAR DELTA ELECTRIC |
| STIER, ANDERSON & MALONE |
| SUMMIT STRUCTURES LLC |
| TELENET COMMUNICATIONS |
| THYSSEN KRUPP ELEVATOR CO. |
| TOMASETTI GROUP |
| TORETTA TRUCKING |
| TOTAL SAFETY CONSULTING LLC |
| TUCCI EQUIPMENT RENTAL CORP |
| TULLY CONSTRUCTION |
| TURNER CONSTRUCTION COMPANY |
| ULTIMATE DEMOLITION/CS HAULING (JOINT VENTURE) |
| UNITED STATES REBAR |
| VANGUARD EQUIPMENT RENTALS |
| VERTICAL TECHNOLOGIES |
| VOLLMER ASSOCIATES |
| W HARRIS & SON INC. |
| WALTER WHITE TRUCKING |
| WEEKS MARINE, INC. |
| WEIDLINGER ASSOCIATES |
| WHITNEY CONTRACTING |
| WOLKOW BRAKER ROOFING |
| YANNUZZI & SONS, INC. |
| YONKERS CONTRACTING |
| YORK HUNTER CONSTRUCTION, LLC |
| ZIEGENFUSS DRILLING |

## EXHIBIT B – WORK VERIFICATION PROCEDURE

To establish that a Primary Plaintiff worked at the WTC Site or other location where Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims and is eligible to participate in the potential settlement of his or her Debris Removal Claims against the Insureds or any of them, the Primary Plaintiff must submit a "Verification Package" as described herein.

Documents in the Verification Package shall be comprised of "Primary Sources" and/or "Secondary Sources," as identified on the attached list of Documents Eligible as Primary Sources and Secondary Sources.

In addition to Primary Sources and Secondary Sources, each Primary Plaintiff (or for Primary Plaintiffs who are deceased, the Primary Plaintiff's personal representative) must submit a Claim Form, attesting under penalty of perjury to having worked at the WTC Site or other location where Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds, or any of them.

Primary Plaintiffs who satisfy this Work Verification Procedure have only established that they worked at the WTC Site or other location where Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them during the relevant time period and are potentially eligible to recover under the Agreement, subject to its other terms, conditions and limitations.

### Individuals Present Working as Employees

A complete Verification Package, consisting of at least one Primary Source and a Primary Plaintiff's sworn Claim Form, verifies that a Primary Plaintiff worked as an employee at the WTC Site or other location where Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them during the relevant period.

To be accepted as a Primary Source, a document identified on the table as a Primary Source must contain the following indicia of reliability: (1) evidence of the subject Primary Plaintiff's presence at the WTC Site or other location where Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds or any of them at any time on or after September 11, 2001; and (2) clear endorsement or acknowledgment of this information by the Primary Plaintiff's employer, including a supervisory or management-level employee, or an appropriate governmental entity. Such endorsement or acknowledgment must be evidenced by a signature, statement or official seal/stamp.

If a Primary Plaintiff submits an affidavit and supporting evidence establishing that his or her employer destroyed his or her employment records, or that his or her employment records otherwise are unavailable due to the employer's dissolution, bankruptcy, or other extraordinary event outside the control of the Primary Plaintiff, then the Allocation Neutral shall have discretion to accept for that Primary Plaintiff two (2) Secondary Sources in lieu of one (1) Primary Source. The Allocation Neutral shall exercise this discretion sparingly, and solely when the unavailability of the Primary Plaintiff's employment records for the reasons described herein would lead to an inequitable result.

**Individuals Present as Volunteers**

The Parties recognize that Primary Plaintiffs who worked at the WTC Site as volunteers may be unable to produce a Primary Source evidencing their presence at the WTC Site. Volunteers should not be excluded arbitrarily from the settlement process, but the standard of proof required to verify a volunteer's presence at the WTC Site must remain sufficiently high to detect fraudulent or inaccurate claims.

Accordingly, a complete Verification Package, consisting of two Secondary Sources and the Primary Plaintiff's attestation to volunteer service at the WTC Site on his or her Claim Form, verifies that a Primary Plaintiff served as a volunteer at the WTC Site during the relevant period. Primary Plaintiffs who worked, or are alleged to have worked, as employees at the WTC Site at any time on or after September 11, 2001 are ineligible to prove their presence at the WTC Site in this manner, and must produce the required Verification Package for employees consisting of one Primary Source and the Primary Plaintiff's sworn Claim Form.

**Work Verification Process**

For Primary Plaintiffs who filed and served a check-off complaint, Plaintiffs' counsel shall identify to counsel for the WTC Captive each Primary Plaintiff acknowledged to have been an employee working at the WTC Site or other location where he or she alleges exposure giving rise to his or her Debris Removal Claims against the Insureds, or any of them, in the Core Discovery responses of an Insured. Upon the WTC Captive's confirmation that a Primary Plaintiff was so acknowledged, that Primary Plaintiff shall be placed on a "pre-approved list" to be submitted to the Allocation Neutral.

Should the Parties be unable to agree whether a particular Primary Plaintiff can be included on the "pre-approved list," that Primary Plaintiff must submit all documents necessary to satisfy the requirements for the Verification Package to the Allocation Neutral. The Allocation Neutral shall consider the document(s) and accept or reject the Primary Plaintiff's submission in accordance with the requirements stated herein.

Every Primary Plaintiff – including those on the pre-approval list – seeking to participate in the Final Settlement Agreement shall submit a Claim Form sworn under penalty of perjury as described herein. The Allocation Neutral shall consider the Claim Form and Verification Package and verify or deny a Primary Plaintiff in accordance with the requirements stated herein.

**Amendments**

The parties may amend this Work Verification Procedure upon written agreement signed by the parties.

**EMPLOYMENT VERIFICATION**
**Documents Eligible as Primary Sources and Secondary Sources**

*Only* for purposes of the chart below, the "WTC Site" shall include other locations where a Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims.

| PRIMARY SOURCE DOCUMENTS | SECONDARY SOURCE DOCUMENTS |
|---|---|
| Defendant-Employer core discovery responses acknowledging work at WTC Site | Affidavits sworn by third parties (evidencing personal knowledge of a Primary Plaintiff's presence at the WTC Site) |
| Foreman Daily Time Report | Waste Disposal Manifest (verified and with destination(s) clearly visible) |
| Staten Island Supervisor's Roster | |
| Notice of Participation (with payroll management system report) | Acknowledgement of Registration of Participation by Workers' Compensation Board |
| Payroll Management System Report | Acknowledgement of Notice of Participation by NYCERS (Letter) |
| Verified Detailed Burden Report | |
| Verified Payroll Reports | Unverified Detailed Burden Report |
| Fit Test Record (bearing signature of test administrator) | Unverified Payroll Report |
| WTC ID Badge | Union Work History Reports |
| Certificates and Awards (from Primary Plaintiff's employer or the City of New York) | Letter from Union Representative confirming Primary Plaintiff's presence at WTC Site |
| NYPD Assignment Roster Sheets | Photograph(s) of Primary Plaintiff at WTC Site post-collapse (multiple photos count as one Secondary Source) |
| NYPD and FDNY Overtime Reports | |
| NYPD and FDNY World Trade Center Exposure Reports | Contemporaneous newspaper article(s) evidencing Primary Plaintiff's presence at WTC Site (multiple articles count as one Secondary Source) |
| Acknowledgement of Notice of Participation Receipt by FDNY (Letter) | |
| Verified Payroll Reports | |
| Line of Duty Accident Reports (NYPD and FDNY) at WTC Site | |
| Attendance/Sick Leave Documents for Work at WTC Site | |
| NYPD Logbooks | |
| NYPD Investigator Daily Activity Report | |
| Pension Forms (forms granting pension benefits and referencing specifically work at WTC Site) | |
| Determination of Disability/Notice of Decision by FDNY, NYPD, City of New York, NYSLERS or Workers' Compensation Board (referencing work at WTC Site as employee or volunteer) | |
| Employee Incident/Accident Reports | |
| Letters from employers | |
| Work histories from employers, including computer records or other electronic information produced directly by an employer or their counsel, if accompanied by copy of transmitting correspondence | |
| Affidavit of non-relative, non-Plaintiff superior officer attesting to Plaintiff's presence at WTC Site | |

## EXHIBIT C – SETTLEMENT GRID

| Disease Groups | | Impairment Level | Base Points |
|---|---|---|---|
| A | Chronic Obstructive Pulmonary Disease | 0 | 975 |
| | | 1 | 3,250 |
| | | 2 | 7,800 |
| | | 3 | 13,000 |
| | | 4 | 19,500 |
| B | Interstitial Lung Disease | 0 | 6,500 |
| | | 1 | 25,000 |
| | | 2 | 60,000 |
| | | 3 | 85,000 |
| | | 4 | 100,000 |
| C | Asthma/ RADS | 0 | 1,500 |
| | | 1 | 7,500 |
| | | 2 | 25,000 |
| | | 3 | 60,000 |
| | | 4 | 85,000 |
| D | Laryngitis or Pharyngitis | 0 | 650 |
| | | 1 | 975 |
| | | 2 | 1,300 |
| | | 3 | 1,625 |
| E | Chronic Rhinosinusitis | 0 | 650 |
| | | 1 | 975 |
| | | 2 | 1,300 |
| | | 3 | 1,625 |
| F | Upper Digestive | 0 | 650 |
| | | 1 | 975 |
| | | 2 | 1,950 |
| G | Sleep Disorders | 0 | 650 |
| | | 1 | 975 |
| | | 2 | 1,300 |
| H | Death | 0 | 650 |
| | | 1 | 25,000 |
| | | 2 | 200,000 |
| I | Cancer | 0 | 650 |
| | | 1 | 2,500 |
| | | 2 | 10,000 |
| | | 3 | 32,500 |
| J | Cardiac | 0 | 650 |
| | | 1 | 650 |
| | | 2 | 650 |
| K | Restrictive Lung Disease | 0 | 650 |
| | | 1 | 975 |
| | | 2 | 1,300 |
| | | 3 | 1,625 |

## EXHIBIT D – QUALIFYING SURGERIES

For purposes of Section XVIII.B of the Agreement, the Allocation Neutral shall consider the surgical procedures listed in the chart below to be Qualifying Surgeries only if:

    i.   the Allocation Neutral determines that a Primary Plaintiff underwent[1] one of the surgical procedures listed in column A in the chart below after his or her work or volunteer service at the WTC Site or at other locations giving rise to his or her Debris Removal Claims;

    ii.   the Allocation Neutral determines according to the Medical Proof Criteria and based upon a Primary Plaintiff's Claim Form and Qualifying Medical Records that the Primary Plaintiff has one of the Qualifying Injury(ies) listed in column B of the chart below that corresponds with the surgical procedure that the Primary Plaintiff underwent; and

    iii.   one or more of the Qualifying Injury(ies) listed in column B of the chart below is, based upon the Plaintiffs' Claim Form and Qualifying Medical Records, the most likely explanation in the Allocation Neutral's judgment for the corresponding surgical procedure listed in column A of the chart below.

Consistent with the forgoing requirements, the Allocation Neutral shall not credit as a Qualifying Surgery for purposes of Section XVIII.B of the Agreement any of the surgical procedures listed in column A of the chart below if the Allocation Neutral determines that those procedure(s) in a particular Primary Plaintiff's case are more likely necessitated by an alternative explanation listed in column C of the chart below, or any other injury or medical condition other than those corresponding Qualifying Injury(ies) listed in column B of the chart below.

For each Qualifying Surgery, the corresponding payment amount is set forth in column D.

| Column A<br><br>Surgical Procedure | Column B<br><br>Corresponding Qualifying Injury(ies) | Column C<br><br>Examples of alternative non-qualifying explanations | Column D<br><br>Payment |
|---|---|---|---|
| Laryngectomy | Laryngeal cancer ("I2") | Traumatic injury | $10,000 |
| Lobectomy | Lung cancer ("I2") | Congenital defects, severe infections, benign cysts, or benign abscesses | $10,000 |
| Actual or recommended lung transplant or double lung transplant | COPD ("A") (but not Emphysema) or ILD ("B") | Cystic fibrosis, primary pulmonary hypertension, Emphysema or other advanced lung diseases | Recommended - $75,000<br>Single - $100,000<br>Double - $150,000 |

---

[1] For purposes of this Exhibit, "underwent" shall include Primary Plaintiffs on a lung transplant list and Primary Plaintiffs for whom a lung transplant surgeon recommended a lung transplant but found them too unstable to undergo the procedure.

| Column A  Surgical Procedure | Column B  Corresponding Qualifying Injury(ies) | Column C  Examples of alternative non-qualifying explanations | Column D  Payment |
|---|---|---|---|
| Pneumonectomy | Lung cancer ("I2") | Traumatic injury, pulmonary infarction, or necrotizing pneumonia | $5,000 |
| Sinus surgery | Chronic rhinosinusitis or chronic sinusitis ("E") | Anatomic defects or polyps | $20,000 for each Qualifying Surgery if the Primary Plaintiff also satisfies the requirements set forth in the text below this table |
| Thyroidectomy | Thyroid cancer ("I1") | Hyperthyroidism, hypothyroidism, goiter, or other masses/growths | $5,000 |

With respect to "sinus surgery," the Allocation Neutral shall award payment, assuming the other requirements of this Exhibit D are satisfied for each Qualifying Surgery, to those Primary Plaintiffs whose Qualifying Medical Records clearly establish in the Allocation Neutral's judgment the following:

   i.  that the Primary Plaintiff's sinus surgery relates to his or her "E2" or "E3" Qualifying Injury diagnosed according to the Medical Proof Criteria within one (1) year of the Primary Plaintiff's last day of 9/11-related work of volunteer service, as confirmed by the Allocation Neutral based upon the Primary Plaintiff's Claim Form and the Qualifying Medical Records submitted therewith;

   ii.  that the Primary Plaintiff took prescription medication for his or her sinus conditions prior to the surgery in question;

   iii.  that the Primary Plaintiff's sinus surgery was not primarily performed to correct, mitigate or otherwise treat an anatomic defect or any other condition unrelated to his her Debris Removal Claims; and

   iv.  that the Primary Plaintiff had no Qualifying Injury in the "E" Disease Group before his or her first date of 9/11-related work or volunteer service, as verified by the Primary Plaintiff's and his or her counsel's execution of the Claim Form.

In determining that a Primary Plaintiff qualifies to recover for a sinus surgery, the Allocation Neutral may consider, but shall not be bound by, opinions by licensed physicians appearing in the Primary Plaintiff's Qualifying Medical Records regarding these factors.  In addition, Primary Plaintiffs who do not submit sufficient Qualifying Medical Records to permit the Allocation Neutral to evaluate each of these factors shall not be entitled to payment for that surgery.

Lastly, Primary Plaintiffs who claim multiple sinus surgeries shall be entitled to up to three (3) of the sinus surgery payments referenced herein, subject to all of the other requirements of this Exhibit D.

## <u>Exhibit E – Cancer Insurance Policy</u>

[see attached]

Draft Metropolitan Life Insurance Company, Inc.
Policy and Certificate Forms subject to regulatory approval

# MetLife®

Metropolitan Life Insurance Company
New York, New York

Metropolitan Life Insurance Company ("MetLife"), a stock company, will pay the benefits specified in the Exhibits of this policy subject to the terms and provisions of this policy.  The Schedule of Exhibits lists each Exhibit to this policy, to whom it applies and its effective date.

(1) **Policyholder:**   [XYZ Trust]

(1) **Policy No.:**     [123XYZ]

**EFFECTIVE DATE AND POLICY TERM**

(1) This policy will take effect on [June 15, 2010.]  The term of this policy will end on [June 14, 2025].   This policy may be renewed by MetLife in accordance with the Renewal provision if the requirements for renewal are met.

**PREMIUM PAYMENTS**

Insurance under this policy is issued in consideration of statements made by the Policyholder in the application for this policy and the payment of the required Premium.  Premium is payable at the home office of MetLife or to its authorized agent.  The Premium is due on the effective date of this policy and this policy will not become effective unless the required Premium is paid.

**POLICY SITUS**

This policy is entered into under and will be governed by the laws of New York.

Signed as of this policy's effective date at MetLife's home office in New York, New York.

Jeffrey A. Welikson
Senior Vice President and Secretary

C. Robert Henrikson
Chairman of the Board, President and
Chief Executive Officer

**CRITICAL INJURY INSURANCE POLICY**
**NON-DIVIDEND  PAYING**

**TABLE OF CONTENTS**

| Section | Page |
|---|---|

POLICY FACE PAGE
    Effective Date ................................................................................................................ 1
    Premium Payments ......................................................................................................... 1
    Policy Situs ..................................................................................................................... 1

UNDERSTANDING THIS POLICY ........................................................................................ 3

DEFINITIONS ........................................................................................................................ 3

INSUREDS ............................................................................................................................ 5

ELIGIBILITY AND EFFECTIVE DATES OF COVERAGE ..................................................... 5

SPECIFIED AMOUNT PROVIDED UNDER THIS POLICY ................................................... 5

RENEWAL ............................................................................................................................. 5

EXPERIENCE CREDITS ....................................................................................................... 6

PREMIUM PROVISIONS ....................................................................................................... 6

TERMINATION OF THIS POLICY ......................................................................................... 6

GENERAL PROVISIONS
    Entire Contract ............................................................................................................... 6
    Policy Changes or Waivers ............................................................................................ 6
    Statements Made by the Policyholder ............................................................................ 6
    Incontestability: Statements Made by Insureds ............................................................. 6
    Misstatement of Age, Gender or Tobacco User Status................................................... 7
    Certificates ..................................................................................................................... 7
    Data Needed .................................................................................................................. 7
    Arbitration ....................................................................................................................... 7
    Non-Dividend Paying ...................................................................................................... 7
    Conformity with Law ....................................................................................................... 7

SCHEDULE OF EXHIBITS..................................................................................................... 8
    EXHIBIT 1: Premium .......................................................................................... EXHIBIT1
    EXHIBIT 2: Certificate Forms ............................................................................ EXHIBIT2
    EXHIBIT 3: Experience Formula ........................................................................ EXHIBIT3
    EXHIBIT 4: List of Insureds ............................................................................... EXHIBIT4

**UNDERSTANDING THIS POLICY**

The terms of this policy have been negotiated between MetLife, the Insureds, and the Defendants through their liability insurance company, with each party being represented by counsel.  MetLife has issued this policy to the Policyholder to provide Coverage for the Insureds.  Any rights of ownership that may exist with respect to this policy belong to the Policyholder, but the Policyholder may not cause any change to the rights of the Insureds.

Each Insured has entered into a Settlement Agreement with the Defendants.  The rights of each Insured are stated in the Certificate issued to that Insured.

**DEFINITIONS**

As used in this policy, the following terms will have the meanings defined below.  When defined terms are used in this policy, they will appear with initial capitalization.  The plural use of a term defined in the singular will share the same meaning.

**Base Benefit** means the minimum amount that MetLife will pay if an Insured  is diagnosed with a Listed Condition during any Policy Period other than Policy Period 1.  The Base Benefit is shown in the Schedule of Benefits in the Certificate.

**Certificate** means the Certificate of Insurance, including any riders, notices, or other attachments, issued to an Insured pursuant to the "Certificates" provision of this policy.

**Cost of Insurance** means the amount of Premium charged for a particular Insured, based on the Insured's risk factors.

**Coverage** means the insurance provided to Insureds under this policy.

**Critical Injury Policy** means a policy insured by MetLife that is specified by MetLife on its face page as a "Critical Injury Policy".

**Defendants** means certain defendants named in claims, causes of action, notices of claims, notices of suits, suits, and actions relating in any way to or arising out of the rescue, recovery and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001, including without limitation Master Docket Nos. 21 MC 100, 21 MC 102, and 21 MC 103 in the United States District Court for the Southern District of New York and in any similar state court proceedings.

**Experience Credit** means an amount in addition to the Base Benefit, as calculated by MetLife in accordance with the Experience Formula, not to exceed $50,000, that may be paid for an Insured who is diagnosed with a Listed Condition during any Policy Period after Policy Period 1.

**Experience Formula** means the formula developed and used by MetLife to determine:
- whether there will be any Experience Credit and, if there will be an Experience Credit, the amount of such Experience Credit; and
- whether to renew the Policy, and if the Policy will be renewed, the length of any Renewal Period.
The Experience Formula is set forth in Exhibit 3 of this policy.

**Insured** means a person covered for the benefits provided in the form of any one of the Certificates attached to this policy as Exhibit 2.

**Listed Condition** means a condition for which Coverage is provided in accordance with the  Certificate.

**Non-Tobacco User** means an Insured who did not use tobacco products (for example, cigarettes, cigars, pipes or chewing tobacco) at any time during the five year period before the effective date of this policy.

**Policy Period** means Policy Period 1, Policy Period 2, Policy Period 3, Policy Period 4, Policy Period 5, Policy Period 6 or a Renewal Period.

**DEFINITIONS (continued)**

(1)    **Policy Period 1** means the period that begins [June 15, 2010] and ends [June 14, 2016].

(1)    **Policy Period 2** means the period that begins [June 15, 2016] and ends [June 14, 2018].

(1)    **Policy Period 3** means the period that begins [June 15, 2018] and ends [June 14, 2020].

(1)    **Policy Period 4** means the period that begins [June 15, 2020] and ends [June 14, 2022].

(1)    **Policy Period 5** means the period that begins [June 15, 2022] and ends [June 14, 2024].

(1)    **Policy Period 6** means the period that begins [June 15, 2024] and ends [June 14, 2025].

**Policyholder** means the Policyholder shown on page 1.

**Premium** means the amount that must be paid to MetLife for all the Coverage provided under this policy.

**Renewal Period** means a period of time, not to exceed two years, for which MetLife agrees, pursuant to the Experience Formula, to renew Coverage for Insureds after the expiration of Coverage.

(1)    **Settlement Agreement** means an agreement, with the effective date of [June 1, 2010], entered into by an individual with the Defendants to settle the individual's claim against the Defendants relating in any way to or arising out of the rescue, recovery and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001.

**Signed** means any symbol or method executed or adopted by a person with the present intention to authenticate a record, and which is on or transmitted by paper or electronic media, and which is consistent with applicable law.

**Specified Amount** means the amount of the benefit payable under the Certificate during the Policy Period in which a Listed Condition is diagnosed as shown in the Schedule of Benefits of the Certificate.

**Tobacco User** means an Insured who used tobacco products (for example, cigarettes, cigars, pipes or chewing tobacco) at any time during the five year period before the effective date of coverage.

**Written** or **Writing** means a record which is on or transmitted by paper or electronic media which is acceptable to Us and consistent with applicable law.

**INSUREDS**

The name of each Insured is set forth in Exhibit 4 of this policy, and no person who is not listed in Exhibit 4 shall be covered under this policy.  An individual may only become an Insured with MetLife's consent in accordance with the terms and conditions of this policy.  Coverage will be provided to Insureds by MetLife under this policy, subject to payment of Premium and all the other terms and provisions of this policy.

MetLife shall have the right to refuse to extend Coverage under this policy to any Insured if the insurance that would be issued to that person under this policy, when combined with insurance under other Critical Injury Policy(ies) that already cover that person, would present an unacceptable accumulation of risk for MetLife.

Except as may be otherwise specifically agreed in writing by MetLife on a case-by-case basis, no more than one Certificate may be issued to any one individual under this policy.

**ELIGIBILITY AND EFFECTIVE DATES OF COVERAGE**

Eligibility for Coverage under this policy is limited to individuals who have entered into a Settlement Agreement.

A person who is eligible for Coverage under this policy, will only become covered after all of the following have occurred:
- the person has executed a release, accepting Coverage under this policy as part of the Settlement Agreement;
- the person has signed a statement confirming:
  - his gender and age;
  - his Tobacco User status (Tobacco User or Non-Tobacco User); and
  - that he has not been treated for or diagnosed as having any of the conditions which qualify as a Listed Condition;
- MetLife has received the required Premium for Coverage; and
- MetLife has consented in accordance with the terms and conditions of this policy to extend Coverage under this policy to the person.

The effective date of the person's Coverage will be specified on the Schedule of Benefits contained in the Certificate.

**SPECIFIED AMOUNT PROVIDED UNDER THIS POLICY**

The Specified Amount payable if an Insured is diagnosed with a Listed Condition is set forth in the Schedule of Benefits of the Certificate.  Once a Specified Amount for a Listed Condition is paid for an Insured under the Insured's Certificate, the Certificate and Coverage for that Insured will end.

**RENEWAL**

As further described in Exhibit 3 of this Policy:
- at least sixty days before the end of the term of this policy, using the Experience Formula, MetLife will determine whether to provide Coverage for a Renewal Period; and
- if there are any Renewal Periods, at least sixty days before the end of each Renewal Period, using the Experience Formula, MetLife will determine whether to provide Coverage for an additional Renewal Period.

MetLife will notify the Policyholder as to whether the policy will be renewed at least 30 days before the end of Policy Period 6 and the Renewal Period (if applicable).

**EXPERIENCE CREDITS**

As further described in Exhibit 3 of this Policy, MetLife may include an Experience Credit in the Specified Amount for any Policy Period after Policy Period 1.  This determination will be made by MetLife at least sixty days before the expiration of each Policy Period.  MetLife will notify the Policyholder and Insureds of any Experience Credit that MetLife determines will apply to a Particular Policy Period at least 30 days before the beginning of the Policy Period.  If there is an Experience Credit during Policy Period 2:
- it will be recalculated for every subsequent Policy Period;
- it may decrease from one Policy Period to the next based on that recalculation; and
- it will never increase from one Policy Period to the next.

**PREMIUM PROVISIONS**

The Coverage provided under this policy is conditional upon payment of the required Premium.  The amount of the Premium will be determined by MetLife based on the Cost of Insurance for each Insured listed in Exhibit 4, with all Insureds listed in Exhibit 4 aggregated to arrive at the Premium due.  The Policyholder or the Policyholder's designee must give MetLife any information that MetLife requires to determine Premium. Full Premium must be paid in United States currency in a single lump sum on or before the date Coverage becomes effective.

**TERMINATION OF THIS POLICY**

This policy will end on the date the Coverage for all Insureds has ended, as provided in the Certificates.

**GENERAL PROVISIONS**

**Entire Contract.**  The entire contract is made up of the following:

1. this policy, including its Exhibits which include the Certificate(s);
2. the enrollment forms completed by Insureds;
3. the Policyholder's application, a copy of which is attached;
4. the amendments and endorsements to this policy, if any.

**Policy Changes or Waivers.**  An officer of MetLife must approve in Writing any change or waiver of the terms and provisions of this policy. No MetLife employee, who is not an officer of MetLife, has MetLife's authority to approve such changes or waivers.  A change or waiver will be evidenced by an amendment Signed by an officer of MetLife and an authorized representative of the Policyholder or an endorsement Signed by an officer of MetLife.  A copy of the amendment or endorsement will be provided to the Policyholder for attachment to this policy and the amendment or endorsement will become a part of this policy.

**Statements Made by the Policyholder.**  Any statement made by the Policyholder will be considered a representation and not a warranty.  MetLife will not use such statement to avoid insurance, reduce benefits or defend a claim unless it is contained in a Written application.  MetLife will not use such statement to contest insurance after it has been in force for two years from its effective date, unless the statement is fraudulent.

**Incontestability:  Statements Made by  Insureds.**  Any statement made by an  Insured  will be considered a representation and not a warranty.  MetLife will not use such statement to avoid insurance, reduce benefits or defend a claim unless the following requirements are met:

1. the statement is made in writing;
2. the statement is signed by the Insured; and
3. a copy of the signed statement has been given to the Insured or his beneficiary.

MetLife will not use an Insured's statements which relate to insurability to contest insurance after it has been in force for two years, unless the statement is fraudulent.

**GENERAL PROVISIONS (continued)**

**Misstatement of Age or Gender**. If the age and/or gender of an Insured is misstated, MetLife will adjust the Specified Amount for that Insured to an amount that the Cost of Insurance paid for the Insured's Coverage would have purchased based on the Insured's correct age and gender.

**Certificates.** MetLife will issue Certificates for delivery to each Insured, as appropriate. Such Certificate will describe the Insured's benefits and rights under this policy.

**Data Needed.** The Policyholder or the Policyholder's designee will provide MetLife with all the data needed to compute Premiums and carry out the terms of this policy. MetLife may examine such data at any reasonable time. If the data the Policyholder or the Policyholder's designee provides Us is incorrect, MetLife will either void coverage or adjust the Specified Amount.

**Arbitration.** All claims relating to the Experience Formula, against MetLife and its subsidiaries and affiliates, and their officers, directors, employees and agents, must be submitted to arbitration. The arbitration must be brought in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect. The arbitrator(s), to be chosen under the AAA rules, must be licensed as an attorney at law, a financial planner or an insurance professional. The award of the arbitrator(s) shall be fully enforceable and subject to entry of judgment by a court of competent jurisdiction.

Neither MetLife, nor any policyholder, Insured or beneficiary, nor any person or entity claiming on their behalf, shall seek to resolve any dispute relating to the Experience Formula by any means other than arbitration, such as a lawsuit. If any party does bring such a lawsuit, the other party(ies) may permanently enjoin that lawsuit and recover from the party that brought the lawsuit all damages and costs. Such costs will include reasonable attorneys' fees incurred to enforce this clause.

The arbitrator(s) may not award punitive or exemplary damages.

**Non-Dividend Paying**. This policy does not pay dividends.

**Conformity with Law**. If the terms and provisions of this policy do not conform to any applicable law, this policy shall be interpreted to so conform.

**SCHEDULE OF EXHIBITS**

| | Exhibit Number | Exhibit Type | Effective Date |
|---|---|---|---|
| (1) | 1 | Premium | [June 15, 2010] |
| (1) | 2 | Certificate Forms | [June 15, 2010] |
| (1) | 3 | Experience Formula | [June 15, 2010] |
| (1) | 4 | List of Insureds | [June 15, 2010] |

(1)     **SCH/EXHIBITS**                    **DATE:  [June 15, 2010]**

**CIP2009**

**EXHIBIT 1**


**PREMIUM**

(2)     [The Premium for the Coverage provided by this policy is as follows:

TO BE PROVIDED]

(1)     **EXHIBIT 1**                                    **Date:  [June 15, 2010]**

**CIP2009**

**EXHIBIT 2**

**CERTIFICATE FORMS**

(1)

| [Certificate Form# | Effective Date | Applicable To |
|---|---|---|
| CIC2009-N | June 15, 2010 | All Insureds who are Non-Tobacco Users |
| CIC2009-T | June 15, 2010 | All Insureds who are Tobacco Users] |

(1)     **EXHIBIT2**                              **Date:  [September 1, 2010]**

**CIP2009**

**EXHIBIT 3**

**EXPERIENCE FORMULA**

(3)      ***[The technical memorandum setting forth the formula as approved by the New York Insurance Department will be inserted here.]***

**EXHIBIT 4**

**LIST OF INSUREDS**

(1)     [

| SSN | Last Name | First Name/MI | Date of Birth | Gender (M/F) | Tobacco User / Non-Tobacco User (T/N) | Certificate Number |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

]

(1)     **EXHIBIT4**                              Date:  [June 15, 2010]

**CIP2009**

# MetLife®

Metropolitan Life Insurance Company
New York, New York

## CERTIFICATE OF INSURANCE

Metropolitan Life Insurance Company ("MetLife"), a stock company, certifies that You are an Insured under the Policy, for the Coverage described in this certificate, subject to the provisions of this certificate.  This certificate is issued to You under the Policy and it includes the terms and provisions of the Policy that describe Your insurance.  **PLEASE READ THIS CERTIFICATE CAREFULLY.**

This certificate is part of the Policy. The Policy is a contract between MetLife and the Policyholder and may be changed without Your consent or notice to You, but only as described herein.

