UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
IN RE WORLD TRADE CENTER DISASTER SITE :     **DESCRIPTION OF**
LITIGATION                                    :     **SETTLEMENT**
                                                      :
                                                      :     21 MC 100 (AKH)
                                                        :
------------------------------------------------------------ x

Pursuant to the Court's July 6, 2015 Scheduling Order, the WTC Captive Insurance

Company, Inc. ("WTC Captive"), and Plaintiffs' Co-Liaison Counsel, Worby Groner Edelman &

Napoli Bern, LLP, and Sullivan Papain Block McGrath & Cannavo, P.C., hereby submit this

description of the parties' respective positions on the "bonus payment" dispute, and of their

settlement of that dispute.  In simple terms, this settlement is the resolution of the dispute over

how to count individuals who were dismissed involuntarily from the litigation during the Opt-In

Period of the landmark 2010 settlement.  The dispute was framed in orders of the Court dated

December 30, 2010 and September 8, 2011, and the direction of the Second Circuit in its

Opinion dated June 9, 2014.

Plaintiffs' Co-Liaison Counsel and the WTC Captive have reached a settlement of $17.5

million to resolve the bonus payment dispute.  This settlement brings the total recovery for

plaintiffs who opted into the SPA above $700 million:

(1) $625 million (Settlement Amount per Section II.B, including premium for the Cancer

Insurance Policy);

(2) $13.8 million (Contingent Payments to date per Section IV);

(3) $5 million (likely Fifth Contingent Payment in January 2016 per Section IV);

(4) $27.5 million (London Marine Insurers' payment amounts per Section II.F);

(5) $12.5 million (bonus payment in March 2011 per Section VI.E); and

(6) $17.5 million (settlement of the instant bonus payment dispute on remand).

Moreover, the above figures do not include the unquantifiable but significant benefits of the Medicare, Medicaid and public assistance lien waivers negotiated on behalf of plaintiffs and the following additional benefits:

(1) Workers' compensation lien waivers – up to $75 million;

(2) Allocation Costs borne by the WTC Captive – $3.5 million

(3) Worby Groner Edelman & Napoli Bern LLP's foregone interest on litigation funding loans and other litigation costs – $8 million; and

(4) Contractual attorneys' fees foregone by plaintiffs' counsel – over $55 million.

Finally, the SPA provided a pathway for subsequent settlements totaling over $100 million by other defendants in the 21 MC 100 and 21 MC 102 dockets.

In accordance with Section VI.E of the SPA, the $17.5 million bonus payment settlement will be apportioned among Tier 4 Plaintiffs and Permanent Disability Fund Awardees as follows:

- $14,975,066.49 for Tier 4 Plaintiffs in 21 MC 100;

- $177,443.49 for Tier 4 Plaintiffs in 21 MC 102;

- $529,421.55 for Tier 4 Plaintiffs in 21 MC 103; and

- $1,818,068.49 for Permanent Disability Fund Awardees.

On average, eligible Primary Plaintiffs will receive a gross recovery over $3,000, with the most severely injured plaintiffs receiving a gross recovery in excess of $48,000.

As described further below, the parties' settlement is a reasonable, efficient, and appropriate resolution to what already has been a lengthy dispute. This settlement resolves the disputed interpretation of the World Trade Center Litigation Settlement Process Agreement, as

Amended ("SPA").[1]  It is a measured compromise between the parties' competing positions based upon agreement as to the procedural history of the individual plaintiffs' cases and upon considered analysis of the available extrinsic evidence regarding the parties' intent in the SPA. Further, the settlement provides plaintiffs the benefit of immediate payments while avoiding the risks of an adverse litigation outcome and delay, and saves the parties additional litigation expenses.  The Plaintiffs' additional litigation expenses would be deducted from any decision on this issue which would mean the Plaintiffs would need to recover a higher amount at trial than what is being offered to them now in order to receive the same net award. Additionally, by avoiding significant expenses and the risks of an adverse litigation outcome, the WTC Captive preserves assets otherwise available for future claims.