This certificate is non-cancelable, which means that MetLife cannot cancel the insurance described in this certificate, or modify any of its terms except as described in this certificate.

Our issuance of this certificate is based on Your responses to the questions on Your enrollment form.  A copy of Your enrollment form is attached to this certificate.  If Your answers are incorrect or untrue we may have the right to adjust benefits or rescind Your Coverage.  The best time to clear up any questions is now, before a claim arises.  If, for any reason, any of Your answers are incorrect, contact Us at 200 Park Avenue, 40th Floor, New York, NY 10116.

**IMPORTANT NOTICE:  THIS CERTIFICATE HAS PROVISIONS UNDER WHICH THE BENEFIT (KNOWN AS THE "SPECIFIED AMOUNT") IS EXPECTED TO BE REDUCED. PLEASE READ THE ENTIRE CERTIFICATE, INCLUDING THE SCHEDULE OF BENEFITS, CAREFULLY.**

| | | |
|---|---|---|
| (1) | Policyholder: | [XYZ Trust] |
| (1) | Policy Number: | [123XYZ] |
| (1) | Certificate Number: | [123XYZ-a] |
| | Type of Insurance: | Critical Injury Insurance |
| | MetLife Toll Free Number(s): | |
| (2) | [For Claim Information | 1-800-XXX-YYYY |
| | For General Information | 1-800-XXX-XXXX] |

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| Certificate Face Page | 1 |
| Table of Contents | 2 |
| Schedule of Benefits | 3 |
| Definitions | 4 |
| Eligibility, Effective Date and End of Coverage Provisions | 7 |
| Eligibility and Effective Dates of Coverage | 7 |
| Date Your Coverage Ends | 7 |
| Insurance Benefit | 7 |
| Payment of the Specified Amount | 8 |
| Exclusions | 8 |
| Filing a Claim | 8 |
| Time Limit on Legal Actions | 8 |
| General Provisions | 8 |
| Assignment | 8 |
| Beneficiary | 9 |
| Entire Contract | 9 |
| Terms of this Certificate | 9 |
| Incontestability: Statements Made By You | 9 |
| Misstatement of Age or Gender | 9 |
| Conformity With Law | 9 |
| Examinations | 10 |
| Autopsy | 10 |
| Gender | 10 |
| Changes to Your Coverage | 10 |
| Waiver of Certificate Provisions | 10 |
| Non-Participating | 10 |
| Your Name, Address and Telephone number | 10 |
| Prejudice | 10 |
| Standard of Time | 10 |

## SCHEDULE OF BENEFITS

| | | |
|---|---|---|
| (1) | Name of Insured: | [John Doe] |
| (1) | Effective Date of Certificate: | [June 15, 2010] |
| (1) | Certificate Expiration Date: | [June 14, 2025]* |
| | Tobacco User Status of Insured: | Non-Tobacco User |
| (1) | Gender of Insured: | [Male] |
| (1) | Birthdate of Insured: | [MM/DD/YYYY] |

The benefit payable under this policy is based upon the Specified Amount that is in effect at the time a Listed Condition is Diagnosed.

**SPECIFIED AMOUNT**

| | |
|---|---|
| During Policy Period 1 | $100,000 |
| During Policy Period 2 | the Base Benefit plus any applicable Experience Credit** |
| During Policy Period 3 | the Base Benefit plus any applicable Experience Credit** |
| During Policy Period 4 | the Base Benefit plus any applicable Experience Credit** |
| During Policy Period 5 | the Base Benefit plus any applicable Experience Credit** |
| During Policy Period 6 | the Base Benefit plus any applicable Experience Credit** |
| During any Renewal Period * | the Specified Amount that was in effect during Policy Period 6 |

**BASE BENEFIT**    $50,000

\*    We will notify You in Writing if We agree to a Renewal Period for Your Coverage at least 30 days before the Certificate Expiration Date.  If We provide a Renewal Period, Our notice will provide the beginning and end dates of the Renewal Period and the Certificate Expiration Date will be changed to the end of the last day of the Renewal Period.

\*\*    We will send You Written notice of any Experience Credit that We determine will apply to a particular Policy Period at least 30 days before the beginning of that Policy Period.

## DEFINITIONS

As used in this certificate, the terms listed below will have the meanings set forth below.  When defined terms are used in this certificate, they will appear with initial capitalization.  The plural use of a term defined in the singular will share the same meaning.

**Base Benefit** means the minimum amount We will pay if you are Diagnosed with a Listed Condition during any Policy Period other than Policy Period 1.  The Base Benefit is shown in the Schedule of Benefits.

**Beneficiary** means a person to whom We will pay Benefits.  The Beneficiary is determined in accordance with the General Provisions section.

**Board Certified** means a Physician has received certification in the appropriate medical specialty by a member board of the American Board of Medical Specialties.

**Cancer** means the presence of a malignant tumor characterized by the uncontrollable and abnormal growth and spread of malignant cells. It does not include any benign tumors, dysplasia or pre-malignant growths.

**Certificate Expiration Date** means the date that Coverage under this certificate is scheduled to end.  Coverage may end earlier than the Certificate Expiration Date as set forth in the provision titled Date Your Insurance Ends (under the Eligibility, Effective Date and End of Insurance Provisions section).  The Certificate Expiration Date is set forth on the Schedule of Benefits.

**Clinical Diagnosis** means a Diagnosis of a Listed Condition based on the study of symptoms and diagnostic test results.  We will accept a Clinical Diagnosis of a Listed Condition only if the following conditions are met:

- under generally accepted medical standards, a pathological Diagnosis cannot be made because it would be medically inappropriate or life-threatening;
- medical diagnostic testing supports the Diagnosis; and
- You have consulted with a Physician who is a Board Certified oncologist for the Listed Condition.

**Cost of Insurance** means the amount of premium required to provide Coverage for You under the Policy.

**Coverage** means the insurance that is in effect for You as shown on the Schedule of Benefits and as described in  this certificate.

**Defendants** means certain defendants named in claims, causes of action, notices of claims, notices of suits, suits, and actions relating in any way to or arising out of the rescue, recovery and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001, including without limitation Master Docket Nos. 21 MC 100, 21 MC 102, and 21 MC 103 in the United States District Court for the Southern District of New York and in any similar state court proceedings.

**Diagnose** means the act of making a Diagnosis.

**Diagnosis** means the certified confirmation by a Physician, that You have a Listed Condition, provided that all of the following requirements are met:
- such confirmation is based upon microscopic (histologic) examination of fixed tissue or preparations of blood or bone marrow and such examination is documented in a Written pathology report by a Physician who is Board Certified in pathology;
- the Diagnosis must be made by a Physician while practicing in the United States; and
- the scope of the Physician's practice must be appropriate to Diagnose the Listed Condition and the Physician must conform to generally accepted standards for his or her specialty at the time of making the Diagnosis.

**DEFINITIONS (continued)**

**Experience Credit** means an amount in addition to the Base Benefit, as calculated by MetLife in accordance with the Experience Formula, not to exceed $50,000, that may be paid to You if You are Diagnosed with a Listed Condition during any Policy Period after Policy Period 1.  If there is an Experience Credit during Policy Period 2:
- it will be recalculated for every subsequent Policy Period;
- it may decrease from one Policy Period to the next based on that recalculation; and
- it will never increase from one Policy Period to the next.

We will send You Written notice of any Experience Credit that We determine will apply to a particular Policy Period at least 30 days before the beginning of that Policy Period.

**Experience Formula** means the formula set forth in the Policy that MetLife will use to determine:
- whether there will be any Experience Credit and, if there will be an Experience Credit, the amount of such Experience Credit; and
- whether to renew the Policy, and if the Policy will be renewed, the length of any Renewal Period.

**Listed Condition** means the following conditions for which We will pay a claim under the terms and conditions of this certificate:

- **Cancer of the Larynx** means a Primary Cancer that originates in the larynx.  It includes cancers of the supraglottis, glottis and subglottis.

- **Leukemia** means a Primary Cancer of the blood forming cells in the bone marrow.  It includes four categories:  acute myelogenous, chronic myelogenous, acute lymphocytic and chronic lymphocytic.

- **Lung Cancer** means a Primary Cancer that originates in the airways (trachea, and bronchi or tracheobronchial tree) or tissues of the lungs.

- **Lymphoma** means a Primary Cancer that originates in the lymphatic system.  It includes Hodgkin lymphoma and Non-Hodgkin lymphoma.

- **Malignant Mesothelioma** means a Primary Cancer of the mesothelium.  This includes pleural mesothelioma, peritoneal mesothelioma and pericardial mesothelioma.

- **Multiple Myeloma** means a Primary Cancer of a single clone of plasma cells in the bone marrow.

**Non-Tobacco User** means You did not use tobacco products (for example, cigarettes, cigars, pipes or chewing tobacco) at any time during the five year period before the effective date of Your certificate.

**Occurs** means that You are Diagnosed with a Listed Condition.

**Policy Period** means Policy Period 1, Policy Period 2, Policy Period 3, Policy Period 4, Policy Period 5, Policy Period 6 or a Renewal Period.

(1)  **Policy Period 1** means the period that begins [June 15, 2010] and ends [June 14, 2016].

(1)  **Policy Period 2** means the period that begins [June 15, 2016] and ends [June 14, 2018].

(1)  **Policy Period 3** means the period that begins [June 15, 2018] and ends [June 14, 2020].

(1)  **Policy Period 4** means the period that begins [June 15, 2020] and ends [June 14, 2022].

(1)  **Policy Period 5** means the period that begins [June 15, 2022] and ends [June 14, 2024].

(1)  **Policy Period 6** means the period that begins [June 15, 2024] and ends [June 14, 2025].

**DEFINITIONS (continued)**

**Physician** means an individual who has received a degree of doctor of medicine (M.D.), or doctor of osteopathy (D.O.), and is acting within the scope of a valid license issued in the United States to Diagnose a Listed Condition or to perform the services required for a Listed Condition for which a claim is made.  A Physician is not:

- You, Your spouse or anyone to whom You are related by blood or marriage;
- anyone with whom You are residing;
- Your adopted or step-child;
- anyone with whom You share a business interest; or
- Your employee.

**Policy** means the insurance policy issued to the Policyholder named on the first page of this certificate.

**Primary Cancer** of any site (organ or tissue) means a cancer that originated at that specific site and did not metastasize there from another site.

**Proof** means Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for payment of the Specified Amount.  When a claim is made for the Specified Amount, Proof must establish:

- the Diagnosis of a Listed Condition;
- Our obligation to pay the claim; and
- the claimant's right to receive payment.

**Renewal Period** means a period of time, not to exceed two years, for which MetLife agrees to renew Coverage after the Certificate Expiration Date.  MetLife will determine whether to provide Coverage for one or more Renewal Periods and the length of any such Renewal Periods in accordance with the Experience Formula set forth in the Policy.

(1)  **Settlement Agreement** means the agreement, with the effective date of [June 1, 2010,] entered into by You with the Defendants to settle Your claim against the Defendants relating in any way to or arising out of the rescue, recovery, and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001.  This certificate is issued to You as part of the Settlement Agreement.

**Signed** means any symbol or method executed or adopted by a person with the present intention to authenticate a record, which is on or transmitted by paper or electronic media which is acceptable to Us and consistent with applicable law.

**Specified Amount** means the amount of the benefit payable under this certificate during the Policy Period in which a Listed Condition is Diagnosed as shown on the Schedule of Benefits.

**Tobacco User** means You used tobacco products (for example, cigarettes, cigars, pipes or chewing tobacco) during the five year period before the effective date of Your Coverage.

**We**, **Us** and **Our** mean MetLife.

**Written** or **Writing** means a record which is on or transmitted by paper or electronic media which is acceptable to Us and consistent with applicable law.

**You** and **Your** mean the named Insured on the Schedule of Benefits.

## ELIGIBILITY, EFFECTIVE DATE, AND END OF COVERAGE PROVISIONS

**ELIGIBILITY AND EFFECTIVE DATES OF COVERAGE**

Coverage for You will become effective after all of the following have occurred:

- You have executed a release, accepting Coverage under the Policy as part of the Settlement Agreement;
- You have signed a statement confirming:
  - Your gender and age;
  - Your Tobacco User status (Tobacco User or Non-Tobacco User); and
  - that You have not been treated for or Diagnosed as having any of the conditions which qualify as a Listed Condition;
- We have received the required premium for Coverage; and
- We have consented in accordance with the terms of the Policy to extend Coverage under the Policy to You.

The effective date of Your Coverage is specified on the Schedule of Benefits.

**DATE YOUR COVERAGE ENDS**

This certificate will expire and Your Coverage will end on the Certificate Expiration Date.

Your insurance will end on a date prior to the Certificate Expiration Date if either of the following occur:

1. the Specified Amount is paid to You or a person making a claim on Your behalf (in this case Coverage will end on the date that the Specified Amount is paid); or

2. You die (in this case, Coverage will end at the end of the day on which You die).

## INSURANCE BENEFIT

In order for the Specified Amount to be payable:

1. a Listed Condition must Occur for You:
   a) while Your Coverage was in effect; or
   b) after Your death, provided Your Coverage is in effect on the date of Your death;

2. Proof that the Listed Condition has Occurred must be sent to Us (please refer to the Filing a Claim section below); and

3. We must determine that all requirements for payment of the claim as set forth in this certificate have been met.

When we receive the required Proof with Your claim, We will review Your claim and, if We approve it, We will pay the Specified Amount in accordance with the Schedule of Benefits.

We will determine the Specified Amount that we will pay based on the Policy Period during which Your Listed Condition Occurs.  If You are alive on the date a Listed Condition is Diagnosed for You, the Listed Condition will be deemed to Occur on the date of the Diagnosis.  If a Listed Condition is Diagnosed for You after Your death, the Listed Condition will be deemed to have Occurred on the date of Your death.

We will only pay the Specified Amount once under this certificate, even if You are Diagnosed with more than one Listed Condition.

**PAYMENT OF THE SPECIFIED AMOUNT**

We will pay the Specified Amount in one sum.  Upon Your request, or  upon the request of Your Beneficiary if the Specified Amount becomes payable after Your death, We may place the Specified Amount in an account that earns interest.  The person to whom we pay the Benefit will have immediate access to all or any part of the account.  We will pay interest on the Specified Amount from the date it becomes payable until all funds in the account have been withdrawn.

If the Specified Amount becomes payable after Your death, it will be paid in accordance with the provision titled Beneficiary under the General Provisions section.

## EXCLUSIONS

We will not pay benefits for any benign tumor, dysplasia, intraepithelial neoplasia or pre-malignant growth.

## FILING A CLAIM

Notice of claim and Proof may be given to Us by following the steps set forth below:

**Step 1**
    A claimant may give Us notice by calling Us at the toll free number shown in the Certificate Face Page within 90 days of the date of a Diagnosis.

**Step 2**
    We will send a claim form to the claimant and explain how to complete it. The claimant should receive the claim form within 15 days of giving Us notice of claim.

**Step 3**
    When the claimant receives the claim form he should fill it out as instructed and return it with the required Proof described in this certificate and the claim form.  If the claimant does not receive a claim form within 15 days after giving Us notice of claim, he may send Us Proof using any form sufficient to provide Us with the required Proof.

**Step 4**
    The claimant must give Us Proof not later than 180 days after the date of the Diagnosis.

If notice of claim or Proof is not given within the time limits described in this section, the delay will not cause a claim to be denied or reduced if such notice and Proof are given as soon as is reasonably possible.

**Time Limit on Legal Actions**

A legal action on a claim may only be brought against Us during a certain period.  This period begins 60 days after the date Proof is filed and ends 2 years after the date such Proof is required to be filed.

## GENERAL PROVISIONS

**Assignment**

The Coverage provided under the Policy may not be assigned prior to a claim for benefits, except as required by law.  We are not responsible for the validity of an assignment.

**GENERAL PROVISIONS (continued)**

**Beneficiary**

If You are not living at the time the Specified Amount under this certificate becomes payable, and you have designated a Beneficiary, we will pay to Your Beneficiary any amount that is or becomes due.  You may designate a Beneficiary in Your enrollment form.  You may change Your beneficiary at any time.  To do so, You must send Us a signed and dated, written request using a form satisfactory to Us.  Your written request to change the Beneficiary must be sent to Us no later than 90 days after the date You sign such request.

If You are not living at the time the Specified Amount under this certificate becomes payable, and there is no Beneficiary designated or no surviving Beneficiary at Your death, We may pay the Specified Amount to Your estate, or We may, in our sole discretion, pay the Specified Amount to any of the following:

- Your spouse, if alive;
- Your child(ren), if there is no surviving spouse;
- Your parent(s), if there is no surviving child;
- Your sibling(s), if there is no surviving parent.

If a Beneficiary or payee is a minor or incompetent to receive payment, We will pay his guardian.

Any payment We make under this provision will discharge Us from further liability for payment of the Specified Amount with respect to the amount paid.

**Entire Contract**

Your Coverage is provided under a contract of insurance with the Policyholder.  The entire contract with the Policyholder is made up of the following:

1. the Policy and its Exhibits, which include the certificate;
2. Your completed enrollment form;
3. the Policyholder's application; and
4. any amendments and/or endorsements to the Policy.

**Terms of this Certificate**

This certificate has been issued to You as part of the Settlement Agreement.  The terms of this certificate were negotiated by You, the Defendants through their liability insurance company, and MetLife, with each party being represented by counsel.

**Incontestability:  Statements Made by  You**

Any statement made by You will be considered a representation and not a warranty.  MetLife will not use such statement to avoid insurance, reduce benefits or defend a claim unless the following requirements are met:

1. the statement is made in writing;
2. the statement is signed by You; and
3. a copy of the signed statement has been given to You or Your Beneficiary.

MetLife will not use Your statements which relate to insurability to contest insurance after it has been in force for two years, unless the statement is fraudulent.

**Misstatement of Age or Gender**

If Your age and/or gender is misstated, We will adjust the Specified Amount to that amount that the Cost of Insurance paid for Your Coverage would have purchased based on Your correct age and/or gender.

**Conformity with Law**

This certificate is issued in and shall be governed by the laws of the State of New York.

**GENERAL PROVISIONS (continued)**

**Examinations**

If a claim is submitted under this certificate, We have the right to ask You to be examined by a Physician(s) of Our choice at Our expense as often as is reasonably necessary to process the claim.

As often as reasonably necessary, We may have Our representatives at Our expense conduct telephone or in-person interviews with You regarding Your claim.

**Autopsy**

At Our expense, We have the right to make a reasonable request for an autopsy and/or exhumation where permitted by law. Any such request will set forth the reasons We are requesting the autopsy or exhumation.

**Gender**

Male pronouns will be read as female where applicable.

**Changes to Your Coverage**

The terms and provisions of the Policy may be changed, at any time, without Your consent as required by applicable law, regulation, regulatory authority or court of competent jurisdiction.

The Coverage provided under this certificate may be changed without Your consent by operation of law.  In such case, We will issue amendments or endorsements to effect such changes, if practicable.  The changes will be effective as of the date required by the operation of law.

An officer of MetLife must approve in Writing any change or waiver of the terms and provisions of the Policy or this certificate. A MetLife employee who is not an officer of MetLife does not have MetLife's authority to approve such changes or waivers.  A change or waiver will be evidenced by an amendment Signed by an officer of MetLife and an authorized representative of the Policyholder or an endorsement Signed by an officer of MetLife. A copy of the amendment or endorsement will be provided to the Policyholder for attachment to this policy or certificate and the amendment or endorsement will become a part of the Policy or the certificate, as the case may be.

**Waiver of Certificate Provisions**

Our failure to invoke or enforce a right that We have reserved under the terms of this certificate shall not be a permanent waiver of that right.

**Non-Participating**

This certificate does not pay dividends.

**Your Name, Address and Telephone Number**

We will send all notices required under this certificate to the last known address that We have in Our records for You.  You are required to promptly inform us of any change in Your name, address or telephone number.  When You write to Us, You must provide Your name, current address and certificate number.

**Prejudice**

The failure of a claimant to comply with the time requirements of the Filing a Claim provision shall not result in the loss of benefits under this Certificate unless such non-compliance results in prejudice to Our interests.

**Standard of Time**

All dates under this certificate will be determined according to Eastern Standard Time, or Eastern Daylight Time if Daylight Saving Time is then being observed, with the day beginning and ending at 12:00 A.M.

# MetLife®

Metropolitan Life Insurance Company
New York, New York

## CERTIFICATE OF INSURANCE

Metropolitan Life Insurance Company ("MetLife"), a stock company, certifies that You are an Insured under the Policy, for the Coverage described in this certificate, subject to the provisions of this certificate. This certificate is issued to You under the Policy and it includes the terms and provisions of the Policy that describe Your insurance. **PLEASE READ THIS CERTIFICATE CAREFULLY.**

This certificate is part of the Policy. The Policy is a contract between MetLife and the Policyholder and may be changed without Your consent or notice to You, but only as described herein.

This certificate is non-cancelable, which means that MetLife cannot cancel the insurance described in this certificate, or modify any of its terms except as described in this certificate.

Our issuance of this certificate is based on Your responses to the questions on Your enrollment form. A copy of Your enrollment form is attached to this certificate. If Your answers are incorrect or untrue we may have the right to adjust benefits or rescind Your Coverage. The best time to clear up any questions is now, before a claim arises. If, for any reason, any of Your answers are incorrect, contact Us at 200 Park Avenue, 40th Floor, New York, NY 10116.

**IMPORTANT NOTICE:  THIS CERTIFICATE HAS PROVISIONS UNDER WHICH THE BENEFIT (KNOWN AS THE "SPECIFIED AMOUNT") IS EXPECTED TO BE REDUCED. PLEASE READ THE ENTIRE CERTIFICATE, INCLUDING THE SCHEDULE OF BENEFITS, CAREFULLY.**

| | | |
|---|---|---|
| (1) | Policyholder: | [XYZ Trust] |
| (1) | Policy Number: | [123XYZ] |
| (1) | Certificate Number: | [123XYZ-a] |
| | Type of Insurance: | Critical Injury Insurance |
| | MetLife Toll Free Number(s): | |
| (2) | [For Claim Information | 1-800-XXX-YYYY |
| | For General Information | 1-800-XXX-XXXX] |

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| Certificate Face Page | 1 |
| Table of Contents | 2 |
| Schedule of Benefits | 3 |
| Definitions | 4 |
| Eligibility, Effective Date and End of Coverage Provisions | 7 |
|     Eligibility and Effective Dates of Coverage | 7 |
|     Date Your Coverage Ends | 7 |
| Insurance Benefit | 7 |
|     Payment of the Specified Amount | 8 |
| Exclusions | 8 |
| Filing a Claim | 8 |
|     Time Limit on Legal Actions | 8 |
| General Provisions | 8 |
|     Assignment | 8 |
|     Beneficiary | 9 |
|     Entire Contract | 9 |
|     Terms of this Certificate | 9 |
|     Incontestability: Statements Made By You | 9 |
|     Misstatement of Age or Gender | 9 |
|     Conformity With Law | 9 |
|     Examinations | 10 |
|     Autopsy | 10 |
|     Gender | 10 |
|     Changes to Your Coverage | 10 |
|     Waiver of Certificate Provisions | 10 |
|     Non-Participating | 10 |
|     Your Name, Address and Telephone number | 10 |
|     Prejudice | 10 |
|     Standard of Time | 10 |

**SCHEDULE OF BENEFITS**

| | | |
|---|---|---|
| (1) | Name of Insured: | [John Doe] |
| (1) | Effective Date of Certificate: | [June 15, 2010] |
| (1) | Certificate Expiration Date: | [June 14, 2025]* |
| | Tobacco User Status of Insured: | Tobacco User |
| (1) | Gender of Insured: | [Male] |
| (1) | Birthdate of Insured: | [MM/DD/YYYY] |

The benefit payable under this policy is based upon the Specified Amount that is in effect at the time a Listed Condition is Diagnosed.

**SPECIFIED AMOUNT**

| | |
|---|---|
| During Policy Period 1 | $100,000 |
| During Policy Period 2 | the Base Benefit plus any applicable Experience Credit** |
| During Policy Period 3 | the Base Benefit plus any applicable Experience Credit** |
| During Policy Period 4 | the Base Benefit plus any applicable Experience Credit** |
| During Policy Period 5 | the Base Benefit plus any applicable Experience Credit** |
| During Policy Period 6 | the Base Benefit plus any applicable Experience Credit** |
| During any Renewal Period * | the Specified Amount that was in effect during Policy Period 6 |

**BASE BENEFIT**          $50,000

\*   We will notify You in Writing if We agree to a Renewal Period for Your Coverage at least 30 days before the Certificate Expiration Date.  If We provide a Renewal Period, Our notice will provide the beginning and end dates of the Renewal Period and the Certificate Expiration Date will be changed to the end of the last day of the Renewal Period.

\*\*  We will send You Written notice of any Experience Credit that We determine will apply to a particular Policy Period at least 30 days before the beginning of that Policy Period.

## DEFINITIONS

As used in this certificate, the terms listed below will have the meanings set forth below.  When defined terms are used in this certificate, they will appear with initial capitalization.  The plural use of a term defined in the singular will share the same meaning.

**Base Benefit** means the minimum amount We will pay if you are Diagnosed with a Listed Condition during any Policy Period other than Policy Period 1.  The Base Benefit is shown in the Schedule of Benefits.

**Beneficiary** means a person to whom We will pay Benefits.  The Beneficiary is determined in accordance with the General Provisions section.

**Board Certified** means a Physician has received certification in the appropriate medical specialty by a member board of the American Board of Medical Specialties.

**Cancer** means the presence of a malignant tumor characterized by the uncontrollable and abnormal growth and spread of malignant cells. It does not include any benign tumors, dysplasia or pre-malignant growths.

**Certificate Expiration Date** means the date that Coverage under this certificate is scheduled to end. Coverage may end earlier than the Certificate Expiration Date as set forth in the provision titled Date Your Insurance Ends (under the Eligibility, Effective Date and End of Insurance Provisions section).  The Certificate Expiration Date is set forth on the Schedule of Benefits.

**Clinical Diagnosis** means a Diagnosis of a Listed Condition based on the study of symptoms and diagnostic test results.  We will accept a Clinical Diagnosis of a Listed Condition only if the following conditions are met:

- under generally accepted medical standards, a pathological Diagnosis cannot be made because it would be medically inappropriate or life-threatening;
- medical diagnostic testing supports the Diagnosis; and
- You have consulted with a Physician who is a Board Certified oncologist for the Listed Condition.

**Cost of Insurance** means the amount of premium required to provide Coverage for You under the Policy.

**Coverage** means the insurance that is in effect for You as shown on the Schedule of Benefits and as described in  this certificate.

**Defendants** means certain defendants named in claims, causes of action, notices of claims, notices of suits, suits, and actions relating in any way to or arising out of the rescue, recovery and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001, including without limitation Master Docket Nos. 21 MC 100, 21 MC 102, and 21 MC 103 in the United States District Court for the Southern District of New York and in any similar state court proceedings.

**Diagnose** means the act of making a Diagnosis.

**Diagnosis** means the certified confirmation by a Physician, that You have a Listed Condition, provided that all of the following requirements are met:
- such confirmation is based upon microscopic (histologic) examination of fixed tissue or preparations of blood or bone marrow and such examination is documented in a Written pathology report by a Physician who is Board Certified in pathology;
- the Diagnosis must be made by a Physician while practicing in the United States; and
- the scope of the Physician's practice must be appropriate to Diagnose the Listed Condition and the Physician must conform to generally accepted standards for his or her specialty at the time of making the Diagnosis.

**DEFINITIONS (continued)**

**Experience Credit** means an amount in addition to the Base Benefit, as calculated by MetLife in accordance with the Experience Formula, not to exceed $50,000, that may be paid to You if You are Diagnosed with a Listed Condition during any Policy Period after Policy Period 1.  If there is an Experience Credit during Policy Period 2:
- it will be recalculated for every subsequent Policy Period;
- it may decrease from one Policy Period to the next based on that recalculation; and
- it will never increase from one Policy Period to the next.

We will send You Written notice of any Experience Credit that We determine will apply to a particular Policy Period at least 30 days before the beginning of that Policy Period.

**Experience Formula** means the formula set forth in the Policy that MetLife will use to determine:
- whether there will be any Experience Credit and, if there will be an Experience Credit, the amount of such Experience Credit; and
- whether to renew the Policy, and if the Policy will be renewed, the length of any Renewal Period.

**Listed Condition** means the following conditions for which We will pay a claim under the terms and conditions of this certificate:

- **Leukemia** means a Primary Cancer of the blood forming cells in the bone marrow.  It includes four categories:  acute myelogenous, chronic myelogenous, acute lymphocytic and chronic lymphocytic.

- **Lymphoma** means a Primary Cancer that originates in the lymphatic system.  It includes Hodgkin lymphoma and Non-Hodgkin lymphoma.

- **Multiple Myeloma** means a Primary Cancer of a single clone of plasma cells in the bone marrow.

**Non-Tobacco User** means You did not use tobacco products (for example, cigarettes, cigars, pipes or chewing tobacco) at any time during the five year period before the effective date of Your certificate.

**Occurs** means that You are Diagnosed with a Listed Condition.

**Policy Period** means Policy Period 1, Policy Period 2, Policy Period 3, Policy Period 4, Policy Period 5, Policy Period 6 or a Renewal Period.

(1)    **Policy Period 1** means the period that begins [June 15, 2010] and ends [June 14, 2016].

(1)    **Policy Period 2** means the period that begins [June 15, 2016] and ends [June 14, 2018].

(1)    **Policy Period 3** means the period that begins [June 15, 2018] and ends [June 14, 2020].

(1)    **Policy Period 4** means the period that begins [June 15, 2020] and ends [June 14, 2022].

(1)    **Policy Period 5** means the period that begins [June 15, 2022] and ends [June 14, 2024].

(1)    **Policy Period 6** means the period that begins [June 15, 2024] and ends [June 14, 2025].

**DEFINITIONS (continued)**

**Physician** means an individual who has received a degree of doctor of medicine (M.D.), or doctor of osteopathy (D.O.), and is acting within the scope of a valid license issued in the United States to Diagnose a Listed Condition or to perform the services required for a Listed Condition for which a claim is made. A Physician is not:

- You, Your spouse or anyone to whom You are related by blood or marriage;
- anyone with whom You are residing;
- Your adopted or step-child;
- anyone with whom You share a business interest; or
- Your employee.

**Policy** means the insurance policy issued to the Policyholder named on the first page of this certificate.

**Primary Cancer** of any site (organ or tissue) means a cancer that originated at that specific site and did not metastasize there from another site.

**Proof** means Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for payment of the Specified Amount. When a claim is made for the Specified Amount, Proof must establish:

- the Diagnosis of a Listed Condition;
- Our obligation to pay the claim; and
- the claimant's right to receive payment.