## I.    THE SETTLEMENT PROCESS AGREEMENT, AS AMENDED

The dispute centers around how to calculate the percentage of plaintiffs who opted in to the SPA, an agreement that appropriately resolved disparate claims of illness and injury among over 10,000 plaintiffs who worked on rescue, recovery and debris removal operations in New York City after 9/11.   In June 2010, after nearly two years of detailed, intense, and comprehensive arm's-length negotiations, the WTC Captive, its insureds, and Plaintiffs' Co-Liaison Counsel on behalf of over ten thousand plaintiffs entered the SPA, which provided a framework for resolving as many of the debris-removal cases before this Court as possible.

To be eligible for the settlement, a plaintiff need only have filed or instituted a "Debris Removal Claim" against an insured on or before April 12, 2010.[2]  The settlement would only go

---

[1] Once the parties affirmed that a sufficient number of eligible plaintiffs opted into the settlement, the SPA became the Final Settlement Agreement, or "FSA."  (*See infra* p. 4.) Nevertheless, for the sake of convenience, the parties refer throughout this submission to the agreement as the SPA.

[2] Section I.O of the SPA defines "Debris Removal Claims" as:

forward if at least ninety-five percent (95%) of the plaintiffs on the Eligible Plaintiff List ("EPL") opted to settle.  (SPA § VI.D.)

Section VI.A of the SPA specifies how the parties' attorneys were to compile the EPL. All plaintiffs asserting Debris Removal Claims were to be included, with only two exceptions: (1) plaintiffs alleging purely orthopedic injuries (not compensable under the settlement)[3] and (2) plaintiffs who voluntarily dismissed with prejudice their claims against the WTC Captive's insureds:

> Only Plaintiffs with Debris Removal Claims filed against the Insureds or any of them [*i.e.* the Settling Defendants], including in any Master Docket, on or before April 12, 2010 or who have instituted Debris Removal Claims against the Insureds or any of them through other legal process recognized by New York law (*e.g.*, a notice of claim submitted to the City of New York) on or before April 12, 2010 shall be eligible for inclusion on the Eligible Plaintiff List; provided, however, that such Plaintiffs who dismiss with prejudice, and without exception, their Debris Removal Claims against the Insureds by executing the Stipulation of Dismissal With Prejudice attached as Exhibit S to this Agreement need not be included on the Eligible Plaintiff List . . . .

Exhibit S is a form stipulation of voluntary dismissal of "all claims by Plaintiff(s) against all Defendant(s) or against any Defendant arising out of or relating in any way to World Trade

---

> all claims, causes of action, notices of claims, notices of suit, suits, and actions relating in any way to or arising out of the rescue, recovery, and/or debris removal operations, activities and/or other alleged or actual conduct or omissions on and/or after September 11, 2001, pending or received on or before April 12, 2010, including without limitation all Plaintiffs' claims against [WTC Captive] Insureds or any of them in any [WTC] Master Docket.

[3] "[A]ny Primary Plaintiff who is named in Appendix A to Case Management Order No. 1 in Master Docket 21 MC 100 need not be included on the Eligible Plaintiff List unless he or she has amended his or her complaint to allege any Qualifying Injury."  (SPA § VI.A.)  "Primary Plaintiffs identified on Exhibit I may be excluded from the Eligible Plaintiff List, or shall be excluded from the Opt-In Threshold calculations in this Section VI of this Agreement even if listed on the Eligible Plaintiff List, only if they dismiss with prejudice all of the claims relating to Qualifying Injuries such that the Primary Plaintiff's only remaining Debris Removal Claims against the Insureds are orthopedic in nature."  (*Id.*)

Center-related rescue, recovery and/or debris removal operations and/or clean-up at any location on and/or after September 11, 2001," pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Section VI.A of the SPA also stated the parallel requirement that plaintiffs who dismiss their cases voluntarily are to be removed from the opt-in percentage ("Opt-In Rate") calculation:

> Plaintiffs who dismiss all of their Debris Removal Claims against the Insureds with prejudice by filing the Stipulation of Dismissal with Prejudice attached as Exhibit S to this Agreement at any time before the Final Settlement Agreement Effective Date shall not be counted for purposes of determining compliance with the Opt-In Threshold.