**Renewal Period** means a period of time, not to exceed two years, for which MetLife agrees to renew Coverage after the Certificate Expiration Date. MetLife will determine whether to provide Coverage for one or more Renewal Periods and the length of any such Renewal Periods in accordance with the Experience Formula set forth in the Policy.

(1) **Settlement Agreement** means the agreement, with the effective date of [June 1, 2010,] entered into by You with the Defendants to settle Your claim against the Defendants relating in any way to or arising out of the rescue, recovery, and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001. This certificate is issued to You as part of the Settlement Agreement.

**Signed** means any symbol or method executed or adopted by a person with the present intention to authenticate a record, which is on or transmitted by paper or electronic media which is acceptable to Us and consistent with applicable law.

**Specified Amount** means the amount of the benefit payable under this certificate during the Policy Period in which a Listed Condition is Diagnosed as shown on the Schedule of Benefits.

**Tobacco User** means You used tobacco products (for example, cigarettes, cigars, pipes or chewing tobacco) during the five year period before the effective date of Your Coverage.

**We**, **Us** and **Our** mean MetLife.

**Written** or **Writing** means a record which is on or transmitted by paper or electronic media which is acceptable to Us and consistent with applicable law.

**You** and **Your** mean the named Insured on the Schedule of Benefits.

## ELIGIBILITY, EFFECTIVE DATE, AND END OF COVERAGE PROVISIONS

**ELIGIBILITY AND EFFECTIVE DATES OF COVERAGE**

Coverage for You will become effective after all of the following have occurred:

- You have executed a release, accepting Coverage under the Policy as part of the Settlement Agreement;
- You have signed a statement confirming:
    - Your gender and age;
    - Your Tobacco User status (Tobacco User or Non-Tobacco User); and
    - that You have not been treated for or Diagnosed as having any of the conditions which qualify as a Listed Condition;
- We have received the required premium for Coverage; and
- We have consented in accordance with the terms of the Policy to extend Coverage under the Policy to You.

The effective date of Your Coverage is specified on the Schedule of Benefits.

**DATE YOUR COVERAGE ENDS**

This certificate will expire and Your Coverage will end on the Certificate Expiration Date.

Your insurance will end on a date prior to the Certificate Expiration Date if either of the following occur:

1. the Specified Amount is paid to You or a person making a claim on Your behalf (in this case Coverage will end on the date that the Specified Amount is paid); or

2. You die (in this case, Coverage will end at the end of the day on which You die).

## INSURANCE BENEFIT

In order for the Specified Amount to be payable:

1. a Listed Condition must Occur for You:
    a) while Your Coverage was in effect; or
    b) after Your death, provided Your Coverage is in effect on the date of Your death;

2. Proof that the Listed Condition has Occurred must be sent to Us (please refer to the Filing a Claim section below); and

3. We must determine that all requirements for payment of the claim as set forth in this certificate have been met.

When we receive the required Proof with Your claim, We will review Your claim and, if We approve it, We will pay the Specified Amount in accordance with the Schedule of Benefits.

We will determine the Specified Amount that we will pay based on the Policy Period during which Your Listed Condition Occurs. If You are alive on the date a Listed Condition is Diagnosed for You, the Listed Condition will be deemed to Occur on the date of the Diagnosis. If a Listed Condition is Diagnosed for You after Your death, the Listed Condition will be deemed to have Occurred on the date of Your death.

We will only pay the Specified Amount once under this certificate, even if You are Diagnosed with more than one Listed Condition.

**PAYMENT OF THE SPECIFIED AMOUNT**

We will pay the Specified Amount in one sum.  Upon Your request, or  upon the request of Your Beneficiary if the Specified Amount becomes payable after Your death, We may place the Specified Amount in an account that earns interest.  The person to whom we pay the Benefit will have immediate access to all or any part of the account.  We will pay interest on the Specified Amount from the date it becomes payable until all funds in the account have been withdrawn.

If the Specified Amount becomes payable after Your death, it will be paid in accordance with the provision titled Beneficiary under the General Provisions section.

## EXCLUSIONS

We will not pay benefits for any benign tumor, dysplasia, intraepithelial neoplasia or pre-malignant growth.

## FILING A CLAIM

Notice of claim and Proof may be given to Us by following the steps set forth below:

**Step 1**
A claimant may give Us notice by calling Us at the toll free number shown in the Certificate Face Page within 90 days of the date of a Diagnosis.

**Step 2**
We will send a claim form to the claimant and explain how to complete it. The claimant should receive the claim form within 15 days of giving Us notice of claim.

**Step 3**
When the claimant receives the claim form he should fill it out as instructed and return it with the required Proof described in this certificate and the claim form.  If the claimant does not receive a claim form within 15 days after giving Us notice of claim, he may send Us Proof using any form sufficient to provide Us with the required Proof.

**Step 4**
The claimant must give Us Proof not later than 180 days after the date of the Diagnosis.

If notice of claim or Proof is not given within the time limits described in this section, the delay will not cause a claim to be denied or reduced if such notice and Proof are given as soon as is reasonably possible.

**Time Limit on Legal Actions**

A legal action on a claim may only be brought against Us during a certain period.  This period begins 60 days after the date Proof is filed and ends 2 years after the date such Proof is required to be filed.

## GENERAL PROVISIONS

**Assignment**

The Coverage provided under the Policy may not be assigned prior to a claim for benefits, except as required by law.  We are not responsible for the validity of an assignment.

**GENERAL PROVISIONS (continued)**

**Beneficiary**

If You are not living at the time the Specified Amount under this certificate becomes payable, and you have designated a Beneficiary, we will pay to Your Beneficiary any amount that is or becomes due.  You may designate a Beneficiary in Your enrollment form.  You may change Your beneficiary at any time.  To do so, You must send Us a signed and dated, written request using a form satisfactory to Us.  Your written request to change the Beneficiary must be sent to Us no later than 90 days after the date You sign such request.

If You are not living at the time the Specified Amount under this certificate becomes payable, and there is no Beneficiary designated or no surviving Beneficiary at Your death, We may pay the Specified Amount to Your estate, or We may, in our sole discretion, pay the Specified Amount to any of the following:

- Your spouse, if alive;
- Your child(ren), if there is no surviving spouse;
- Your parent(s), if there is no surviving child;
- Your sibling(s), if there is no surviving parent.

If a Beneficiary or payee is a minor or incompetent to receive payment, We will pay his guardian.

Any payment We make under this provision will discharge Us from further liability for payment of the Specified Amount with respect to the amount paid.

**Entire Contract**

Your Coverage is provided under a contract of insurance with the Policyholder.  The entire contract with the Policyholder is made up of the following:

1. the Policy and its Exhibits, which include the certificate;
2. Your completed enrollment form;
3. the Policyholder's application; and
4. any amendments and/or endorsements to the Policy.

**Terms of this Certificate**

This certificate has been issued to You as part of the Settlement Agreement.  The terms of this certificate were negotiated by You, the Defendants through their liability insurance company, and MetLife, with each party being represented by counsel.

**Incontestability:  Statements Made by  You**

Any statement made by You will be considered a representation and not a warranty.  MetLife will not use such statement to avoid insurance, reduce benefits or defend a claim unless the following requirements are met:

1. the statement is made in writing;
2. the statement is signed by You; and
3. a copy of the signed statement has been given to You or Your Beneficiary.

MetLife will not use Your statements which relate to insurability to contest insurance after it has been in force for two years, unless the statement is fraudulent.

**Misstatement of Age or Gender**

If Your age and/or gender is misstated, We will adjust the Specified Amount to that amount that the Cost of Insurance paid for Your Coverage would have purchased based on Your correct age and/or gender.

**Conformity with Law**

This certificate is issued in and shall be governed by the laws of the State of New York.

**GENERAL PROVISIONS (continued)**

**Examinations**

If a claim is submitted under this certificate, We have the right to ask You to be examined by a Physician(s) of Our choice at Our expense as often as is reasonably necessary to process the claim.

As often as reasonably necessary, We may have Our representatives at Our expense conduct telephone or in-person interviews with You regarding Your claim.

**Autopsy**

At Our expense, We have the right to make a reasonable request for an autopsy and/or exhumation where permitted by law. Any such request will set forth the reasons We are requesting the autopsy or exhumation.

**Gender**

Male pronouns will be read as female where applicable.

**Changes to Your Coverage**

The terms and provisions of the Policy may be changed, at any time, without Your consent as required by applicable law, regulation, regulatory authority or court of competent jurisdiction.

The Coverage provided under this certificate may be changed without Your consent by operation of law.  In such case, We will issue amendments or endorsements to effect such changes, if practicable.  The changes will be effective as of the date required by the operation of law.

An officer of MetLife must approve in Writing any change or waiver of the terms and provisions of the Policy or this certificate. A MetLife employee who is not an officer of MetLife does not have MetLife's authority to approve such changes or waivers.  A change or waiver will be evidenced by an amendment Signed by an officer of MetLife and an authorized representative of the Policyholder or an endorsement Signed by an officer of MetLife. A copy of the amendment or endorsement will be provided to the Policyholder for attachment to this policy or certificate and the amendment or endorsement will become a part of the Policy or the certificate, as the case may be.

**Waiver of Certificate Provisions**

Our failure to invoke or enforce a right that We have reserved under the terms of this certificate shall not be a permanent waiver of that right.

**Non-Participating**

This certificate does not pay dividends.

**Your Name, Address and Telephone Number**

We will send all notices required under this certificate to the last known address that We have in Our records for You.  You are required to promptly inform us of any change in Your name, address or telephone number.  When You write to Us, You must provide Your name, current address and certificate number.

**Prejudice**

The failure of a claimant to comply with the time requirements of the Filing a Claim provision shall not result in the loss of benefits under this Certificate unless such non-compliance results in prejudice to Our interests.

**Standard of Time**

All dates under this certificate will be determined according to Eastern Standard Time, or Eastern Daylight Time if Daylight Saving Time is then being observed, with the day beginning and ending at 12:00 A.M.

## EXHIBIT F – AGE ADJUSTMENT FACTOR TABLE

| Primary Plaintiff's Age on Sept. 11, 2001 | Multiplier | Primary Plaintiff's Age on Sept. 11, 2001 | Multiplier |
|---|---|---|---|
| 21 and under | 1.14 | 51 | 0.94 |
| 22 | 1.13 | 52 | 0.93 |
| 23 | 1.12 | 53 | 0.92 |
| 24 | 1.11 | 54 | 0.91 |
| 25 | 1.10 | 55 | 0.90 |
| 26 | 1.09 | 56 | 0.89 |
| 27 | 1.08 | 57 | 0.88 |
| 28 | 1.07 | 58 | 0.87 |
| 29 | 1.06 | 59 | 0.86 |
| 30 | 1.05 | 60 | 0.85 |
| 31 | 1.04 | 61 | 0.84 |
| 32 | 1.03 | 62 | 0.83 |
| 33 | 1.02 | 63 | 0.82 |
| 34 | 1.01 | 64 | 0.81 |
| 35 | 1.00 | 65 | 0.80 |
| 36 | 1.00 | 66 | 0.79 |
| 37 | 1.00 | 67 | 0.78 |
| 38 | 1.00 | 68 | 0.77 |
| 39 | 1.00 | 69 | 0.76 |
| 40 | 1.00 | 70 | 0.75 |
| 41 | 1.00 | 71 | 0.74 |
| 42 | 1.00 | 72 | 0.73 |
| 43 | 1.00 | 73 | 0.72 |
| 44 | 1.00 | 74 | 0.71 |
| 45 | 1.00 | 75 | 0.70 |
| 46 | 0.99 | 76 | 0.69 |
| 47 | 0.98 | 77 | 0.68 |
| 48 | 0.97 | 78 | 0.67 |
| 49 | 0.96 | 79 | 0.66 |
| 50 | 0.95 | 80 and older | 0.65 |

## EXHIBIT G – LIST OF ADJUDICATORY BODIES

Board of Trustees of the New York City Fire Department Pensions Fund, Subchapter II

Department of Veterans Affairs

Municipalities within New York State (Pursuant to NY GML § 207-A)

New York City Employees' Retirement System (NYCERS)

New York City Police Pension Fund Board of Trustees

New York State and Local Retirement System (NYSLRS)

Social Security Administration

Workers' Compensation Boards and Insurance Carriers

## EXHIBIT H – SECOND INJURY LETTER

[Plaintiff's counsel's letterhead]

Dear [Insert Plaintiff's Name]:

This letter explains important terms of your World Trade Center ("WTC") settlement. Please read it very carefully.  You need to sign this letter below to be eligible for any payment.

As an initial matter, this is NOT a confidential communication between us, as your lawyers, and you.  As a result, this letter is NOT privileged and may be used as evidence against you in the future.

By entering into this settlement, you are releasing, and promising not to sue later for, any claims you could assert in the future against any insureds of the WTC Captive Insurance Company, Inc. ("WTC Captive"), including the City of New York, all of the City's prime contractors, and all of their sub-contractors ("Settling Defendants"), with respect to any of their WTC-related rescue, recovery, or debris removal conduct or omissions.

In particular, your release and promise not to sue ends, fully and forever, all claims you have now and ALL CLAIMS WHICH YOU MAY HAVE IN THE FUTURE against any or all of the Settling Defendants based upon:

1. All of your CURRENT injuries, if any, which you attribute to any Settling Defendant's or Settling Defendants' WTC-related rescue, recovery, or debris removal operations or omissions; AND

2. All of your FUTURE injuries, if any, which you attribute at any time to any Settling Defendant's or Settling Defendants' WTC-related rescue, recovery, or debris removal operations or omissions.

Your release of and promise not to sue with respect to your FUTURE WTC-related injuries, if any, applies WITHOUT ANY EXCEPTIONS.  For example, your release of and promise not to sue with respect to future injuries applies both to your current injuries, if any, that get worse in the future and to new and distinct injuries, if any, that develop later.

In other words, BY SETTLING NOW, YOU CANNOT LATER SUE ANY SETTLING DEFENDANT WITH RESPECT TO ANY CURRENT OR FUTURE INJURY WHICH RELATES TO ANY SETTLING DEFENDANT'S WTC-RELATED CONDUCT OR OMISSIONS.

In exchange for your signed release and promise not to sue, you will receive one or more cash payments if you comply with the terms of the settlement.  In addition, you are required to enroll in a Cancer Insurance Policy issued by Metropolitan Life Insurance Company ("MetLife"), unless you already have a cancer covered by that policy.  This MetLife policy will provide a further payment to you if in the future you develop a cancer covered by that policy.

In addition, if in the future you sue the Settling Defendant(s) and/or the WTC Captive and you lose, you are agreeing as part of this settlement that you may be required to pay the Settling Defendants' and the WTC Captive's costs, expenses and attorneys' fees relating to your future suit.

Lastly, you must sign this letter in the presence of a notary public. By doing so, you are agreeing that this letter and your release of and promise not to sue the Settling Defendants accurately state your intent. You also are indicating that you have spoken with your attorney about this letter and your release and promise not to sue, or that you opted to settle without doing so.

Sincerely,


[Plaintiff's counsel]


EXECUTED ON: _____ ____, 20__.

PRIMARY PLAINTIFF'S SIGNATURE: _____


On _____ _____, 20___, before me, _____,

Notary Public, personally appeared _____, personally known to me

(or proved to me on the basis of satisfactory evidence) to be the person whose name is

subscribed to the written instrument and acknowledged to me that he executed the same in his

authorized capacity, and that by his signature on the instrument the person, or the entity upon

behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal

_____

Notary Public in and for the

_____

## EXHIBIT I – LIST OF MIXED ORTHOPEDIC PLAINTIFFS

This Exhibit I lists Primary Plaintiffs who qualify as Mixed Orthopedic Plaintiffs for purposes of the Sections I.II and XVIII.A of the Agreement.

| Primary Plaintiff | S.D.N.Y. Civil Action No. |
|---|---|
| Alonzo, Julio | 05cv10368 |
| Alvear, Santiago | 06cv02220 |
| Anderson, Donald | 06cv07343 |
| Arcese, Patrick | 05cv00311 |
| Bahrt, Jason | 06cv08333 |
| Barriere, Wilfred | 07cv05186 |
| Bauer, John | 07cv09948 |
| Benfante, Andrew | 07cv10106 |
| Bessler, Paul | 06cv07918 |
| Betro, Louis | 05cv01073 |
| Blandon, Daysy | 07cv09949 |
| Bonilla, Felix | 06cv10254 |
| Buquicchio, John | 06cv07949 |
| Byrne, Dennis | 07cv04888 |
| Casey, Laron | 06cv08890 |
| Castro, Christopher | 06cv07287 |
| Cayetano, Teresita | 07cv05282 |
| Citara, Sr., John | 08cv00642 |
| Clark, Alma | 08cv00644 |
| Coballes, Sarbelia | 08cv02261 |
| Contini, Louis | 06cv07380 |
| Corbett, John | 06cv08892 |
| Corr, Howard | 06cv08360 |
| D'Alessio, Peter | 06cv08974 |
| Danese, Elizabeth | 07cv09971 |
| DeFilippis, Michael | 06cv08374 |
| Delaney, John | 04cv08814 |
| DiLonardo, John | 06cv09536 |

| Primary Plaintiff | S.D.N.Y. Civil Action No. |
|---|---|
| Driscoll, Robert | 06cv10296 |
| Eaton, Beverly G. | 07cv10903 |
| Edwards, Christopher | 06cv07403 |
| Failla, Joseph | 06cv08211 |
| Farello, Theresa | 06cv13894 |
| Faust, John | 05cv01223 |
| Finnerty, Jennifer | 07cv08466 |
| Ford, Lawrence | 04cv04984 |
| Foulkes, Robert | 07cv09101 |
| Francan, Jeff | 06cv08900 |
| Garvin, Jr., Hadden | 06cv13918 |
| Geary, Gerard | 06cv07993 |
| Giallanzo, Robert | 06cv07994 |
| Gontarek, Susan | 06cv13930 |
| Gonzalez, Roberta | 07cv04245 |
| Gorglione, Frank | 06cv06360 |
| Granick, Michelle | 06cv08603 |
| Grimaldi, Fernando | 06cv08692 |
| Guise, Steven | 07cv09028 |
| Harvey, Michael | 06cv10776 |
| Haughton, Roger | 05cv10390 |
| Hernandez, Judith | 06cv10662 |
| Hernandez, Maxine | 06cv13946 |
| Hudak, John | 07cv10162 |
| Hughes, Rachel | 07cv05178 |
| Ioveno, Peter | 06cv09794 |
| Jackson, George | 08cv00702 |
| Jackson, Joseph | 06cv11189 |
| Johnson, Johnny L. | 07cv09030 |
| Kenny, Michael | 06cv14770 |
| Kopcza, Michal | 07cv05396 |

| Primary Plaintiff | S.D.N.Y. Civil Action No. |
|---|---|
| LaPenna, James | 07cv04981 |
| Lawrence, Salavec | 06cv10628 |
| Lebow, Keith | 06cv08444 |
| Levine, Mark | 08cv00716 |
| LiGreci, Ken | 06cv08671 |
| Makarius, Arthur | 07cv04996 |
| Malmbeck, Baudon | 07cv04997 |
| Masutti, Narciso | 07cv09147 |
| McAllister, Brian | 06cv12301 |
| McCaffrey, Owen | 06cv08041 |
| McCormack, Michael | 06cv08964 |
| McHale, Thomas | 06cv14031 |
| Mendez, Gamalier | 06cv07493 |
| Miller, Kelly | 05cv00874 |
| Miranda, Susana | 08cv02293 |
| Mulhern, Richard | 04cv09081 |
| Murphy, Dennis | 06cv14912 |
| Nalbach, John | 06cv06726 |
| Narayanan, Appukkutan | 05cv07186 |
| Noboa, Freddie | 05cv01788 |
| Nolan, James | 05cv01749 |
| O'Brien, Daniel | 06cv08923 |
| O'Connor, Catherine | 06cv06727 |
| O'Connor, Patrick | 07cv10194 |
| O'Grady, Peter | 06cv07213 |
| Olivero, Anna | 06cv14062 |
| Owens-Page, Ella | 06cv11575 |
| Page, Melissa | 06cv14945 |
| Peralta, Marilin | 06cv14956 |
| Perzichilli, Antonio | 06cv12406 |
| Porigow, Brett | 06cv11046 |

| Primary Plaintiff | S.D.N.Y. Civil Action No. |
|---|---|
| Prager, Richard | 07cv05041 |
| Ramos, Richard | 06cv14989 |
| Rieger, Eric | 06cv15003 |
| Robinson, William | 06cv15009 |
| Rodolico, Michael | 05cv09868 |
| Sabella, Christopher | 08cv06654 |
| Salavec, Lawrence | 06cv10628 |
| Scotti, Joseph | 06cv12820 |
| Signorile, John | 07cv05080 |
| Smith, Edward | 06cv09714 |
| Sobral, Jose | 08cv03426 |
| Sutter, Karl | 06cv10505 |
| Talavera, Giovanni | 07cv08998 |
| Thompson, Donald | 04cv08300 |
| Tracy, Peter | 05cv01195 |
| Trincone, Mark | 06cv08979 |
| Troiano, Anthony | 06cv07562 |
| Walsh, William | 06cv12698 |
| Whelan, Kenneth | 05cv07187 |
| Wilson, Claire | 05cv01513 |
| Wolff, Judith | 05cv01507 |
| Wright, Jonathan | 06cv06813 |

## EXHIBIT J – ALLOCATION PROCESS TIMELINE

Deadlines are measured in days after the Final Settlement Agreement Effective Date. All deadlines in this Exhibit J are subject to the date calculation rules set forth in Section XXI.T of the Final Settlement Agreement. This Exhibit J is intended as a summary of the timing of the Allocation Process and must be read in conjunction with the Final Settlement Agreement and the retention agreement for the Allocation Neutral and should not be understood to displace the more specific treatment of the predicate conditions for the occurrence of certain events addressed in the Final Settlement Agreement. The Parties agree to consult with the Allocation Neutral and the Claims Appeal Neutral concerning all deadlines set forth in this Exhibit J.

| Deadline | Responsibility | Obligation | Comment |
|---|---|---|---|
| 20 Days | WTC Captive | Make Initial Payments to Primary Plaintiffs who opt into the Final Settlement Agreement and who are on the "pre-approval list" referenced in Exhibit B (Work Verification) and to corresponding Derivative Plaintiffs;<br><br>Initial Payments to Primary Plaintiffs who opt into the Final Settlement Agreement but who are not on the "pre-approval list" and to corresponding Derivative Plaintiffs shall follow as soon as possible after the Allocation Neutral determines work verification issues pursuant to Exhibit B | Subject to confirmation of Plaintiffs' eligibility to receive benefits pursuant to Section VII of the Final Settlement Agreement. |
| 30 Days | Plaintiffs' Counsel | Submit all Claim Forms, except for Primary Plaintiffs who claim that the City of New York has not met its obligations under Section XI.H of the Final Settlement Agreement in which case the affected Primary Plaintiffs shall have thirty (30) days from the date of the City of New York's compliance to submit their respective Claim Forms | |

| Deadline | Responsibility | Obligation | Comment |
|---|---|---|---|
| 60 Days | WTC Captive | Make all Accelerated Final Payments to Plaintiffs in Tier 2 or Tier 3 *unless* (i) the Primary Plaintiff submits a Reconsideration Request; (ii) the Allocation Neutral issues a Deficiency Notice to the Primary Plaintiff; (iii) the Primary Plaintiff's claim is selected for audit; or (iv) the Primary Plaintiff submits an Appeal to the Claims Appeal Neutral.  If (i), (ii), (iii), or (iv) occurs, payment will follow resolution as expeditiously as possible | Due on a rolling basis 25 days after Allocation Neutral places a Primary Plaintiff in Tier 2 or Tier 3 and the pre-conditions are met, unless Primary Plaintiff waives Reconsideration Request, in which case due in 10 days |
| 90 Days | Allocation Neutral | Issue all Deficiency Notices (Tier 1-3 Deficiency Notices expected to be issued before the preceding Accelerated Payment deadline) | Due on a rolling basis 20 days after Allocation Neutral determines that a Primary Plaintiff's documentation is deficient |
| 105 Days | Plaintiffs' Counsel | Submit all responses to Deficiency Notices | Due on a rolling basis 15 days after receipt of Deficiency Notice |
| TBD | WTC Captive | Make Interim Payments to Verified Tier 4 Primary Plaintiffs and to corresponding Derivative Plaintiffs | Timing of Interim Payments is governed by Section IX.C of the Final Settlement Agreement and may differ depending upon the Primary Plaintiff's Allocation Pool |
| 180 Days | Allocation Neutral | Complete Initial Audit | |
| 180 Days | Allocation Neutral | Determine Plaintiffs' Total Scores | Tier 4 Plaintiffs only |

| Deadline | Responsibility | Obligation | Comment |
|----------|----------------|------------|---------|
| 200 Days | Plaintiffs' Counsel | Submit all Reconsideration Requests | Due on a rolling basis 20 days after Tier placement by the Allocation Neutral or for Verified Tier 4 Primary Plaintiffs after the Allocation Neutral's Final Total Score calculation |
| 215 Days | Allocation Neutral | Respond to all pending Reconsideration Requests | No more than 15 days after receipt |
| 230 Days | Plaintiffs' counsel | Submit all Appeals | Due on a rolling basis 15 days after the Allocation Neutral issues a determination in response to Primary Plaintiff's Reconsideration Request |
| 260 Days | Allocation Neutral | Complete Targeted Audits, if any | Refer to Section XI.N of the Final Settlement Agreement |
| 290 Days | Claims Appeal Neutral | Issue Determinations regarding all Appeals | Determinations to be issued on a rolling basis within 60 days after an Appeal is submitted and to be completed by this deadline or earlier if feasible |
| 315Days | Allocation Neutral | Complete Allocation Process for all three Master Docket Allocation Pools | Due no more than 15 days after the Claims Appeal Neutral renders determinations on all Appeals for each Allocation Pool |

| Deadline | Responsibility | Obligation | Comment |
|----------|----------------|------------|---------|
| 345 Days | WTC Captive | Issue Final Distributions | No more than 30 days after Allocation Process is complete for each Allocation Pool |

The Allocation Process shall be completed as expeditiously and efficiently as possible. Consistent with the Final Settlement Agreement, this Exhibit J contemplates an expedited process for review and payment of claims for Plaintiffs in Tier 2 and Tier 3, with all Final Distributions to be issued within one year of the Final Settlement Agreement Effective Date to the extent practicable as determined by the Allocation Neutral and the Claims Appeal Neutral.

## <u>EXHIBIT K – CASE MANAGEMENT ORDERS FOR EACH MASTER DOCKET</u>

**For Master Docket 21 MC 100**
[item 1]

**For Master Docket 21 MC 102**
[item 2]

**For Master Docket 21 MC 103**
[item 3]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
                                                        :
IN RE WORLD TRADE CENTER DISASTER    :    **CASE MANAGEMENT**
SITE LITIGATION                                    :    **ORDER NO. _____**
                                                        :
                                                        :    21 MC 100 (AKH)
                                                        :
--------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

    This Case Management Order No. ___ shall apply to all plaintiffs with cases pending as
of April 12, 2010, and all new plaintiffs filing cases after April 12, 2010 ("Plaintiff" or
"Plaintiffs"). The requirements imposed upon Plaintiffs by this Order shall apply only as against
those actual or potential defendants identified on Exhibit A hereto ("Listed Defendants").

    1.    <u>Filing of Amended Complaints.</u> Each Plaintiff with an existing case as of April
12, 2010, shall file and thereafter serve an Amended Complaint satisfying the requirements of
the Federal Rules of Civil Procedure ("FRCP") and this Case Management Order ("CMO") on
Listed Defendants' Counsel by **[DATE]** *<date is determined as one hundred and thirty (130)
days after the Affirmation of Final Settlement Agreement>*, if that Plaintiff's case is not
dismissed with prejudice prior to this deadline pursuant to the final settlement agreement.
Plaintiff's counsel shall comply with Rule 11 of the FRCP when filing any Complaint provided
for herein.

    2.    <u>Content of Complaints.</u> New Plaintiffs that file cases or Plaintiffs that amend
their cases pursuant to Section 1 of this CMO shall include in their Complaint or Amended
Complaint, in addition to the information required pursuant to the FRCP, the detailed
information identified in Section 5 (e) through (h) herein and also information sufficient to
respond adequately to the following:

a.    <u>Reason Plaintiff's Claim Not Time-Barred.</u>  The reason Plaintiff's claim is not barred by the statute of limitations as to each Listed Defendant, and, as to the City of New York, not barred by notice of claim requirements;

b.    <u>Facts Supporting Contention That Listed Defendants Not Immune From Liability.</u>  A statement of the facts supporting Plaintiff's contention that each particular Listed Defendant is not immune from liability under state and federal law.  *See In re World Trade Ctr. Disaster Site Litig.,* 456 F. Supp. 2d 520 (S.D.N.Y. 2006).

c.    <u>Listed Defendants Against Whom Liability is Alleged.</u>  The particular Listed Defendants that Plaintiff alleges are liable for his or her alleged injuries at the World Trade Center Site, and the particular factual and legal basis for such alleged liability specific to each particular Listed Defendant that Plaintiff sued.  Or, a Plaintiff may provide responses to Request Nos. 11, 12 and 13 of the November 21, 2007 CMO, with specificity as to each particular Listed Defendant that Plaintiff sued.

3.    <u>Completion of Database Information.</u>  Each Plaintiff with an existing case as of April 12, 2010, shall populate (if not already populated) all required information to the Court database by **[DATE]** *<date is determined as one hundred and sixty (160) days after the Affirmation of Final Settlement Agreement is executed>*, if that Plaintiff's case is not dismissed with prejudice pursuant to the final settlement agreement.  New Plaintiffs that file cases after April 12, 2010, shall populate all required information to the Court Database within thirty (30) days after filing a Complaint in accordance with the FRCP and the requirements of this CMO.

4.    <u>Requirement to Serve Case-Specific Expert Report.</u>  Each Plaintiff (including each personal representative of an estate of any deceased or incompetent participant in the World Trade Center rescue, recovery and/or debris removal operation claiming injury), and the Plaintiff's counsel, in consultation with such medical advisor(s) as they see fit to consult, shall serve a case-specific expert report stating that there is a causal relationship between the individual Plaintiff's claimed injury and his or her World Trade Center Site service and exposure and the good faith basis for that opinion, executed under oath and subject to the penalties of perjury (a "Case-Specific Expert Report").  Each Plaintiff with an existing case as of April 12, 2010 shall serve his or her Case-Specific Expert Report on Listed Defendants' counsel by **[DATE]** *<date is determined as one hundred and eighty (180) days after the Affirmation of Final Settlement Agreement is executed>*, if that Plaintiff's case is not dismissed with prejudice pursuant to the final settlement agreement.  New Plaintiffs that file cases after April 12, 2010, shall serve the Case-Specific Expert Report within ninety (90) days after filing a Complaint in accordance with the FRCP and the requirements of this CMO.