Calculating the Opt-In Rate is straightforward: divide the number of plaintiffs who opted into the settlement by the number of plaintiffs on the EPL. If the Opt-In Rate thus calculated is at least 95% (and certain other criteria are met), the Opt-In Threshold is satisfied, the settlement becomes effective, and the SPA becomes the "Final Settlement Agreement."

Further, if the Opt-In Rate is at least 96% at the close of the Opt-In Period, Section VI.E of the SPA requires the WTC Captive to pay additional funds (the so-called "bonus payment") into the settlement in addition to the $625 million Settlement Amount:

> In addition, if during the Opt-In Period or any extension thereof by the WTC Captive, actual opt-in experience for purposes of Section VI.D.i of this Agreement exceeds ninety-five percent (95%), the WTC Captive shall pay two percent (2%) of [$625 million] for every one percent (1%) in excess of the ninety-five percent (95%) requirement in Section VI.D.i of this Agreement; provided, however, that if actual opt-in experience for purposes of Section VI.D.i of this Agreement exceeds ninety-eight percent (98%), the WTC Captive shall pay one-fifth of one percent (0.20%) of [$625 million] for every tenth of one percent (0.10%) above the ninety-five percent (95%) requirement set forth in Section VI.D.i of this Agreement.

For example, if 96% of all eligible plaintiffs opted in, Section VI.E requires the WTC Captive to make a bonus payment of $12.5 million; if 97%, $25 million; if 98%, $37.5 million; and if 99%, $50 million. In other words, the bonus payment increases with the percentage of the plaintiffs on the EPL that settled. The parties established this system to address concerns endemic to

aggregate settlements where plaintiffs decide individually whether to participate.  In particular, the possibility of additional payments served the dual purpose of protecting early participants if more than the minimum number of plaintiffs opted into the settlement, and giving later-acting plaintiffs an incentive to opt in.

## II.   ORIGINS OF DISPUTE AND PROCEDURAL HISTORY

The Court is undoubtedly familiar with this dispute's procedural history.  Nevertheless, the parties believe that the context below fosters a better understanding of the parties' respective positions on the correct Opt-In Rate and resulting bonus payment amount.

As noted, the SPA became final upon "[s]atisfaction of the Opt-In Threshold as set forth in Section VI.D of this Agreement."  (SPA § XXII.A.)  Throughout the latter half of 2010, the overwhelming majority of eligible plaintiffs opted in to the settlement.  During the same period, other plaintiffs stipulated to the dismissal of their claims against the WTC Captive's insureds with prejudice and were removed from the EPL by the SPA's terms.  In addition, the parties agreed separately in writing to remove from the EPL certain categories of plaintiffs that were technically eligible to participate, but who were ineligible either to recover benefits under the settlement or to pursue claims against the WTC Captive's insureds.[4]

In November 2010, the Court appointed Michael Hoenig, Esq., as "Special Counsel" charged with attempting to reach those clients of Worby Groner Edelman & Napoli Bern LLP who had not opted into the SPA, including plaintiffs who prior to his appointment had

---

[4] Specifically, the parties agreed pursuant to Section XXI.W of the SPA to remove from the EPL: (1) 59 plaintiffs who received a prior award from the September 11th Victim Compensation Fund of 2001; (2) 21 plaintiffs who served a notice of claim on the City of New York but chose not to file suit within the statutory time period; (3) 7 resident plaintiffs who never worked at the WTC Site; and (4) approximately 200 plaintiffs whose only claims against a WTC Captive insured (Pinnacle Environmental) were dismissed after all parties agreed they had no factual basis.

voluntarily dismissed their claims pursuant to Federal Rule of Civil Procedure 41.  (Order Appointing Special Counsel, 21 MC 100, ECF No. 2257 (Nov. 24, 2010).)  On December 22, 2010, Special Counsel Hoenig reported that he had been unable to reach hundreds of these plaintiffs, while others indicated their intention to opt in, opt out, or voluntarily discontinue their suits.  Importantly, some of the plaintiffs who Special Counsel Hoenig was unable to contact had (a) previously agreed to voluntarily dismiss their claims with prejudice, (b) opted into the settlement in the interim, or (c) affirmatively declared to counsel their intention to opt out and litigate their claims.