5.    <u>Contents of Case-Specific Expert Report</u>.  Each Case-Specific Expert Report shall include the following information:

a.    <u>Plaintiff's Information</u>.  The Plaintiff's name and date of birth;

b.    <u>Plaintiff's Employer</u>.  The name(s) of each and every employer for whom Plaintiff worked at the World Trade Center Site;

c.    <u>Expert's Information</u>.  The name, professional address, and curriculum vitae of the physician or medical expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the

foundation for the expert's opinion in relation to his or her professional experience;

d.    Plaintiff's Medical Records.    A copy of the Plaintiff's medical records reviewed by the expert prior to the preparation of the Case-Specific Expert Report;

e.    Exposure Dates.    The dates during which the Plaintiff alleges to have been exposed at the World Trade Center Site and copies of documents relied upon, if any, as evidence of such alleged exposure;

f.    Exposure Locations. The  location(s) at which the Plaintiff alleges to have been exposed at the World Trade Center Site and copies of documents relied upon, if any, as evidence of such alleged exposure.  In identifying the alleged locations of exposure, the Plaintiff will make reference to one or more of the locations set forth in the pull down menu or "pick list" used in conjunction with completion of the fields in the Court database administered by TCDI.

g.    Plaintiff's Injury.  If Plaintiff does not allege exacerbation of a condition existing prior to Plaintiff's work at the World Trade Center Site, whether the Plaintiff's medical records reviewed by the expert indicate that the Plaintiff experienced an injury causally related to alleged exposures at the World Trade Center Site and, if so: (i) the nature of the alleged injury; (ii) the date of the alleged injury and the date the Plaintiff knew of the alleged injury; (iii) that the alleged injury was not a condition existing prior to

Plaintiff's work at the World Trade Center Site; and (iv) references to the particular medical record(s) relied upon as evidence of such alleged injury;

h.    <u>Exacerbation of Pre-existing Condition</u>.  If Plaintiff alleges exacerbation of a condition existing prior to Plaintiff's work at the World Trade Center Site, whether the Plaintiff's medical records reviewed by the expert indicate that the Plaintiff experienced an exacerbation of a pre-existing condition causally related to alleged exposures at the World Trade Center Site and, if so: (i) the nature of the alleged exacerbated condition; (ii) the date of the alleged exacerbated condition and the date the Plaintiff knew of the alleged exacerbation; and (iii) references to the particular medical record(s) relied upon as evidence of such alleged exacerbated condition;

i.    <u>Opinion Regarding Causation Sworn to by Medical Expert</u>.  An opinion that there is a causal relationship between the individual Plaintiff's claimed injury and his or her World Trade Center Site service and exposure, prepared by a physician or other medical expert and sworn/affirmed to and subject to the penalties of perjury.

6.    <u>Responding to Complaints.</u>  The time for Listed Defendants to file a response to any Complaint or Amended Complaint subject to the requirements of this CMO shall not begin to run until after the receipt by counsel for the Listed Defendants of the Case-Specific Expert Report required pursuant to this CMO.

7.    <u>Dismissal of Plaintiffs Who Fail to Comply With This Order</u>.

a.    <u>Notice of Non-compliance and Opportunity to Cure</u>.  If any Plaintiff fails to comply with any provision of this Order, including without limitation

5

the timely service of a Complaint or Amended Complaint, the timely population of information to the Court Database, and/or the timely service of the Case-Specific Expert Report, counsel for Listed Defendants shall place Plaintiff on written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance.  Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure his or her Non-Compliance specified in the Notice of non-compliance.  During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Listed Defendants, including without limitation the deadline to file and serve a pleading responsive to Plaintiff's Complaint or Amended Complaint, shall be held in abeyance.

b.      <u>Failure to Cure</u>.  If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure his or her non-compliance, upon application by the Listed Defendants, the Plaintiff will be subject to having his or her claims, as well as any derivative claim(s), dismissed pursuant to FRCP 41(b) as against the Listed Defendants only.

c.      <u>Extensions of Time</u>.  The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

8.      <u>Order Shall Become Void If Final Settlement Agreement Not Executed.</u>  This Order shall become void and of no prospective or retroactive effect as to any Plaintiff or Listed Defendant if affirmation of a final settlement agreement is not executed by all required signatories under the settlement agreement by [date of entry plus 120 days], such date subject to extension of time on motion and for good cause shown by any Listed Defendant.

9.    <u>Objections</u>.    Any party objecting to the entry of this Order shall file such objection by [date of entry plus 15 days].

**SO ORDERED.**

Date:             _____, 2010
                  New York, New York

                                        _____
                                        ALVIN K. HELLERSTEIN
                                        United States District Judge

# EXHIBIT A

## LIST OF DEFENDANTS TO WHICH THIS ORDER APPLIES

| |
|---|
| CITY OF NEW YORK, including the: |
|     BOARD OF EDUCATION OF THE CITY OF NEW YORK |
|     BOROUGH OF MANHATTAN COMMUNITY COLLEGE |
|     CITY UNIVERSITY OF NEW YORK |
|     NEW YORK CITY DEPARTMENT OF EDUCATION |
|     NEW YORK CITY SCHOOL CONSTRUCTION AUTHORITY |
| A RUSSO WRECKING |
| ACROW |
| ALLCOM ELECTRIC |
| AMEC CONSTRUCTION MANAGEMENT, INC. |
| AMEC EARTH AND ENVIRONMENTAL |
| ANTHONY CORTESE SPECIALIZED HAULING LLC |
| ASG PEST CONTROL |
| ATC GROUP SERV/DBA ATC ASSOCIATES |
| ATLANTIC HEYDT CORP. |
| ATLAS CONCRETE |
| AVANTI DEMOLITION & CARTING CORP. |
| BECHTEL CONSTRUCTION, INC. |
| BERGEN CONCRETE CUTTING |
| BERKEL & CO. CONTRACTORS, INC. |
| BIG APPLE WRECKING & CONSTRUCTION |
| BOVIS LEND LEASE LMB, INC. |
| BREEZE CARTING |
| BREEZE NATIONAL, INC. |
| BRER FOUR TRANSPORTATION |
| BURO HAPPOLD CONSULT ENG. |
| C & D FIREPROOFING |
| C & D PAINTING, INC. |
| C.B. CONTRACTING CORP. |
| CANRON CONSTRUCTION CORP. |
| CANTOR SEINUK GROUP |
| CERTIFIED FENCE CORP. |
| CIVETTA COUSINS |
| CLARCO ENTERPRISE CORP. |
| COMPONENT ASSEMBLY SYS |
| COORDINATED METALS, INC. |
| CORD CONTRACTING CO., INC. |

| |
|---|
| CRAIG TEST BORING |
| CRITICOM INTERNATIONAL CORP |
| DAKOTA DEMO-TECH |
| DESIMONE CONSULTING ENGINEERS, PLLC |
| DCM ERECTORS, INC. |
| DIAMOND POINT EXCAVATION CORP |
| DIEGO CONSTRUCTION |
| DIVERSIFIED CARTING |
| DMT ENTERPRISE |
| D'ONOFRIO GENERAL CONTRACTORS CORP. |
| EAGLE LEASING & INDUSTRIAL SUPPLY (SEASONS) |
| EAGLE ONE ROOFING CONTRACTORS, INC. |
| EAGLE SCAFFOLDING CO. (SEASONS) |
| EJ DAVIES, INC. |
| EN-TECH CORP. |
| ENTERTAINMENT PARTNERS |
| ET ENVIRONMENTAL |
| EVERGREEN RECYCLING OF CORONA (EROC) |
| EWELL W. FINLEY, P.C. |
| EXECUTIVE MED SERVICES, PC |
| F&G MECHANICAL CORPORATION |
| FELIX EQUITIES, INC. |
| FLEET TRUCKING |
| FRANCIS A. LEE EXTERIOR RESTORATION |
| FRANK MICELLI JR CONTRACTING |
| FTI TRUCKING |
| G & G CONTRACTING, INC. |
| GILSANZ, MURRAY, & STEFICEK |
| GINO CRACOLICI & SONS, INC. |
| GOLDSTEIN ASSOCIATES PLLC |
| GRACE INDUSTRIES |
| GUY NORDENSON AND ASSOCIATES |
| HALLEN WELDING SERVICE |
| HELMSMAN MANAGEMENT SERVICES, INC. |
| HGC CONTRACTING CORP. |
| HIGH RISE HOISTING AND SCAFFOLDING |
| HIGH-RISE ELECTRIC, INC. |
| HP ENVIRONMENTAL |
| JP EQUIPMENT RENTAL MATERIALS, INC. |

| |
|---|
| KEVIN MCMANUS |
| KOCH SKANSKA, INC. |
| LAQUILLA CONSTRUCTION, INC. |
| LASTRADA GENERAL CONTRACTING CORP. |
| LESLIE E. ROBERTSON ASSOCIATES |
| LIBERTY MUTUAL GROUP |
| LIRO |
| LOCKWOOD, KESSLER & BARTLETT (LKB) |
| LUCIUS PITKIN |
| LZA TECH-DIVISION OF THORTON TOMASETTI |
| M. G. MCLAREN, P.C. |
| MANAFORT BROTHERS, INC. |
| MAZZOCCHI WRECKING, INC. |
| MEDCOR, INC. |
| MENT BROTHERS |
| MERIDIAN CONSTRUCTION GROUP |
| MG MCLAREN P.C. |
| MORETRENCH AMERICAN, CORP. |
| MRA ENGINEERING, PC |
| MUESER RUTLEDGE CONSULTING ENGINEERS |
| MUSCO SPORTS LIGHTING, LLC |
| NACIREMA INDUSTRIES |
| NEW YORK CRANE & EQUIPMENT CORP. |
| NICHOLSON CONSTRUCTION CO. |
| NICHOLSON/HEYWOOD JOINT VENTURE |
| OFF ROAD WELDING, INC. |
| THE OFFICES OF JAMES RUDERMAN, LLP |
| OLYMPIC PLUMBING AND HEATING |
| OVE ARUP & PARTNERS |
| PARSON GROUP |
| PETER SCALAMANDRE & SONS |
| PINNACLE ENVIRONMENTAL |
| PLAZA CONSTRUCTION CORP. |
| PRO SAFETY SERVICES, LLC |
| PT & L CONTRACTING CORP. |
| REGIONAL SCAFFOLD & HOISTING CO, INC. |
| RICH MARK ENVIRONMENTAL SERVICES, INC. |
| ROBER SILMAN ASSOCIATES |
| ROBERT C STEWART |

| |
|---|
| ROBERT ERRAT |
| ROBERT L GEROSA |
| RODAR ENTERPRISES, INC. |
| ROYAL GM, INC. |
| SAB TRUCKING |
| SAFEWAY ENVIRONMENTAL |
| SEMCOR EQUIPMENT |
| SEVERUD ASSOCIATES CONSULTING ENGINEERS |
| SHELDRAKE ORGANIZATION, INC. |
| SILVERADO CONTRACTORS |
| SILVERITE CONTRACTING |
| SIMPSON, GUMPERTZ, & HEGER |
| SKIDMORE, OWINGS & MERRILL LLP |
| STAR DELTA ELECTRIC |
| STIER, ANDERSON & MALONE |
| SUMMIT STRUCTURES LLC |
| TELENET COMMUNICATIONS |
| THYSSEN KRUPP ELEVATOR CO. |
| TOMASETTI GROUP |
| TORETTA TRUCKING |
| TOTAL SAFETY CONSULTING LLC |
| TUCCI EQUIPMENT RENTAL CORP |
| TULLY CONSTRUCTION |
| TURNER CONSTRUCTION COMPANY |
| ULTIMATE DEMOLITION/CS HAULING (JOINT VENTURE) |
| UNITED STATES REBAR |
| VANGUARD EQUIPMENT RENTALS |
| VERTICAL TECHNOLOGIES |
| VOLLMER ASSOCIATES |
| W HARRIS & SON INC. |
| WALTER WHITE TRUCKING |
| WEEKS MARINE, INC. |
| WEIDLINGER ASSOCIATES |
| WHITNEY CONTRACTING |
| WOLKOW BRAKER ROOFING |
| YANNUZZI & SONS, INC. |
| YONKERS CONTRACTING |
| YORK HUNTER CONSTRUCTION, LLC |
| ZIEGENFUSS DRILLING |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                                                           :
                                                           :
IN RE WORLD TRADE CENTER                                   :
LOWER MANHATTAN DISASTER                                   :
SITE LITIGATION                                            :        **CASE MANAGEMENT**
                                                           :        **ORDER NO. _____**
                                                           :
                                                           :        21 MC 102 (AKH)
                                                           :
                                                           :
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

    This Case Management Order No. \_\_\_ shall apply to all plaintiffs in this consolidated

(for pretrial purposes) Master Docket with cases pending as of April 12, 2010, and all new

plaintiffs filing cases after April 12, 2010 ("Plaintiff" or "Plaintiffs").  The requirements imposed

upon Plaintiffs by this Order shall apply only as against those actual or potential defendants

identified on Exhibit A hereto ("Listed Defendants").

    1.    <u>Filing of Amended Complaints.</u>  Each Plaintiff with an existing case as of April

12, 2010, shall file and thereafter serve an Amended Complaint satisfying the requirements of

the Federal Rules of Civil Procedure ("FRCP") and this Case Management Order ("CMO") on

Listed Defendants' Counsel by **[DATE]** *<date is determined as one hundred and thirty (130)*

*days after the Affirmation of Final Settlement Agreement>*, if that Plaintiff's case is not

dismissed with prejudice prior to this deadline pursuant to the final settlement agreement.

Plaintiff's counsel shall comply with Rule 11 of the FRCP when filing any Complaint provided

for herein.

    2.    <u>Content of Complaints.</u>    New Plaintiffs that file cases or Plaintiffs that

amend their cases pursuant to Section 1 of this CMO shall include in their Complaint or

Amended Complaint, in addition to the information required pursuant to the FRCP, the detailed

information identified in Section 5 (e) through (h) herein and also information sufficient to respond adequately to the following:

a.   <u>Reason Plaintiff's Claim Not Time-Barred.</u>  The reason Plaintiff's claim is not barred by the statute of limitations as to each Listed Defendant, and, as to the City of New York, New York City School Construction Authority, New York City Board of Education, New York City Department of Education, and City University of New York, not barred by notice of claim requirements;

b.   <u>Facts Supporting Contention That Listed Defendants Not Immune From Liability.</u>  A statement of the facts supporting Plaintiff's contention that each particular Listed Defendant is not immune from liability under state and federal law.  *See In re World Trade Ctr. Disaster Site Litig.,* 456 F. Supp. 2d 520 (S.D.N.Y. 2006).

c.   <u>Listed Defendants Against Whom Liability is Alleged.</u>  The particular Listed Defendants that Plaintiff alleges are liable for his or her alleged injuries, and the particular factual and legal basis for such alleged liability specific to each particular Listed Defendant that Plaintiff sued.  Or, Plaintiff's counsel may certify responses to the Requests set forth in Section II(B) of the jointly negotiated discovery demands referenced in CMO No. 6, with specificity as to each particular Listed Defendant that Plaintiff sued.

3.   <u>Completion of Database Information.</u>  Each Plaintiff with an existing case as of April 12, 2010, shall populate all required information to the Court Database by **[DATE]** <*date*

*is determined as one hundred and sixty (160) days after the Affirmation of Final Settlement Agreement>*, if that Plaintiff's case is not dismissed with prejudice pursuant to the final settlement agreement.  New Plaintiffs that file cases after April 12, 2010, shall populate all required information to the Court Database within thirty (30) days after filing a Complaint in accordance with the FRCP and the requirements of this CMO.

4.    <u>Requirement to Serve Case-Specific Expert Report.</u>  Each Plaintiff (including each personal representative of an estate of any deceased or incompetent participant claiming injury as a result of work including, but not limited to debris removal, building cleaning, and other associated activities in buildings and areas in Lower Manhattan following the terrorist attack of September 11, 2001 ("World Trade Center-related work")), and the Plaintiff's counsel, in consultation with such medical advisor(s) as they see fit to consult, shall serve a case-specific expert report stating that there is a causal relationship between the individual Plaintiff's claimed injury and his or her World Trade Center-related work and exposure and the good faith basis for that opinion, executed under oath and subject to the penalties of perjury (a "Case-Specific Expert Report").  Each Plaintiff with an existing case as of April 12, 2010 shall serve his or her Case-Specific Expert Report on Listed Defendants' counsel by **[DATE]** *<date is determined as one hundred and eighty (180) days after the Affirmation of Final Settlement Agreement is executed>*, if that Plaintiff's case is not dismissed with prejudice pursuant to the final settlement agreement. New Plaintiffs that file cases after April 12, 2010, shall serve the Case-Specific Expert Report within ninety (90) days after filing a Complaint in accordance with the FRCP and the requirements of this CMO.

5.    <u>Contents of Case-Specific Expert Report</u>.  Each Case-Specific Expert Report shall include the following information:

a.    <u>Plaintiff's Information</u>.  The Plaintiff's name and date of birth;

b.    <u>Plaintiff's Employer</u>.  The name(s) of each and every employer for whom Plaintiff performed World Trade Center-related work;

c.    <u>Expert's Information</u>.  The name, professional address, and curriculum vitae of the physician or medical expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to his or her professional experience;

d.    <u>Plaintiff's Medical Records</u>.  A copy of the Plaintiff's medical records reviewed by the expert prior to the preparation of the Case-Specific Expert Report;

e.    <u>Exposure Dates</u>.  The dates during which the Plaintiff alleges to have been exposed while participating in World Trade Center-related work and copies of documents relied upon, if any, as evidence of such alleged exposure;

f.    <u>Exposure Locations</u>. The location(s) at which the Plaintiff alleges to have been exposed and copies of documents relied upon, if any, as evidence of such alleged exposure.  In identifying the alleged locations of exposure, the Plaintiff will make reference to one or more of the locations set forth in the operative Amended Master Complaint in this Master Docket.

g.    <u>Plaintiff's Injury</u>.  If Plaintiff does not allege exacerbation of a condition existing prior to Plaintiff's participation in World Trade Center-related work, whether the Plaintiff's medical records reviewed by the expert

indicate that the Plaintiff experienced an injury causally related to alleged exposures while participating in World Trade Center-related work and, if so: (i) the nature of the alleged injury; (ii) the date of the alleged injury and the date the Plaintiff knew of the alleged injury; (iii) that the alleged injury was not a condition existing prior to Plaintiff's participation in World Trade Center-related work; and (iv) references to the particular medical record(s) relied upon as evidence of such alleged injury;

h.      <u>Exacerbation of Pre-existing Condition</u>.  If Plaintiff alleges exacerbation of a condition existing prior to Plaintiff's participation in World Trade Center-related work, whether the Plaintiff's medical records reviewed by the expert indicate that the Plaintiff experienced an exacerbation of a pre-existing condition causally related to alleged exposures while participating in World Trade Center-related work and, if so: (i) the nature of the alleged exacerbated condition; (ii) the date of the alleged exacerbated condition and the date the Plaintiff knew of the alleged exacerbation; and (iii) references to the particular medical record(s) relied upon as evidence of such alleged exacerbated condition;

i.      <u>Opinion Regarding Causation Sworn to by Medical Expert</u>.  An opinion that there is a causal relationship between the individual Plaintiff's claimed injury and his or her World Trade Center-related work, prepared by a physician or other medical expert and sworn/affirmed to and subject to the penalties of perjury;

6.     <u>Responding to Complaints.</u>  The time for Listed Defendants to file a response to any Complaint or Amended Complaint subject to the requirements of this CMO shall not begin to run until after the receipt by counsel for the Listed Defendants of the Case-Specific Expert Report required pursuant to this CMO.

7.     <u>Dismissal of Plaintiffs Who Fail to Comply With This Order</u>.

a.     <u>Notice of Non-compliance and Opportunity to Cure</u>.  If any Plaintiff fails to comply with any provision of this Order, including without limitation the timely service of a Complaint or Amended Complaint, the timely population of information to the Court Database, and/or the timely service of the Case-Specific Expert Report, counsel for Listed Defendants shall place Plaintiff on written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance.  Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure his or her Non-Compliance specified in the Notice of Non-compliance.  During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Listed Defendants, including without limitation the deadline to file and serve a pleading responsive to the operative Amended Master Complaint or that particular Plaintiff's Check-Off Complaint, shall be held in abeyance.

b.     <u>Failure to Cure</u>.  If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure his or her non-compliance, upon application by the Listed Defendants, the Plaintiff will

be subject to having his or her claims, as well as any derivative claim(s), dismissed pursuant to FRCP 41(b) as against the Listed Defendants only.

      c.    <u>Extensions of Time</u>.  The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

8.    <u>Order Shall Become Void If Final Settlement Agreement Not Executed</u>.  This Order shall become void and of no prospective or retroactive effect as to any Plaintiff or Listed Defendant if affirmation of a final settlement agreement is not executed by all required signatories under the settlement agreement by [date of entry plus 120 days], such date subject to extension of time on motion and for good cause shown by any Listed Defendant.

9.    <u>Objections</u>.  Any party objecting to the entry of this Order shall file such objection by [date of entry plus 15 days].

**SO ORDERED.**

Date:      _____, 2010
          New York, New York

                        _____
                        ALVIN K. HELLERSTEIN
                        United States District Judge

## EXHIBIT A

## LIST OF DEFENDANTS TO WHICH THIS ORDER APPLIES

| |
|---|
| CITY OF NEW YORK, including the: |
|     BOARD OF EDUCATION OF THE CITY OF NEW YORK |
|     BOROUGH OF MANHATTAN COMMUNITY COLLEGE |
|     CITY UNIVERSITY OF NEW YORK |
|     NEW YORK CITY DEPARTMENT OF EDUCATION |
|     NEW YORK CITY SCHOOL CONSTRUCTION AUTHORITY |
| A RUSSO WRECKING |
| ACROW |
| ALLCOM ELECTRIC |
| AMEC CONSTRUCTION MANAGEMENT, INC. |
| AMEC EARTH AND ENVIRONMENTAL |
| ANTHONY CORTESE SPECIALIZED HAULING LLC |
| ASG PEST CONTROL |
| ATC GROUP SERV/DBA ATC ASSOCIATES |
| ATLANTIC HEYDT CORP. |
| ATLAS CONCRETE |
| AVANTI DEMOLITION & CARTING CORP. |
| BECHTEL CONSTRUCTION, INC. |
| BERGEN CONCRETE CUTTING |
| BERKEL & CO. CONTRACTORS, INC. |
| BIG APPLE WRECKING & CONSTRUCTION |
| BOVIS LEND LEASE LMB, INC. |
| BREEZE CARTING |
| BREEZE NATIONAL, INC. |
| BRER FOUR TRANSPORTATION |
| BURO HAPPOLD CONSULT ENG. |
| C & D FIREPROOFING |
| C & D PAINTING, INC. |
| C.B. CONTRACTING CORP. |
| CANRON CONSTRUCTION CORP. |
| CANTOR SEINUK GROUP |
| CERTIFIED FENCE CORP. |
| CIVETTA COUSINS |
| CLARCO ENTERPRISE CORP. |
| COMPONENT ASSEMBLY SYS |
| COORDINATED METALS, INC. |
| CORD CONTRACTING CO., INC. |

| |
|---|
| CRAIG TEST BORING |
| CRITICOM INTERNATIONAL CORP |
| DAKOTA DEMO-TECH |
| DESIMONE CONSULTING ENGINEERS, PLLC |
| DCM ERECTORS, INC. |
| DIAMOND POINT EXCAVATION CORP |
| DIEGO CONSTRUCTION |
| DIVERSIFIED CARTING |
| DMT ENTERPRISE |
| D'ONOFRIO GENERAL CONTRACTORS CORP. |
| EAGLE LEASING & INDUSTRIAL SUPPLY (SEASONS) |
| EAGLE ONE ROOFING CONTRACTORS, INC. |
| EAGLE SCAFFOLDING CO. (SEASONS) |
| EJ DAVIES, INC. |
| EN-TECH CORP. |
| ENTERTAINMENT PARTNERS |
| ET ENVIRONMENTAL |
| EVERGREEN RECYCLING OF CORONA (EROC) |
| EWELL W. FINLEY, P.C. |
| EXECUTIVE MED SERVICES, PC |
| F&G MECHANICAL CORPORATION |
| FELIX EQUITIES, INC. |
| FLEET TRUCKING |
| FRANCIS A. LEE EXTERIOR RESTORATION |
| FRANK MICELLI JR CONTRACTING |
| FTI TRUCKING |
| G & G CONTRACTING, INC. |
| GILSANZ, MURRAY, & STEFICEK |
| GINO CRACOLICI & SONS, INC. |
| GOLDSTEIN ASSOCIATES PLLC |
| GRACE INDUSTRIES |
| GUY NORDENSON AND ASSOCIATES |
| HALLEN WELDING SERVICE |
| HELMSMAN MANAGEMENT SERVICES, INC. |
| HGC CONTRACTING CORP. |
| HIGH RISE HOISTING AND SCAFFOLDING |
| HIGH-RISE ELECTRIC, INC. |
| HP ENVIRONMENTAL |
| JP EQUIPMENT RENTAL MATERIALS, INC. |

| |
|---|
| KEVIN MCMANUS |
| KOCH SKANSKA, INC. |
| LAQUILLA CONSTRUCTION, INC. |
| LASTRADA GENERAL CONTRACTING CORP. |
| LESLIE E. ROBERTSON ASSOCIATES |
| LIBERTY MUTUAL GROUP |
| LIRO |
| LOCKWOOD, KESSLER & BARTLETT (LKB) |
| LUCIUS PITKIN |
| LZA TECH-DIVISION OF THORTON TOMASETTI |
| M. G. MCLAREN, P.C. |
| MANAFORT BROTHERS, INC. |
| MAZZOCCHI WRECKING, INC. |
| MEDCOR, INC. |
| MENT BROTHERS |
| MERIDIAN CONSTRUCTION GROUP |
| MG MCLAREN P.C. |
| MORETRENCH AMERICAN, CORP. |
| MRA ENGINEERING, PC |
| MUESER RUTLEDGE CONSULTING ENGINEERS |
| MUSCO SPORTS LIGHTING, LLC |
| NACIREMA INDUSTRIES |
| NEW YORK CRANE & EQUIPMENT CORP. |
| NICHOLSON CONSTRUCTION CO. |
| NICHOLSON/HEYWOOD JOINT VENTURE |
| OFF ROAD WELDING, INC. |
| THE OFFICES OF JAMES RUDERMAN, LLP |
| OLYMPIC PLUMBING AND HEATING |
| OVE ARUP & PARTNERS |
| PARSON GROUP |
| PETER SCALAMANDRE & SONS |
| PINNACLE ENVIRONMENTAL |
| PLAZA CONSTRUCTION CORP. |
| PRO SAFETY SERVICES, LLC |
| PT & L CONTRACTING CORP. |
| REGIONAL SCAFFOLD & HOISTING CO, INC. |
| RICH MARK ENVIRONMENTAL SERVICES, INC. |
| ROBER SILMAN ASSOCIATES |
| ROBERT C STEWART |

| |
|---|
| ROBERT ERRAT |
| ROBERT L GEROSA |
| RODAR ENTERPRISES, INC. |
| ROYAL GM, INC. |
| SAB TRUCKING |
| SAFEWAY ENVIRONMENTAL |
| SEMCOR EQUIPMENT |
| SEVERUD ASSOCIATES CONSULTING ENGINEERS |
| SHELDRAKE ORGANIZATION, INC. |
| SILVERADO CONTRACTORS |
| SILVERITE CONTRACTING |
| SIMPSON, GUMPERTZ, & HEGER |
| SKIDMORE, OWINGS & MERRILL LLP |
| STAR DELTA ELECTRIC |
| STIER, ANDERSON & MALONE |
| SUMMIT STRUCTURES LLC |
| TELENET COMMUNICATIONS |
| THYSSEN KRUPP ELEVATOR CO. |
| TOMASETTI GROUP |
| TORETTA TRUCKING |
| TOTAL SAFETY CONSULTING LLC |
| TUCCI EQUIPMENT RENTAL CORP |
| TULLY CONSTRUCTION |
| TURNER CONSTRUCTION COMPANY |
| ULTIMATE DEMOLITION/CS HAULING (JOINT VENTURE) |
| UNITED STATES REBAR |
| VANGUARD EQUIPMENT RENTALS |
| VERTICAL TECHNOLOGIES |
| VOLLMER ASSOCIATES |
| W HARRIS & SON INC. |
| WALTER WHITE TRUCKING |
| WEEKS MARINE, INC. |
| WEIDLINGER ASSOCIATES |
| WHITNEY CONTRACTING |
| WOLKOW BRAKER ROOFING |
| YANNUZZI & SONS, INC. |
| YONKERS CONTRACTING |
| YORK HUNTER CONSTRUCTION, LLC |
| ZIEGENFUSS DRILLING |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
               :
IN RE COMBINED WORLD TRADE CENTER  :   **CASE MANAGEMENT**
DISASTER AND LOWER MANHATTAN    :   **ORDER NO. _____**
DISASTER SITE LITIGATION (straddler   :
plaintiffs)             :   21 MC 103 (AKH)
               :
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

    This Case Management Order No. ___ shall apply to all plaintiffs with cases pending as of April 12, 2010, and all new plaintiffs filing cases after April 12, 2010 ("Plaintiff" or "Plaintiffs").  The requirements imposed upon Plaintiffs by this Order shall apply only as against those actual or potential defendants identified on Exhibit A hereto ("Listed Defendants").

    1.   <u>Filing of Amended Complaints.</u>  Each Plaintiff with an existing case as of April 12, 2010 shall file and thereafter serve an Amended Complaint satisfying the requirements of the Federal Rules of Civil Procedure ("FRCP") and this Case Management Order ("CMO") on Listed Defendants' Counsel by **[DATE]** *<date is determined as one hundred and thirty (130) days after the Affirmation of Final Settlement Agreement>*, if that Plaintiff's case is not dismissed with prejudice prior to this deadline pursuant to the final settlement agreement. Plaintiff's Counsel shall comply with Rule 11 of the FRCP when filing any Complaint provided for herein.

    2.   <u>Content of Complaints.</u>  New Plaintiffs that file cases or Plaintiffs that amend their cases pursuant to Section 1 of this CMO shall include in their Complaint or Amended Complaint, in addition to the information required pursuant to the FRCP, the detailed information identified in Section 5 (e) through (h) herein and also information sufficient to respond adequately to the following:

97996

a.   <u>Reason Plaintiff's Claim Not Time-Barred.</u>  The reason Plaintiff's claim is not barred by the statute of limitations as to each Listed Defendant, and, as to the City of New York, not barred by notice of claim requirements;

b.   <u>Facts Supporting Contention That Listed Defendants Not Immune From Liability.</u>  A statement of the facts supporting Plaintiff's contention that each particular Listed Defendant is not immune from liability under state and federal law.  *See In re World Trade Ctr. Disaster Site Litig.,* 456 F. Supp. 2d 520 (S.D.N.Y. 2006).

c.   <u>Listed Defendants Against Whom Liability is Alleged.</u>  The particular Listed Defendants that Plaintiff alleges are liable for his or her alleged injuries at the World Trade Center Site or while participating in World Trade Center-related debris removal or building cleaning operations, and the particular factual and legal basis for such alleged liability specific to each particular Listed Defendant that Plaintiff sued.  If the Listed Defendant is alleged to be liable for Plaintiff's alleged injuries at the World Trade Center Site, Plaintiff's counsel may also certify responses to Request Nos. 11, 12 and 13 of the November 21, 2007 CMO, with specificity as to each particular Listed Defendant that Plaintiff sued.