Based upon Special Counsel Hoenig's report, on December 30, 2010, the Court entered three orders: (1) the Order Dismissing Cases with Prejudice for Failure to Prosecute ("FTP Order") that dismissed 409 actions where the Court found that plaintiffs "could not be located, failed to respond to numerous communications directed to them, or refused to respond" (21 MC 100, ECF No. 2268); (2) the Order Dismissing Cases with Prejudice ("Voluntary Dismissal Order") that dismissed 48 actions by plaintiffs who indicated to Special Counsel Hoenig their desire to voluntarily discontinue their claims (21 MC 100, ECF No. 2267); and (3) the Order Accepting Report of Special Counsel and Providing for Effectiveness of Settlement ("Bonus Payment Order"), which directed the parties to remove all voluntarily and involuntarily dismissed plaintiffs from the EPL (21 MC 100, ECF No. 2269).  The Court also ruled that "the final percentage of Plaintiffs who have opted into the settlement exceeds ninety-eight percent" and directed the parties to recalculate the bonus payment accordingly.  (Bonus Payment Order, at 5–6.)  The WTC Captive's insureds objected to the Bonus Payment Order's requirement that involuntarily dismissed plaintiffs be removed from the EPL.  (21 MC 100, ECF No. 2314 (Jan. 31, 2011).)

On January 5, 2011, based upon their joint understanding that at least 95% of plaintiffs on the EPL had opted in, the parties executed the Affirmation of Final Settlement Agreement, closing the Opt-In Period and confirming that the settlement would go forward. Nevertheless, due to their disagreement as to the effect upon the Opt-In Rate of the FTP Order and the Bonus Payment Order, the parties agreed to postpone determination of the final Opt-In Rate for purposes of calculating any payments due under Section VI.E. Shortly thereafter, once additional plaintiffs completed or corrected deficient releases, the WTC Captive and its insureds concluded that at least 96% of plaintiffs on the EPL had opted in. Thus, in March 2011 the WTC Captive made a $12.5 million bonus payment, which was distributed in accord with the SPA and this Court's orders.

On September 8, 2011, the Court overruled the WTC Captive's insureds' objections to the Bonus Payment Order in its Summary Order Denying Objection to Bonus Payment ("Summary Order"), 21 MC 100, ECF No. 2523. After ruling that the SPA required involuntarily dismissed plaintiffs to be removed from the EPL, and without the benefit of up-to-date facts regarding the status of individual plaintiffs from the parties, the Court calculated that "approximately 99.4%" (*id.* at 5) of plaintiffs opted into the settlement. Because the Court did not have access to the EPL, the Court explained that this estimate was based upon its understanding that "10,087 Plaintiffs opted into the settlement (the numerator of the fraction), [and] the number of eligible Plaintiffs [had been] reduced to 10,147 (the denominator of the fraction) . . . ." (*Id.* at 4.) Under the SPA, this Opt-In Rate would yield a total bonus payment of $55 million—$42.5 million more than the WTC Captive has paid to date.

The WTC Captive's insureds' appealed, disputing both the rationale of the Bonus Payment Order and the calculations in the September 8, 2011 Order. On June 9, 2014, the

Second Circuit ruled, in pertinent part, that the SPA was ambiguous as to whether plaintiffs whose claims were dismissed involuntarily would remain on the EPL for purposes of calculating the Opt-In Rate.  *In re World Trade Center Disaster Site Litig.*, 754 F.3d 114, 123-24 (2d Cir. 2014).   Accordingly, the Second Circuit vacated the pertinent aspects of the Bonus Payment Order and the Summary Order and remanded the case for further proceedings, including consideration of extrinsic evidence of the parties' intent.  *Id.*

## III.   THE PARTIES' POSITIONS ON REMAND

After remand, counsel for the WTC Captive and Plaintiffs' Co-Liaison Counsel worked together to determine the bookends of the dispute—*i.e.*, the amount of the bonus payment under their respective positions—despite the WTC Captive's contention that no payment was due under a proper reading of the SPA supported by extrinsic evidence.  As noted, the Summary Order calculated an Opt-In Rate of "approximately 99.4 percent" based upon 10,087 opt-ins and 10,147 eligible plaintiffs.  (Summary Order at 4.)  The parties agree that the numerator is fixed by the Allocation Neutral's Payment Status Report, however, which says 10,114 plaintiffs "officially submitted claims."  (21 MC 100, ECF No. 2436 (Apr. 14, 2011), at 4.)  The dispute regarding the amount at issue if plaintiffs' prevail concerns the number of opt-outs who belong in the denominator.