3.   <u>Completion of Database Information.</u>  Each Plaintiff with an existing case as of April 12, 2010, shall populate all required information to the Court Database by **[DATE]** *<date is determined as one hundred and sixty (160) days after the Affirmation of Final Settlement Agreement>*, if that Plaintiff's case is not dismissed with prejudice pursuant to the final settlement agreement.  New Plaintiffs that file cases after April 12, 2010, shall populate all

required information to the Court Database within thirty (30) days after filing a Complaint in accordance with the FRCP and the requirements of this CMO.

4.    <u>Requirement to Serve Case-Specific Expert Report.</u>  Each Plaintiff (including each personal representative of an estate of any deceased or incompetent participant claiming injury from work in (a) World Trade Center rescue, recovery and/or debris removal operations and (b) in buildings and areas in Lower Manhattan doing World Trade Center related debris removal or building cleaning operations ("World Trade Center-related work")), and the Plaintiff's counsel, in consultation with such medical advisor(s) as they see fit to consult, shall serve a case-specific expert report stating that there is a causal relationship between the individual Plaintiff's claimed injury and his or her World Trade Center Site service and World Trade Center-related work and exposure and the good faith basis for that opinion, executed under oath and subject to the penalties of perjury (a "Case-Specific Expert Report").  Each Plaintiff with an existing case as of April 12, 2010 shall serve his or her Case-Specific Expert Report on Listed Defendants' counsel by **[DATE]** *<date is determined as one hundred and eighty (180) days after the Affirmation of Final Settlement Agreement is executed>*, if that Plaintiff's case is not dismissed with prejudice pursuant to the final settlement agreement.  New Plaintiffs that file cases after April 12, 2010, shall serve the Case-Specific Expert Report within ninety (90) days after filing  a Complaint in accordance with the FRCP and the requirements of this CMO.

5.    <u>Contents of Case-Specific Expert Report.</u>  Each Case-Specific Expert Report shall include the following information:

a.    <u>Plaintiff's Information.</u>  The Plaintiff's name and date of birth;

b.     <u>Plaintiff's Employer.</u>  The name(s) of each and every employer for whom Plaintiff worked at the World Trade Center Site and performed World Trade Center-related debris removal or building cleaning operations;

c.     <u>Expert's Information.</u>  The name, professional address, and curriculum vitae of the physician or medical expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to his or her professional experience;

d.     <u>Plaintiff's Medical Records.</u>  A copy of the Plaintiff's medical records reviewed by the expert prior to the preparation of the Case-Specific Expert Report;

e.     <u>Exposure Dates.</u>  The dates during which the Plaintiff alleges to have been exposed at the World Trade Center Site and while participating in World Trade Center-related debris removal or building cleaning operations and copies of documents relied upon, if any, as evidence of such alleged exposure;

f.     <u>Exposure Locations.</u>  The location(s) at which the Plaintiff alleges to have been exposed and copies of documents relied upon, if any, as evidence of such alleged exposure.  In identifying the alleged locations of exposure, the Plaintiff will make reference to one or more of the locations set forth in the pull down menu or "pick list" used in conjunction with completion of the fields in the Court database administered by TCDI.

g.    <u>Plaintiff's Injury.</u>  If Plaintiff does not allege exacerbation of a condition existing prior to Plaintiff's work at the World Trade Center Site and participation in World Trade Center-related debris removal or building cleaning operations, whether the Plaintiff's medical records reviewed by the expert indicate that the Plaintiff experienced an injury causally related to alleged exposures at the World Trade Center Site and while participating in World Trade Center-related debris removal or building cleaning operations and, if so: (i) the nature of the alleged injury; (ii) the date of the alleged injury and the date the Plaintiff knew of the alleged injury; (iii) that the alleged injury was not a condition existing prior to Plaintiff's work at the World Trade Center Site and participation in World Trade Center-related debris removal or building cleaning operations; and (iv) references to the particular medical record(s) relied upon as evidence of such alleged injury;

h.    <u>Exacerbation of Pre-existing Condition.</u>  If Plaintiff alleges exacerbation of a condition existing prior to Plaintiff's work at the World Trade Center Site and participation in World Trade Center-related debris removal or building cleaning operations, whether the Plaintiff's medical records reviewed by the expert indicate that the Plaintiff experienced an exacerbation of a pre-existing condition causally related to alleged exposures at the World Trade Center Site and while participating in World Trade Center-related debris removal or building cleaning operations and, if so: (i) the nature of the alleged exacerbated condition; (ii) the date of the

alleged exacerbated condition and the date the Plaintiff knew of the alleged exacerbation; and (iii) references to the particular medical record(s) relied upon as evidence of such alleged exacerbated condition;

i. <u>Opinion Regarding Causation Sworn to by Medical Expert.</u>  An opinion that there is a causal relationship between the individual Plaintiff's claimed injury and his or her World Trade Center Site and World Trade Center-related service and exposure, prepared by a physician or other medical expert and sworn/affirmed to and subject to the penalties of perjury.

6. <u>Responding to Complaints.</u>  The time for Listed Defendants to file a response to any Complaint or Amended Complaint subject to the requirements of this CMO shall not begin to run until after the receipt by counsel for the Listed Defendants of the Case-Specific Expert Report required pursuant to this CMO.

7. <u>Dismissal of Plaintiffs Who Fail to Comply With This Order.</u>

a. <u>Notice of Non-compliance and Opportunity to Cure.</u>  If any Plaintiff fails to comply with any provision of this Order, including without limitation the timely service of a Complaint or Amended Complaint, the timely population of information to the Court Database, and/or the timely service of the Case-Specific Expert Report, counsel for Listed Defendants shall place Plaintiff on written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance.  Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure his or her Non-Compliance specified in the Notice of non-compliance.  During the

period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Listed Defendants, including without limitation the deadline to file and serve a pleading responsive to Plaintiff's Check-Off Complaint, shall be held in abeyance.

b.  <u>Failure to Cure.</u>  If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure his or her non-compliance, upon application by the Listed Defendants, the Plaintiff will be subject to having his or her claims, as well as any derivative claim(s), dismissed pursuant to FRCP 41(b) as against the Listed Defendants only.

c.  <u>Extensions of Time.</u>  The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

8.  <u>Order Shall Become Void If Final Settlement Agreement Not Executed.</u>  This Order shall become void and of no prospective or retroactive effect as to any Plaintiff or Listed Defendant if affirmation of a final settlement agreement is not executed by all required signatories under the settlement agreement by [date of entry plus 120 days], such date subject to extension of time on motion and for good cause shown by any Listed Defendant.

9.  <u>Objections.</u>  Any party objecting to the entry of this Order shall file such objection by [date of entry plus 15 days].

**SO ORDERED.**

Date:  _____, 2010
       New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge

7

**EXHIBIT A**

**LIST OF DEFENDANTS TO WHICH THIS ORDER APPLIES**

| |
|---|
| CITY OF NEW YORK, including the: |
|     BOARD OF EDUCATION OF THE CITY OF NEW YORK |
|     BOROUGH OF MANHATTAN COMMUNITY COLLEGE |
|     CITY UNIVERSITY OF NEW YORK |
|     NEW YORK CITY DEPARTMENT OF EDUCATION |
|     NEW YORK CITY SCHOOL CONSTRUCTION AUTHORITY |
| A RUSSO WRECKING |
| ACROW |
| ALLCOM ELECTRIC |
| AMEC CONSTRUCTION MANAGEMENT, INC. |
| AMEC EARTH AND ENVIRONMENTAL |
| ANTHONY CORTESE SPECIALIZED HAULING LLC |
| ASG PEST CONTROL |
| ATC GROUP SERV/DBA ATC ASSOCIATES |
| ATLANTIC HEYDT CORP. |
| ATLAS CONCRETE |
| AVANTI DEMOLITION & CARTING CORP. |
| BECHTEL CONSTRUCTION, INC. |
| BERGEN CONCRETE CUTTING |
| BERKEL & CO. CONTRACTORS, INC. |
| BIG APPLE WRECKING & CONSTRUCTION |
| BOVIS LEND LEASE LMB, INC. |
| BREEZE CARTING |
| BREEZE NATIONAL, INC. |
| BRER FOUR TRANSPORTATION |
| BURO HAPPOLD CONSULT ENG. |
| C & D FIREPROOFING |
| C & D PAINTING, INC. |
| C.B. CONTRACTING CORP. |
| CANRON CONSTRUCTION CORP. |
| CANTOR SEINUK GROUP |
| CERTIFIED FENCE CORP. |
| CIVETTA COUSINS |
| CLARCO ENTERPRISE CORP. |
| COMPONENT ASSEMBLY SYS |
| COORDINATED METALS, INC. |
| CORD CONTRACTING CO., INC. |

| |
|---|
| CRAIG TEST BORING |
| CRITICOM INTERNATIONAL CORP |
| DAKOTA DEMO-TECH |
| DESIMONE CONSULTING ENGINEERS, PLLC |
| DCM ERECTORS, INC. |
| DIAMOND POINT EXCAVATION CORP |
| DIEGO CONSTRUCTION |
| DIVERSIFIED CARTING |
| DMT ENTERPRISE |
| D'ONOFRIO GENERAL CONTRACTORS CORP. |
| EAGLE LEASING & INDUSTRIAL SUPPLY (SEASONS) |
| EAGLE ONE ROOFING CONTRACTORS, INC. |
| EAGLE SCAFFOLDING CO. (SEASONS) |
| EJ DAVIES, INC. |
| EN-TECH CORP. |
| ENTERTAINMENT PARTNERS |
| ET ENVIRONMENTAL |
| EVERGREEN RECYCLING OF CORONA (EROC) |
| EWELL W. FINLEY, P.C. |
| EXECUTIVE MED SERVICES, PC |
| F&G MECHANICAL CORPORATION |
| FELIX EQUITIES, INC. |
| FLEET TRUCKING |
| FRANCIS A. LEE EXTERIOR RESTORATION |
| FRANK MICELLI JR CONTRACTING |
| FTI TRUCKING |
| G & G CONTRACTING, INC. |
| GILSANZ, MURRAY, & STEFICEK |
| GINO CRACOLICI & SONS, INC. |
| GOLDSTEIN ASSOCIATES PLLC |
| GRACE INDUSTRIES |
| GUY NORDENSON AND ASSOCIATES |
| HALLEN WELDING SERVICE |
| HELMSMAN MANAGEMENT SERVICES, INC. |
| HGC CONTRACTING CORP. |
| HIGH RISE HOISTING AND SCAFFOLDING |
| HIGH-RISE ELECTRIC, INC. |
| HP ENVIRONMENTAL |
| JP EQUIPMENT RENTAL MATERIALS, INC. |

| |
|---|
| KEVIN MCMANUS |
| KOCH SKANSKA, INC. |
| LAQUILLA CONSTRUCTION, INC. |
| LASTRADA GENERAL CONTRACTING CORP. |
| LESLIE E. ROBERTSON ASSOCIATES |
| LIBERTY MUTUAL GROUP |
| LIRO |
| LOCKWOOD, KESSLER & BARTLETT (LKB) |
| LUCIUS PITKIN |
| LZA TECH-DIVISION OF THORTON TOMASETTI |
| M. G. MCLAREN, P.C. |
| MANAFORT BROTHERS, INC. |
| MAZZOCCHI WRECKING, INC. |
| MEDCOR, INC. |
| MENT BROTHERS |
| MERIDIAN CONSTRUCTION GROUP |
| MG MCLAREN P.C. |
| MORETRENCH AMERICAN, CORP. |
| MRA ENGINEERING, PC |
| MUESER RUTLEDGE CONSULTING ENGINEERS |
| MUSCO SPORTS LIGHTING, LLC |
| NACIREMA INDUSTRIES |
| NEW YORK CRANE & EQUIPMENT CORP. |
| NICHOLSON CONSTRUCTION CO. |
| NICHOLSON/HEYWOOD JOINT VENTURE |
| OFF ROAD WELDING, INC. |
| THE OFFICES OF JAMES RUDERMAN, LLP |
| OLYMPIC PLUMBING AND HEATING |
| OVE ARUP & PARTNERS |
| PARSON GROUP |
| PETER SCALAMANDRE & SONS |
| PINNACLE ENVIRONMENTAL |
| PLAZA CONSTRUCTION CORP. |
| PRO SAFETY SERVICES, LLC |
| PT & L CONTRACTING CORP. |
| REGIONAL SCAFFOLD & HOISTING CO, INC. |
| RICH MARK ENVIRONMENTAL SERVICES, INC. |
| ROBER SILMAN ASSOCIATES |
| ROBERT C STEWART |

| |
|---|
| ROBERT ERRAT |
| ROBERT L GEROSA |
| RODAR ENTERPRISES, INC. |
| ROYAL GM, INC. |
| SAB TRUCKING |
| SAFEWAY ENVIRONMENTAL |
| SEMCOR EQUIPMENT |
| SEVERUD ASSOCIATES CONSULTING ENGINEERS |
| SHELDRAKE ORGANIZATION, INC. |
| SILVERADO CONTRACTORS |
| SILVERITE CONTRACTING |
| SIMPSON, GUMPERTZ, & HEGER |
| SKIDMORE, OWINGS & MERRILL LLP |
| STAR DELTA ELECTRIC |
| STIER, ANDERSON & MALONE |
| SUMMIT STRUCTURES LLC |
| TELENET COMMUNICATIONS |
| THYSSEN KRUPP ELEVATOR CO. |
| TOMASETTI GROUP |
| TORETTA TRUCKING |
| TOTAL SAFETY CONSULTING LLC |
| TUCCI EQUIPMENT RENTAL CORP |
| TULLY CONSTRUCTION |
| TURNER CONSTRUCTION COMPANY |
| ULTIMATE DEMOLITION/CS HAULING (JOINT VENTURE) |
| UNITED STATES REBAR |
| VANGUARD EQUIPMENT RENTALS |
| VERTICAL TECHNOLOGIES |
| VOLLMER ASSOCIATES |
| W HARRIS & SON INC. |
| WALTER WHITE TRUCKING |
| WEEKS MARINE, INC. |
| WEIDLINGER ASSOCIATES |
| WHITNEY CONTRACTING |
| WOLKOW BRAKER ROOFING |
| YANNUZZI & SONS, INC. |
| YONKERS CONTRACTING |
| YORK HUNTER CONSTRUCTION, LLC |
| ZIEGENFUSS DRILLING |

# EXHIBIT L – CLAIM FORM

WTC Debris Removal Litigation                                    Claim Form

## INSTRUCTIONS:

This Claim Form sets forth your claim for recovery under the Final Settlement Agreement.

**You only need to complete the portions of this Claim Form that apply to your claim.**

*All* Claim Forms must include responses to Part 1 (General Information), Part 2 (Preliminary Affirmations), Part 7 (Complaint/Notice of Claim), Part 8 (Eligibility for Payments), Part 9 (Lien Disclosures) and Part 10 (Marine Claims).

Check the boxes below that describe your claim and complete the specified Part(s) of the Claim Form:

☐ Primary Plaintiff is deceased (complete Part 3 regarding the personal representative);

☐ There is a Derivative Plaintiff (complete Parts 4 and 5);

☐ Derivative Plaintiff is deceased (complete Part 6 regarding the personal representative);

☐ Primary Plaintiff claims a Tier 2 Primary Qualifying Injury (complete Part 11);

☐ Primary Plaintiff claims a Tier 3 Primary Qualifying Injury (complete Part 12);

☐ Primary Plaintiff claims a Tier 4 Primary Qualifying Injury (complete Parts 13 and 14);

☐ Primary Plaintiff claims a Permanent Disability Fund payment (complete Part 15);

☐ Primary Plaintiff claims a Qualifying Surgery payment (complete Part 16);

☐ Primary Plaintiff claims a Mixed Orthopedic Injury payment (complete Part 17).

Please follow carefully all instructions in this Claim Form. All Capitalized terms in this Claim Form have the meaning ascribed to them in the Final Settlement Agreement.

Once this Claim Form is completed electronically, it must be printed and signed by all Plaintiffs, any Personal Representatives, and your lawyer. Before signing, it is important to ask your attorney any questions you have about this Claim Form. If someone else prepared this Claim Form for you, review its contents carefully. <u>You</u> are responsible for any material misrepresentations, material omissions or material concealment in this Claim Form.

This Claim Form and all supporting records can be submitted with your Release and Covenant not to Sue and must be submitted within forty-five days of the Final Settlement Agreement Effective Date.

## FRAUD WARNING:

> *Any person who knowingly presents false information or conceals material information called for on this Claim Form is guilty of a crime, including but not limited to perjury, and may be subject to criminal prosecution, confinement in prison, and monetary fines and penalties. In addition, any such person shall be denied any and all benefits of the settlement and shall be subject to court action seeking the return of any monies paid to that person as part of the settlement prior to discovery of the knowingly false or concealed information, as well as all costs, attorneys' fees and expenses incurred by the parties to the settlement as a result of the knowingly false or concealed information.*

**WTC Debris Removal Litigation**  **Claim Form**
**For Primary  Plaintiff**

| PART 1: GENERAL INFORMATION (*Provide Information Regarding Primary Plaintiff*) | | |
|---|---|---|
| **A. Current Legal Name:** | Plaintiff | Primary |
| | Family Name (Last), *and suffix if applicable* | Given Name (First)       M.I. |
| **B. Any Prior Legal Name(s):** | | |
| | Family Name (Last), *and suffix if applicable* | Given Name (First)       M.I. |
| **C. Identification Number:** | U.S. Social Security Number:   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 | |
| *Or Alternate Identification*   Type: | | No.: |
| **D. Date of Birth:**   Jan. 1, 1901 | **E. Primary Plaintiff is:**   Alive (skip Part 3) | |
| **F. Home Address:** | | |
| | Street Number and Street Name | Apt. No.  00000 |
| | City | State         Zip Code |
| **G. Marital Status:**   Single | **H. Date of Marriage to Derivative Plaintiff:**   [insert if applicable] | |
| **I. Counsel:**   Plaintiff's Attorney | | |

| PART 2: PRELIMINARY AFFIRMATIONS (*Must check all four items to affirm*): |
|---|
| ☐ Primary Plaintiff is included on the Eligible Plaintiff List with Primary Injury code: ___. |
| ☐ Primary Plaintiff worked or volunteered at the WTC Site or another location at which 9/11-related clean-up work occurred. |
| ☐ Primary Plaintiff did not recover from the September 11th Victim Compensation Fund. |
| ☐ Primary Plaintiff has no outstanding liens against  payments to be received by him or her under the Final Settlement Agreement or will satisfy fully any and all such liens against him or her. |

| PART 3: PERSONAL REPRESENTATIVE OF DECEASED PRIMARY PLAINTIFF (*Skip if alive*) | | |
|---|---|---|
| **A. Current Legal Name:** | Representative | Personal |
| | Family Name (Last), *and suffix if applicable* | Given Name (First)       M.I. |
| **B. Home Address:** | | |
| | Street Number and Street Name | Apt. No.  00000 |
| | City | State         Zip Code |
| **Attach probate order, court order or official document identifying Personal Representative.** | | |

**WTC D**EBRIS **R**EMOVAL **L**ITIGATION                                                    **C**LAIM **F**ORM
**F**OR **P**RIMARY  **P**LAINTIFF

---

| PART 4: DERIVATIVE PLAINTIFF GENERAL INFORMATION (*Skip if No Derivative Plaintiff*) |
|---|

**A. Current Legal Name:**    Plaintiff                                    Derivative

<span style="font-size:smaller">Family Name (Last), *and suffix if applicable*          Given Name (First)                M.I.</span>

**B. Any Prior Legal Name(s):**

<span style="font-size:smaller">Family Name (Last), *and suffix if applicable*          Given Name (First)                M.I.</span>

**C. Identification Number:**    U.S. Social Security Number:    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

*Or Alternate Identification*    Type:                          No.:

**D. Derivative Plaintiff is:**    Alive (skip Part 6)

**E. Home Address:**

<span style="font-size:smaller">Street Number and Street Name</span>                                    Apt. No.

00000

<span style="font-size:smaller">City                                          State                    Zip Code</span>

| PART 5: REQUIRED AFFIRMATIONS (*Skip if No Derivative Plaintiff*) |
|---|

**A. Required Affirmations from Primary Plaintiffs** (*Must check both items to affirm*):

☐ Primary Plaintiff lawfully married the Derivative Plaintiff before Sept. 11, 2001.

☐ Primary Plaintiff remained lawfully married to and cohabitated with Derivative Plaintiff as of his or her last day of work or volunteer service at the WTC Site and/or at another location at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims.

**B. Required Affirmations from Derivative Plaintiffs** (*Must check all three items to affirm*):

☐ Derivative Plaintiff is included on the Eligible Plaintiff List.

☐ Derivative Plaintiff lawfully married the Primary Plaintiff before Sept. 11, 2001.

☐ Derivative Plaintiff remained lawfully married to and cohabitated with the Primary Plaintiff as of the Primary Plaintiff's last day of work or volunteer efforts at the WTC Site and/or at another location at which the Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims.

| PART 6: PERSONAL REPRESENTATIVE OF DECEASED DERIVATIVE PLAINTIFF (*Skip if alive*) |
|---|

**A. Current Legal Name:**    Representative                          Personal

<span style="font-size:smaller">Family Name (Last), *and suffix if applicable*          Given Name (First)                M.I.</span>

**B. Home Address:**

<span style="font-size:smaller">Street Number and Street Name</span>                                    Apt. No.

00000

<span style="font-size:smaller">City                                          State                    Zip Code</span>

**Attach probate order, court order or official document identifying Personal Representative.**

**WTC Debris Removal Litigation**                          **Claim Form**
                                                    **For Primary  Plaintiff**

---

| **Part 7: Complaint/Notice of Claim** |
|---|

| **Type of Complaint** (*Select the most accurate box and fill in details*): |
|---|

☐ Plaintiff(s) have a complaint pending in the Southern District of New York (S.D.N.Y.) with civil action number: <u>00 CV 00000</u>, in Master Docket <u>Not Applicable</u>.

☐ Plaintiff(s) submitted a Notice of Claim to the City of New York on <u>[insert date]</u> and have filed a complaint pending in the S.D.N.Y. *against Other Defendants* with civil action number: <u>00 CV 00000</u>, in Master Docket <u>Not Applicable</u>.

☐ Plaintiff(s) submitted a Notice of Claim to the City of New York on <u>[insert date]</u> but have *not* filed a complaint against the Insureds or any Other Defendant in the S.D.N.Y. or other venue.

☐ Plaintiff(s) have a complaint pending *outside* the S.D.N.Y. in <u>[insert name of court]</u> with civil action number: <u>[insert civil action number]</u>.

| **Part 8: Eligibility For Benefits** |
|---|

| **A. Work Verification** (*Check either first or second box*): |
|---|

☐ Primary Plaintiff is on the work verification pre-approval list.

☐ Primary Plaintiff is *not* on the work verification pre-approval list, but is providing with this Claim Form documentation sufficient for the Allocation Neutral to conclude that Primary Plaintiff worked or volunteered at the WTC Site or at another location at which 9/11-related clean-up work or other services occurred and which form the basis for the Primary Plaintiff's Debris Removal Claims, consistent with the Work Verification Procedure attached as Exhibit B to the Final Settlement Agreement.

| **B. Release and Covenant Not to Sue and Second Injury Letter** (*Check <u>all</u> boxes that apply*): |
|---|

☐ Primary Plaintiff has signed the Release and Covenant Not to Sue.

☐ Derivative Plaintiff has signed the Release and Covenant Not to Sue.

☐ Primary Plaintiff signed the Second Injury Letter in the presence of a Notary Public.

| **C. Cancer Insurance Policy Eligibility** (*Check either first or second box*): |
|---|

☐ Primary Plaintiff has been provided with a Cancer Insurance Policy application form, believes he or she is eligible, and will apply for coverage.

☐ Primary Plaintiff has been provided with a Cancer Insurance Policy application form and understands that he or she must apply if eligible, but *does not intend* to apply for coverage because the Primary Plaintiff already has or had a cancer covered by the Cancer Insurance Policy.

**WTC DEBRIS REMOVAL LITIGATION**                    **CLAIM FORM**
                                                     **FOR PRIMARY PLAINTIFF**

---

| PART 9: LIEN DISCLOSURES |
|---|

**A. Government Benefits** (*Select box 1 or box 2 – if box 2, fill in details*):

☐ **1.** Primary Plaintiff *has not received* any government healthcare benefits giving rise to a lien against his or her payments under the Settlement since his or her first date of alleged exposure (*Skip to Part 9.B*); **OR**

[Please note: Medical, screening, monitoring and treatment through the City of New York, or Logistics Heath, Inc. do not give rise to liens. In addition, any WTC medical screening, monitoring and treatment funded through or by NIOSH, including, but not limited to, the WTC Screening Monitoring and Treatment Programs administered by and through the Mount Sinai Medical Center and its affiliated entities, Long Island University Hospital, Bellevue Hospital and University of Medicine and Dentistry of New Jersey (EOSHI) do not give rise to liens unless the Plaintiff has sought workers' compensation benefits for the injury identified by or through such programs.]

☐ **2.** Primary Plaintiff *has received* government healthcare benefits giving rise to a lien against his or her payments under the Settlement since his or her first date of alleged exposure, specifically (*Check all that apply and fill in details*):

☐ Medicare – HICN or Medicare ID No. [insert number]

☐ Medicaid

☐ Department of Veterans Affairs (VA)

☐ TRICARE

☐ Other government healthcare program: [insert name of program]

**B. Benefits from Non-Governmental Healthcare Providers or Insurers** (*Select box 1 or box 2*):

☐ **1.** Primary Plaintiff *has* had a non-governmental healthcare provider or insurer pay for care related to his or her Debris Removal Claims and related injuries (*check all that apply and fill in details*):

☐ Private Health Insurance Policy No. [insert number], through [insert name of Insurance Company(-ies)]

☐ Employer Health Plan through [insert name of Employer(s)]

☐ Workers' Compensation benefit(s) through [insert name of Employer(s)]

☐ Medicare Advantage Plan through [insert name of Private Insurer]

☐ MediGap/Medicare Supplemental Insurance through [insert name of Private Insurer]

☐ Other [explain compensation program and identify source]

☐ **2.** Primary Plaintiff *has not* received any of the above-mentioned benefits at any time since his or her first date of alleged exposure.

**C. Benefits Correspondence** (*Check the most accurate box*):

☐ Primary Plaintiff *has received* correspondence or inquiries from one of the above-mentioned healthcare benefit providers and has provided those materials to his or her counsel. [Plaintiff *must* provide such materials if they have been received.]

☐ Primary Plaintiff *has not received* correspondence or inquiries from one of the above-mentioned healthcare benefit providers.

**WTC DEBRIS REMOVAL LITIGATION**                    **CLAIM FORM**
                                                    **FOR PRIMARY  PLAINTIFF**

---

| PART 10: MARINE CLAIMS |
|---|

**Primary Plaintiff's Allegations of Marine Exposure** (*Select box 1 or box 2 – if box 2, fill in details*):

☐ **1.** Primary Plaintiff ***does not allege*** exposure on a vessel, such as a barge, owned by the City of New York or Weeks Marine, Inc., or at a pier, dock, or other location used by such vessels.

☐ **2.** Primary Plaintiff ***alleges*** exposure on a vessel, such as a barge, owned by the City of New York or Weeks Marine, Inc., or at a pier, dock, or other location used by such vessels ("Alleged Marine Exposure") (*Complete the three sentences below with details*):

Primary Plaintiff's employer during his or her Alleged Marine Exposure was: [insert employer name].

Primary Plaintiff's work relating to his or her Alleged Marine Exposure consisted of: [insert description of work at marine locations, including role and responsibilities].

Alleged Marine Exposure constituted 00% of Primary Plaintiff's total alleged exposure giving rise to his or her Debris Removal Claims.

---

| PART 11: MEDICAL CRITERIA FOR PLAINTIFFS CLAIMING A TIER 2 PRIMARY QUALIFYING INJURY |
|---|

To qualify for Tier 2, a Primary Plaintiff must provide Qualifying Medical Records to document any of the following conditions. Although Primary Plaintiffs in Tier 2 can only receive payment for one (1) Qualifying Injury, you may submit documentation for more than one injury.

**Check the appropriate box(es) and attach Qualifying Medical Record(s) that provide the required documentation specified below:**

☐ A Physician Diagnosis of **Chronic Laryngitis or Chronic Pharyngitis** (or physician diagnoses of Laryngitis or Pharyngitis occurring with such frequency that it amounts to a chronic disease*) on or after September 11, 2001.

[Please note: Physician Diagnoses of Acute Laryngitis, Acute Pharyngitis, and Upper Respiratory Infections ("URI") are examples of medical conditions, findings or observations that do not qualify.]

☐ A Physician Diagnosis of **Chronic Rhinosinusitis, Chronic Sinusitis, Chronic Rhinitis or Vocal Cord Dysfunction** (or physician diagnoses of Rhinosinusitis, Rhinitis, or Sinusitis occurring with such frequency that it amounts to a chronic disease*) on or after September 11, 2001.

[Please note: Physician Diagnoses of Allergic Rhinitis, Acute Sinusitis, and Acute Rhinitis are examples of medical conditions, findings or observations that do not qualify.]

☐ A Physician Diagnosis of **Gastroesophageal Reflux Disease (GERD), Barrett's Esophagus, Esophagitis, Esophageal Reflux, Esophageal Ulcer and Esophageal Stricture, or GI Stricture** (or physician diagnoses of Acid Reflux occurring with such frequency that it amounts to a chronic disease*) on or after September 11, 2001.

[Please note: Physician Diagnoses of Heartburn, Chronic Heartburn, Laryngeal Reflux, Gastric Ulcer, Gastric Regurgitation and Gastritis are examples of medical conditions, findings or observations that do not qualify.]

☐ A Physician Diagnosis of **Sleep Disordered Breathing** on or after September 11, 2001.

[Please note: Symptoms of sleep disorders (*e.g.*, snoring or insomnia) are examples of findings or observations that do not qualify.]

☐ **Death** certificate, hospital note, or other authoritative document establishing death after his or her alleged exposure at the WTC Site or other location giving rise to his or her Debris Removal Claims against any Insured and before the Final Settlement Agreement Effective Date.

☐ A Physician Diagnosis of a **Pre-Cancerous Condition** (dysplasia, pre-malignant, preneoplasia, intraepithelial neoplasia, adenomatous colon polyps or actinic keratosis conditions) on or after September 11, 2001.

☐ A Physician Diagnosis of **Skin Cancer other than Melanoma** (including without limitation basal cell carcinoma or squamous cell carcinoma) on or after September 11, 2001.

☐ A Physician Diagnosis of **Hypertension, Heart Attack, or Miscellaneous Cardiac Condition** on or after September 11, 2001.

[Please note: Physician Diagnoses of congenital heart defects (*e.g.*, septal defects, valve defects, or other malformations), heart conditions caused by infectious diseases (*e.g.*, bacterial, viral, fungal or parasitic conditions), and heart conditions caused by autoimmune diseases (*e.g.*, lupus) do not qualify as Miscellaneous Cardiac Conditions.]