### A.   Plaintiffs' Position

Plaintiffs acknowledge 133 opt-outs as eligible plaintiffs who should remain on the EPL, including some dismissed by the FTP Order and later reinstated, with a corresponding Opt-In Rate of 98.7% (10,114 opt-ins/[10,114 opt-ins + 133 opt-outs]).  This Opt-In Rate would require the WTC Captive to make a Section VI.E bonus payment of $46.25 million, $33.75 million beyond what it paid in March 2011.  Plaintiffs contend that this is what that the parties intended when they entered into the SPA, or, in the alternative, that if the Court finds that the parties did

not objectively intend this result that the Court would imply a contract term that would reach the same result.

The SPA includes a negotiated Stipulation of Voluntary Dismissal as Exhibit "S". The parties to the SPA agreed that those plaintiffs who desired to voluntarily discontinue their cases by having their counsel execute an Exhibit "S" would be removed from the EPL. The language of Exhibit "S" was negotiated by the parties and executed Exhibit "S" stipulations were submitted to the Court for consideration once the Plaintiffs expressed their desire to withdraw their lawsuits.   The Court eventually became troubled by the language of the Exhibit "S" stipulations and the method counsel had followed in preparing these Exhibit "S" stipulations. As a result, the Court asked Worby Groner Edelman & Napoli Bern, LLP for a memorandum explaining the method by which clients' consents to these voluntary discontinuances were obtained. A memorandum was prepared and delivered to the Court along with supporting exhibits comprised of the prior communications delivered to various groups of plaintiffs. The memorandum stated, in part, that the Plaintiffs whose claims were being voluntarily dismissed by these Stipulations had each verbally advised their attorneys office in early 2010 that they neither chose to opt in to the settlement or continue with their litigation. Instead, these Plaintiffs directed their counsel to discontinue the litigation commenced on their behalf. It should be noted that all communications to the Plaintiffs in the memorandum were approved by the Court-Appointed Ethics Special Master, Professor Roy M. Simon, who confirmed that even without written confirmation of a prior verbal directive, Plaintiff's Counsel as the clients attorneys had an obligation to follow their directive and discontinue their cases.

The Court held a hearing on November 18, 2010 to discuss the language of the Exhibit "S" stipulations. At the hearing, counsel for the WTC Captive Insurance Company told the Court

that the removal of these plaintiffs from the Eligible Plaintiffs List would be the "tipping point" as to whether the settlement participation rate met the required 95% opt-in threshold. If the Court had allowed the Exhibit "S" stipulations to be filed and the actions voluntarily discontinued, all of those plaintiffs would have been removed from the EPL without objection from the WTC Captive Insurance Company, Inc. However the Court did not allow the Exhibit "S" stipulations to be filed. Instead the Court determined that it would appoint Special Counsel Hoenig to reach out to the group of plaintiffs who had either verbally told their attorneys to discontinue their lawsuits or had not communicated with their attorneys in any meaningful way.  During the hearing, the Court mentioned that plaintiffs who do not cooperate with special counsel by doing nothing would warrant the court to dismiss their claims with prejudice under Rule 41(b) and the net effect would be a reduction of the total eligible plaintiffs. The WTC Captive Insurance Company, Inc and its attorneys did not make any objections to these comments at the hearing.