☐ A Physician Diagnosis of a **Restrictive Lung Disease** not attributable to obesity (BMI under 30) on or after September 11, 2001.

\* Determination of whether multiple diagnoses constitute a diagnosis of a chronic condition is up to the Allocation Neutral's independent judgment.

Qualifying Medical Records supporting the above diagnosis(es) are attached as QMR No. [Fill in Page/Page Range].

WTC Debris Removal Litigation

CLAIM FORM
For Primary  Plaintiff

---

| Part 12: Medical Criteria for Plaintiffs Claiming a Tier 3 Primary Qualifying Injury |
|---|

To qualify for Tier 3, a Primary Plaintiff must provide Qualifying Medical Records to document any of the following conditions.  Although Primary Plaintiffs in Tier 3 can only receive payment for one (1) Qualifying Injury, you may submit documentation for more than one injury.

☐ **A. To demonstrate COPD ("A0"), Primary Plaintiff attaches:**

A Physician Diagnosis of COPD, Chronic Bronchitis, Emphysema, Bullous Lung Disease, Small Airway(s) Disease or Obstructive Airway(s) Disease on or after September 11, 2001.

[Please note: Physician Diagnoses of Obstructive Lung Defect, Small Obstructive Lung Defect, Ground Glass Syndrome, Peripheral Airway(s) Dysfunction, WTC Cough and Chronic Cough are examples of medical conditions, findings or observations that do not qualify.]

☐ **B. To demonstrate Laryngitis/Pharyngitis ("D1"), Primary Plaintiff attaches:**

A Physician Diagnosis of Chronic Laryngitis, Chronic Pharyngitis (or physician diagnoses of Laryngitis or Pharyngitis occurring with such frequency that it amounts to a chronic disease*) on or after September 11, 2001; *AND* (*select one of the following*):

[Please note: Physician Diagnoses of Acute Laryngitis, Acute Pharyngitis, and Upper Respiratory Infections ("URI") are examples of medical conditions, findings or observations that do not qualify.]

☐ Physician evaluation of audibility, intelligibility, and functional efficiency meet many needs of everyday speech; *OR*

☐ Strobovideolaryngoscopy ("SVL") where objective voice and speech measures, and Voice Handicap Index ("VHI") are mildly to moderately abnormal.

☐ **C. To demonstrate Chronic Rhinosinusitis ("E1"), Primary Plaintiff attaches:**

A Physician Diagnosis of Chronic Rhinosinusitis, Chronic Sinusitis, Chronic Rhinitis or Vocal Cord Dysfunction (or physician diagnoses of Rhinosinusitis, Rhinitis, or Sinusitis occurring with such frequency that it amounts to a chronic disease*) on or after September 11, 2001; *AND* (*select one of the following*):

[Please note: Physician Diagnoses of Allergic Rhinitis, Acute Sinusitis, and Acute Rhinitis are examples of medical conditions, findings or observations that do not qualify.]

☐ Endoscopy that shows mild to moderate mucosal thickening, mild to moderate obstruction of nasopharynx or opharynx; *OR*

☐ Sinus CT that shows mild to moderate mucosal thickening, mild to moderate obstruction of nasopharynx or opharynx; *OR*

☐ MRI that shows mild to moderate mucosal thickening, mild to moderate obstruction of nasopharynx or opharynx; *OR*

☐ Laryngoscopy that shows mild to moderate alteration in vocal fold (cord) function.

**WTC Debris Removal Litigation**                                           **Claim Form**
                                                                **For Primary   Plaintiff**

---

☐ **D. To demonstrate an Upper Digestive condition ("F1"), Primary Plaintiff attaches:**

A Physician Diagnosis of Gastroesophageal Reflux Disease (GERD), Barrett's Esophagus, Esophagitis, Esophageal Reflux, Esophageal Ulcer and Esophageal Stricture, or GI Stricture (or physician diagnoses of Acid Reflux occurring with such frequency that it amounts to a chronic disease*) on or after September 11, 2001; **AND**

[Please note: Physician Diagnoses of Heartburn, Chronic Heartburn, Laryngeal Reflux, Gastric Ulcer, Gastric Regurgitation and Gastritis are examples of medical conditions, findings or observations that do not qualify.]

An endoscopy that reveals mild or moderate findings in the esophagus such as inflammation, esophagitis, erosions, and mucosal breaks.

☐ **E. To demonstrate Sleep Apnea ("G1"), Primary Plaintiff attaches:**

A Physician Diagnosis of Obstructive Sleep Apnea or Sleep Apnea on or after September 11, 2001; **AND**

[Symptoms of sleep disorders (*e.g.*, snoring or insomnia) are examples of findings or observations that do not qualify.]

A Polysomnograph demonstrating obstructive sleep apnea.

☐ **F. To demonstrate Restrictive Lung Disease ("K1"), Primary Plaintiff attaches:**

A Physician Diagnosis of a Restrictive Lung Disease not attributable to obesity on or after September 11, 2001; **AND**

Documentation of Primary Plaintiff's weight and height as of the date of the test; **AND**

A full Pulmonary Function Test showing:

TLC less than or equal to 79% predicted; **and**

FVC less than or equal to 79% predicted; **and**

FEV1/FVC (%)>70% predicted.

---

\* Determination of whether multiple diagnoses constitute a diagnosis of a chronic condition is up to the Allocation Neutral's independent judgment.

Qualifying Medical Records supporting the above diagnosis(es) as well as related impairment documentation are attached as QMR No. [Fill in Page/Page Range].

**WTC DEBRIS REMOVAL LITIGATION**

**CLAIM FORM**
**FOR PRIMARY  PLAINTIFF**

---

PART 13: MEDICAL CRITERIA FOR PLAINTIFFS CLAIMING A TIER 4 PRIMARY QUALIFYING INJURY

To qualify for Tier 4, a Primary Plaintiff must provide Qualifying Medical Records to document one or more of the Tier 4 Qualifying Injuries.  Although Primary Plaintiffs in Tier 4 can receive payment for only one Secondary Qualifying Injury, you may submit documentation for more than two injuries and allow the Allocation Neutral to determine which are your Primary and Secondary Qualifying Injuries.

**A. COPD –** ☐ Primary Plaintiff seeks recovery for Chronic Obstructive Pulmonary Disease (COPD), Chronic Bronchitis, Emphysema, Bullous Lung Disease, Small Airway(s) Disease or Obstructive Airway(s) Disease.

**1. Qualifying Injury**

☐ Primary Plaintiff has a Physician Diagnosis of [specify Qualifying Injury], attached as QMR No. [fill in].

**2. Diagnostic Support (*a or b required for Severity Levels A2-A4*)**

☐ **a.** Spirometry with Post-Bronchodilator $FEV_1/FVC \leq 0.7$ ($\leq 70\%$) is attached as QMR No. [fill in]; *OR*

☐ **b.** (*For Emphysema only*) CT scan that states as a conclusion any or all of the following: Emphysema (panlobular, panacinar, or paraseptal), Bullous disease, or Giant Bullae, is attached as QMR No. [fill in].

[Please note: Conclusions on a CT scan reflecting mild or minor emphysematous changes, air-trapping, pneumatoceles, cysts or cystic disease, and/or bronchiectasis do not qualify.]

**3. Impairment Records (*required for Severity Levels A1-A4*)**

☐ **a. For Severity Level A1 –** impairment is demonstrated by (*check one of the following*):

☐ Pulmonary Function Test ("PFT") showing FVC of $\leq 79\%$ of predicted *or* $FEV_1$ of $\leq 79\%$ of predicted, attached as QMR No. [fill in]; *OR*

☐ Carbon Monoxide Diffusion Capacity Test showing DLCO of $\leq 74\%$ of predicted, attached as QMR No. [fill in]; *OR*

☐ Cardio-Pulmonary Stress Test showing $VO_2$ max of $\leq 25ml/(kg\cdot min)$ *or* $VO_2$ max of $\leq 7.1$ METs, attached as QMR No. [fill in].

☐ **b. For Severity Levels above A1 –** impairment is demonstrated by two tests (can be Pulmonary Function Tests, Carbon Monoxide Diffusion Capacity Tests, Cardio-Pulmonary Stress Tests or a combination thereof):

**Most recent test**, which satisfies the COPD Impairment Criteria for Severity Level N/A, is attached as QMR No. [fill in]; *AND*

**Other confirming test at least three months earlier**, which satisfies the COPD Impairment Criteria for Severity Level N/A, is attached as QMR No. [fill in].

[Please note: If Primary Plaintiff is deceased and cannot provide a second test due to his or her death before such second test could be administered, this requirement will be waived and Impairment will be graded by the most recent test.]

---

**4. Timing of Diagnosis (*a or b required*):**

☐ **a.** Primary Plaintiff was first diagnosed with a COPD Qualifying Injury ***before* his or her first alleged exposure**, which occurred on [insert date], **AND** (*check one of the following*):

☐ The condition has *worsened* since his or her first date of alleged exposure. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. [fill in]]; *or*

☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ **b.** Primary Plaintiff was first diagnosed with a COPD Qualifying Injury on [insert date] ***after* his or her first alleged exposure**, which occurred on [insert date], as established by QMR No. [fill in], **AND** (*check one of the following*):

☐ First Physician Diagnosis is less than 2.5 years after first day of alleged exposure; *or*

☐ First Physician Diagnosis is 2.5 years or more after the first day of alleged exposure

---

**B. ILD –** ☐ Primary Plaintiff claims recovery for Chemical Pneumonitis, BOOP, Eosinophilic or other Granulomatosis, Hypersensitivity Pneumonitis, Sarcoidosis, Silicosis, Asbestosis, Pulmonary or Interstitial Fibrosis, Interstitial Lung Disease, Pneumoconiosis or Wegener's Granulomatosis.

**1. Qualifying Injury**

☐ Primary Plaintiff has a Physician Diagnosis of [specify Qualifying Injury], attached as QMR No. [fill in].

**2. Diagnostic Support (*a or b required*):**

☐ **a.** A Chest CT or X-ray finding supporting such diagnosis, such as bibasilar reticular abnormalities (*e.g.*, increased interstitial markings, honey-combing, hazy opacifications that are worse in the subpleural and inferior regions) with or without ground glass opacities, is attached as QMR No. [fill in]; *OR*

☐ **b.** A Lung biopsy that supports such diagnosis, is attached as QMR No. [fill in].

**3. Impairment Records (*a, b, or c is required for Severity Levels B1-B4*):**

☐ **a. For Severity Level B1**, impairment is demonstrated by a Pulmonary Function Test showing TLC ≤ 79% predicted; ***and*** FVC ≤ 79% predicted; ***and*** $FEV_1/FVC$ (%)> 70% predicted, attached as QMR No. [fill in].

☐ **b. For Severity Levels above B1**, impairment is demonstrated by:

**The most recent Full Pulmonary Function Test or other Full Pulmonary Function Test within the last 12 months**, which satisfies the ILD Impairment Criteria for Severity Level <u>N/A</u>, is attached as QMR No. <u>[fill in]</u>; *AND* (*select one of the following*):

☐ **A second PFT at least three months prior to the most recent test**, which satisfies the ILD Impairment Criteria for Severity Level <u>N/A</u>, is attached as QMR No. <u>[fill in]</u>; *or*

[Please note: If Primary Plaintiff is deceased and cannot provide a second test due to his or her death before such second test could be administered, this requirement will be waived and Impairment will be graded by the most recent test.]

☐ **A high-resolution CT scan** that confirms impairment at the B2, B3, or B4 levels

[Please note: The Allocation Neutral shall be responsible for determining whether a CT scan meets this criteria.]

☐ **c. For Sarcoidosis at Severity Levels B3-B4,** a CT scan and/or X-ray that satisfies the ILD Impairment Criteria for Severity Level <u>N/A</u>, attached as QMR No. <u>[fill in]</u>.

**4. Timing of Onset (*a or b required*):**

☐ Primary Plaintiff was first diagnosed with an ILD Qualifying Injury *before* **his or her first alleged exposure**, which occurred on <u>[insert date]</u>, *AND* (*check one of the following*):

☐ The condition has *worsened* since initial WTC work. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. <u>[fill in]</u>.]; *or*

☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ Primary Plaintiff was first diagnosed with an ILD Qualifying Injury on <u>[insert date]</u> *after* **his or her first alleged exposure**, which occurred on <u>[insert date]</u>, as established by QMR No. <u>[fill in]</u>, *AND* (*check one of the following*):

☐ First Physician Diagnosis is less than 2.5 years after first day of alleged exposure; *or*

☐ First Physician Diagnosis is 2.5 years or more after the first day of alleged exposure.

**C. Asthma/RADS –** ☐ Primary Plaintiff claims recovery for Asthma, Reactive Airway(s) Disease ("RADS"), Chronic Asthmatic Bronchitis, Asthma Exacerbation, Airway(s) Hyperreactivity or Hyperreactive Airway(s).

**1. Qualifying Injury**

☐ Primary Plaintiff has a Physician Diagnosis of <u>[specify Qualifying Injury]</u>, attached as QMR No. <u>[fill in]</u>.

[Please Note: Physician Diagnoses of Hyperresponsiveness, Bronchospasm, and WTC Syndrome are examples of medical conditions, findings or observations that do not qualify.]

WTC DEBRIS REMOVAL LITIGATION

CLAIM FORM
FOR PRIMARY PLAINTIFF

---

**2. Diagnostic Support (*a or b is required for Severity Levels C2-C4*):**

☐ **a.** A Pulmonary Function Test with Pre-Bronchodilator $FEV_1$ < 80% of predicted and Post-Bronchodilator $FEV_1$ improvement of 12% or 250 cc, is attached as QMR No. [fill in]

☐ **b.** A Methacholine Challenge Test with ≥ 20% decrease in $FEV_1$ at or below 8 mg/ml, is attached as QMR No. [fill in]

**3. Impairment Records (*a, b, c, d, or e required for Severity Levels C1-C4, as specified*):**

☐ **a. For Severity Level C1** (*select one of the following*):

☐ A Pulmonary Function Test with post-Bronchodilator $FEV_1$ of ≤ 80% of predicted, attached as QMR No. [fill in].

☐ Pharmacy records or physician notes of any steroid or bronchodilator use, attached as QMR No. [fill in].

☐ **b. For Severity Levels C1-C4 –** A Methacholine Challenge Test that meets the Impairment Criteria for Severity Level N/A, is attached as QMR No. [fill in]

☐ **c. For Severity Levels above C1 two or three Pulmonary Function Tests (PFTs):**

One PFT ("PFT 1"), which satisfies the Asthma/RADS Impairment Criteria for Severity Level N/A, is attached as QMR No. [fill in]; *AND*

A second PFT ("PFT 2") at least three months prior to PFT 1, which satisfies the Asthma/RADS Impairment Criteria for Severity Level N/A, is attached as QMR No. [fill in]; *AND*

A third PFT (*if available*) at least three months prior to PFT 2, which satisfies the Asthma/RADS Impairment Criteria for Severity Level N/A, is attached as QMR No. [fill in].

☐ **d. For Severity Levels C1-C4** (*include all of the following*):

A Methacholine Challenge Test with ≥ 20% decrease in $FEV_1$, attached as QMR No. [fill in]; *and/or*

A Pulmonary Function Test, attached as QMR No. [fill in]; *and/or*

Two sets of Pharmacy/Medical records at least six months apart confirming Not Applicable, are attached as QMR Nos. [fill in numbers]; *and/or*

Three sets of Pharmacy/Medical Records dated 2008-2010 documenting a course of systemic steroids (if applicable, must also provide other pharmacy records), are attached as QMR Nos. [fill in numbers]

☐ **e. For Severity Level C4** (*Complete if not met by other criteria*):

A physician statement issued in the course and in furtherance of the Primary Plaintiff's medical care and not upon the Primary Plaintiff's or his or her counsel's request that Asthma/RADS Qualifying Injury not controlled despite use of [select medication use], attached as QMR No. [fill in]; *AND*

Qualifying Medical Records demonstrating (*Select either option below and complete sub-parts*):

☐ Primary Plaintiff's ingestion of one of the following medications for at least six months daily (*select any of the following*):

☐ ≥ 20 mg of Prednisone per day, attached as QMR No. [fill in];

☐ ≥ 16 mg of Methylprednisolone per day, attached as QMR No. [fill in]; *or*

☐ ≥ 3 mg of Dexamethasone per day, attached as QMR No. [fill in].

☐ Physician statement that the Primary Plaintiff cannot tolerate long-term daily oral steroid use, attached as QMR No. [fill in], and other records indicating Primary Plaintiff's ingestion of one of the following medications for four (4) courses within one year (*select any of the following*):

☐ ≥ 20 mg of Prednisone per day, attached as QMR No. [fill in];

☐ ≥ 16 mg of Methylprednisolone per day, attached as QMR No. [fill in]; *or*

☐ ≥ 3 mg of Dexamethasone per day, attached as QMR No. [fill in].

**4. Timing of Onset (*a or b is required*):**

☐ **a.** Primary Plaintiff was first diagnosed with an Asthma/RADS Qualifying Injury *before* **his or her first alleged exposure**, which occurred on [insert date], *AND* (*check one of the following*):

☐ The condition has *worsened* since his or her first date of alleged exposure. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. [fill in].]; *or*

☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ **b.** Primary Plaintiff was first diagnosed with an Asthma/RADS Qualifying Injury on [insert date] *after* **his or her first alleged exposure**, which occurred on [insert date], as established by QMR No. [fill in], *AND* (*check one of the following*):

☐ First Physician Diagnosis is less than 7 months after first day of alleged exposure; *or*

☐ First Physician Diagnosis is 7 months or more after the first day of alleged exposure

---

**D. Laryngitis/Pharyngitis –** ☐ Primary Plaintiff claims recovery for Chronic Laryngitis or Chronic Pharyngitis.

**1. Qualifying Injury (*a or b is required*):**

☐ **a.** Primary Plaintiff has a Physician Diagnosis of [specify Qualifying Injury], attached as QMR No. [fill in].

[Please note: Physician Diagnoses of Acute Laryngitis, Acute Pharyngitis, and Upper Respiratory Infections ("URI") are examples of medical conditions, findings or observations that do not qualify.]

☐ **b.** Primary Plaintiff has multiple physician diagnoses of [specify Laryngitis or Pharyngitis], attached as QMR Nos. [fill in range], demonstrating that the condition occurs with such frequency that it amounts to a chronic disease.

**2. Diagnostic Support (*required for Severity Levels D2-D3*):**

☐ A record from a physical examination or Endoscopy, including Laryngoscopy or Pharyngoscopy finding redness, inflammation and/or swelling of pharyngeal or laryngeal mucosal membranes, is attached as QMR No. [fill in].

**3. Impairment Records (*required for Severity Levels D1-D3*):**

☐ **a. For Severity Level D1 –** physician evaluation of audibility, intelligibility, and functional efficiency meet many needs of everyday speech satisfies the Laryngitis/Pharyngitis Impairment Criteria, is attached as QMR No. [fill in]; ***OR***

☐ **b. For Severity Levels D1-D3 –** physician evaluation of audibility, intelligibility, and functional efficiency meet many needs of everyday speech satisfies the Laryngitis/Pharyngitis Impairment Criteria, is attached as QMR No. [fill in].

**4. Timing of Onset (*a or b is required*):**

☐ **a.** Primary Plaintiff was first diagnosed with a Laryngitis/Pharyngitis Qualifying Injury ***before*** **his or her first alleged exposure**, which occurred on [insert date], ***AND*** (*check one of the following*):

☐ The condition has *worsened* since his or her first date of alleged exposure. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. [fill in].]; *or*

☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ **b.** Primary Plaintiff was first diagnosed with a Laryngitis/Pharyngitis Qualifying Injury on [insert date] ***after*** **his or her first alleged exposure**, which occurred on [insert date], as established by QMR No. [fill in], ***AND*** (*check one of the following*):

☐ First Physician Diagnosis is less than 7 months after first day of alleged exposure; ***or***

☐ First Physician Diagnosis is 7 months or more after the first day of alleged exposure.

---

**E. Chronic Rhinosinusitis –** ☐ Primary Plaintiff claims recovery for Chronic Rhinosinusitis, Chronic Rhinitis, Chronic Sinusitis or Vocal Cord Dysfunction.

**1. Qualifying Injury (*a or b is required*):**

☐ **a.** Primary Plaintiff has a Physician Diagnosis of [specify Qualifying Injury], attached as QMR No. [fill in]; *OR*

[Please note: Physician Diagnoses of Allergic Rhinitis, Acute Sinusitis, and Acute Rhinitis are examples of medical conditions, findings or observations that do not qualify.]

☐ **b.** Primary Plaintiff has multiple physician diagnoses of [specify condition], attached as QMR Nos. [fill in range], demonstrating that the condition occurs with such frequency that it amounts to a chronic disease.

**2. Diagnostic Support (*required for Severity Levels E1-E3*)**

☐ An endoscopy, Sinus CT, or MRI that shows mucosal thickening, obstruction of the nasopharynx or opharynx is attached as QMR No. [fill in].

**3. Impairment Records (*required for Severity Levels E1-E3, as specified*)**

☐ **a. For Severity Level E1 –** Nasal endoscopy that shows mucosal thickening, obstruction of the nasopharynx or opharynx is attached as QMR No. [fill in].

☐ **b. For Severity Level E1-E3 –** Sinus CT scan or MRI that shows mucosal thickening, obstruction of the nasopharynx or opharynx, establishing Severity Level N/A impairment is attached as QMR No. [fill in].

☐ **c. For Severity Level E1-E3 –** Laryngoscopy that shows alteration in vocal fold (cord) function establishing Severity Level N/A impairment is attached as QMR No. [fill in].

**4. Timing of Onset (*a or b is required*):**

☐ **a.** Primary Plaintiff was first diagnosed with a Chronic Rhinosinusitis Qualifying Injury *before* **his or her first alleged exposure**, which occurred on [insert date], *AND* (*check one of the following*):

☐ The condition has *worsened* since his or her first date of alleged exposure. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. [fill in].]; *or*

☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ **b.** Primary Plaintiff was first diagnosed with a Chronic Rhinosinusitis Qualifying Injury on [insert date] *after* **his or her first alleged exposure**, which occurred on [insert date], as established by QMR No. [fill in], *AND* (*check one of the following*):

☐ First Physician Diagnosis is less than 7 months after first day of alleged exposure; *or*

☐ First Physician Diagnosis is 7 months or more after the first day of alleged exposure

---

**F. Upper Digestive –** ☐ Primary Plaintiff claims recovery for Gastroesophageal Reflux Disease (GERD), Barrett's Esophagus, Esophagitis, Esophageal Reflux, Esophageal Ulcer and Esophageal Stricture, or GI Stricture.

**1. Qualifying Injury (*a or b is required*):**

☐ **a.** Primary Plaintiff has a Physician Diagnosis of [specify Qualifying Injury], attached as QMR No. [fill in]; ***OR***

[Please note: Physician Diagnoses of Heartburn, Chronic Heartburn, Laryngeal Reflux, Gastric Ulcer, Gastric Regurgitation and Gastritis are examples of medical conditions, findings or observations that do not qualify.]

☐ **b.** Primary Plaintiff has multiple physician diagnoses of Acid Reflux, attached as QMR Nos. [fill in range], demonstrating that the condition occurs with such frequency that it amounts to a chronic disease.

**2. Impairment Records (*required for Severity Levels F1-F2, as specified*):**

☐ **a. For Severity Level F1 –** Primary Plaintiff's post-work endoscopy reveals mild or moderate findings in the esophagus such as inflammation, esophatigis, erosion and/or mucosal breaks, and is attached as QMR No. [fill in].

☐ **b. For Severity Level F2 –** Primary Plaintiff's post-work endoscopy reveals severe findings in the esophagus such as Barrett's esophagus, benign peptic esophageal stricture, ulcers, hemorrhage or severe esophagitis, and is attached as QMR No. [fill in].

**3. Timing of Onset (*a or b is required*):**

☐ **a.** Primary Plaintiff was first diagnosed with an Upper Digestive Qualifying Injury ***before his or her first alleged exposure***, which occurred on [insert date], ***AND*** (*check one of the following*):

☐ The condition has *worsened* since his or her first date of alleged exposure. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. [fill in].]; *or*

☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ **b.** Primary Plaintiff was first diagnosed with an Upper Digestive Qualifying Injury on [insert date] ***after his or her first alleged exposure***, which occurred on [insert date], as established by QMR No. [fill in], ***AND*** (*check one of the following*):

☐ First Physician Diagnosis is less than 7 months after first day of alleged exposure; ***or***

☐ First Physician Diagnosis is 7 months or more after the first day of alleged exposure

**WTC DEBRIS REMOVAL LITIGATION**                    **CLAIM FORM**
                                              **FOR PRIMARY  PLAINTIFF**

---

**G. Sleep Disorders –** ☐ Primary Plaintiff claims Obstructive Sleep Apnea, Sleep Apnea or other Sleep Disordered Breathing.

**1. Qualifying Injury**

☐ Primary Plaintiff has a Physician Diagnosis of [specify Qualifying Injury], attached as QMR No. [fill in].

[Please note: Symptoms of sleep disorders (*e.g.*, snoring or insomnia) are examples of findings or observations that do not qualify for Tier 4.]

**2. Diagnostic Support (*required for Severity Levels G1-G2*):**

☐ Primary Plaintiff has a polysomnogram demonstrating obstructive sleep apnea, attached as QMR No. [fill in].

**3. Impairment Records (*required for Severity Levels G1-G2, as specified*):**

☐ **a. For Severity Level G1 & G2** – For Primary Plaintiff's most recent post-work polysomnogram demonstrating obstructive sleep apnea is attached as QMR No. [fill in].

☐ **b. For Severity Level G2** – Primary Plaintiff has medical records indicating current treatment with CPAP/BiPAP or need to have CPAP/BiPAP titration, attached as QMR No. [fill in].

**4. Timing of Onset (*a or b required*):**

☐ **a.** Primary Plaintiff was first diagnosed with an Sleep Disorder Qualifying Injury ***before his or her first alleged exposure***, which occurred on [insert date], ***AND*** (*check one of the following*):

☐ The condition has *worsened* since his or her first date of alleged exposure. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. [fill in].]; *or*

☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ **b.** Primary Plaintiff was first diagnosed with an Sleep Disorder Qualifying Injury on [insert date] ***after his or her first alleged exposure***, which occurred on [insert date], as established by QMR No. [fill in],

**H. Death –** ☐ Primary Plaintiff claims death subsequent to work at the WTC Site or other location giving rise to his or her Debris Removal Claims against any Insured and before the Final Settlement Agreement Effective Date.

### 1. Qualifying Criterion

☐ Proof of the Primary Plaintiff's death on or after the last date of work at the WTC Site or other location giving rise to his or her Debris Removal Claims against any Insured, established by a death certificate, hospital notes, or other authoritative document (*e.g.*, physician letter) confirming death, attached as QMR No. [fill in].

### 2. Impairment Criteria (*a and b required for levels H1-H2, c is optional*):

☐ **a.** Primary Plaintiff died as a result of (*Select one of the two options below*):

☐ Qualifying Injuries B2-B4, C2-C4 or I3 as set forth in Part 13.B, 13.C, or 13.I of this Claim Form, *or*

☐ An injury caused by his or her work or volunteer service at the WTC Site or other location(s) at which the Primary Plaintiff's alleged exposure gave rise to his or her Debris Removal Claims against an Insured, according to a report from the County of New York Medical Examiner attached as QMR No. [fill in].

☐ **b.** Primary Plaintiff has provided documentation sufficient for the Allocation Neutral to establish that the predicate injury referenced in the proceeding section did not pre-exist Plaintiff's first date of work at the WTC Site or other location giving rise to his or her Debris Removal Claims against any Insured, and additional documentation, if necessary, is attached as QMR No(s). [fill in numbers for all documents].

☐ **c.** Primary Plaintiff hereby provides additional documentary support to demonstrate a causal relationship between Primary Plaintiff's death and the Settlement Grid injury referenced above and/or to refute alternate causes for the Primary Plaintiff's death, attached as QMR No(s). [fill in numbers for all documents].

**I. Cancer –** ☐ Primary Plaintiff claims Pre-Cancerous Condition (dysplasia, pre-malignant, preneoplasia, intraepithelial neoplasia, adenomatous colon polyps or actinic keratosis conditions), Skin Cancer other than Melanoma, Solid Tumor Cancer, Respiratory Solid Tumor Cancer or Blood Cancer.

### 1. Qualifying Injury (*a, b, c, d, or e required*)

☐ **a.** Primary Plaintiff has a Physician Diagnosis or a histopathy report demonstrating a Pre-Cancerous Condition, specifically, [insert listed pre-cancerous condition], attached as QMR No. [fill in].

[Please note: Pre-Cancerous Conditions do not include benign tumors, brain lesions, enlarged lymph nodes, lung nodules, polyps (*e.g.*, nasal, laryngeal, throat, sinus or vocal cord), cysts or benign skin lesions (*e.g.,* seborrheic keratosis, lipoma, dermatofibroma, pyogenic granuloma, epidermoid cyst or papilloma).]

☐ **b.** Primary Plaintiff has a Physician Diagnosis or a histopathy report demonstrating any Skin Cancer other than Melanoma, including without limitation basal cell carcinoma and squamous cell carcinoma.

☐ **c.** Primary Plaintiff has physician documentation of diagnosis of or treatment for a Respiratory Solid Tumor Cancer originating in the larynx, in the airways or tissues of the lungs, or in the mesothelium, specifically [insert type of respiratory solid tumor cancer], attached as QMR No. [fill in].

☐ **d.** Primary Plaintiff has physician documentation of diagnosis of or treatment for any Solid Tumor Cancer not covered by I.1.b or I.1.c above, specifically [insert type of solid tumor cancer], attached as QMR No. [fill in].

☐ **e.** Primary Plaintiff has physician documentation of diagnosis of or treatment for a Blood Cancer, specifically, [insert type of blood cancer], attached as QMR No. [fill in].

**2. Timing of Onset (*a or b required*):**

☐ **a.** Primary Plaintiff was first diagnosed with a Cancer Qualifying Injury ***before*** his or her **first alleged exposure**, which occurred on [insert date].

☐ **b.** Primary Plaintiff was first diagnosed with a Cancer Qualifying Injury on [insert date] ***after*** **his or her first alleged exposure**, which occurred on [insert date], as established by QMR No. [fill in], ***AND*** (*check one of the following*):

☐ First Physician Diagnosis is before January 1, 2007; *or*

☐ First Physician Diagnosis is January 1, 2007 or later.

**J. Cardiac –** ☐ Primary Plaintiff claims Hypertension, a Heart Attack, or other Miscellaneous Cardiac Condition *other than* a congenital heart defect (*e.g.*, septal defects, valve defects, or other malformations); a heart condition caused by infectious diseases (*e.g.*, bacterial, viral, fungal or parasitic conditions); or a heart condition caused by autoimmune diseases (*e.g.*, lupus).

**1. Qualifying Injuries (*a, b, or c required*)**

☐ **a.** Primary Plaintiff has a Physician Diagnosis of a miscellaneous cardiac condition, specifically [insert miscellaneous heart condition], attached as QMR No. [fill in].