Furthermore, the Plaintiffs further believe that there were some clerical errors in Special Counsel Hoenig's December 22, 2010 Report that that resulted in under reporting the amount of Plaintiffs who wished to voluntarily discontinue their cases. Additionally, the Plaintiffs believe that the emails, memoranda and conversations between the parties will demonstrate that any dismissal, whether voluntary or involuntary were to be removed from the EPL. There were Court hearings and town hall meetings in Queens and Staten Island where various communications between the parties took place about the consequences of dismissed cases. The Plaintiffs believe that they can successfully argue to the trier of fact that it was the parties intent to have all dismissed cases removed from the EPL in order to effectuate the settlement.   Accordingly, the Plaintiffs believe there would be enough evidence to show that their ability to execute Exhibit "S" stipulations was hindered by the Court's interference and appointment of Special Counsel

Hoenig and it was the parties intent to remove all of the cases on the Exhibit "S" stipulations submitted to the Court from the EPL.  Additionally, the Plaintiffs also believe they have enough extrinsic evidence to show that the parties understood that there really was no difference between involuntary and voluntary dismissals.

It bears note that Evan Chesler, whom the Second Circuit had appointed amicus curiae on the appeals, is in accord with Plaintiffs' position.  As he noted in the amicus brief submitted to the Second Circuit:

> "The City raises several meritless other objections to the District Court's resolution of the ambiguity. It claims it intended to distinguish between voluntary dismissals under Rule 41(a) and involuntary dismissals under Rule 41(b) because the latter supposedly 'is more amenable to reopening under Rule 60(b)'. (City Bonus Br. 31-34.)
>
> The District Court fairly characterized this argument as 'nonsense'. (A1957.) The City offers no record support for its assertion that 'the City and the Contractors were careful in negotiating' this distinction (City Bonus Br. 21). Nor is there any basis in law or fact to support the proposition that a plaintiff whose action was dismissed under Rule 41(b) was in any better position to reinstate his claims. The City suggests that a Rule 41(a) dismissal 'may estop a party from seeking Rule 60(b)(1) relief.' (City Bonus Br. 32 (citing 11 Wright & Miller, Federal Practice and Procedure § 2858 (3d ed. 2012)).) Yet the same authority suggests that a party who 'did not keep track' of the progress of the case (as a nonresponsive plaintiff whose claims were involuntarily dismissed would have to argue) likewise cannot reopen a dismissal under Rule 60(b)(1). 11 Wright & Miller, Federal Practice and Procedure § 2858 (3d ed. 2012).
>
> The City asserts also that 'throughout 2011, the district court reinstated many of the 409 involuntarily dismissed cases.' (City Bonus Br. 31.) Amicus has been unable to locate record support for the City's assertion.  To the contrary, it appears that only 25 dismissed plaintiffs have had their claims reinstated. (See A1883-85, 1893-94.) Those plaintiffs moved promptly. Ten of the 25 demonstrated that they had actually communicated their intent to opt in or out of the settlement, and their involuntary dismissal resulted from a misunderstanding. (See AA57-59; A1893.) The other fifteen sought reinstatement within the 30-day reinstatement period the District Court provided in its dismissal order. (See SPA14-15; AA36-40.) The District Court reinstated these plaintiffs without objection by the City. (A1883.) More than three years have now passed since the settlement became effective. The City has no reasonable apprehension that

additional plaintiffs whose claims were involuntarily dismissed could succeed in reviving their claims."

Accordingly, it is the Plaintiffs position that the correct opt-in rate is 98.7% resulting in a total bonus payment of $46.25 million, $33.75 million beyond what was paid in March 2011.

**B.**     **The WTC Captive's Position**

The WTC Captive maintains that no additional bonus payment is due under the SPA, and that even if any money were due, the proper calculation would result in payment of at most $27.5 million.

**1.**     **No payment is due because the extrinsic evidence supports the WTC Captive's position.**

The parties did not intend for involuntarily dismissed plaintiffs to come off of the EPL. If the proceedings continued to a formal hearing on the evidence, for which the WTC Captive believe a jury is required, the WTC Captive would rely on testimony of the principal negotiators of the SPA as well as documentary evidence including lists of proposed terms, e-mail messages and drafts of the SPA.[5]

First, the documentary evidence reflects a timeline supporting the WTC Captive's position:

- Plaintiffs' Co-Liaison Counsel proposed that plaintiffs who agree to voluntarily dismiss their claims should not be counted on the EPL and therefore come out of the denominator in the calculation of the Opt-In Rate, which would increase the Opt-In Rate if plaintiffs voluntarily dismissed their claims;

- The WTC Captive agreed to include such a term in the back-and-forth negotiations of the settlement.