[Please note: Physician Diagnoses of congenital heart defects (*e.g.*, septal defects, valve defects, or other malformations), heart conditions caused by infectious diseases (*e.g.*, bacterial, viral, fungal or parasitic conditions), and heart conditions caused by autoimmune diseases (*e.g.*, lupus) do not qualify.]

☐ **b.** Primary Plaintiff has physician documentation of diagnosis of or treatment for hypertension, attached as QMR No. [fill in].

☐ **c.** Primary Plaintiff physician documentation of diagnosis of or treatment for a heart attack, attached as QMR No. [fill in].

**WTC Debris Removal Litigation**                              **Claim Form**
                                                          **For Primary Plaintiff**

---

**2. Timing of Onset (*a or b required*):**

☐ **a.** Primary Plaintiff was first diagnosed with a Cardiac Qualifying Injury ***before* his or her first alleged exposure**, which occurred on [insert date], *AND* (*check one of the following*):

> ☐ The condition has *worsened* since his or her first date of alleged exposure. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. [fill in].]; *or*

> ☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ **b.** Primary Plaintiff was first diagnosed with a Cardiac Qualifying Injury on [insert date] ***after* his or her first alleged exposure**, which occurred on [insert date], as established by QMR No. [fill in],

---

**K. Restrictive Lung Disease –** ☐ Primary Plaintiff claims Restrictive Lung Disease.

**1. Qualifying Injury**

☐ Primary Plaintiff has a Physician Diagnosis of Restrictive Lung Disease not attributable to obesity (*i.e.*, body mass index is below 30), attached as QMR No. [fill in].

**2. Diagnostic Support (*required for Severity Levels K1-K3, as specified*)**

☐ **a. For Severity Level K1 –** a Restrictive Pulmonary Function Test, attached as QMR No. [fill in].

☐ **b. For Severity Levels K2-K3 –** a Restrictive Pulmonary Function Tests, and no or normal imaging studies, attached as QMR No. [fill in].

**3. Impairment Records (*required for Severity Levels K1-K3, as specified*):**

☐ **a. For Severity Level K1 –** impairment is demonstrated by a Pulmonary Function Test showing TLC $\leq$ 79% predicted; *and* FVC $\leq$ 79% predicted; *and* FEV$_1$/FVC (%)> 70% predicted, attached as QMR No. [fill in], together with records establishing the Primary Plaintiff's height and weight at the time of the test, attached as QMR No. [fill in].

☐ **a. For Severity Level K2 –** impairment is demonstrated by a Pulmonary Function Test showing TLC $\leq$ 59% predicted; *and* FVC $\leq$ 59% predicted; *and* FEV$_1$/FVC (%)> 70% predicted, attached as QMR No. [fill in], together with records establishing the Primary Plaintiff's height and weight at the time of the test, attached as QMR No. [fill in].

☐ **a. For Severity Level K3 –** impairment is demonstrated by a Pulmonary Function Test showing TLC < 50% predicted; *and* FVC < 50% predicted; *and* FEV$_1$/FVC (%)> 70% predicted, attached as QMR No. [fill in], together with records establishing the Primary Plaintiff's height and weight at the time of the test, attached as QMR No. [fill in].

WTC DEBRIS REMOVAL LITIGATION

CLAIM FORM
FOR PRIMARY PLAINTIFF

---

**4. Timing of Onset (*a or b required*):**

☐ **a.** Primary Plaintiff was first diagnosed with a Restrictive Lung Disease Qualifying Injury *before* **his or her first alleged exposure**, which occurred on [insert date], *AND* (*check one of the following*):

☐ The condition has *worsened* since his or her first date of alleged exposure. [Qualifying Medical Records establishing pre-9/11 impairment are attached as QMR No. [fill in].]; *or*

☐ The condition is the same or better, since his or her first date of alleged exposure.

☐ **b.** Primary Plaintiff was first diagnosed with a Restrictive Lung Disease Qualifying Injury on [insert date] *after* **his or her first alleged exposure**, which occurred on [insert date], as established by QMR No. [fill in],

---

**PART 14: ADJUSTMENT FACTORS FOR PRIMARY PLAINTIFFS WITH TIER 4 QUALIFYING INJURIES**

**A. Timing of Work at the WTC Site or Other Location**:

Primary Plaintiff's first date of work or volunteer service at the WTC Site or other location at which he or she alleges exposure forming the basis of his or her Debris Removal Claims: Jan. 1, 2001.

Primary Plaintiff's last date of work or volunteer service at the WTC Site or other location at which he or she alleges exposure forming the basis of his or her Debris Removal Claims: Jan. 1, 2001.

Primary Plaintiff's cumulative days of work or volunteer service at the WTC Site or other location at which he or she alleges exposure forming the basis of his or her Debris Removal Claims: 7 days or fewer (less than 56 hours total).

**B. Smoking History (*check all descriptions that apply*):**

☐ Primary Plaintiff has a 20 pack-year history of smoking (*e.g.*, 1 pack a day for 20 years, or 2 packs a day for 10 years, or a half-pack a day for 40 years).

☐ Primary Plaintiff has smoked cigarettes in the last year.

☐ Primary Plaintiff has smoked cigarettes in the last 5 years.

☐ Primary Plaintiff does not meet any of the above criteria.

**C. Primary Plaintiff's Locations of Alleged Exposure (*skip if in 21 MC 100*):**

00% – Is the percentage of Primary Plaintiff's rescue, recovery and debris removal work or volunteer activities at the WTC Site and/or at other locations at which Primary Plaintiff alleges exposure forming the basis of his or her Debris Removal Claims against any Insured from September 11, 2001 to the present.

00% – Is the percentage of Primary Plaintiff's rescue, recovery and debris removal work or volunteer activities performed at other locations from September 11, 2001 to the present

Note: Work location percentages must sum to 100%. Time not allocated will be added to the second period.

**WTC DEBRIS REMOVAL LITIGATION**                    **CLAIM FORM**
                                              **FOR PRIMARY   PLAINTIFF**

---

| **PART 15. PERMANENT DISABILITY FUND CRITERIA (*Skip if Not Claiming Permanent Disability*)** |
|---|
| Primary Plaintiffs who seek to recover separately from the Permanent Disability Fund must complete this Part and submit the required Qualifying Medical Records (QMRs) together with this Claim Form. |
| **A. Existence of Permanent Disability Determination** (*select one of four bases*): |
| ☐ 1. The Primary Plaintiff was found permanently disabled by: [Insert name of Adjudicatory Body], as demonstrated by attached QMR No(s). [fill in]. |
| ☐ 2. The Primary Plaintiff has not yet been found permanently disabled, but Primary Plaintiff's application for permanent disability is pending and has been preliminarily approved or Primary Plaintiff has been found unfit for duty by [insert name of body finding a disabling injury and recommending disability] as demonstrated by attached QMR No(s). [fill in]. |
| [Please note: Eligible documentation includes any writing by an employer, its workers' compensation carrier, or any licensed physician retained thereby supporting the Primary Plaintiff's application for permanent disability benefits; or documentation from the 1-b medical board of the New York City Fire Department Pension Fund has approved Primary Plaintiff's application for permanent disability benefits; or the Medical Board of the Police Pension Fund of the Police Department of the City of New York has approved Primary Plaintiff's application for permanent accidental disability benefits.] |
| ☐ 3. The Primary Plaintiff is deceased and documentation submitted with this Claim Form establishes Potentially Related Death ("H1") or Related Death ("H2"), as demonstrated by attached QMR No(s). [fill in]. |
| ☐ 4. The Primary Plaintiff is deceased and his or her heirs receive(d) World Trade Center related death benefits, as demonstrated by attached QMR No(s). [fill in]. |
| **B. Basis for Permanent Disability Determination** (*select one of the following options*): |
| ☐ The Primary Plaintiff's disability determination is due *solely* to a Qualifying Injury or Qualifying Injuries established in the Claim Form. |
| ☐ The Primary Plaintiff's disability determination is in due *in part* to an injury (i) pre-dating the Primary Plaintiff's first date of work at the WTC Site or other location giving rise to his or her Debris Removal Claims against any Insured; (ii) any orthopedic injury, a wound, or burn; or (iii) any other injury or condition that is not a Qualifying Injury (provided, however, that a Primary Plaintiff need not select this option simply because the disability determination was due to more than two conditions and there can be only two Qualifying Injuries under this agreement). |
| **C. Documentation of Connection to Alleged Exposure Supporting Debris Removal Claims** |
| The connection between the Primary Plaintiff's disability determination and his or her alleged exposure during work or volunteer service at the WTC Site or other locations giving rise to his or her Debris Removal Claims against any Insured is established by [insert basis for claim], found in attached QMR No(s). [fill in]. |

**WTC DEBRIS REMOVAL LITIGATION**

**CLAIM FORM**
**FOR PRIMARY  PLAINTIFF**

| PART 16. QUALIFYING SURGERIES (*Skip if not claiming Qualifying Surgery*) |
|---|

Primary Plaintiffs who seek to recover separately for a Qualifying Surgery must complete this Part and submit the required Qualifying Medical Records together with this Claim Form.

☐ **Primary Plaintiff underwent one or more of the following Qualifying Surgeries *after* his or her first date of work at the WTC Site or other location giving rise to his or her Debris Removal Claims against any Insured *to address* a condition caused by the specified Qualifying Injury, which must be *established separately* on this Claim Form.**

☐ *Laryngectomy* to address Laryngeal Cancer ("I2"), the records for which are attached in QMR No. [fill in].

☐ *Lobectomy* to address Lung Cancer ("I2"), the records for which are attached in QMR No. [fill in].

☐ *Lung transplant* to address any COPD ("A") (other than Emphysema), or any ILD ("B") (includes double lung transplants and individuals for whom a lung transplant was recommended, but who were deemed too sick to undergo the procedure), the records for which are attached in QMR No. [fill in]..

☐ *Pneumonectomy* to address Lung Cancer ("I2"), the records for which are attached in QMR No. [fill in].

☐ *Sinus surgery* to address Chronic Rhinosinusitis or Chronic Sinusitis ("E"), the records for which are attached in QMR No. [fill in], and establish:

(i) that the sinus surgery relates to Primary Plaintiff's "E2" or "E3" Qualifying Injury within one (1) year of the Primary Plaintiff's last day of 9/11-related work of volunteer service;

(ii) that the Primary Plaintiff took prescription medication for his or her "E" conditions prior to the surgery in question;

(iii) that the sinus surgery was not performed to correct, mitigate or otherwise treat an anatomic defect or any other condition unrelated to his her Debris Removal Claims; and

(iv) that the Primary Plaintiff had no Qualifying Injury in the "E" Disease Group before his or her first date of 9/11-related work or volunteer service.

☐ *Thyroidectomy* to address Thyroid Cancer ("I1"), the records for which are attached in QMR No. [fill in].

**WTC DEBRIS REMOVAL LITIGATION**

**CLAIM FORM**
**FOR PRIMARY PLAINTIFF**

---

| PART 17. MIXED ORTHOPEDIC INJURIES (*Skip if not claiming Mixed Orthopedic Injury*) |
|---|

Primary Plaintiffs who seek to recover separately for a Mixed Orthopedic Injury must complete this Part and submit the required Qualifying Medical Records together with this Claim Form.

☐ Primary Plaintiff is entitled to recover for a Mixed Orthopedic Injury sustained while working or volunteering at the WTC Site or other location at which Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds (*Confirm each of the following and attach support where indicated*):

> ☐ Primary Plaintiff is Eligible to apply for a Mixed Orthopedic Injury payment because (*Select one option below*):
>
> > ☐ Primary Plaintiff is listed on Exhibit I to the Final Settlement Agreement; *or*
> >
> > ☐ Primary Plaintiff was not listed on Exhibit I to the Final Settlement Agreement due to extraordinary circumstances outside of his or her control, as explained in and verified by the attached affidavit signed by the Primary Plaintiff at Record No. [fill in].
>
> ☐ Primary Plaintiff's Mixed Orthopedic Injury was sustained on [insert date of injury], as demonstrated by attached Record No. [fill in];
>
> ☐ Primary Plaintiff was present at the WTC Site or other location at which Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds when the Mixed Orthopedic Injury occurred, as demonstrated by attached Record No. [fill in];
>
> ☐ Conditions at the WTC Site or other location at which Primary Plaintiff alleges exposure giving rise to his or her Debris Removal Claims against the Insureds caused Primary Plaintiff's Mixed Orthopedic Injury, as demonstrated by attached Record No. [fill in]; and
>
> ☐ Primary Plaintiff's Mixed Orthopedic Injury was confirmed by objective medical tests or studies (*e.g.*, MRI, CT-Scan, X-ray, etc.), attached as QMR No. [fill in].
>
> ☐ Primary Plaintiff filed suit against one or more Insureds alleging this Mixed Orthopedic Injury, or served notice of claim to the City of New York alleging this Mixed Orthopedic Injury, within three years of the injury, or served a notice of claim upon the City of New York between September 16, 2009 and September 17, 2010, as demonstrated by attached Record No. [fill in].

You may include additional records for the Allocation Neutral to consider in assessing the severity of the Mixed Orthopedic Injury. If applicable, such records are attached as QMR No. [fill in].

**WTC Debris Removal Litigation**

**Claim Form
For Primary  Plaintiff**

---

**Primary Plaintiff's Signature Page**

**Fraud Warning:**

Any person who knowingly presents false information or conceals material information called for on this Claim Form is guilty of a crime, including but not limited to perjury, and may be subject to criminal prosecution, confinement in prison, and monetary fines and penalties.  In addition, any such person shall be denied any and all benefits of the settlement and shall be subject to court action seeking the return of any monies paid to that person as part of the settlement prior to discovery of the knowingly false or concealed information, as well as all costs, attorneys' fees and expenses incurred by the parties to the settlement as a result of the knowingly false or concealed information.

**Primary Plaintiff Attestation**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that all documents submitted with this Claim Form are true and correct copies of original records.

Executed on: _____  ____, 20___.

_____

Primary  Plaintiff

On _____  ____, 20___, before me, _____, Notary Public, personally appeared Primary   Plaintiff, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the written instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal

_____

Notary Public in and for the

_____

**WTC DEBRIS REMOVAL LITIGATION**                    **CLAIM FORM**
                                                  **FOR PRIMARY  PLAINTIFF**

---

**DERIVATIVE PLAINTIFF'S SIGNATURE PAGE (*IF APPLICABLE*)**

**FRAUD WARNING:**

Any person who knowingly presents false information or conceals material information called for on this Claim Form is guilty of a crime, including but not limited to perjury, and may be subject to criminal prosecution, confinement in prison, and monetary fines and penalties.  In addition, any such person shall be denied any and all benefits of the settlement and shall be subject to court action seeking the return of any monies paid to that person as part of the settlement prior to discovery of the knowingly false or concealed information, as well as all costs, attorneys' fees and expenses incurred by the parties to the settlement as a result of the knowingly false or concealed information.

**DERIVATIVE PLAINTIFF ATTESTATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that all documents submitted with this Claim Form are true and correct copies of original records.

Executed on: _____ ____, 20____.

_____
DERIVATIVE  PLAINTIFF

On _____  ____, 20__, before me, _____, Notary Public, personally appeared Derivative  Plaintiff, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the written instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal

_____
Notary Public in and for the

_____

**WTC DEBRIS REMOVAL LITIGATION**                                    **CLAIM FORM**
                                                                     **FOR PRIMARY  PLAINTIFF**

---

**PLAINTIFFS' COUNSEL'S SIGNATURE PAGE**

**FRAUD WARNING:**

Any person who knowingly presents false information or conceals material information called for on this Claim Form is guilty of a crime, including but not limited to perjury, and may be subject to criminal prosecution, confinement in prison, and monetary fines and penalties.  In addition, any such person shall be denied any and all benefits of the settlement and shall be subject to court action seeking the return of any monies paid to that person as part of the settlement prior to discovery of the knowingly false or concealed information, as well as all costs, attorneys' fees and expenses incurred by the parties to the settlement as a result of the knowingly false or concealed information.

**PLAINTIFF'S COUNSEL ATTESTATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief, and that all documents submitted with this Claim Form are true and correct copies of original records to the best of my knowledge, information and belief.

Executed on: _____  ___, 20___.

_____
PLAINTIFF'S ATTORNEY

**WTC Debris Removal Litigation**                    CLAIM FORM
                                                FOR PRIMARY  PLAINTIFF

---

**PRIMARY PLAINTIFF'S PERSONAL REPRESENTATIVE'S SIGNATURE PAGE (*IF APPLICABLE*)**

**FRAUD WARNING:**

Any person who knowingly presents false information or conceals material information called for on this Claim Form is guilty of a crime, including but not limited to perjury, and may be subject to criminal prosecution, confinement in prison, and monetary fines and penalties.  In addition, any such person shall be denied any and all benefits of the settlement and shall be subject to court action seeking the return of any monies paid to that person as part of the settlement prior to discovery of the knowingly false or concealed information, as well as all costs, attorneys' fees and expenses incurred by the parties to the settlement as a result of the knowingly false or concealed information.

**PERSONAL REPRESENTATIVE ATTESTATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that all documents submitted with this Claim Form are true and correct copies of original records.

Executed on: _____ ____, 20___.

_____
Personal   Representative

On _____    ____, 20___, before me, _____, Notary Public, personally appeared Personal   Representative, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the written instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal

_____
Notary Public in and for the

_____

**WTC DEBRIS REMOVAL LITIGATION**                    **CLAIM FORM**
**FOR PRIMARY  PLAINTIFF**

---

**DERIVATIVE PLAINTIFF'S PERSONAL REPRESENTATIVE'S SIGNATURE PAGE (*IF NECESSARY*)**

**FRAUD WARNING:**

Any person who knowingly presents false information or conceals material information called for on this Claim Form is guilty of a crime, including but not limited to perjury, and may be subject to criminal prosecution, confinement in prison, and monetary fines and penalties.  In addition, any such person shall be denied any and all benefits of the settlement and shall be subject to court action seeking the return of any monies paid to that person as part of the settlement prior to discovery of the knowingly false or concealed information, as well as all costs, attorneys' fees and expenses incurred by the parties to the settlement as a result of the knowingly false or concealed information.

**PERSONAL REPRESENTATIVE ATTESTATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that all documents submitted with this Claim Form are true and correct copies of original records.

Executed on: _____ ____, 20___.

_____
Personal   Representative

On _____  ____, 20___, before me, _____, Notary Public, personally appeared Personal   Representative, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the written instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal

_____
Notary Public in and for the

_____

# Exhibit M

[Deleted Intentionally]

## EXHIBIT N

[Deleted Intentionally]

# EXHIBIT O

[Deleted Intentionally]

## EXHIBIT P – RELEASE AND COVENANT NOT TO SUE

I, the undersigned Releasor (as defined below), am eligible to participate in the settlement of World Trade Center-related rescue, recovery, debris removal and clean-up litigation which settlement is known collectively as the World Trade Center Litigation Settlement Process Agreement, as Amended and Final Settlement Agreement (hereinafter, "Final Settlement Agreement").

I am signing this Release and Covenant Not to Sue (hereinafter, "Release"), which is an exhibit to the Final Settlement Agreement, resolving my claims, and the claims of others. I understand that this Release incorporates terms defined in the Final Settlement Agreement, and I have read the Final Settlement Agreement and this Release and discussed each and all of their respective terms and conditions with my counsel or have had the opportunity to discuss them with my counsel but elected not to do so.

I understand that the binding terms and conditions of my agreement to settle are set forth in the Final Settlement Agreement and that certain of those binding terms and conditions are not repeated in this Release. I hereby represent and warrant that I am signing this Release and thereby opting into the Final Settlement Agreement, purposefully and intentionally, understanding that I may or may not be entitled to any payment under the Final Settlement Agreement or to enroll in the Cancer Insurance Policy (as referenced in the Final Settlement Agreement) as set forth more fully in the Final Settlement Agreement and the other exhibits thereto.

In addition, I understand and agree that, in order to become eligible for any payment(s) under and/or to enroll in the Cancer Insurance Policy under the Final Settlement Agreement, I am required to release any and all Debris Removal Claims (as defined in the Final Settlement Agreement) that I and the other Releasing Parties (collectively, "Releasors" as defined below) had, have, or may have in the future, against the City of New York and the various entities that contracted with and/or provided services and/or assistance to the City of New York during and in the aftermath of the terrorist attacks on the World Trade Center on September 11, 2001, with respect to rescue, recovery, debris removal and clean-up operations at the WTC Site (as defined in the Final Settlement Agreement) and at other locations.

In consideration for the releases and covenants in this Release, I am electing to opt into the Allocation Process (as defined in the Final Settlement Agreement), to accept payments, if any, due to me pursuant to the terms, conditions and limitations of the Final Settlement Agreement, and to enroll for coverage under the Cancer Insurance Policy, subject to its terms, conditions and limitations.

I understand that by signing this Release, I am releasing, fully, finally and forever, and as set forth more fully below, all of my past, present and future Debris Removal Claims (as defined in the Final Settlement Agreement) against the WTC Captive Insurance Company, Inc. (hereinafter, "WTC Captive") and all of the entities listed on Schedule A to this Release (hereinafter, "Settling Defendants" or, as defined in the Final Settlement Agreement, "Insureds"), as well as all of my past, present and future claims of any kind against them or any of them, also as more fully set forth below.

In consideration for the WTC Captive's and the Settling Defendants' agreement to establish the Allocation Process, the expenses being incurred by the WTC Captive on behalf of the Settling Defendants with respect to the Allocation Process, the WTC Captive's and the Settling Defendants' waiver of defenses (except as reflected in the Allocation Process criteria themselves) in the context of the Allocation Process and for settlement purposes only, and the opportunity to submit my claim into the Allocation Process under the terms and conditions of the Final Settlement Agreement, I hereby give and make the following releases, waivers, acknowledgements, covenants and agreements for the benefit of the Released Parties.

This Release is also entered into by any Derivative Plaintiff (as more fully defined below) whose claims correspond to mine and who is eligible for payment, if any, as set forth in the Final Settlement Agreement and who executes a signature page hereto, in which case the agreement of such Derivative Plaintiff is incorporated in, and is part of, this Release. By signing this Release, any such Derivative Plaintiff and I understand and acknowledge that there is no assurance as to (i) the amount, if any, of payment to be made to either of us under the Allocation Process or (ii) my eligibility for benefits, if any, under the Cancer Insurance Policy, and these facts shall in no way affect the validity or effect of this Release.

**Releases**:  On my own behalf and on behalf of each other Releasing Party, as defined below, and intending to be legally bound, I hereby knowingly and voluntarily release, remise, acquit and forever discharge the Released Parties and each of them from (i) any and all known and unknown rights, remedies, actions, claims, demands, causes of action, suits at law or in equity, verdicts, suits or judgments and Liens (as defined under "Liens and Other Third-Party Payor Claims," below), of any kind whatsoever relating in any way to or arising out of my Debris Removal Claims or any New Debris Removal Claims (as defined in the Final Settlement Agreement) I may purport to bring, which I or any other Releasing Party may have ever had, may now have or at any time hereafter may have against the Released Parties or any of them (hereinafter, "Claims") and (ii) any and all known and unknown debts, liabilities, obligations, covenants, promises, contracts, agreements and obligations, of any kind whatsoever (hereinafter, "Liabilities"), which the Released Parties or any of them may have ever had, may now have or at any time hereafter may have to me or any other Releasing Party with respect to such Debris Removal Claims or New Debris Removal Claims.  These Claims and Liabilities are the "Released Claims and Liabilities."

In addition, on my own behalf and on behalf of each other Releasing Party, and intending to be legally bound, I hereby knowingly and voluntarily promise and covenant not to sue the Released Parties or any of them with respect to any known or unknown past, present or future injury or injuries relating to or arising out of my World Trade Center-related rescue, recovery, debris removal and/or clean-up work and/or volunteer service on and/or after September 11, 2001, at the WTC Site and/or at any other location, including without limitation for any and all unknown future injuries relating to, in whole or in part, or unrelated to my current injury or injuries, if any.

The term "Released Parties" means the WTC Captive and all of the Settling Defendants listed on Schedule A hereto, and each and all of their respective past, present, and/or future parents, subsidiaries, divisions, affiliates, joint venturers, predecessors, successors, assigns, transferees, officers (or the equivalent thereto), directors (or the equivalent thereto), shareholders

(or the equivalent thereto), managers, principals, employees, consultants, advisors, attorneys, agents, servants, representatives, heirs, trustees, executors, estate administrators and personal representatives (or the equivalent thereto).

The term "Releasing Parties" means (i) myself and (ii) any and all persons who have or assert the right to sue the Released Parties or any of them independently, derivatively or otherwise, by reason of their personal relationship with me, and/or otherwise by, through or under, or otherwise in relation to, including without limitation my Derivative Plaintiff, if any, my heirs, beneficiaries, surviving spouse, and the personal representative(s) (or the equivalent thereto) of my estate, if any.

I acknowledge that I (and/or any other Releasing Party) may in the future learn of additional and/or different facts as they relate to my World Trade Center-related rescue, recovery, debris removal and/or clean-up work and/or volunteer service on and/or after September 11, 2001, at the WTC Site or any other location and/or to any injury I (and/or any other Releasing Party) have ever claimed, or may at any time in the future claim, relates in any way to my World Trade Center-related rescue, recovery, debris removal and/or clean-up work and/or volunteer service on and/or after September 11, 2001, at the WTC Site or any other location. I understand and acknowledge the significance and consequences of releasing all of the Released Claims and Liabilities and hereby (on my own behalf and on behalf of each other Releasing Party) assume full risk and responsibility for any and all such additional and/or different facts and any and all Released Claims and Liabilities that I (and/or any other Releasing Party) may hereinafter incur or discover. To the extent that any law, statute, ordinance, rule, regulation, case or other legal provision or authority (each, a "Law") may at any time purport to preserve my and/or any other Releasing Party's right to hereinafter assert any such unknown and/or unanticipated Claims and/or Liabilities, I hereby (on my own behalf and on behalf of each other Releasing Party) specifically and expressly waive (to the fullest extent permitted by applicable Law) each Releasing Party's rights under such Law. I further acknowledge having had an opportunity to obtain advice of counsel of my choice regarding this waiver and having discussed it with such counsel to my satisfaction or having had the opportunity to discuss it with such counsel but having elected not to do so.

On my own behalf and on behalf of each other Releasing Party, I acknowledge and agree that the releases set forth in this Release are irrevocable and unconditional, inure to the benefit of each Released Party, and are intended to be as broad as can possibly be created.

WITHOUT LIMITING ANY OF THE FOREGOING, THIS RELEASE IS SPECIFICALLY INTENDED TO OPERATE AND BE APPLICABLE EVEN IF IT IS ALLEGED, CHARGED OR PROVEN THAT SOME OR ALL OF THE RELEASED CLAIMS AND LIABILITIES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE, NEGLIGENCE PER SE, GROSS NEGLIGENCE, BREACH OF WARRANTY, VIOLATION OF LAW, DEFECTIVE PRODUCT, MALICE, AND/OR CONDUCT OF ANY TYPE. THIS RELEASE IS SPECIFICALLY INTENDED TO AND DOES INCLUDE, BUT IS NOT LIMITED TO, A RELEASE OF, AND COVENANT NOT TO SUE FOR, ANY WRONGFUL DEATH CLAIM THAT MAY BE BROUGHT AT ANY TIME BY OR ON BEHALF OF ANY OF THE RELEASING PARTIES IN CONNECTION WITH ANY OF THE FACTS, EVENTS

AND/OR INCIDENTS THAT GAVE RISE TO ANY OF THE RELEASED CLAIMS AND LIABILITIES.

**Attorneys' Fees; Division of Any Settlement Payment:**  I understand that the Released Parties are not responsible for any attorneys' fees or costs I have paid, incurred or may at any time incur.  I understand that, with respect to any payment that may be made to me pursuant to the Final Settlement Agreement (hereinafter, a "Settlement Payment"), any division of such Settlement Payments between me and any Derivative Plaintiff executing this Release, on the one hand, and our respective counsel, if any, executing a Certification of Counsel attached to this Release, on the other hand, as well as any such division between counsel executing a Certification of Counsel and any other counsel, or any dispute in relation thereto, shall in no way affect the validity of this Release.

**Pursuit of Certain Claims:**  I agree that I will never (i) take any legal or other action to initiate, pursue or maintain, or otherwise attempt to execute upon, collect or otherwise enforce, any of the Released Claims and Liabilities against or from any Released Party; (ii) institute or participate in any new legal action against any Released Party to any extent, or in any way, arising out of, relating to, resulting from and/or connected with my World Trade Center-related rescue, recovery, debris removal and/or clean-up work and/or volunteer service on and/or after September 11, 2001, at the WTC Site or any other location, and/or with any injury I and/or any other Releasing Party have ever claimed, or may at any time hereafter claim was caused in whole or in part by my World Trade Center-related rescue, recovery, debris removal and/or clean-up work and/or volunteer service on and/or after September 11, 2001, at the WTC Site or any other location; or (iii) attempt to execute or collect upon, or otherwise enforce against, any Released Party any judgment relating in any way to my World Trade Center-related rescue, recovery, debris removal and/or clean-up work and/or volunteer service on and/or after September 11, 2001, at the WTC Site or any other location.

**Liens and Other Third-Party Payor Claims:**  I agree that prior to the first time, if any, that a Settlement Payment is made to me, I shall identify to the Lien Resolution Administrator (as defined in the Final Settlement Agreement) all Third Party Providers/Payors (as defined below) known to me to hold or assert any lien, pledge, charge, security interest, assignment, encumbrance, subrogation right, third-party interest and/or other adverse claim of any nature whatsoever ("Lien") with respect to any Settlement Payment (and/or the right to receive such Settlement Payment), through procedures and protocols to be established by the Lien Resolution Administrator, subject to approval by the Allocation Neutral (as defined in the Final Settlement Agreement).

A "Third Party Provider/Payor" is any provider or payor, public or private, of (i) health, hospital, medical, physician, healthcare and/or pharmaceutical services, products or expenses and/or (ii) any other form of compensation, including, but not limited to, federal and state governmental authorities (or other persons) providing Medicaid and/or Medicare services or benefits.

I understand and acknowledge that satisfaction and discharge of any and all Liens with respect to any Settlement Payment (and/or the right to receive any Settlement Payment) is the sole responsibility of me, any Derivative Plaintiff executing this Release and our respective

counsel (if any) executing a Certification of Counsel attached to this Release and must, in relation to all governmental authorities that are Third Party Providers/Payors who hold or assert any Liens pursuant to any applicable statute, be established to the satisfaction of the Lien Resolution Administrator before any Settlement Payment (if any) can be disbursed to me and/or to any Derivative Plaintiff.

Prior to the first time, if any, that a Settlement Payment is made to me, I shall, jointly and severally with any Derivative Plaintiff who executes this Release (and with our respective counsel, if any, executing a Certification of Counsel attached to this Release), represent and warrant that any and all Liens with respect to any and all Settlement Payments (and/or the right to receive any and all Settlement Payments) have been satisfied and discharged. Furthermore, before any Settlement Payment is made to me, the WTC Captive, the Settling Defendants and/or any of them shall be entitled to proof of satisfaction and discharge of any or all such Liens pursuant to any applicable statute in relation to all governmental authorities that are Third Party Providers/Payors.