---

[5] When the Court asked for the parties' views on remand procedures, the WTC Captive asserted its right to jury trial of any disputed fact in what is effectively a breach-of-contract action seeking legal damages.

- Plaintiffs' Co-Liaison Counsel then suggested that the language in the draft agreement also would allow involuntarily dismissed plaintiffs to be removed from the EPL.

- The SPA was edited to clarify that only plaintiffs who executed the newly-created Exhibit S stipulation of voluntary dismissal would be removed.

A reasonable interpretation of this timeline is that the parties considered and rejected the possibility that involuntarily dismissed plaintiffs should be removed from the EPL. Therefore, a fact-finder could and should conclude that no additional Opt-In Rate bonus payment is owed by the WTC Captive.

Further, extrinsic evidence would reflect that the parties repeatedly discussed the fact that in any mass tort of this size there are plaintiffs who lose touch with their counsel, or who are no longer interested in litigating by the time a settlement is reached. This is simply a matter of human nature and the mobility of the population. The WTC Captive contends that this evidence shows the parties were aware that the EPL would include plaintiffs who were no longer prosecuting their claims and who could be involuntary dismissed. As such, the probability that some number of plaintiffs would fail to provide any definitive communication to their counsel regarding the settlement was considered and priced into the SPA.

The evidence would thus reflect that the parties considered involuntary dismissals in their negotiations and did not provide for their exclusion from the EPL, which precludes the Court from implying such a term into the SPA. This reinforces the aforementioned extrinsic evidence showing that the parties considered involuntary dismissals in context of draft language that would have removed involuntarily dismissed plaintiffs from the EPL, but rejected this approach in favor of a restrictive term removing from the EPL only plaintiffs who dismissed their claims

voluntarily with prejudice pursuant to Exhibit S. This approach results in a 96.52% Opt-In Rate (10,114 opt-ins/[10,114 opt-ins + 364 opt-outs]), and a corresponding bonus of $12.5 million, which the WTC Captive paid in March 2011.

<strong>2.       The most that could be at issue is $27.5 million</strong>

Even if plaintiffs prevail on remand in establishing that the intent of the parties was for plaintiffs dismissed involuntarily by the FTP Order to be ineligible and come off of the EPL, the WTC Captive maintains that the remaining bonus due should be no more than $27.5 million, because, in addition to the undisputed 133 opt-outs, another 42 plaintiffs should remain on the EPL for three reasons:

- 37 plaintiffs were dismissed by the FTP Order for failure to respond to Special Counsel Hoenig but had previously advised counsel of their desire to opt out;

- 4 plaintiffs were involuntarily dismissed for failure to prosecute *after* the SPA became effective on January 5, 2011, which is too late for removal from the EPL; and

- 1 plaintiff was included on the Voluntary Dismissal Order despite expressly telling Special Counsel Hoenig that he wanted to opt out *and* discontinue his claim.

Including these 42 plaintiffs raises the opt-out total to 175 and results in an Opt-In Rate of 98.299% (10,114 opt-ins/[10,114 opt-ins + 175 opt-outs]), which corresponds to the $27.5 million in additional bonus that the WTC Captive contends is the outcome even if the SPA is found to treat involuntarily and voluntary dismissals the same.

## IV.   SETTLEMENT OF THE BONUS PAYMENT DISPUTE

On January 16, 2015, the Court issued its Order Regulating Distributions to Tier 4 Plaintiffs and Fixing Attorneys' Fees, 21 MC 100, ECF 3196 (Jan. 16, 2015), at 9 (setting five-tiered fee schedule based upon potential recovery). Thereafter, counsel for the WTC Captive and Plaintiffs' Co-Liaison Counsel continued the in-depth settlement negotiations that began in

December 2014.  Although the negotiations preceded formal discovery, both sides have access to the most probative documentary evidence in the form of written correspondence exchanged by the parties during negotiation of the SPA, and the settlement negotiations included discussions of the extrinsic evidence.