In addition to and without limitation of the foregoing, I hereby agree, jointly and severally with any Derivative Plaintiff who executes this Release and with our respective counsel, if any, executing a Certification of Counsel attached to this Release, to indemnify and hold harmless the WTC Captive, Settling Defendants and all other Released Parties and each of them from and against (i) any and all claims made or asserted at any time against them or any of them by any Third Party Provider/Payor with respect to any Lien(s) relating in any way to me or to any other Third Party Provider/Payor claim made or asserted at any time against them or any of them relating in any way to me and (ii) any and all damages, losses, costs, expenses (including, but not limited to, reasonable legal fees and expenses) and/or liabilities incurred or suffered by, or imposed upon, the WTC Captive, Settling Defendants, other Released Parties or any of them in connection with, arising out of or resulting from any claim described in clause (i) of this sentence. The WTC Captive has the right to set off against any Settlement Payment all or any portion of any amount payable to Releasor and/or any Derivative Plaintiff pursuant to the foregoing provisions of this paragraph. Furthermore and without limitation of the foregoing, upon receipt of any claim triggering the indemnification and hold harmless provisions set forth in this paragraph, at least one of the Released Parties affected by such claim shall provide notice to the Releasor's counsel within ten (10) days.

**Confidentiality:**  I agree not to disclose to the media or to otherwise publicize the amount of any Settlement Payment to me or the amount of any benefit I later receive with respect to the Cancer Insurance Policy, except as may be required by applicable Law; provided, that I understand that I may disclose such information to my immediate family members and to my counsel, accountants and/or financial advisors, if any (each of whom I shall, upon such disclosure, instruct to maintain as strictly confidential information).  I agree that if I materially breach this confidentiality provision, money damages would not be a sufficient remedy and, accordingly, without limitation of any other remedies that may be available at law or in equity, the WTC Captive and/or the Settling Defendants or any of them shall be entitled to specific performance and injunctive or other equitable relief as remedies for such breach.

**Medical Documentation Authorization:**  I have authorized my counsel to obtain and supply (or, if I am not represented by counsel, I will obtain and supply) to the Allocation Neutral

and to any separate Lien Resolution Administrator and their respective agents, employees, staff, auditors and others deemed necessary by each to assist them, all Qualifying Medical Records (as defined in the Final Settlement Agreement) and other documents, if any, I am required to submit to be considered for payment under the Final Settlement Agreement. In addition, if required by the Final Settlement Agreement, my counsel will supply (or, if I am not represented by counsel, I will supply) to the Allocation Neutral a release signed by me and authorizing all of my health, medical and/or pharmaceutical providers to release all of my records, regardless of the date(s) thereof, to the Allocation Neutral. Such authorization to release my records shall comply in all respects with the Health Insurance Portability and Accountability Act.

**ACKNOWLEDGEMENT OF COMPREHENSION; NO GUARANTEE OF PAYMENT:** I AM ENTERING INTO THIS RELEASE FREELY AND VOLUNTARILY. I WAS NOT INDUCED, PRESSURED OR INFLUENCED BY ANYONE TO SIGN THIS RELEASE. IN DECIDING TO SIGN THIS RELEASE AND WITH RESPECT TO ITS TERMS AND THE TERMS OF THE FINAL SETTLEMENT AGREEMENT, I DID NOT RELY ON ANY REPRESENTATION OR OTHER STATEMENT MADE BY, OR ON BEHALF OF, THE RELEASED PARTIES OR ANY OF THEM. I UNDERSTAND AND ACKNOWLEDGE THE NATURE, VALUE AND SUFFICIENCY OF THE CONSIDERATION DESCRIBED IN THIS RELEASE. I HAVE READ THIS RELEASE AND THE FINAL SETTLEMENT AGREEMENT OR HAVE HAD AMPLE OPPORTUNITY TO DO SO BUT ELECTED VOLUNTARILY NOT TO DO SO. I ALSO HAVE HAD AN OPPORTUNITY TO OBTAIN ADVICE FROM, AND ASK QUESTIONS OF, COUNSEL OF MY CHOICE REGARDING THE TERMS AND LEGAL EFFECT OF THESE DOCUMENTS AND ABOUT MY DECISION TO ENROLL TO PARTICIPATE IN THE ALLOCATION PROCESS. I FURTHER ACKNOWLEDGE THAT I HAVE DISCUSSED ALL OF THESE MATTERS WITH THE MY COUNSEL EXECUTING THE "CERTIFICATION OF COUNSEL" ATTACHED TO THIS RELEASE, OR THAT I HAVE HAD THAT OPPORTUNITY BUT HAVE ELECTED NOT TO DO SO. SUCH COUNSEL HAS ANSWERED ALL MY QUESTIONS, IF ANY, TO MY SATISFACTION. IN ADDITION, I ACKNOWLEDGE THAT I UNDERSTAND THIS RELEASE AND THE FINAL SETTLEMENT AGREEMENT.

I UNDERSTAND THAT THERE IS NO GUARANTEE THAT I WILL RECEIVE ANY PAYMENT. IN ADDITION, I UNDERSTAND THAT IF ANY SETTLEMENT PAYMENT IS MADE TO ME, THE AMOUNT THEREOF IS NOT GUARANTEED. I ALSO UNDERSTAND THAT I MAY BE INELIGIBLE FOR BENEFITS UNDER THE CANCER INSURANCE POLICY. LASTLY, I UNDERSTAND THAT EVEN IF NO PAYMENT IS DUE TO ME UNDER THE FINAL SETTLEMENT AGREEMENT AND/OR IF I AM INELIGIBLE FOR BENEFITS UNDER THE CANCER INSURANCE POLICY, THIS RELEASE SHALL REMAIN VALID AND BINDING.

**Waiver of Certain Provisions Regarding Timing of Any Payments.** If I have any civil action pending in any jurisdiction that has enacted, promulgated or otherwise adopted any Law containing provisions that establish specific time periods within which settlement funds, if any, must be paid to me in connection with the settlement of such civil action and/or impose sanctions, penalties or other similar obligations against the paying party if the settlement funds are not paid within such time periods and/or invalidate or otherwise affect the terms of the

settlement of such civil action, I hereby (i) specifically and expressly waive (to the fullest extent permitted by applicable Law) my rights under any such provisions and (ii) agree that payment of any Settlement Payment shall be made solely in accordance with the terms and conditions of the Final Settlement Agreement.

**No Admission of Fault:** I understand and agree that the WTC Captive and the Settling Defendants have entered into this Release and the Final Settlement Agreement solely by way of compromise and settlement. These documents are not, and shall not be construed at any time to be, an admission of liability, responsibility or fault by the WTC Captive, the Settling Defendants and/or any other Released Parties or any of them.

**Representations and Warranties:** I hereby represent and warrant that:

1.    I have full power, authority and capacity to enter into this Release, which is binding and enforceable in accordance with its terms;

2.    Except as set forth in the "Attorneys' Fees; Division of Any Settlement Payment" section above, I have the sole right to receive any and all Settlement Payments, if any, due to me under the Final Settlement Agreement; and

3.    Except with respect to any Liens (as defined above) held by a "Third Party Provider/Payor" (as defined above), neither I nor any other Releasing Party has sold, assigned, transferred or otherwise disposed of or pledged or otherwise encumbered, any of the Released Claims and Liabilities in whole or in part.

**Governing Law:** This Release shall be governed by and construed in accordance with the substantive law of New York State without regard to any choice-of-law rules, unless and to the extent New York State law is inconsistent with or preempted by federal law, in which case federal law shall apply as set forth in the Section 408(b)(2) of the Air Transportation Safety and System Stabilization Act of 2001.

**Severability:** I agree that if any provision of this Release is adjudicated to be invalid, illegal or unenforceable in any jurisdiction, the relevant provision shall be deemed modified to the extent necessary to make it enforceable in such jurisdiction and, if it cannot be so modified, this Release shall be deemed amended to delete the invalid or unenforceable provision, and this Release shall otherwise remain in full force and effect as so modified. Any such modification or amendment in any event shall apply only with respect to the operation of this Release in the particular jurisdiction in which such adjudication was made and shall not affect such provision in any other jurisdiction. To the fullest extent permitted by applicable Law, I hereby (on my own behalf and on behalf of each other Releasing Party) specifically and expressly waive any provision of Law that renders any provision of this Release invalid, illegal or unenforceable in any respect.

**Legal Representatives:** If I am signing this Release as a legal representative of a deceased Primary Plaintiff (as defined in the Final Settlement Agreement), I represent and warrant that I have the requisite authority do to so and that I understand that the references in this

Release to my injury and to my rescue, recovery, debris removal and/or clean-up work and/or volunteer services at the WTC Site and/or other locations on and/or after September 11, 2001, refer to the decedent, and not to me personally. Furthermore, to the extent any payment(s) are made to me on the deceased Primary Plaintiff's behalf, before accepting such payment(s), I will obtain judicial approval of this Release to the extent required under applicable Law.

  **Structured Settlement Payments:** If Releasor later elects to receive any payment(s) due to him or her under the Final Settlement Agreement in the form of structured payment(s), rather than as lump sum(s), as permitted by Section VII.D of the Final Settlement Agreement, this Release may be amended by written addendum hereto only to the extent necessary to facilitate such structured payment(s).

**[The remainder of this page is intentionally left blank]**

## SIGNATURE AND AGREEMENT BY RELEASOR

IN WITNESS WHEREOF, I executed this Release effective as of the date below:

RELEASOR'S NAME: _____

SOCIAL SECURITY NO.: _____ - ___ - _____

EXECUTED ON: _____ ___, 20__.


RELEASOR'S SIGNATURE: _____

On _____ ____, 20___, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the written instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person executed the instrument.

**WITNESS my hand and official seal**                    **Notary Public in and for the**


_____                    _____

## SIGNATURE AND AGREEMENT BY DERIVATIVE PLAINTIFF

I have sued the Settling Defendants or any of them by reason of my relationship with Releasor. I hereby enter into the Release to which this page is attached and agree to be bound by its terms (and, without limitation, hereby give and make all releases, waivers, acknowledgements, agreements, representations, warranties and indemnities) on the same basis as Releasor as set forth therein. This agreement is effective as of the date set forth below.

IN WITNESS WHEREOF, I executed this Release effective as of the date below:

DERIVATIVE PLAINTIFF'S NAME: _____

SOCIAL SECURITY NO.: _____ - ___ - _____

EXECUTED ON: _____ ____, 20_____


DERIVATIVE PLAINTIFF'S SIGNATURE: _____

On _____ ____, 20___, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the written instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person executed the instrument.

**WITNESS my hand and official seal**                    **Notary Public in and for the**


_____                    _____

## CERTIFICATION OF COUNSEL FOR RELEASOR
## AND FOR DERIVATIVE PLAINTIFF, IF ANY

I, counsel for Releasor and for Derivative Plaintiff, if any, represent and declare that:

1.      Releasor and Derivative Plaintiff, if any, have at all relevant times been represented by me.  I have provided Releasor and Derivative Plaintiff, if any, a copy of the Release to which this Certification of Counsel is attached and have made available to Releasor and Derivative Plaintiff, if any, a copy of the Final Settlement Agreement referred to in the Release, including all exhibits to the Final Settlement Agreement and schedules to those exhibits.

2.      I discussed with Releasor and Derivative Plaintiff, if any, or gave each and all of them the opportunity to discuss with me, the terms and legal effect of all of the foregoing documents and the decision by Releasor and Derivative Plaintiff, if any, to execute the Release and to participate in the Allocation Process (as defined in the Final Settlement Agreement), and I answered any and all questions Releasor and/or Derivative Plaintiff, if any, posed to me.

3.      I certify that, having had a full opportunity to read, understand, and inquire of counsel about the terms and conditions of the foregoing documents, Releasor and Derivative Plaintiff, if any, do not have, and I do not have, any objection to the terms of this Release or to any of the other foregoing documents.

4.      I have made no assurance, promise, guarantee or misrepresentation to Releasor, Derivative Plaintiff, if any, and/or to any other Releasing Party concerning the amount, if any, of any payment(s) which Releasor or Derivative Plaintiff, if any, will receive under the Final Settlement Agreement.   Furthermore, I have made no assurance, promise, guarantee or misrepresentation to Releasor concerning the amount, if any, of benefits which may become due to him or her under the Cancer Insurance Policy attached to the Final Settlement Agreement as Exhibit E.  In addition, I have explained to Derivative Plaintiff, if any, that he or she is ineligible for benefits under that Cancer Insurance Policy.  I also have complied at all relevant times with Model Rule of Professional Conduct 1.8(g) and N.Y. Code of Professional Responsibility DR 5-106(A).

5.      I agree to be bound by the "Confidentiality" section in this Release and my joint and several obligations to provide representations and warranties regarding the satisfaction of, and indemnification with respect to, Liens as set forth under "Liens and Other Third-Party Payor Claims" herein.

6.      I waive any objections to the restrictions on attorneys' fees set forth in Section II.G of the Final Settlement Agreement.

READ AND AGREED BY COUNSEL FOR RELEASOR:

NAME:       _____

SIGNATURE:     _____

FIRM:       _____

EXECUTED ON: _____  _____, 20_____

SCHEDULE A – LIST OF SETTLING DEFENDANTS
(ALSO REFERRED TO AS "INSUREDS" IN THE FINAL SETTLEMENT AGREEMENT)

| | |
|---|---|
| CITY OF NEW YORK, including the: | CORD CONTRACTING CO., INC. |
|     BOARD OF EDUCATION OF THE CITY OF NEW YORK | CRAIG TEST BORING |
|     BOROUGH OF MANHATTAN COMMUNITY COLLEGE | CRITICOM INTERNATIONAL CORP |
|     CITY UNIVERSITY OF NEW YORK | DAKOTA DEMO-TECH |
|     NEW YORK CITY DEPARTMENT OF EDUCATION | DESIMONE CONSULTING ENGINEERS, PLLC |
|     NEW YORK CITY SCHOOL CONSTRUCTION AUTHORITY | DCM ERECTORS, INC. |
| A RUSSO WRECKING | DIAMOND POINT EXCAVATION CORP |
| ACROW | DIEGO CONSTRUCTION |
| ALLCOM ELECTRIC | DIVERSIFIED CARTING |
| AMEC CONSTRUCTION MANAGEMENT, INC. | DMT ENTERPRISE |
| AMEC EARTH AND ENVIRONMENTAL | D'ONOFRIO GENERAL CONTRACTORS CORP. |
| ANTHONY CORTESE SPECIALIZED HAULING LLC | EAGLE LEASING & INDUSTRIAL SUPPLY (SEASONS) |
| ASG PEST CONTROL | EAGLE ONE ROOFING CONTRACTORS, INC. |
| ATC GROUP SERV/DBA ATC ASSOCIATES | EAGLE SCAFFOLDING CO. (SEASONS) |
| ATLANTIC HEYDT CORP. | EJ DAVIES, INC. |
| ATLAS CONCRETE | EN-TECH CORP. |
| AVANTI DEMOLITION & CARTING CORP. | ENTERTAINMENT PARTNERS |
| BECHTEL CONSTRUCTION, INC. | ET ENVIRONMENTAL |
| BERGEN CONCRETE CUTTING | EVERGREEN RECYCLING OF CORONA (EROC) |
| BERKEL & CO. CONTRACTORS, INC. | EWELL W. FINLEY, P.C. |
| BIG APPLE WRECKING & CONSTRUCTION | EXECUTIVE MED SERVICES, PC |
| BOVIS LEND LEASE LMB, INC. | F&G MECHANICAL CORPORATION |
| BREEZE CARTING | FELIX EQUITIES, INC. |
| BREEZE NATIONAL, INC. | FLEET TRUCKING |
| BRER FOUR TRANSPORTATION | FRANCIS A. LEE EXTERIOR RESTORATION |
| BURO HAPPOLD CONSULT ENG. | FRANK MICELLI JR CONTRACTING |
| C & D FIREPROOFING | FTI TRUCKING |
| C & D PAINTING, INC. | G & G CONTRACTING, INC. |
| C.B. CONTRACTING CORP. | GILSANZ, MURRAY, & STEFICEK |
| CANRON CONSTRUCTION CORP. | GINO CRACOLICI & SONS, INC. |
| CANTOR SEINUK GROUP | GOLDSTEIN ASSOCIATES PLLC |
| CERTIFIED FENCE CORP. | GRACE INDUSTRIES |
| CIVETTA COUSINS | GUY NORDENSON AND ASSOCIATES |
| CLARCO ENTERPRISE CORP. | HALLEN WELDING SERVICE |
| COMPONENT ASSEMBLY SYS | HELMSMAN MANAGEMENT SERVICES, INC. |
| COORDINATED METALS, INC. | HGC CONTRACTING CORP. |
| | HIGH RISE HOISTING AND |

| | |
|---|---|
| SCAFFOLDING | RICH MARK ENVIRONMENTAL SERVICES, INC. |
| HIGH-RISE ELECTRIC, INC. | ROBER SILMAN ASSOCIATES |
| HP ENVIRONMENTAL | ROBERT C STEWART |
| JP EQUIPMENT RENTAL MATERIALS, INC. | ROBERT ERRAT |
| KEVIN MCMANUS | ROBERT L GEROSA |
| KOCH SKANSKA, INC. | RODAR ENTERPRISES, INC. |
| LAQUILLA CONSTRUCTION, INC. | ROYAL GM, INC. |
| LASTRADA GENERAL CONTRACTING CORP. | SAB TRUCKING |
| | SAFEWAY ENVIRONMENTAL |
| LESLIE E. ROBERTSON ASSOCIATES | SEMCOR EQUIPMENT |
| LIBERTY MUTUAL GROUP | SEVERUD ASSOCIATES CONSULTING ENGINEERS |
| LIRO | |
| LOCKWOOD, KESSLER & BARTLETT (LKB) | SHELDRAKE ORGANIZATION, INC. |
| | SILVERADO CONTRACTORS |
| LUCIUS PITKIN | SILVERITE CONTRACTING |
| LZA TECH-DIVISION OF THORTON TOMASETTI | SIMPSON, GUMPERTZ, & HEGER |
| | SKIDMORE, OWINGS & MERRILL LLP |
| M. G. MCLAREN, P.C. | STAR DELTA ELECTRIC |
| MANAFORT BROTHERS, INC. | STIER, ANDERSON & MALONE |
| MAZZOCCHI WRECKING, INC. | SUMMIT STRUCTURES LLC |
| MEDCOR, INC. | TELENET COMMUNICATIONS |
| MENT BROTHERS | THYSSEN KRUPP ELEVATOR CO. |
| MERIDIAN CONSTRUCTION GROUP | TOMASETTI GROUP |
| MG MCLAREN P.C. | TORETTA TRUCKING |
| MORETRENCH AMERICAN, CORP. | TOTAL SAFETY CONSULTING LLC |
| MRA ENGINEERING, PC | TUCCI EQUIPMENT RENTAL CORP |
| MUESER RUTLEDGE CONSULTING ENGINEERS | TULLY CONSTRUCTION |
| | TURNER CONSTRUCTION COMPANY |
| MUSCO SPORTS LIGHTING, LLC | ULTIMATE DEMOLITION/CS HAULING (JOINT VENTURE) |
| NACIREMA INDUSTRIES | |
| NEW YORK CRANE & EQUIPMENT CORP. | UNITED STATES REBAR |
| NICHOLSON CONSTRUCTION CO. | VANGUARD EQUIPMENT RENTALS |
| NICHOLSON/HEYWOOD JOINT VENTURE | VERTICAL TECHNOLOGIES |
| OFF ROAD WELDING, INC. | VOLLMER ASSOCIATES |
| THE OFFICES OF JAMES RUDERMAN, LLP | W HARRIS & SON INC. |
| | WALTER WHITE TRUCKING |
| OLYMPIC PLUMBING AND HEATING | WEEKS MARINE, INC. |
| OVE ARUP & PARTNERS | WEIDLINGER ASSOCIATES |
| PARSON GROUP | WHITNEY CONTRACTING |
| PETER SCALAMANDRE & SONS | WOLKOW BRAKER ROOFING |
| PINNACLE ENVIRONMENTAL | YANNUZZI & SONS, INC. |
| PLAZA CONSTRUCTION CORP. | YONKERS CONTRACTING |
| PRO SAFETY SERVICES, LLC | YORK HUNTER CONSTRUCTION, LLC |
| PT & L CONTRACTING CORP. | ZIEGENFUSS DRILLING |
| REGIONAL SCAFFOLD & HOISTING CO, INC. | |

## EXHIBIT Q – ASTHMA IMPAIRMENT CRITERIA

**Method for Calculation of Asthma/RADS Impairment Based on Combination Score**

This Exhibit Q details the method by which the Allocation Neutral can determine a Primary Plaintiff's Asthma/RADS impairment level based upon a combination of factors. A combined score is calculated from the sum of the three factors outlined in Tables 1, 2 and 3 below. All PFT values for Tables 1 and 2 (post-BD $FEV_1$, pre-BD $FEV_1$, and % $FEV_1$ change) must come from a single valid test.

**Table 1. Postbronchodilator $FEV_1$**

| Points | $FEV_1$ % Predicted |
|--------|---------------------|
| 0 | Greater than 80% |
| 1 | 70% to 80% |
| 2 | 60% to 69% |
| 3 | 50% to 59% |
| 4 | Less than 50% |

*Adapted from 1993 ATS Guidelines.*

**Table 2. Reversibility of $FEV_1$ or Degree of Airway Hyperresponsiveness**

| Points | % $FEV_1$ Change | Methacholine Challenge Test Response $PC_{20}$ mg/ml or equivalent |
|--------|------------------|-------------------------------------------------------------------|
| 0 | Less than 10% | Greater than 8 mg/ml |
| 1 | 10% to 19% | 0.5 to 8 mg/ml |
| 2 | 20% to 29% | 0.125 to 0.5 mg/ml |
| 3 | 30% or Higher | 0.125 or fewer mg/ml |

*Adapted from 1993 ATS Guidelines*

Note: A Plaintiff can gain points in Table 2 from either % $FEV_1$ change or MCT response. The *pre*-BD $FEV_1$ is used to determine which of these measures should be used.
- If the *pre*-BD $FEV_1$ is greater than 80%, the $PC_{20}$ mg/ml should be used.
- If the *pre*-BD $FEV_1$ is 70 to 80%, either measure can be used.
- If the *pre*-BD $FEV_1$ is less than 70%, the % $FEV_1$ change should be used.

**Table 3. Medication Use**

| Points | Medications |
|--------|-------------|
| 0 | No Medication |
| 1 | Occasional Bronchodilator ***and/or*** Cromolyn |
| 2 | Daily Inhaled Steroid *or* Anti-Leukotriene *or* Long Acting Beta Agonist (LABA) |
| 3 | Daily Long Acting Beta Agonist (LABA) ***AND*** Daily Inhaled Steroid *or* Anti-Leukotriene |
| 4 | Daily Long Acting Beta Agonist (LABA) ***AND*** Daily Inhaled Steroid *or* Anti-Leukotriene ***AND*** Occasional course of systemic steroids (3 or more times in past 2 years) |

To demonstrate an "occasional course of systemic steroids" as required to receive four (4) points under Table 3, a Primary Plaintiff must append to his or her Claim Form three (3) prescription records or other Qualifying Medical Records documenting separate courses of systemic steroid treatment for the period including January 2008 to present.  To establish all other medication use referenced in Table 3, a Primary Plaintiff must append to his or her Claim Form (i) two (2) prescriptions records demonstrating the requisite medication use more than six (6) months apart or (ii) two (2) other Qualifying Medical Records referencing the requisite medication use more than six (6) months apart.

Medications are classified according to the Asthma/RADS Medication Scoring table below:

| Bronchodilator Only | | |
|---|---|---|
| Accuneb | Airet | Albuterol |
| Alupent | Atrovent | Bitolterol |
| Brethaire | Brethine | Combivent |
| Duoneb | Ipratropium | Levalbuterol |
| Maxair | Metaproterenol | Pirbuterol |
| Proair | Proventil | Terbutaline |
| Theophylline | Tornalate | Ventolin |
| Volmax | Vospire | Xopenex |
| LABA Only | | |
| Foradil | Formoterol | Salmeterol |
| Serevent | Slo-Phyllin | |
| LABA & Inhaled Steroid | | |
| Advair | Advair Diskus | Symbicort |
| Inhaled Steroid Only (Not Nasal Spray) | | |
| AeroBid | Asmanex | Azmacort |
| Beclomethasone | Beclovent | Budesonide |
| Flunisolide | Fluticasone | Mometasone |
| Pulmicort | Qvar | Triamcinolone Acetonide |
| Systemic Steroids Only | | |
| Corticosteroids | Cortisone | Decadron |
| Dexamethasone | Deltasone | Hydrocortisone |
| Medrol | Methylprednisolone | Prednisone |
| Solu-Medrol | | |
| Cromolyn Only | | |
| Cromolyn | Intal | |
| Anti-Leukotriene (Leukotriene Antagonist) | | |
| Accolate | Montelukast | Singulair |

## EXHIBIT R – AFFIRMATION OF FINAL SETTLEMENT AGREEMENT

The WTC Captive Insurance Company, Inc. ("WTC Captive"); all of its Insureds listed on Exhibit A to the World Trade Center Litigation Settlement Process Agreement, As Amended ("Agreement"); and Plaintiffs' Liaison Counsel on behalf of all Plaintiffs, hereby affirm on the date or dates indicated below that the following conditions have been satisfied and, therefore, that the Agreement is the Final Settlement Agreement:

1.        Sufficient Primary Plaintiffs (including __._% of Primary Plaintiffs on the Eligible Plaintiff List) have executed Releases and Covenants Not to Sue to satisfy the Opt-In Threshold as described in Section VI.D of the Agreement;

2.        The WTC Captive has not exercised its exclusive right to void the Agreement as described in Section VI.E of the Agreement;

3.        The Case Management Orders described in Section XXI.A of the Agreement have been entered; and

4.        The WTC Captive, the Insureds, and Plaintiffs have not exercised the right to void the Agreement as described in Section XX.E of the Agreement.

**On behalf of the WTC Captive Insurance Company, Inc.**


_____
Margaret H. Warner, Esquire
McDermott Will & Emery LLP
*Counsel to the WTC Captive Insurance Company, Inc.*

Date: _____

**On behalf of the Insureds**

_____
James E. Tyrrell, Jr., Esquire
Patton Boggs LLP
*Counsel to the Insureds*

Date: _____

**On behalf of all Plaintiffs**

_____
Paul J. Napoli, Esquire
Worby Groner Edelman & Napoli Bern, LLP
*Plaintiffs' Liaison Counsel*

Date: _____

_____
William H. Groner, Esquire
Worby Groner Edelman & Napoli Bern, LLP
*Plaintiffs' Liaison Counsel*

Date: _____

_____
Nicholas Papain, Esquire
Andrew J. Carboy, Esquire
Sullivan Papain Block McGrath & Cannavo, P.C.
*Plaintiffs' Liaison Counsel*

Date: _____

<u>**EXHIBIT S – STIPULATION OF VOLUNTARY DISMISSAL**</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE [*MASTER DOCKET DESCRIPTION*] | **STIPULATION OF VOLUNTARY DISMISSAL** |
| [*PRIMARY PLAINTIFF(S)*] and [*DERIVATIVE PLAINTIFF(S)*], | 21 MC 10_ (AKH) |
| | __ Civ. _____ (AKH) |
| Plaintiff(s), | |
| -against- | |
| [*FIRST NAMED DEFENDANT*], et al., | |
| Defendant(s). | |

IT IS HEREBY STIPULATED AND AGREED by and between the parties that, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii):

1.      The above-captioned action is voluntarily dismissed with prejudice;

2.      All claims by Plaintiff(s) against all Defendant(s) or against any Defendant arising out of or relating in any way to World Trade Center-related rescue, recovery and/or debris-removal operations and/or clean-up at any location on and/or after September 11, 2001, are voluntarily dismissed with prejudice; and

3.      The dismissal is without costs.

Dated: _____            Dated: _____


_____            _____
[*Counsel for Plaintiff(s)*]            [*Signature Blocks for All Defendants' Counsel*]
[*Signature Block*]

**EXHIBIT T – STIPULATED ORDER OF DISMISSAL WITH PREJUDICE
PURSUANT TO FINAL SETTLEMENT AGREEMENT**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE [*MASTER DOCKET DESCRIPTION*] | **STIPULATED ORDER OF DISMISSAL WITH PREJUDICE PURSUANT TO FINAL SETTLEMENT AGREEMENT** |
| [*PRIMARY PLAINTIFF(S)*] and [*DERIVATIVE PLAINTIFF(S)*], | 21 MC 10_ (AKH) __ Civ. _____ (AKH) |
| Plaintiff(s), | |
| -against- | |
| [*SETTLING DEFENDANTS*], et al., | |
| Defendant(s). | |

IT IS HEREBY STIPULATED AND AGREED by and between the Plaintiff(s) and [*List all settling defendants, including all Insureds listed on Exhibit A to the Final Settlement Agreement, or reference all such settling defendants on an appended list*] ("Settling Defendants") that:

1.     Plaintiff(s) and Settling Defendants have entered into a settlement agreement resolving all claims by Plaintiff(s) against Settling Defendants in the above-captioned action.

2.     Plaintiff(s) has (have) executed releases and covenants not to sue in which Plaintiff(s) has (have) released the Settling Defendants and each of them from any and all obligations and liability to Plaintiff(s) for past, present, and future injuries arising out of or relating in any way to World Trade Center-related rescue, recovery and/or debris-removal operations and/or clean-up at any location on and/or after September 11, 2001.  Accordingly,

Plaintiff(s)' claim(s) against the Settling Defendants and each of them shall be dismissed, and hereby is (are) dismissed, with prejudice;

3.      Plaintiff(s) also has (have) executed before a notary public document(s) evidencing their understanding that they are foreclosed from suing the Settling Defendants or any of them in the future for currently unknown, future injuries arising out of or relating in any way to World Trade Center-related rescue, recovery and/or debris-removal operations and/or clean-up at any location on and/or after September 11, 2001, regardless of whether such currently unknown, future injuries arise out of or relate in any way to the injury(ies) Plaintiff has pleaded in this action.  Such understanding shall be, and hereby is, judicially noticed.

Dated: _____            Dated: _____


_____            _____
[*Counsel for Plaintiff(s)*]                  [*Signature Blocks for Settling Defendants'*
[*Signature Block*]                           *Counsel*]


SO ORDERED, this _____ day of _____, 201__,


                              _____
                              ALVIN K. HELLERSTEIN
                              United States District Judge

# Exhibit U - Eligible Plaintiff List Template

| No. | Primary Plaintiff | | Derivative Plaintiff | | Personal Representative | | Civil Action Number | | Master Docket | Representing Law Firm | 1° Qual. Injury | Claimed Eligibility | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Last Name | First Name | Last Name | First Name | Last Name | First Name | Primary | All Others | | | | PDF | Ortho. | Qual. Surg. |
| 1 | Plaintiff | Primary | Plaintiff | Derivative | Representative | Personal | 10cv00000 | | | Law Firm Name | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | |
| 34 | | | | | | | | | | | | | | |
| 35 | | | | | | | | | | | | | | |
| 36 | | | | | | | | | | | | | | |
| 37 | | | | | | | | | | | | | | |
| 38 | | | | | | | | | | | | | | |