After six months of arm's-length negotiations, Plaintiffs' Co-Liaison Counsel and counsel for the WTC Captive agreed upon a total bonus payment of $30 million, which after deducting the WTC Captive's prior payment of $12.5 million results in a remaining payment of $17.5 million.  This agreement constitutes a full and final settlement of all plaintiffs' claims under Section VI.E.

### A.     The Benefits Afforded to Plaintiffs

Where the maximum potential recovery for plaintiffs is between $27.5 million (the WTC Captive's view) and $33.75 million (plaintiffs' view), the $17.5 million settlement is a reasonable compromise of this contentious and hotly contested issue that already has required four years of litigation and could easily extend for several more, given that either side is likely to appeal an adverse result in this Court to the Second Circuit.  The parties have outlined above the overall benefits of the SPA, and it is entirely appropriate to include $17.5 million for the Opt-In Rate bonus payment, resulting in a documented settlement value of over $700 million.

### B.     Settlement is the Best Outcome for All

The only alternative to this settlement—continued litigation—carries risks for all involved.  There is no clear-cut answer to the likelihood of success for plaintiffs.  As detailed above, the WTC Captive is prepared to present extrinsic evidence to support its position that no further bonus payment is due.  For plaintiffs entitled to a portion of any additional bonus payment, the outcome of a contested trial is inherently uncertain when it is dependent on how the

fact-finder assesses the extrinsic evidence and the credibility of the principal negotiators and their respective recollections of events. Plaintiffs could recover nothing.

Setting aside the risk of losing, continued litigation carries the certainty of cost and delay. Even if plaintiffs were to prevail at trial, any judgment would be subject to appeal, creating additional uncertainty, costs, and postponing recovery. This dispute over the bonus payment has carried on for four-and-a-half years; it is time to resolve it and for plaintiffs to receive their allocated shares without further delay.

For the WTC Captive and its insureds, continued litigation also poses the risk of a judgment that vastly exceeds the bonus payment they believe is owed under the SPA. Even if the WTC Captive and its insureds ultimately prevail, the costs of litigating further would be significant, further depleting the company's assets needed to protect the WTC Captive's insureds against future claims. Preserving the WTC Captive's funds also may benefit those individuals who in the future establish latent injuries due to their work at the WTC Site, particularly if the federally-funded September 11th Victim Compensation Fund is closed and not renewed.

Finally, this settlement will conserve judicial resources by bringing to a conclusion one of the last major 9/11-related dispute pending before this Court. [6] Otherwise, the judicial system will be burdened with undefined further proceedings in this Court, a likely appeal, and possible further proceedings in this Court. Respectfully, the best approach for resolving this dispute is the one reflected in the Court's advice on January 16, 2015 – the parties should negotiate a

---

[6] The parties' settlement does not require the Court's approval, and this Settlement Description is not a request for approval. *See, e.g.*, *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 835 (3d Cir. 1995) ("There are only certain designated types of suits, for instance consent decrees, class actions, shareholder derivative suits, and compromises of bankruptcy claims where settlement of the suit requires court approval."). Moreover, by the express terms agreed to by every plaintiff when opting in to the SPA, the parties are authorized to agree upon the Opt-In Rate without further judicial intervention. (SPA § XXII.A; Ex. R. ("Affirmation of Final Settlement Agreement").)

resolution.  Having done so, the WTC Captive stands ready to execute the terms of the settlement
and proceed to issue payments to plaintiffs.

Dated:  July 15, 2015                              Respectfully submitted,

McDermott Will & Emery, LLP                        Worby Groner Edelman & Napoli Bern, LLP
*Counsel for the WTC Captive Insurance*            *Plaintiffs' Co-Liaison Counsel*
*Company, Inc.*

Margaret H. Warner                                 Paul J. Napoli
500 North Capitol Street, N.W.                     350 Fifth Avenue, Suite 7413
Washington, D.C. 20001-1531                        New York, New York  10118
(202) 756-8228                                     (212) 267-3700


                                                   Sullivan Papain Block McGrath & Cannavo,
                                                   P.C.
                                                   *Plaintiffs' Co-Liaison Counsel*


                                                   Nicholas Papain
                                                   120 Broadway
                                                   New York, New York 10271
                                                   (212) 732-9000